UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |  |
|---|---|---|
| GALVASID S.A. DE C.V., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | Court No. 25-00235 |
| *Defendant,* | ) | |
| | ) | **PUBLIC VERSION** |
| *and* | ) | Business proprietary information redacted from pages 5, 9, 18, and 25. |
| | ) | |
| STEEL DYNAMICS, INC.; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND UNITED STATES STEEL CORPORATION, | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |
| | ) | |

**DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

| | |
|---|---|
| Roger B. Schagrin | James E. Ransdell |
| Jeffrey D. Gerrish | Thomas M. Beline |
| Nicholas C. Phillips | Margaret E. Monday |
| **SCHAGRIN ASSOCIATES** | **CASSIDY LEVY KENT (USA) LLP** |
| 900 Seventh Street, NW | 2112 Pennsylvania Ave. NW |
| Suite 500 | Suite 300 |
| Washington, DC 20001 | Washington, DC 20036 |

*Counsel to Steel Dynamics, Inc. and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC*

*Counsel to United States Steel Corporation*

March 27, 2026

TABLE OF CONTENTS

I.    RULE 56.2 STATEMENT .................................................................................... 1

      A. Administrative Determination Under Review ................................................. 1

      B. Issue Presented For Review .......................................................................... 1

II.   STATEMENT OF FACTS .................................................................................... 2

      A. The Administrative Proceeding ..................................................................... 2

      B. Galvasid's Initiation of this Action ............................................................... 10

III.  STANDARD OF REVIEW ................................................................................ 12

IV.   SUMMARY OF THE ARGUMENT ................................................................. 13

V.    ARGUMENT ..................................................................................................... 14

      A. Commerce's Application of AFA Was Reasonable and Supported by Substantial
         Evidence ...................................................................................................... 14

      1. Commerce Reasonably Found that Expense Reporting Was Not Equivalent to Revenue
         Reporting ..................................................................................................... 16

      2. Whether Commerce Was Entitled to "Cap" Freight and Insurance Revenues Is Unrelated
         to Whether Galvasid Was Required to Disclose Them ................................... 23

VI.   CONCLUSION .................................................................................................. 26

## TABLE OF AUTHORITIES

**Cases**

*ABB Inc. v. United States*, 355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018)......................... 17, 23, 25

*Advanced Tech. & Materials Co. v. United States*, 33 C.I.T. 1537, 1539 (2009) ...................... 11

*Alloy Piping Products, Inc. v. United States*, 201 F. Supp. 2d 1267 (Ct. Int'l Trade 2002), *aff'd*, 334 F.3d 1284 (Fed. Cir. 2003)........................................................................................... 24

*Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974)......................... 12

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ............................................... 12

*Consolo v. Federal Maritime* Comm'n, 383 U.S. 607 (1966)........................................... 12

*Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010)..................... 18, 25

*FCC v. NextWave Pers. Commc'ns, Inc.,* 537 U.S. 293 (2003) ........................................ 13

*Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020)..................... 16

*Huvis Corp. v. United States v. United States*, 525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007) ...... 12

*Hyundai Heavy Industries Co., Ltd. v. United States*, 393 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) .................................................................................................................... 15, 23

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)........................... 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29 (1983) .................................. 12

*Nippon Steel Corp. v. United States*, 337 F. 3d 1373 (Fed. Cir. 2003)................................. 16

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) ...... 12

**Statutes and Regulations**

19 U.S.C. § 1516a(b)(1)(B)(i).......................................................................................... 12

19 U.S.C. § 1677a(c).................................................................................................... 14

19 U.S.C. § 1677e(a)(1)-(2)........................................................................................... 15

19 U.S.C. § 1677e(b) ................................................................................................... 15

19 U.S.C. § 1677m....................................................................................................... 16

28 U.S.C. § 1581(c) ..................................................................................................... 11

28 U.S.C. § 2636(c) ..................................................................................................... 11

**Other Authorities**

*Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 80,196 (Dep't Commerce Oct. 2, 2024) ........................................................ 2

*Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value*; 90 Fed. Reg. 42,187 (Aug. 29, 2025) ...................................... 1

*Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination*, 77 Fed. Reg. 63,291 (Dep't Commerce Oct. 16, 2012) and accompanying Issues and Decision Memorandum at Comment 6 .............................. 15, 19

*Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 Fed. Reg. 76,724 (Dep't Commerce Nov. 7, 2023) and accompanying IDM at Comment 1 ......................................................................................... 21, 22

*Common Alloy Aluminum Sheet From the Republic of Korea: Final Negative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 13,307 (Dep't Commerce Mar. 8, 2021) and accompanying Issues and Decision Memorandum at Comment 4 ........................................... 19

*Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders,* 90 Fed. Reg. 59,494 (Dep't Commerce Dec. 19, 2025) .................................................................................................. 11

*Polyester Textured Yarn from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 58,883 (Dep't Commerce Oct. 25, 2021) and accompanying Issues and Decision Memorandum at Comment 10 .............................................................................. 20

*Welded Stainless Pressure Pipe From India: Amended Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 48,442 (Dep't Commerce July 27, 2023) and accompanying Issues and Decision Memorandum at Comment 1 ........................................... 21

PUBLIC VERSION

On behalf of Defendant-Intervenors Steel Dynamics, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and United States Steel Corporation ("Defendant-Intervenors"), we hereby submit this response in opposition to the motion for judgment on the agency record and accompanying brief filed by Galvasid S.A. de C.V. ("Galvasid" or "Plaintiff") in the above-captioned action. *See* Motion of Plaintiff Galvasid S.A. de C.V. for Judgment on the Agency Record (Jan. 26, 2026), ECF No. 32 ("Pl. Br."). For the reasons discussed below, Defendant-Intervenors respectfully request that this Court reject the arguments raised by Galvasid and affirm the final determination of the U.S. Department of Commerce ("Commerce") in *Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value*; 90 Fed. Reg. 42,187 (Aug. 29, 2025) ("Final Determination") (Public Record ("PR") 482).

## I.      RULE 56.2 STATEMENT

### A.  Administrative Determination Under Review

Galvasid's appeal arises from the Final Determination, which was published in the Federal Register on August 29, 2025, and the accompanying Issues and Decision Memorandum ("IDM") (PR 466).

### B.  Issue Presented For Review

1. Were Commerce's determination that Galvasid had failed to report freight and insurance revenues associated with its U.S. sales, and its resulting application of partial adverse facts available ("AFA") to Galvasid, supported by substantial evidence and otherwise in accordance with law?

