UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |
|---|---|
| GALVASID S.A. DE C.V.,<br><br>     Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>    and<br><br>STEEL DYNAMICS, INC., UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND UNITED STATES STEEL CORPORATION,<br><br>    Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Court No. 25-00235<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

PLAINTIFF'S REPLY BRIEF

PUBLIC DOCUMENT

WINTON & CHAPMAN PLLC
1100 13th Street NW, Suite 825
Washington, DC  20005
(202) 774-5500

Attorneys for Galvasid S.A. de C.V.

April 24, 2026

Table of Contents

ARGUMENT ................................................................................................................. 3

    A.    This Court Has Jurisdiction Over This Action ...................................................... 3

    B.    Commerce's Application of Adverse Facts Available  to Galvasid for
          an Alleged Failure to Report Separate  Revenue Is Contrary to the
          Facts and the Law .............................................................................................. 6

          1.    Neither the Government Nor the Defendant-Intervenors  Have
                 Identified Any Evidence that Galvasid's Invoices  to Its U.S.
                 Customers Separately Identified Charges for  Freight or Insurance
                 Revenues or that Galvasid's  Customers Paid Any Separate
                 Amounts for Such Services ........................................................................... 6

          2.    Commerce Did Not Request that Galvasid  Report Its Internal
                 Breakdown of the Single  Invoice Price for DDP and CIF Sales.................. 8

          3.    Galvasid's Argument Does Not Depend on the Fact  that Galvasid
                 (Correctly) Reported Freight Costs  and Self-Insurance for Its
                 DDP and CIF Sales ..................................................................................... 10

          4.    There Is No Evidence that Galvasid Received  Any Separate
                 Revenues in Addition to the  Reported DDP and CIF Invoice
                 Amounts ...................................................................................................... 11

               a.    The Fact that Galvasid Received Freight and  Insurance
                     Revenue on Some Home-Market Sales Is Not Evidence that
                     It Received Similar Revenue on U.S. Sales ....................................... 11

               b.    Payment of the Commercial Invoice Amount  to Galvasid by
                     an Insurer Does Not  Constitute Evidence that the Customer
                     Paid  Additional Amounts to Galvasid for Insurance......................... 13

                 c.    Commerce's Past Decisions Confirm that a Respondent  Is
                     Required to Report Only Revenues that Are "Separately
                     Negotiated" in Separate Field in its Sales Databases ......................... 14

                 d.    Past Decisions by Commerce and the Court Confirm  that a
                     Respondent Is Not Required to Disaggregate Its  Invoice
                     Prices into Separate Fields Based on a Purely  Internal
                     Breakdown of a DDP or CIF Invoice Price......................................... 19

CONCLUSION ............................................................................................................. 23

Table of Authorities

CASES

*ABB v. United States*,
  355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018).......................................................... 19, 20, 21

*Advanced Technology & Materials Co., Ltd. v. United States*,
  33 C.I.T. 1537 (Ct. Int'l Trade 2009)............................................................................... 3

*American Cast Iron Pipe Company v. United States*,
  405 F.Supp.3d 1378 (Ct. Int'l Trade Oct. 16, 2019)..................................................... 4, 5

*Bioparques de Occidente S.A de C.V., v. United States*,
  31 F.4th 1336 (Fed. Cir. Apr. 14, 2022)....................................................................... 3, 4

*Hyundai Elec. & Energy Sys. v. United States*,
  578 F.Supp.3d 1245, 1252 (Ct. Int'l Trade May 10, 2022) ....................................... 21, 22

*Hyundai Heavy Industries Co., Ltd. v. United States*,
  393 F. Supp. 3d 1293 (Ct. Int'l Trade 2019)............................................................ 19, 22, 23

*Pipe & Piling Supplies v. United States*,
  798 F.Supp.3d 1370 (Ct. Int'l Trade Sept. 8, 2025)........................................................ 4

STATUTES

19 U.S.C. § 1516a(a)(5)(A)................................................................................................. 4

19 U.S.C. § 1516a(g).......................................................................................................... 4

19 U.S.C. § 1516a(g)(3)(A)(i)............................................................................................ 3

19 U.S.C. § 1516a(g)(3)(B)................................................................................................ 5

ADMINISTRATIVE DECISIONS

*Certain Carbon and Alloy Steel Cut-To-Length Plate From Taiwan:*
  *Final Determination of Sales at Less Than Fair Value and*
  *Final Negative Determination of Critical Circumstances,*
  82 Fed. Reg. 16372 (Apr. 4, 2017)................................................................................. 18

*Common Alloy Aluminum Sheet from India: Final Results*
  *of Antidumping Duty Administrative Review*;
  2020-2022, 88 Fed. Reg. 76724 (Nov. 7, 2023)....................................................... 16, 17

*Polyester Textured Yarn from Thailand: Final Affirmative*
  *Determination of Sales at Less Than Fair Value*,
    86 Fed. Reg. 58883 (Oct. 25, 2021) ........................................................................ 16, 17

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE JANE A. RESTANI, JUDGE

|  |  |  |
|---|---|---|
| GALVASID S.A. DE C.V.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>STEEL DYNAMICS, INC., UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND UNITED STATES STEEL CORPORATION,<br><br>Defendant-Intervenors. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Court No. 25-00235 |

PLAINTIFF'S REPLY BRIEF

This brief should be unnecessary. The facts and the law are clear.