   Defendant-Intervenors' Position: Yes. Commerce explicitly required that Galvasid report all revenues associated with selling the subject merchandise in the United States. Commerce was not required to accept Galvasid's view that its reporting of DDP and CIF sales terms – which reflect expenses incurred, not revenues – was sufficient to disclose the existence of freight and insurance revenues. Commerce reasonably determined that

1

PUBLIC VERSION

Galvasid received such revenues but did not disclose them until verification, which deprived Commerce of the opportunity to meaningfully examine how the revenues were accounted for and determine their proper treatment. Galvasid's argument that it did not need to separately report these revenues because they were not separately negotiated with customers does not excuse its failure to disclose such revenues prior to verification. Commerce must have knowledge of the revenues before it can consider whether to ultimately cap such revenues.

## II.    STATEMENT OF FACTS

### A.  The Administrative Proceeding

On September 5, 2024, Defendant-Intervenors filed a petition at Commerce alleging that certain corrosion-resistant steel products ("CORE") imported from Mexico were being sold in the United States at less than fair value. Commerce initiated an antidumping duty investigation on October 2, 2024 and subsequently selected Galvasid as one of the mandatory respondents. *See Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 80,196 (Dep't Commerce Oct. 2, 2024) (PR 60); Commerce Memorandum re: *Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Respondent Selection* (Oct. 21, 2024) (PR 80, Confidential Record ("CR") 28).

Commerce issued an antidumping questionnaire to Galvasid soliciting information regarding revenues and expenses associated with its U.S. sales. Specifically, in Section C of the questionnaire, Commerce provided the following instructions:

> The fields listed above have been designed to capture *all revenues and expenses* you have incurred in selling the subject merchandise in the United States market. If there are additional revenues or expenses that are not reported above, such as export taxes incurred in the country of manufacture, create a field for each in the computer file, describe the revenue or expense in your narrative response, and include all calculation worksheets as attachments to your narrative response.

PUBLIC VERSION

Commerce Letter and Initial Questionnaire re: *Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products (CORE) from Mexico* (Nov. 18, 2024) ("Initial Questionnaire") at C-37 (PR 111) (emphasis added). Commerce's instructions made at least two things clear: (1) revenues and expenses are distinct, and (2) *all* revenues and *all* expenses Galvasid incurred in selling the subject merchandise in the U.S. market must be reported in full, even if previous questions did not directly ask for them.

In its response to Section C of the questionnaire, Galvasid reported that it had incurred certain expenses for freight and insurance costs associated with selling CORE in the United States. *See* Galvasid Letter re: *Response of Galvasid To Section C Of The Department's November 18 Questionnaire* (Jan. 13, 2025) ("Section C Response"), at C-30-31 (PR 221, CR 193). Regarding freight expenses, Galvasid reported the following:

> …Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis. The merchandise for those sales was transported from {Galvasid's} plant in Apodaca to the port of Altamira by unaffiliated trucking companies, and then from the port to Puerto Rico by unaffiliated marine transport carriers. The cost for transport from Galvasid's Apodaca plant to the port of {Altamira} has been reported in the "DINLFTPU" field in the sales listing provided in Appendix C-1, and the cost of sea transport to Puerto Rico has been reported in the "INTNFRU" field.

> Galvasid's other sales of CORE products to U.S. customers during the investigation period were made through direct shipments on a DDP basis from Galvasid's plant in Apodaca to the destination in the United States designated by the unaffiliated U.S. customer. The merchandise was transported from Galvasid's Apodaca plant to the destination designated by the customer using unaffiliated trucking companies, some of which invoiced Galvasid in Mexican Pesos, and others of which invoiced Galvasid in U.S. dollars. The cost of transportation for shipments for which the transportation company invoiced Galvasid in Mexican Pesos has been reported in "INTNFRU" field in the sales listing{.}

*Id.* at 30-31 (PR 221, CR 193). Galvasid thus explained to Commerce that it was responsible for expenses associated with shipping merchandise to the United States and reported these expenses in separate fields in its U.S. sales database, "INTNFRU" and "DINLFTPU." This reporting

3

comported with the sales terms CIF ("Cost, Insurance, and Freight") and DDP ("Delivered Duty Paid") that Galvasid used for its U.S. sales. These sales terms "make the seller responsible for freight for, and for the risk of loss during transit to the designated delivery location." Pl. Br. at 14. Regarding insurance, Galvasid reported that, for CIF sales, "the terms of sale made Galvasid responsible for losses during marine transport" and that "in the event that the merchandise was damaged or lost during transport, Galvasid provided compensation to the customer directly." Section C Response at 31 (PR 221, CR 193).

Galvasid's reporting made clear that it was legally required to bear the cost of freight and insurance for its U.S. sales, and, accordingly, that it reported *expenses* associated with these costs in its U.S. sales database. Galvasid did not, however, report that it received *revenue* from its customers to offset these costs, despite Commerce's instruction to report "*all revenues* and expenses you have incurred in selling the subject merchandise in the United States market{.}" Initial Questionnaire at C-37 (PR 111) (emphasis added).

In May 2025, Commerce conducted verification of the sales information reported by Galvasid. On July 11, 2025, Commerce issued its verification report describing its findings. *See* Commerce Memorandum re: *Verification of the Sales Response of Galvasid S.A. de C.V. (Galvasid) in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico* (July 11, 2025) ("Verification Report") (PR 421, CR 829). Commerce recounted that during verification, it had "discovered that Galvasid had included both freight revenue and insurance revenue in its reported U.S. gross unit price (GRSUPRU)." *Id.* at 14.[1] That is,

---

[1] The Verification Report also stated that "For every U.S. sales trace reviewed…freight revenue was included as a separate line item in the sales invoice." As Commerce later acknowledged, this statement was not accurate. *See* IDM at 48 (PR 466). Rather, it was Galvasid's internal accounting vouchers that separately listed amounts for freight and insurance that had been charged to customers. *See id.*

Commerce had found that Galvasid increased its prices beyond the cost of the merchandise to cover freight and insurance expenses and had not previously disclosed this fact to Commerce.