The questionnaire issued by the U.S. Department of Commerce ("Commerce") to Galvasid S.A. de C.V. ("Galvasid") explicitly stated that respondents should "{r}eport the unit price as it appears on the invoice," while revenues for freight, insurance, and other services should be reported in separate fields "{i}f the invoice to your customer includes separate charges for other services directly related to the sale...." Galvasid did precisely as it was instructed. The unit prices it reported for its U.S. sales matched the amounts stated on its invoices. The invoices for Galvasid's U.S. sales did not include any "separate charges for other services directly related to the sale;" the communications between

Galvasid and its U.S. customers did not describe any such "separate charges;" and the payments Galvasid received from its U.S. customers did not include any amounts for such "separate charges." There were, in fact, no "separate charges" at all.

Instead, the sales from Galvasid to its U.S. customers were ordinary DDP and CIF sales, under which Galvasid was required (for the *single* agreed-upon price) to provide freight to the destination designated by the customer and to absorb the risk of any losses during transport. Commerce's past decisions have explicitly held that the prices for DDP and CIF transactions *do not* have to be disaggregated into separate amounts for the merchandise and for freight and insurance services, *even when such amounts are broken out on the invoice,* if they were not separately negotiated with the customer.

In their rebuttal briefs, the Government and Defendant-Intervenors assert that Galvasid was required, nevertheless, to inform Commerce that its purely internal accounting records did allocate the *single* invoice price for each DDP and CIF sale to U.S. customers into separate amounts for the merchandise and for freight and insurance services. But there was nothing in Commerce's questionnaires or past decisions that supports that view. To the contrary, Galvasid's reporting of the prices for its U.S. sales was entirely consistent with the instructions of Commerce's questionnaire and with established precedent. The arguments by the Government and Defendant-Intervenors simply have no merit.

<u>ARGUMENT</u>

*A.    This Court Has Jurisdiction Over This Action*

Defendant-Intervenors allege that, because Galvasid's Summons and Complaint were filed before the publication of the antidumping duty order, this action was initiated prematurely.[1]  Defendant-Intervenors are incorrect.

Defendant-Intervenors have cited *Advanced Tech. & Materials Co. v. United States* for the proposition that an action initiated prior to the publication of an antidumping duty order is premature and "must be dismissed."[2]  However, the holding in *Advanced Tech & Materials* is inapplicable to this case, because it did not relate to judicial review of an antidumping duty determination *involving a free trade area country*.[3]

As explained in our initial brief, 19 U.S.C. § 1516a(g)(3)(A)(i) provides special rules for commencing judicial review of final determinations by Commerce involving free trade area countries (such as Mexico).[4]  In that regard, the Federal Circuit has explicitly stated:

> And, of particular importance here, FTA-country antidumping duty review actions *are not subject to the rule for non-FTA countries* (not disputed here, as noted above) that a party cannot challenge an affirmative final antidumping duty determination until after an antidumping duty order has been published.[5]

---

[1] *See* Defendant-Intervenor's Response Brief at 10-12 (ECF Nos. 33 and 34).

[2] *See id.* at 11.

[3] *See Advanced Technology & Materials Co., Ltd. v. United States*, 33 C.I.T. 1537, 1537 (Ct. Int'l Trade 2009) ("Plaintiffs instituted this action pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and 1516a(a)(2)(B)(i) to challenge a determination by the International Trade Administration, United States Department of Commerce ("Commerce") that diamond sawblades and parts thereof *from China and Korea* were being sold in the United States at less than fair value.") (emphasis added).

[4] *See* Galvasid's Rule 56.2 Brief at 6 (ECF Nos. 31 and 32).  *See also Bioparques de Occidente S.A de C.V. v. United States*, 31 F.4th 1336, 1347 (Fed. Cir. Apr. 14, 2022).

[5] *Bioparques*, 31 F.4th 1336, 1347 (Fed. Cir. Apr. 14, 2022) (emphasis added).

- 3 -

The Federal Circuit's holding in *Bioparques* also made clear that parties may appeal a final antidumping duty determination involving a free trade area country *before* the antidumping duty order is published.[6]

Moreover, this Court has recognized that 19 U.S.C. § 1516a(g) permits review of final antidumping duty determinations involving United States-Mexico-Canada-Agreement ("USMCA") countries before the antidumping duty order is published.[7]  In *American Cast Iron Pipe Company v. United States*, the Court held that a plain reading of 19 U.S.C. § 1516a(a)(5)(A) requires that the 30-day period for filing an appeal of a final determination involving a USMCA country begins on the 31st day after the final determination is published in the Federal Register.[8]  The Court explained:

> Plaintiffs' interpretation of the statutory scheme does not overcome the plain meaning of the notice requirement in the Special Rule, the 20-

---

[6] *See* Galvasid's Rule 56.2 Brief at 6 (ECF Nos. 31 and 32) (citing *Bioparques*, 31 F.4th 1336 at 1347) ("Reviewability of an FTA country affirmative final determination requires no such order; the period of review is defined with reference only to "the date on which notice of the determination is published in the Federal Register.  Specifically, the period for filing begins on the 31st day after the day of publication of the determination (not an order based on it), with a summons due within the next 30 days and a complaint due 30 days after the summons, § 1516a(a)(2).").

[7] *See American Cast Iron Pipe Company v. United States*, 405 F.Supp.3d 1378, 1382 (Ct. Int'l Trade Oct. 16, 2019); *see also Pipe & Piling Supplies v. United States*, 798 F.Supp.3d 1370, 1376 (Ct. Int'l Trade Sept. 8, 2025).