Defendant-Intervenors submitted a case brief to Commerce arguing that, *inter alia*, Galvasid had improperly inflated its U.S. prices by including unreported revenue amounts for freight and insurance, which had the effect of reducing Galvasid's dumping margin. *See* Petitioners' Case Brief on Sales Issues and Post-Preliminary Analysis Concerning Galvasid (July 28, 2025) ("Pet. Case Brief") at 16 (PR 446, CR 851). Defendant-Intervenors compared the revenue amounts for freight and insurance that Commerce discovered in Galvasid's internal accounting vouchers[2] with the amounts reported in Galvasid's expense fields, INTNFRU and DINLFTPU, and found that the revenue amounts incorporated into Galvasid's prices exceeded the reported expenses by an average of [     ]%. *See id.* at 19. Therefore, Defendant-Intervenors proposed that Commerce use facts otherwise available to reduce Galvasid's gross unit prices by [     ]%. *See id.*

Galvasid submitted a rebuttal brief arguing that, because Galvasid's sales were made on a DDP and CIF basis, "{t}he prices for such sales, by their nature, include the cost of freight and related expenses incurred to transport the merchandise from Galvasid's plant to the location designated by the customer." Rebuttal Brief of Galvasid, S.A. de C.V. on General and Sales Issues (Aug. 4, 2025) ("Galvasid Rebuttal Br.") at 16 (PR 458, CR 855). Galvasid claimed that because the sales invoices to customers only stated a single price, with no separate line items for freight or insurance, Commerce was prohibited from "capping" the upward adjustment of prices

---

[2] The accounting vouchers were collected for seven U.S. sales that were selected for further examination at verification and were included as part of Galvasid's sales verification exhibits. *See* Galvasid Letter re: *Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico – Sales Verification Exhibits* (May 23, 2025) at 9-E – 9-H and 9-L – 9-N (PR 406, CR 745-748).

to the amount of the expense. Instead, Galvasid argued that Commerce was required to use Galvasid's reported prices as stated on its invoices.

On August 25, 2025, Commerce issued its Final Determination and IDM and rejected Galvasid's argument, finding instead that Galvasid had failed to report the existence of freight and insurance revenue despite Commerce's explicit instruction to do so. Commerce explained as follows in the IDM:

> In this case, Galvasid failed to disclose in its questionnaire responses that it had included freight revenue and insurance revenue in its reported U.S. gross unit prices, or that it received these revenues in the U.S. market at all. In fact, Commerce did not discover until verification that Galvasid included additional accounts containing freight and insurance revenue within its sales reconciliation, and that Galvasid received such revenue and had included the revenue in its reported U.S. prices. Because Galvasid failed to also provide separate revenue data fields in its U.S. sales database, or disclose the existence of such revenues in the U.S. market, it was impossible for Commerce to determine whether the reporting of such expenses within the gross unit price was appropriate prior to verification, much less identify the amount of freight revenue and insurance revenue attributed to each individual gross unit price or which sales Galvasid also received freight and/or insurance revenue in its U.S. sales database.

IDM at 48 (PR 466). Galvasid's rebuttal brief focused on whether Commerce could employ its "capping" methodology and limit the upward adjustment of its prices to the amount of the freight or insurance expense, rather than by the full amount of freight or insurance revenue. But Commerce's IDM addressed a more fundamental issue: Galvasid's failure to timely report the existence of such revenues in the first place. Without knowledge of these revenues prior to verification, Commerce was unable to verify whether Galvasid's attribution of such revenues to its sales was accurate and reasonable.

Commerce determined that, due to Galvasid's reporting failure, "necessary information is missing from the record, was not provided in a timely manner or in the form or manner requested, significantly impeded the proceeding, and could not be verified." *Id.* at 49. Commerce

6

also determined that Galvasid "failed to act to the best of its ability to comply with Commerce's requests for information{.}" *Id.* Accordingly, Commerce applied facts otherwise available with an adverse inference, *i.e.*, AFA, to Galvasid's reported gross unit prices. As partial AFA, Commerce decreased Galvasid's gross unit prices for its U.S. sales by the amount by which Galvasid's unreported freight and insurance revenues exceeded the equivalent expenses. Commerce found "this estimated amount to be reliable given that it is based on Galvasid's data and Commerce's findings after examining the data." *Id.*

On September 2, 2025, Galvasid alleged that Commerce's determination regarding the freight and insurance revenues constituted a ministerial error. *See* Galvasid Letter re: *Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico – Final Determination Ministerial Error Comments* (Sept. 2, 2025) ("Ministerial Error Allegation") (PR 483, CR 869). The basis of Galvasid's allegation was that Commerce had overlooked record information revealing that Galvasid did inform Commerce about the existence of freight and insurance revenues for its U.S. sales. This record information consisted of (1) Galvasid's reporting that its U.S. sales were made on a DDP or CIF basis and (2) Galvasid's reporting of its freight and insurance *expenses* in its response to Section C of the questionnaire. *Id.* at 2-4. Galvasid argued that under DDP and CIF sales terms, "the prices for such sales, by definition, include freight and insurance to transport the merchandise from Galvasid's plant to the location designated by the customer" and cited to prior proceedings where Commerce allegedly treated "the reported sales term {as} sufficient evidence of whether freight and insurance are included in the invoice price." *Id.* at 3. Galvasid further cited to the expense amounts it had reported in fields DINLFTPU and INTNFRU and argued that because it reported these expenses as reductions to

7

its gross unit prices, this meant that amounts covering these expenses must have been included in the prices. *Id.* at 4.

Galvasid then returned to the question of capping. It reprised its argument that Commerce only limits the inclusion of freight and insurance revenue in prices if these services are separately invoiced to the customer, and that because Galvasid did not do so, it was not required to report these revenues using separate fields, as it did for expenses. *Id.* at 5. Galvasid claimed that this understanding is reflected in Commerce's questionnaire instructions for reporting gross unit prices, which instruct respondents that "{i}f the invoice to your customer includes separate charges for other services directly related to the sale…create a separate field for reporting each additional charge." *Id*.

On September 26, 2025, Commerce issued a memo that carefully analyzed, and rejected, Galvasid's ministerial error allegation. *See* Commerce Memorandum re: *Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Analysis of Ministerial Error Allegations for the Final Determination* (Sept. 26, 2025) ("Ministerial Error Memo") (PR 492),[3] As Commerce found, Galvasid's allegation clearly did not meet the legal definition of a ministerial error because it concerned Commerce's intentional methodological choices rather than unintentional or clerical errors. *See* 19 C.F.R.§ 351.224(f); Ministerial Error Memo at 8.