[8] *See American Cast Iron*, 405 F.Supp.3d at 1382 ("The statute is not a model of clarity on this point. Section 1516a(g)(3)(B)(iii) directs the party seeking judicial review to notify other interested parties within "20 days after the date described in subparagraph (A) ... of subsection (a)(5)." That subsection, however, describes when a party seeking judicial review can bring a case, saying "the 31st day after the date on which notice of the determination is published in the Federal Register." It is therefore not entirely clear at first glance what "the date described in subparagraph (A)" is. The only non-absurd answer, however, is "the date on which notice of the determination is published in the Federal Register." Otherwise, the deadline for notice would be 20 days after a party can bring a case, and 21 days after the deadline to request a binational panel expires.") (internal citations omitted).

day time period for which begins with the date of Federal Register publication of the LTFV determination, *not the date of publication of a resulting antidumping duty order*. *See* 19 U.S.C. § 1516a(g)(1) (defining the term "determination" as applicable here, as the determination described in 19 U.S.C. § 1516a(a)(2)(B)(i), which is a final affirmative LTFV determination).[9]

Although the Court's decision in *American Cast Iron* was made in the context of the 20-day deadline for filing a Notice of Intent to Commence Judicial Review as required by 19 U.S.C. § 1516a(g)(3)(B), its holding nevertheless recognized that the statutory time period for filing an appeal of a final determination involving a USMCA country begins after the publication of the final determination in the Federal Register, regardless of when the Order is published.

As explained in our initial brief, Galvasid initiated this action by filing a summons and complaint on October 28, 2025, within the 30-day period that began to run 31 days after the date of publication of the Final Determination being challenged here.[10] Accordingly, this action was timely filed, and Defendant-Intervenors' claim that the Court lacks jurisdiction over this action must be rejected.

---

[9] *Id.* at 1382-83 (emphasis added).

[10] *See* Galvasid's Rule 56.2 Brief at 7 (ECF Nos. 31 and 32). The Final Determination being challenged here was published in the Federal Register on August 29, 2025. Therefore, the period for filing an appeal did not begin to run until September 29, with a summons due by October 29, and complaint due by November 28.

    **B.**    *Commerce's Application of Adverse Facts Available*
          *to Galvasid for an Alleged Failure to Report Separate*
          *Revenue Is Contrary to the Facts and the Law*

          **1.**    *Neither the Government Nor the Defendant-Intervenors*
                 *Have Identified Any Evidence that Galvasid's Invoices*
                 *to Its U.S. Customers Separately Identified Charges for*
                 *Freight or Insurance Revenues or that Galvasid's*
                 *Customers Paid Any Separate Amounts for Such Services*

Commerce's initial questionnaire explicitly instructed Galvasid to report its unit prices (in the GRSUPRH field for home-market sales and in the GRSUPRU field for U.S. sales) as follows:

> Report the unit price *as it appears on the invoice* for sales shipped and invoiced in whole or in part.[11]

In addition, the questionnaire also instructed Galvasid to report items charged separately on the invoice (and not as part of the line-item invoice price for the particular item of merchandise) as follows:

> The gross unit price less price adjustments should equal the net amount of revenue received from the sale. *If the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge.*[12]

Commerce's questionnaire *did not* ask Galvasid to explain whether it allocated its invoice prices in any way for purely internal purposes.

The evidence on this issue is clear and undisputed. The prices that Galvasid reported for U.S. sales in the GRSUPRU field directly matched the prices on its invoices.[13] *None* of

---

[11] *See* Commerce's November 18, 2024, Initial Questionnaire at B-19 and C-18 (PR-111) (emphasis added).

[12] *See id.* at B-18 and C-16 (emphasis added).

[13] *See.* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748).

Galvasid's invoices for its U.S. sales identified any separate amounts for "other services directly related to the sale."[14]  And, finally, the payment information for U.S. sales that was reviewed at verification demonstrated that the amounts received by Galvasid were exactly equal to the invoice prices and did not include any additional amounts for freight or insurance.[15]  There was simply no revenue received by Galvasid on its U.S. sales beyond the invoice price stated on the invoices to its U.S. customers.

This conclusion was further confirmed by the fact that Galvasid's initial response reported that its U.S. sales were made on either a DDP or CIF basis.[16]  Those sales terms, as a matter of law, required that Galvasid (1) provide transport to the destination designated by the customer, and (2) bear the risk of any loss due to damage to the merchandise during transport (either by obtaining outside insurance or by self-insuring the cargo).[17]  Under those terms, Galvasid was not *allowed* to charge its customers any additional amounts for providing those services.

Neither the Government nor Defendant-Intervenors contest any of these points. Nevertheless, they contend that Commerce appropriately punished Galvasid through the application of "adverse facts available" for failing to report the existence of "separate revenue."  They assert, in particular, that Galvasid did not properly develop the record with

---

[14] *See* Galvasid's Rule 56.2 Brief at 11 (ECF Nos. 31 and 32).  *See also* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748).

[15] *See* Galvasid's Rule 56.2 Brief at 11-12 (ECF Nos. 31 and 32).  *See also* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748).

[16] *See* Galvasid's January 13, 2025, Section C Response at 14 (PR-221, CR-193).

[17] *See* Galvasid's Rule 56.2 Brief at 20-21 (ECF Nos. 31 and 32).

documentation showing how revenues were reflected in customer prices, and failed to "report the existence of such revenues in the first place."[18]

The simple answer, of course, is that there was no "separate revenue" to report. For each U.S. sale, there was a single invoice price on a DDP or CIF basis, under sales terms that required Galvasid, for the single agreed-upon price, to provide freight to the designated location and to bear the risk of any loss during transport. Nothing in Commerce's questionnaire suggested that Galvasid was required to split a single invoice price into separate amounts for the merchandise and for freight and insurance services, and nothing in the questionnaire required Galvasid to explain whether it performed such a disaggregation for internal purposes.