However, Commerce went well beyond Galvasid's failure to allege an error that was ministerial in nature and also considered the substance of Galvasid's allegations across four pages of analysis. First, Commerce considered Galvasid's argument that the DDP and CIF sales terms and Galvasid's expense reporting, by themselves, were sufficient disclosure of Galvasid's

---

[3] Due to an apparent technical error, the confidential version of the Ministerial Error Memo was not included in the administrative record index. Defendant-Intervenors therefore can only provide the public record citation for this document.

receipt of freight and insurance revenue from its customers. Commerce explained that "{w}hile it is correct that DDP denotes freight incurred by the seller and the CIF sales term denotes both insurance and freight incurred by the seller, these sales terms denote expenses incurred by the seller and do not explain how, if any, revenue is incurred and how it is accounted." Ministerial Error Memo at 6 (PR 492). Similarly, Galvasid's expenses reported in fields DINLFTPU and INTNFRU "are likewise expenses and do not explain how, if any, freight revenue is incurred." *Id*. Indeed, Commerce observed discrepancies between the sales terms and the revenues Galvasid received in its accounting system,[4] such that the former could not act as a guide to the latter. *Id.* at 6-7. Commerce then distinguished all of the prior proceedings that Galvasid cited as claimed examples of Commerce treating sales term reporting as sufficient, by itself, to disclose freight and insurance revenue. As Commerce explained, it found in each of these cases that additional information existed on the record to alert Commerce to the existence of freight and insurance revenue beyond the mere terms of sale. *See id.* at 7.

Second, Commerce explained that the question of capping, *i.e.*, whether Galvasid's invoicing practices satisfied the legal test for Commerce to limit the inclusion of service revenue in gross unit prices, was beside the point. As Commerce stated, "{h}ere, the issue at hand is whether or not Galvasid should have disclosed that it received freight and insurance revenue in the first place; the issue of its reporting of the gross unit price and its expenses is secondary, because Commerce did not receive the underlying information to make the determination of the appropriateness of requiring a freight or insurance revenue cap." *Id.* Commerce's AFA decision was driven by a disclosure failure by Galvasid that limited Commerce's ability to seek supplemental information and verify the accuracy and appropriateness of Galvasid's reporting. It

---

[4] For example, Commerce observed that "the sales trace for SEQU [      ] reports CIF sales terms and [          ], but does not [                                              ]." Ministerial Error Memo at 6.

9

was "not that the reporting of the gross unit price and expense fields was, in and of itself, inappropriate." *Id.* Commerce further explained:

> Regardless of whether Galvasid appropriately reported its gross unit price and freight expenses in its U.S. sales database, Galvasid was not excused from disclosing that it incurred freight and insurance revenue to Commerce. With a gap in the record with respect to these facts, such that there was no record evidence or statement of Galvasid collecting freight and insurance revenue until verification, Commerce cannot determine whether Galvasid's reporting was correct in the first place. Commerce clearly explained its decision to apply AFA…noting that we had requested in the antidumping duty questionnaire explicitly that the respondents should report all revenues incurred in selling the subject merchandise in the U.S., and any types of revenue not already specifically included within the AD questionnaire should still be disclosed. Because Galvasid did not disclose that it received these revenues, Commerce was unable to timely determine whether Galvasid appropriately reported the same sales database fields that it argues properly disclosed the freight and insurance revenue.

*Id.* at 8. Accordingly, Commerce rejected Galvasid's ministerial error allegation, and the Final Determination remained unchanged. *Id*.

## B. Galvasid's Initiation of this Action

Galvasid initiated this action by filing a summons and complaint on October 28, 2025. *See* Galvasid Summons, ECF No. 1 ("Summons"); Galvasid Complaint, ECF No. 6 ("Complaint"). Galvasid did so claiming jurisdiction under 19 U.S.C. §§ 1516a(a)(2)(A)(i), 1516a(a)(2)(B)(i), and 1516a(g)(3). *See* Complaint at ¶ 2. Section 1516a(a)(2)(A) provides that within 30 days after the publication of an antidumping order based on a final determination in Commerce's less-than-fair-value investigation (defined at Section 1516a(a)(2)(B)(i)), an interested party "may commence an action in the United States Court of International Trade by filing a summons{.}"

10

Galvasid filed its summons *prior* to the publication of the antidumping duty order, which was published on December 19, 2025.[5] *See Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders,* 90 Fed. Reg. 59,494 (Dep't Commerce Dec. 19, 2025) (the "Orders"). In the Joint Status Report filed by the parties on January 23, 2026, Galvasid took the position that "there is some ambiguity concerning the deadline under the statute for the commencement of an appeal of a final determination in an investigation involving Mexico or Canada – in particular, whether the deadline runs from the date of the publication of the final determination or the date of publication of the antidumping order." Joint Status Report and Proposed Briefing Schedule (Jan. 23, 2026), ECF No. 29 at 2. Galvasid explained that it would file a separate appeal on January 23, 2026 and that "this Court has jurisdiction over one or both of those appeals" under 28 U.S.C. § 1581(c). *Id.* Defendant-Intervenors took the position that because Galvasid's summons and complaint in this action were filed prior to the publication of the Orders, its action was initiated prematurely and barred pursuant to 28 U.S.C. § 2636(c). On January 23, 2026, Galvasid filed a separate summons and complaint. *See Galvasid S.A. de C.V. v. United States*, CIT Ct. No. 26-00825, ECF No. 1 and ECF No. 6. However, this subsequent action was filed more than 30 days after the date of the Orders, which were published on December 19, 2025. Hence, both of Galvasid's actions were filed outside the window prescribed by the statute. *See* 19 U.S.C. § 1516a(a)(2)(A); *Advanced Tech. & Materials Co. v. United States*, 33 C.I.T. 1537, 1539 (2009) ("An action commenced

---

[5] Publication of the antidumping duty order was delayed beyond usual timeframes due to operational limitations associated with the lapse in federal government appropriations.

prior to the publication of an antidumping duty order will be deemed premature and must be dismissed.").