> 2. *Commerce Did Not Request that Galvasid Report Its Internal Breakdown of the Single Invoice Price for DDP and CIF Sales*

Before Commerce may apply adverse facts available due to a respondent's failure to supply information, it must show that it actually requested the information.[19] The Government and Defendant-Intervenors both contend that Commerce satisfied that requirement in this case. In particular, they claim that Galvasid was required to report the internal breakdown of its invoice prices under the following "catch-all" instruction, which appeared at the end of Section C of its initial questionnaire:

---

[18] *See* Defendant-Intervenors' Response Brief at 13 (ECF Nos. 33 and 34).

[19] *See* Galvasid's Rule 56.2 Brief at 28 (ECF Nos. 31 and 32).

> *The fields listed above* have been designed to capture all revenues and expenses you have incurred in selling the subject merchandise in the United States market. If there are additional revenues or expenses that are not reported above, such as export taxes incurred in the country of manufacture, create a field for each in the computer file, describe the revenue or expense in your narrative response, and include all calculation worksheets as attachments to your narrative response.[20]

But a review of the structure of the questionnaire demonstrates that the Government's claim is baseless.

As discussed above, Commerce's initial questionnaire explicitly instructed Galvasid to report its unit prices for U.S. sales in the GRSUPRU field. The instructions for that field stated that Galvasid should:

> Report the unit price *as it appears on the invoice* for sales shipped and invoiced in whole or in part.[21]

That instruction appears on page C-18 of the Section C questionnaire, well before the "catch-all" instruction relied upon by the Government, which appears on page C-37. Consequently, the GRSUPRU field was one of the fields encompassed within the "catch-all" instruction's statement that "*{t}he fields listed above* have been designed to capture all revenues and expenses you have incurred in selling the subject merchandise in the United States market." And, since the invoice amount reported in the GRSUPRU field (in accordance with the explicit instructions for that field) fully captured the revenue that Galvasid received for its sales, there were no "additional revenues or expenses that are not

---

[20] *See* Government's Response Brief at 3, 27 (ECF Nos. 36 and 37), citing Commerce's November 18, 2024, Initial Questionnaire at C-37 (PR-111) (emphasis added). *See also* Defendant-Intervenor's Response Brief at 16 (ECF Nos. 33 and 34). We note that a similar instruction appears at the end of the Section B questionnaire. *See* Commerce's November 18, 2024, Initial Questionnaire at B-33 (PR-111).

[21] *See* Commerce's November 18, 2024, Initial Questionnaire at C-18 (PR-111) (emphasis added).

reported above" for Galvasid to report.  The fact that Galvasid broke down the DDP and

CIF invoice prices in its internal accounting records did not create "additional revenue"

that had not already been reported in the GRSUPRU field.  Consequently, the "catch-all"

instruction simply did not apply.

3.    *Galvasid's Argument Does Not Depend on the Fact*
      *that Galvasid (Correctly) Reported Freight Costs*
      *and Self-Insurance for Its DDP and CIF Sales*

According to Defendant-Intervenors, "Galvasid's case is built on the argument that its

reporting of freight and insurance *expenses* was sufficient disclosure that it was receiving

*revenues* to cover theses expenses."[22]  But Defendant-Intervenors have completely

mischaracterized Galvasid's argument.  Galvasid did not argue that, because it had

reported freight expenses on DDP and CIF sales, it was somehow excused from reporting

freight revenues.  Nor did Galvasid argue that, because it had explained to Commerce that

it self-insured its U.S. sales, it was somehow excused from reporting insurance revenues.

Instead, Galvasid argued that:  (1) it had reported that all of its U.S. sales were made

on a DDP or CIF basis; (2) the fact that its sales were made on a DDP or CIF basis

necessarily meant that there could be no additional amounts charged to its U.S. customers

for providing freight or insurance on its U.S. sales; and (3) there was absolutely no

evidence that Galvasid had received any such additional revenues or separately negotiated

any additional revenues on its U.S. sales, *because Galvasid did not, in fact, receive any*

*additional revenue beyond the invoice price on its U.S. sales*.  As explained above, and in

---

[22] Defendant-Intervenors' Response Brief at 16 (ECF Nos. 33 and 34).

Galvasid's initial brief,[23] the evidence fully supports Galvasid's position, and neither Defendant-Intervenors nor the Government have refuted it.

> ### 4. There Is No Evidence that Galvasid Received Any Separate Revenues in Addition to the Reported DDP and CIF Invoice Amounts

The Government and Defendant-Intervenors attempt to justify Commerce's finding that Galvasid failed to report freight and insurance revenues incurred on its *U.S.* sales based on three theories: (1) Galvasid did receive additional revenue for freight and insurance from customers on some of its *home-market* sales, (2) Galvasid reported a payment of the invoice amount for one sale from an insurance company, rather than from the customer and (3) internal accounting vouchers presented by Galvasid as part of its sales traces at verification showed that Galvasid internally allocated a portion of the single U.S. price to freight and insurance. None of these purported justifications has any merit.

> ### a. The Fact that Galvasid Received Freight and Insurance Revenue on Some <u>Home-Market</u> Sales Is Not Evidence that It Received Similar Revenue on <u>U.S.</u> Sales

The Government claims that the fact that Galvasid reported freight and insurance revenue that had been separately stated on its invoices for some of its home-market sales and reported in separate fields in its home-market sales database supports Commerce's finding that Galvasid failed to report freight and insurance revenue incurred on its U.S. sales.[24] The argument is absurd. The fact that Galvasid received freight and insurance revenues on some home-market sales says nothing about whether Galvasid received additional revenues on its U.S. sales.

---

[23] *See* Galvasid's Rule 56.2 Brief at 22 (ECF Nos. 31 and 32).

[24] *See* Government's Response Brief at 16 (ECF Nos. 36 and 37).