## III.    STANDARD OF REVIEW

The Court will uphold a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime* Comm'n, 383 U.S. 607, 620 (1966). Thus, the Court must decide whether "the administrative record contain{s} substantial evidence to support" Commerce's decision and whether that decision was "rational." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (stating that it is not the weight of the evidence, but whether it reasonably supports a rational decision that is evaluated by a reviewing court). Although Commerce must, under the standard, "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," the court "will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). Commerce's determination is in accordance with law if it has met all constitutional, statutory, regulatory, and procedural requirements. *Huvis Corp. v. United States v. United States*,

PUBLIC VERSION

525 F. Supp. 2d 1370, 1374 (Ct. Int'l Trade 2007) (citing *FCC v. NextWave Pers. Commc'ns, Inc.,* 537 U.S. 293, 300 (2003)).

## IV.    SUMMARY OF THE ARGUMENT

Commerce's application of partial AFA was reasonable and supported by substantial evidence. First, Commerce reasonably found that Galvasid's reporting of its DDP and CIF sales terms and freight *expenses* did not satisfy Commerce's instruction to report all *revenues* associated with U.S. sales. Commerce's questionnaire expressly distinguished between revenues and expenses, and Galvasid was not free to decide that reporting one amounted to disclosure of the other. Commerce's distinction between revenue and expense reporting was reasonable, particularly because the record showed that Galvasid's freight and insurance revenues revealed at verification were not mathematically equivalent to its reported expenses. The sales traces Commerce examined at verification showed that, on average, revenues exceeded expenses, and Commerce identified additional discrepancies between the reported sales terms and Galvasid's revenues. Further, Commerce's instruction to Galvasid to timely report all revenues – before verification – was necessary for Commerce to determine how any such revenues were incurred and accounted for, whether supplemental questionnaires or follow-ups at verification were needed, and whether and how revenues should offset expenses. Unlike prior proceedings in which respondents properly developed the record with documentation showing how freight revenues were reflected in customer prices, Galvasid merely disclosed the sales terms without mentioning the additional revenues. Commerce therefore reasonably determined that Galvasid failed to cooperate to the best of its ability and properly applied AFA.

Second, Galvasid's claim that the record lacked evidence that its freight and insurance revenues were separately negotiated with customers, and that Commerce was therefore

prohibited from capping them, misses the point. Whether Commerce ultimately could cap freight or insurance revenues at the amount of the corresponding expense is a separate question from whether Galvasid satisfied Commerce's instruction to disclose those revenues in the first place. Even assuming that Commerce may only cap service-related revenues that were communicated to customers, Commerce could not determine whether such treatment was appropriate here because Galvasid failed to disclose the existence of those revenues until verification. Galvasid thus confuses the standard governing Commerce's substantive treatment of previously disclosed revenues with the threshold obligation imposed by the questionnaire to disclose the revenues. Because Commerce did not learn of the revenues in time to examine them, the agency was unable to determine whether they appeared on customer-facing documents and whether capping would be appropriate. It was reasonable for Commerce to find that a respondent acting to the best of its ability was required to disclose its revenues and permit Commerce – not the respondent – to determine their proper treatment. Galvasid's unilateral judgement that its freight and insurance revenues were merely internal and not separately negotiable therefore does not excuse its failure to disclose their existence when Commerce instructed Galvasid to report all revenues and expenses.

## V.    ARGUMENT

### A. Commerce's Application of AFA Was Reasonable and Supported by Substantial Evidence

Pursuant to 19 U.S.C. § 1677a(c), Commerce is required to reduce a respondent's U.S. prices by the amount of expenses incurred to ship the subject merchandise to the place of delivery in the United States. However, when a respondent receives revenue from its customers to cover such movement expenses, Commerce "incorporate{s} freight-related revenues as offsets to movement expenses because they relate to the movement and transportation of subject

14

PUBLIC VERSION

merchandise." *See Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination*, 77 Fed. Reg. 63,291 (Dep't Commerce Oct. 16, 2012) and accompanying Issues and Decision Memorandum at Comment 6. There are certain conditions that govern how and when Commerce makes such offsets, such as "capping" revenue offsets by the amount of the expense where the revenues are separately negotiable with the customer. *See Hyundai Heavy Industries Co., Ltd. v. United States*, 393 F. Supp. 3d 1293, 1307 (Ct. Int'l Trade 2019). But in order for Commerce to determine the correct treatment of revenues, it first must know they exist in the first place. Accordingly, Commerce's antidumping questionnaire instructs respondents to report "***all*** revenues and expenses you have incurred in selling the subject merchandise in the United States market." Initial Questionnaire at C-37 (PR 111) (emphasis added). As explained below, Commerce reasonably concluded that Galvasid failed to do so.

The antidumping statute requires Commerce to use facts otherwise available if "necessary information is not available on the record" or when a respondent "withholds information that has been requested," "fails to provide such information by the deadlines…or in the form and manner requested," "significantly impedes a proceeding," or provides information that "cannot be verified." 19 U.S.C. § 1677e(a)(1)-(2). In selecting from among the facts available, Commerce may employ an adverse inference (*i.e.*, apply AFA) if an interested party fails to cooperate by not acting to the best of its ability to comply with Commerce's requests for information. *Id.* § 1677e(b). The "best of its ability" standard requires that the respondent maintain full and complete records, be familiar with all of its records, and conduct a careful review of its records. As the U.S. Court of Appeals for the Federal Circuit has recognized, the information the respondent submits must represent the "maximum it is able to do" and must be

15

complete and accurate. *See Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1382 (Fed. Cir. 2003).[6] For the reasons set forth below, Commerce's determination to apply partial AFA based on Galvasid's failure to cooperate to the best of its ability in disclosing its freight and insurance revenue associated with its U.S. sales was reasonable and supported by substantial evidence.

### 1. Commerce Reasonably Found that Galvasid's Expense Reporting Was Not Equivalent to Revenue Reporting

In Section C of its antidumping questionnaire, Commerce instructed Galvasid to report all revenues and all expenses associated with selling the subject merchandise in the United States, even where the revenue or expense had not been otherwise specifically requested:

> The fields listed above have been designed to capture *all revenues and expenses* you have incurred in selling the subject merchandise in the United States market. If there are additional revenues or expenses that are not reported above, such as export taxes incurred in the country of manufacture, create a field for each in the computer file, describe the revenue or expense in your narrative response, and include all calculation worksheets as attachments to your narrative response.