Furthermore, Galvasid clearly explained its reporting of these revenues for home-market sales. In its response to Commerce's initial questionnaire, Galvasid reported that, unlike its invoice practices for its U.S. sales, Galvasid did charge certain *home-market* customers for freight and/or insurance as a separate item on the invoice.[25] For those home-market sales, Galvasid reported the additional amounts received for freight and insurance in separate fields in its home-market sales database in accordance with the questionnaire's instructions.[26] The invoices for Galvasid's U.S. sales, by contrast, stated only a single delivered price for each transaction, without identifying separate amounts for freight or insurance.[27]

The sales documentation reviewed by Commerce at verification confirmed that, for some home-market sales, the invoices did separately identify amounts for freight or insurance charged to home-market customers, which Galvasid separately reported for the relevant home-market sales.[28] The sales documentation reviewed by Commerce at verification also confirmed that *none* of the U.S. commercial invoices, and *none* of the other customer-facing documentation, separately identified amounts for freight or insurance charged to U.S. customers.[29] Accordingly, the record is clear that Galvasid followed Commerce's instructions for its sales reporting for both the U.S. and

---

[25] *See* Galvasid's January 13, 2025, Section B Response at 22-23 (PR-220, CR-192).

[26] *See id.*

[27] *See* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748).

[28] *See id.* at Appendices 9-A to 9-D and 9-I to 9-K (PR-406, CR-744-747).

[29] *See id.* at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748), Commerce's Final Issues & Decision Memorandum at cmt. 12 (PR-466) (Commerce's final determination acknowledged that the "verification report inadvertently stated, incorrectly, that freight revenue was separately listed on the U.S. sales invoices.").

home-market, and the fact that Galvasid incurred additional revenues on some of its home-market sales has no bearing on Galvasid's U.S. sales reporting.

      b.    *Payment of the Commercial Invoice Amount to Galvasid by an Insurer Does Not Constitute Evidence that the Customer Paid Additional Amounts to Galvasid for Insurance*

The Government also asserts that Commerce's conclusion that Galvasid had unreported freight and insurance revenue is supported by the fact that an insurer, and not the customer, paid the invoice amount for one of Galvasid's U.S. sales made on a CIF basis.[30]  Apparently, the Government's lawyers are unfamiliar with the concept of insurance and what revenue is reportable in an antidumping proceeding.[31]

The evidence shows that the sale in this case was covered by some form of insurance.[32]  The evidence also shows that the customer did not pay Galvasid anything for the invoice amount.[33]  Instead, the insurer paid the full invoice amount in place of the

---

[30] *See* Government's Response Brief at 28-29 (ECF Nos. 36 and 37).

[31] When the questionnaire mentions "insurance revenue," it refers to separately-invoiced revenue that a seller receives from the buyer in compensation for the seller's service of obtaining insurance for the shipment.  It does not refer to compensation received by an insured from an insurer.  *See* Commerce's November 18, 2024, Initial Questionnaire at C-16 (PR-111) ("If the invoice *to your customer* includes separate charges for other services directly related to the sale, . . .create a separate field for reporting each additional charge.") (emphasis added).

[32] The name of the insurer suggests that the insurance in question was "credit insurance," which protected Galvasid in the event that the customer did not pay.  *See* Galvasid's Rule 56.2 Brief at 29 (ECF Nos. 31 and 32) (noting that the insurer's name includes the term *"Seguro de Credito,"* which is the Spanish term for "credit insurance.").  However, Commerce did not inquire about the nature of the insurance and, as a result, the record is not clear as to the precise nature of the insurance or as to which party (whether Galvasid, or its customer, or the freight company that performed the transport from the customer to the designated location) was responsible for obtaining it.

[33] *See* Galvasid's May 22, 2025, Submission, SVE-9M at 7and 15-16 (PR-406, CR-747) (demonstrating that the full invoice amount was credited to Galvasid's U.S. customer.

customer.[34]  This evidence simply demonstrates the normal functioning of insurance, whereby the insurance company pays the insured — or someone to whom the insured is liable — for any covered losses.[35]  What this evidence does <u>not</u> demonstrate, is a payment from the *customer* to Galvasid for insurance.

Of course, the receipt of payment from an insurance company suggests that someone must have paid a premium to the insurer for insurance.  It does not, however, tell us who paid that premium.  And it certainly does not indicate that the buyer paid amounts *to the seller in addition to the invoice* price to obtain insurance.  Indeed, in an ordinary CIF transaction, the sales terms indicate that the seller will bear the risk of loss during transport and *will not* charge the customer any additional amounts for obtaining insurance against such losses.

### c.    Commerce's Past Decisions Confirm that a Respondent Is Required to Report Only Revenues that Are "Separately Negotiated" in Separate Field in its Sales Databases

The Government and Defendant-Intervenors also claim that, because Galvasid's internal accounting vouchers allocated the total DDP and CIF price received from its customers into amounts for the merchandise, freight, and insurance, Galvasid must have incurred "unreported freight and insurance revenues."[36]  This argument is directly contrary to legal precedent by Commerce and the Court.

---

[34] *See id.* at 17-18.  *See also* Galvasid's Rule 56.2 Brief at note 81 (ECF Nos. 31 and 32).

[35] For example, if two cars crash due to negligence by one driver, the insurer for the party at fault for the crash may directly reimburse both the insured *and* the party hit by the insured for their damages.

[36] *See* Government's Response Brief at 20 (ECF Nos. 36 and 37).  *See also* Defendant-Intervenors' Response Brief at 18 (ECF Nos. 33 and 34).