Initial Questionnaire at C-37 (PR 111) (emphasis added). Galvasid's case is built on the argument that its reporting of freight and insurance *expenses* was sufficient disclosure that it was receiving *revenues* to cover these expenses. However, Commerce's instruction made clear that it drew a distinction between revenues and expenses, such that reporting expenses would not be sufficient to disclose revenues. Indeed, the two reporting fields to which Galvasid points, INTNFRU and DINLFTPU, are expressly labeled as "Movement *Expenses*" in Commerce's questionnaire. *See* Pl. Br. at 9; Initial Questionnaire at C-20, C-22, C-24 (PR 111) (emphasis added). Commerce's expectation that Galvasid would abide by the explicit distinction between revenues and expenses was reasonable.

---

[6] Generally, Commerce's authority to use facts otherwise available is subject to notice provisions under 19 U.S.C. § 1677m, but the courts have found that these do not apply when, as here, reporting failures are first discovered at verification. *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020).

Galvasid argues that it did provide Commerce with the information the agency sought because Galvasid reported that its sales were made on a DDP or CIF basis. Because of these sales terms, Galvasid states that "the per-unit invoice prices necessarily included both the cost of transport to the customer and the value of Galvasid's assumption of the risk of loss during transit." Pl. Br. at 19. But Commerce reasonably concluded that "these sales terms denote expenses incurred by the seller and do not explain how, if any, revenue is incurred and how it is accounted." Ministerial Error Memo at 6 (PR 492). Indeed, Galvasid describes these sales terms as meaning that "the *seller* is responsible for all costs associated with delivery of the goods…" Pl. Br. at 20 (emphasis added).

Galvasid essentially asserts that reporting its sales terms should have been sufficient to satisfy Commerce's request for it to disclose "all revenues" associated with its U.S. sales, because Commerce should have expected that Galvasid would pass on the expenses that had been allocated to Galvasid by operation of the sales terms in the sales prices Galvasid charged to its customers. This argument fails, for several reasons. First, "{i}t is Commerce, not the respondent, that determines what information is to be provided…" in an antidumping proceeding. *See Ansaldo Componenti, S.p.A. v. United States*, 629 F. Supp. 198, 205 (Ct. Int'l Trade 1986). If a respondent's reporting that it had borne an expense was sufficient for Commerce to assume that it had necessarily passed on that expense, Commerce would not instruct respondents to report all expenses *and* all revenues. Because Commerce did, Galvasid was not at liberty to decide that its sales terms – which only disclosed the costs for which *Galvasid* was liable – were sufficient for Commerce's purposes. *See ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 n.24 (Ct. Int'l Trade 2018) ("A respondent must respond to the questionnaire as a whole; it may not choose what information to report based on what it thinks is

17

relevant"); *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ("Regardless of whether {the respondent} deemed the {} information relevant, it nonetheless should have produced it in the event that Commerce reached a different conclusion.").

Second, it was reasonable for Commerce to distinguish between expense reporting and revenue reporting. They are not equivalent. Indeed, Defendant-Intervenors' case brief pointed out that the freight and insurance revenue amounts in the sales traces examined at verification exceeded the reported expenses for those sales by an average of [    ]%. *See* Pet. Case Br. at 19 (PR 446, CR 851). Commerce adjusted Galvasid's U.S. gross unit prices by that amount after "find{ing} this estimated amount to be reliable given that it is based on Galvasid's data and Commerce's findings after examining the data." IDM at 49 (PR 466). Commerce also found discrepancies between the reported sales terms and the freight and insurance revenue amounts in Galvasid's accounting system and concluded that "{t}he record remains unclear regarding when and how Galvasid charged for freight and insurance revenue, and how Galvasid was accounting for such revenue in both its accounting system and its invoice prices." Ministerial Error Memo at 6-7 (PR 492).

Record evidence of discrepancies between the expense and revenue amounts and among the revenue amounts themselves highlights the need for Galvasid to have disclosed both when Commerce asked. As a threshold matter, Commerce must be able to analyze both expenses and revenues, assess whether it needs to request additional information relating to those amounts, and verify such reporting. For example, in *Common Alloy Aluminum Sheet from Korea*, the respondent reported a single DDP invoice price along with an expense for Section 232 duties, which were included in the invoice price and paid by the customer. Commerce observed that while "Commerce generally requires respondents to report movement revenue in separate fields

18

in their sales databases," the respondent demonstrated that "no evidence shows that customers either over or underpaid {the respondent} for the Section 232 duties," and accordingly, the respondent's reporting was accepted. *See Common Alloy Aluminum Sheet From the Republic of Korea: Final Negative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 13,307 (Dep't Commerce Mar. 8, 2021) and accompanying Issues and Decision Memorandum at Comment 4. Here, by contrast, there is record evidence that Galvasid's reported expenses are not equivalent to the amounts paid by customers for freight and insurance. *See* IDM at 49 (PR 466); Ministerial Error Memo at 6-7 (PR 492). Galvasid's reporting of an expense therefore cannot stand in as equivalent to reporting revenue realized in selling the subject merchandise.

As Commerce explained, the agency requires full reporting of revenues, in addition to expenses, so that it can determine "how…revenue is incurred and how it is accounted." *Id.* at 6. A respondent's reporting of revenue gives Commerce information that may prompt the issuance of supplemental questionnaires or follow-up questions during verification and permits Commerce to determine whether and how it should offset expenses. *See Orange Juice from Brazil* IDM at Comment 6. However, Galvasid denied Commerce this opportunity. As Commerce explained, "{t}he basis of the AFA determination is that Commerce was unable to examine and issue further supplemental questionnaires to determine whether Galvasid's reporting was appropriate in the first place, not that the reporting of the gross unit price and expense fields was, in and of itself, inappropriate." Ministerial Error Memo at 8 (PR 492).

Galvasid cites to previous Commerce proceedings that supposedly stand for the proposition that "sales made on a DDP or CIF basis do not include separately-reportable freight or insurance revenue." Pl. Br. at 21. However, as Commerce found, these proceedings are inapposite, and none stands for the proposition that reporting sales terms alone is adequate

19

disclosure of freight and insurance revenue. For example, in *Polyester Textured Yarn from Thailand*, the shipping terms "add weight to the appropriateness of the respondent company's reporting, rather than sufficing, in and of itself, as a reporting of freight and insurance revenue." Ministerial Error Memo at 6; *see also Polyester Textured Yarn from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 58,883 (Dep't Commerce Oct. 25, 2021) and accompanying Issues and Decision Memorandum at Comment 10. Further, in that case, during the course of the investigation and prior to verification, the respondent "provided sample sales documentation demonstrating that…the rate agreed upon between {the respondent} and the customer is inclusive of all expenses to deliver the goods to an agreed upon destination." *Polyester Textured Yarn from Thailand*, Issues and Decision Memorandum at Comment 10. Thus, the respondent had not merely reported its sales terms. It had developed the record by demonstrating how its invoice prices included amounts that were inclusive of freight expenses. That is exactly what Commerce found Galvasid did not do:

> Commerce did not discover until verification that Galvasid included additional accounts containing freight and insurance revenue within its sales reconciliation, and that Galvasid received such revenue and had included the revenue in its reported U.S. prices….{I}t was impossible for Commerce to determine whether the reporting of such expenses within the gross unit price was appropriate prior to verification, much less identify the amount of freight revenue and insurance revenue attributed to each individual gross unit price or which sales Galvasid also received freight and/or insurance revenue in its U.S. sales database.