The Government repeatedly insists that, for every U.S. sales trace reviewed at verification, freight revenue was included as a separate line item in Galvasid's *"sales documentation."*[37]  But the sales documentation they reference consisted solely of Galvasid's own internal accounting vouchers.  There was nothing in Galvasid's invoices that disaggregated the single DDP and CIF prices shown on Galvasid's invoices into separate amounts for the merchandise, freight, and insurance.[38]  And, importantly, neither Commerce in its determination nor the Government and Defendant-Intervenors in this appeal have asserted that there is any evidence that Galvasid's internal accounting vouchers were ever communicated with its U.S. customers, or that any documentation provided to the customer gave a breakdown of the single DDP or CIF invoice price.

As we explained in our initial brief, Commerce and the Court have been absolutely clear that, where there is no indication that freight or insurance revenues are separately negotiated with the customer, sales made on a DDP or CIF basis do not include separately-reportable freight or insurance revenue.[39]  As we explained, Commerce's decision in *Polyester Textured Yarn from Thailand* rejected the petitioners' argument that the respondent should have reported freight and insurance "revenues" in separate fields in its sales databases for CIF and DDP sales, because the price that the respondent charged to its customers for such sales included freight and insurance in accordance with CIF and DDP terms of sale, and "because no freight and insurance revenues were separately

---

[37] *See* Government's Response Brief at 17, 23, and 28 (emphasis added).

[38] *See id.* at 23; Defendant-Intervenors' Response Brief at n.1 (ECF Nos. 33 and 34) ("Rather, it was Galvasid's internal accounting vouchers that separately listed amounts for freight and insurance that had been charged to customers.").

[39] *See* Galvasid's Rule 56.2 Brief at 21-22 and n. 60 (ECF Nos. 31 and 32).

negotiated and recovered from the customer."[40] And, in *Common Alloy Aluminum Sheet from India*, Commerce rejected the petitioners' argument that the respondent failed to properly report its U.S. prices, because there were no line items separately identifying freight, insurance, or duties charges on any customer-facing documentation during negotiation of the sales price and, therefore, no evidence that the respondent separately negotiated and charged its customer for additional revenues.[41]

The Government attempts to distinguish *Polyester Textured Yarn from Thailand* and *Common Alloy Aluminum Sheet from India* based on the claim that, in contrast to the facts in those cases, "here, each sales trace indicated that these revenues were recovered from the customer."[42] That position is absurd. In all DDP and CIF sales, the amount "recovered from the customer" necessarily includes compensation from the customer for providing freight to the designated location and for assuming the risk of loss during transport. The only issue under those cases is whether evidence indicates that the seller separately negotiated any amounts for providing such freight or insurance. Similarly, in this case, there is simply no evidence of such separately negotiated amounts for Galvasid's U.S. sales.

For their part, Defendant-Intervenors claim that the *Polyester Textured Yarn from Thailand* and *Common Alloy Aluminum Sheet from India* cases require Galvasid to do

---

[40] *See Polyester Textured Yarn from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 58883 (Oct. 25, 2021), and accompanying Issues and Decision Memorandum, Oct. 18, 2021, at cmt. 10.

[41] *See Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review*; 2020-2022, 88 Fed. Reg. 76724 (Nov. 7, 2023), and accompanying Issues and Decision Memorandum, Nov. 1, 2023, at cmt. 1.

[42] *See* Government's Response Brief at 22-23 (ECF Nos. 36 and 37).

more than just report its sales terms to adequately support its reporting that it did not incur

separate revenue for freight or insurance.[43]  Defendant-Intervenors are incorrect.  In both

those cases, the commercial invoice to customers for DDP or CIF sales separately

identified amounts for freight or insurance.[44]  Accordingly, to demonstrate that those

amounts were not separately negotiated — and thus not reportable as revenue despite being

identified on the invoice — the respondents provided additional supporting documentation

such as internal accounting information and other sales documents.[45]  As a result, neither

of these cases stand for the proposition that Galvasid was required to submit its internal

accounting breakdown of its sales revenue when it did not separately invoice its customer

for services.

Instead, what these cases demonstrate is that even when a respondent's commercial

invoices *do* separately identify amounts for freight and insurance under sales terms for

which the seller is responsible for those services, Commerce still requires additional

evidence that the freight and insurance amounts were separately negotiated before making

an adjustment to the gross unit price.  For example, in *CTL Plate from Taiwan,* Commerce

found that, even though a few of the respondent's commercial invoices identified amounts

for freight, there was not enough evidence that the amounts for freight were separately

negotiated with the customers, and therefore, not enough evidence that the respondent

failed to report freight revenue.  Commerce stated:

---

[43] *See* Defendant-Intervenors' Response Brief at 20-21 (ECF Nos. 33 and 34).

[44] *See Polyester Textured Yarn from Thailand*, 86 Fed. Reg. 58,883 and accompanying Issues and Decision Memorandum at cmt. 10.  *See also Common Alloy Aluminum Sheet from India*, 88 Fed. Reg. 76,724 and accompanying Issues and Decision Memorandum at cmt. 1.

[45] *See id.*

In fact, both the sales contract and the commercial invoices refer to Shang Chen's delivery terms *on a CFR basis*. Absent any substantiation of pre-negotiated freight revenue, the lack of any verification findings, and the fact that such revenue was not reported to the Department on sales made to the United States, we do not find that the few instances in which line items for freight values appeared on a few commercial invoices collected at verification serve as sufficient evidence that Shang Chen received revenue for freight services rendered on U.S. sales.[46]

In Galvasid's case, its U.S. invoices identified only a single, gross unit price, and did not separately identify any amounts for freight or insurance.[47] The Government and Defendant-Intervenors admit that the *only* document that provided breakouts for freight and insurance were Galvasid's internal accounting vouchers, which separated the total gross unit price received from its customers into amounts for the merchandise, freight, and insurance, for internal accounting purposes only.[48] And, neither the Government nor Defendant-Intervenors have identified any information on the record suggesting that Galvasid separately negotiated amounts for freight or insurance revenue with its U.S. customers. In these circumstances, there is simply no basis for Commerce's finding that Galvasid received, but did not report, freight and insurance revenue.