IDM at 48 (PR 466).

The other proceedings that Galvasid cites likewise involved respondents that had disclosed and explained that they were receiving amounts for freight from customers, beyond merely reporting their sales terms. In *Welded Pipe from India*, Commerce had much fuller visibility into how the respondent received revenue for freight costs, recounting that the respondent "later requested that the customers assist with the increased cost of ocean freight"

20

PUBLIC VERSION

beyond the amount originally charged in the DDP sale. *See Welded Stainless Pressure Pipe From India: Amended Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 48,442 (Dep't Commerce July 27, 2023) and accompanying Issues and Decision Memorandum at Comment 1.

Additionally, in *Common Alloy Aluminum Sheet from India*, the respondent's invoices included amounts for freight, insurance, and duty "for Customs declaration purposes only," and Commerce found that "these freight and duty amounts simply reflect the shipping terms agreed to with the customer and included in the price of the merchandise{.}" *Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 2020-*2022, 88 Fed. Reg. 76,724 (Dep't Commerce Nov. 7, 2023) and accompanying IDM at Comment 1 ("*CAAS from India* IDM"). The respondent had disclosed its "internal accounting records" for freight and insurance, which matched the sales terms, rather than reporting the sales terms alone. *Id.* In fact, the respondent's thorough reporting was exactly what allowed Commerce to determine how to treat its freight and insurance revenues:

> {The respondent} explained that India's accounting standards require it to record these revenues in a separate account and provided documentation to support its explanation....{W}e do not find that application of AFA is warranted here. While we do not find it appropriate to segregate these revenues, as noted above, if we were to determine to do so, the record contains all information necessary to segregate those revenues. Moreover, this information shows that none of the revenues exceed the corresponding expense. Thus, separately accounting for those revenues as an offset to the associated freight expenses would have no impact on Hindalco's final dumping margin.

*Id.* Not only did Galvasid fail to similarly develop the record, it was not the case here that "none of the revenues exceed the corresponding expense." Galvasid's revenues did, in fact, exceed the corresponding expenses for Galvasid's sales. Thus, Commerce chose the amount by which Galvasid's revenues exceeded its expenses as the partial AFA adjustment after determining that

21

this amount was "reliable." *See* IDM at 49 (PR 466). *Common Alloy Aluminum Sheet from India* supports Commerce's approach.

Finally, Galvasid argues that it disclosed revenues by including Account 4030001 in the U.S. sales reconciliation it provided as part of its response to Section C of the Initial Questionnaire.[7] *See* Pl. Br. at 12. Account 4030001 was labeled "Loading and Unloading Goods," and Galvasid claims that the amounts recorded in this account "reflected Galvasid's internal assignment of a portion of the total DDP and CIF amounts to freight and insurance." *Id.* But Commerce could not reach that conclusion independently because this was not apparent on the face of Galvasid's sales reconciliation. Galvasid derived an amount for U.S. sales by starting with the total value of sales to all markets and then subtracting home market sales from that amount. *See* Section C Response at Appendix C-3 (PR 221, CR 193). Account 4030001 was listed in a group of accounts that made up the starting total sales amount, and the deduction for home market sales did not identify the accounts that were included in the deduction. Nothing in the name of the account indicated that it was associated solely with U.S. sales. Thus, there was no way for Commerce to know that account 4030001's amount for "Loading and Unloading Goods" related to U.S. sales. Accordingly, "Commerce did not discover until verification that Galvasid included additional accounts containing freight and insurance revenue within its sales reconciliation." IDM at 48 (PR 466).

The record in the underlying investigation here and Commerce's prior determinations demonstrate that Commerce had substantial evidence to determine that Galvasid's reporting of its sales terms did not comply with Commerce's instruction to report "all revenues and expenses you have incurred in selling the subject merchandise in the United States market." Initial

---

[7] As part of its antidumping questionnaire, Commerce instructs respondents to reconcile their reported sales values with their financial statements.

22

Questionnaire at C-37 (PR 111). Therefore, Commerce reasonably determined that Galvasid had failed to cooperate to the best of its ability to provide requested information, and the Court's standard of review thus compels affirmance of Commerce's determination to apply AFA to Galvasid.

### 2. Whether Commerce Was Entitled to "Cap" Freight and Insurance Revenues Is Unrelated to Whether Galvasid Was Required to Disclose Them

When Commerce offsets movement expenses with revenues, it "caps" the amount of the offset to the amount of the expense. *See Hyundai Heavy Industries Co., Ltd. v. United States*, 393 F. Supp. 3d 1293, 1307 (Ct. Int'l Trade 2019). This prevents respondents from inflating the U.S. price of subject merchandise using profits derived from sales of services, rather than from sales of the subject merchandise. Commerce may not cap service revenues on the basis of purely internal revenue accounting. Rather, such revenue amounts must be separately negotiable with the customer. *See ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1220 (Ct. Int'l Trade 2018). Commerce looks for evidence that service-related revenues were separately negotiable by seeking customer-facing documentation, such as invoices and purchase orders, in which the services are separately stated as line items or otherwise communicated to the customer. *See id.* at 1221; *CAAS from India* Issues and Decision Memorandum at Comment 1.

Galvasid claims that because the only documentation on the record discussing its receipt of freight and insurance revenues was internal and not customer-facing, it was not required to report these revenues to Commerce. *See* Pl. Br. at 23 ("{T}here was no indication that these internal assignments of portions of the total DDP and CIF amounts for freight and insurance were ever communicated with Galvasid's U.S. customers."). Galvasid puts the cart before the horse. It mistakes the test for whether Commerce is permitted to cap revenues with the test for whether Galvasid was required to disclose their existence to Commerce. Here, the agency never

23

had a chance to determine whether Galvasid's freight and insurance revenues were separately negotiable, and therefore whether they should be capped, because Commerce did not learn about these revenues until verification. As Commerce explained, "the issue at hand is whether or not Galvasid should have disclosed that it received freight and insurance revenue in the first place; the issue of its reporting of the gross unit price and its expenses is secondary, because Commerce did not receive the underlying information to make the determination of the appropriateness of requiring a freight or insurance revenue cap." Ministerial Error Memo at 7 (PR 492).