---

[46] *See Certain Carbon and Alloy Steel Cut-To-Length Plate From Taiwan: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,* 82 Fed. Reg. 16372 (Apr. 4, 2017), and accompanying Issues and Decision Memorandum, Mar. 29, 2017, at cmt. 20 (emphasis added).

[47] *See* Galvasid's May 22, 2025, Submission at Appendices 9-E to 9-H and 9-L to 9-N (PR-406, CR-745-748).

[48] *See* Government's Response Brief at 23 (ECF Nos. 36 and 37); Defendant-Intervenors' Response Brief at n. 1 (ECF Nos. 33 and 34).

> d.    *Past Decisions by Commerce and the Court Confirm*
> *that a Respondent Is Not Required to Disaggregate Its*
> *Invoice Prices into Separate Fields Based on a Purely*
> *Internal Breakdown of a DDP or CIF Invoice Price*

As we explained in our initial brief, Commerce has adopted a practice of "capping" any upward adjustment of freight and insurance revenue by the amount of the freight or insurance costs incurred.[49]  In light of this practice, Commerce requires respondents to separately report any freight or insurance revenue, so that Commerce may "cap" the upward adjustment for that revenue by the actual costs incurred.[50]  The Court has been absolutely clear that Commerce *may not rely on purely-internal company documents* to determine whether there is separate service-related revenue that might be subject to a cap.[51] In fact, in every case where Commerce has found that a respondent failed to report revenues based on internal company documents alone, the Court has found that Commerce's decision was unreasonable and has remanded the case back to Commerce with instructions to recalculate the margin without use of adverse facts available.[52]  Given the legal precedent, Galvasid simply had no basis to expect that Commerce would require Galvasid to disaggregate its invoices prices based on its internal accounting vouchers.

---

[49] *See* Galvasid's Rule 56.2 Brief at 24 (ECF Nos. 31 and 32).

[50] *See, e.g.,* Commerce's November 18, 2024, Initial Questionnaire at B-18 and C-16 (PR-111).

[51] *See ABB v. United States*, 355 F. Supp. 3d 1206, 1220-21 (Ct. Int'l Trade 2018) ("Here, the inquiry is whether Commerce may rely on internal company communications, rather than documentation or communications shared with the unaffiliated customer, to determine that there is separate service-related revenue to cap. The court concludes that it may not."); *Hyundai Heavy Industries Co., Ltd. v. United States*, 393 F. Supp. 3d 1293, 1307-08 (Ct. Int'l Trade 2019).

[52] *See ABB Inc.*, 355 F. Supp. 3d at 1220-21; *Hyundai Heavy Industries*, 393 F.Supp.3d at 1307-1308.

The Government claims that the facts of the *ABB* case can be distinguished from this case.  In this regard, the Government notes, correctly, that the Court in *ABB* upheld Commerce's finding that the respondent failed to properly report service-related revenues that were stated in *separate line-items for such services* in multiple commercial invoices to U.S. customers.[53]  But, the Government then goes on to assert that,

> And in *ABB Inc.,* Commerce relied on internal company communications to determine that there was a separate service-related revenue to cap.[54]

That assertion is false.  While the Court in *ABB* did find that the respondent failed to properly report service-related revenues for sales in which the revenues were stated in separate line-items on the commercial invoice to unaffiliated customers, the Court also specifically rejected Commerce's application of its capping methodology for sales in which service-related revenues only appeared on internal company communications, and *did not* appear on the commercial invoice to unaffiliated customers.  The Court stated:

> Thus, the court finds that substantial evidence supports Commerce's application of its capping methodology with respect to those transactions for which Commerce identified communications (e.g., purchase orders and invoices) between Hyundai and its unaffiliated customers indicating that the provision of those services may reasonably have been separately negotiable. Relatedly, substantial evidence supports Commerce's finding that Hyundai failed to provide information necessary for Commerce to apply its capping methodology with respect to those same transactions. *Substantial evidence does not support Commerce's application of its capping methodology to those transactions or services for which Commerce relied only on internal communications among Hyundai employees or affiliates.*[55]

---

[53] *See* Government's Response Brief at 24 (ECF Nos. 36 and 37).

[54] *See id*.

[55] *See ABB Inc.*, 355 F. Supp. 3d at 1220-21.

In these circumstances, the Government's attempt to distinguish *ABB* is plainly without merit. By penalizing Galvasid for failing to report a price breakdown that only appeared on purely internal accounting vouchers that were never communicated with the U.S. customer, Commerce did the very thing that the Court rejected in *ABB.*

The Government also cites this Court's decision in *Hyundai Electric & Energy Systems* to support the claim that evidence of affiliation between the exporter and customer at issue in *ABB* was a "factual predicate" of Commerce's treatment of service-related revenues in that case. According to the Government, "as Galvasid has raised no evidence of affiliation, its reliance on *ABB Inc.* is misplaced."[56]

But *Hyundai Electric* does not, in fact, support the Government's claim. In *ABB,* the Court found that sales documentation between two affiliated companies that evidenced service-related revenue were "internal communications," and therefore could not be relied upon by Commerce as evidence of communications with the unaffiliated customer.[57] In *Hyundai Electric,* the two parties in question were no longer considered to be affiliates, due to a corporate restructuring and change in ownership structure.[58] In those circumstances, Court concluded that, because the two parties were no longer affiliated, the sales documentation between them were no longer "internal communications."[59] Accordingly, the Court held that Commerce could rely on those communications to

---

[56] *See* Government's Response Brief at 24-25 (ECF Nos. 36 and 37).