Galvasid claims that "there is no evidence in this case that freight or insurance revenue amounts for U.S. sales were separately listed on Galvasid's invoices or separately negotiated with its customers." Pl. Br. at 26. But this statement refers to a record that was never sufficiently developed regarding the exact methods that Galvasid used to collect and account for freight and insurance revenue. Galvasid failed to carry its burden of creating a record sufficient to support the conclusion it proffers. *See Alloy Piping Products, Inc. v. United States*, 201 F. Supp. 2d 1267, 1284 (Ct. Int'l Trade 2002), *aff'd*, 334 F.3d 1284 (Fed. Cir. 2003) ("The general rule with regard to a respondent's submission of data to Commerce during the course of an AD investigation or review is that the respondent bears the burden and responsibility of creating an accurate record within the statutory timeline."). Because Commerce did not learn about the existence of these revenues until it was in the process of verifying Galvasid's questionnaire responses, the question of the nature and appropriate treatment of these revenues necessarily went unanswered. *See* IDM at 48 (PR 466) ("Commerce was unable to determine or verify whether these revenues are not listed separately in all invoices, or if there were exceptions{.}"); *see also* Ministerial Error Memo at 8 (PR 492) ("With a gap in the record with respect to these facts, such that there was no record evidence or statement of Galvasid collecting freight and insurance revenue until

24

verification, Commerce cannot determine whether Galvasid's reporting was correct in the first place.").

In fact, it is entirely possible that had Galvasid developed the record necessary for Commerce to fully examine Galvasid's revenues, Commerce would have come to a different conclusion than Galvasid did on its own. Commerce observed that its "findings at verification indicated that U.S. customers were purchasing [                                    ] of merchandise," and cited to a [


                          ]." Ministerial Error Memo at 8. This is not definitive evidence on its own that Galvasid's freight revenues were [                                    ]. However, it illustrates that there was more to learn regarding [

                          ]. Commerce could have pursued such inquiries had it known about the existence of the revenues prior to verification. *See, e.g., ABB Inc.,* 355 F. Supp. 3d at 1221 (upholding Commerce's application of the capping methodology for sales "for which Commerce identified communications (e.g., purchase orders and invoices) between {respondent} and its unaffiliated customers indicating that the provision of those services may reasonably have been separately negotiable.").

Accordingly, Galvasid's argument that it was absolved from reporting freight or insurance revenues in separate fields because these revenues were not separately negotiated with customers rings hollow. *See* Pl. Br. at 25. Galvasid may not unilaterally determine its reporting requirements. Rather, it was required to answer Commerce's instruction to report "all revenues and expenses" and then let Commerce determine whether these revenues merited reporting in separate fields. *See Essar Steel*, 721 F. Supp. 2d at 1299 ("Regardless of whether {the

25

respondent} deemed the {} information relevant, it nonetheless should have produced it in the event that Commerce reached a different conclusion."). Although it is true that respondents need not report revenues in separate sales database fields if they are not separately negotiated with the customer, this does not mean that a respondent may entirely withhold disclosure of its receipt of revenues on the basis of its own independent determination that these were internal-only. That is the distinction that Commerce drew: "{I}n this case, Commerce did not have 'internal documentation' regarding freight and insurance revenue until verification, and applied partial AFA due to the failure of Galvasid to disclose those facts, rather than for failing to separately report the freight and insurance revenue from the gross unit price." Ministerial Error Memo at 8 (PR 492).

Commerce found that Galvasid did receive revenue amounts from its customers to cover freight and insurance. *See* IDM at 48 (PR 466). It was reasonable for Commerce to conclude that, at minimum, a respondent cooperating to the best of its ability would have alerted Commerce to their existence and allowed Commerce to determine their proper treatment. Because Galvasid failed to do so, its contention that these revenues were not separately negotiable arrives too late and attempts to perform an analysis that was properly the domain of Commerce. Commerce reasonably determined that it should apply partial AFA for Galvasid's failure to cooperate to the best of its ability under these circumstances.

## VI.    CONCLUSION

For these reasons, Defendant-Intervenors respectfully request that the Court deny Galvasid's motion for judgment on the agency record and sustain Commerce's Final Determination in full.

26

PUBLIC VERSION

Respectfully submitted,

*/s/* Jeffrey D. Gerrish
Roger B. Schagrin, Esq.
Jeffrey D. Gerrish, Esq.
Nicholas C. Phillips, Esq.*
**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001
*Counsel to Steel Dynamics, Inc. and United Steel,*
*Paper and Forestry, Rubber, Manufacturing,*
*Energy, Allied Industrial and Service Workers*
*International Union, AFL-CIO, CLC*

*Only admitted in New York. Practice limited to
matters before federal courts and agencies.

*/s/* Thomas M. Beline
Thomas M. Beline
James E. Ransdell
Margaret E. Monday
**CASSIDY LEVY KENT (USA) LLP**
2112 Pennsylvania Ave. NW
Suite 300
Washington, DC 20036

*Counsel to United States Steel Corporation*

27

PUBLIC VERSION

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing response brief contains 8,575 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

Dated:  March 27, 2026                          /s/ Jeffrey D. Gerrish
                                                 Jeffrey D. Gerrish

PUBLIC VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| GALVASID S.A. DE C.V., <br><br> *Plaintiff,* <br><br> *v.* <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> *and* <br><br> STEEL DYNAMICS, INC.; UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC; AND UNITED STATES STEEL CORPORATION, <br><br> *Defendant-Intervenors.* | Court No. 25-00235 |

## ORDER

Upon consideration of Plaintiff's Rule 56.2 motion for judgment on the agency record, the responses in opposition, and all other papers and pleadings herein, it is hereby

**ORDERED** that the motion is denied, and it is further

**ORDERED** that the challenged decision of the U.S. Department of Commerce is affirmed.

_____
Hon. Jane A. Restani, Judge

Dated: _____, 2026
New York, New York