[57] *See ABB Inc.*, 355 F. Supp. 3d at 1220-21.

[58] *See Hyundai Elec. & Energy Sys. v. United States*, 578 F.Supp.3d 1245, 1252, 1254 (Ct. Int'l Trade May 10, 2022).

[59] *See id* at 1254.

establish the "cap" for service revenue precisely because they were no longer "internal communications."[60]

In Galvasid's case, of course, it is undisputed that the internal accounting vouchers identified by Commerce were, in fact, purely internal documents. They were not communications with *any* outside party, affiliated or unaffiliated. The Government does not claim Galvasid's internal accounting vouchers were ever communicated with its U.S. customers. Instead, the record confirms that the internal accounting vouchers were purely internal documents used for the purpose of allocating portions of the DDP or CIF prices paid by Galvasid's U.S. customers into amounts for the merchandise, freight, and insurance, for internal accounting purposes only.

Finally, the Government attempts to distinguish the facts of *Hyundai Heavy Industries* from the facts of this case by claiming that "{t}he unreported revenue figures in that case were not first discovered at verification, unlike here."[61] The Government has, once again, misrepresented the holding of the case. The Court's holding in *Hyundai Heavy Industries* had nothing to do with when the "revenues" were "discovered." Instead, the Court held, unequivocally, that Commerce "may not rely" on internal documents to determine the amount of the "cap" for service-related revenues.[62] Furthermore, the Court held that without substantial evidence that the service revenue identified in a company's internal

---

[60] *See id.*

[61] *See* Government's Response Brief at 25 (ECF Nos. 36 and 37).

[62] *See Hyundai Heavy Industries*, 393 F.Supp.3d at 1307-1308.

documents were separately negotiable with the unaffiliated customer, "Commerce lacked a

legal basis" to fault a company for not reporting its internal breakdown of revenue.[63]

<div align="center">CONCLUSION</div>

This case, unfortunately, presents a cascade of unsupportable statements by

Commerce, urged on by counsel to the Domestic Interested Parties, to justify a conclusion

that has no factual or legal basis.  Commerce's initial verification report stated, incorrectly,

that Galvasid's invoices for U.S. sales listed separate amounts for freight and insurance

charges to be paid by the customer.[64]  Counsel for the Domestic Interested Parties

reviewed the underlying documents that clearly demonstrated that the statement in

Commerce's verification report was false, and still decided to argue that Commerce should

apply adverse facts available to Galvasid for failing to report these non-existent invoice

amounts.[65]  In its final determination, Commerce conceded that the statement in its

verification report was incorrect, but nevertheless decided to apply adverse facts available

to Galvasid because, it claimed, "Galvasid failed to disclose in its questionnaire responses

that it had included freight revenue and insurance revenue in its reported U.S. gross unit

prices, or that it received these revenues in the U.S. market at all."[66]  Even after Galvasid

demonstrated that there was simply no additional revenue — that the amounts received

from the customers matched the DDP and CIF invoice prices, and that Commerce's

longstanding practice did not require disaggregation of DDP and CIF prices based on

internal breakdowns — Commerce still insisted that "The record remains unclear regarding

---

[63] *Id*. at 1308.

[64] *See, e.g.,* Galvasid's Rule 56.2 Brief, at 12-13 (ECF Nos. 31 and 32).

[65] *Id.* at 13-14.

[66] *Id.* at 15.

when and how Galvasid charged for freight and insurance revenue, and how Galvasid was accounting for such revenue in both its accounting system and its invoice prices."[67]  In support of that position, Commerce argued, again incorrectly, that Galvasid had failed to explain why there were no reported transport-insurance *expenses* for its U.S. sales on a CIF basis,[68] even though Galvasid had fully explained in its initial questionnaire response that it self-insured those U.S. sales.[69]

Rather than concede defeat, the Government and Defendant-Intervenor's have offered up a series of baseless claims again in this appeal.  But the record in this case is clear and indisputable.  Galvasid reported the unit prices that appeared on its invoices in the GRSPRU field of its U.S. sales listing in accordance with the explicit instructions of Commerce's questionnaire.  There were no revenues beyond those unit prices for Galvasid to report:  Galvasid did not receive any "additional revenue" for freight or insurance from its customers for U.S. sales.  And, the past decisions by Commerce and this Court are also clear that, when a company makes sales on a DDP or CIF basis, it is not required to disaggregate the invoice prices into separate amounts for the merchandise and for freight and insurance services *unless* those prices are separately negotiated with the customer.

This is not a case that should have required an appeal.  We are certainly prepared to present our case if the Court believes oral argument would help it understand the issues in this case.  However, we do not intend to request oral argument.  In our view, this case is too simple to require additional burdens on the parties and the Court.  And our client has

---

[67] *Id.* at 17-18.

[68] *Id.*

[69] *Id.*

an interest in having the issue resolved as quickly as possible.  We request that the Court

issue a decision as quickly as possible remanding this case with instructions to Commerce

to recalculate the dumping margins for Galvasid without any application of adverse facts

available.  Given the simplicity of the issue and the correction, no more than 15 days

should be permitted for that remand, to ensure that the remedy provided to Galvasid is

swift and meaningful.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/Jeffrey M. Winton
Jeffrey M. Winton
Amrietha Nellan
Rachel Hauser

WINTON & CHAPMAN PLLC
1100 13th Street NW, Suite 825
Washington, DC  20005
(202) 774-5500

Attorneys for Galvasid S.A. de C.V.

</div>

Dated:  April 24, 2026

CERTIFICATE OF COMPLIANCE


Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 6,905 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.


　　　　　　　　　　　　　　　　　　　/s/　Jeffrey M. Winton


April 24, 2026