GALVASID S.A. DE C.V.,

        *Plaintiff*,

      v.

UNITED STATES,

        *Defendant*,

     and

STEEL DYNAMICS, INC., UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND UNITED STATES STEEL CORPORATION,

      *Defendant-Intervenors*.

)))))))))))))))))))))))

Court Nos. 25-00235
and 26-00825

JOINT APPENDIX
PUBLIC VERSION

WINTON & CHAPMAN PLLC
1100 13th Street NW, Suite 825
Washington, DC 20005
(202) 774-5500

Attorneys for Galvasid S.A. de C.V.

May 8, 2026

*Galvasid S.A. v. United States*
Court Nos. 25-00235 and 26-00825

Joint Appendix
Table of Contents

| Tab | Document Cited | Date | P.R | C.R | Pages Included |
|---|---|---|---|---|---|
| 1 | Initiation of Less-Than-Fair-Value Investigations, 89 Fed. Reg. 80,196 | October 2, 2024 | 60 | | All |
| 2 | Commerce's Respondent Selection Memorandum | October 21, 2024 | 80 | 28 | All |
| 3 | Commerce's Initial Questionnaire | November 18, 2024 | 111 | | All |
| 4 | Galvasid's Section A Response | December 23, 2024 | 137-138 | 35, 38 | Cover, Table of Contents, List of Appendices, Page 1, Appendix A-6-B, Appendix A-8-B |
| 5 | Galvasid's Section B Response | January 13, 2025 | 220 | 192 | Cover, Table of Contents, List of Appendices, Page 1, 22-23, and 28 |
| 6 | Galvasid's Section C Response | January 13, 2025 | 221 | 193 | Cover, Table of Contents, List of Appendices, Page 1-51, Appendix C-3 |
| 7 | Commerce's Section B-C Supplemental Questionnaire | February 6, 2025 | 259 | 299 | All |
| 8 | Commerce's Second Section B-C Supplemental Questionnaire | February 21, 2025 | 276 | 301 | All |
| 9 | Galvasid's Response to Sections B-C Supplemental Questionnaire | February 24, 2025 | 278-279 | 303-304 | Cover, List of Appendices, Page 1, Appendix SC-4 |
| 10 | Galvasid's Response to Second Sections B-C Supplemental Questionnaire | March 3, 2025 | 297-298 | 424, 426 | Cover, List of Appendices, Page 1-4, Appendix S2C-1 |
| 11 | Galvasid's Supplemental Section D Questionnaire Response | March 20, 2025 | 328 | 537, 544 | Cover, List of Appendices, Page 1, Appendix S3C-1, Appendix S3C-2 |
| 12 | Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair- Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico | April 3, 2025 | 345 | | All |
| 13 | Preliminary Affirmative Determination of Sales at Less Than Fair Value, 90 Fed. Reg. 15349 | April 10, 2025 | 362 | | All |
| 14 | Commerce's Sales Verification Agenda for Galvasid | May 2, 2025 | 378 | 679 | All |
| 15 | Galvasid's Sales Verification Exhibits | May 22, 2025 | 406 | 741, 745-748 | Cover, List of Appendices, Appendix SVE-7B, Appendices SVE-9A through SVE-9N |
| 16 | Verification of the Sales Response of Galvasid in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico | July 11, 2025 | 421 | 829 | All |
| 17 | Petitioners' Case Brief on Sales Issues and Post-Preliminary Analysis Concerning Galvasid | July 28, 2025 | 446 | 851 | Cover, Table of Contents, Page 1-2, 16-23 |
| 18 | Rebuttal Brief of Galvasid on General and Sales Issues | August 4, 2025 | 458 | 855 | Cover, Table of Contents, Page 16-23, List of Attachments, Attachment 1, Attachment 2 |
| 19 | Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from Mexico | August 25, 2025 | 466 | | All |
| 20 | Final Determination Margin Calculation Memorandum for Galvasid | August 25, 2025 | 475 | 866 | All |
| 21 | Final Affirmative Determination of Sales at Less Than Fair Value, 90 Fed. Reg. 42,187 | August 29, 2025 | 482 | | All |
| 22 | Galvasid's Final Determination Ministerial Error Comments | September 2, 2025 | 483 | 869 | All |
| 23 | Petitioners' Final Determination Ministerial Error Comments | September 2, 2025 | 484 | 870 | All |
| 24 | Petitioners' Response to Galvasid's Ministerial Error Comments | September 8, 2025 | 486 | | All |
| 25 | Galvasid's Request for Rejection of Petitioners' September 8 Letter | Septmber 11, 2025 | 488 | | All |
| 26 | Rejection of Galvasid's September 11, 2025, Request to Reject the Petitioners' Rebuttal Comments and Providing Galvasid an Opportunity to Submit Rebuttal Comments | September 16, 2025 | 490-91 | | All |
| 27 | Commerce's September 26, 2025, Ministerial Error Allegations Memorandum | September 26, 2025 | 492 | 871 | All |
| 28 | Amended Final Affirmative Determination and Order, 90 Fed. Reg. 59,494 | December 19, 2025 | 508 | | All |

Tab 1

Initiation of Less-Than-Fair-Value
Investigations, 89 Fed. Reg. 80,196
(October 2, 2024)

PR-60

commercially unavailable fabrics, yarns, and fibers in Annex 3–B of the Agreement.

Chapter 3, Article 3.3, paragraph 7 of the Agreement requires that the President "promptly" publish procedures for parties to exercise the right to make these requests. Section 203(o)(4) of the Act authorizes the President to establish procedures to modify the list of fabrics, yarns, or fibers not available in commercial quantities in a timely manner in either the United States or Colombia as set out in Annex 3–B of the Agreement. The President delegated the responsibility for publishing the procedures and administering commercial availability requests to the Committee for the Implementation of Textile Agreements ("CITA"), which issues procedures and acts on requests through the U.S. Department of Commerce, Office of Textiles and Apparel ("OTEXA") (See Proclamation No. 8818, 77 FR 29519, May 18, 2012).

The intent of the U.S.-Colombia TPA Commercial Availability Procedures is to foster the use of U.S. and regional products by implementing procedures that allow products to be placed on or removed from a product list, on a timely basis, and in a manner that is consistent with normal business practice. The procedures are intended to facilitate the transmission of requests; allow the market to indicate the availability of the supply of products that are the subject of requests; make available promptly, to interested entities and the public, information regarding the requests for products and offers received for those products; ensure wide participation by interested entities and parties; allow for careful review and consideration of information provided to substantiate requests, responses and rebuttals; and provide timely public dissemination of information used by CITA in making commercial availability determinations.

CITA must collect certain information about fabric, yarn, or fiber technical specifications and the production capabilities of Colombian and U.S. textile producers to determine whether certain fabrics, yarns, or fibers are available in commercial quantities in a timely manner in the United States or Colombia, subject to Section 203(o) of the Act.

## II. Method of Collection

Participants in a commercial availability proceeding must submit public versions of their Requests, Responses or Rebuttals electronically (via email) for posting on OTEXA's website. Confidential versions of those submissions which contain business confidential information must be delivered in hard copy to the Office of Textiles and Apparel (OTEXA) at the U.S. Department of Commerce.

## III. Data

*OMB Control Number:* 0625–0272.
*Form Number(s):* None.
*Type of Review:* Regular submission.
*Affected Public:* Business or for-profit organizations.
*Estimated Number of Respondents:* 16.
*Estimated Time per Response:* 8 hours per Request, 2 hours per Response, and 1 hour per Rebuttal.
*Estimated Total Annual Burden Hours:* 89.
*Estimated Total Annual Cost to Public:* $5,340.
*Respondent's Obligation:* Voluntary.
*Legal Authority:* Title II, Section 203(o) of the United States-Colombia Trade Promotion Agreement Implementation Act (Pub. L. 112–42).

## IV. Request for Comments

We are soliciting public comments to permit the Department/Bureau to: (a) Evaluate whether the proposed information collection is necessary for the proper functions of the Department, including whether the information will have practical utility; (b) Evaluate the accuracy of our estimate of the time and cost burden for this proposed collection, including the validity of the methodology and assumptions used; (c) Evaluate ways to enhance the quality, utility, and clarity of the information to be collected; and (d) Minimize the reporting burden on those who are to respond, including the use of automated collection techniques or other forms of information technology.

Comments that you submit in response to this notice are a matter of public record. We will include or summarize each comment in our request to OMB to approve this ICR. Before including your address, phone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you may ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

**Sheleen Dumas,**
*Departmental PRA Clearance Officer, Office of the Under Secretary for Economic Affairs, Commerce Department.*
[FR Doc. 2024–22689 Filed 10–1–24; 8:45 am]
**BILLING CODE 3510–DS–P**

# DEPARTMENT OF COMMERCE

## International Trade Administration

[A–602–812, A–351–862, A–122–871, A–201–863, A–421–818, A–791–829, A–583–878, A–489–855, A–520–811, A–552–843]

## Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable September 25, 2024.

**FOR FURTHER INFORMATION CONTACT:**
Maisha Cryor at (202) 482–5831 (Australia and Canada), Nathan Araya at (202) 482–3401 (Brazil), William Horn at (202) 482–4868 (Mexico), Kabir Archuletta at (202) 482–2593 (the Netherlands), Jacob Saude at (202) 482–0981 (South Africa), Fred Baker and Monique Cummings at (202) 482–2924 and (202) 482–3996, respectively (Taiwan), Brittany Bauer at (202) 482–3860 (the Republic of Türkiye (Türkiye)), Toni Page at (202) 482–1398 (the United Arab Emirates (UAE)), and Jacob Waddell at (202) 482–1369 (the Socialist Republic of Vietnam (Vietnam)), AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

## The Petitions

On September 5, 2024, the U.S. Department of Commerce (Commerce) received antidumping duty (AD) petitions concerning imports of certain corrosion-resistant steel products (CORE) from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the UAE, and Vietnam filed in proper form on behalf of Steel Dynamics, Inc. (SDI), Nucor Corporation (Nucor), United States Steel Corporation (U.S. Steel), Wheeling-Nippon Steel, Inc. (Wheeling-Nippon), and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC (the USW), domestic producers of CORE and a certified union, which represents workers engaged in the production of CORE in the United States (collectively,

the petitioners).[1] The AD Petitions were accompanied by countervailing duty (CVD) petitions concerning imports of CORE from Brazil, Canada, Mexico, and Vietnam.[2]

Between September 9 and 19, 2024, Commerce requested supplemental information pertaining to certain aspects of the Petitions in supplemental questionnaires.[3] The petitioners responded to Commerce's supplemental questionnaires between September 12 and 20, 2024.[4]

In accordance with section 732(b) of the Tariff Act of 1930, as amended (the Act), the petitioners allege that imports of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the UAE, and Vietnam are being, or are likely to be, sold in the United States at less than fair value (LTFV) within the meaning of section 731 of the Act, and that imports of such products are materially injuring, or threatening material injury to, the CORE industry in the United States. Consistent with section 732(b)(1) of the Act, the

Petitions were accompanied by information reasonably available to the petitioners supporting their allegations.

Commerce finds that the petitioners filed the Petitions on behalf of the domestic industry, because the petitioners are interested parties, as defined in sections 771(9)(C) and (D) of the Act.[5] Commerce also finds that the petitioners demonstrated sufficient industry support for the initiation of the requested LTFV investigations.[6]

**Periods of Investigation**

Because the Petitions were filed on September 5, 2024, pursuant to 19 CFR 351.204(b)(1), the period of investigation (POI) for Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, and the UAE LTFV investigations is July 1, 2023, through June 30, 2024. Because Vietnam is a non-market economy (NME) country, pursuant to 19 CFR 351.204(b)(1), the POI for the Vietnam LTFV investigation is January 1, 2024, through June 30, 2024.

**Scope of the Investigations**

The product covered by these investigations is CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the UAE, and Vietnam. For a full description of the scope of these investigations, *see* the appendix to this notice.

**Comments on the Scope of the Investigations**

On September 9 and 16, 2024, Commerce requested information and clarification from the petitioners regarding the proposed scope to ensure that the scope language in the Petitions is an accurate reflection of the products for which the domestic industry is seeking relief.[7] On September 12 and 18, 2024, the petitioners provided clarifications and revised the scope.[8] The description of merchandise covered by these investigations, as described in the appendix to this notice, reflects these clarifications.

As discussed in the *Preamble* to Commerce's regulations, we are setting aside a period for interested parties to raise issues regarding product coverage

(*i.e.,* scope).[9] Commerce will consider all scope comments received from interested parties and, if necessary, will consult with interested parties prior to the issuance of the preliminary determinations. If scope comments include factual information,[10] all such factual information should be limited to public information. To facilitate preparation of its questionnaires, Commerce requests that scope comments be submitted by 5:00 p.m. Eastern Time (ET) on October 15, 2024, which is 20 calendar days from the signature date of this notice.[11] Any rebuttal comments, which may include factual information, and should also be limited to public information, must be filed by 5:00 p.m. ET on October 25, 2024, which is 10 calendar days from the initial comment deadline.

Commerce requests that any factual information that parties consider relevant to the scope of these investigations be submitted during that period. However, if a party subsequently finds that additional factual information pertaining to the scope of the investigations may be relevant, the party must contact Commerce and request permission to submit the additional information. All scope comments must be filed simultaneously on the records of the concurrent LTFV and CVD investigations.

**Filing Requirements**

All submissions to Commerce must be filed electronically via Enforcement and Compliance's Antidumping Duty and Countervailing Duty Centralized Electronic Service System (ACCESS), unless an exception applies.[12] An electronically filed document must be received successfully in its entirety by the time and date it is due.

**Comments on Product Characteristics**

Commerce is providing interested parties an opportunity to comment on the appropriate physical characteristics of CORE to be reported in response to Commerce's AD questionnaires. This

---

[1] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties," dated September 5, 2024 (the Petitions). Nucor is not a petitioner with respect to the AD/CVD petitions on CORE from Mexico. U.S. Steel, Wheeling-Nippon, and the USW are not petitioners with respect to the AD/CVD petitions on CORE from Canada.

[2] *Id.*

[3] *See* Commerce's Letters, "Supplemental Questions," dated September 9, 2024 (General Issues Questionnaire); *see also* Country-Specific AD Supplemental Questionnaires: Australia Supplemental, Brazil Supplemental, Canada Supplemental, Mexico Supplemental, the Netherlands Supplemental, South Africa Supplemental, Taiwan Supplemental, Türkiye Supplemental, UAE Supplemental, and Vietnam Supplemental, dated September 9, 2024; Commerce's Letter, "Second Supplemental Questions," dated September 16, 2024 (Second General Issues Questionnaire); Second Country-Specific AD Supplemental Questionnaires: the Netherlands Second Supplemental and Vietnam Second Supplemental, dated September 17, 2024; and Memorandum, "Phone Call," dated September 19, 2024.

[4] *See* Petitioners' Letters, "Response to General Issues Questionnaire and Amendment to Volume I of Petitions," dated September 12, 2024 (First General Issues Supplement); *see also* Country-Specific AD Supplemental Responses: Australia AD Supplement, Brazil AD Supplement, Canada AD Supplement, Mexico AD Supplement, the Netherlands AD Supplement, South Africa AD Supplement, Taiwan AD Supplement, Türkiye AD Supplement, UAE AD Supplement, and Vietnam AD Supplement, dated September 12, 2024; Petitioners' Letter, "Petitioner's Response to Second General Issues Supplemental Questionnaire and Amendment to Volume I of Petitions," dated September 18, 2024 (Second General Issues Supplement); Country-Specific AD Supplemental Responses: Second Netherlands AD Supplement and Second Vietnam AD Supplement, dated September 18, 2024; and Petitioners' Letter, "Response to Third General Issues Questionnaire and Amendment to Volume I of Petitions," dated September 20, 2024 (Third General Issues Supplement).

[5] SDI, Nucor, U.S. Steel, and Wheeling-Nippon are interested parties under section 771(9)(C) of the Act, while the USW is an interested party under section 771(9)(D) of the Act.

[6] *See* section on "Determination of Industry Support for the Petitions," *infra.*

[7] *See* General Issues Questionnaire; *see also* Second General Issues Questionnaire.

[8] *See* First General Issues Supplement at 7–9 and Exhibit Supp. I–55; *see also* Second General Issues Supplement at 2–3 and Exhibit 2nd Supp I–7.

[9] *See Antidumping Duties; Countervailing Duties, Final Rule,* 62 FR 27296, 27323 (May 19, 1997) (*Preamble*); *see also* 19 CFR 351.312.

[10] *See* 19 CFR 351.102(b)(21) (defining "factual information").

[11] *See* 19 CFR 351.303(b)(1).

[12] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures,* 76 FR 39263 (July 6, 2011); *see also Enforcement and Compliance: Change of Electronic Filing System Name,* 79 FR 69046 (November 20, 2014) for details of Commerce's electronic filing requirements, effective August 5, 2011. Information on using ACCESS can be found at *https://access.trade.gov/help.aspx* and a handbook can be found at *https://access.trade.gov/help/Handbook_on_Electronic_Filing_Procedures.pdf.*

information will be used to identify the key physical characteristics of the subject merchandise in order to report the relevant factors of production (FOP) or cost of production (COP) accurately, as well as to develop appropriate product comparison criteria.

Interested parties may provide any information or comments that they feel are relevant to the development of an accurate list of physical characteristics. Specifically, they may provide comments as to which characteristics are appropriate to use as: (1) general product characteristics; and (2) product comparison criteria. We note that it is not always appropriate to use all product characteristics as product comparison criteria. We base product comparison criteria on meaningful commercial differences among products. In other words, although there may be some physical product characteristics utilized by manufacturers to describe CORE, it may be that only a select few product characteristics take into account commercially meaningful physical characteristics. In addition, interested parties may comment on the order in which the physical characteristics should be used in matching products. Generally, Commerce attempts to list the most important physical characteristics first and the least important characteristics last.

In order to consider the suggestions of interested parties in developing and issuing the AD questionnaires, all product characteristics comments must be filed by 5:00 p.m. ET on October 15, 2024, which is 20 calendar days from the signature date of this notice.[13] Any rebuttal comments must be filed by 5:00 p.m. ET on October 25, 2024, which is 10 calendar days from the initial comment deadline. All comments and submissions to Commerce must be filed electronically using ACCESS, as explained above, on the record of each of the LTFV investigations.

## Determination of Industry Support for the Petitions

Section 732(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 732(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) at least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 732(c)(4)(D)

of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, Commerce shall: (i) poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the "industry."

Section 771(4)(A) of the Act defines the "industry" as the producers as a whole of a domestic like product. Thus, to determine whether a petition has the requisite industry support, the statute directs Commerce to look to producers and workers who produce the domestic like product. The U.S. International Trade Commission (ITC), which is responsible for determining whether "the domestic industry" has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both Commerce and the ITC apply the same statutory definition regarding the domestic like product,[14] they do so for different purposes and pursuant to a separate and distinct authority. In addition, Commerce's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[15]

Section 771(10) of the Act defines the domestic like product as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title." Thus, the reference point from which the domestic like product analysis begins is "the article subject to an investigation" (i.e., the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, the petitioners do not offer a definition of the domestic like product distinct from the scope of the investigations.[16] Based on our analysis

of the information submitted on the record, we have determined that CORE, as defined in the scope, constitutes a single domestic like product, and we have analyzed industry support in terms of that domestic like product.[17]

In determining whether the petitioners have standing under section 732(c)(4)(A) of the Act, we considered the industry support data contained in the Petitions with reference to the domestic like product as defined in the "Scope of the Investigations," in the appendix to this notice. To establish industry support, the petitioners provided the 2023 total shipments of the domestic like product for the U.S. producers and workers that support the Petitions and compared this to the estimated total 2023 shipments of the domestic like product for the entire domestic industry.[18] The petitioners estimated total shipments of the domestic like product for the entire domestic industry based on shipment data from the American Iron and Steel Institute and made certain adjustments to these data to approximate total shipments of the domestic like product in 2023.[19] Because total industry production data for the domestic like product for 2023 are not reasonably available to the petitioners, and the petitioners have established that shipments are a reasonable proxy for production data,[20] we have relied on the data provided by the petitioners for purposes of measuring industry support.[21]

On September 18, 2024, we received timely filed comments on industry support from several parties: Stelco, Inc. (Stelco), a Canadian producer/exporter of CORE;[22] ArcelorMittal Dofasco G.P. (Dofasco), a Canadian producer and exporter of CORE;[23] Ternium USA and Ternium Mexico S.A. de C.V. (collectively, Ternium), a U.S. producer

---

[13] See 19 CFR 351.303(b)(1).

[14] See section 771(10) of the Act.

[15] See USEC, Inc. v. United States, 132 F. Supp. 2d 1, 8 (CIT 2001) (citing Algoma Steel Corp., Ltd. v. United States, 688 F. Supp. 639, 644 (CIT 1988), aff'd Algoma Steel Corp., Ltd. v. United States, 865 F.2d 240 (Fed. Cir. 1989)).

[16] For a discussion of the domestic like product analysis as applied to these cases and information regarding industry support, see Checklists, "Antidumping Duty Investigation Initiation Checklists: Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam," dated

concurrently with, and hereby adopted by, this notice (Country-Specific AD Initiation Checklists), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam (Attachment II). These checklists are on file electronically via ACCESS.

[17] See Attachment II of the Country-Specific AD Initiation Checklists.

[18] Id.

[19] Id.

[20] Id.

[21] Id.

[22] See Stelco's Letter, "Comments on Industry Support for the Petitions and Request for Polling," dated September 18, 2024.

[23] See Dofasco's Letter, "Comments on Industry Support and Request for Industry Polling," dated September 18, 2024.

and importer of CORE and a Mexican producer/exporter of CORE, respectively; [24] and Government of Canada (GOC) and the Government of Ontario (collectively).[25] In its September 18, 2024, submission, Ternium stated that it opposed the Mexico AD Petition.[26] In addition, in consultations held by Commerce officials with representatives of the GOC on September 19, 2024, regarding the Canada CVD Petition, the GOC raised industry support concerns relating to both the CVD and AD Petitions.[27] On September 20, 2024, the petitioners responded to the comments from Stelco, GOC, Dofasco, and Ternium in timely filed rebuttal submissions.[28] Also on September 20, 2024, Stelco, Dofasco, and Ternium submitted additional comments.[29] On September 24, 2024, Ternium submitted additional comments and provided its 2023 shipments and production.[30]

Our review of the data provided in the Petitions, the First General Issues Supplement, Second General Issues Supplement, the Third General Issues Supplement, Petitioners' Response I, Petitioners' Response II, Petitioners' Response III, and other information readily available to Commerce, indicates that the petitioners have established industry support for the Petitions.[31] With respect to the Australia, Brazil, Mexico, Netherlands, South Africa, Taiwan, Türkiye, UAE, and Vietnam AD Petitions, we determine that the domestic producers and workers that

support these AD Petitions account for more than 50 percent of the total production of the domestic like product and, as such, Commerce is not required to take further action to evaluate industry support (*e.g.,* polling).[32] Second, the domestic producers and workers have met the statutory criteria for industry support under section 732(c)(4)(A)(i) of the Act because the domestic producers and workers who support the Australia, Brazil, Mexico, Netherlands, South Africa, Taiwan, Türkiye, UAE, and Vietnam AD Petitions account for at least 25 percent of the total production of the domestic like product.[33] Finally, the domestic producers and workers have met the statutory criteria for industry support under section 732(c)(4)(A)(ii) of the Act because the domestic producers and workers who support the Australia, Brazil, Mexico, Netherlands, South Africa, Taiwan, Türkiye, UAE, and Vietnam AD Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions.[34] Accordingly, Commerce determines that the Australia, Brazil, Mexico, Netherlands, South Africa, Taiwan, Türkiye, UAE, and Vietnam AD Petitions were filed on behalf of the domestic industry within the meaning of section 732(b)(1) of the Act.[35]

With respect to the Canada AD Petition, based on information provided in the Petition and supplemental responses thereto, we determine that the domestic producers (or workers) have met the statutory criteria for industry support under section 732(c)(4)(A)(i) of the Act, because the domestic producers (or workers) who support the Canada AD Petition account for at least 25 percent of the total production of the domestic like product.[36] Because the Canada AD Petition and supplemental submissions did not establish support from domestic producers (or workers) accounting for more than 50 percent of the total production of the domestic like product, Commerce was required to take further action in order to evaluate industry support.[37] In this case, Commerce was able to rely on other information, in accordance with section 732(c)(4)(D)(i) of the Act, to determine

industry support.[38] Based on information provided in the Petitions, supplemental responses, and other information readily available to Commerce, the domestic producers (or workers) have met the statutory criteria for industry support under section 732(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Canada AD Petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Canada AD Petition.[39] Accordingly, Commerce determines that the Canada AD Petition was filed on behalf of the domestic industry within the meaning of section 732(b)(1) of the Act.[40]

## Allegations and Evidence of Material Injury and Causation

The petitioners allege that the U.S. industry producing the domestic like product is being materially injured, or is threatened with material injury, by reason of the imports of the subject merchandise sold at LTFV. In addition, with respect to Brazil, Canada, Mexico, Taiwan, and Vietnam, the petitioners allege that subject imports exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[41] With respect to Australia, the Netherlands, South Africa, Türkiye, and the UAE, while the allegedly dumped imports from each of these countries do not individually exceed the statutory requirements for negligibility, the petitioners provided data demonstrating that the aggregate import share from these five countries is 9.01 percent, which exceeds the seven percent threshold established by the exception in section 771(24)(A)(ii) of the Act.[42]

The petitioners contend that the industry's injured condition is illustrated by the significant volume of subject imports; reduced market share; underselling and price depression and/or suppression; and low and declining capacity utilization; and declines in U.S. commercial shipment values, net sales values, operating income, and net

---

[24] *See* Ternium's Letters, "Comments on Petitioners' Standing," dated September 18, 2024 (Ternium Letter I), and "Entry of Appearance," dated September 13, 2024.

[25] *See* GOC and Government of Ontario's Letter, "Industry Support Comments," dated September 18, 2024.

[26] *See* Ternium Letter I at 3.

[27] *See* Memorandum, "Consultations with Officials from the Government of Canada.," dated September 19, 2024; *see also* GOC's Letter, "Government of Canada's Consultations Materials," dated September 20, 2024.

[28] *See* Petitioners' Letters, "Response to Comments on Industry Support and Request for Polling," dated September 20, 2024 (Petitioners' Response I), "Response to Comments on Industry Support," dated September 20, 2024 (Petitioners' Response II), and "Response to Comments on Petitioners' Standing," dated September 20, 2024 (Petitioners' Response III).

[29] *See* Stelco's Letter, "Rebuttal Comments on Industry Support for the Petitions and Request for Polling," dated September 20, 2024; *see also* Dofasco's Letter, "Rebuttal Comments to Petitioners' Response to the Second General Issues Questionnaire and Amendment to Volume I of Petitions," dated September 20, 2024; and Ternium's Letter, "Ternium's Second Comments on Petitioners' Standing," dated September 20, 2024.

[30] *See* Ternium's Letter, "Ternium's Third Comments on Petitioners' Standing," dated September 24, 2024.

[31] For further discussion, *see* Attachment II of the Country-Specific AD Initiation Checklists.

[32] *Id.; see also* section 732(c)(4)(D) of the Act.

[33] *See* Attachment II of the Country-Specific AD Initiation Checklists.

[34] *Id.*

[35] *Id.*

[36] *See* Attachment II of the Canada AD Initiation Checklist.

[37] *Id.; see also* section 732(c)(4)(D) of the Act.

[38] *See* Attachment II of the Canada AD Initiation Checklist.

[39] *Id.*

[40] *Id.*

[41] For further information regarding negligibility and the injury allegation, *see* Country-Specific AD Initiation Checklists at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Antidumping and Countervailing Duty Petitions Covering Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam (Attachment III).

[42] *See* Attachment III of the Country-Specific AD Initiation Checklists.

income.[43] We assessed the allegations and supporting evidence regarding material injury, threat of material injury, causation, cumulation, as well as negligibility, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[44]

### Allegations of Sales at LTFV

The following is a description of the allegations of sales at LTFV upon which Commerce based its decision to initiate LTFV investigations of imports of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the UAE, and Vietnam. The sources of data for the deductions and adjustments relating to U.S. price and normal value (NV) are discussed in greater detail in the Country-Specific AD Initiation Checklists.

### U.S. Price

For Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Türkiye, the UAE, and Vietnam, the petitioners based export price (EP) on the POI average unit values (AUVs) derived from official U.S. import statistics for imports of CORE produced in and exported from each country.[45] For Taiwan, the petitioners based EP on a transaction-specific AUV (*i.e.,* month- and port-specific AUV) derived from official import statistics and tied to ship manifest data.[46] For each country, the petitioners made certain adjustments to U.S. price to calculate a net ex-factory U.S. price, where applicable.[47]

### Normal Value [48]

For Australia, Brazil, Canada, Mexico, the Netherlands, Taiwan, Türkiye, and the UAE, the petitioners based NV on home market pricing information they obtained for CORE produced in and sold, or offered for sale, in the respective countries during the applicable time period.[49] For Canada, the Netherlands, and the UAE, the petitioners provided information indicating that the prices for CORE sold or offered for sale in the respective

countries were below the COP. Therefore, for Canada, the Netherlands, and the UAE, the petitioners based NV on constructed value (CV).[50] For South Africa, the petitioners stated that they were unable to obtain home market or third country pricing information for CORE to use as a basis for NV.[51] Therefore, for South Africa, the petitioners calculated NV based on CV.[52] For further discussion of CV for Canada, the Netherlands, South Africa, and the UAE, *see* the section ''Normal Value Based on Constructed Value,'' below.

Commerce considers Vietnam to be an NME country.[53] In accordance with section 771(18)(C)(i) of the Act, any determination that a foreign country is an NME country shall remain in effect until revoked by Commerce. Therefore, we continue to treat Vietnam as an NME country for purposes of the initiation of the Vietnam LTFV investigation. Accordingly, we base NV on FOPs valued in a surrogate market economy country in accordance with section 773(c) of the Act.

The petitioners claim that Morocco is an appropriate surrogate country for Vietnam because it is a market economy that is at a level of economic development comparable to that of Vietnam and is a significant producer of comparable merchandise.[54] The petitioners provided publicly available information from Morocco to value all FOPs.[55] Based on the information provided by the petitioners, we believe it is appropriate to use Morocco as a surrogate country for Vietnam to value all FOPs for initiation purposes.

Interested parties will have the opportunity to submit comments regarding surrogate country selection and, pursuant to 19 CFR 351.301(c)(3)(i), will be provided an opportunity to submit publicly available information to value FOPs within 30 days before the scheduled date of the preliminary determination.

### Factors of Production

Because information regarding the volume of inputs consumed by Vietnamese producers/exporters was not reasonably available, the petitioners used product-specific consumption rates from a U.S. producer of CORE as

a surrogate to value Vietnamese manufacturers' FOPs.[56] Additionally, the petitioners calculated factory overhead, selling, general, and administrative (SG&A) expenses, and profit based on the experience of a Moroccan producer of comparable merchandise.[57]

### Normal Value Based on Constructed Value

As noted above for Canada, the Netherlands, and the UAE, the petitioners provided information indicating that the prices for CORE sold or offered for sale in the respective countries were below the COP. Also as noted above, for South Africa, the petitioners stated that they were unable to obtain home market or third-country prices for CORE to use as a basis for NV. Therefore, for Canada, the Netherlands, South Africa, and the UAE, the petitioners calculated NV based on CV.[58]

Pursuant to section 773(e) of the Act, the petitioners calculated CV as the sum of the cost of manufacturing, SG&A expenses, financial expenses, and profit.[59] For Canada, the Netherlands, South Africa, and the UAE, in calculating the cost of manufacturing, the petitioners relied on the production experience and input consumption rates of a U.S. producer of CORE, valued using publicly available information applicable to the respective countries, where applicable.[60] In calculating SG&A expenses, financial expenses, and profit ratios, the petitioners relied on the fiscal year 2023 financial statements of producers of comparable merchandise domiciled in each country, respectively.[61]

### Fair Value Comparisons

Based on the data provided by the petitioners, there is reason to believe that imports of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the UAE, and Vietnam are being, or are likely to be, sold in the United States at LTFV. Based on comparisons of EP to NV in accordance with sections 772 and 773 of the Act, the estimated dumping margins for CORE for each of the countries covered by this initiation are as follows: (1) Australia—45.86 to 51.79 percent; (2) Brazil—52.03 to 107.67 percent; (3) Canada—19.73 to 52.08 percent; (4)

---

[43] *Id.*

[44] *Id.*

[45] *See* Country-Specific AD Initiation Checklists.

[46] *See* Taiwan AD Initiation Checklist.

[47] *See* Country-Specific AD Initiation Checklists.

[48] In accordance with section 773(b)(2) of the Act, for the Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, and the UAE investigations, Commerce will request information necessary to calculate the constructed value (CV) and COP to determine whether there are reasonable grounds to believe or suspect that sales of the foreign like product have been made at prices that represent less than the COP of the product.

[49] *See* Country-Specific AD Initiation Checklists.

[50] *Id.*

[51] *See* South Africa AD Initiation Checklist.

[52] *Id.*

[53] *See, e.g., Raw Honey from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Changed Circumstances Review,* 89 FR 64411 (August 7, 2024), and accompanying NME Analysis Memorandum at 5.

[54] *See* Vietnam AD Initiation Checklist.

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *See* Country-Specific AD Initiation Checklists.

[59] *Id.*

[60] *Id.*

[61] *Id.*

Mexico—27.46 to 41.94 percent; (5) the Netherlands—12.70 to 20.51 percent; (6) South Africa—53.81 to 53.86 percent ; (7) Taiwan—67.81 percent; (8) Türkiye—18.30 to 34.59 percent; (9) the UAE—77.09 to 78.53 percent; and (10) Vietnam—195.23 percent.[62]

## Initiation of LTFV Investigations

Based upon the examination of the Petitions and supplemental responses, we find that they meet the requirements of section 732 of the Act. Therefore, we are initiating LTFV investigations to determine whether imports of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the UAE, and Vietnam are being, or are likely to be, sold in the United States at LTFV. In accordance with section 733(b)(1)(A) of the Act and 19 CFR 351.205(b)(1), unless postponed, we will make our preliminary determinations no later than 140 days after the date of these initiations.

## Respondent Selection

*Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, and Türkiye*

In the Petitions, the petitioners identified six companies in Australia, eight companies in Brazil, five companies in Canada, six companies in Mexico, seven companies in the Netherlands, three companies in South Africa, and 27 companies in Türkiye as producers/exporters of CORE.[63] Following standard practice in LTFV investigations involving market economy countries, in the event Commerce determines that the number of companies is large, and it cannot individually examine each company based upon Commerce's resources, where appropriate, Commerce intends to select mandatory respondents based on U.S. Customs and Border Protection (CBP) data for imports under the appropriate Harmonized Tariff Schedule of the United States (HTSUS) subheading(s) listed in the ''Scope of the Investigations,'' in the appendix.

On September 23 and 25, 2024, Commerce released CBP data on imports of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, and Türkiye under administrative protective order (APO) to all parties with access to information protected by APO and indicated that interested parties wishing to comment on CBP data and/or respondent selection must do so within three business days of the

publication date of the notice of initiation of these investigations.[64] Comments must be filed electronically using ACCESS. An electronically filed document must be received successfully in its entirety via ACCESS by 5:00 p.m. ET on the specified deadline. Commerce will not accept rebuttal comments regarding the CBP data or respondent selection.

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305(b). Instructions for filing such applications may be found on Commerce's website at *https://www.trade.gov/administrative-protective-orders.*

### Taiwan

In the Petitions, the petitioners identified 13 companies in Taiwan as producers and/or exporters of CORE.[65] In the event that Commerce determines that the number of companies is large, and it cannot individually examine each company based upon Commerce's resources, where appropriate, Commerce intends to select mandatory respondents based on quantity and value (Q&V) questionnaires issued to potential respondents. Following standard practice in LTFV investigations involving market economy countries, Commerce would normally select respondents based on CBP entry data for imports under the appropriate HTSUS subheading(s) listed in the ''Scope of the Investigations'' in the Appendix. However, for the Taiwan LTFV investigation, due to the existing AD order on imports of CORE from Taiwan,[66] we cannot rely on CBP data in selecting respondents. Accordingly, for Taiwan, Commerce will send Q&V questionnaires to each producer and/or exporter for which there is complete address information on the record.

Commerce will post the Q&V questionnaire along with filing instructions on Commerce's website at *https://www.trade.gov/ec-adcvd-case-announcements.* Producers/exporters of CORE from Taiwan that do not receive Q&V questionnaires may still submit a

response to the Q&V questionnaire and can obtain a copy of the Q&V questionnaire from Commerce's website. Responses to the Q&V questionnaire must be submitted by the relevant Taiwanese producers/exporters no later than 5:00 p.m. ET on October 9, 2024, which is two weeks from the signature date of this notice. All Q&V questionnaire responses must be filed electronically via ACCESS. An electronically filed document must be received successfully, in its entirety, by ACCESS no later than 5:00 p.m. ET on the deadline noted above.

### UAE

In the Petitions, the petitioners named five companies in the UAE as producers and/or exporters of CORE.[67] In the event that Commerce determines that the number of companies is large, and it cannot individually examine each company based upon Commerce's resources, where appropriate, Commerce intends to select mandatory respondents based on Q&V questionnaires issued to potential respondents. Following standard practice in LTFV investigations involving market economy countries, Commerce would normally select respondents based on CBP entry data for imports under the appropriate HTSUS subheading(s) listed in the ''Scope of the Investigations'' in the Appendix. However, for the UAE LTFV investigation, due to Commerce's determination that certain imports of CORE from the UAE are circumventing the AD order on CORE from the People's Republic of China,[68] we cannot rely on CBP data in selecting respondents. Accordingly, for the UAE, Commerce will send Q&V questionnaires to each producer and/or exporter for which there is complete address information on the record.

Commerce will post the Q&V questionnaire along with filing instructions on Commerce's website at *https://www.trade.gov/ec-adcvd-case-announcements.* Producers/exporters of CORE from the UAE that do not receive Q&V questionnaires may still submit a response to the Q&V questionnaire and can obtain a copy of the Q&V questionnaire from Commerce's website. Responses to the Q&V questionnaire must be submitted by the relevant UAE producers/exporters no later than 5:00 p.m. ET on October 9, 2024, which is two weeks from the signature date of

---

[62] *Id.*

[63] *See* Petitions at Volume I (page 27 and Exhibits I–9 through I–14 and I–16); *see also* First General Issues Supplement at 7 and Exhibits Supp. I–14 and Supp. I–16.

[64] *See* Country-Specific Memoranda, ''Release of U.S. Customs and Border Protection Entry Data,'' dated September 23 and 25, 2024.

[65] *See* Petitions at Volume I (page 27 and Exhibit I–15); *see also* First General Issues Supplement at 7 and Exhibit Supp. I–15.

[66] *See Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,* 81 FR 48390 (July 25, 2016); *see also Corrosion-Resistant Steel Products from Taiwan: Notice of Third Amended Final Determination of Sales at Less Than Fair Value Pursuant to Court Decision and Partial Exclusion from Antidumping Duty Order,* 88 FR 58245 (August 25, 2023).

[67] *See* Petitions at Volume I (page 27 and Exhibit I–17).

[68] *See Certain Corrosion-Resistant Steel Products from the People's Republic of China: Affirmative Final Determination of Circumvention Involving the United Arab Emirates,* 85 FR 41957 (July 13, 2020).

this notice. All Q&V questionnaire responses must be filed electronically via ACCESS. An electronically filed document must be received successfully, in its entirety, by ACCESS no later than 5:00 p.m. ET on the deadline noted above.

*Vietnam*

In the Petitions, the petitioners named 17 companies in Vietnam as producers and/or exporters of CORE.[69] Our standard practice for respondent selection in AD investigations involving NME countries is to select respondents based on quantity and value (Q&V) questionnaires in cases where Commerce has determined that the number of companies is large, and it cannot individually examine each company based upon its resources. Therefore, considering the number of producers and/or exporters identified in the Petitions, Commerce will solicit Q&V information that can serve as a basis for selecting exporters for individual examination in the event that Commerce determines that the number is large and decides to limit the number of respondents individually examined pursuant to section 777A(c)(2) of the Act. There are 17 Vietnamese producers and/or exporters identified in the Petitions. Commerce has determined that this number of producers and/or exporters is large, and thus, it will issue Q&V questionnaires to each potential respondent for which there is complete address information on the record.

Commerce will post the Q&V questionnaires along with filing instructions on Commerce's website at *https://www.trade.gov/ec-adcvd-case-announcements.* Producers/exporters of CORE from Vietnam that do not receive Q&V questionnaires may still submit a response to the Q&V questionnaire and can obtain a copy of the Q&V questionnaire from Commerce's website. Responses to the Q&V questionnaire must be submitted by the relevant Vietnamese producers/exporters no later than 5:00 p.m. ET on October 9, 2024, which is two weeks from the signature date of this notice. All Q&V questionnaire responses must be filed electronically via ACCESS. An electronically filed document must be received successfully, in its entirety, by ACCESS no later than 5:00 p.m. ET on the deadline noted above.

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305(b). As stated above, instructions for filing

such applications may be found on Commerce's website at *https://www.trade.gov/administrative-protective-orders.*

*Separate Rates*

In order to obtain separate rate status in an NME investigation, exporters and producers must submit a separate rate application. The specific requirements for submitting a separate rate application in an NME investigation are outlined in detail in the application itself, which is available on Commerce's website at *https://access.trade.gov/Resources/nme/nme-sep-rate.html.* The separate rate application will be due 30 days after publication of this initiation notice. Exporters and producers must file a timely separate rate application if they want to be considered for individual examination. Exporters and producers who submit a separate rate application and have been selected as mandatory respondents will be eligible for consideration for separate rate status only if they respond to all parts of Commerce's AD questionnaire as mandatory respondents. Commerce requires that companies from Vietnam submit a response both to the Q&V questionnaire and to the separate rate application by the respective deadlines to receive consideration for separate rate status. Companies not filing a timely Q&V questionnaire response will not receive separate rate consideration.

**Use of Combination Rates**

Commerce will calculate combination rates for certain respondents that are eligible for a separate rate in an NME investigation. The Separate Rates and Combination Rates Bulletin states:

{w}hile continuing the practice of assigning separate rates only to exporters, all separate rates that {Commerce} will now assign in its NME investigation will be specific to those producers that supplied the exporter during the period of investigation. Note, however, that one rate is calculated for the exporter and all of the producers which supplied subject merchandise to it during the period of investigation. This practice applies both to mandatory respondents receiving an individually calculated separate rate as well as the pool of non-investigated firms receiving the {weighted average} of the individually calculated rates. This practice is referred to as the application of "combination rates" because such rates apply to specific combinations of exporters and one or more producers. The cash-deposit rate assigned to an exporter will apply only to merchandise both exported by the firm in question *and* produced by a firm that supplied the exporter during the period of investigation.[70]

**Distribution of Copies of the Petitions**

In accordance with section 732(b)(3)(A) of the Act and 19 CFR 351.202(f), copies of the public version of the Petitions have been provided to the governments of Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the UAE, and Vietnam via ACCESS. To the extent practicable, we will attempt to provide a copy of the public version of the Petitions to each exporter named in the Petitions, as provided under 19 CFR 351.203(c)(2).

**ITC Notification**

Commerce will notify the ITC of our initiation, as required by section 732(d) of the Act.

**Preliminary Determinations by the ITC**

The ITC will preliminarily determine, within 45 days after the date on which the Petitions were filed, whether there is a reasonable indication that imports of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the UAE, and/or Vietnam are materially injuring, or threatening material injury to, a U.S. industry.[71] A negative ITC determination for any country will result in the investigation being terminated with respect to that country.[72] Otherwise, these LTFV investigations will proceed according to statutory and regulatory time limits.

**Submission of Factual Information**

Factual information is defined in 19 CFR 351.102(b)(21) as: (i) evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by Commerce; and (v) evidence other than factual information described in (i)–(iv). Section 351.301(b) of Commerce's regulations requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted[73] and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or

[69] *See* Petitions at Volume I (page 27 and Exhibit I–18); *see also* First General Issues Supplement at 7 and Exhibit Supp. I–18.

[70] *See* Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in

Antidumping Investigation involving NME Countries," (April 5, 2005) at 6 (emphasis added), available on Commerce's website at *https://access.trade.gov/Resources/policy/bull05-1.pdf.*

[71] *See* section 733(a) of the Act.

[72] *Id.*

[73] *See* 19 CFR 351.301(b).

correct.[74] Time limits for the submission of factual information are addressed in 19 CFR 351.301, which provides specific time limits based on the type of factual information being submitted. Interested parties should review the regulations prior to submitting factual information in these investigations.

## Particular Market Situation Allegation

Section 773(e) of the Act addresses the concept of particular market situation (PMS) for purposes of CV, stating that ''if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology.'' When an interested party submits a PMS allegation pursuant to section 773(e) of the Act (*i.e.,* a cost-based PMS allegation), the submission must be filed in accordance with the requirements of 19 CFR 351.416(b), and Commerce will respond to such a submission consistent with 19 CFR 351.301(c)(2)(v). If Commerce finds that a cost-based PMS exists under section 773(e) of the Act, then it will modify its dumping calculations appropriately.

Neither section 773(e) of the Act, nor 19 CFR 351.301(c)(2)(v), sets a deadline for the submission of cost-based PMS allegations and supporting factual information. However, in order to administer section 773(e) of the Act, Commerce must receive PMS allegations and supporting factual information with enough time to consider the submission. Thus, should an interested party wish to submit a cost-based PMS allegation and supporting new factual information pursuant to section 773(e) of the Act, it must do so no later than 20 days after submission of a respondent's initial section D questionnaire response.

We note that a PMS allegation filed pursuant to sections 773(a)(1)(B)(ii)(III) or 773(a)(1)(C)(iii) of the Act (*i.e.,* a sales-based PMS allegation) must be filed within 10 days of submission of a respondent's initial section B questionnaire response, in accordance with 19 CFR 351.301(c)(2)(i) and 19 CFR 351.404(c)(2).

## Extensions of Time Limits

Parties may request an extension of time limits before the expiration of a time limit established under 19 CFR 351.301, or as otherwise specified by Commerce. In general, an extension

request will be considered untimely if it is filed after the expiration of the time limit established under 19 CFR 351.301, or as otherwise specified by Commerce.[75] For submissions that are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. ET on the due date. Under certain circumstances, Commerce may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, we will inform parties in a letter or memorandum of the deadline (including a specified time) by which extension requests must be filed to be considered timely. An extension request must be made in a separate, standalone submission; under limited circumstances we will grant untimely filed requests for the extension of time limits, where we determine, based on 19 CFR 351.302, that extraordinary circumstances exist. Parties should review Commerce's regulations concerning the extension of time limits and the *Time Limits Final Rule* prior to submitting factual information in these investigations.[76]

## Certification Requirements

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[77] Parties must use the certification formats provided in 19 CFR 351.303(g).[78] Commerce intends to reject factual submissions if the submitting party does not comply with the applicable certification requirements.

## Notification to Interested Parties

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. Parties wishing to participate in these investigations should ensure that they meet the requirements of 19 CFR 351.103(d) (*e.g.,* by filing the required letter of appearance). Note that Commerce has amended certain of its

requirements pertaining to the service of documents in 19 CFR 351.303(f).[79]

This notice is issued and published pursuant to sections 732(c)(2) and 777(i) of the Act, and 19 CFR 351.203(c).

Dated: September 25, 2024.

**Ryan Majerus,**

*Deputy Assistant Secretary for Policy and Negotiations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

## Appendix

### Scope of the Investigations

The products covered by these investigations are certain flat-rolled steel products, either clad, plated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished, laminated, or coated with plastics or other non-metallic substances in addition to the metallic coating. The products covered include coils that have a width of 12.7 mm or greater, regardless of form of coil (*e.g.,* in successively superimposed layers, spirally oscillating, *etc.*). The products covered also include products not in coils (*e.g.,* in straight lengths) of a thickness less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness. The products covered also include products not in coils (*e.g.,* in straight lengths) of a thickness of 4.75 mm or more and a width exceeding 150 mm and measuring at least twice the thickness. The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process, *i.e.,* products which have been ''worked after rolling'' (*e.g.,* products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above:

(1) Where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

(2) where the width and thickness vary for a specific product (*e.g.,* the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of these investigations are products in which: (1) iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less, by weight.

Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including but not limited to annealing, tempering, painting,

[74] *See* 19 CFR 351.301(b)(2).

[75] *See* 19 CFR 351.301; *see also Extension of Time Limits; Final Rule,* 78 FR 57790 (September 20, 2013) (*Time Limits Final Rule*), available at *https://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm.*

[76] *See* 19 CFR 351.302; *see also, e.g., Time Limits Final Rule.*

[77] *See* section 782(b) of the Act.

[78] *See Certification of Factual Information to Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*). Additional information regarding the *Final Rule* is available at *https://access.trade.gov/Resources/filing/index.html.*

[79] *See Administrative Protective Order, Service, and Other Procedures in Antidumping and Countervailing Duty Proceedings,* 88 FR 67069 (September 29, 2023).

varnishing, trimming, cutting, punching and/or slitting or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the in-scope corrosion resistant steel.

All products that meet the written physical description are within the scope of these investigations unless specifically excluded. The following products are outside of and/or specifically excluded from the scope of these investigations:

• Flat-rolled steel products either plated or coated with tin, lead, chromium, chromium oxides, both tin and lead ("terne plate") or both chromium and chromium oxides ("tin free steel"), whether or not painted, varnished or coated with plastics or other non-metallic substances in addition to the metallic coating;

• Clad products in straight lengths of 4.7625 mm or more in composite thickness and of a width which exceeds 150 mm and measures at least twice the thickness;

• Certain clad stainless flat-rolled products, which are three-layered corrosion-resistant carbon steel flat-rolled products less than 4.75 mm in composite thickness that consist of a carbon steel flat-rolled product clad on both sides with stainless steel in a 20%-60%-20% ratio; and

Also excluded from the scope of the antidumping duty investigation on corrosion resistant steel from Taiwan are any products covered by the existing antidumping duty order on corrosion-resistant steel from Taiwan. *See Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,* 81FR 48390 (July 25, 2016); *Corrosion-Resistant Steel Products from Taiwan: Notice of Third Amended Final Determination of Sales at Less Than Fair Value Pursuant to Court Decision and Partial Exclusion from Antidumping Duty Order,* 88 FR 58245 (August 25, 2023).

Also excluded from the scope of the antidumping duty investigation on corrosion-resistant steel from the United Arab Emirates and the antidumping duty and countervailing duty investigations on corrosion-resistant steel from the Socialist Republic of Vietnam are any products covered by the existing antidumping and countervailing duty orders on corrosion-resistant steel from the People's Republic of China and the Republic of Korea and the antidumping duty order on corrosion-resistant steel from Taiwan. *See Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,* 81 FR 48390 (July 25, 2016); *see also Certain Corrosion-Resistant Steel Products from India, Italy, Republic of Korea and the People's Republic of China: Countervailing Duty Order,* 81 FR 48387 (July 25, 2016). This exclusion does not apply to imports of corrosion-resistant steel that are entered, or withdrawn from warehouse, for consumption in the United States for which the relevant importer and exporter certifications have been completed and maintained and all other applicable certification requirements have been met such that the entry is entered into the United States as not subject to the antidumping and countervailing duty orders on corrosion-resistant steel from the People's Republic of China, the antidumping and countervailing duty orders on corrosion-resistant steel from the Republic of Korea, or the antidumping duty order on corrosion-resistant steel from Taiwan.

The products subject to the investigations are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7210.30.0030, 7210.30.0060, 7210.41.0000, 7210.49.0030, 7210.49.0040, 7210.49.0045, 7210.49.0091, 7210.49.0095, 7210.61.0000, 7210.69.0000, 7210.70.6030, 7210.70.6060, 7210.70.6090, 7210.90.6000, 7210.90.9000, 7212.20.0000, 7212.30.1030, 7212.30.1090, 7212.30.3000, 7212.30.5000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7212.60.0000, 7225.91.0000, 7225.92.0000, 7226.99.0110, and 7226.99.0130.

The products subject to the investigations may also enter under the following HTSUS item numbers: 7210.90.1000, 7215.90.1000, 7215.90.3000, 7215.90.5000, 7217.20.1500, 7217.30.1530, 7217.30.1560, 7217.90.1000, 7217.90.5030, 7217.90.5060, 7217.90.5090, 7225.99.0090, 7226.99.0180, 7228.60.6000, 7228.60.8000, and 7229.90.1000.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the investigations is dispositive.

[FR Doc. 2024–22592 Filed 10–1–24; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[C–351–863, C–122–872, C–201–864, C–552–844]**

## Certain Corrosion-Resistant Steel Products From Brazil, Canada, Mexico, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable September 25, 2024.

**FOR FURTHER INFORMATION CONTACT:** Paul Senoyuit and Sofia Pedrelli at 202–482–6106 and 202–482–4310 (Brazil), Colin Thrasher at 202–482–3004 (Canada), Maria Teresa Aymerich at 202–482–0499 (Mexico), and Mary Kolberg at 202–482–1785 (the Socialist Republic of Vietnam (Vietnam)), AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

## The Petitions

On September 5, 2024, the U.S. Department of Commerce (Commerce) received countervailing duty (CVD) petitions concerning imports of certain corrosion-resistant steel products (CORE) from Brazil, Canada, Mexico, and Vietnam filed in proper form on behalf of Steel Dynamics, Inc. (SDI), Nucor Corporation (Nucor), United States Steel Corporation (U.S. Steel), Wheeling-Nippon Steel, Inc. (Wheeling-Nippon), and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC (the USW), domestic producers of CORE and a certified union, which represents workers engaged in the production of CORE in the United States (collectively, the petitioners).[1] The CVD petitions were accompanied by antidumping duty (AD) petitions concerning imports of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and Vietnam.[2]

Between September 9 and 19, Commerce requested supplemental information pertaining to certain aspects of the Petitions.[3] Between September 12 and 20, 2024, the petitioners filed timely responses to these requests for additional information.[4]

In accordance with section 702(b)(1) of the Tariff Act of 1930, as amended

---

[1] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties," dated September 5, 2024 (the Petitions). Nucor is not a petitioner with respect to the AD/CVD petitions on CORE from Mexico. U.S. Steel, Wheeling-Nippon, and the USW are not petitioners with respect to the AD/CVD petitions on CORE from Canada.

[2] *Id.*

[3] *See* Commerce's Letters, "Supplemental Questions," dated September 9, 2024 (General Issues Questionnaire), *see also* Country-Specific CVD Supplemental Questionnaires: Brazil Supplemental, Canada Supplemental, Mexico Supplemental, and Vietnam Supplemental, dated September 10 and 11, 2024; Commerce's Letter, "Second Supplemental Questions," dated September 16, 2024 (Second General Issues Questionnaire); and Memorandum, "Phone Call," dated September 19, 2024.

[4] *See* Petitioners' Letters, "Response to General Issues Questionnaire and Amendment to Volume I of Petitions," dated September 12, 2024 (First General Issues Supplement); *see also* Petitioners' Country-Specific CVD Supplemental Responses: Brazil CVD Supplement, Canada CVD Supplement, Mexico CVD Supplement, and Vietnam CVD Supplement, dated September 13 and 16, 2024; Petitioners' Letter, "Petitioners' Response to Second General Issues Supplemental Questionnaire and Amendment to Volume I of Petitions," dated September 18, 2024 (Second General Issues Supplement); and Petitioners' Letter, "Response to Third General Issues Questionnaire and Amendment to Volume I of Petitions," dated September 20, 2024 (Third General Issues Supplement).

Tab 2

Commerce's Respondent Selection Memo
(October 21,2024)

PR-80, CR-28

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-863
Investigation
~~Business Proprietary Document~~
E&C/OVIII: WH
**PUBLIC VERSION**

October 21, 2024

**MEMORANDUM TO:**     Scot Fullerton
                      Acting Deputy Assistant Secretary
                        for Antidumping and Countervailing Duty Operations

**THROUGH:**           Kathleen Marksberry
                      Director, Office VIII
                      Antidumping and Countervailing Duty Operations

**FROM:**              William Horn
                      Katerina Katsiadas
                      International Trade Compliance Analysts, Office VIII
                      Antidumping and Countervailing Duty Operations

**RE:**                Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant
                      Steel Products from Mexico:  Respondent Selection

---

## I.     SUMMARY

For the reasons detailed below, we recommend selecting, in alphabetical order, GALVASID SA
DE CV (Galvasid) and TERNIUM MEXICO SA DE CV (Ternium) as the mandatory
respondents in this less-than-fair-value (LTFV) investigation.

## II.     BACKGROUND

On September 5, 2024, the U.S. Department of Commerce (Commerce) received a petition
concerning imports of certain corrosion-resistant steel products (CORE) from Mexico filed on
behalf of Steel Dynamics, Inc. (SDI), United States Steel Corporation (U.S. Steel), Wheeling-
Nippon Steel, Inc. (Wheeling-Nippon), and the United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO,
CLC (the USW), domestic producers of CORE and a certified union, which represents workers
engaged in the production of CORE in the United States (collectively, the petitioners).[1]  The
period of investigation (POI) is July 1, 2023, through June 30, 2024.

---

[1] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties," dated September
5, 2024 (Petition).

On October 2, 2024, Commerce initiated an LTFV investigation of CORE from Mexico.[2] In the "Respondent Selection" section of the *Initiation Notice*, Commerce stated that it intended to select respondents based on U.S. Customs and Border Protection (CBP) data for entries of CORE from Mexico made under the Harmonized Tariff Schedule of the United States (HTSUS) subheading(s) listed in the "scope of investigations," in the appendix.[3]

Accordingly, on September 25, 2024, Commerce released the CBP data to all interested parties under an administrative protective order and requested comments regarding the data and respondent selection.[4] On October 7, 2024, we received comments regarding the data and respondent selection from the Petitioners[5] and Ternium.[6] We received no other comments from interested parties.

## III. DISCUSSION OF ISSUES

### Issue 1: Limiting Examination to a Reasonable Number of Companies

Applicable Statutory Provision

Section 777A(c)(1) of the Tariff Act of 1930, as amended (the Act), directs Commerce to determine an individual weighted-average dumping margin for each known exporter and producer of the subject merchandise. Commerce, however, may limit its examination to a reasonable number of exporters or producers under section 777A(c)(2) of the Act and 19 CFR 351.204(c)(2), if it determines that it is not practicable to determine individual weighted-average dumping margins because of the large number of exporters or producers involved in the investigation.

Analysis

The Petition identified six exporters or producers of CORE from Mexico,[7] and the CBP data indicate there are 142[8] companies attributable to entries during the POI under the HTSUS subheadings identified by the scope.

Ideally, in an investigation, Commerce would examine all known exporters and producers. However, in instances where Commerce must limit its examination due to the large number of

---

[2] *See Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 89 FR 80196 (October 2, 2024) (*Initiation Notice*).

[3] *Id.*, 89 FR at 80203.

[4] *See* Memorandum, "Release of U.S. Customs and Border Protection Data," dated September 25, 2024 (CBP Data Memorandum).

[5] *See* Petitioner's Letter, "Comments on U.S. Customs and Border Protection Data and Respondent Selection," dated October 7, 2024 (Petitioners' Respondent Selection Comments).

[6] *See* Ternium's Letter, "Comments on U.S. Customs and Border Protection Data and Respondent Selection," dated October 7, 2024 (Ternium's Respondent Selection Comments).

[7] *See* Petitions at Volume I (page 27 and Exhibits I–9 through I–14 and I–16).

[8] *See* CBP Data Memorandum at Attachment.

potential respondents relative to its resource constraints, Commerce will examine as many exporters and producers as is practicable, consistent with its statutory obligation.

While section 777A(c)(2) of the Act does not define a "large number of exporters or producers," we find that the number of exporters and producers included in the Petition constitutes a large number. Accordingly, we conclude that it would not be practicable in this investigation to examine each known exporter and producer individually and determine an individual weighted-average dumping margin for each. Examining all known exporters and producers would require significant resources for Commerce to analyze each company's corporate structure, accounting and selling practices, and production information.

In addition to this investigation, Antidumping Duty (AD)/CVD Operations Office VIII, the office to which this investigation is assigned, is conducting numerous concurrent AD and CVD proceedings.[9] Further, because this is an investigation, verification will be mandatory.[10] The complexity of the above factors, combined with overlapping statutory deadlines of other AD and CVD proceedings, as well as Office VIII's heavy workload, place a significant constraint on the number of analysts that can be assigned to this case and, thus, limit the number of respondents Commerce can reasonably examine. Moreover, because of the significant workload throughout Enforcement and Compliance, Office VIII does not anticipate receiving any additional resources to devote to this investigation.

In light of the large number of known exporters or producers of CORE from Mexico, Commerce's current resource constraints and practical considerations outlined above, and after careful consideration, we find that it is not practicable to individually examine all known exporters or producers of CORE from Mexico as directed by section 777A(c)(1) of the Act.

---

[9] AD/CVD Operations Office VIII is currently conducting numerous concurrent and complex AD and CVD investigations and administrative reviews. Examples include, but are not limited to: AD investigation of alkyl phosphate esters from China; CVD investigation of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from Thailand; AD investigations of dioctyl terephthalate from Türkiye and Taiwan; AD and CVD investigations of ferrosilicon from Brazil; AD and CVD investigations of melamine from the Federal Republic of Germany (Germany); AD administrative review of mattresses from Indonesia; AD and CVD administrative reviews of collated steel staples from China; AD administrative review of CORE from Korea; CVD changed circumstances review of CORE from Korea; AD and CVD administrative reviews of certain carbon and alloy steel cut-to-length plate from Korea; AD administrative review of forged steel fittings from China; CVD administrative review of forged steel fluid end blocks from Germany; CVD administrative review of multilayered wood flooring from China; AD administrative reviews of steel nails from China and Taiwan; AD and CVD administrative reviews of large diameter welded pipe from Korea; CVD administrative reviews of phosphate fertilizers from the Kingdom of Morocco and the Russian Federation; AD and CVD administrative reviews of granular PTFE resin from India; AD and CVD administrative reviews of wood mouldings and millwork products from China; AD administrative review of CVP-23 from India.

[10] *See* section 782(i)(1) of the Act.

Recommendation

For the reasons discussed above, we recommend limiting Commerce's examination of respondents in this investigation to a reasonable number of exporters or producers, consistent with section 777A(c)(2) of the Act and 19 CFR 351.204(c)(2).

☒                    ☐
_____         _____
Agree               Disagree

**Issue 2: Selection of Respondents**

Applicable Statutory Provision

Where it is not practicable to examine all known exporters and producers of the subject merchandise, section 777A(c)(2) of the Act permits Commerce to determine the weighted-average dumping margins for a reasonable number of exporters or producers, by limiting its examination to: (1) a sample of exporters, producers, or types of products that it determines is statistically valid based on the information available to it at the time of selection; or (2) the exporters or producers accounting for the largest volume of the subject merchandise from the exporting country that Commerce determines can be reasonably examined.[11] The Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA) interprets this provision to mean that the authority to select respondents, whether by using a statistically valid sample or by examining respondents accounting for the largest volume of subject merchandise, rests exclusively with Commerce.[12]

Comments

The petitioner states that that Commerce should select the two largest exporters, Galvasid and Ternium, as the mandatory respondents in this investigation based on the CBP data.[13] The petitioner submits that the U.S. Court of International Trade has found that a reasonable number of exporters or producers does not encompass a quantity of one.[14] Further, the petitioner comments that the two largest exporters would ensure that Commerce provides as accurate a representation as possible of the level of dumping of subject CORE from Mexico.

Ternium states that it should be selected as a mandatory respondent in this investigation based on its portion of the total imports of CORE from Mexico in the CBP data.[15]

---

[11] *See* section 777A(c)(2)(A) and (B) of the Act.
[12] *See* SAA, H.R. Doc. 103-316, vol. 1 (1994) at 872.
[13] *See* Petitioners' Respondent Selection Comments at 2.
[14] *Id.* (citing *Schaefler Italia S. R.L. v. United States*, 781 F. Supp. 2d 1358, 1362-63 (CIT 2011)).
[15] *See* Ternium's Respondent Selection Comments at 2.

Analysis

In this investigation, we are selecting respondents accounting for the largest volume of subject merchandise that can be reasonably examined, consistent with section 777A(c)(2)(B) of the Act. This methodology is transparent and consistent with the methodology used in other AD proceedings.  Furthermore, no party has argued that Commerce should select respondents for limited examination pursuant to 777A(c)(2)(A) (*i.e.*, based on sampling).

To determine the exporters and producers which account for the largest volume of subject merchandise, we reviewed the CBP entry data for each company listed in the petition in terms of the aggregated volume of entries of subject merchandise attributed to that company into the United States during the POI.  We ranked these companies by the total volume of entries into the United States during the POI.[16]  An individual examination of the two exporters and/or producers that account for the largest volume of entries of subject merchandise during the POI will allow Commerce to capture the largest volume of exports Commerce can reasonably examine, in light of resource constraints and in compliance with the statutory requirements.

Following these parameters, we selected the top two exporters and/or producers of CORE entered for consumption into the United States.  Based on the CBP data, the two exporters and/or producers with the largest volume of entries of subject merchandise, are, in alphabetical order: Galvasid and Ternium.[17]

Recommendation

For the reasons discussed above, we recommend selecting Galvasid and Ternium, the two exporters and/or producers that account for the largest volume of subject merchandise, for individual examination as mandatory respondents in this investigation.

☒                    ☐
_____          _____
Agree                Disagree

10/21/2024

X  *Scot 7. Fullerton*  _____

Signed by: SCOT FULLERTON

Scot Fullerton
Acting Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

---

[16] *See* Attachment for the top ten companies by volume of exports to the United States during the POI, based on CBP entry data.
[17] *See* Attachment.  According to CBP, the names and addresses of the largest exporters and/or producers do not constitute business proprietary information.

**Attachment**

*Public Version*

1. Exporters/Producers Total Exports
   Quantity: [   ] kilograms of CORE.

2. The following chart identifies the entry volume (%) of exports of CORE from the top ten

   Mexican companies during the POI.

   Source: CBP

| Company Name | Total Quantity (Gross in Kgs) | | Entry Volume (%) | |
|---|---|---|---|---|
| TERNIUM MEXICO SA DE CV | [ | | | ] |
| GALVASID SA DE CV | [ | | | ] |
| POSCO MEXICO, S.A. DE C.V. | [ | | | ] |
| PRODUCTOS LAMINADOS DE MONETRREY | [ | | | ] |
| LAMINA Y PLACA COMERCIAL SA DE CV | [ | | | ] |
| ESJ SA DE CV | [ | | | ] |
| METAL DECKING SOLUTIONS SA DE CV | [ | | | ] |
| CONSERVAS COSTENA | [ | | | ] |
| NUCOR JFE STEEL MEXICO S DE RL | [ | | | ] |
| SERVIACERO PLANOS SA DE CV | [ | | | ] |
| All other 132 companies | [ | | | ] |
| **Total** | [ | ] | 100 | |

6

Tab 3

Commerce's Initial Questionnaire
(November 18, 2024)

PR-111

Barcode:4665870-01 A-201-863 INV - Investigation -

**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-201-863
Investigation
Public Document
OVIII:KK

NOVEMBER 18, 2024

Galvasid S.A. de C.V.
c/o Jeffrey M. Winton
Winton & Chapman PLLC
1100 13th Street NW Suite 825
Washington, DC 20005

Re:  Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products (CORE) from Mexico:  Request for Information

Dear Mr. Winton,

I am writing to you on behalf of Enforcement and Compliance, a unit of the United States Department of Commerce.  On October 2, 2024, we initiated an investigation pursuant to section 732 of the Tariff Act of 1930, as amended (the Act), to determine whether merchandise imported into the United States that you are believed to produce and/or export is being sold at less-than-fair-value, i.e., at dumped prices.  Dumping occurs when imported merchandise is sold in, or for export to, the United States at less than the normal value of the merchandise; *i.e.*, the United States price is less than the price at which identical or similar merchandise is sold in a foreign market (usually the home market of the producer and/or exporter of the merchandise), or is less than the constructed value of the merchandise.  The product under investigation is CORE from MEXICO.  We began the investigation based on a petition filed Steel Dynamics, Inc. (SDI), United States Steel Corporation (U.S. Steel), Wheeling-Nippon Steel, Inc. (Wheeling-Nippon), and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC (the USW), on behalf of the United States industry producing the merchandise under investigation.

On October 21, 2024, the United States International Trade Commission (ITC) preliminarily determined that there is a reasonable indication that imports of the product under investigation are materially injuring or threatening material injury to) the United States industry.  We will now determine whether sales of the subject merchandise in, or to, the United States are being dumped. If so, the ITC will decide whether those dumped imports are materially injuring, or threatening material injury to, the United States industry.  If both Commerce and the ITC issue affirmative final determinations, we will issue an antidumping duty order.

We are soliciting the information requested in the enclosed questionnaire to determine whether subject merchandise that you produced and/or exported was in fact sold in, or to, the United States at dumped prices.  General instructions for responding to the questionnaire follow immediately after the table of contents.  We have divided the questionnaire into five sections, A

Filed By: William Horn, Filed Date: 11/18/24 12:03 PM, Submission Status: Approved

through E, and attached supplemental information, including a glossary of terms, in Appendices I through VII.  Please review the contents page and ensure that you have received all the sections of the questionnaire.  If you have not received the entire questionnaire, please contact the official in charge immediately.

You are requested to respond to sections A (General Information), B (Sales in the Home Market or to Third Countries), C (Sales to the United States), and D (Cost of Production/Constructed Value).[1]

You are not currently required to respond to section E (Cost of Further Manufacturing or Assembly Performed in the United States).  However, we may request a response to this section if we determine, based on your response to section A, that we require the information to account for further-processing expenses incurred in the United States.

Please refer to the cover page and general instructions of the enclosed questionnaire for the time period covered by this investigation, the due dates for responding to the questionnaire, and the instructions for filing the response.  We remind you that, beginning August 5, 2011, with certain, limited exceptions, all submissions for all proceedings must be filed electronically using Enforcement and Compliance's ACCESS.  An electronically filed document must be received successfully in its entirety by Commerce's electronic records system, ACCESS, by 5 p.m. Eastern Time (ET) on the date indicated on the cover page of the enclosed questionnaire.  Note that Commerce has amended certain requirements pertaining to the service of documents in section 351.303(f) of our regulations.[2]

For your convenience, Commerce has the following resources available online to assist you in complying with these electronic filing procedures:

ACCESS:  Help Link
https://access.trade.gov/help.aspx

ACCESS:  External User Guide
https://access.trade.gov/help/ACCESS_User_Guide.pdf

ACCESS:  Handbook on Electronic Filing Procedures
https://access.trade.gov/help/Handbook_on_Electronic_Filing_Procedures.pdf

*Federal Register* notice:  *Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures*, 76 FR 39263 (July 6, 2011)

---

[1] On June 29, 2015, President Obama signed into law The Trade Preferences Extension Act of 2015, Public Law 114-27 (the "Act"), which provides a number of amendments to the antidumping duty ("AD") and countervailing duty ("CVD") laws.  Under the amendment of Section 773(b)(2) of the Tariff Act of 1930, 19 U.S.C. § 1677b(b)(2), Commerce will request constructed value and cost of production information from respondent companies in all AD proceedings.  Therefore, you must submit a full response to Section D of this questionnaire.

[2] *See Administrative Protective Order, Service, and Other Procedures in Antidumping and Countervailing Duty Proceedings; Final Rule*, 88 FR 67069 (September 29, 2023).

2

http://www.gpo.gov/fdsys/pkg/FR-2011-07-06/pdf/2011-16352.pdf and *Enforcement and Compliance:  Change of Electronic Filing System Name,* 79 FR 69046 (November 20, 2014) http://www.gpo.gov/fdsys/pkg/FR-2014-11-20/pdf/2014-27530.pdf

Please note that revised certification requirements are in effect for company/government officials as well as their representatives.  In all segments of antidumping duty or countervailing duty proceedings, parties submitting factual information must use the formats for the revised certifications provided at the end of the *Final Rule*.[3]  Templates for these certificates are included as an appendix to this questionnaire.

Commerce must conduct this investigation in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadline, or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response.  If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline.  Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request.  Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request.  Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  Commerce will not accept any requested information submitted after the deadline.  As required by section 351.302(d) of our regulations, we will reject such submissions as untimely.  Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

**DEADLINE FOR SUBMISSION**:  **Your response is due no later than 5:00 p.m. Eastern Time on December 9, 2024 and December 25, 2024.**  Questionnaire responses normally entail the filing of many exhibits and databases on ACCESS.  Accordingly, to the extent you submit your filing on the day it is due, rather than earlier, we strongly recommend that you begin uploading your response **no later than 12:00 noon on the above due date**.  A questionnaire response must be filed in its entirety by the deadline to be considered timely.[4]

---

[3] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings*, 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* the frequently asked questions regarding the *Final Rule*, available at http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf. Templates for these certifications are included as an appendix to this questionnaire.
[4] 19 CFR 351.303(b)(1).

3

**EXTENSIONS:**   **Note well:**  Any extension request must be filed in writing.  Extension requests filed after 5 p.m. on the due date will not be granted, except in extraordinary circumstances.  An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[5]  An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[6]  Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires."[7]  For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[8]

**Note well**:

Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on its disposition.  Parties should not assume that they will receive an extension of a time limit if they have not received a response from Commerce.  For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day**. *See* 19 CFR 351.103(b).[9]  **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues.  When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties.  The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.
Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

---

[5] 19 CFR 351.302(a)(2).
[6] *See Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).
[7] *Id.* at 57792.
[8] *Id.*
[9] *Id.* (emphasis added).

Should you have any questions about this matter, please contact Katerina Katsiadas (202) 482-4929.

Sincerely,

Rebecca Trainor
Program Manager
AD/CVD Operations, Office VIII

Enclosure

5

# UNITED STATES DEPARTMENT OF COMMERCE
# ENFORCEMENT AND COMPLIANCE
# ANTIDUMPING AND
# COUNTERVAILING DUTY OPERATIONS

## OFFICE VIII

## REQUEST FOR INFORMATION

## ANTIDUMPING DUTY INVESTIGATION

## GALVASID SA DE CV

### MEXICO

### CERTAIN CORROSION-RESISTANT STEEL PRODUCTS

**PERIOD OF INVESTIGATION:** July 1, 2023, through June 30, 2024.

**RESPONSE DUE DATE:** Section A:  December 9, 2024
Sections B-D: December 25, 2024

**OFFICIALS IN CHARGE:**

**NAME:** Katerina Katsiadas                          **NAME:** William Horn
**PHONE:** (202) 482-4929                             **PHONE:** (202) 482-4868
**E-MAIL:** Katerina.Katsiadas@trade.gov              **E-MAIL:** William.Horn@trade.gov

**A response must be submitted electronically using Enforcement and Compliance's ACCESS at http://access.trade.gov.**

For the electronic filing regulations, please refer to:  *Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures*, 76 FR 39263 (July 6, 2011) and *Enforcement and Compliance:  Change of Electronic Filing System Name,* 79 FR 69046 (November 20, 2014).  You may also obtain the following electronic filing guidelines on the ACCESS website (**http://access.trade.gov**):  ACCESS External User Guide, ACCESS Handbook.

CONTENTS

General Instructions

Section A          Organization, Accounting Practices, Markets and Merchandise

Section B          Sales in the Home Market or to a Third Country

Section C          Sales to the United States

Section D          Cost of Production and Constructed Value

Section E          Cost of Further Manufacture or Assembly Performed in the United States

Appendix I         Glossary of Terms

Appendix II        Instructions for Submitting Computer Databases and Spreadsheets

Appendix III       Description of Products Under Investigation

Appendix IV        Certifications of Factual Accuracy and Certificate of Service

Appendix V         Questions Regarding 232 Duties/Case-Specific Questions and Modifications, Including Matching Criteria

Appendix VI        Arms-Length Sales to Affiliated Parties

Appendix VII       Sales Database Summaries

# GENERAL INSTRUCTIONS

> *Note: The latest antidumping questionnaires and relevant laws and regulations can be found at the following links:*
>
> Antidumping Questionnaires
> https://access.trade.gov/Resources/questionnaires/questionnaires-ad.html
>
> Laws and Regulations
> https://access.trade.gov/Resources/ADCVD_Resources.aspx

This questionnaire requests information to enable the United States Department of Commerce (Commerce) to determine whether your company dumped the **subject merchandise** in the United States.[1]  **Dumping** is the sale of merchandise to the United States at prices below the **normal value** of the merchandise.  If you have questions, we urge you to consult with the **official in charge** named on the cover page.  If for any reason you do not believe that you can complete the response to the questionnaire by the date specified on the cover page of this questionnaire, or in the form requested, you should contact the official in charge immediately. You must formally request an extension of time in writing.  Any extension will be approved in writing; otherwise the original deadlines will apply.

Your response to the questionnaire should include all of the information requested.  It is essential and in your interest that Commerce receive complete information early in the proceeding to ensure a thorough and accurate analysis and to provide all parties the fullest opportunity to review and comment on your submission and Commerce's analysis.  We appreciate your cooperation in this investigation.

> *Note: This investigation will be conducted on a schedule dictated by law.  If you fail to provide accurately the information requested within the time provided, Commerce may be required to base its findings on the **facts available**.  If you fail to cooperate with Commerce by not acting to the best of your ability to comply with a request for information, Commerce may use information that is adverse to your interest in conducting its analysis.*

This questionnaire consists of the following sections:

> Section A requests information about your organization and accounting practices, and general information regarding sales of the merchandise under investigation.
>
> Section B requests information about your **home market**, or where appropriate, a **third-country** market,[2] including a sales list and other information necessary for us to calculate the normal value of the merchandise.

---

[1] In each section of the questionnaire, the first use of each term included in the Glossary of Terms at Appendix I is shown in bold typeface.

[2] Hereafter referred to as your **foreign market**.

Section C requests information about the United States market, including a sales list and other data necessary to calculate the price in or to the United States market.

Section D requests information about the **cost of production** of merchandise sold in the foreign market and the **constructed value** of merchandise sold in or to the United States, which may be required in connection with the calculation of normal value.

Section E requests information about further manufacturing or assembly in the United States prior to delivery to un**affiliated** United States customers.

Please comply with the following general instructions for filing and preparing your response to this questionnaire.

## I.   **Instructions for Filing the Response**

The following instructions apply to your response to this questionnaire and all other documents you submit to Commerce during the course of this proceeding, such as responses to additional questionnaires, extension requests, and case briefs.

> *Note:  Please label the electronic files that you upload in a manner indicating their specific contents.  For example, ABC Ltd March 15 QR – Exhibits 10-15, rather than ABC Ltd March 15 QR – part 3.  If possible, please do not split exhibits between electronic files.*

### A.   Due Date

1.   All submissions must be made electronically using Commerce's ACCESS website at http://access.trade.gov , unless an exception applies.  To determine if your response qualifies for manual filing, see the section on "Manual Filing" below.  All laws, regulations, and other descriptive materials that supplement your responses should be submitted on the same date as the initial response.

2.   The **business proprietary** response should be submitted on the day specified on the cover page of this questionnaire.  The **public version** of the response may be filed one business day after the proprietary response.

3.   An electronically filed document must be received successfully in its entirety by ACCESS by 5 p.m. Eastern Time (ET) on the due date, unless an earlier time is specified.  Where applicable, a submitter must manually file a document between the hours of 8:30 a.m. and 5 p.m. ET on the due date, unless an earlier time is specified.

### B.   Format

1.   You are required to state in the upper right-hand corner of your cover letter the following information in the following format:

    a.  on the first line, indicate the case number stated on the cover page to this questionnaire;

    b.  on the second line, indicate the total number of pages in the document including cover pages, appendices, and any unnumbered pages;

    c.  on the third line, indicate the specific segment of the proceeding, (*e.g.*, investigation, administrative review, scope inquiry, suspension agreement, *etc.*) and, if applicable, indicate the complete period of review (MM/DD/YY - MM/DD/YY);

    d.  on the fourth line, indicate Commerce office conducting the proceeding;

    e.  on the fifth and subsequent lines, indicate whether any portion of the document contains business proprietary information and, if so, list the page numbers containing business proprietary information; and indicate the business proprietary/public status of the document and whether you agree or object to release of the submitted information under **administrative protective order** (APO) by stating one of the following:
- "Business Proprietary Document -- May Be Released Under APO,"
- "Business Proprietary Document -- May Not Be Released Under APO,"
- "Business Proprietary/APO Version-- May Be Released Under APO," as applicable,
- "Public Version," or
- "Public Document."

2. Please include a "Re:" line on the cover letter of your response, or any other submissions you make during this proceeding.  In the Re:  line, briefly summarize the purpose of your submission, *e.g.*, "response to questionnaire," "case brief."

3. Prepare your response in typed form and in English (*see* 351.303(d) and (e) for these and other formatting requirements).  Include an original and translated version of all pertinent portions of non-English language documents that accompany your response, including financial statements.

4. Repeat the question to which you are responding in your narrative submission and place your answer directly below it.

5. Please respond to each question.  If a particular question does not apply, please state so and explain why in your response.  Failure to do so could lead to the use of adverse inferences for that particular question.

6.  In each of your answers, please identify your source of information.  Please include with your response copies of source documents necessary to understand your response.  For additional information sources not included in your response, indicate the location where the documents or electronic data systems are maintained.  If information is maintained at multiple locations, please list in an appendix to your response these locations along with notes indicating the information maintained at each location.  This information is used by Commerce to prepare for **verification**.

7.  Include all worksheets, financial reports, and other requested documents as appendices to your response.

8.  Provide a table of attachments.  Assign a number to each attachment and include a descriptive name for each attachment and its number in the table.

9.  All monetary amounts should be shown in the currency in which they were originally denominated, and in the currency in which they are registered in your accounts (if the two are different).  Also, report the actual exchange rate used for a particular conversion.  For all values adjusted for inflation, please provide the data in both nominal and adjusted terms and explain how these values were adjusted.

    Identify all units of measurement, currencies, and conversion factors used in your narrative response, worksheets, or other appendices.  For electronic databases submitted in antidumping proceedings, you must complete Appendix VII, which is a template providing a standard format for reporting the units of measurement, currencies, and conversion factors.  Please complete a separate template for each database submitted (home market sales, U.S. sales, cost, *etc*.) and be sure to provide the requested data for each numerical field in the database.  In addition, for antidumping proceedings, please refer to Appendix II (not included for countervailing duty (CVD) proceedings), which includes additional information for submitting databases.

10. It is your responsibility to contact the official in charge if subsequent to your filing there are events that affect your response (*e.g.*, changes in your cost accounting system are relevant to antidumping proceedings, and changes as a result of an audit are relevant to both antidumping and CVD proceedings).

C.   Manual Filing

1.  All submissions must be filed electronically.  Only under the following four circumstances will Commerce accept a hardcopy response that is manually filed:

    - Documents exceeding 500 pages in length may be filed manually (in paper form) in the APO/Dockets Unit.  This is referred to as a "bulky document."

- Data files greater than 50 MB may be filed in an alternative manner after consulting https://access.trade.gov/help/Super_Bulky_Document_Submissions.pdf and contacting the ACCESS Help Desk at 202-482-3150.

- If the ACCESS system is unable to accept filings continuously or intermittently over the course of any period of time greater than one hour between 12:00 p.m. and 4:30 p.m. ET or for any duration of time between 4:31 p.m. and 5:00 p.m. ET, then a person may manually file the document in the APO/Dockets Unit. Commerce will provide notice of such technical failures on the ACCESS Help Desk line at 202-482-3150 and on the Enforcement and Compliance website, which is https://www.trade.gov/us-antidumping-and-countervailing-duties.

- Apart from the above, if you are unable to comply with the electronic filing requirement, as provided in 19 CFR 351.103(c) of Commerce's regulations, and in accordance with section 782(c) of the Tariff Act of 1930, as amended (the Act), you must promptly notify the official in charge and submit a full written explanation of the reasons you are unable to file the document electronically. You must also suggest alternative forms in which to submit the information. Commerce will consider the ability of a submitter and may modify the electronic filing requirement on a case-by-case basis.

2. All manually filed documents must be accompanied by a cover sheet generated in ACCESS. For manually filed bulky documents, separator sheets must also be generated and used.

3. If your response qualifies as a bulky document and you opt to file it manually, you must file two identical paper copies of the document. For all other authorized manual submissions, only one paper copy is required.

4. Manual submissions must be addressed and submitted to:
   **Secretary of Commerce**
   **Attention: Enforcement and Compliance, AD/CVD Operations Office** (*specify office number indicated on the cover page of this questionnaire*)
   **APO/Dockets Unit, Room 18022**
   **U.S. Department of Commerce**
   **Fourteenth Street and Constitution Avenue, N.W.**
   **Washington, D.C. 20230**

D. Certification

1. Submit the required **certification of accuracy**. Providers of information and the person(s) submitting it, if different (*e.g.*, a legal representative), must certify that they have read the submission and that the information submitted is accurate and

G-6

complete.  Commerce cannot accept questionnaire responses that do not contain the certification statements.  Forms for such certification are included as appendices to this questionnaire.  You may photocopy this form and submit a completed copy with each of your submissions.

2. Provide the required **certificate of service** (included as an appendix) with each business proprietary document and public version submitted to Commerce.

3. Signed certifications of accuracy and certificates of service should be scanned and appended to the appropriate electronic documents filed in ACCESS.

E. Business Proprietary Information and Summarization of Business Proprietary Information

1. Request business proprietary treatment for information submitted that you do not wish to be made publicly available.  As a general rule, Commerce places all correspondence and submissions received in the course of an antidumping or countervailing duty proceeding in a public reading file.  However, information deemed to be proprietary information will not be made available to the public.  If you wish to make a request for proprietary treatment for particular information, refer to sections 351.304, 351.305, and 351.306 of Commerce's regulations.  You must submit the request for proprietary treatment at the same time as the claimed business proprietary information is submitted to Commerce.

2. Utilize the "one-day lag rule" under section 351.303(c)(2) of Commerce's regulations if you wish an additional day to review the final bracketing of business proprietary information in a document and to prepare the required public version.  The filing requirements under the one-day lag rule provide for a party to file only the business proprietary document  within the applicable time limit (section 351.303(c)(2)(i)).  By the close of business one business day after the date the business proprietary document is filed, the person must file the complete final business proprietary document (section 351.303(c)(2)(ii)).  The final business proprietary document must be identical to the original document except for any bracketing corrections.

3. By the close of business one business day after the date the business proprietary document is filed (refer to the "one-day lag rule" in the preceding paragraph), submit the public version of your response (section 351.303(c)(2)(iii)).  A public version must contain:

a. a non-proprietary (public) version of your response that is in sufficient detail to permit a reasonable understanding of the information submitted in confidence, and/or

G-7

b.  an itemization of particular information that you believe you are unable to summarize.  State the reasons why you cannot summarize each piece of information.

*Note:*  *The summarization requirement does not apply solely to the narrative portion of your response.  It applies equally to worksheets and other appendices to your response, and even to sales and cost databases submitted in antidumping proceedings.  Generally, numerical data, such as that provided in sales and cost databases in antidumping proceedings, are adequately summarized only if grouped or presented in terms of indices or figures ranged within 10 percent of the actual figure.  If a particular portion of data is voluminous, use ranged figures for at least one percent of the voluminous portion.*

*Responses, or portions thereof, that are not adequately summarized may be rejected from the record of this proceeding.*

4.  Submit the statements required regarding limited release of business proprietary information under the provisions of an APO.  U.S. law permits limited disclosure to representatives of parties (*e.g.*, legal counsel) of certain business proprietary information, including electronic business proprietary information, under an APO.  (Note that data received under an APO cannot be shared with others who are not covered by the APO.)  Under the provisions governing APO disclosure, you must submit either:

a.  a statement agreeing to permit the release under APO of information submitted by you in confidence during the course of the proceeding, or

b.  a statement itemizing those portions of the information which you believe should not be released under APO, together with arguments supporting your objections to that release.

We are required by our regulations to reject, at the time of filing, submissions of business proprietary information that do not contain one of these statements.  As discussed above, you must state in the upper right-hand corner of the cover letter accompanying your questionnaire response whether you agree or object to release of the submitted information under APO (*e.g.*, May Be Released Under APO or May Not Be Released Under APO).  (*See* section 351.304 of Commerce's regulations for specific instructions.[3])

---

[3] If you do not agree to release under APO all or part of the proprietary information, but we determine that the information should be released, you will have the opportunity to withdraw the information (*see* section 351.304(d) of our regulations).  However, any information which you withdraw will be taken out of the official record and will not be used in our determination.

G-8

5.  Place brackets ("[ ]") around information for which you request business proprietary treatment.  Place double brackets ("[[ ]]") around information for which you request proprietary treatment and which you do not agree to release under APO.[4]

6.  Provide to all parties whose representatives have been granted APO access and who are listed on Commerce's most recent APO Service List, a complete copy of the submission--proprietary document and public version, except for that information which you do not agree to release under APO.  (APO service lists, as well as public service lists, are regularly updated and maintained as record documents in ACCESS at https://access.trade.gov.  The current service lists are also either attached to the cover letter of this questionnaire or will be provided by a subsequent letter from Commerce).  If you exclude information because you do not agree to release it under APO, you must submit the complete business proprietary version, wherein information in double brackets has been excluded.  This version of the response must be marked "Business Proprietary/APO Version-- May Be Released Under APO" on the cover page.  For parties that do not have access to information under APO, please provide a public version only.

7.  A chart summarizing AD/CVD filing requirements can be found at https://access.trade.gov/Resources/filing/index.html.  ACCESS filing instructions are https://access.trade.gov/help/Handbook_on_Electronic_Filing_Procedures.pdf. .  Detailed and supplemental information concerning APOs, including the APO Handbook, a complete set of APO regulations, and APO application forms and service lists, can be found at https://access.trade.gov/Resources/Administrative_Protective_Order.aspx.

F.      Government Confidential Information

Any government confidential information submitted to us should be clearly labeled, preferably with the national security classification mark of the responsible authority.  The appropriate authority should also submit a statement explaining, in detail, why the information is confidential.

Please note that any company-specific information submitted by government authorities, for which the government is acting merely as a conduit, is not entitled to government confidential treatment; such information is covered by the business proprietary information guidelines outlined above.

---

[4] Commerce will not disclose proprietary customer names under APO during an antidumping or countervailing duty investigation until either an order is published or the investigation is suspended.  To ensure that proprietary customer names are properly treated in this case, place double brackets ("[[ ]]") around all proprietary customer names in your submissions to Commerce during the course of this investigation.

G.      Verification

All information submitted may be subject to verification.  Failure to allow full and complete verification of any information may affect the consideration accorded to that or any other verified or non-verified item in the responses.

H.      Extension Requests

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines.  If you are unable to respond completely to every question in the attached questionnaire by the established deadline, or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response.  If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline.  Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request.  Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request.  Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5:00 pm ET on the established deadline, we may conclude that you have decided not to cooperate in this proceeding.  Commerce will not accept any requested information submitted after the deadline.  As required by section 351.302(d) of our regulations, we will reject such submissions as untimely.  Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

I.      Separate Letter of Appearance Required

Pursuant to 19 CFR 351.103(d)(1), "with the exception of a petitioner filing a petition in an investigation, to be included on the public service list for a particular segment, each interested party must file a letter of appearance."  The letter of appearance must be filed separately from any other document (with the exception of an application for APO access).  If you have an ACCESS E-Filer account, you may also enter your appearance by logging into ACCESS at https://access.trade.gov and clicking on "Manage Entry of Appearance" and then "Create New Entry of Appearance."

II.     **Additional Instructions for Preparing an Antidumping Questionnaire Response**

A.      Report all **price adjustments,** sales expenses, and cost data in the computer data files requested in sections B, C, and D of this questionnaire.  Report price adjustments and

expenses on an allocated basis (*e.g.*, on an average basis) only when price adjustments and expenses cannot be tied to a specific sale (*e.g.*, indirect selling expenses).

Commerce will accept allocated price adjustments and expenses only if you can demonstrate that the allocation is calculated on as specific a basis as is feasible (*e.g.*, on a customer-specific basis, product-specific basis, and/or monthly-specific basis, *etc.*) and is not unreasonably distortive. In doing so, provide a complete explanation of: (1) how the price adjustments or expenses are recorded in your records; (2) why you cannot report the price adjustment or expense on a more specific basis using your records; and, (3) why your allocation methodology does not cause inaccuracies or distortions. For example, if you must allocate an expense between subject and non-subject merchandise and you perform the allocation on the basis of sales value, show that subject and non-subject merchandise incur, or should incur, the expense in such proportions. Include the allocation formula and supporting worksheets in your response.

B.  The narrative portion of your response should include an explanation of each price adjustment, sales expense, and cost field reported in your databases. Such explanations should include a discussion of the nature of the price adjustment, expense, or cost, as well as a detailed description of the calculation used (including samples). Explain whether sales expenses relate directly or indirectly to your sales of the subject merchandise. Please refer to the Glossary of Terms included as an appendix for a definition of **direct** and **indirect expenses**.

C.  Report all revenues and expenses in the currencies in which they were earned or incurred.

D.  Revenues and expenses should be identified by name and by the account or sub-account codes listed in your chart of accounts.

E.  Prepare only a single response for you and your **affiliates** involved with the production or sale of the products under investigation during the **period of investigation** (POI) in the foreign market or the United States. In other words, report the sales and cost information of these affiliates and your sales and cost information in the same computer data files and submit only one narrative response. However, clearly separate your answers regarding each company for which you are reporting information. Likewise, each record in your electronic sales databases should indicate which company is the manufacturer and which is the seller. Each record in your cost database should indicate the manufacturer.

F.  If (a) you are uncertain whether a company is affiliated with you; (b) you do not believe you are able to prepare a response that includes the information of a known affiliate; or, (c) you do not believe it is appropriate to prepare a response that includes the information of a known affiliate, contact the official in charge immediately.

G.  If you make sales to unaffiliated customers in the United States through an affiliated reseller located in the United States, your sales will generally be classified as **constructed export price** sales. For these sales, Commerce deducts from the price to the

G-11

unaffiliated customer all selling, distribution, and manufacturing expenses incurred in the United States.  Commerce also makes a deduction for profit attributable to U.S. operations. Commerce will typically calculate a profit rate based on your reported revenues and expenses (in the United States and the foreign market).

H.      You must report all sales, including those sales which you believe are outside the **ordinary course of trade**.  If you claim that some sales are outside the ordinary course of trade, you should then identify those sales.  You must include a complete explanation in your narrative of why you consider those sales to be outside the ordinary course of trade.

## III.      Submission of Computer Databases and Spreadsheets

Refer to Appendix II for additional instructions

**SECTION A**

**Organization, Accounting Practices,
Markets and Merchandise**

1.       Quantity and Value of Sales

Information on the quantity and value of sales is necessary to determine whether we will attempt to compare the prices of merchandise under investigation sold to the United States market to (a) the prices of comparable merchandise in your **home market**, (b) prices of comparable merchandise in a **third-country** market or (c) **constructed value**.[1]  Refer to the term **viability** in the Glossary of Terms at Appendix I for a more complete discussion.

In this questionnaire we generally refer to the home market or third-country market selected for the calculation of normal value as the **foreign market.**

   a.  State the total quantity and value of the merchandise under investigation that you sold during the **period of investigation** (POI) in (or to):

   i.     the United States,
   ii.    the home market, and
   iii.   each of the three largest third-country markets.[2]

   A chart for reporting the sales quantity and value is included at the end of this section.

   Complete a combined chart for merchandise produced and sold by your company and its affiliates and, where appropriate, a separate chart for the merchandise of each unaffiliated manufacturer whose merchandise under investigation you sold during the POI.  Report the value of all sales in U.S. dollars and convert your quantity of sales to a uniform unit of measure; list the conversion rates used.  To the extent possible, sales values should be reported based on the same terms of sale.  For sales of merchandise

---

[1] Throughout this questionnaire, whenever we refer to the "products under investigation" or "merchandise under investigation," we are referring generally to all products within the scope of the investigation that your company sold during the period of investigation in any market.  When we use the term **subject merchandise,** we are referring to products sold to the United States.  When we use the term **foreign like product,** we are referring to products sold in your home market or exported to a country other than the United States.  We have provided a description of the merchandise included in the investigation in Appendix III.

[2] If Commerce has requested that you file your response to section A before your responses to sections B and C, in responding to this question, you may use the **date of sale** you use in your accounting system to determine the quantity and value sold during the period of investigation.  However, the viability of your home and third county markets will ultimately be based on the date of sale used in your responses to sections B and C of this questionnaire.  Accordingly, if you use the date of sale you employ in your accounting system to prepare section A, but expect to use a different date of sale in the preparation of sections B and C, and your section A response for home market sales is close to the threshold of five percent of U.S. sales, contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

further manufactured or consumed by affiliates in the United States, report the quantity and value (based on the prices you charge to your U.S. affiliate) of the product as imported into the United States, and not as the further processed product.

b.  Report separately the quantity and value of sales in the home market and, if necessary, to each of the three largest third countries, that were made to affiliates.

c.  If you sold to affiliated customers, also report separately the quantity and value such sales represent as a percentage of all home market sales and of sales in each of the largest third country markets, respectively.

d.  Report third-country market information in the chart only if the volume of home market sales of the foreign like product is less than five percent of the volume of United States sales of the subject merchandise.  If the volume of your home market sales of the foreign like product is less than five percent of the volume of your sales to the United States of the subject merchandise (or if, for other reasons,  you do not believe that your home market sales are usable as a basis for normal value), contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter) because Commerce, except in unusual situations, will not use your home market as the basis for calculating **normal value**.  If home market sales are less than 5 percent of U.S. sales, you may present to Commerce any special circumstances which might justify why your home market should be used as the basis for normal value.

e.  If your home market does not meet the five percent threshold described above, report the sales to each of the three largest (by volume) third-country markets (provided each meets the five percent threshold) in the chart and respond to each of the remaining questions in this section of the questionnaire by describing each of these three third-country markets.  If the volume of your largest third-country market sales of the foreign like product is also less than five percent of the volume of your sales to the United States of the subject merchandise, do not report this market.  If this is the case, the section D of this questionnaire will be used to calculate constructed value.

f.  If there are special circumstances that you believe Commerce should consider in selecting a third-country market for determining normal value, please describe these circumstances (*e.g.*, similarity of merchandise, similarity of channels of distribution) for each of the three largest third-country markets.  In addition, if you believe that the foreign like product sold in the three largest third-country markets is not appropriate for comparison to the subject merchandise, then also report any third-country sales for the market to which you sold merchandise that is best compared to the U.S. market.  Describe the circumstances that make that market appropriate for making comparisons.

g.  If you export merchandise for entry into a foreign trade zone (FTZ), into a bonded warehouse in the United States, or under a temporary import bond, this may affect the way we treat these sales.  Please note whether your merchandise goes into a FTZ or a bonded warehouse and contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter) to discuss the reporting requirements.

h.  In your response to Section B and Section C, provide a complete package of documents and worksheets demonstrating how you identified the sales you reported to Commerce in your quantity and value chart and in your comparison market and U.S. market sales databases and reconciling the reported sales to the total sales listed in your general ledger.  Include a copy of all computer programs used to separate the reported sales from your total sales and to calculate expenses.

i.  If you sold merchandise that falls under the description of the merchandise under consideration (as described in Appendix III), but which was produced in more than one country, explain how you determined the country of origin of the merchandise for individual sales.  If all the merchandise you sold originated in one country, so indicate, and explain how you can be sure of this.

2.  <u>Corporate Structure and Affiliations</u>

The purpose of the questions concerning operational and legal structures and affiliations is to provide Commerce with an understanding of your company and its role in the manufacture, sale and distribution of the merchandise under investigation.  Commerce requests information not only about your company but also about affiliates, because it may be necessary to use information gathered from affiliated parties to establish prices, selling and general expenses, and production costs.  In responding to questions about **affiliated persons**, please refer to the definition provided in the Glossary of Terms at Appendix I.  For the purposes of the following questions, a "person" includes any company, organization, individual, partnership or group.

a.  Provide an organization chart and description of your company's operating structure. Describe the general organization of the company and each of its operating units.  For example, if your operations are structured by product or families of products, provide a description of each product group; if your operations are structured by function, provide a list of functional groups and the activities performed by each.

Although you may provide a general description of the structure of the company as a whole, it is particularly important that the description of those units involved in the development, production, sale and/or distribution of the merchandise under investigation be sufficiently detailed to provide Commerce with a good working understanding of how these units function within the company.

b.  Provide a list of all the production facilities, sales office locations, research and development facilities and administrative offices involved in the development, production, sale and/or distribution of the merchandise under investigation operated by your company and its affiliates.  Please briefly describe the purpose of each.  Provide a complete address and telephone number for each of these plants, offices, and other facilities.

c.  Provide an organization chart and description of your company's legal structure.  Include any parent companies and subsidiaries of your company and all other persons affiliated with your company and provide a description of all such persons.

d.  Provide a list of:  (1) the shareholders who directly or indirectly own, control or hold with power to vote, 5 percent or more of your company's outstanding voting stock; (2) the ten shareholders with the highest ownership percentage of your company, if such information is not provided in response to 1 above; (3) all companies in which your company directly or indirectly owns, holds or controls with power to vote, 5 percent or more of the outstanding voting stock; (4) if your company is a subsidiary of another company, the ten largest shareholders of your parent company and of the other subsidiaries of your parent company which are involved in the development, production, sale and/or distribution of the merchandise under investigation; and (5) if your parent company is itself a subsidiary of another company, the ten largest shareholders of its parent company.  For all of the above, state the percentage of voting stock owned, held or controlled, directly or indirectly.

Explain fully any business relationships your company had or has with the owners of the companies listed above and the effect such relationships may have on the development, production, sales or distribution of the merchandise under investigation.

If any of the affiliated persons identified above are in turn affiliated with other persons that are involved in the development, production (including inputs), sale and/or distribution of the merchandise under investigation, provide a list of those persons and describe the nature of the affiliation (*e.g.*, shared directors or managers, equity ownership, close supplier relationship).  Include any such affiliated persons in the chart you provided in response to this section.  Also, describe the nature of each person's involvement with the merchandise under investigation.

e.  State whether your company is part of a group.  Examples of groups are:  (1) a parent company and its subsidiaries; (2) a defined corporate group (*e.g.*, kieretsu or chaebol); (3) a network of companies with cross ownership; (4) two or more companies involved in the development, production, sale and/or distribution of the merchandise under investigation which are directly or indirectly controlled by a family or investor group.  For more information pertaining to control, *see* section 771(33)(F) and (G) of the Act, section 351.102(b) of the regulations, the definition of **affiliated persons** in Appendix I and questions f and h below.

If your company is part of a group, provide:

    i.    An organization chart of the companies in the group.

    ii.    The amount of outstanding voting stock directly or indirectly owned, held or controlled, with power to vote, of each company in the group by: (a) any other company in the group; (b) any member of the family group; and/or (c) any member of the investor group.

    iii.    The names of the officers, director and managers of each company in the group and indicate whether any of them is also: (a) an officer, director or manager of another company in the group; (b) a member of the family group; and/or (c) a member of the investor group.

          Explain all business or operational relationships affecting the development, production, sale and/or distribution of the merchandise under investigation which your company has or had with the parent company, any other company in the group, any member of the family group, and/or any member of the investor group. Such business or operational relationships may include, but are not limited to, shared managers, employees, facilities, and borrowings.

f.   State whether your company is under "common control" with another person by a third person (*e.g.*, a family group or investor group) and/or whether your company and another person commonly control a third person (*e.g.*, a joint venture). Control exists where a person is legally or operationally in a position to exercise restraint or direction over another person. Some factors, individually or in aggregate, which may influence your review for determining whether or not control may exist include, for example, ownership (with power to vote) of the voting stock of a company, substantial borrowings, intertwined business operations, and common officers, directors, or managers.

   If there is such a relationship, describe the nature of the relationship (*e.g.*, ownership percentage, common officers/directors), your business relationship with such company or person and the effect such relationship may have on the development, production, sale and/or distribution of the merchandise under investigation.

g.   If your company is affiliated with another producer that manufactures or has the potential to manufacture the merchandise under investigation, identify that producer and explain whether your company and the affiliated producer manufactures or could manufacture identical or similar products without substantial retooling of either facility.

   If you do not believe that the affiliated producer and your company could manufacture identical or similar products without substantial retooling, please explain the reasons for your conclusion and provide support for such a conclusion.

For each affiliated producer or potential producer of the merchandise under investigation:  (1)  state the level of common ownership (*e.g.*, the amount of cross equity ownership between the producers and/or ownership by any third party of both of the producers); (2) provide the names of any officers, directors and/or managerial employees of one company who are also officers, directors and/or managerial employees of the other company or of a company that is affiliated with both your company and the other producer; and (3) explain any intertwined operations (*e.g.,* shared employees and/or shared facilities, shared sales information, common involvement in production and pricing decisions, and transactions between your company and the affiliated producers).  Please refer to Appendix I for the definition of affiliated parties.

h.  Identify all suppliers, (sub)contractors, lenders, exporters, distributors, resellers, and other persons involved in the development, production, sale and/or distribution of the merchandise under investigation which Commerce may also consider affiliated with your company, in accordance with section 771(33) of the Act and sections 351.102(b) and 351.401(f) of the regulations.  Some factors which you should consider include, for example, whether you acquire a significant amount of a major input from only a single supplier, the length of time your company has had a relationship with a supplier, (sub)contractor, distributor, exporter or reseller, the exclusivity of the relationship, all business relationships your company has or had with these persons, and other relationships between your company and the other person (*e.g.*, director/manager relationships).[3]

i.  Identify all business transactions that may directly or indirectly affect the development, production, sale and/or distribution of the merchandise under investigation which your company has or had with any affiliate (except to the extent you have provided this in response to one of the questions above).

Examples of such business transactions may include, but are not limited to, loans made by or to an affiliate, purchases and resales of the merchandise under investigation by an affiliated reseller, purchases made from a close supplier, and/or transactions with joint ventures, or a company acting as an agent for your company's sales.

3.  <u>Distribution Process</u>

To the extent practicable, where appropriate, Commerce calculates normal value based on sales made in the foreign market at the same level of trade as the constructed export price (CEP) or export price, or adjusts for the differences in levels of trade.  In a CEP situation, economic activities occurring in the United States are not considered in determining the level of trade.  The

---

[3] Reported affiliations, selling expenses shared by, or distributed to, business associates, and/or the existence of commissions reported in questionnaire sections B and C may be used to further analyze the potential existence of affiliations between the respondent, its customers, and other relevant entities.

level of trade of the U.S. sale is that associated with sales to any constructed export price entity. In other words, in determining the level of trade for CEP sales, do not include the economic activities that occur in the United States.4  The expenses for these U.S. activities should be reported as part of the U.S. affiliate's direct or indirect expenses.

In order to establish whether differences in levels of trade exist, Commerce reviews distribution systems, including categories of customers, selling activities, and levels of selling expenses for each type of sale.  Different levels of trade are typically characterized by purchasers at different stages in the chain of distribution and sellers performing qualitatively and/or quantitatively different selling activities.  Different levels of trade necessarily involve differences in selling activities, although differences in selling activities alone are not sufficient to establish differences in levels of trade.  Similarly, customer categories such as distributor, wholesaler, retailer, and end-user are often useful in identifying levels of trade, although they, too, are insufficient in themselves to establish differences in levels of trade.  Rather, Commerce evaluates differences in levels of trade based on a seller's entire marketing process.

When Commerce bases normal value on sales in the foreign market at a level of trade that is different from that of the EP or CEP, Commerce may adjust the normal value to account for differences in levels of trade between the two markets.

However, Commerce makes these adjustments only when there is a difference in the levels of trade and that difference is demonstrated to affect price comparability.  Commerce determines whether there is an effect on price comparability by determining whether there is a pattern of consistent price differences between sales at different levels of trade in the foreign market.

    a.  Provide information requested below for each selling activity reported **in the selling functions chart at the end of this section**.  The information you provide should support your claims regarding the level of intensity at which you performed sales activities.

        i.  List the specific activities performed for that sales activity category.

        ii.  Provide documentation demonstrating that you performed each of these activities during the POI/POR.  Explain how this documentation supports your claim that you performed each reported activity, and discuss how the reported activity is relevant to the LOT analysis.

        iii.  Indicate how often you performed each of the specific activities during the POI/POR.

        iv.  Provide a quantitative analysis showing how the expenses assigned to POI/POR sales made at different claimed levels of trade impact price

---

4 In a CEP situation, the level of trade is based on the selling functions provided by the producer/exporter in the exporting country.  The level of trade is not based on the selling functions provided by the producer's/exporter's U.S. affiliate.

comparability. Your analysis should not include direct expenses reported to Commerce in your comparison market and U.S. market sales databases. For example, if you arranged freight services for sales of subject merchandise, you may consider in that analysis the expenses incurred for arranging freight services in your level of trade analysis, but should not consider the per-unit inland freight expenses reported to Commerce in your sales databases. Do not include selling activities performed by affiliated parties located in the United States in your analysis.

    v. Demonstrate how indirect selling expenses vary by the different levels of trade claimed.

    vi. Explain how the quantitative analysis provided in response to the requests for information above support the claimed levels of intensity for the selling activities reported in the selling functions chart.

    vii. If you normally incur an expense for performing a selling activity but did not incur such an expense during the POI/POR, you may submit annual historical expense data reflecting average expenses incurred during a three-year period prior to the beginning of the POI/POR for Commerce's consideration.

4.    Sales Process

The **date of sale** for your sales to the United States and the foreign market is important to Commerce's analysis. It will determine which sales records are reported in response to sections B and C of this questionnaire and the exchange rate used to convert normal value into U.S. dollars. Note, however, that Commerce's criteria for determining date of sale may differ from those that you apply in the normal course of business. A description of Commerce's criteria is included in the Glossary of Terms at Appendix I; please use these criteria in preparing your response to this questionnaire. If you have difficulty deciding which date to use as the date of sale, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

    a. State what you are using as date of sale (*e.g.*, invoice date, *etc.*). If date of sale varies within or between markets, please explain.

    b. Describe the sales process for each method or channel of distribution described in response to question 3 above. Include a description of each step in the sales process.

    c. Explain how you determined the ultimate customer or market for the products sold through resellers. For these sales, explain whether you restrict the reseller's volume or geographic area for distribution. In addition, explain whether you provide customer lists to or make joint sales calls with the reseller, or provide post-sales support or purchase incentives to the reseller's customers. Provide written sales

contracts or sales terms with these resellers.   In addition, indicate whether different packing is required for products sold for export or domestic consumption or whether documentation is required with respect to exported merchandise.  Finally, explain whether you classify these sales as export or home market sales in your business records, and describe the criteria you use to classify sales.

d.  Describe your agreement(s) for sales in the United States and the foreign market (*e.g.*, long-term purchase contract, short-term purchase contract, purchase order, order confirmation).  Provide a copy of each type of agreement and all sales-related documentation generated in the sales process (including the purchase order, internal and external order confirmation, invoice, and shipping and export documentation) for a sample sale in the foreign market and U.S. market during the POI.

    *Note:  Your Section B and Section C responses should identify which sales records in your comparison market and U.S. market sales databases are covered by the documentation provided here (*see *Section B and Section C).*

e.  Describe the types of changes that occur after the initial agreement that affect the terms of the sale other than delivery dates.

f.  Provide the approximate percentage of sales of the merchandise under investigation in the United States market and the foreign market made pursuant to each type of agreement listed in response to question 4.d. above.

g.  Provide copies of all price lists used in sales of the merchandise under investigation to the United States and to the foreign market and identify the types of sales to which these price lists pertain.  Include any **discount** or **rebate** schedules used with each price list.

h.  Describe your invoicing practice(s) for each channel of distribution described in response to question 3 above.  Explain when invoices are issued in relation to when the merchandise is shipped.  Also explain any circumstances under which you deviate from the usual practice and describe how often this occurs.

5.  <u>Sales to Affiliated Persons (Affiliates) in the Foreign Market</u>

An affiliated customer is considered to have resold the foreign like product if the product sold by the affiliate is within the definition of the merchandise in Appendix III.  This is the case whether the affiliate resold the product in the same condition as it was purchased or whether the affiliate processed the product before resale.  The affiliated customer is considered to have "consumed" the foreign like product if the affiliate uses it in the production of merchandise which does not fall within the description of the merchandise provided in Appendix III.

a. Provide a list of affiliates that purchased and resold the foreign like product in the foreign market.  Also, please state the approximate percentage of your sales of the foreign like product in the foreign market which were made by these affiliates.

b. Describe the services provided by each of the affiliated resellers.  For example, explain whether the reseller acts as a sales agent ordering and reselling in the same lot sizes without taking physical possession of the merchandise or whether the reseller warehouses the merchandise and resells it in different lot sizes or in a further processed form of the foreign like product.  In addition, explain whether the reseller provides warranties and technical or customer service, registration services, or arranges for transportation to the unaffiliated customer.

c. Provide a list of affiliates that purchased the foreign like product for consumption in the foreign market or elsewhere.  Explain your policy for establishing prices to such affiliates.  Indicate the approximate percentage of sales of the foreign like product that were made to these affiliates.

6. <u>Accounting/Financial Practices</u>

A detailed understanding of your accounting and financial practices will help to ensure an accurate **verification**, and is necessary for Commerce to analyze your reporting and allocation of expenses.

a. Describe your company's accounting and financial reporting practices, including your normal corporate accounting period.

b. Please provide the following financial documents for the two most recently completed fiscal years plus all subsequent monthly or quarterly statements:  (1) chart of accounts; (2) audited, consolidated and unconsolidated financial statements (including any footnotes and auditor's opinion); (3) internal financial statements or profit and loss reports of any kind that are prepared and maintained in the normal course of business for the merchandise under investigation or, in the absence of such reports, for the product line that corresponds most closely to the definition of the merchandise under investigation, including those for the next largest and smallest categories of merchandise and for the next largest and smallest internal business unit producing or selling the merchandise under investigation; (4) financial statements or other relevant documents (*i.e.*, profit and loss reports) of all affiliates involved in the production or sale of the subject merchandise in the foreign market and the U.S. market, of all affiliated suppliers to these affiliates, and of the parent(s) of these affiliates; (5) any financial statement or other financial report filed with the local or national government of the country in which your company is located.

c. If in any month during the period of investigation the annual inflation rate in the foreign market was in excess of 25 percent, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance

date of this questionnaire appears on the first page of the cover letter). We may request that you respond to a modified questionnaire. (These instructions are provided to alert Commerce to high inflation rates that might require adjustments to costs.)

7.      Merchandise

The questions that follow relate to the merchandise under investigation sold in the United States and the foreign market.

   a.   Provide a description of the types of merchandise under investigation produced and/or sold by your company. Include an explanation of the differences and similarities of the merchandise under investigation sold in the foreign market and that exported to the United States.

   b.   List all other types of merchandise (*i.e.*, merchandise not under investigation) produced and/or sold by your company, and mark with an asterisk ("*") those which are inputs into the production process for merchandise under investigation.

   c.   Provide a key to your product codes assigned to the merchandise in the normal course of business, including an explanation of the full range of prefixes, suffixes, or other notations that identify special features. Explain whether identical products are listed under different product codes in the United States and the foreign market. If so, provide a list showing how identical products are identified by product codes for each market.

   d.   Describe the parts, materials, specifications, applications, standards, and production processes employed in the production of the merchandise sold in the foreign market and sold in and/or to the United States. Include copies of the industry specifications or standards for each market. Explain other factors that differentiate the products under investigation sold by your company.

   e.   Provide all catalogs and brochures issued by or on behalf of your firm and affiliates that include the merchandise under investigation sold by your firm in the United States and in the foreign market. If translating the foreign market catalogs and brochures is burdensome, contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter). If this information is voluminous, please provide a table of contents for each catalog or brochure. The table of contents should be translated into English if it is in another language.

        Additionally, if your firm has a website, identify the URL address and provide a copy of the site index. If the site index is in a language other than English, provide a translation.

Filed By: William Horn, Filed Date: 11/18/24 12:03 PM, Submission Status: Approved

f. If your merchandise is sold in the foreign market in different quantity units than in the United States, describe any conversion factors necessary to put the sales on the same basis.

g. State whether you had any transactions involving merchandise samples in either your foreign market of the U.S. market.  Describe the terms and circumstances of any such transactions.

8. Further Manufacture or Assembly in the United States

This section of the questionnaire concerns subject merchandise exported to the United States and changed in value or physical condition (**further manufacture**) prior to delivery to the first unaffiliated customer in the United States.

Provide the following information with respect to merchandise that is further manufactured or assembled in the United States by an affiliate or contractor.

a. Provide a list and description of the products sold to unaffiliated customers during the POI that were produced from or incorporate subject merchandise.  For each such product sold, identify the particular subject merchandise used to produce that final product.

b. Provide the weighted-average net price for the period of investigation charged to the affiliated importer for each product included in the investigation that has been further manufactured and the weighted-average net price for the period of investigation charged the unaffiliated U.S. customers for each further manufactured final product. For each further manufactured product sold during the POI, list the product code and name of the subject merchandise included in that product, the net unit transfer price charged the affiliated importer, the amount of the subject merchandise consumed in the production of the further manufactured product, and the total value of the consumed subject merchandise (unit transfer price multiplied by the number of units consumed in production).[5]

c. Explain how you determined the net unit transfer price.

9. Exports Through Intermediate Countries

If you are aware that any of the merchandise you sold to third countries was ultimately shipped to the United States, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

---

[5] This question is designed to provide Commerce with the information necessary to determine whether the value-added in the United States exceeds substantially the value of the subject merchandise that has been processed.  You may provide this information in any format that supplies the appropriate information.

10. <u>Sales of Merchandise Under Investigation Supplied by an Unaffiliated Producer.</u>

Please respond to this section of the questionnaire if neither your company nor an affiliate produced the merchandise under investigation that you sold either in the comparison market or to the United States.

    a. Provide the names, addresses, phone numbers, email addresses, and facsimile numbers of those companies that supplied you with the merchandise under investigation that your company or an affiliate sold to the United States or to the foreign market.

    b. State whether the supplier of the merchandise under investigation knew or had reason to know the ultimate destination of any merchandise purchased by your company at the time of sale. For example, did you request that the supplier ship the merchandise directly to the United States; was the destination apparent from the product codes or other markings; were there product characteristics or features typical of the United States market? Was there an explicit or implicit understanding giving permission to or responsibility for exporting to the United States, or restricting, discouraging, or prohibiting sales in the home market, the foreign market or elsewhere? Does the supplier have the right to review your sales records? Does the supplier provide after-sales service in the U.S., participate in U.S. sales calls and/or activities, or provide sales incentives to your customers?

A-14

## FORMAT FOR REPORTING QUANTITY AND VALUE OF SALES

| Market | Period of Investigation | Unit of Measure | Total Quantity | Total Value in U.S. Dollars |
|---|---|---|---|---|
| United States<br>1. Export Price<br><br>2. Constructed<br>    Export Price<br><br>3. Further<br>    Manufactured<br><br>    Total | | | | |
| Home<br>1. Affiliated<br>2. Unaffiliated<br>    Total | | | | |
| Third Country 1<br> 1. Affiliated<br> 2. Unaffiliated<br>    Total | | | | |
| Third Country 2<br> 1. Affiliated<br> 2. Unaffiliated<br>    Total | | | | |
| Third Country 3<br>1. Affiliated<br>2. Unaffiliated<br>    Total | | | | |

## **Selling Functions by Category**

Report level of intensity information using a scale of zero to ten in which five represents a sale with average associated selling expenses, and level of intensity information is reported in relation to this baseline of five.

| Selling Activity/Function | Home Market Channel 1 | Home Market Channel 2 | US Channel 1 Export to US affiliate #1 (CEP sales)6 | US Channel 2 Export to unaffiliated US customers (EP sales) |
|---|---|---|---|---|
| **Provision of Sales Support** (*e.g.*, sales forecasting, strategic/economic planning, advertising, sales promotion, sales/marketing support, market research, other (list/describe)) | | | | |
| **Provision of Training Services** (*e.g.*, personnel training /exchange, distributor/dealer training, other (list/describe)) | | | | |
| **Provision of Technical Support** (*e.g.*, engineering services, technical assistance, other (list/describe)) | | | | |
| **Provision of Logistical Services** (*e.g.*, inventory maintenance, post-sale warehousing, repacking, freight and delivery, other (list/describe)) | | | | |
| **Performance of Sales Related Administrative Activities** (*e.g.*, order input/processing, rebate programs, warranty service, other (list/describe)) | | | | |

---

6 Do not include economic activities provided by the producer's/exporter's U.S. affiliate.

## SECTION B

### Sales in the Home Market
### or to a Third Country

### I.       General Explanation

This section of the questionnaire provides instructions for reporting your sales of the **foreign like product** in your home market or a third-country market.  The choice of the appropriate market is based, in part, on your response to question 1 in section A.

For simplicity, the instructions refer to the **foreign market** or **comparison market**.  The foreign market is the home market or a third-country market, whichever will be used to determine normal value.

> Please submit a copy of the computer program/spreadsheet/worksheet that you used to calculate the prices, expenses, and adjustments reported in your foreign-market sales lists.  The documentation submitted should provide detail on any formulas used for the calculation of the figures provided in the sales lists, identify any factors used therein, and identify the price or unit basis to which the factors are applied.

### II.      Summary of Foreign Market Sales File

Please complete the comparison market sales database summary that appears in Appendix VII.

At the top of the spreadsheet is a place to indicate the date the spreadsheet was submitted to Commerce.  You are responsible for ensuring that the spreadsheet is consistent with the accompanying narrative response and any accompanying databases submitted on electronic media.  Each time you revise your questionnaire response, such as in answer to a supplemental questionnaire, and your response requires a change in a spreadsheet, you must submit a revised spreadsheet with the date the revision is submitted to Commerce.

Please submit the worksheet computer file in a standard spreadsheet format such as Excel.  You must include as well a printout of this spreadsheet that is identical in content to the computer file.

If you have any questions concerning completion and submission of this spreadsheet, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

## III.    Computer File of Foreign Market Sales

A.    Sales Reporting

In accordance with the instructions provided in this section, prepare a separate computer data file containing each sale made during the period of investigation (POI) of the foreign like product. Report all sales of the foreign like product, whether or not you consider particular merchandise to be that which is most appropriately compared to your sales of the subject merchandise. Commerce will then select the appropriate comparison sales from your sales listing. Do not, however, report canceled sales.

For sales of merchandise that have been shipped to the customer and invoiced by the time this response is prepared, each record in the computer data file should correspond to an invoice line item (*i.e.*, each unique product included on the invoice). For sales of merchandise that have not yet been fully shipped and invoiced, separate records should be provided for the shipped and unshipped portions of the sale. For sales shipped in installments, a separate record should be provided for each installment.

Each computer record submitted should contain the information requested concerning the product sold, the terms of the sale, the selling expenses incurred and other information. The following portion of section B describes the information Commerce requires.

The chart which follows is a summary of the data fields for the foreign market sales computer file which are described in the remainder of this section of the questionnaire. Please refer to Appendix II Instructions for Submitting Computer Data for instructions on preparing the electronic file.

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 0.0 | Sequential Number | SEQH |
| 1.0 | Complete Product Code | PRODCODH[1] |
| 2.0 | Matching Control Number | CONNUMH |
| 3.1 thru 3.n | Product Characteristics | |
| 4.0 | Customer Code | CUSCODH |
| 4.1 | Consolidated Customer Code | CCUSCODH |
| 5.0 | Customer Relationship | CUSRELH |
| 6.0 | Customer Category | CUSCATH |
| 7.0 | Channel of Distribution | CHANNELH |
| 8.0 | Sale Invoice Date | SALINDTH |
| 9.0 | Date of Sale | SALEDATH |

[1] For Third-Country sales, replace the "H" at the end of all field names with a "T".

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 10.0 | Sale Invoice Number | INVOICEH |
| 11.0 | Date of Shipment | SHIPDATH |
| 12.0 | Date of Receipt of Payment | PAYDATEH |
| 13.0 | Terms of Delivery | SALETERH |
| 14.0 | Terms of Payment | PAYTERMH |
| 15.0 | Quantity | QTYH |
| 16.0 | Quantity Unit of Measure | QTYUNITH |
| 17.0 | Gross Unit Price | GRSUPRH |
| 18.1-n | Billing Adjustments | BILLADJH |
| 19.1 | Early Payment Discounts | EARLPYH |
| 19.2 | Quantity Discounts | QTYDISH |
| 19.3-19.n | Other Discounts | OTHDIS(1-n)H |
| 20.1-20.n | Rebates | REBATE(1-n)H |
| 21.0 | Level of Trade | LOTH |
| 22.0 | Level of Trade Adjustment | LOTADJH |
| 23.0 | Inland Freight - Plant to Distribution Warehouse | INLFTWH |
| 24.0 | Warehousing Expense | WAREHSH |
| 25.0 | Inland Freight - Plant/Warehouse to Customer | INLFTCH |
| 26.0 | Inland Insurance | INSUREH |
| 27.0 | Destination | DESTH |
| 28.0 | Commissions | COMMH |
| 29.0 | Selling Agent | SELAGENH |
| 30.0 | Selling Agent Relationship | SELARELH |
| 31.0 | Credit Expenses | CREDITH |
| 32.0 | Late Payment Fee | LATEPAYH |
| 33.0 | Advertising Expenses | ADVERTH |
| 34.0 | Warranty Expense | WARRH |
| 35.0 | Technical Service Expense | TECHSERH |
| 36.0 | Royalties | ROYALH |
| 37.0 | Bank Charges | BANKCHARH |
| 38.1-38.n | Other Direct Selling Expenses | DIRSELH |
| 39.0 | Indirect Selling Expenses | INDIRSH |
| 40.0 | Inventory Carrying Costs | INVCARH |

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 41.0 | Packing Cost | PACKH |
| 42.0 | Manufacturer | MFRH |
| 43.0 | Samples | SAMPLEH |
| **Additional Fields for Third-Country Sales** | | |
| 44.0 | International Freight | INTNFRT |
| 45.0 | Marine Insurance | MARNINT |
| 46.0 | Third-Country Inland Freight from Port to Warehouse | INLFPWT |
| 47.0 | Third-Country Inland Freight from Warehouse to the Unaffiliated Customer | INLFWCT |
| 48.0 | Third-Country Inland Insurance | TCINLINT |
| 49.0 | Third-Country Brokerage and Handling | TCBRKHT |
| 50.0 | Third-Country Customs Duty | TCDUTYT |
| 51.0 | Duty Drawback | DTYDRAWT |

B.     Sales to Affiliated Customers in the Comparison Market

This section applies to respondents who made sales of the foreign like product to affiliated parties in the comparison market.[2]  If you did not make sales to affiliated parties in the comparison market during the POI, please disregard this section and proceed to section C, below.

In general, if you sold to an affiliate that resold the merchandise to an unaffiliated party in the comparison market, report the affiliate's resales during the POI to unaffiliated customer rather than your sales to the affiliate.  However, certain exceptions apply; these are described below.

1. If your aggregate sales to all affiliated customers in the comparison market constitute less than five percent of your total sales in the comparison market, report your sales to the affiliated customers rather than the affiliates' resales to unaffiliated customers.

2. If your sales to all affiliates, in the aggregate, are equal to or greater than five percent of your total sales in the comparison market, then the following instructions apply.

   a. If you had sales of the foreign like product to an affiliated reseller, and you can demonstrate that those sales were arm's-length transactions, you may report your sales to that affiliate rather than that affiliate's resales to unaffiliated customers. However, if the affiliated reseller also consumed some of the merchandise, skip to

---

[2] *See* the definition of **affiliated person** in Appendix I.

paragraph B.2.b. below.  (By "consumed" we mean used in the production of merchandise that does not fall within the description provided in Appendix III.) Conduct your analysis of sales to affiliates in accordance with the guidelines set forth in Appendix VI, and provide copies of the program and output as well as worksheets illustrating and explaining your results.

*Note:  We may apply facts available, including an adverse inference, pursuant to Sections 776(a) and (b) of the Tariff Act of 1930, as amended (the Act), in determining your dumping margin if you do not provide the affiliate's sales to the first unaffiliated party, and also do not show that you determined, and how you determined, that your sales to affiliated parties were made at arm's length in accordance with the guidelines set forth in Appendix VI.*

In addition, if you report affiliated-party sales and complete documentation concerning the affiliated party test that appears to indicate that the sales to the affiliate were made at arm's length, but we later determine that you did not demonstrate that the affiliated party sales passed the arm's length test, we may require that you report the affiliates' sales to the first unaffiliated customers under an accelerated deadline later in the investigation.

b.  If you had sales to an affiliated party that consumed all or some of the merchandise (i.e., used it in the production of merchandise that does not fall within the description provided in Appendix III), then report all of  your sales to that affiliate, whether the merchandise was consumed or resold by the affiliate. Conduct an arm's-length analysis of sales to the affiliate in accordance with the guidelines set forth in Appendix VI, and provide copies of the program and output as well as worksheets illustrating and explaining your results.  If you cannot demonstrate that your sales to the affiliate were at arm's-length prices, then you must also report the affiliate's sales to unaffiliated customers; however, in any case you must report your sales to the affiliate.

*Note:  We may apply facts available, including an adverse inference, pursuant to Sections 776(a) and (b) of the Act, in determining your dumping margin if you do not provide the affiliate's sales to the first unaffiliated party, and also do not show that you determined, and how you determined, that your sales to affiliated parties were made at arm's length in accordance with the guidelines set forth in Appendix VI.*

In addition, if you report affiliated-party sales and complete documentation concerning the affiliated party test that appears to indicate that the sales to the affiliate were made at arm's length, but we later determine that you did not demonstrate that the affiliated party sales passed the arm's length test, we may require that you report the affiliates' sales to the first unaffiliated customers under an accelerated deadline later in the investigation.

c. If you have questions regarding which of the above situations applies to your company, or believe you have a situation not described above, contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

## IV. **Foreign Market Sales Reconciliation**

Please provide a reconciliation of the sales reported in your home market sales databases to the total sales listed in your financial statements (profit and loss/income statement). Your reconciliation **must** provide supporting documentation (*e.g.*, financial statements, trial balance sheets, relevant excerpts from general ledger, sub-ledger, *etc.*) **for each** step in the reconciliation. The reconciliation must include the following:

1. Worksheets demonstrating how the POI financial statements' sales totals tie to the general ledger sales revenue accounts. Please include the relevant supporting documents from your accounting and financial systems, such as excerpts from the general ledger, sub-ledger, etc.

2. Worksheets demonstrating how the general ledgers' sales revenue accounts in step one, above, tie to the sales reported in the home market sales databases. The worksheet should identify the total quantity and value of all sales in the fiscal years overlapped by the POI and identify the quantity and value of each category of non-subject merchandise sales that are excluded from your reported sales of foreign like product/subject merchandise (*e.g.*, sales outside the POI, sales to foreign markets other than the United States, *etc.*). Please include the relevant supporting documents from your accounting and financial systems, such as excerpts from the general ledger, sub-ledger, etc.

3. A detailed narrative explaining how all worksheets and supporting documentation tie together.

4. An explanation of the means used to identify and exclude all these non-subject merchandise sales (*e.g.*, internal country code, product description, *etc.*).

5. A product list, with product codes and descriptions, of all products excluded from the reported sales of subject merchandise.

## V. **Reporting of Expenses**

For each expense data field reported in the sales database, using the chart of accounts, please identify the account(s) used to calculate such expense. In addition, for each reported field, provide all sub accounts to the account referenced.

This information can be provided in chart form. For example, for movement expenses, please report the expenses in the following manner:

| Field | Main Account | Sub Accounts |
|---|---|---|
| Port Charges (PORTCHGH) | Account 030 Handling | Account 031 Port XYZ Account 0312 XXX |

Each field used to report expenses should thus identify all accounts which were used to calculate such expense.

## VI. Instructions for the Narrative Response and the Computer File of Foreign Market Sales

The following instructions combine the questionnaire with the computer data file format. "FIELD NUMBER" includes the number and descriptive name of the field in the computer data file. "FIELD NAME" is the variable name for the submitted printouts of the data file. "DESCRIPTION" describes the information you should report in the field of the computer data file, and "NARRATIVE" describes the additional information we request you provide, not in the computer data file, but in the narrative response.

| Fields 1 through 3 |
|---|
| Report the information requested concerning the product sold. Fields 1 and 2 are reserved for the product code and a "matching" control number Commerce will use in the calculation of the dumping margin. Fields numbered 3.1 to 3.n specify the product characteristics requested by Commerce. You may add additional product characteristics in separate fields. However, if you add characteristics not specified in the questionnaire, describe in the narrative response why you believe that Commerce should use this information to define **identical** and **similar merchandise**. At this point, do not incorporate these additional product characteristics into your response to CONNUMH (Field Number 2.0). |

**FIELD NUMBER 0.0**:    **Sequential Number**

      FIELD NAME:    SEQH

      DESCRIPTION:    Assign a unique sequential number to each sales record. This sales record number should remain constant in all future submissions (*i.e.*, sales record line items should not be renumbered during the course of this segment). This field will assist you in reconciling our calculations with the data you submit in your response.

**FIELD NUMBER 1.0:**    **Complete Product Code**

    FIELD NAME:    PRODCODH (or PRODCODT)[3]

    DESCRIPTION:    Report the commercial product code assigned by your company in the normal course of business to the specific product sold.

    NARRATIVE:    The product code should be described in response to question 7 b in section A of this questionnaire.

**FIELD NUMBER 2.0:**    **Matching Control Number**

    FIELD NAME:    CONNUMH

    DESCRIPTION:    Assign a control number to each unique product reported in the section B sales data file. Identical products should be assigned the same control number in each record in every file in which the product is referenced (*e.g.*, products with identical physical characteristics reported in the foreign market sales file and the U.S. market sales file should have the same control number).

**FIELD NUMBER 2.1:**    **OVERRUNS**

    FIELD NAME:    OVERRUNH

    DESCRIPTION:    Indicate whether the transaction is an overrun or not. Please describe in detail how overrun merchandise is categorized internally and marketed. If it is not possible to separately identify overruns, explain why you are unable to do so.

Y = Yes, the transaction is an overrun.
N = No, the transaction is not an overrun.

Note that this field should not be included in the construction of the CONNUM.

**FIELD NUMBER 2.2:**    **PRIMARY VS. SECONDARY MERCHANDISE**

    FIELD NAME:    PRIMEH

    DESCRIPTION:    Indicate whether the merchandise is prime or non-prime (secondary) merchandise. Please describe in detail how secondary merchandise is categorized internally and marketed.

1 = Prime

---

[3] If you are reporting sales made to a third-country, replace the "H" at the end of all field names with a "T".

2 = Non-Prime

Note that this field should **not** be included in the construction of the CONNUM.

**FIELD NUMBER 2.3:**     **SPECIFICATION/GRADE**

FIELD NAME:     SPECH

DESCRIPTION:     Report the specification/designation/type/grade of the product.  For example, for ASTM A653, designation SS, grade 33, report "ASTM A653 designation SS grade 33;" for ASTM A653, designation CS Type A, report "ASTM A653 designation CS Type A;" etc.

Also, if you have not already done so, submit a complete English language version of every single specification for which you have sales.  If products are made to a grade only (e.g., only identification is "SAE grade 1006"), but not a specification, be sure to report the full name of the grade (e.g., "SAE grade 1006").  If a specification is proprietary, provide a complete, legible copy of the original specification and a complete English translation, and explain in your narrative when, by whom, and how the specification was devised.

Note that this field should **not** be included in the construction of the CONNUM.

**The following fields should be included in the construction of the CONNUM:**

**FIELD NUMBER 3.1**:     **TYPE**

FIELD NAME:     CTYPEH

DESCRIPTION:     Type

10 = Clad (metals bonded by the hot-rolling process)
30 = Coated/plated with metal:  Painted, Polyvinylidene Fluoride (PVDF), regardless of whether or not laminated
40 = Coated/plated with metal:  Painted, All Others (i.e., other than PVDF), regardless of whether or not laminated
80 = Coated/plated with metal:   Laminated but not painted
90 = Coated/plated with metal:  Neither painted nor laminated

The classification of "painted" does not include pretreatments such as phosphatizing or chromatizing alone, nor does it include temporary oils or greases.

**FIELD NUMBER 3.2:**     **REDUCTION PROCESS**

FIELD NAME:      ROLLH

DESCRIPTION:     Reduction Process

10 = Cold rolled
20 = Not cold rolled

Note that temper rolling and skin passing do not constitute "cold rolling" in this context.

**FIELD NUMBER 3.3:**     **CLAD MATERIAL/COATING METAL**

FIELD NAME:     CMETALH

DESCRIPTION:     Clad Material/Coating Metal

010 = Zinc/Iron
020 = Zinc (galvanized) (e.g., ASTM A653, coating designation G30)
024 = Zinc (galvannealed) (e.g., ASTM A653, coating designation ZF180)
040 = Zinc/Magnesium
050 = Zinc/Aluminum/Magnesium (approximately 90% Zn/7% Al/ 3% Mg (e.g., ASTM A1046))
060 = Zinc/Aluminum, (approximately 95% Zn/ 5% Al) (e.g., ASTM A875  Type I and ASTM A875 Type II)
065 = Zinc/Aluminum (approximately 55% Al/ 45% Zn (e.g., ASTM A792)
080 = Zinc/Nickel (e.g., ASTM A918)
160 = Aluminum (e.g., ASTM A463)
170 = Aluminum/Silicon
180 = Nickel
190 = Iron/Nickel
200 = Brass

Use additional number codes for each other clad material/coating metal, and explain what differentiates each of those from the ones listed above.

The "zinc/iron" category is for use for products whose coatings, at the time they were being applied, contained both zinc and iron; the "zinc/iron" category is not for use for galvannealed products.  If the coating metal is zinc, but the coating is transformed into a zinc and iron intermetallic alloy through subsequent annealing, the "zinc (galvannealed)" category should be used.

**FIELD NUMBER 3.4:**     **METALLIC COATING WEIGHT**

     FIELD NAME:     CWEIGHTH

     DESCRIPTION:     Metallic Coating Weight

10 = < 0.28 oz/ft2 (e.g., ASTM A653 coating designation ZF75)
20 = 0.28 to < 0.48 oz/ft2 (e.g., ASTM A653 coating designations G30 and Z90)
30 = 0.48 to < 0.58 oz/ft2 (e.g., ASTM A792 coating designations AZ50)
40 = 0.58 to < 0.78 oz/ft2 (e.g., ASTM A653 coating designations G60 and Z180)
50 = 0.78 to < 1.10 oz/ft2 (e.g., ASTM A653 coating designations G90 and Z275)
60 = 1.10 to < 1.60 oz/ft2 (e.g., ASTM A653 coating designation G115)
70 = 1.60 to < 2.10 oz/ft2 (e.g., ASTM A653 coating designation Z550)
80 = > 2.10 oz/ft2 (e.g., ASTM A653 coating designations G300 and Z900)

Note that the coating weights are the minimum requirement for the total of both sides of
the steel, and are based on the minimum requirements.

**FIELD NUMBER 3.5:**     **METALLIC COATING PROCESS**

     FIELD NAME:     CPROCESH

     DESCRIPTION:     Metallic Coating Process

10 = Hot-dipped
20 = Electrolytically Coated
40 = Clad

**FIELD NUMBER 3.6:**     **QUALITY**

     FIELD NAME:     CQUALH

     DESCRIPTION:     Quality

30 = Structural (e.g., ASTM A635 designation SS)
40 = Commercial (e.g., ASTM A635 designation CS Type A)
50 = Drawing (whether or not special killed) (e.g., ASTM A635 designation FS Type B)
60 = Bake Hardenable (e.g., ASTM A635 designation BHS)
70 = Deep Drawing Steels (e.g., Deep Drawing Quality, Deep Drawing Quality Special
Killed, Extra Deep Drawing Quality, Extra Deep Drawing Quality Special Killed, Deep
Drawing Quality Special Killed Fully Stabilized, Extra Deep Drawing Quality Special
Killed Fully Stabilized, Interstitial Free) (e.g., ASTM A635 designation DDS Type A)
80 = HSLA (e.g., ASTM A653 designation HSLA)
90 = Advanced High-Strength Steel (e.g., Transformation Induced Plasticity ("TRIP"),
TRIP-Assisted, Dual Phase, Multi-Phase, Complex Phase (e.g., ASTM 1079))

Use additional number codes for each additional Quality, and explain in detail what differentiates each of those from the ones listed above. Please be sure to describe the properties that distinguish the additional Quality from those listed above.

Report as "bake hardenable" sales of all models which are classified as bake hardenable regardless of any other quality designation (e.g., a drawing quality bake hardenable steel would be reported under bake hardenable, not under drawing quality).

**FIELD NUMBER 3.7:**     **YIELD STRENGTH**

FIELD NAME:     CSTRENH

DESCRIPTION:     Yield Strength

1 = Minimum specified yield strength to <25,000 psi
3 = Minimum specified yield strength of 25,000 psi to <35,000 psi
4 = Minimum specified yield strength of 35,000 psi to <50,000 psi
5 = Minimum specified yield strength of 50,000 psi to <65,000 psi
6 = Minimum specified yield strength of 65,000 psi to <80,000 psi
7 = Minimum specified yield strength of 80,000 psi to <100,000 psi
8 = Minimum specified yield strength of greater than or equal to 100,000 psi

For example, under ASTM A1079, the minimum specified yield strength for "Designation CP grade 780T/500Y is 500 MPa, which converts to approximately 72,519 psi, so for that product, you would report code "6".

Where no minimum yield strength is required, but a typical minimum is identified within the specification from a standards organization such as ASTM (e.g., under ASTM A653, the typical range of yield strengths for "Designation CS Type A" is identified as 25,000 psi to 55,000 psi, yielding a typical minimum of 25,000 psi, which in turn falls under reporting code "3").

If no such requirements or guidance on minimum specified yield strength is identified in the specification for the product in question, explain in detail your rationale for using one of the above reporting codes to report this field for the product (do not create additional reporting codes).

Finally, provide a chart that identifies all of the specifications/grades/types/designations in your comparison market and U.S. market sales datasbases. After identifying in the first column the complete specification/grade/type/designation identification (e.g., "ASTM A653 Designation SS grade 230"), identify in subsequent columns the allowable range of carbon content, the minimum specified yield strength (in pounds per square inch), the minimum specified tensile strength (in pounds per square inch), and the minimum specified elongation percentage. For those values in this chart that are based

on non-mandatory guidance provided in the specification (such as for the minimum yield strength for the ASTM A653 CS Type A products referenced above), place three asterisks next to the value in question (e.g., "25,000***").

**FIELD NUMBER 3.8:**      **NOMINAL THICKNESS**

        FIELD NAME:      CTHICKH

        DESCRIPTION:      Nominal Thickness

001 = < 0.014"
014 = 0.014" to < 0.018"
018 = 0.018" to < 0.022"
022 = 0.022" to < 0.028"
028 = 0.028" to < 0.044"
044 = 0.044" to < 0.060"
060 = 0.060" to < 0.085"
085 = 0.085" to < 0.130"
130 = > or equal to 0.130"

Report the code based on the nominal thickness. The nominal thickness is the thickness agreed upon between the customer and the supplier at the time of sale. This may be a minimum thickness if the negative thickness tolerance is zero.

**FIELD NUMBER 3.9:**      **NOMINAL WIDTH**

        FIELD NAME:      CWIDTHH

        DESCRIPTION:      Width

1 = < 24"
2 = 24" to < 48"
3 = 48" to < 60"
6 = > 60"

Report the code based on the nominal width.

**FIELD NUMBER 3.10:**      **FORM**

        FIELD NAME:      FORMH

        DESCRIPTION:      Form

1 = Coil
3 = Not in coil (squares or rectangles)

4 = Not in coil (not squares or rectangles)
5 = Not in coil (corrugated)

| Fields 4 through 7 |
| --- |
| Report the information requested concerning the customer and the channel of distribution for the merchandise.  In the section A response, you have described the various channels through which you distribute the merchandise.  The response to field 7 should correspond to the description you have provided in your response to section A. |

**FIELD NUMBER 4.0:**          **Customer Code**

     FIELD NAME:          CUSCODH

     DESCRIPTION:          Report the name of the customer or the internal accounting code designating the customer, as used in your normal course of business.

     NARRATIVE:          Provide a list of customer names and codes as an attachment to your response.  If known, identify customers that export some or all of their purchases of the foreign like product.  Explain how you determined which sales were for consumption in the foreign market.

**FIELD NUMBER 4.1:**          **Consolidated Customer Code**

     FIELD NAME:          CCUSCODH

     DESCRIPTION:          Report only one name or code for each of your customers, even if more than one name or accounting code exists for that customer in your books and records.  For example, if you use different codes for regional offices of the same customer, report the same code for this customer, regardless of the location of the office.

     NARRATIVE:          Provide a list of customer names and codes as an attachment to your response, ensuring that each customer is assigned only one discrete code for this field.

**FIELD NUMBER 5.0:**          **Customer Relationship**

     FIELD NAME:          CUSRELH

     DESCRIPTION:          Report the code designating whether the customer is affiliated.  As previously noted, the definition of affiliated parties is in Appendix I.  For each customer you reported as an affiliate, please provide a detailed explanation of the nature of the affiliation.

1 = Unaffiliated Customers
2 = Affiliated Customers

**FIELD NUMBER 6.0:**  **Customer Category**

FIELD NAME:    CUSCATH

DESCRIPTION:    1 = Original Equipment Manufacturers
2 = Trading Companies
3 = Distributors
4 = Retailers
5 - n = Specify additional categories as required.

NARRATIVE:    Identify any additional categories and indicate the code used for each.  Identify any customers that have been classified in more than one customer category and explain the circumstances requiring such treatment.

**FIELD NUMBER 7.0:**  **Channel of Distribution**

FIELD NAME:    CHANNELH

DESCRIPTION:    The channels of distribution designated in this field should conform to those described in the response to question 3 in section A of the questionnaire.

1 = Channel 1
2 = Channel 2
3 - n = Channel 3 - n.

NARRATIVE:    Identify any additional channels and indicate the code used for each.  The codes for channel of distribution listed above are examples only.  You need not use them.

| **Fields 8 through 14** |
|---|
| Report the information requested concerning the terms of delivery and payment and the dates of the specified events of each sale.  Please be sure to report dates in the specified eight-digit format.  The Glossary of Terms at Appendix I describes Commerce's criteria for determining the date of sale.  The criteria used by Commerce to determine the date of sale may be different from the criteria you use in your accounting system; please contact the official in charge if, after reviewing Commerce's criteria, you are uncertain when a sale has occurred. |

**FIELD NUMBER 8.0:**    **Sale Invoice Date**

    FIELD NAME:    SALINDTH

    DESCRIPTION:    Positions 1 - 4 = Year
    Positions 5 & 6 = Month
    Positions 7 & 8 = Day

**FIELD NUMBER 9.0:**    **Date of Sale (if different than Sale Invoice Date)**

    FIELD NAME:    SALEDATH

    DESCRIPTION:    Include this field only if the date of sale is different from the sale invoice date.

    Positions 1 - 4 = Year
    Positions 5 & 6 = Month
    Positions 7 & 8 = Day

**FIELD NUMBER 10.0:**    **Sale Invoice Number**

    FIELD NAME:    INVOICEH

    DESCRIPTION:    Report the reference number assigned to the invoice in your accounting system.

    NARRATIVE:    Describe the invoice numbering system used by each sales entity that originated a sale reported in this data file.  Is it simply a sequential number or is additional information included in the code, such as place of sale?  If additional information is contained in the code, provide a key describing each component of the code.

**FIELD NUMBER 11.0:**    **Date of Shipment**

    FIELD NAME:    SHIPDATH

    DESCRIPTION:    Report the date of shipment from the last facility under your control; *e.g.*, the factory or distribution warehouse to the customer.

    Positions 1 - 4 = Year
    Positions 5 & 6 = Month
    Positions 7 & 8 = Day

**FIELD NUMBER 12.0:**      **Date of Receipt of Payment**

     FIELD NAME:      PAYDATEH

     DESCRIPTION:      Report the date your records indicate payment was received from the customer.

         Positions 1 - 4 = Year
         Positions 5 & 6 = Month
         Positions 7 & 8 = Day

     NARRATIVE:      Indicate the basis for determining the date of payment and the ledger from which this date was identified. If you cannot collect the dates of payment in the time allowed for responding to this questionnaire, explain why and do not complete this field. If you collect the information but a particular invoice is unpaid, leave this field blank for that invoice.

**FIELD NUMBER 13.0:**      **Terms of Delivery**

     FIELD NAME:      SALETERH

     DESCRIPTION:      1 = Delivered
         2 = FOB (specify delivery point; *e.g.*, FOB railroad)
         3 - n = Specify other delivery terms as required.

     NARRATIVE:      Describe the terms of delivery offered and indicate the code used for each. If the terms vary by channel of distribution, explain how these are related.

         The codes for delivery terms listed above are examples only. You need not use them.

**FIELD NUMBER 14.0:**      **Terms of Payment**

     FIELD NAME:      PAYTERMH

     DESCRIPTION:      Report terms of payment granted the customer.

         1 = 30 days after invoice.
         2 = 60 days after invoice.
         3- n = Specify other payment terms as required.

     NARRATIVE:      Describe each of the terms of payment you offer and indicate the code used for each. If the terms vary by channel of distribution,

explain how these are related.  If the payment terms you offer are tied to early payment discounts or to interest penalties for late payment, please explain.  Indicate whether the payment terms are stated or coded on each invoice or, otherwise, how customers agree to payment terms.

The codes for payment terms listed above are examples only.  You need not use them.

---

**Fields 15 through 20**

Report the information requested concerning the quantity sold and the price per unit paid in each sale transaction.  All **price adjustments** granted, including **discounts** and **rebates**, should be reported in these fields.  The gross unit price less price adjustments should equal the net amount of revenue received from the sale.  If the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge.  Refer to the Glossary of Terms at Appendix I for a more complete description of each of the price adjustments listed.

---

**FIELD NUMBER 15.0:**    **Quantity**

FIELD NAME:    QTYH

DESCRIPTION:    Report the sale quantity for this transaction.  In general, this quantity will be the quantity of the specific shipment or invoice line, net of returns where possible.  For sales that have not been fully shipped/invoiced at the time the computer data for this section is prepared, also report the quantity of the sale not yet shipped (*i.e.*, total quantity sold less the quantity shipped and invoiced to date - and reported in other records in this file).

For example, assume the date of sale is the date of the customer's order.  In the last month of the POI a customer orders 100 tons to be shipped in 5 lots of 20 tons each once every 30 days.  At the time of preparation of your questionnaire response, 3 of the 5 shipments have been made and an invoice sent for each shipment to the customer.

The file you submit to Commerce should contain 4 records: one record for each shipment and invoice and a fourth record for the unshipped amount of 40 tons.  For the record containing the unshipped 40 tons, complete the adjustment fields based on estimates.

NARRATIVE:    Explain how returns, if you permit them, affect your sales recorded in the general ledger and sales ledger.

**FIELD NUMBER 16.0:**   **Quantity Unit of Measure**

FIELD NAME:   QTYUNITH

DESCRIPTION:   Report all sales in this file in the same unit of measure.  Use an abbreviation or code to indicate the unit of measure.  For example,

1 or MT = metric tons
2 or KG = kilograms
3 – n or specify as needed.

NARRATIVE:   Provide a table of the units of measure and abbreviations or codes used.

The codes for unit of measure listed above are examples only. You need not use them.

Please use a single unit of measure for expressing all prices, expenses, and adjustments you report.  If you make sales or incur expenses or adjustments using more than one unit of measure, select the predominantly used unit of measure for sales of merchandise to express all reported data.  Additionally, in separate fields report the price, expense or adjustment as it appears in your records (*i.e.*, before the conversion to a single unit of measure), and the conversion factor applied to convert the data to a single unit of measure.

| **Fields 17 through 51** |
| --- |
| Report the sale price, discounts, rebates and all other revenues and expenses in the currencies in which they were earned or incurred and net of taxes rebated or not collected when the product is exported (*e.g.*, net of value added taxes (VAT)). |

**FIELD NUMBER 17.0:**   **Gross Unit Price**

FIELD NAME:   GRSUPRH

DESCRIPTION:   Report the unit price as it appears on the invoice for sales shipped and invoiced in whole or in part.  To report portions of sales not shipped, provide the agreed unit sale price for the quantity that will be shipped to complete the order.  This value should be the gross unit price.  Discounts and rebates should be reported separately in fields numbered 19.n and 20.n, respectively.

**FIELD NUMBER 18.1:**     **Billing Adjustments**

    FIELD NAME:      BILLADJH

    DESCRIPTION:    Report any price adjustments made for reasons other than discounts or rebates.  State whether these billing adjustments are reflected in your gross unit price.  Report a decrease in price as a negative figure and an increase in price as a positive figure.  Report zero in this field if no adjustments were made to the price.  Create a separate field for each type of billing adjustment (*e.g.*, corrections of invoicing errors, post-invoicing price adjustments).

    NARRATIVE:     Describe the nature of each type of billing adjustment that is recognized in your sales records.  Describe the document flow employed to process the price changes.

**FIELD NUMBER 19.1:**     **Early Payment Discounts**

    FIELD NAME:      EARLPYH

    DESCRIPTION:    Report the unit value of any discount granted to the customer for early payment.

    NARRATIVE:     Explain your policy and practice for granting early payment discounts.  Describe the basis for eligibility for such discount.  If discounts vary by channel of distribution (field 7.0) or by customer category (field 6.0), provide an explanation of the discounts given to each channel or category.  Explain how you calculated the per-unit discount.  Where available, provide sample documentation, including sample agreements, for this type of discount.

**FIELD NUMBER 19.2:**     **Quantity Discounts**

    FIELD NAME:      QTYDISH

    DESCRIPTION:    Report the unit value of each type of discount granted to the customer due to the quantity of the purchase.

    NARRATIVE:     Explain your policy and practice for granting quantity discounts.  Describe the basis for eligibility for such discounts.  If discounts vary by channel of distribution (field 7.0) or by customer category (field 6.0), provide an explanation of the discount given to each channel and category.  Explain how you calculated the per-unit discount.  Provide your quantity discount schedule or other documentation establishing the discount program.

**FIELD NUMBER 19.3-n:**   **Other Discounts**

    FIELD NAME:      OTHDIS(1-n)H

    DESCRIPTION:     Report the unit value of other discounts granted to the customer. Create a separate field for reporting each discount granted.

    NARRATIVE:      Explain your policy and practice for granting each additional discount. Describe each type of discount granted and the basis for eligibility for such discount. If discounts vary by channel of distribution (field 7.0) or by customer category (field 6.0), provide an explanation of the discounts given to each category. Explain how you calculated each additional per-unit discount. Where available, provide sample documentation, including sample agreements, for each type of discount.

**FIELD NUMBER 20.1-n:**   **Rebates**

    FIELD NAME:      REBATE(1-n)H

    DESCRIPTION:     Report the unit value of each rebate given to the customer. Create a separate field for reporting each rebate granted. Rebates should be reported with the sales to which they apply.

    NARRATIVE:      Explain your policy and practice for granting rebates. Describe the terms and conditions of each rebate program and when the terms and conditions are established in the sales process. If rebates vary by customer category (field 6.0) or channel of distribution (field 7), provide an explanation of the rebates given to each. For rebates that have not yet been paid, describe how you computed the amount to be rebated. Include your worksheets as an attachment to the response. Where available, provide documentation, including sample agreements, for each type of rebate.

**FIELD NUMBER 21.0**   **Level of Trade**

    FIELD NAME:      LOTH

    DESCRIPTION:     Report the **level of trade**. Use an abbreviation or code to indicate the level of trade.

    NARRATIVE:      Provide a key to any abbreviation or codes used.

**FIELD NUMBER 22.0**   This field is currently not in use.

| Fields 23 through 26 - Movement Expenses |
| --- |
| Report the information requested concerning the direct cost incurred to bring the merchandise from the original place of shipment to the customer's place of delivery if included in the price charged to your customer. Commerce normally considers the production facility as being the original place of shipment. However, if you are a reseller unaffiliated with the producer of the merchandise, you should treat the original place from which you shipped the merchandise as the original place of shipment. If you report something other than the production facility as the original place of shipment, please provide an explanation in your narrative response. |
| All the direct costs incurred to transport the merchandise should be reported in these fields. You may add fields, if needed. For merchandise which was sold during the POI but which has not been shipped at the time of preparation of the response, report estimated charges and your basis for these estimates. |
| The fields listed below anticipate the types of transport expenses commonly incurred on domestic and, in the case of third-country sales, international shipments. However, it is not uncommon for certain of these transport expenses to be combined in a single fee paid a transport company (*e.g.*, combined transport and transport insurance). If expenses are combined, do not attempt to separate them but report them in a single field and explain in your narrative response. |

**FIELD NUMBER 23.0:** **Inland Freight - Plant to Distribution Warehouse**

FIELD NAME: INLFTWH

DESCRIPTION: Report the unit cost of inland freight from the factory to the distribution warehouse or other intermediate location. Where it is necessary to allocate because multiple items were included in a shipment, freight cost should be allocated on the basis incurred (*e.g.*, weight, volume). If you shipped the product directly from the factory to the customer, report the cost of transport in field 25.

NARRATIVE: Describe the forms of transport you used to deliver the merchandise to your distribution warehouse(s) or other intermediate location and any affiliations you had with the carriers during the POI. If you shipped by common carrier, please submit the specific freight charges incurred on each transaction and the method of allocation, when more than one type or size of merchandise was shipped. If it is not possible to specifically identify the cost of each shipment, describe how you calculated the freight cost per unit. Include your worksheets as attachments to the narrative response.

If you used your own vehicles to deliver the product, explain how you calculated the freight cost for each sale and provide the total expense incurred by type of expense (*e.g.*, fuel).  Include your worksheets as attachments to the narrative response.

**FIELD NUMBER 24.0:**     **Warehousing Expense**

FIELD NAME:     WAREHSH

DESCRIPTION:     Report the unit cost of **warehousing**.  The cost of warehousing reported in this field should include only expenses incurred at a distribution warehouse not located at the factory that produced the merchandise, less any reimbursement received from the customer.

NARRATIVE:     Describe the distribution warehousing system you operate and provide a list of the warehouse locations used to distribute the foreign like product.  Describe any warehousing services provided to customers.  Provide a list of customer names and codes that receive warehousing services, including the name and location of the warehouse used.  Also, state whether the warehouse is operated by a separate entity that is affiliated with you and describe the nature of the affiliation.

Describe the manner in which you calculated the unit cost of warehousing and submit your worksheets as an attachment to the narrative response.  If the warehouse is owned by you or an affiliate, describe how you allocated the cost of the warehouse operations.

**FIELD NUMBER 25.0:**     **Inland Freight - Plant/Warehouse to Customer**

FIELD NAME:     INLFTCH

DESCRIPTION:     Report the unit cost of inland freight to the customer's place of delivery from the factory or the distribution warehouse (or other intermediate location).  Where it is necessary to allocate because multiple items were included in a shipment, freight cost should be allocated on the basis incurred (*e.g.*, weight, volume).

NARRATIVE:     Describe the forms of transport you used to deliver the merchandise to your customers and any affiliations you had with the carriers during the POI.  If you shipped by common carrier, please submit the specific freight charges incurred on each transaction and the method of allocation, when more than one type or size of merchandise was shipped.  If it is not possible to

specifically identify the cost of each shipment please describe how you derived the freight cost per unit.  Include your worksheets as attachments to the narrative response.

If you used your own vehicles to deliver the product, provide the total expense incurred by type of expense (*e.g.*, fuel) and describe the method you used to allocate the expenses incurred to each sale. Include your worksheets as attachments to the narrative response.

**FIELD NUMBER 26.0:** **Inland Insurance**

  FIELD NAME:  INSUREH

  DESCRIPTION:  Report the unit cost of inland insurance on shipments from the factory or distribution warehouse to the customer's place of delivery.

  NARRATIVE:  Describe how you calculated the unit cost of inland insurance and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 27.0:** **Destination**

  FIELD NAME:  DESTH

  DESCRIPTION:  Report the internal destination code or other code, such as a postal code, that specifies the customer's place of delivery.

  NARRATIVE:  Provide a key to the codes and destinations.

| **Fields 28 through 37** |
|---|
| Report the information requested concerning the selling expenses listed.  Include the expenses of any affiliated selling agents instead of the commissions paid to those agents. These expenses will be used to make adjustments for different **circumstances of sale**. Report only **direct expenses** in Fields 28 through 37.  Refer to the definitions of **circumstances of sale** and direct and **indirect expenses** in the Glossary of Terms at Appendix I. |

**FIELD NUMBER 28.0:** **Commissions**

  FIELD NAME:  COMMH

  DESCRIPTION:  Report the unit cost of commissions paid to selling agents and other intermediaries.  If more than one commission was paid, report each commission in a separate field.  Do not report commissions paid to affiliated selling agents unless there is a

compelling reason that you cannot report an affiliated agent's actual expenses.

NARRATIVE: Describe the terms under which commissions were paid and how commission rates were determined. Explain whether the amount of the commission varies depending on the party to whom it is paid and whether that party is affiliated with you. Include samples of each type of commission agreement used.

If you report payments to any affiliated selling agent in lieu of the agent's actual expenses, provide an explanation of why you are unable to report those actual expenses. Indicate whether the commissions were paid at **arm's length** by reference to commission payments to unaffiliated parties in the foreign market and other markets. Submit evidence demonstrating the arm's-length nature of the commissions.

**FIELD NUMBER 29.0:** **Selling Agent**

FIELD NAME: SELAGENH

DESCRIPTION: Report the name or internal code designating the commissioned selling agent or intermediary. If more than one commission was paid, report the name or code of each selling agent in a separate field.

NARRATIVE: Provide a list of commissioned selling agents and intermediaries and an internal code for each, the applicable commission rates, and whether the agent is affiliated with you.

**FIELD NUMBER 30.0:** **Selling Agent Relationship**

FIELD NAME: SELARELH

DESCRIPTION: Report the code designating affiliation.

1 = Unaffiliated
2 = Affiliated

**FIELD NUMBER 31.0:** **Credit Expenses**

FIELD NAME: CREDITH

DESCRIPTION: Report the unit cost of credit computed at the actual cost of short-term debt incurred by your company in the foreign market. If you

did not borrow short-term during the POI, use a published commercial short-term lending rate.

This expense should be calculated and reported on a transaction-by-transaction basis using the number of days between date of shipment to the customer and date of payment. If you are unable to determine actual payment dates from your records, you may base the calculation on the average age of accounts receivable. If payment has not yet been received for this sale, leave this field blank for the transaction.

NARRATIVE: Provide the equation you have used to calculate credit expenses and a worksheet showing the calculation of your average short-term interest rate. Explain the calculation and any other factors that affect net credit costs, such as compensating deposits to the extent that they were a precondition for acquiring the loan. Indicate the source of the short-term interest rates used in the calculation.

**FIELD NUMBER 32.0:** **Late Payment Fee**

FIELD NAME: LATEPAYH

DESCRIPTION: Report the per unit fees collected on each sale for late payment of the invoice.

NARRATIVE: Describe the conditions under which you charge customers such fees. If the practice varies by channel of distribution or category of customer, explain why it varies and how.

**FIELD NUMBER 33.0:** **Advertising Expenses**

FIELD NAME: ADVERTH

DESCRIPTION: Report the unit cost of advertising specifically for the foreign like product that you have paid on behalf of your customer. This is the cost you incurred to advertise to your customer's customers. Report all advertising expenses incurred to advertise to your customers as part of indirect selling expenses (Field 38).

NARRATIVE: Describe separately advertising programs directed at your customer's customer (*e.g.*, co-op advertising) and advertising programs directed at your customers. Provide separate lists of the expenses incurred for each and provide worksheets demonstrating

B-27

the allocation of the advertising to your customer's customers to each sale of the foreign like product.

**FIELD NUMBER 34.0:**      **Warranty Expense**

FIELD NAME:       WARRH

DESCRIPTION:      Report the unit cost of warranty expenses incurred during the POI. Warranty expenses should include only the direct expense less any reimbursement received from the customer or unaffiliated parts suppliers.  Report indirect warranty expenses as part of indirect selling expenses (field 38).  If you produce different models or types of the merchandise under investigation, warranty cost should be based upon your experience by model.  If this is impractical, express warranty cost on the most product specific basis possible.

NARRATIVE:        Describe both the warranty expenses incurred on sales of this merchandise and the reimbursement, if any, received or expected from the customer.  Provide lists of the direct and indirect expenses incurred and worksheets demonstrating the allocation of the direct expense to each sale of the foreign like product.  Describe the nature and terms of the warranty provided.  Include a copy of each type of warranty agreement as an attachment to the response.

Include a schedule of direct and indirect warranty expenses incurred for the foreign like product for the three most recently completed fiscal years.  In addition, calculate a cost per unit for each year.

**FIELD NUMBER 35.0:**      **Technical Service Expense**

FIELD NAME:       TECHSERH

DESCRIPTION:      Report the unit cost of **technical services**.  Include only the direct expense less any reimbursement received from the customer.  Report indirect technical service expenses as part of indirect selling expenses (field 38).

NARRATIVE:        Describe the technical services provided, including any service, repair, or consultation that directly relate to sales of the foreign like product.  Describe any reimbursement received for these services.  Provide lists of the direct and indirect expenses incurred and worksheets demonstrating the allocation of the direct expense to each sale of the foreign like product.

Filed By: William Horn, Filed Date: 11/18/24 12:03 PM, Submission Status: Approved

**FIELD NUMBER 36.0:**      **Royalties**

     FIELD NAME:      ROYALH

     DESCRIPTION:      Report the unit cost of any royalties you paid on the sale of the product. Create a separate field for each royalty paid.

     NARRATIVE:      Describe each royalty paid to third parties as a result of production or sale. Include a description of all royalties paid in this section of the narrative but include the unit cost of production royalties as a **cost of manufacture** (section D). The description should include the key terms of the agreements, the names of the parties that granted the rights, and a list of products covered by the agreements.

**FIELD NUMBER 37.0:**      **Bank Charges**

     FIELD NAME:      BANKCHARH

     DESCRIPTION:      Report the unit cost of sales-specific bank charges incurred during the POI, including fees associated with opening letters of credit, transaction fees deducted from electronic payments from customers, *etc*.

     NARRATIVE:      Describe each type of bank charge incurred and your basis for considering it directly related to sales of the foreign like product.

**FIELD NUMBER: 38.1-n:**      **Other Direct Selling Expenses**

     FIELD NAME:      DIRSELH

     DESCRIPTION:      Report the unit cost of other direct selling expenses you incurred on sales of the foreign like product which are not reported in other fields. Report each additional direct selling expense in a separate field. Include only the direct expenses incurred less any reimbursement received from the customer.

     NARRATIVE:      Describe each type of direct selling expense incurred and your basis for considering it directly related to sales of the foreign like product.

| **Fields 38 and 39** |
|---|
| Report the information requested concerning indirect selling expenses in field 38 and **inventory carrying cost** in field 39. Indirect selling expenses include all sales overhead expenses (*e.g.*, salesmen's salaries and office rent) as well as any indirect expenses |

> separated from fields 33 through 38. Refer to the Glossary of Terms at Appendix I for a more complete description of these items.
>
> In conjunction with the credit expenses reported above, inventory carrying costs should account for each day between the date of final production of merchandise until payment is received from the customer. In other words, inventory carrying costs should account for the period between final production and shipment, and credit expenses should account for the period between shipment and payment. The date of final production is typically the date merchandise is transferred from the work-in-progress ledger to the finished goods inventory. Date of shipment is defined above.

**FIELD NUMBER 39.0:**        **Indirect Selling Expenses**

      FIELD NAME:        INDIRSH

      DESCRIPTION:        Report the unit cost of indirect selling expenses (*e.g.*, sales office rent and salesmen's salaries) incurred to sell the product in the foreign market. Where indirect selling expenses have been incurred by the producer and an affiliated reseller, create separate fields for the expenses of each company.

      NARRATIVE:        Describe the sales overhead expenses incurred. Include a list of the overhead expenses incurred and provide worksheets demonstrating the allocation of these expenses, as well as the indirect expenses separated from the direct selling expenses reported in fields 33 through 38. Where more than one company incurred indirect selling expenses, submit separate worksheets for each.

**FIELD NUMBER 40.0:**        **Inventory Carrying Costs**

      FIELD NAME:        INVCARH

      DESCRIPTION:        Report the unit opportunity cost incurred from the time of final production to the time of shipment in the foreign market, computed at the actual cost of short-term debt incurred by your company in the foreign market. If you are a reseller, reported the unit opportunity cost incurred from the time you purchased the merchandise to the time of shipment, computed at the actual cost of short-term debt incurred by your company in the foreign market. If you did not borrow short-term during the POI, use a published commercial short-term lending rate.

                                   Please calculate inventory carrying costs on as specific a basis as possible (*e.g.*, sale, model, product group, *etc.*).

B-30

NARRATIVE:    Describe how the products under investigation are stored prior to shipment and provide the average length of time in inventory prior to shipment to the first unaffiliated customer (or to the affiliated customer if you are reporting such sales). The cost reported should be based on the period from the end of production to the date of shipment to the customer. Indicate the source of the short-term interest rate used in the calculation. Include your worksheets as attachments to the response.

**FIELD NUMBER 41.0:**    **Packing Cost**

FIELD NAME:    PACKH

DESCRIPTION:    Report the unit cost of packing the foreign like product for sale in the foreign market. Include the cost of labor, materials and overhead. If a product is produced at more than one plant, report the weighted average packing cost of all plants combined.

NARRATIVE:    Describe the packing types used in the foreign market. For each type of packing, provide a worksheet that demonstrates the calculation of packing material, labor and overhead for a single unit.

The worksheets should include a list of packing materials, the average cost of each material, and how much of each material was used. In addition, report the average labor hours by packing type and the average labor cost per hour including benefits. Include a list of overhead expenses incurred in packing and demonstrate how these expenses were allocated to each packing type.

| Field 42 |
|---|
| If you are reporting sales of the identical product in both the U.S. and foreign markets, it is not necessary to supply this information. However, if you elect not to supply this information and Commerce later determines that a U.S. sale should be compared to a sale of a similar product in the foreign market, Commerce may have to resort to the **facts available**. Refer to **difference in merchandise adjustments** in the Glossary of Terms at Appendix I. |

**FIELD NUMBER 42.0:**      **Manufacturer**

     FIELD NAME:      MFRH

     DESCRIPTION:      If you have sold the foreign like product of more than one manufacturer, identify the manufacturer in each record by the use of a code. If the manufacturer is unknown, identify your supplier.

     NARRATIVE:      If you are not the manufacturer, report the manufacturer of the merchandise in your narrative response and provide a key to the code.

**FIELD NUMBER 43.0:**      **Samples**

     FIELD NAME:      SAMPLEH

     DESCRIPTION:      If the transaction in question involved sample merchandise, please report the code "S" (sample).

     NARRATIVE:      Explain the circumstances surrounding the sales of sample merchandise. Describe how sales of sample merchandise differ from sales of merchandise that does not fall under this category.

---

**Fields 44 through 51**

Please respond to the following items if you are reporting third-country sales.

---

**FIELD NUMBER 44.0:**      **International Freight**

     FIELD NAME:      INTNFRT

     DESCRIPTION:      Report the unit cost of ocean freight or air freight expense incurred on shipments from the port of exit in the country of manufacture to the third-country port of entry.

     NARRATIVE:      Indicate whether the ocean freight carrier is affiliated. Supply any contracts or tariff rate agreements with carriers that apply to the merchandise under investigation. Describe how you calculated the unit cost of ocean freight and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 45.0:**      **Marine Insurance**

    FIELD NAME:      MARNINT

    DESCRIPTION:    Report the unit cost of marine insurance expense incurred on shipments from the port of exit in the country of manufacture to the third- country port of entry.

    NARRATIVE:      Describe how you calculated the unit cost of marine insurance and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 46.0:**      **Third-Country Inland Freight from Port to Warehouse**

    FIELD NAME:      INLFPWT

    DESCRIPTION:    Report the unit cost of any freight expense incurred on shipments from the third-country port of entry to the affiliated reseller's warehouse or other intermediate location.  If the sale is direct to an unaffiliated third-country customer, report the unit cost of freight from the port of entry to the unaffiliated customer.

    NARRATIVE:      Describe how you calculated the unit cost of inland freight and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 47.0:**      **Third-Country Inland Freight from Warehouse to the Unaffiliated Customer**

    FIELD NAME:      INLFWCT

    DESCRIPTION:    Report the unit cost of freight expense incurred on shipments from the affiliated third-country reseller's warehouse or other intermediate location to the unaffiliated customer.

    NARRATIVE:      Describe how you calculated the unit cost of third-country inland freight and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 48.0:**      **Third-Country Inland Insurance**

    FIELD NAME:      TCINLINT

    DESCRIPTION:    Report the unit cost of third-country inland insurance expense incurred on shipments within the third country.

NARRATIVE:      Describe how you calculated the unit cost of third-country inland insurance and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 49.0:**      **Third-Country Brokerage and Handling**

FIELD NAME:      TCBRKHT

DESCRIPTION:      Report the unit cost of any additional brokerage and handling expense incurred on shipments within the third country.

NARRATIVE:      Describe how you calculated the unit cost of third-country brokerage and handling and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 50.0:**      **Third-Country Customs Duty**

FIELD NAME:      TCDUTYT

DESCRIPTION:      Report the unit amount of any third-country customs duty and customs fees paid on foreign like product.

NARRATIVE:      Describe how you calculated the unit cost of third-country customs duties and customs fees and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 51.0:**      **Duty Drawback**

FIELD NAME:      DTYDRAWT

DESCRIPTION:      Report the unit amount of any duty drawback received upon exportation of the foreign like product from the country of manufacture to the third country.

NARRATIVE:      Explain how the amount of duty drawback received is calculated and submit your worksheets as attachments to the narrative response.

| **Other Revenues and Expenses** |
|---|
| The fields listed above have been designed to capture all revenues and expenses you have incurred in selling the foreign like product in the foreign market.  If there are additional revenues or expenses that are not reported above, create a field for each in the computer file, describe the revenue or expense in your narrative response, and include all calculation worksheets as attachments to your narrative response. |

## SECTION C

## Sales to the United States

### I.      General Explanation

This section of the questionnaire provides instructions for reporting your sales of the **subject merchandise** in or to the United States.   Normally, we will compare the prices at which this merchandise is sold in the United States with the prices at which the **foreign like product** is sold in the foreign market in order to determine whether the subject merchandise was sold at less than **normal value** in the United States during the period of investigation (POI).

*Note:  Please submit a copy of the computer program/spreadsheet/worksheet that you used to calculate the prices, expenses, and adjustments reported in your U.S. sales lists.  The documentation submitted should provide detail on any formulas used for the calculation of the figures provided in the sales lists, identify any factors used therein, and identify the price or unit basis to which the factors are applied.*

### II.     Summary of U.S. Sales File

Please complete the U.S. market sales database summary that appears in Appendix VII.

At the top of the spreadsheet is a place to indicate the date the spreadsheet was submitted to Commerce.  You are responsible for ensuring that the spreadsheet is consistent with the accompanying narrative response and any accompanying databases submitted on electronic media.  Each time you revise your questionnaire response, such as in answer to a supplemental questionnaire, and your response requires a change in a spreadsheet, you must submit a revised spreadsheet with the date the revision is submitted to Commerce.

Please submit the worksheet computer file in a standard spreadsheet format such as Excel.  You must include as well a printout of this spreadsheet that is identical in content to the computer file.

If you have any questions concerning completion and submission of this spreadsheet, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

### III.    Computer File of U.S. Sales

In accordance with the instructions provided in this section, prepare a separate computer data file containing each sale made during the POI of the subject merchandise, including sales of further manufactured merchandise.  Do not report canceled sales.  This file format is designed to accommodate **export price** (EP) and **constructed export price** (CEP) transactions.

C-2

For sales of merchandise that has been shipped to the customer and invoiced by the time this response is prepared, each record in the computer data file should correspond to an invoice line item (*i.e.*, each unique product included on the invoice). For sales of merchandise that have not yet been fully shipped and invoiced, separate records should be provided for the shipped and unshipped portions of the sale. For sales shipped in installments, a separate record should be provided for each installment.

Each computer record submitted should contain the information requested concerning the product sold, the terms of the sale, the selling expenses incurred, and other information. The following portion of section C describes the information Commerce requires.

The chart which follows is a summary of the data fields for the U.S. sales computer file which are described in the reminder of this section of the questionnaire. Please refer to Appendix II Instructions for Submitting Computer Data for instructions on preparing the electronic file.

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 0.0 | Sequential Number | SEQU |
| 1.0 | Complete Product Code | PRODCODU |
| 2.0 | Matching Control Number | CONNUMU |
| 3.1 thru 3.n | Product Characteristics | |
| 4.0 | Sale Type | SALEU |
| 5.0 | Consignment Identifier | CONSIGNU |
| 6.0 | Customer Code | CUSCODU |
| 6.1 | Consolidated Customer Code | CCUSCODU |
| 7.0 | Customer Category | CUSCATU |
| 8.0 | Channel of Distribution | CHANNELU |
| 9.0 | Sale Invoice Date | SALINDTU |
| 10.0 | Date of Sale | SALEDATU |
| 11.0 | Sale Invoice Number | INVOICEU |
| 12.0 | Date of Shipment | SHIPDATU |
| 13.0 | Date of Receipt of Payment | PAYDATEU |
| 14.0 | Terms of Delivery | SALETERU |
| 15.0 | Terms of Payment | PAYTERMU |
| 16.0 | Quantity | QTYU |
| 17.0 | Quantity Unit of Measure | QTYUNITU |
| 18.0 | Gross Unit Price | GRSUPRU |
| 19.1-n | Billing Adjustments | BILLADJU |
| 20.1 | Early Payment Discounts | EARLPYU |

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 20.2 | Quantity Discounts | QTYDISU |
| 20.3-20.n | Other Discounts | OTHDIS1-n U |
| 21.1-21.n | Rebates | REBATEU |
| 22.0 | Level of Trade | LOTU |
| 23.0 | Inland Freight - Plant to Distribution Warehouse | DINLFTWU |
| 24.0 | Warehousing Expense | DWAREHU |
| 25.0 | Inland Freight - Plant/Warehouse to Port of Exit | DINLFTPU |
| 26.0 | Country of Manufacture Inland Insurance | INSUREU |
| 27.0 | Brokerage and Handling in the Country of Manufacture | DBROKU |
| 28.0 | Brokerage and Handling in the United States | USBROKU |
| 29.0 | International Freight | INTNFRU |
| 30.0 | Marine Insurance | MARNINU |
| 31.0 | U.S. Inland Freight from Port to Warehouse | INLFPWU |
| 32.0 | U.S. Warehousing Expense | USWAREHU |
| 33.0 | U.S. Inland Freight from Warehouse to the Unaffiliated Customer | INLFWCU |
| 34.0 | U.S. Inland Insurance | USINSURU |
| 35.0 | Other U.S. Transportation Expense | USOTHTRU |
| 36.0 | U.S. Customs Duty | USDUTYU |
| 37.0 | Destination | DESTU |
| 38.0 | Duty Drawback | DTYDRAWU |
| 39.0 | Commissions | COMMU |
| 40.0 | Selling Agent | SELAGENU |
| 41.0 | Selling Agent Relationship | SELARELU |
| 42.0 | Credit Expenses | CREDITU |
| 43.0 | Late Payment Fee | LATEPAYU |
| 44.0 | Advertising Expenses | ADVERTU |
| 45.0 | Warranty Expense | WARRU |
| 46.0 | Technical Service Expense | TECHSERU |
| 47.0 | Royalties | ROYALU |
| 47.1 | Bank Charges | BANKCHARU |
| 48.1-n | Other Direct Selling Expenses | DIRSELU |
| 49.1 | Indirect Selling Expenses Incurred in the Country of Manufacture | DINDIRSU |

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 49.2 | Indirect Selling Expenses Incurred in the United States | INDIRSU |
| 50.1 | Inventory Carrying Costs Incurred in the Country of Manufacture | DINVCARU |
| 50.2 | Inventory Carrying Costs Incurred in the United States | INVCARU |
| 51.0 | Packing Cost | PACKU |
| 52.0 | U.S. Repacking Cost | REPACKU |
| 53.0 | Value Added Tax | TAXU |
| 54.0 | Further Manufacturing | FURMANU |
| 55.0 | Samples | SAMPLEU |
| 56.0 | Foreign Trade Zone | FTZU |
| 57.0 | Temporary Import Bond | TEMPIMPU |
| 58.0 | Manufacturer | MFRU |

## IV.  U.S. Market Sales Reconciliation

Please provide a reconciliation of the sales reported in your U.S. sales databases to the total sales listed in your financial statements (profit and loss/income statement). Your reconciliation **must** provide supporting documentation (*e.g.*, financial statements, trial balance sheets, relevant excerpts from general ledger, sub-ledger, *etc.*) **for each** step in the reconciliation. The reconciliation must include the following:

1.  Worksheets demonstrating how the POI financial statements' sales totals tie to the general ledger sales revenue accounts. Please include the relevant supporting documents from your accounting and financial systems, such as excerpts from the general ledger, sub-ledger, etc.

2.  Worksheets demonstrating how the general ledgers' sales revenue accounts in step one, above, tie to the sales reported in the U.S. sales databases. The worksheet should identify the total quantity and value of all sales in the fiscal years overlapped by the POI and identify the quantity and value of each category of non-subject merchandise sales that are excluded from your reported sales of foreign like product/subject merchandise (*e.g.*, sales outside the POI, sales to foreign markets other than the United States, *etc.*). Please include the relevant supporting documents from your accounting and financial systems, such as excerpts from the general ledger, sub-ledger, etc.

3.  A detailed narrative explaining how all worksheets and supporting documentation tie together.

4.  An explanation of the means used to identify and exclude all these non-subject merchandise sales (*e.g.*, internal country code, product description, *etc.*).

5.      A product list, with product codes and descriptions, of all products excluded from the reported sales of subject merchandise.

## V.      Reporting of Expenses

For each expense data field reported in the sales database, using the chart of accounts, please identify the account(s) used to calculate such expense.  In addition, for each reported field, provide all sub accounts to the account referenced.

This information can be provided in chart form.  For example, for movement expenses, please report the expenses in the following manner:

| Field | Main Account | Sub Accounts |
|---|---|---|
| Port Charges (PORTCHGU) | Account 030 Handling | Account 031 Port XYZ Account 0312 XXX |

Each field used to report expenses should thus identify all accounts which were used to calculate such expense.

## VI.      Instructions for the Narrative Response and the Computer File of U.S. Sales

The following instructions combine the questionnaire with the computer data file format.  "FIELD NUMBER" includes the number and descriptive name of the field in the computer data file.  "FIELD NAME" includes the "short" or variable name for the submitted printouts of the data file.  "DESCRIPTION" defines the data you should report in the field of the computer data file, and "NARRATIVE" describes the additional information we request you provide, not in the computer data file, but in a narrative response.

| **Fields 1 through 3** |
|---|
| Report the information requested concerning the product sold.  Fields 1 and 2 are reserved for the product code and a matching control number Commerce will use in the calculation of the dumping margin.  Fields numbered 3.1 to 3.n specify the product characteristics requested by Commerce.  You may add additional product characteristics.  However, if you add characteristics not specified in the questionnaire, describe in the narrative response why you believe that Commerce should use this information to define **identical** and **similar merchandise**. <br><br> If the product sold was further manufactured in the U.S., report the product code of the product sold in field 1, the control number of the product imported in field 2, and the technical characteristics of the product imported in field 3.1 to 3. n. |

C-6

**FIELD NUMBER 0.0**:          **Sequential Number**

  FIELD NAME:          SEQU

  DESCRIPTION:          Assign a unique sequential number to each sales record.  This sales record number should remain constant in all future submissions (*i.e.*, sales record line items should not be renumbered during the course of this segment).  This field will assist you in reconciling our calculations with the data you submit in your response.

**FIELD NUMBER 1.0:**          **Complete Product Code**

  FIELD NAME:          PRODCODU

  DESCRIPTION:          Report the commercial product code assigned by your company in the normal course of business to the specific product sold in the United States.

  If the product sold is further manufactured in the United States, report the product code of the product sold not the product imported.

  NARRATIVE:          The product code should be described in response to question 7 b in section A of this questionnaire.

**FIELD NUMBER 2.0:**           **Matching Control Number**

  FIELD NAME:          CONNUMU

  DESCRIPTION:          Assign a control number to each unique product reported in the section C sales data file.  Identical products should be assigned the same control number in each record in every file in which the product is referenced (*e.g.*, products with identical physical characteristics reported in the foreign market sales file and the U.S. market sales file should have the same control number).

  If the product sold is further manufactured in the United States, report the control number of the product imported, not of the product sold.

**FIELD NUMBER 2.1:**     **OVERRUNS**

     FIELD NAME:     OVERRUNU

     DESCRIPTION:     Indicate whether the transaction is an overrun or not.  Please describe in detail how overrun merchandise is categorized internally and marketed.  If it is not possible to separately identify overruns, explain why you are unable to do so.

Y = Yes, the transaction is an overrun.
N = No, the transaction is not an overrun.

Note that this field should **not** be included in the construction of the CONNUM.

**FIELD NUMBER 2.2:**     **PRIMARY VS. SECONDARY MERCHANDISE**

     FIELD NAME:     PRIMEU

     DESCRIPTION:     Indicate whether the merchandise is prime or non-prime (secondary) merchandise.  Please describe in detail how secondary merchandise is categorized internally and marketed.

1 = Prime
2 = Non-Prime

Note that this field should **not** be included in the construction of the CONNUM.

**FIELD NUMBER 2.3:**     **SPECIFICATION/GRADE**

     FIELD NAME:     SPECU

     DESCRIPTION:     Report the specification/designation/type/grade of the product.  For example, for ASTM A653, designation SS, grade 33, report "ASTM A653 designation SS grade 33;" for ASTM A653, designation CS Type A, report "ASTM A653 designation CS Type A;" etc.

Also, if you have not already done so, submit a complete English language version of every single specification for which you have sales.  If products are made to a grade only (e.g., only identification is "SAE grade 1006"), but not a specification, be sure to report the full name of the grade (e.g., "SAE grade 1006").  If a specification is proprietary, provide a complete, legible copy of the original specification and a complete English translation, and explain in your narrative when, by whom, and how the specification was devised.

Note that this field should **not** be included in the construction of the CONNUM.

**The following fields should be included in the construction of the CONNUM:**

**FIELD NUMBER 3.1**:         **TYPE**

      FIELD NAME:         CTYPEU

      DESCRIPTION:         Type

10 = Clad (metals bonded by the hot-rolling process)
30 = Coated/plated with metal:  Painted, Polyvinylidene Fluoride (PVDF), regardless of whether or not laminated
40 = Coated/plated with metal:  Painted, All Others (i.e., other than PVDF), regardless of whether or not laminated
80 = Coated/plated with metal:   Laminated but not painted
90 = Coated/plated with metal:  Neither painted nor laminated

The classification of "painted" does not include pretreatments such as phosphatizing or chromatizing alone, nor does it include temporary oils or greases.

**FIELD NUMBER 3.2:**         **REDUCTION PROCESS**

      FIELD NAME:         ROLU

      DESCRIPTION:         Reduction Process

10 = Cold rolled
20 = Not cold rolled

Note that temper rolling and skin passing do not constitute "cold rolling" in this context.

**FIELD NUMBER 3.3:**         **CLAD MATERIAL/COATING METAL**

      FIELD NAME:         CMETALU

      DESCRIPTION:         Clad Material/Coating Metal

010 = Zinc/Iron
020 = Zinc (galvanized) (e.g., ASTM A653, coating designation G30)
024 = Zinc (galvannealed) (e.g., ASTM A653, coating designation ZF180)
040 = Zinc/Magnesium
050 = Zinc/Aluminum/Magnesium (approximately 90% Zn/7% Al/ 3% Mg (e.g., ASTM A1046))

060 = Zinc/Aluminum, (approximately 95% Zn/ 5% Al) (e.g., ASTM A875 Type I and ASTM A875 Type II)
065 = Zinc/Aluminum (approximately 55% Al/ 45% Zn (e.g., ASTM A792)
080 = Zinc/Nickel (e.g., ASTM A918)
160 = Aluminum (e.g., ASTM A463)
170 = Aluminum/Silicon
180 = Nickel
190 = Iron/Nickel
200 = Brass

Use additional number codes for each other clad material/coating metal, and explain what differentiates each of those from the ones listed above.

The "zinc/iron" category is for use for products whose coatings, at the time they were being applied, contained both zinc and iron; the "zinc/iron" category is not for use for galvannealed products. If the coating metal is zinc, but the coating is transformed into a zinc and iron intermetallic alloy through subsequent annealing, the "zinc (galvannealed)" category should be used.

**FIELD NUMBER 3.4: METALLIC COATING WEIGHT**

FIELD NAME: CWEIGHTU

DESCRIPTION: Metallic Coating Weight

10 = < 0.28 oz/ft2 (e.g., ASTM A653 coating designation ZF75)
20 = 0.28 to < 0.48 oz/ft2 (e.g., ASTM A653 coating designations G30 and Z90)
30 = 0.48 to < 0.58 oz/ft2 (e.g., ASTM A792 coating designations AZ50)
40 = 0.58 to < 0.78 oz/ft2 (e.g., ASTM A653 coating designations G60 and Z180)
50 = 0.78 to < 1.10 oz/ft2 (e.g., ASTM A653 coating designations G90 and Z275)
60 = 1.10 to < 1.60 oz/ft2 (e.g., ASTM A653 coating designation G115)
70 = 1.60 to < 2.10 oz/ft2 (e.g., ASTM A653 coating designation Z550)
80 = > 2.10 oz/ft2 (e.g., ASTM A653 coating designations G300 and Z900)

Note that the coating weights are the minimum requirement for the total of both sides of the steel, and are based on the minimum requirements.

**FIELD NUMBER 3.5: METALLIC COATING PROCESS**

FIELD NAME: CPROCESU

DESCRIPTION: Metallic Coating Process

10 = Hot-dipped
20 = Electrolytically Coated

40 = Clad

**FIELD NUMBER 3.6:**     **QUALITY**

    FIELD NAME:     CQUALU

    DESCRIPTION:     Quality

    30 = Structural (e.g., ASTM A635 designation SS)
    40 = Commercial (e.g., ASTM A635 designation CS Type A)
    50 = Drawing (whether or not special killed) (e.g., ASTM A635 designation FS Type B)
    60 = Bake Hardenable (e.g., ASTM A635 designation BHS)
    70 = Deep Drawing Steels (e.g., Deep Drawing Quality, Deep Drawing Quality Special Killed, Extra Deep Drawing Quality, Extra Deep Drawing Quality Special Killed, Deep Drawing Quality Special Killed Fully Stabilized, Extra Deep Drawing Quality Special Killed Fully Stabilized, Interstitial Free) (e.g., ASTM A635 designation DDS Type A)
    80 = HSLA (e.g., ASTM A653 designation HSLA)
    90 = Advanced High-Strength Steel (e.g., Transformation Induced Plasticity ("TRIP"), TRIP-Assisted, Dual Phase, Multi-Phase, Complex Phase (e.g., ASTM 1079))

    Use additional number codes for each additional Quality, and explain in detail what differentiates each of those from the ones listed above. Please be sure to describe the properties that distinguish the additional Quality from those listed above.

    Report as "bake hardenable" sales of all models which are classified as bake hardenable regardless of any other quality designation (e.g., a drawing quality bake hardenable steel would be reported under bake hardenable, not under drawing quality).

**FIELD NUMBER 3.7:**     **YIELD STRENGTH**

    FIELD NAME:     CSTRENU

    DESCRIPTION:     Yield Strength

    1 = Minimum specified yield strength under <25,000 psi
    3 = Minimum specified yield strength of 25,000 psi to <35,000 psi
    4 = Minimum specified yield strength of 35,000 psi to <50,000 psi
    5 = Minimum specified yield strength of 50,000 psi to <65,000 psi
    6 = Minimum specified yield strength of 65,000 psi to <80,000 psi
    7 = Minimum specified yield strength over 80,000 psi to < 100,000 psi
    8 = Minimum specified yield strength of greater than or equal to 100,000 psi

    For example, under ASTM A1079, the minimum specified yield strength for "Designation CP grade 780T/500Y is 500 MPa, which converts to approximately 72,519 psi, so for that product, you would report code "6".

Where no minimum yield strength is required, but a typical minimum is identified within the specification from a standards organization such as ASTM (e.g., under ASTM A653, the typical range of yield strengths for "Designation CS Type A" is identified as 25,000 psi to 55,000 psi, yielding a typical minimum of 25,000 psi, which in turn falls under reporting code "3").

If no such requirements or guidance on minimum specified yield strength is identified in the specification for the product in question, explain in detail your rationale for using one of the above reporting codes to report this field for the product (do not create additional reporting codes).

Finally, provide a chart that identifies all of the specifications/grades/types/designations in your comparison market and U.S. market sales datasbases. After identifying in the first column the complete specification/grade/type/designation identification (e.g., "ASTM A653 Designation SS grade 230"), identify in subsequent columns the allowable range of carbon content, the minimum specified yield strength (in pounds per square inch), the minimum specified tensile strength (in pounds per square inch), and the minimum specified elongation percentage. For those values in this chart that are based on non-mandatory guidance provided in the specification (such as for the minimum yield strength for the ASTM A653 CS Type A products referenced above), place three asterisks next to the value in question (e.g., "25,000***").

**FIELD NUMBER 3.8:**     **NOMINAL THICKNESS**

FIELD NAME:     CTHICKU

DESCRIPTION:     Nominal Thickness

001 = < 0.014"
014 = 0.014" to < 0.018"
018 = 0.018" to < 0.022"
022 = 0.022" to < 0.028"
028 = 0.028" to < 0.044"
044 = 0.044" to < 0.060"
060 = 0.060" to < 0.085"
085 = 0.085" to < 0.130"
130 = > or equal to 0.130"

Report the code based on the nominal thickness. The nominal thickness is the thickness agreed upon between the customer and the supplier at the time of sale. This may be a minimum thickness if the negative thickness tolerance is zero.

**FIELD NUMBER 3.9:**  **NOMINAL WIDTH**

      FIELD NAME:     CWIDTHU

      DESCRIPTION:    Width

      1 = < 24"
      2 = 24" but < 48"
      3 = 48" but < 60"
      6 = >60"

**FIELD NUMBER 3.10:**  **FORM**

      FIELD NAME:     FORMU

      DESCRIPTION:    Form

      1 = Coil
      3 = Not in coil (squares or rectangles)
      4 = Not in coil (not squares or rectangles)
      5 = Not in coil (corrugated)

| **Fields 4 through 8** |
| --- |
| Report the information requested concerning the sale type, customer and the channel of distribution for the merchandise.  In the section A response, you have described the various channels through which you distribute the merchandise.  The response to field 8 should correspond to the description you have provided in your response to section A. |

**FIELD NUMBER 4.0:**  **Sale Type**

      FIELD NAME:     SALEU

      DESCRIPTION:    Identify the sale as either "EP" (export price) or "CEP" (constructed export price).

**FIELD NUMBER 5.0:**  **Consignment Identifier**

      FIELD NAME:     CONSIGNU

      DESCRIPTION:    Identify the sale as either "C" (consignment sale) or "NC" (non-consignment sale).

**FIELD NUMBER 6.0:**     **Customer Code**

    FIELD NAME:     CUSCODU

    DESCRIPTION:     Report the name of the customer or the internal accounting code designating the customer, as used in your normal course of business.

    NARRATIVE:     Provide a list of customer names and codes as an attachment to your narrative response.

**FIELD NUMBER 6.1:**     **Consolidated Customer Code**

    FIELD NAME:     CCUSCODU

    DESCRIPTION:     Report only one name or code for each of your customers, even if more than one name or accounting code exists for that customer in your books and records.  For example, if you use different codes for regional offices of the same customer, report the same code for this customer, regardless of the location of the office.

    NARRATIVE:     Provide a list of customer names and codes as an attachment to your response, ensuring that each customer is assigned only one discrete code for this field.

**FIELD NUMBER 7.0:**     **Customer Category**

    FIELD NAME:     CUSCATU

    DESCRIPTION:     1 = Original Equipment Manufacturers
2 = Trading Companies
3 = Distributors
4 = Retailers
5 - n = Specify additional categories as required.

    NARRATIVE:     Identify any additional categories and indicate the code used for each.  Identify any customers that have been classified in more than one customer category and explain the circumstances justifying such treatment.

**FIELD NUMBER 8.0:**     **Channel of Distribution**

    FIELD NAME:     CHANNELU

    DESCRIPTION:     The channels of distribution designated in this field should conform to those described in the response to question 3 in section A of the questionnaire.

                        1 = Channel 1
                        2 = Channel 2
                        3 - n = Channel 3 - n

    NARRATIVE:     Identify any additional channels and indicate the codes used for each.  The codes for channel of distribution listed above are examples only.  You need not use them.

---

**Fields 9 through 15**

Report the information requested concerning the terms of delivery and payment and the dates of the specified events of each sale.  Please be sure to report dates in the specified eight-digit format.  The Glossary of Terms at Appendix I describes Commerce's criteria for determining the date of sale.  The criteria used by Commerce to determine the date of sale may be different from the criteria you use in your accounting system; please contact the official in charge if, after reviewing Commerce's criteria, you are uncertain when a sale has occurred.

---

**FIELD NUMBER 9.0:**     **Sale Invoice Date**

    FIELD NAME:     SALINDTU

    DESCRIPTION:     Positions 1 - 4 = Year
                         Positions 5 & 6 = Month
                         Positions 7 & 8 = Day

**FIELD NUMBER 10.0:**     **Date of Sale (if different than Sale Invoice Date)**

    FIELD NAME:     SALEDATU

    DESCRIPTION:     Include this field only if the date of sale is different from the sale invoice date.

                         Positions 1 - 4 = Year
                         Positions 5 & 6 = Month
                         Positions 7 & 8 = Day

**FIELD NUMBER 11.0:**     **Sale Invoice Number**

    FIELD NAME:      INVOICEU

    DESCRIPTION:     Report the reference number assigned to the invoice in your accounting system.

    NARRATIVE:     Describe the invoice numbering system used by each sales entity that originated a sale reported in this data file.  Is it simply a sequential number or is additional information included in the code, such as place of sale?  If additional information is contained in the code, provide a key describing each component of the code.

**FIELD NUMBER 12.0:**     **Date of Shipment**

    FIELD NAME:      SHIPDATU

    DESCRIPTION:     Report the date of shipment from the last facility under your control; *e.g.*, the factory or distribution warehouse to the customer.

                       Positions 1 - 4 = Year
                       Positions 5 & 6 = Month
                       Positions 7 & 8 = Day

**FIELD NUMBER 13.0:**     **Date of Receipt of Payment**

    FIELD NAME:      PAYDATEU

    DESCRIPTION:     Report the date your records indicate payment was received from the customer.

                       Positions 1 - 4 = Year
                       Positions 5 & 6 = Month
                       Positions 7 & 8 = Day

    NARRATIVE:     Indicate the basis for determining the date of payment and the ledger from which this date was identified.  If you cannot collect the dates of payment in the time allowed for responding to this questionnaire, explain why and do not complete this field.  If you collect the information but a particular invoice is unpaid, leave this field blank for that invoice.

**FIELD NUMBER 14.0:**    **Terms of Delivery**

    FIELD NAME:    SALETERU

    DESCRIPTION:    1 = Delivered
                           2 = FOB (specify delivery point; *e.g.*, FOB home market seaport)
                            3 - n = Specify other delivery terms as required.

    NARRATIVE:    Describe the terms of delivery offered and indicate the code used for each.  If the terms vary by channel of distribution, explain how these are related.

                            The codes for delivery terms listed above are examples only.  You need not use them.

**FIELD NUMBER 15.0:**    **Terms of Payment**

    FIELD NAME:    PAYTERMU

    DESCRIPTION:    Report terms of payment granted the customer.

                            1 = 30 days after invoice.
                            2 = 60 days after invoice.
                            3- n = Specify other payment terms as required.

    NARRATIVE:    Describe each of the terms of payment you offer and indicate the code used for each.  If the terms vary by channel of distribution, explain how these are related.  If the payment terms you offer are tied to early payment discounts or to interest penalties for late payment, please explain.  Indicate whether the payment terms are stated or coded on each invoice or, otherwise, how customers agree to payment terms.

                            The codes for payment terms listed above are examples only.  You need not use them.

---

**Fields 16 through 21**

Report the information requested concerning the quantity sold and the price per unit paid in each sale transaction.  All **price adjustments** granted, including **discounts** and **rebates**, should be reported in these fields.  The gross unit price less price adjustments should equal the net amount of revenue received from the sale.  If the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge.  Refer to the Glossary of Terms at Appendix I for a more complete description of each of the price adjustments listed.

---

C-17

**FIELD NUMBER 16.0:**    **Quantity**

FIELD NAME:    QTYU

DESCRIPTION:    Report the sale quantity for this transaction. In general, this quantity will be the quantity of the specific shipment or invoice line, net of returns where possible. For sales that have not been fully shipped/invoiced at the time the computer data for this section is prepared, report the quantity of the sale not yet shipped (total quantity sold less the quantity shipped and invoiced to date - and reported in this file in separate records).

For example, assume the date of sale is the date of the customer's order. In the last month the POI a customer orders 100 tons to be shipped in 5 lots of 20 tons each once every 30 days. At the time of preparation of your questionnaire response, 3 of the 5 shipments have been made and an invoice sent for each shipment to the customer.

The file you submit to Commerce should contain 4 records: one record for each shipment and invoice and a fourth record for the unshipped amount of 40 tons. For the record containing the unshipped 40 tons, complete the adjustment fields based on estimates.

NARRATIVE:    Explain how returns, if you permit them, affect your sales recorded in the general ledger and sales ledger.

**FIELD NUMBER 17.0:**    **Quantity Unit of Measure**

FIELD NAME:    QTYUNITU

DESCRIPTION:    Report all sales in this file in the same unit of measure. Use an abbreviation or code to indicate the unit of measure. For example,

1 or MT = metric tons
2 or KG = kilograms
3 – n or specify as needed.

NARRATIVE:    Provide a table of the units of measure and abbreviations or codes used.

The codes for unit of measure listed above are examples only. You need not use them.

Please use a single unit of measure for expressing all prices, expenses, and adjustments you report.  If you make sales or incur expenses or adjustments using more than one unit of measure, select the predominantly used unit of measure for sales of merchandise to express all reported data.  Additionally, in separate fields report the price, expense or adjustment as it appears in your records (*i.e.*, before the conversion to a single unit of measure), and the conversion factor applied to convert the data to a single unit of measure.

| **Fields 18 through 56** |
|---|
| Report the sale price, discounts, rebates and all other revenues and expenses in the currencies in which they were earned or incurred.  If a revenue or expense field is expressed in the same currency in all records in the file, simply note the currency name on the descriptive chart requested in Appendix II section B (Instructions for Submitting Computer Data - File Formats).  However, if a revenue or expense field is expressed in one currency in certain records and another currency in other records, create a companion field that designates the currency for each record with a code or abbreviation. |

**FIELD NUMBER 18.0:**          **Gross Unit Price**

FIELD NAME:          GRSUPRU

DESCRIPTION:          Report the unit price as it appears on the invoice for sales shipped and invoiced in whole or in part.  To report portions of sales not yet shipped, provide the agreed unit sale price for the quantity that will be shipped to complete the order.  This value should be the gross unit price.  Discounts and rebates should be reported separately in fields numbered 20.n and 21.n, respectively.

**FIELD NUMBER 19.1-n:**          **Billing Adjustments**

FIELD NAME:          BILLADJU

DESCRIPTION:          Report any price adjustments made for reasons other than discounts or rebates.  State whether these billing adjustments are reflected in your gross unit price.  Report a decrease in price as a negative figure and an increase in price as a positive figure.  Report zero in this field if no adjustments were made to the price.  Create a separate field for each type of billing adjustment (*e.g.*, corrections of invoicing errors, post-invoicing price adjustments).

NARRATIVE: Describe the nature of each type of billing adjustment that is recognized in your sales records. Describe the document flow employed to process the price changes.

**FIELD NUMBER 20.1:** **Early Payment Discounts**

FIELD NAME: EARLPYU

DESCRIPTION: Report the unit value of any discount granted to the customer for early payment.

NARRATIVE: Explain your policy and practice for granting early payment discounts. Describe the basis for eligibility for such discount. If discounts vary by channel of distribution (field 8) or by customer category (field 7), provide an explanation of the discounts given to each channel or category. Explain how you calculated the per-unit discount. Where available, provide sample documentation, including sample agreements, for this type of discount.

**FIELD NUMBER 20.2:** **Quantity Discounts**

FIELD NAME: QTYDISU

DESCRIPTION: Report the unit value of each type of discount granted to the customer due to the quantity of the purchase.

NARRATIVE: Explain your policy and practice for granting quantity discounts. Describe the basis for eligibility for such discounts. If discounts vary by channel of distribution (field 8) or by customer category (field 7), provide an explanation of the discount given to each channel and category. Explain how you calculated the per-unit discount. Provide your quantity discount schedule or other documentation establishing the discount program.

**FIELD NUMBER 20.3-n:** **Other Discounts**

FIELD NAME: OTHDIS(1-n)U

DESCRIPTION: Report the unit value of other discounts granted to the customer. Create a separate field for reporting each discount granted.

NARRATIVE: Explain your policy and practice for granting each additional discount. Describe each type of discount granted and the basis for eligibility for such discount. If discounts vary by channel of distribution (field 8) or by customer category (field 7), provide an

explanation of the discounts given to each category.  Explain how you calculated each additional per-unit discount.  Where available, provide sample documentation, including sample agreements, for each type of discount.

**FIELD NUMBER 21.1-n:**    **Rebates**

FIELD NAME:          REBATE(1-n)U

DESCRIPTION:        Report the unit value of each rebate given to the customer.  Create a separate field for reporting each rebate granted.  Rebates should be reported with the sales to which they apply.

NARRATIVE:           Explain your policy and practice for granting rebates.  Describe the terms and conditions of each rebate program and when the terms and conditions are established in the sales process.  If rebates vary by customer category (field 7) or channel of distribution (field 8), provide an explanation of the rebates given to each.  For rebates that have not yet been paid, describe how you computed the amount to be rebated.  Include your worksheets as an attachment to the response.  Where available, provide documentation, including sample agreements, for each type of rebate.

**FIELD NUMBER 22.0**       **Level of Trade**

FIELD NAME:          LOTU

DESCRIPTION:        Report the level of trade. Use an abbreviation or code to indicate the level of trade.

NARRATIVE:           Provide a key to any abbreviation or codes used.  For CEP sales, the level of trade specified should be that of the sale to your affiliated importer, not the subsequent sale to the first unaffiliated customer.

---

**Fields 23 through 36 – Movement Expenses**

Report the information requested concerning the direct cost incurred to bring the merchandise from the original place of shipment to the customer's place of delivery if included in the price charged to your customer.  Commerce normally considers the production facility as being the original place of shipment.  However, if you are a reseller unaffiliated with the producer of the merchandise, you should treat the original place from which you shipped the merchandise as the original place of shipment.  If you report something other than the production facility as the original place of shipment, please provide an explanation in your narrative response.

---

All the direct costs incurred to transport the merchandise should be reported in these fields. You may add fields, if needed. (Field 35 can be used for other U.S. transportation expenses not requested separately.) For merchandise which was sold during the POI but which has not been shipped at the time of preparation of the response, report estimated charges and your basis for these estimates.

The fields listed below anticipate the types of transport expenses commonly incurred on international shipments. However, it is not uncommon for certain of these transport expenses to be combined in a single fee paid a transport company (*e.g.*, combined ocean transport and U.S. internal transport to the customer's place of delivery). If expenses are combined, do not attempt to separate them but report them in a single field and explain in your narrative response.

**FIELD NUMBER 23.0:**   **Inland Freight - Plant to Distribution Warehouse**

   FIELD NAME:   DINLFTWU

   DESCRIPTION:   Report the unit cost of inland freight from the factory to the distribution warehouse (or other intermediate location) in the country of manufacture. Where it is necessary to allocate because multiple items were included in a shipment, freight cost should be allocated on the basis incurred (*e.g.*, weight, volume). If you ship the merchandise from the factory to the port of exit, report the cost of inland freight in field 25.

   NARRATIVE:   Describe the forms of transport you used to deliver the merchandise to your distribution warehouse(s) or other intermediate location and any affiliations you had with the carriers during the POI. If you shipped by common carrier, please submit the specific freight charges incurred on each transaction and the method of allocation, when more than one type or size of merchandise was shipped. If it is not possible to specifically identify the cost of each shipment, describe how you calculated the freight cost per unit. Include your worksheets as attachments to the narrative response.

   If you used your own vehicles to deliver the product, explain how you calculated the freight cost for each sale and provide the total expense incurred by type of expense (*e.g.*, fuel). Include your worksheets as attachments to the narrative response.

**FIELD NUMBER 24.0:**     **Warehousing Expense**

    FIELD NAME:      DWAREHU

    DESCRIPTION:      Report the unit cost of **warehousing** expenses incurred in the country of manufacture on sales to the United States.  The cost of warehousing reported in this field should include only expenses incurred at a distribution warehouse not located at the factory that produced the merchandise, less any reimbursement received from the customer.

    NARRATIVE:      Describe the distribution warehousing system you operate and provide a list of the warehouse locations used to distribute the merchandise.  Describe any warehousing services provided to customers.  Provide a list of customer names and codes that receive warehousing services, including the name and location of the warehouse used.  Also, state whether the warehouse is operated by a separate entity that is affiliated with you and describe the nature of the affiliation.

                            Describe the manner in which you calculated the unit cost of warehousing and submit your worksheets as an attachment to the narrative response.  If the warehouse is owned by you or an affiliate, describe how you allocated the cost of the warehouse operations.

**FIELD NUMBER 25.0:**     **Inland Freight - Plant/Warehouse to Port of Exportation**

    FIELD NAME:      DINLFTPU

    DESCRIPTION:      Report the unit cost of inland freight to the port of exportation in the country of manufacture from the factory or distribution warehouse (or other intermediate location).  Where it is necessary to allocate because multiple items were included in a shipment, freight cost should be allocated on the basis incurred (*e.g.*, weight, volume).

    NARRATIVE:      Describe the forms of transport you used to deliver the merchandise to port of exportation in the country of manufacture and any affiliations you had with the carriers during the POI.  If you shipped by common carrier, please submit the specific freight charges incurred on each transaction and the method of allocation, when more than one type or size of merchandise was shipped.  If it is not possible to specifically identify the cost of each shipment,

please describe how you derived the freight cost per unit.  Include your worksheets as attachments to the narrative response.

If you used your own vehicles to deliver the product, provide the total expense incurred by type of expense (*e.g.*, fuel) and describe the method you used to allocate the expenses incurred to each sale. Include your worksheets as attachments to the narrative response.

**FIELD NUMBER 26.0:**     **Country of Manufacture Inland Insurance**

FIELD NAME:     INSUREU

DESCRIPTION:     Report the unit cost of inland insurance on shipments from the factory or distribution warehouse (or other intermediate location) to the domestic port of exportation in the country of manufacture.

NARRATIVE:     Describe how you calculated the unit cost of inland insurance incurred in the country of manufacture and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 27.0:**     **Brokerage and Handling Incurred in the Country of Manufacture**

FIELD NAME:     DBROKU

DESCRIPTION:     Report the unit cost of any brokerage and handling incurred in the country of manufacture on sales to the United States.

NARRATIVE:     Describe how you calculated the unit cost of brokerage and handling incurred in the country of manufacture and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 28.0:**     **Brokerage and Handling Incurred in the United States**

FIELD NAME:     USBROKU

DESCRIPTION:     Report the unit cost of any brokerage and handling incurred in the United States on sales to the United States.

NARRATIVE:     Describe how you calculated the unit cost of brokerage and handling incurred in the United States and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 29.0:**     **International Freight**

    FIELD NAME:      INTNFRU

    DESCRIPTION:     Report the unit cost of ocean freight or air freight incurred on shipments from the port of exit in the country of manufacture to the U.S. port of entry.

    NARRATIVE:     Indicate whether the ocean freight carrier is affiliated.  Supply any contracts or tariff rate agreements with carriers that apply to the merchandise under investigation.  Describe how you calculated the unit cost of ocean freight and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 30.0:**     **Marine Insurance**

    FIELD NAME:      MARNINU

    DESCRIPTION:     Report the unit cost of marine insurance incurred on shipments from the port of exit in the country of manufacture to the U.S. port of entry.

    NARRATIVE:     Describe how you calculated the unit cost of marine insurance and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 31.0:**     **U.S. Inland Freight from Port to Warehouse**

    FIELD NAME:      INLFPWU

    DESCRIPTION:     For CEP sales, report the unit cost of any freight incurred on shipments from U.S. port of entry to the affiliated reseller's U.S. warehouse or other intermediate location.  For EP sales, report the unit cost of freight from the port of entry to an intermediate location.

    NARRATIVE:     Describe how you calculated the unit cost of inland freight from the port to the warehouse and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 32.0:**     **U.S. Warehousing Expense**

    FIELD NAME:      USWAREHU

    DESCRIPTION:     Report the unit cost of warehousing expenses incurred in the United States.  The cost of warehousing reported in this field

should include only expenses incurred at a warehouse not located at the distribution facility that sold the merchandise. In the case of merchandise processed further in the United States, report only expenses incurred at a warehouse not located at the facility that processed the merchandise. Reduce the cost of warehousing by any reimbursement received from the customer. Warehousing expenses might be incurred if just-in-time delivery or inventory segregation are conditions of sale.

NARRATIVE: Describe the distribution warehousing system you operate and provide a list of the warehouse locations used to distribute the foreign like product. Describe any warehousing services provided to customers. Provide a list of customer names and codes that receive warehousing services, including the name and location of the warehouse used. Also, state whether the warehouse is operated by a separate entity that is affiliated with you and describe the nature of the affiliation.

Describe the manner in which you calculated the unit cost of warehousing and submit your worksheets as an attachment to the narrative response. If the warehouse is owned by you or an affiliate, describe how you allocated the cost of the warehouse operations.

**FIELD NUMBER 33.0:** **U.S. Inland Freight from Warehouse to the Unaffiliated Customer**

FIELD NAME: INLFWCU

DESCRIPTION: For CEP sales, report the unit cost of freight incurred on shipments from the affiliated U.S. reseller to the U.S. unaffiliated customer. For EP sales, report the unit cost of freight to the customer from the port of entry or an intermediate location.

NARRATIVE: Describe how you calculated the unit cost of freight from the warehouse or other intermediate location and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 34.0:** **U.S. Inland Insurance**

FIELD NAME: USINSURU

DESCRIPTION: Report the unit cost of U.S. inland insurance incurred on shipments within the United States.

NARRATIVE: Describe how you calculated the unit cost of U.S. inland insurance and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 35.0:** **Other U.S. Transportation Expense**

FIELD NAME: USOTHTRU

DESCRIPTION: Report the unit cost of any additional transportation expense incurred in the United States.

NARRATIVE: Describe the expense and how you calculated the unit cost and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 36.0:** **U.S. Customs Duty**

FIELD NAME: USDUTYU

DESCRIPTION: Report the unit amount of any customs duty paid on the subject merchandise. Include the unit cost of the U.S. customs processing fee and the U.S. harbor maintenance fee.

NARRATIVE: Describe how you calculated the unit cost of U.S. customs duties and customs fees and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 37.1:** **Destination - ZIP**

FIELD NAME: DESTU

DESCRIPTION: Report the five-digit U.S. postal "ZIP" code of the customer's place of delivery.

**FIELD NUMBER 37.2** **Destination - State**

FIELD NAME: STATEU

DESCRIPTION: Report the state in which the customer's place of delivery is located.

**FIELD NUMBER 38.0:**      **Duty Drawback**

> FIELD NAME:      DTYDRAWU
>
> DESCRIPTION:      Report the unit amount of any duty drawback received upon exportation of the subject merchandise to the United States.
>
> NARRATIVE:      Explain how the amount of duty drawback received is calculated and submit your worksheets as attachments to the narrative response.

| **Fields 39 through 48** |
| --- |
| Report the information requested concerning the selling expenses listed.  Include the expenses of any affiliated selling agents instead of the commissions paid to those agents. These expenses will be used to make adjustments for different **circumstances of sale** or CEP deductions.  Report only direct expenses in Fields 39-48.  Refer to the definitions of circumstances of sale and **direct and indirect expenses** in the Glossary of Terms at Appendix I. |

**FIELD NUMBER 39.0:**      **Commissions**

> FIELD NAME:      COMMU
>
> DESCRIPTION:      Report the unit cost of commissions paid to selling agents and other intermediaries.  If more than one commission was paid, report each commission in a separate field.  Do not report commissions paid to affiliated selling agents unless there is a compelling reason that you cannot report an affiliated agent's actual expenses.
>
> NARRATIVE:      Describe the terms under which commissions were paid and how commission rates were determined.  Explain whether the amount of the commission varies depending on the party to whom it is paid and whether that party is affiliated with you.  Include samples of each type of commission agreement used.
>
> If you report payments to any affiliated selling agent in lieu of the agent's actual expenses, provide an explanation of why you are unable to report those actual expenses.  Indicate whether the commissions were paid at **arm's length** by reference to payments to unaffiliated parties in the United States, the foreign market and other markets.  Submit evidence demonstrating the arm's-length nature of the commissions.

**FIELD NUMBER 40.0:**  **Selling Agent**

  FIELD NAME:  SELAGENU

  DESCRIPTION:  Report the name or internal code designating the commissioned selling agent or intermediary.  If more than one commission was paid, report the name or code of each selling agent in a separate field.

  NARRATIVE:  Provide a list of commissioned selling agents and intermediaries and an internal code for each, the applicable commission rates, and whether the agent is affiliated with you.

**FIELD NUMBER 41.0:**  **Selling Agent Relationship**

  FIELD NAME:  SELARELU

  DESCRIPTION:  Report the code designating affiliation.

    1 = Unaffiliated
    2 = Affiliated

**FIELD NUMBER 42.0:**  **Credit Expenses**

  FIELD NAME:  CREDITU

  DESCRIPTION:  Report the unit cost of credit computed at the actual cost of short-term debt incurred by your company.  It is preferable to use a rate paid on short-term borrowing in U.S. dollars.  If you did not borrow in U.S. dollars during the POI, use a published commercial short-term dollar lending rate.

    This expense should be calculated and reported on a transaction-by-transaction basis using the number of days between date of shipment to the customer and date of payment.  If you are unable to determine actual payment dates from your records, you may base the calculation on the average age of accounts receivable.  If payment has not yet been received for this sale, leave this field blank for the transaction.

  NARRATIVE:  Provide the equation you have used to calculate credit expenses and a worksheet showing the calculation of your average short-term interest rate.  Explain the calculation and any other factors that affect net credit costs, such as compensating deposits to the extent that they were a precondition for acquiring the loan.

Indicate the source of the short-term interest rates used in the calculation.

**FIELD NUMBER 43.0:**     **Late Payment Fee**

FIELD NAME:     LATEPAYU

DESCRIPTION:     Report the per unit fees collected on each sale for late payment of the invoice.

NARRATIVE:     Describe the conditions under which you charge customers such fees.  If the practice varies by channel of distribution or category of customer, explain why it varies and how.

**FIELD NUMBER 44.0:**     **Advertising Expenses**

FIELD NAME:     ADVERTU

DESCRIPTION:     Report the unit cost of advertising specifically for the subject merchandise that you have paid on behalf of your customer.  This is the cost you incurred to advertise to your customer's customers. Report all advertising expenses incurred to advertise to your customers as part of indirect selling expenses (Field 49.n)

NARRATIVE:     Describe separately advertising programs directed at your customer's customer (*e.g.*, co-op advertising) and advertising programs directed at your customers.  Provide separate lists of the expenses incurred for each and provide worksheets demonstrating the allocation of the advertising to your customers to each sale of the subject merchandise.

**FIELD NUMBER 45.0:**     **Warranty Expense**

FIELD NAME:     WARRU

DESCRIPTION:     Report the unit cost of warranty expenses incurred during the POI. Warranty expenses should include only the direct expense less any reimbursement received from the customer or unaffiliated parts suppliers.  Report indirect warranty expenses as part of indirect selling expenses (field 49.n).  If you produce different models or types of the merchandise under investigation, warranty cost should be based upon your experience by model.  If this is impractical, express warranty cost on the most product-specific basis possible.

NARRATIVE: Describe both the warranty expenses incurred on sales of this merchandise and the reimbursement, if any, received or expected from the customer.  Provide lists of the direct and indirect expenses incurred and worksheets demonstrating the allocation of the direct expense to each sale of the foreign like product.  Describe the nature and terms of the warranty provided.  Include a copy of each type of warranty agreement as an attachment to the response.

Include a schedule of direct and indirect warranty expenses incurred for the subject merchandise for the three most recently completed fiscal years.  In addition, calculate a cost per unit for each year.

**FIELD NUMBER 46.0:**     **Technical Service Expense**

FIELD NAME: TECHSERU

DESCRIPTION: Report the unit cost of technical services.  Include only the direct expense less any reimbursement received from the customer.  Report indirect technical service expenses as part of indirect selling expenses (field 49.n).

NARRATIVE: Describe the technical services provided, including any service, repair, or consultation that directly relate to sales of the subject merchandise.  Describe any reimbursement received for these services.  Provide lists of the direct and indirect expenses incurred and worksheets demonstrating the allocation of the direct expense to each sale of the subject merchandise.

**FIELD NUMBER 47.0:**     **Royalties**

FIELD NAME: ROYALU

DESCRIPTION: Report the unit cost of any royalties you paid on the sale of the product.  Create a separate field for each royalty paid.

NARRATIVE: Describe each royalty paid to third parties as a result of production or sale.  Include a description of all royalties paid in this section of the narrative but include the unit cost of production royalties as a cost of manufacture (section D).  The description should include the key terms of the agreements, the names of the parties that granted the rights, and a list of products covered by the agreements.

**FIELD NUMBER 47.1:**     **Bank Charges**

    FIELD NAME:     BANKCHARU

    DESCRIPTION:     Report the unit cost of sales-specific bank charges incurred during the POI, including fees associated with opening letters of credit, transaction fees deducted from electronic payments from customers, *etc*.

    NARRATIVE:     Describe each type of bank charge incurred and your basis for considering it directly related to sales of the subject merchandise.

**FIELD NUMBER 48.1-n:**     **Other Direct Selling Expenses**

    FIELD NAME:     DIRSELU

    DESCRIPTION:     Report the unit cost of other direct selling expenses you incurred on sales of the subject merchandise which are not reported in other fields. Report each additional direct selling expense in a separate field. Include only the direct expenses incurred less any reimbursement received from the customer.

    NARRATIVE:     Describe each type of direct selling expense incurred and your basis for considering it directly related to the sales of the subject merchandise.

---

**Fields 49 and 50**

Report the information requested concerning indirect selling expenses in field 49 and **inventory carrying cost** in field 50. Indirect selling expenses include all sales overhead expenses (*e.g.*, salesmen's salaries and office rent) as well as any indirect expenses separated from fields 44 through 48. Refer to the Glossary of Terms at Appendix I for a more complete description of these items.

In conjunction with the credit expenses reported above, inventory carrying costs should account for each day between the date of final production of merchandise until payment is received from the customer. In other words, inventory carrying costs should account for the period between final production and shipment, and credit expenses should account for the period between shipment and payment. The date of final production is typically the date merchandise is transferred from the work-in-progress ledger to the finished goods inventory. Shipment date is defined above.

When you complete these fields, please do so for both types of U.S. sales, EP and CEP. Report those indirect selling expenses and inventory carrying costs that are incurred in the country of manufacture of the subject merchandise in separate fields from those expenses incurred in the United States.

---

**FIELD NUMBER 49.1:**     **Indirect Selling Expenses Incurred in the Country of Manufacture**

    FIELD NAME:     DINDIRSU

    DESCRIPTION:     Report the unit cost of indirect selling expenses (*e.g.*, sales office rent and salesmen's salaries) incurred in the country of manufacture to sell the product to the United States.  Where indirect selling expenses have been incurred by the producer and an affiliated reseller, create separate fields for the expenses of each company.

    NARRATIVE:     Describe the sales overhead expenses incurred in the home market.  Include a list of the overhead expenses incurred and provide worksheets demonstrating the allocation of these expenses, as well as any indirect expenses separated from the direct selling expenses reported in fields 44 through.  Where more than one company incurred indirect selling expenses, submit separate worksheets for each.

**FIELD NUMBER 49.2:**     **Indirect Selling Expenses Incurred in the United States**

    FIELD NAME:     INDIRSU

    DESCRIPTION:     Report the unit cost of indirect selling and administrative expenses (*e.g.*, sales office rent and salesmen's salaries) incurred in the United States.  Where indirect selling expenses have been incurred by more than one affiliated reseller, create separate fields for the expenses of each company.

    NARRATIVE:     Describe the sales and administrative overhead expenses incurred in the United States.  Include a list of the overhead expenses incurred and provide worksheets demonstrating the allocation of these expenses, as well as any indirect expenses separated from the direct selling expenses reported in fields 44 through 48.  Where more than one company incurred indirect selling expenses, submit separate worksheets for each.

**FIELD NUMBER 50.1:**      **Inventory Carrying Costs Incurred in the Country of Exportation**

     FIELD NAME:      DINVCARU

     DESCRIPTION:      For CEP sales, report the unit opportunity cost incurred from the time of final production to the time of arrival in the United States, computed at the actual cost of short-term debt incurred by your company. If you are a reseller, report the unit opportunity cost incurred from the time you purchased the merchandise to the time of arrival in the United States computed at the actual cost of short-term debt incurred by your company in the country of exportation. It is preferable to use a rate paid on short-term borrowing in U.S. dollars. If you did not borrow in U.S. dollars during the POI, use a published commercial short-term dollar lending rate.

                 For EP sales, report the unit opportunity cost incurred from the time of final production (or time of purchase) in the country of manufacture to the time of shipment to the United States computed at the same rate of interest as the CEP adjustment described above.

                 Please calculate inventory carrying costs on as specific a basis as possible (*e.g.*, sale, model, product group, *etc.*).

     NARRATIVE:      Describe how the products under investigation are stored prior to shipment. Provide the average length of time in inventory in the country of manufacture and provide separately the average length of time of shipment from the country of manufacture to the United States. Indicate the source of the short-term interest rate used in the calculation. Include your worksheets as attachments to the response.

**FIELD NUMBER 50.2:**      **Inventory Carrying Costs Incurred in the United States**

     FIELD NAME:      INVCARU

     DESCRIPTION:      For CEP sales, report the unit opportunity cost incurred from the time of arrival in the United States until the time of shipment from the warehouse or other intermediate location in the United States to the first unaffiliated customer.

                 Compute the adjustment at the actual cost of U.S. dollar denominated short-term debt incurred by your company. If you have not borrowed in U.S. dollars, use a U.S. published commercial bank prime short-term lending rate.

Please calculate inventory carrying costs on as specific a basis as possible (*e.g.*, sale, model, product group, *etc.*).

NARRATIVE: Describe how the products under investigation are stored in the United States prior to shipment and the average length of time in inventory in the United States.  Indicate the source of the short-term interest rate used in the calculation.  Include your worksheets as attachments to the response.

**FIELD NUMBER 51.0:       Packing Cost**

FIELD NAME:       PACKU

DESCRIPTION:      Report the unit cost of packing the subject merchandise for shipment to the United States.  Include the cost of labor, materials and overhead.  If a product is produced at more than one plant, report the weighted-average packing cost of all plants combined.  Report any costs associated with repacking the merchandise in the U.S. separately under field 52.

NARRATIVE: Describe the types of packing used to prepare the subject merchandise for shipment to the United States.  For each type of packing, provide a worksheet that demonstrates the calculation of packing material, labor and overhead for a single unit.
The worksheets should include a list of packing materials, the average cost of each material, and how much of each material was used.  In addition, report the average labor hours by packing type and the average labor cost per hour including benefits.  Include a list of overhead expenses incurred in packing and demonstrate how these expenses were allocated to each packing type.

**FIELD NUMBER 52.0:       U.S. Repacking Cost**

FIELD NAME:       REPACKU

DESCRIPTION:      For CEP sales, report the unit cost of any repacking in the United States.  Include the cost of labor, materials and overhead.

NARRATIVE: Describe any repacking that occurs in the United States.  For each type of packing, provide a worksheet that demonstrates the calculation of packing material, labor and overhead for a single unit.

The worksheets should include a list of packing materials, the average cost of each material, and how much of each material was used.  In addition, report the average labor hours by packing type and the average labor cost per hour including benefits.  Include also a list of overhead expenses incurred in packing and demonstrate how these expenses were allocated to each packing type.

**FIELD NUMBER 53.0:**    **Value Added Tax**

FIELD NAME:    TAXU

DESCRIPTION:    If you pay value-added taxes on your merchandise sold to the United States and those taxes are not rebated upon export, report them here.  If you paid no such taxes, you may omit this field and note in your narrative response that it does not apply.

NARRATIVE:    Provide a complete description of the value-added taxes, including the tax rate and tax base.  Include copies of all relevant tax laws.

**FIELD NUMBER 54.0:**    **Further Manufacturing**

FIELD NAME:    FURMANU

DESCRIPTION:    If you are required to report the cost of further manufacture or assembly (**further manufacture**) performed in the United States, record the unit cost in this field.  This value is the total unit cost reported in the computer data file prepared in response to questionnaire section E - Cost of Further Manufacturing Performed in the United States.

If you have incurred further manufacturing cost in the United States but are not required to report the cost, record the code "FM" in this field for each sale of a further manufactured product.  Enter a zero in this field for sales of products that have not been further manufactured.

NARRATIVE:    If you further manufacture subject merchandise in the United States, please contact the official in charge immediately.  You may be required to respond to section E of this questionnaire.  No additional narrative description is required for this field.  Refer to section A question 8.

**FIELD NUMBER 55.0:**    **Samples**

    FIELD NAME:      SAMPLEU

    DESCRIPTION:     If the transaction in question involved sample merchandise, please report the code "S" (sample).

    NARRATIVE:     Explain the circumstances surrounding the sales of sample merchandise.  Describe how sales of sample merchandise differ from sales of merchandise that does not fall under this category.

**FIELD NUMBER 56.0:**    **Foreign Trade Zone**

    FIELD NAME:      FTZU

    DESCRIPTION:     Identify all sales of merchandise shipped into foreign trade zones in the United States by recording the code "FTZ" in this field.  If you shipped the subject merchandise to an affiliate in an FTZ that further processed the merchandise into products not within the description of merchandise in Appendix III prior to entry into U.S. customs territory, separately identify these transactions with the code FTZA.  If the merchandise entered U.S. customs territory without being further processed into products not within the description of the merchandise, enter the code FTZB.

                         For merchandise that was not shipped into foreign trade zones or was entered for consumption prior to admission to a foreign trade zone, enter a zero in this field.  If none of your merchandise was shipped into a foreign trade zone, you may omit this field entirely and note in your narrative response that it does not apply.

    NARRATIVE:     Explain the circumstances that pertained to FTZ transactions.  State whether you, your U.S. affiliate, or an unaffiliated firm entered (or may have entered) the merchandise into the Customs territory of the United States.

**FIELD NUMBER 57.0**    **Temporary Import Bond**

    FIELD NAME:      TEMPIMPU

    DESCRIPTION:     Identify all sales of merchandise that you knew were imported under temporary import bonds by recording the code TIB in this field.  If the subject merchandise entered into the United States under a temporary import bond and was processed further by an affiliate into products not within the description of merchandise

(*see* Appendix V) prior to entry into U.S. customs territory, separately identify these transactions with the code TIBA. If the merchandise entered U.S. customs territory without being further processed into products not within the description of the merchandise, enter the code TIBB.

For merchandise that was not shipped under a temporary import bond, enter a zero in this field. If none of your merchandise was imported under a temporary import bond, you may omit this field entirely and note in your narrative response that it does not apply.

NARRATIVE:     Explain the circumstances that pertained to sales of merchandise imported under temporary import bonds. State whether you, your U.S. affiliate, or an unaffiliated firm entered (or may have entered) the merchandise into the Customs territory of the United States.

**FIELD NUMBER 58.0:**     **Manufacturer**

FIELD NAME:     MFRU

DESCRIPTION:     If you have sold the foreign like product of more than one manufacturer, identify the manufacturer in each record by the use of a code. If the manufacturer is unknown, identify your supplier.

NARRATIVE:     If you are not the manufacturer, report the manufacturer of the merchandise in your narrative response and provide a key to the code.

| **Other Revenues and Expenses** |
| --- |
| The fields listed above have been designed to capture all revenues and expenses you have incurred in selling the subject merchandise in the United States market. If there are additional revenues or expenses that are not reported above, such as export taxes incurred in the country of manufacture, create a field for each in the computer file, describe the revenue or expense in your narrative response, and include all calculation worksheets as attachments to your narrative response. |

**SECTION D**

**Cost of Production and
Constructed Value**

As noted in the cover letter to this questionnaire, Commerce is requesting constructed value and cost of production information from respondent companies in all AD proceedings. Therefore, please submit a full response to Section D of this questionnaire.

## I.     General Explanation

This section of the antidumping questionnaire provides instructions for reporting the **cost of production** (COP) of the **foreign like product** and the **constructed value** (CV) of the **subject merchandise,** collectively referred to as the **merchandise under consideration (MUC)**. [23]

If you have questions concerning any part of the section D questionnaire, you are instructed to contact the official in charge. Please note, however, that requests by your company to alter the reporting of the information requested in the section D questionnaire must be submitted in writing to Commerce.

A.     Cost of Production

Cost of production is the weighted-average control number (CONNUM) specific cost[24] of the product(s) sold by your company in the comparison market (*i.e.*, the home or third country market). Commerce will compare the COP to the sale prices for that product in the comparison market to determine whether those prices can be used as the basis for normal value. Unless otherwise instructed by Commerce, you should report per-unit COP information for each CONNUM included in your home market or third country sales listing submitted in response to section B of this questionnaire.

B.     Constructed Value

Constructed value is the weighted-average CONNUM specific cost of the product sold by your company in the U.S. market, plus an amount for profit. Because CV is a type of normal value, selling, general and administrative (SG&A) expenses and profit are computed as if the merchandise had been sold in your comparison market. Unless

---

[23] Throughout the questionnaire, whenever we refer to the merchandise under consideration (MUC) we are referring generally to all products within the scope of the investigation that your company sold in any market. When we use the term subject merchandise, we are referring to products sold to the United States. When we use the term foreign like product, we are referring to products sold in your home market or exported to a country other than the United States. Note that we consider merchandise under consideration, products under investigation, and merchandise under investigation to be synonymous. We have provided a description of the merchandise included in the investigation in Appendix III.

[24] There should be a single weighted-average cost for each CONNUM regardless of market destination as defined by Commerce's product characteristics.

otherwise instructed by Commerce, you should report per-unit CV information for each CONNUM included in your U.S. market sales listing submitted in response to section C of this questionnaire.

C.      Reporting Period for Cost of Production and Constructed Value

Calculate reported COP and CV figures based on the actual costs incurred by your company during the period of investigation (POI), as recorded under your company's normal accounting system.[25]  If you have any questions regarding the appropriate cost calculation period for the merchandise under consideration, notify Commerce in writing before preparing your response to this section of the questionnaire.

D.      Weighted-Average COP and CV

Please report per-unit cost information (i.e., a per-unit cost per CONNUM) for all merchandise under consideration produced by your company corresponding to those CONNUMs reported in your responses to Sections B and C of this questionnaire.  Ensure that each CONNUM included in your comparison market or U.S. sales listing has a corresponding CONNUM-specific cost reported in response to this section of the questionnaire.  Calculate reported COP and CV figures on a weighted-average basis using the CONNUM specific production quantity, regardless of market sold, as the weighting factor.  Thus, each CONNUM should be assigned only one cost, regardless of the market or markets in which the product(s) were sold.  If more than one unique product produced at a domestic facility falls within the definition of a specific CONNUM, determine first the weighted-average CONNUM specific costs at that facility; then calculate the company-wide weighted-average CONNUM specific costs.  If you have any questions regarding how to compute the weighted-average cost of the merchandise under consideration, notify Commerce in writing before preparing your response to this section of the questionnaire.

E.  Submit electronic versions in Excel format of all worksheets provided in response to this supplemental section D questionnaire.

## II.      **General Information**

The production process, financial accounting, and cost accounting information requested below is necessary for Commerce to better understand your company's operations, its products and production processes, and its financial and cost accounting practices.  Therefore, you should provide complete narrative responses to each of the items listed below.

A.      Products and Production Processes

Provide a description of your company's production process for the merchandise under

---

[25] If your company's fiscal year ends within three months of the POI and you want to report COP and CV based on your company's fiscal year, you must contact the official in charge within 14 days after receipt of the initial questionnaire.  See 19 CFR 351.301(c)(2)(iv).

consideration.[26]  Your description should address each of the items 1 through 8 listed below.

1. Provide a description of your company's production facilities and their address.  If production of the merchandise under consideration takes place at more than one facility, identify each facility and describe the general production activities that take place at each facility.  Identify all product categories manufactured at each facility, including products not under consideration.

2. Provide a flowchart of the production process for the merchandise under consideration.  Supplement your flowchart with descriptions of the processing that takes place at each stage.

3. List all co-products, by-products, and scrap that result from producing the merchandise under consideration.  Describe why your company considers these items to be co-products, by-products, or scrap.  State how each is accounted for in the normal books and records.

4. State whether your finished goods internal product codes are used for production control, cost accounting, sales, and inventory records.  Provide a key to the finished goods internal product codes used in the production process, cost accounting, and inventory records.  Include an explanation of the full range of prefixes, suffixes, or other notations that identify special features.

5. List **all** significant inputs used to produce the merchandise under consideration, including specific types of raw materials, labor, energy, subcontractor services, research and development, *etc*.

6. For the three most significant direct material inputs (not to include conversion costs) used in producing the merchandise under consideration, provide monthly inventory movement schedules that show the quantity and value of the beginning inventory, purchases, consumption, other adjustments, and ending inventory for the POI.  Indicate the unit of measure for each input and include in the worksheet the average monthly per-unit cost.

7. Provide the percentage each of the three most significant direct material inputs represents of the total cost of manufacturing of the merchandise under consideration.  Demonstrate your calculation.

---

[26] If you have already provided a description of your company's production process in response to section A of this questionnaire, you may repeat that description or refer to the page numbers in that part of your response where the information is presented.  However, your response must address each of the items noted in parts II.A.1 through 8 of this section of the questionnaire.  If it does not, provide the description of your company's production process in this section of your response and supplement it accordingly with the requested information.

8. Provide the following information.
   a. Provide the following data, in an Excel worksheet, using a cost database format that:
      1) Calculates and reports the quarterly weighted-average per-unit direct material (DIRMAT) cost (*i.e.*, actual DIRMAT costs incurred in each quarter of the POI/POR divided by the respective quarter's production quantity (PRODQTY)) for the five CONNUMs with the highest volume of sales to the U.S. and the five CONNUMs with the highest volume of sales in the comparison market for each quarter of the POI. The worksheet should include additional rows of data per CONNUM, one for each quarter, which report the CONNUM-specific quarterly PRODQTY and the corresponding CONNUM-specific quarterly weighted-average per-unit DIRMAT.
      2) Continue to report the weighted-average POI per-unit cost for all other cost fields (*e.g.*, OTHMAT, DIRLAB, VOH, FOH, *etc.*).
   b. If the change between the high and low quarterly cost of manufacturing (*i.e.*, (high COM - low COM) / low COM) for the majority of the CONNUMs reported above is significant (*i.e.*, greater than 25 percent for a 12-month POI), provide a table in Excel format that compares the resulting quarterly average per-unit cost of manufacturing (*i.e.*, the sum of the quarterly average per-unit DIRMAT and the POI weighted average costs for all other fields) to the related reported quarterly average net prices, for the five CONNUMs with the highest volume of sales to the U.S. and the five CONNUMs with the highest volume of sales in the comparison market. Depending on the significance of the production cost changes throughout the POI and the linkage between the quarterly costs and quarterly sales prices, it may be necessary for Commerce to calculate the dumping margin using its alternative cost averaging methodology and require that you provide an additional cost database.

9. List the **major** inputs purchased from affiliated parties that are used to produce the merchandise under consideration during the cost calculation period. A major input is an essential component of the finished merchandise which accounts for a significant percentage of the total cost of manufacturing incurred to produce one unit of the merchandise under consideration.[27] For <u>each</u> major input identified, complete the following chart (*i.e.,* complete a separate chart for each major input):

| Name of Major Input | Total Volume Purchased | Total Value Purchased | Average Price | Affiliated Supplier's COP | % Supplier-Specific Purchases Represent of Total Purchases of that Input ((b) Volume / (a) Volume)[28] | % Input Represents of COM (Consumption Value of Input / Total COM) [29] |
|---|---|---|---|---|---|---|
| | | | | | | |

---

[27] In reporting CONNUM specific per unit COP and CV figures under section IV below, report the cost of affiliated purchases in accordance with the amounts as recorded in your normal accounting records.

[28] Base the percentage on the volume purchased from each affiliate to the total volume purchased from all parties (*i.e.*, affiliated and unaffiliated).

[29] Base the percentage on the values recorded in your normal accounting system. Use the consumption value and

| Name(s) of Affiliated Supplier(s) | (b) | (b) | (e) | (f) | (g₁) | |
|---|---|---|---|---|---|---|
| Unaffiliated Supplier(s) | (c) | (c) | (d) | | | |
| Total | (a) | (a) | | | | (g₂) |

The letters below are descriptions of the corresponding letters contained in the chart:

a. the total volume and value (as recorded under your company's normal accounting system) of the input purchased from all sources by your company during the cost calculation period;

b. the total volume and value of the input purchased from <u>each</u> affiliated supplier (list and identify each affiliated supplier separately);

c. the aggregate volume and value of the input purchased from unaffiliated parties during the same period;

d. the average unit market value per unaffiliated supplier(s);
   *Note: If there are no such purchases but your affiliated supplier sells the identical input to unaffiliated customers in the market under consideration, in a separate schedule provide the average price paid for the input by the unaffiliated purchasers.*

e. the average unit transfer price for each affiliated supplier;

f. Provide the product specific per-unit cost of production[30] incurred by <u>each</u> affiliated supplier producing the major input (list and identify each affiliated supplier separately); and,

g. complete the rest of the chart accordingly and provide the calculation of the requested percentages. Adjust figures accordingly for self-produced items.

10. Provide a worksheet that identifies those inputs and other items (*e.g.*, fixed assets, services, *etc.*), that your company receives from affiliated parties (exclude major inputs already identified in Q.9 above). For each item received from an affiliated party, provide the following:
   a. the name of the affiliated party
   b. state the nature of the affiliation;
   c. the POI total quantity and transfer price of the transactions, and;
   d. the percentage the item represents of the total MUC's COM.

11. Provide a description of how the production control system tracks the production quantities of each finished product. Explain what unit is used to record or track the quantity of the produced product.

---

total COM of the merchandise under consideration into which the item in question was an input. State whether the item in question is an input for only certain models.

[30] The product specific per-unit cost of production should include movement costs incurred by the affiliated supplier for shipping the good to the respondent and a portion of the affiliate's SG&A. Include an amount for the affiliated supplier's interest expenses unless that affiliated supplier is included in the consolidated financial statements being used to report financial expenses for the producer in the COP buildup for the merchandise under consideration. Provide a worksheet showing the cost build-up. The cost build-up should be based on the affiliate's normal accounting system.

12. Identify and describe all internal tax programs that assess taxes on purchases of inputs used to produce the merchandise under consideration. Identify the tax rate associated with each internal tax. Explain whether the tax is rebated or not collected on exports. If it is collected and not rebated upon export, but it is recovered through some other means, explain how (*e.g.*, through home country sales, export sales, or some other means). If you did not recover such internal taxes paid during the POI through either home market sales, export sales, or some other means, report the net amount incurred for each type of internal tax during the cost calculation period.

B.      Financial Accounting Systems and Policies

Describe your company's financial accounting practices and the system it uses to accumulate and summarize accounting data for purposes of preparing financial statements. Your description should address each of the items listed below.

1. State whether your company's financial accounting practices are in accordance with generally accepted accounting principles (GAAP) practiced in the country in which the merchandise under consideration is produced. If not, explain all differences.

2. Provide a flowchart illustrating your company's financial accounting books and record keeping system. Provide a description of your company's financial accounting system (*e.g.*, Software used, accounting modules, subsidiary ledgers (e.g., raw materials purchases, inventories, sales, accounts receivable, *etc.*)).

3. Explain your financial accounting practices regarding the following:

   a.  valuation methodologies for raw materials, work-in-process, finished goods inventories, and cost of goods sold;
   b.  explain whether there were any changes to the inventory valuation methodology, particularly for direct materials, during the POI (if so, describe such changes);
   c.  fixed asset valuation, revaluation, depreciation, and treatment of idled assets;
   d.  whether the depreciation methodology or useful lives of any assets have changed within two years of the beginning of the POI (provide a summary table of the useful lives of each class of assets);
   e.  inventory write-off and write-down methods for raw materials, work-in-process, and finished goods;
   f.  income and expense accounts requiring year-end and periodic provisions, accruals, and other adjustments;
   g.  capitalization of general and administrative expenses or interest expenses as part of inventory or fixed asset valuation;
   h.  plant closure, shut-down (including periods for maintenance and retooling), or restructuring costs (state whether you recognized any expenses during the cost calculation period because of shut-downs, closures, or restructuring during previous periods);
   i.  changes in accounting methods (*e.g.*, accounting principles or estimates)

during the fiscal period(s) that include part of the POI and one preceding fiscal year; and,

j.   the effects of inflation on financial statement information.

C.   Cost Accounting Systems and Policies

1.   Describe your company's normal cost accounting system.[31]

   a.   Explain whether your company uses a job order, process, operations, or other type of cost accounting system.
   b.   Identify the type of system (*e.g.*, SAP) and each of the individual modules used by your company.  Explain how the modules interact with each other and with the financial accounting and production control systems.
   c.   Explain how the system records, classifies, aggregates, and allocates the costs to specific products in the normal course of business.
   d.   Explain how your normal cost accounting system accounts for each of the physical characteristics identified for this proceeding.

2.   Describe how the company's cost accounting system reconciles to the financial accounting system. In addition, address each of the items listed below.

   a.   Explain whether the amounts from the cost accounting system are changed when assigning values to products in finished goods inventory.
   b.   Identify all production costs included in the cost of goods sold for financial accounting purposes which are valued differently for cost accounting purposes.
   c.   If your company does not have a formal cost accounting system, provide a detailed explanation and example of how the fiscal year-end inventory values are determined.

3.   List and describe all reports generated by your company's cost accounting and production control system. List and describe all reports prepared for reporting cost and production information to Commerce.

4.   Describe the level of product specificity over which your company's cost accounting system normally captures production costs.  Explain how the product specific costs recorded in your normal accounting system compare to the weighted-average CONNUM specific costs reported for COP and CV.

5.   Provide a list of the direct cost centers, and their cost center codes, included as part of your company's cost accounting system.  Identify those cost centers through which the merchandise under consideration passes during production. Identify whether those cost center also process Non-MUC.

---

[31] If you do not have a formal cost accounting system, describe the extent to which costs and production are tracked in your normal records for production and inventory purposes.

6. Explain how materials, labor, and other direct costs incurred at each cost center are recorded and charged to the merchandise produced.  If direct costs are allocated to individual units of the merchandise at these cost centers, then state the basis for the allocation.

7. Provide a list of the indirect or other common cost centers, and their cost center codes, included as part of your company's cost accounting system. Describe the operations that take place in each of these indirect cost centers and how the costs of those operations are accumulated and recorded.  Explain how the costs accumulated by each indirect or common cost centers are allocated to the direct cost centers listed and state the basis for the allocation.

8. If your company's cost accounting system is based on standard or budgeted costs, then provide the following information:[32]

   a. list each variance or budgeted cost allocation recorded under your company's cost accounting system.  For each, identify, the level of product specificity for which the variance or budget allocation is measured and the types of costs included in the variance;
   b. the period for which your company computes and records each type of variance;
   c. the methods used to develop each variance used in your company's cost accounting system;
   d. a description of how the standard or budgeted costs (*e.g.*, input prices, usage, *etc.*) were calculated and the frequency with which your company revises its cost accounting standards or budgeted costs, including the dates on which the latest revisions were made for input price and the usage factors; and,
   e. Explain how the company normally allocates variances between cost of goods sold and finished goods inventory.

9. Describe the method used under your company's cost accounting system to account for scrap generated at each stage of the production process.

   a. State whether the scrap material generated is reintroduced into the production cycle as raw materials, sold, or otherwise disposed of in the normal course of business.
   b. Explain how the offset for scrap recovery is valued, if at all, and how any reintroduced scrap is valued.
   c. Provide an inventory movement schedule that shows, by month, the quantities and values of scrap generated and consumed during the POI (i.e., beginning inventory, generated, re-consumed in the production process, sold, other adjustments, and ending inventory).
   d. Compare the values from the schedule to the offset taken in the cost buildups.

---

[32] Please answer these questions even if your system calculates an "actual" cost at the end of an accounting period, but relies on standard or budgeted costs during the interim period.  For example, some ERP systems can calculate both a standard and actual costs.

10. Describe the method used under your company's cost accounting system to account for co-products and by-products that may result from producing the merchandise under consideration.  Identify the point in the production process where co-products or by-products become individually identifiable.  If the by-products are valued at a lesser amount in your normal records than for reporting, explain how the revised value is determined and what happens with the excess amount of cost.

11. Describe the method used under your company's cost accounting system to allocate costs to non-prime products that may result from producing the merchandise under consideration.  Identify the point in the production process where non-prime products become individually identifiable and whether they can be sold as MUC.  If the reported per unit costs allocated to the non-prime products exceed that normally allocated to such products in your normal records, explain how the revised value was determined and why you deviated from your normal books and records.  Provide the quantity and value of the prime products that were reclassified as non-prime during the POI.

12. Describe how your company accounts for processing yields or losses throughout the production cycle.  Indicate each stage in the production cycle where processing yields are measured.  Provide a schedule showing the average actual yield experience during the cost calculation period for each stage of production.

D.    Startup Costs

If a startup operation has taken place at your company during the POI and you are claiming a startup adjustment for a new product or a new production facility, address each of the following:

1.   describe the new product or production facility and provide the total costs attributable to the new product or production facility (*i.e.*, the total construction or development costs prior to the startup phase of production; also, describe how those costs were treated in your company's normal accounting records);

2.   state the total costs associated with the startup phase of production and describe how those costs were treated in your company's normal accounting records;

3.   for a new facility, identify the date on which the new facility was completed;

4.   if the claimed startup adjustment is for an expansion of capacity to an existing facility, demonstrate that the expansion constituted such a major undertaking that it required the construction of a new facility and resulted in the depression of production levels due to technical factors associated with the new facility's initial production phase (as part of your analysis, provide the amount spent in expanding the facility compared to the historical cost of the existing facility);

5. if the claimed startup adjustment is for retooling of an existing facility, demonstrate that the retooling involved the replacement of nearly all production machinery or the equivalent rebuilding of existing machinery (as part of your analysis, provide the amount spent in refurbishing or retooling the facility compared to the historical cost of the machinery and equipment used previously in the facility);

6. if the claimed startup adjustment is for a new product, demonstrate that the new product required substantial additional investment or, in the case of an existing product, involved the complete revamping or redesign of the product (as part of your analysis, demonstrate that the "new" product is technically distinct from those already manufactured by the company and provide the amount spent to develop the product);

7. provide all dates relevant to the startup period, including: the beginning and ending dates of any test manufacturing prior to the startup phase of production, the start date of the initial start-up period, and the date when commercial production levels were reached or the projected date for reaching commercial production levels;

8. explain how the production levels were limited by technical factors associated with the initial phase of commercial production (as part of your analysis, describe the technical factors which limited production, demonstrate how these technical factors restricted the number of units processed by the company, and demonstrate how these technical factors are unique to the startup phase, not a result of chronic or normal production problems);

9. explain how commercial production levels were determined; as part of your analysis, provide:  (1) the monthly production volumes and the number of units started into production each month during both the startup period and the cost calculation period (*i.e.,* the post startup period); (2) the production capacity of the old and new facility; (3) the planned production quantity for the new product; (4) quantitative historical data reflecting experiences in producing the same or similar products; and (5) an analysis showing that low production levels were not caused by factors unrelated to startup operations;

10. include the claimed startup adjustment in a computer data field entitled STARTUP, which represents the difference between the normalized cost and the actual cost, on a CONNUM specific per-unit basis; and,

11. provide worksheets documenting the calculation of your claimed startup adjustment (the calculations must demonstrate not only the claimed startup adjustment, but also how the unit production costs incurred during the startup period were substituted with the unit production costs incurred after the startup period).

## III.   Response Methodology

The CONNUM specific per-unit COP and CV figures that you provide in response to this section of the questionnaire must reconcile to the actual costs reported in your company's normal cost

accounting system and to the accounting records used by your company to prepare its financial statements. Therefore, be advised that you will be required to reconcile the summation of the per-unit COP and CV figures to the amounts recorded in your cost accounting system and to the cost of manufacturing recorded in your financial accounting system.

If your company normally uses a cost accounting system based on actual costs, use that system for purposes of computing your submitted COP and CV amounts. Similarly, if your company normally uses a standard cost accounting system, use that system for purposes of computing COP and CV; in such case, however, ensure that you have allocated to the merchandise under consideration all variances resulting from differences between standard and actual production costs.

Therefore, the starting point for your response must be the costs as recorded in your normal books and records, see section 773(f) of the statute. While it may be necessary to adjust those costs to comply with certain reporting requirements you must provide the reasons for each departure from your normal books and records. If in preparing the COP and CV calculations you intend to depart from your company's normal accounting system and normal cost allocation methods, you must notify Commerce in writing <u>before</u> you respond to this section of the questionnaire.

A.      Description of Response Methodology

Describe the method you used to compute your company's submitted COP and CV figures.

1.  Describe how you developed the reported CONNUM specific per-unit costs from your normal cost accounting system.

2.  Describe how you used your normal cost and financial accounting records to compute each of the following cost elements:

    a. production quantity;[33]
    b. direct materials;
    c. internal taxes (including value added taxes (VAT)) and import duties on materials purchases. State whether you were exempted from paying or were rebated these taxes and duties on imported raw materials used to produce the merchandise under consideration;
    d. direct labor;
    e. variable production overhead (provide a list of the cost categories that comprise your submitted variable overhead cost figures);
    f. fixed production overhead (provide a list of the cost categories that comprise your submitted fixed overhead cost figures);
    g. research and development costs;

---

[33] State whether the reported quantity is based on theoretical weight or an "actual" weight. Explain the calculation of the basis used. State whether the quantities reported on the B & C sales files is consistent with the basis used for the cost file.

    h.  general and administrative (G&A) expenses (provide a list of the cost categories that comprise your submitted G&A costs); and,

    i.  net interest expense (include a list of all interest income and expense items and other financing amounts used to compute net interest expense).

3.  If a physical characteristic identified by Commerce is not tracked by the company's normal cost accounting system, calculate the appropriate cost differences for that physical characteristic using a reasonable method based on available company records (*e.g.*, production records, engineering statistics). The starting point for any such calculation must be the product specific costs as recorded in your normal cost accounting system.

If there is a physical characteristic not tracked by the company, for which the company believes that there is an insignificant cost difference between products, identify the particular physical characteristic, quantify, and explain your reasons for not reporting a cost difference.

4.  List and describe all differences between costs computed under your company's normal cost and financial accounting systems and the costs submitted in response to this section of the questionnaire. Include in your description the reasons why it was necessary for you to depart from your company's normal accounting practices to compute the submitted COP and CV figures.

B.    <u>Reconciliations</u>

Provide the following worksheets that illustrate how the costs reported on the financial statements reconcile to the general ledger or trial balance, to the cost accounting system (*i.e.*, the source used to derive the reported costs), and to the reported costs.[34] On the worksheets, identify the source documents for all major items shown and cross-reference the worksheets where appropriate (*i.e.*, link between worksheets).

If your company has a limited cost accounting system, reconcile the general ledger or trial balance to the books and records normally kept by the company which were used to derive the reported per-unit costs. This section takes a "top down" approach (*e.g.*, financial statements to per-unit cost), starting with cost of sales from the financial statements and proceeding step-by-step down through cost of manufacturing for the reporting period to the summation of the reported per-unit costs **(See sample reconciliation provided below)**.

1.  Provide summary trial balances for the POI and fiscal year. Provide a worksheet reconciling all items on the fiscal year income statement (*e.g.*, revenues, cost of sales, selling and administrative expenses, and non-operating expenses) in the audited financial statements to the total costs in the financial accounting system (*i.e.*, the

---

[34] Please note that the sequence of each of the below steps may vary depending on your system.

summary trial balance).[35]  Describe and quantify each reconciling item.

2.  Provide a worksheet reconciling the financial accounting system fiscal year cost of sales (or equivalent) to the POI cost of sales (or equivalent).

3.  Provide a worksheet reconciling the POI cost of sales (or equivalent) to the total POI costs from the cost accounting system (*i.e.*, the source used to derive the reported costs).  Describe and quantify each reconciling item.

4.  Provide a worksheet reconciling the total POI costs from the cost accounting system (*i.e.*, the source used to derive the reported costs) to the total POI cost of manufacturing (COM).  Commerce defines COM as the cost of materials, labor, variable overhead, and fixed overhead incurred to produce the finished goods during the POI.  Thus, the COM should exclude general and administrative expenses and financial costs.  Describe and quantify each reconciling item.

5.  Provide worksheets reconciling the total POI COM to the total of the per-unit manufacturing costs submitted to Commerce (*i.e.*, multiply the reported per-unit COMs of all merchandise under consideration for the POI by their respective production quantities regardless of ultimate destination as listed on the COP/CV database, then sum the totals).  Identify and quantify the following reconciling items:

    a.  differences between the reporting methodology and the normal books and records;
    b.  cost of merchandise <u>not</u> under consideration (*i.e.*, multiply the per-unit COM of all merchandise <u>not</u> under consideration produced by the company during the POI by their respective production quantities regardless of ultimate destination, then sum the totals; <u>or</u> if per-unit costs are not tracked or calculated, then, sum the total of the costs that you have directly assigned to or allocated to the merchandise <u>not</u> under consideration);
    c.  if not provided in the data file, the cost of merchandise under consideration not sold in either the United States or comparison market (*i.e.*, multiply the per-unit COM of all merchandise under consideration not sold in either the U.S. or the comparison market for the POI by their respective production quantities, then sum the totals); and,
    d.  all other reconciling items.

| Case Number:  A-XXX-XXX<br>Company Name: ABC Company<br>POI:  MM/DD/YY to MM/DD/YY<br>Overall Cost Reconciliation | | A-XXX-XXX<br>Business Proprietary Information<br>Exhibit X |
|---|---|---|
| | Yen (000s) | References/Comments |
| Cost of Goods Sold (COGS) per Audited Fin. Stmt. for the FY Ended MM/DD/YY | XXX,XXX | *Most closely matching POI* |
| Plus: Differences between Audited Fin. Stmt. & Fin. Accounting | X,XXX | *List each type separately .* |

---

[35] This worksheet should cross reference each account on the summary trial balance to the corresponding summarized line item on the income statement.

| | | |
|---|---|---|
| Less: Differences between Audited Fin. Stmt. & Fin. Accounting | X,XXX | *List each type separately.* |
| COGS per Financial Accounting for the FY Ended MM/DD/YY | XXX,XXX | *Tie to the trial balance.* |
| | | |
| Less: COGS of Purchased and Resold Merchandise | X,XXX | *Tie to reported summary trial balances.* |
| Less: Beginning Finished Goods Inventory as of MM/DD/YY | X,XXX | *Tie to reported summary trial balances.* |
| Plus: Ending Finished Goods Inventory as of MM/DD/YY | X,XXX | *Tie to reported summary trial balances.* |
| Cost of Manufacturing (COM) Per Financial Accounting System | XXX,XXX | *Tie to reported summary trial balances.* |
| | | |
| Less: COM of facilities Not Producing MUC | X,XXX | *Tie to reported summary trial balances.* |
| COM of Facilities Producing MUC | XXX,XXX | |
| | | |
| Less: Portion of FY Ending MM/DD/YY COM not in POI | X,XXX | *Tie to reported summary trial balances.* |
| Add: COM of POI Months not in FY Ending MM/DD/YY | X,XXX | *Tie to reported summary trial balances.* |
| POI COM of Facilities Producing MUC | XXX,XXX | |
| | | |
| Less: Packing Expenses Reported as Selling Exp. | X,XXX | *Tie to reported summary trial balances.* |
| Less: Merchandise Not Under Consideration | X,XXX | *List each category of Non-MUC separately.* |
| Plus: Other Differences Between Accounting and Reported Costs | X,XXX | *List each type of difference separately.* |
| Less: Other Differences Between Accounting and Reported Costs | X,XXX | *List each type of difference separately.* |
| | | |
| POI COM of Merchandise Under Consideration | XXX,XXX | A |
| | | |
| Extended TOTCOM per COP/CV File | XXX,XXX | B *Tie to most recently submitted COP/CV File* |
| Difference | XXX | C =A-B |
| Percent Difference | XX% | D =C/B |

Note:  The items and order of the reconciliation will vary by situation.  If your financial statements only show net revenue (e.g., no COGS is shown) include at the beginning of the reconciliation the calculation of operating costs and other adjustments to derive a cost of goods sold.

C.  **CONNUM Specific Worksheets**
For two CONNUMs – (1) the CONNUM with the highest sales volume in the market used for comparison purposes, and (2) the CONNUM with the highest U.S. market sales volume -- provide the following worksheets that illustrate how your company calculated the reported CONNUM specific per-unit COP and CV figures from your normal books and records.

1.  If you produced the merchandise under consideration at more than one domestic facility during the POI, provide a worksheet that demonstrates the method you used to weight-average the production costs of each facility to compute the single weighted-average COM (and the individual fields included therein) for the CONNUMs.

2.  For the facility with the highest production quantity, for each of these two CONNUMs -- if that facility's CONNUM specific cost is itself a weighted-average cost of several unique products -- provide worksheets showing the calculation of that facility's weighted-average figures for the CONNUM.  Show on the worksheets all products produced at the facility that were weight-averaged together to obtain that facility's cost for the specified CONNUMs.  For each unique product shown on the worksheet, show the product's internal product code, production quantity, and corresponding value for each computer field.

3. From question III.C.2, identify the unique product with the highest production volume in each set of worksheets reported for the CONNUM weight-averaging, or the individual product if there is only one in the CONNUM, and provide a complete cost buildup of that individual product's reported per-unit cost. In addition to the cost buildup documents requested below, supplement your buildup with narratives and cross references.

   a. Provide worksheets that demonstrate how all the cost elements for the product were calculated (e.g., Quantity, Direct materials, Labor, Variable Overhead, Fixed Overhead).
   b. The worksheets must show how the amounts were calculated and how they trace back to source data from the accounting system. If they are directly taken from your system, demonstrate how the unit amount was created within the system. If your company relies on a standard cost accounting system, also show how you allocated cost variances to derive actual production costs.
   c. The worksheets must show the accumulation of costs at each stage of production, the yield losses, scrap recovery, and the production quantity.
   d. The worksheets must show the allocations of costs to the individual products, as well as, the allocation of indirect costs to direct cost centers.

4. In addition, for the total merchandise under consideration, provide monthly inventory movement schedules that show the quantity and value of the beginning inventory, purchases, self-produced, sold, other adjustments, and ending inventory, for the period covering both the POI and the most closely matching fiscal year. Also, include in the worksheet the average monthly per-unit production cost.

D. <u>Worksheets for General Expenses</u>

1. Provide a worksheet that demonstrates how you computed your company's G&A expense ratio. Include in your reported G&A expenses an amount for administrative services performed on your company's behalf by its parent company or other affiliated party. Compute G&A expenses on an annual basis as a ratio of total company-wide G&A expenses divided by cost of goods sold (COGS). In calculating your company's G&A ratio, use the full-year G&A expense and COGS reported in your company's audited fiscal year financial statements for the fiscal year that most closely corresponds to the POI. Demonstrate how the G&A expenses and the COGS used in the ratio reconcile to your company's audited fiscal year financial statements. To compute the per-unit amount of G&A expense, multiply the G&A expense ratio by the per-unit TOTCOM for each of the CONNUMs.

2. Provide a worksheet that demonstrates how you computed your company's net interest expense ratio. If your company is a member of a consolidated group of companies, calculate your financial expense based on the <u>consolidated</u> audited fiscal year financial statements of the highest consolidation level available. In calculating

your company's net interest ratio, use the full-year net interest expense and COGS reported in the consolidated audited fiscal year financial statements for the period that most closely corresponds to the POI.

In calculating net interest expense for COP and CV, include interest expense relating to both long- and short-term borrowings made by your company. Reduce the amount of interest expense incurred by any interest income earned by your company on short-term investments of its working capital. Demonstrate the short-term nature of the short-term interest. Demonstrate how the interest income, interest expense, and COGS used in the ratio reconcile to your company's audited fiscal year financial statements. To compute the per-unit amount of net interest expense, multiply the net interest expense ratio by the per-unit TOTCOM for each of the CONNUMs.

## IV.    **Instructions for Submitting COP and CV Data File**

In accordance with the instructions provided below, provide one computer data file reporting the costs incurred for the merchandise under consideration.[36] The file should contain per-unit cost information for the products sold in the U.S. market and the comparison market. **If you are reporting a single response for multiple affiliates involved with the production of the merchandise under consideration, per II.E on page G-8 of the General Instructions, provide separate computer data files for each affiliated producer of the MUC as well as a weighted-average file combining all affiliated producers.**

Instructions regarding the specific information required to complete each data field for the cost file are provided below. "FIELD NUMBER" includes the number and descriptive name of the field in the computer data file. "FIELD NAME" includes the "short" or variable name for the submitted hard copy printouts of the data file. "DESCRIPTION" defines the data that you must report in the field of the computer data file. Provide a table that shows for each computer field the unit of currency and the unit of measure.

**FIELD NUMBER 1.0:**          **Matching Control Number**

    FIELD NAME:          CONNUM

    DESCRIPTION:          Report the unique CONNUM assigned to the products on the comparison market sales file from section B of this questionnaire and the U.S. market sales file from section C of this questionnaire. Unless otherwise instructed by Commerce, ensure that your cost computer file contains a separate record for each unique product CONNUM contained in your comparison market and U.S. market sales files.

---

[36] Refer to the Instructions for Submitting Computer Data at Appendix II for technical information regarding the computer media required by Commerce.

**FIELD NUMBERS 2.1 – 2.n:**     **Product Characteristics**

    FIELD NAME:     Various Names

    DESCRIPTION:     Report each of the product characteristics as specified by Commerce in fields 3.1 through 3.n of the section B and section C questionnaires in separate fields.  Do not include suffixes (*e.g.*, 'H', 'T' or 'U') in the names of the product characteristic variables.

**FIELD NUMBER 3.0:**     **Production Quantity**

    FIELD NAME:     PRODQTY

    DESCRIPTION:     For each CONNUM, report the quantity produced during the cost calculation period. If you report a zero or negative production quantity in this field for any CONNUM, provide a narrative explanation and an example of how you calculated the corresponding cost.

---

**Fields 4 through 8**

These fields should contain information regarding the specific cost elements incurred to produce the merchandise under consideration.  The COM includes materials and fabrication costs actually incurred by your company.  Calculate reported COP and CV figures on a weighted-average basis using the CONNUM specific production quantity, regardless of market sold, as the weighting factor.  Thus, each CONNUM should be assigned only one cost, regardless of the market or markets in which the product(s) were sold.  If more than one unique product produced at a domestic facility falls within the definition of a specific CONNUM, determine first the weighted-average CONNUM specific costs at that facility; then calculate the company-wide weighted-average CONNUM specific costs at all facilities. If you have any questions regarding how to compute the weighted-average cost of the merchandise under consideration, notify Commerce in writing <u>before</u> preparing your response to this section of the questionnaire.

---

**FIELD NUMBER 4.0:**     **Direct Material Costs**

    FIELD NAME:     DIRMAT

    DESCRIPTION:     Report the yielded CONNUM specific per-unit direct material costs incurred to produce the merchandise under consideration.  Direct material costs should include transportation charges, import duties and other expenses normally associated with obtaining the materials that become an integral part of the finished product.  Exclude

from your reported direct material costs the amount of any internal taxes imposed on the purchase of materials used to produce the merchandise under consideration. *See* field 12.0 for instructions on reporting internal taxes.

**FIELD NUMBER 4.1:**    **Other Direct Material Costs**

    FIELD NAME:    OTHDIRMAT

    DESCRIPTION:    Report the yielded CONNUM specific per-unit other direct material costs incurred to produce the merchandise under consideration. Other direct materials may include coatings, attachments, etc. Other direct material costs should include transportation charges, import duties and other expenses normally associated with obtaining the materials that become an integral part of the finished product. Exclude from your reported direct material costs the amount of any internal taxes imposed on the purchase of materials used to produce the merchandise under consideration. *See* field 12.0 for instructions on reporting internal taxes.

**FIELD NUMBER 5.0:**    **Direct Labor Costs**

    FIELD NAME:    DIRLAB

    DESCRIPTION:    Report the yielded CONNUM specific per-unit direct labor costs incurred to produce the merchandise under consideration. Direct labor includes the costs incurred for all production workers, inspection/testing workers, relief workers, and all other workers directly involved in producing the merchandise. Direct labor consists of your workers' base pay, overtime pay, incentive wages, shift differentials, bonuses, and all other form of wages or benefits paid to them by your company (*e.g.*, vacation, holidays, sick pay, insurance, government mandated social programs).

**FIELD NUMBER 6.0:**    **Variable Overhead Costs**

    FIELD NAME:    VOH

    DESCRIPTION:    Report the yielded CONNUM specific per-unit variable overhead costs incurred to produce the merchandise under

consideration.  Variable overhead costs include those production costs that generally vary in total with changes in the volume of merchandise produced at a given level of operations.  Variable overhead costs may include the costs incurred for indirect materials, indirect labor, utilities, and other variable overhead costs.

**FIELD NUMBER 8.0:**          **Fixed Overhead Costs**

> FIELD NAME:             FOH

> DESCRIPTION:            Report the yielded CONNUM specific per-unit fixed overhead costs incurred to produce the merchandise under consideration.  Fixed overhead costs include those production costs that generally do not vary in total with changes in the volume of merchandise produced at a given level of operations.  Fixed overhead costs may include the costs incurred for building or equipment rental, depreciation, supervisory labor, plant property taxes, and factory administrative costs.  In addition, include in fixed overhead costs research and development (R&D) costs which relate specifically to the merchandise under consideration.

**FIELD NUMBER 9.0:**          **Total Cost of Manufacture**

> FIELD NAME:             TOTCOM

> DESCRIPTION:            Report the yielded CONNUM specific per-unit total COM incurred to produce the merchandise under consideration. Compute this amount as the sum of data fields 4.0 through 6.0, plus field 8.

| Fields 10 and 11 |
| :--- |
| These fields should contain information regarding G&A expenses and net interest expense incurred in connection with the general operations of the company. |

**FIELD NUMBER 10.0:**          **General and Administrative Expenses**

> FIELD NAME:             GNA

> DESCRIPTION:            Report the per-unit G&A expenses incurred by your company.  G&A expenses are those period expenses which relate indirectly to the general operations of the company rather than directly to the production process.  G&A

expenses include amounts incurred for general R&D activities, executive salaries and bonuses, and operations relating to your company's corporate headquarters.

**FIELD NUMBER 11.0:**          **Net Interest Expense**

       FIELD NAME:          INTEX

       DESCRIPTION:          Report the per-unit net interest expense incurred by your company.

---

**Field 12**

This field should contain information regarding the net per-unit internal taxes incurred on all inputs.

---

**FIELD NUMBER 12.0:**          **Internal Taxes on Inputs**

       FIELD NAME:          TAXES

       DESCRIPTION:          Report the net per-unit amount incurred for all internal taxes on purchases of inputs which were not refunded or paid by the customer.

**SECTION E**

**Cost of Further Manufacture or Assembly
Performed in the United States**

I.        **General Explanation**

This section of the antidumping questionnaire provides instructions for reporting the costs incurred for **further manufacture or assembly** of the subject merchandise in the United States.

If you have questions concerning any part of the section E questionnaire, you are instructed to contact the official in charge.  Please note, however, that requests by your company to alter the reporting of the information requested in the section E questionnaire must be submitted in writing to Commerce.

A.        Cost of Further Manufacture or Assembly

Further manufacture or assembly costs include amounts incurred for direct materials, labor and overhead, plus amounts for general and administrative expenses, interest expenses, additional U.S. packing expenses, and all costs involved in moving the merchandise under consideration (MUC) from the U.S. port of entry to the further manufacturer.  The summation of the U.S. further manufacturing costs that you report in response to this section of the questionnaire must be reported in data field 54.0 of your company's U.S. sales listing submitted in response to section C of this questionnaire.

B.        Reporting Period for Further Manufacturing Costs

The further manufacturing costs that you report should be calculated based on the actual costs incurred by your U.S. affiliate (the company) during the period of investigation (POI), as recorded under its normal accounting system.  If you have any questions regarding the appropriate cost calculation period for the MUC, please notify Commerce in writing <u>before</u> preparing your response to this section of the questionnaire.

C.        Weighted-Average Further Manufacturing Costs

If you further manufactured the subject merchandise at more than one U.S. facility, you must report the weighted-average of the further manufacturing costs from all such facilities.  The further manufacturing costs that you report should be calculated on a weighted-average basis using as the weighting factor the model-specific production quantity for the product sold in the United States.  If you have any questions regarding how to compute the weighted-average further manufacturing costs for the subject merchandise, please notify Commerce in writing <u>before</u> preparing your response to this section of the questionnaire.

## II.     General Information

The production process, financial accounting, and cost accounting information requested below is necessary for Commerce to better understand your company's operations, its products and production processes, and its financial and cost accounting practices.  We therefore ask that you provide complete and detailed narrative responses to each item listed below.

A.     Products and Production Process

Provide a description of the further manufacturing processes performed on the subject merchandise shipped to the United States and sold to the first unaffiliated customer. Your description should address each of the items listed below.

1. Describe the U.S. production facilities used to further manufacture the subject merchandise and provide the address of each facility.  If further manufacturing operations take place at more than one facility, identify each facility and describe the production activities that take place at each facility.

2. Identify all MUC and Non-MUC products manufactured using the same production facilities used to further manufacture the subject merchandise.

3. Provide a flowchart that details the complete production process for all of the reported further manufactured end products sold in the U.S.  This should include descriptions of each stage of production and the locations of primary cost centers.  It must also explain whether: 1) the imported product stays essentially intact and is only enhanced; 2) the imported product is assembled with other components; 3) the imported product is split into more than one end-product; or, 4) more than one imported product is combined together into one end product.

4. Provide a description of how the company keeps account of processing yields or losses throughout the further manufacturing production process.  Indicate each stage in the production process where processing yields are measured.

5. List the inputs used to further manufacture the subject merchandise, including specific types of raw materials, labor, electricity or other power supply, machinery and equipment, and subcontractor services.

6. Identify all inputs or services that were purchased from an affiliated party (*i.e.*, **affiliated person**).  For each input received from an affiliated party, provide the name of the affiliated party and state the nature of the affiliation.

7. For inputs received from affiliated parties and used to further manufacture the MUC during the cost calculation period, provide the following information:

> > a. the total POI volume and value purchased from each affiliated and unaffiliated party during the same period (also show the per-unit average from each);

> > b. if the input was not purchased directly from an unaffiliated party, but the affiliated supplier sells the identical input to other unaffiliated purchasers, provide the total POI volume and value (and unit price paid) for the input sold to the unaffiliated purchaser.

B. <u>Financial Accounting Systems and Policies</u>

Describe your company's financial accounting practices and the system it uses to accumulate and summarize accounting data for purposes of preparing financial statements. Your description should address each of the items listed below.

1. State whether your company's financial accounting practices are in accordance with generally accepted accounting principles (GAAP) in the United States.

2. Provide a narrative and flowchart illustrating the company's basic financial accounting books and record keeping system.

3. Describe how data from the company's financial accounting system are summarized in its financial statements.

C. <u>Cost Accounting</u>

Provide narrative responses to the following questions as they relate to each affiliate that performs further manufacturing of the subject merchandise. This information will provide us with an understanding of the cost accounting system used by the company in its normal course of business.

1. State whether the company's cost accounting system accumulates costs for the subject merchandise based on the actual production costs incurred, on standard or budgeted costs. Provide a narrative describing the company's cost accounting system and how it is used to classify, allocate, aggregate, and record the costs incurred to further manufacture the subject merchandise. Your description should be provided in narrative form and should include a flow chart that (1) illustrates how the system records and reports costs for the merchandise throughout the production process, and (2) shows the various subsidiary cost ledgers maintained under the system and how they reconcile to the company's normal financial statement data.

2. Provide a list of all direct, indirect, and common cost centers and their corresponding

cost center codes.  Referencing II.A.3 above, briefly describe the operations that take place at each of these cost centers.  For direct cost centers, describe how the production costs are accumulated and charged to the merchandise produced.  For indirect and common cost centers, describe how the costs incurred are accumulated and allocated to the direct cost centers.

3.  Describe the level of product specificity over which the company's cost accounting system normally captures production costs.  Explain how the product-specific costs as recorded in the company's normal accounting system compare to the product-specific costs reported for further manufacturing.

4.  If the company's cost accounting system is based on standard or budgeted costs, then provide the following information:

    a.  the variances recorded under the company's cost accounting system and how they are used by management in the normal course of business (for each variance, identify the level of product specificity for which the variance is measured);

    b.  the period for which the company computes and records each variance;

    c.  the methods used to develop each variance used in the company's cost accounting system;

    d.  the frequency with which the company revises its standard or budgeted costs, including the date on which the latest revision was made; and

    e.  the disposition of favorable or unfavorable variances (including under- or over-applied overhead) resulting from production operations during each accounting period (*e.g.*, charge to cost of sales, prorate between cost of sales and inventory balances).

5.  List and describe all production costs incurred by the company that are valued differently for cost accounting purposes than for financial accounting purposes.

## III.  Response Methodology

The per-unit further manufacturing cost figures that you provide in response to this section of the questionnaire must reconcile to the actual costs reported in the company's cost accounting system and to accounting records used by the company to prepare its financial statements.  If the company normally uses a cost accounting system based on actual costs, you should use that system for purposes of computing your submitted further manufacturing cost amounts.  Similarly, if the company uses a standard cost accounting system, you should use that system for

purposes of computing further manufacturing costs.  In such case, however, you must also ensure that you have allocated to the further manufacturing costs all variances resulting from differences between standard and actual production costs.

While it may be necessary to adjust those costs to comply with certain reporting requirements you must provide the reasons for each departure from your normal books and records.   If you do not intend to use the company's normal accounting system and cost allocation methods to compute further manufacturing cost for the subject merchandise, you must notify Commerce in writing <u>before</u> preparing your response to this section of the questionnaire.

Submit electronic versions in Excel format of all worksheets provided in response to this supplemental section D questionnaire.

A.      <u>Description of Response Methodology</u>

Provide a narrative description of the methodology that you used to compute the company's submitted further manufacturing costs.  Your description should address items listed below.

1.  Describe how you used the company's normal cost and financial accounting records to compute the per-unit further manufacturing cost figures reported in response to this section of the questionnaire.  Include in your description a discussion of how you used the company's accounting system and actual cost and financial accounting data to compute each of the following cost elements relating to the submitted further manufacturing cost figures:

    a.  direct materials;
    b.  direct labor;
    c.  factory overhead (provide a list of the cost categories that comprise your submitted factory overhead cost figures);
    d.  yield loss;
    e.  research and development (R&D) costs;
    f.  general and administrative expenses (including a list of all miscellaneous income and expense items); and
    g.  net interest expense (including a list of all interest income and expense items and other financing amounts used to compute net interest expense).

2.  List and describe in detail all differences between costs computed under the company's normal cost and financial accounting systems and the costs submitted in response to this section of the questionnaire.  Include in your description the reasons why it was necessary for you to depart from the company's normal accounting practices compute the submitted further manufacture costs.

B.      Reconciliation

Provide summary trial balances for the POI and fiscal year.  Provide a worksheet reconciling all items on the fiscal year income statement (*e.g.*, revenues, cost of sales, selling and administrative expenses, and non-operating expenses) in the audited financial statements to the total costs in the financial accounting system (*i.e.*, the summary trial balance).[1]  Describe and quantify each reconciling item.

Provide a reconciliation demonstrating how the extended per-unit further manufacturing costs reconcile to the actual costs recorded in the company's accounting system (e.g., summary trial balance) and to accounting records used by the company to prepare its financial statements.  Explain all reconciling items.

C.      Worksheets

Provide the worksheets requested below that illustrate how your company calculated the per-unit further manufacturing costs submitted in response to this section of the questionnaire.

1.  For the further manufactured product with the highest U.S. market sales volume during the POI, provide worksheets that demonstrate how your company computed direct materials (other than the imported subject merchandise), direct labor, fixed and variable overhead costs, and yield loss for the submitted further manufacturing cost figure(s).  If your company relies on a standard cost accounting system, the worksheets that you prepare should show the buildup of the standard costs and how you allocated any cost variances in deriving actual production costs. If your company relies on an actual cost accounting system, the worksheets that you prepare should show how you accumulated costs at each stage and allocated the costs to individual products.  If the further manufactured products vary significantly, provide some additional examples for major types of products.

2.  Provide a worksheet that demonstrates how you computed your company's general and administrative (G&A) expense ratio.  The worksheet that you provide should demonstrate how the G&A expenses used for your ratio calculation reconcile to your company's financial statements.  Demonstrate that the allocation properly allocates G&A to all products.

3.  Provide a worksheet that demonstrates how you computed your company's net interest expense ratio.  The interest expense rate should be calculated from the highest

---

[1] This worksheet should cross reference each account on the summary trial balance to the corresponding summarized line item on the income statement.

E-7

level consolidated financial statements in which the company is reported.   The worksheet that you provide should demonstrate how the interest income and expense figures used for your ratio calculation reconcile to your company's financial statements.  Demonstrate that the allocation properly allocates interest expense to all products.


## IV.   Instructions for Submitting Further Manufacturing Cost Data File

In accordance with the instructions provided below, prepare a computer file reporting the costs incurred to further manufacture the subject merchandise in the United States.  Instructions regarding the specific information required to complete each data field for the further manufacturing cost file are provided below.  These instructions combine the questionnaire with the computer data file format.  FIELD NUMBER includes the number and descriptive name of the field in the computer data file.  FIELD NAME includes the short or variable name for the submitted hard copy printouts of the data file.  DESCRIPTION defines the data that you must report in the field of the computer data file.

| **Fields 1 through 2.1** |
| --- |
| For each file record, report in these fields the product code for each further manufactured product and the matching control number for each unique model of the subject merchandise that was further manufactured in the United States.  This information should allow Commerce to match the detailed further manufacturing cost data to the total further manufacturing cost data provided in your response to section C of this questionnaire. |

**FIELD NUMBER 1.0:**       **Complete Product Code**

FIELD NAME:       PRODCODU

DESCRIPTION:       Report the commercial product code assigned by the company in the normal course of business to the specific further manufactured product sold in the United States.

**FIELD NUMBER 2.0:**       **Matching Control Number**

FIELD NAME:       CONNUMU

DESCRIPTION:       Report the unique control number assigned to the subject merchandise (as imported) from the U.S. sales files in your response to section C of this questionnaire.  Unless otherwise instructed by Commerce, you should ensure that your further manufacturing cost computer file contains a record for each unique product control number contained in the U.S. sales file which required further manufacturing in the United States.

**FIELD NUMBER 2.1:**      **Production Quantity**

     FIELD NAME:      PRODQTY

     DESCRIPTION:      Report the quantity produced of PRODCODU during the cost calculation period.

| Fields 2.5 through 2.9 |
| --- |
| In certain circumstances, it may be necessary to use these fields to provide a separate identifying variable(s) which will link the sale of each product which is further manufactured in the U.S. to the product(s) as imported.  For example, if the company imports multiple parts which are assembled into a single product sold in the U.S., this field would be used to report a code which will specifically identify these parts to the U.S. sale.  If a single product is imported and then further manufactured into multiple U.S. products, the sale of each of these U.S. products must be linked to the single imported product.  The variable(s) reported in this field should also appear in the company's U.S. sales database reported in response to section C of the questionnaire. |

**FIELD NUMBER 2.5:**      **Linking Variables**

     FIELD NAME:      LINKVAR

     DESCRIPTION:      Report the identifying variable which will link the further manufacturing cost record to the corresponding sale or sales in the U.S. sales file.

| Fields 3 through 6 |
| --- |
| These fields should contain information regarding the specific cost elements incurred to further manufacture the subject merchandise in the United States.  The further manufacturing costs include direct materials and fabrication costs actually incurred by the company.  If the company performed further manufacturing operations for the subject merchandise at more than one facility, the amounts reported for COM should be based on the weighted-average manufacturing costs from all facilities. |

**FIELD NUMBER 3.0:**      **Direct Materials Cost**

     FIELD NAME:      FURMAT

     DESCRIPTION:      Report the costs incurred for direct materials used to further manufacture the subject merchandise, not the subject merchandise itself.  This should include transportation charges and other expenses normally associated with obtaining the materials that become an integral part of the finished product sold in the United States.  Direct materials costs include only the costs incurred for materials added in the United States and not the cost of the

imported subject merchandise. However, in addition to the cost of all direct materials added in the United States, you should include in this field the costs incurred for all movement charges incurred to transport the subject merchandise from the port of entry to the company's U.S. further manufacturing facilities.

FIELD NUMBER 3.1:      Yield Loss

      FIELD NAME:      FURMANYLD

      DESCRIPTION:      Report the actual costs incurred for any yield loss in connection with the further manufacture of the subject merchandise in the United States. (Note that you should compute the amount of any yield loss taking into account both the cost of the imported subject merchandise and the costs incurred for U.S. further manufacturing.)

**FIELD NUMBER 4.0:**      **Direct Labor Costs**

      FIELD NAME:      FURLAB

      DESCRIPTION:      Report the direct labor costs incurred to further manufacture the subject merchandise.

**FIELD NUMBER 5.0:**      **Factory Overhead Costs**

      FIELD NAME:      FURFOH

      DESCRIPTION:      Report the factory variable and fixed overhead costs incurred to further manufacture the subject merchandise. Overhead costs may include costs incurred for indirect materials, indirect labor, and manufacturing utilities, as well as other costs.

**FIELD NUMBER 6.0:**      **Total Production Cost**

      FIELD NAME:      FURCOM

      DESCRIPTION:      Report the total production costs incurred to further manufacture the subject merchandise computed as the sum of data fields 3.0 through 5.0.

| **Fields 7 and 8** |
| --- |
| These fields should contain information regarding general and administrative (G&A) expenses and net interest expense incurred in connection with the further manufacture of the subject merchandise in the United States. |

**FIELD NUMBER 7.0:   General and Administrative Expenses**

FIELD NAME:   FURGNA

DESCRIPTION:   Report the per-unit G&A expenses incurred by the company in connection with the U.S. further manufacture of the subject merchandise.  G&A expenses are those period expenses that relate to the general production operations of the company rather than directly to the production process for the subject merchandise.  You should also include in your reported G&A expenses an amount for administrative services performed on the company's behalf by its parent company or other affiliated party.

Calculate the G&A expenses as follows.
1. Compute the G&A expense ratio on an annual basis as a ratio of the company's total G&A expenses divided by its total cost of sales.  In calculating the company's G&A ratio, you should rely on full-year G&A expense and cost of sales figures reported in the company's audited financial statements for the year that most closely corresponds to the POI.
2. To derive the amount for G&A expenses, multiply the G&A expense ratio by the per-unit further manufacturing cost for the subject merchandise plus the COP (including G&A and interest) of the subject merchandise that was further processed.  The COP of the subject merchandise should be taken from the cost database submitted in Section D of the questionnaire.
3. For the G&A expense ratio to be applied on the same basis as it was calculated, adjust the cost of sales denominator of the G&A expense ratio to include the COP of the subject merchandise purchased by the company rather than the purchase price paid (i.e., eliminate the profit or loss element on purchases of subject merchandise).  The COP of the subject merchandise in the revised cost of sales denominator should represent the COP of the subject merchandise reported in the cost database submitted in Section D of the questionnaire.

**FIELD NUMBER 8.0:   Net Interest Expense**

FIELD NAME:   FURINT

DESCRIPTION:   Report the per-unit net interest expense incurred by the company in connection with the further manufacture of the subject merchandise.

Calculate the net interest expense as follows.

If your company's operating results are included in the same consolidated financial statements that were used to calculate the interest expense reported in the cost database in Section D of the questionnaire, then to derive the amount for interest expense multiply the interest expense ratio reported in Section D by the per-unit further manufacturing cost for the subject merchandise.

If your company's operating results are not included in the same consolidated financial statements that were used to calculate the interest expense reported in Section D:

1. Compute the interest expense ratio on an annual basis as a ratio of the company's net interest expense divided by its total cost of sales. If the company is a member of a consolidated group of companies, then you should base your interest expense ratio calculation on the consolidated financial statements of the highest consolidation level available that includes operating results of the company for the fiscal year that most closely corresponds to the POI

2. To derive the amount for interest expense, multiply the interest expense ratio by the per-unit further manufacturing cost for the subject merchandise plus the COP (including G&A and interest) of the subject merchandise that was further processed. The COP of the subject merchandise should be taken from the cost database submitted in Section D of the questionnaire.

3. For the interest expense ratio to be applied on the same basis as it was calculated, adjust the cost of sales denominator of the interest expense ratio to include the COP of the subject merchandise purchased by the company rather than the purchase price (i.e., eliminate the profit or loss element on purchases of subject merchandise). The COP of the subject merchandise in the revised cost of sales denominator should represent the COP of the subject merchandise reported in the cost database submitted in Section D of the questionnaire.

**FIELD NUMBER 9.0:**       **Total Further Manufacturing Costs**

FIELD NAME:        TOTFMG

DESCRIPTION:       Report the unit total further manufacturing costs incurred for the product sold in the U.S. market. You should compute this amount as the sum of data fields 3.0 through 9.0.

## APPENDIX I

## GLOSSARY OF TERMS

This glossary is intended to provide parties with a basic understanding of many technical terms that appear in the antidumping questionnaire.  These explanations are not regulations or rules with the force of law.  As difficult or detailed questions arise, parties should seek clarification from the statute, regulations, and Commerce, rather than attempting to derive precise guidance from these general explanations.

**Administrative Protective Order**

An administrative protective order is the legal mechanism that controls the limited disclosure of business proprietary information to representatives of interested parties.  Commerce authorizes the release of proprietary information under administrative protective order only when the representatives file a request in which they agree to the following four conditions: (a) to use the information only in the antidumping (AD) proceeding, (b) to secure the information and protect it from disclosure to any  person not subject to an administrative protective order, (c) to report any violation of the terms of the protective order, and (d) to acknowledge that they may be subject to sanctions if they violate the terms of the order.  (Section 777(c) of the Tariff Act of 1930, as amended (the Act).  *See also* **Proprietary Information** and **Proprietary Treatment**.)

**Administrative Review**

Annual proceeding conducted by Commerce to determine the amount of AD duties that Customs will assess on imports of the subject merchandise during the period of review or to determine if a suspension agreement has been violated.  Commerce also establishes new cash deposit rates for entered subject merchandise for each of the companies reviewed.  *See* section 751 of the Act.

**Affiliated Persons**

The term affiliated persons (affiliates) includes:  (1) members of a family; (2) an officer or director of an organization and that organization; (3) partners; (4) employers and employees; (5) any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and that organization; (6) two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; and (7) any person who controls any other person and that other person.  Control exists when a person is legally or operationally in a position to exercise restraint or direction over another person.  A control relationship should also have the potential to affect decisions concerning the production, pricing, or cost of the merchandise under investigation or review.  (Section 771(33) of the Act; sections 351.102(b) and 351.401(f) of the regulations.)

Examples of situations which may indicate control include (but are not limited to):

I-2

(a) joint ventures and franchises; (b) lender/borrower situations; (c) a close relationship with a supplier, (sub) contractor, lender, distributor, exporter or reseller; and (d) a group of companies controlled by, for example, a family, a corporation, or the same investors. An example of affiliation by common control may be the affiliation between the owners of a joint venture when each owner is in a control position with that joint venture.

Section 351.102(b) of Commerce's regulations states that the term person includes any interested party as well as any other individual, enterprise, or entity, as appropriate. In Commerce's practice, the term person includes any company, individual, organization, partnership or group.

## Antidumping Law and Regulations

The United States antidumping laws are set forth in Title VII of the Tariff Act of 1930, as amended (the Act) (19 U.S.C. 1673 *et seq.*). Commerce's regulations governing antidumping proceedings are set forth at 19 CFR Part 351, published in the *Federal Register* on May 19, 1997 (62 FR 27379-27424). For procedures governing Administrative Protective Orders and the treatment of proprietary information, please *see* 19 CFR Parts 351 and 354, published in the *Federal Register* on May 4, 1998 (63 FR 24391).

## Arm's-Length Transactions (between affiliates)

Generally, Commerce may use transactions between affiliates as a basis for normal value, only if the transactions are made at arm's length. Arm's-length transactions are those in which the selling price between the affiliated parties is comparable to the selling prices in transactions involving persons who are not affiliated. Commerce takes into account terms of sale, conditions of delivery, and other circumstances related to the sales in deciding if the selling prices are comparable. To determine whether sales to an affiliate should be included in the normal value calculation, Commerce performs an arm's-length test. In this test, Commerce compares the weighted-average price to each affiliate for each product to the weighted-average price of the same or a similar product to all unaffiliated customers. If the overall ratio calculated for an affiliate is between 98 percent and 102 percent, inclusive, of sales prices to all unaffiliated customers, sales to that affiliate may be considered in the **ordinary course of trade** and used in the normal value calculation. Sales not made at arm's length are not considered to be within the ordinary course of trade. *See also* **Ordinary Course of Trade**.

## Business Proprietary Information

Business proprietary information (BPI) is sensitive business data that would cause substantial harm to the submitting party if disclosed publicly. Examples of information that Commerce normally treats as business proprietary, if requested and not already in the public domain, include trade secrets concerning the production process, production and distribution costs, terms of sale, individual prices, and the names of customers and suppliers.

## Certification of Accuracy

Any person that submits factual information to Commerce must include with the submission a certification of the completeness and accuracy of the factual information. Certifications must be made by a knowledgeable official responsible for presentation of the factual information and by the party's legal counsel or other representative, if any. A sample certification form is included as Appendix IV to the questionnaire. (Section 782 (b) of the Act; section 351.303(g) of the regulations.)

## Circumstances of Sale

In comparing normal value to export price or constructed export price, Commerce makes adjustments to normal value for certain differences in expenses or prices that exist because the conditions under which the sales are made in the two markets differ. Besides particular adjustments named in the statute (*e.g.*, differences in quantities and levels of trade), the statute also allows Commerce to adjust for other differences in circumstances of sale. This adjustment normally is based only on differences in direct selling expenses that Commerce does not adjust for under more specific provisions. (Section 773(a)(6)(C)(iii) of the Act; section 351.410 of the regulations.) *See also* **Direct vs. Indirect Expenses**.

## Comparison Market

*See* **Foreign Market**

## Constructed Export Price

*See* **Export Price and Constructed Export Price**

## Constructed Export Price Offset

To the extent practicable, Commerce attempts to base normal value on sales made at the same level of trade as the export price or constructed export price or adjust for the differences in levels of trade. Where this is not possible, the law provides for an adjustment to normal value to account for differences in level of trade when: (1) U.S. price is a constructed export price; (2) normal value is determined at a more advanced level of trade than the level of trade of the constructed export price;[1] and (3) the data available do not provide an appropriate basis for

---

[1] More advanced refers to a more advanced stage of marketing, which generally means that the home market level of

determining whether differences in levels of trade affect price comparability and quantifying the amount of a level of trade adjustment.  This adjustment takes the form of a deduction from normal value of the amount of indirect selling expenses incurred in the foreign market.  The amount of this deduction may not exceed (*i.e.*, it is capped by) the amount of indirect selling expenses deducted in calculating constructed export price.  (Section 773(a)(7)(B) of the Act; 351.412(f) of the regulations.)  *See also* **Level of Trade, Level of Trade Adjustment**.

## Constructed Value

When there are no sales of the foreign like product in the foreign market suitable for matching to the subject merchandise (including, for example, when Commerce disregards sales because they are below the cost of production), Commerce uses constructed value as the basis for normal value.  The constructed value is the sum of:  (1) the cost of materials and fabrication of the subject merchandise, (2) selling, general, and administrative expenses and profit in the foreign market, and (3) the cost of packing for exportation to the United States.  (Section 773(e) of the Act; sections 351.405 and 351.407 of the regulations.)

## Contemporaneous Sales

In investigations, Commerce normally compares average export prices (or constructed export prices) to average normal values.  The averages normally are based on sales made over the course of the period of investigation.

In administrative reviews of existing antidumping orders, on the other hand, Commerce normally compares the export price (or constructed export price) of an individual U.S. sale to an average normal value for a contemporaneous month.

The preferred month is the month in which the particular U.S. sale was made.  If, during the preferred month, there are no sales in the foreign market of a foreign like product that is identical to the subject merchandise, Commerce will then employ a six-month window for the selection of contemporaneous sales.  For each U.S. sale, Commerce will calculate an average price for sales of identical merchandise in the most recent of the three months prior to the month of the U.S. sale.  If there are no such sales, Commerce will use sales of identical merchandise in the earlier of the two months following the month of the U.S. sale.  If there are no sales of identical merchandise in any of these months, Commerce will apply the same progression to sales of similar merchandise.  (Section 351.414 of the regulations.)

---

trade is more remote from the factory door than the constructed export price level of trade.  A more advanced, or remote, level of trade is typically characterized by more selling activities and greater selling expenses.

## Cost of Manufacture

The cost of manufacture is the sum of material, fabrication and other processing costs incurred to produce the products under investigation or review. *See also* **Cost of Production**.

## Cost of Production

Cost of production means the cost of producing the foreign like product. The cost of production is the sum of: (1) material, fabrication, and other processing costs, (2) selling, general, and administrative expenses, and (3) the cost of containers and other packing expenses. Commerce may disregard foreign market sales in calculating normal value if they are made at prices which are less than the cost of production. Commerce will disregard all sales below cost if made: (A) within an extended period of time (normally one year) in substantial quantities ( at least 20 percent of the volume of the product examined is sold below cost or the weighted-average unit price is below the weighted-average cost for the period examined); and (B) at prices that do not permit recovery of costs within a reasonable period of time (*i.e.*, a price is less than the weighted-average cost of production during the period examined).

## Credit Expense

Credit expense is a type of expense for which Commerce frequently makes circumstances-of-sale adjustments. It is the interest expense incurred (or interest revenue foregone) between shipment of merchandise to a customer and receipt of payment from the customer. Commerce normally imputes the expense by applying a firm's annual short-term borrowing rate in the currency of the transaction, prorated by the number of days between shipment and payment, to the unit price. If actual payment dates are not kept in a way that makes them accessible, the calculation may be based on the average number of days that accounts receivable remain outstanding. *See also* **Imputed Expenses**.

Note that credit expenses are not the same as bank charges or fees. While credit expenses represent the imputed costs of extending different credit periods on different sales, bank charges and fees are actual expenses incurred by a company, recorded on its books, and typically should be reported as a direct selling expense.

## Date of Sale

Because Commerce attempts to compare sales made at the same time, establishing the date of sale is an important part of the dumping analysis. Commerce will normally use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, Commerce may use a date other than the date of invoice (*e.g.*, the date of contract in the case of a long-term contract) if satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale (*e.g.*, price, quantity). (Section

351.401(i) of the regulations.)  If, for any specific sale, the date selected is after the shipment date for that sale, Commerce will use shipment date as the date of sale instead, but only for the sale in question.

---

## Difference in Merchandise Adjustments

When normal value is based on sales in the foreign market of a product which is similar, but not identical, to the product sold in the United States, Commerce may adjust normal value to account for differences in the variable costs of producing the two products.  Generally, the adjustment is limited to differences in the costs of materials, labor and variable production costs that are attributable to physical differences in the merchandise.  Commerce will not adjust for differences in fixed overhead or administrative expenses or profit.  (Section 351.411 of the regulations.)

---

## Direct vs. Indirect Expenses

In calculating export price, constructed export price, and normal value, Commerce treats selling expenses differently depending on whether they are direct expenses or indirect expenses.  For instance, circumstances-of-sale adjustments normally involve only direct expenses, while the constructed export price offset involves indirect expenses.

Direct expenses generally must be (1) variable and (2) traceable in a company's financial records to sales of the merchandise under investigation or review.

1. <u>Variable vs. fixed expenses</u>:  Direct expenses are typically variable expenses that are incurred as a direct and unavoidable consequence of the sale (*i.e.*, in the absence of the sale these expenses would not be incurred).  Indirect expenses are fixed expenses that are incurred whether or not a sale is made.

   The same expense may be classified as fixed or variable depending on how the expense is incurred.  For example, if an exporter pays an unaffiliated contractor to perform a service, this fee would normally be considered variable and treated as a direct expense (provided that condition 2, below, is also satisfied).  However, if the exporter provides the service through a salaried employee, the fixed salary expense will be treated as an indirect expense.

2. <u>Tying of the expense to sales of the merchandise under investigation or review</u>:  Selling expenses must be reasonably dependent upon sales of the merchandise under investigation or review to qualify as direct selling expenses.  However, even if a <u>fixed</u> expense is allocable to the merchandise under investigation or review, Commerce normally will treat it as an indirect expense.

Common examples of direct selling expenses include credit expenses, commissions, and the variable portions of guarantee, warranty, technical assistance, and servicing expenses.  Common

examples of indirect selling expenses include inventory carrying costs, salesmen's salaries, and product liability insurance. The fixed portion of expenses, such as salaries for employees who perform technical services or warranty repairs, are indirect expenses.

Commerce also treats assumptions of expenses as direct expenses, provided they are attributable to a later sale of the merchandise. For example, Commerce treats expenses incurred for advertising aimed at retailers as if they were direct selling expenses when the exporter is selling to wholesalers.

## Discounts

*See* **Price Adjustments**

## Dumping

Dumping occurs when imported merchandise is sold in, or for export to, the United States at less than the normal value of the merchandise, *i.e.*, a price that is less than the price at which identical or similar merchandise is sold in the foreign market, or less than the constructed value of the merchandise. The dumping margin is the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise. The weighted-average dumping margin is the sum of the dumping margins divided by the sum of the export prices and constructed export prices.

## Export Price and Constructed Export Price

Export price and constructed export price refer to the two types of calculated prices for merchandise imported into the United States. Commerce compares these prices to normal values to determine whether goods are dumped. Both export price and constructed export price are calculated from the price at which the subject merchandise is first sold to a person not affiliated with the foreign producer or exporter.

Generally, a U.S. sale is classified as an export price sale when the first sale to an unaffiliated person occurs *before* the goods are imported into the United States. In cases where the foreign manufacturer knows or has reason to believe that the merchandise is ultimately destined for the United States, the manufacturer's sale is usually the sale subject to investigation or review. If, on the other hand, the manufacturer sold the merchandise to a trader without knowledge of the trader's intention to export the merchandise to the United States, then the trader's first sale to an unaffiliated person is the sale subject to investigation or review.

Generally, a U.S. sale is classified as a constructed export price sale when the first sale to an unaffiliated person occurs *after* importation. Constructed export price also applies if the first

sale to the unaffiliated person is made by a person in the United States affiliated with the foreign exporter before importation.

Commerce makes adjustments to the price to the first unaffiliated customer in calculating the export price or constructed export price. For both export price and constructed export price Commerce adds packing charges, if not already included in the price, rebated import duties, and, if applicable, certain countervailing duties. Also for both, Commerce deducts transportation costs and export taxes or duties. No other adjustments are made in calculating export price. However, in calculating the constructed export price, Commerce also deducts selling commissions and other expenses incurred for selling activities in the United States performed in selling the subject merchandise to unaffiliated U.S. customers, the cost of any further manufacture or assembly performed in the United States, and profit. These expenses and profits represent activities undertaken in the United States to support the U.S. resale to an unaffiliated customer. Generally these activities are undertaken by the affiliated U.S. reseller. However, Commerce will also deduct any selling expenses incurred to support the U.S. resale that are paid by the producer or exporter on behalf of its affiliated U.S. reseller. (Section 772 of the Act; section 351.402(b) of the regulations.)

**Exporter**

As a general matter, an exporter arranges for the sending or carrying abroad of merchandise. Most commonly, the exporter of merchandise takes possession of the merchandise and actively participates in the transport of merchandise to an importer. Should an intermediate party, who is not a reseller, be involved in export transactions, Commerce will focus primarily on the actual involvement of the intermediate party in the sale and transportation of the merchandise to determine which party is the "exporter" for AD/CVD purposes.

**Facts Available**

Commerce seeks to make its antidumping determinations on the basis of responses to its antidumping questionnaires. However, for a variety of reasons, the data needed to make such determinations may be unavailable or unusable. In such instances, the law requires Commerce to make its determinations on the basis of "the facts otherwise available" (more commonly referred to as "the facts available"). More specifically, Commerce must use the facts available if necessary information is not available on the record of an antidumping proceeding. In addition, Commerce must use the facts available where an interested party or any other person: (1) withholds information requested by Commerce; (2) fails to provide requested information by the requested date or in the form and manner requested; (3) significantly impedes an antidumping proceeding; or (4) provides information that cannot be verified.

In selecting the information to use as the facts available, the law authorizes Commerce to make an inference that is adverse to an interested party if Commerce finds that party failed to cooperate by not acting to the best of its ability to comply with a request for information.

Submitted information that does not meet all of the requirements may be used if: (1) the information is submitted within applicable deadlines; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for a determination; (4) the party establishes that it acted to the best of its ability; and (5) Commerce can use the information without undue difficulties. Finally, if an interested party promptly informs Commerce of difficulties it is having in responding to a request for information, Commerce will consider modifying its request to the extent necessary to avoid imposing an unreasonable burden on the party. (Sections 776 and 782(c)-(e) of the Act; section 351.308 of the regulations.)

## Foreign Like Product

The term foreign like product refers to merchandise that is sold in the foreign market and that is identical or similar to the subject merchandise. When used in the questionnaire, foreign like product means all merchandise that is sold in the foreign market and that fits within the description of merchandise provided in Appendix III to the questionnaire. (Section 771(16) of the Act.) *See also* **Identical Merchandise** and **Similar Merchandise**.

## Foreign Market

The foreign market is the home or third-country market from which Commerce selects the prices used to establish normal values. *See also* **Viability**.

## Further Manufacturing Adjustment

In calculating constructed export price, Commerce normally deducts from the price of the merchandise sold in the United States the cost of any further manufacture or assembly performed in the United States by, or for, the exporter or an affiliate. However, if the value of the further processing is more than the value of the subject merchandise as imported, Commerce may instead use an alternative basis for the constructed export price. Commerce normally will determine that the value added in the United States meets this requirement if the value of the further processing in the United States by the affiliated person is estimated to be at least 65 percent of the price charged to the first unaffiliated purchaser for the merchandise as it is sold in the United States. In such cases, if possible, Commerce will use the price of identical or similar subject merchandise sold to an unaffiliated customer by the producer, exporter, or affiliated seller. If there is an insufficient quantity of such sales or it is not appropriate to use such sales, Commerce may rely on any other reasonable basis. (Sections 772(d)(2) and 772(e) of the Act; sections 351.402 (b) and (c) of the regulations.)

**General and Administrative Expenses**

General and administrative expenses (G&A) are those period expenses which relate indirectly to the general operations of the company rather than directly to the production process.  G&A expenses include, for example, amounts incurred for general research & development activities, executive salaries and bonuses, litigation expenses, and operations relating to the company's corporate headquarters.

**Home Market**

The home market refers to the market for sales of the foreign like product in the country in which the merchandise under investigation or review is produced.  Home market sales are the preferred basis for normal value.  *See also* **Third-Country Market** and **Viability**.

**Identical Merchandise**

Commerce prefers to compare U.S. sales to foreign market sales of identical merchandise.  The identical merchandise is merchandise that is produced by the same manufacturer in the same country as the subject merchandise, and which Commerce determines is identical or virtually identical in all physical characteristics with the subject merchandise, as imported into the United States.  *See also* **Similar Merchandise** and **Foreign Like Product**.

**Imputed Expenses**

Imputed expenses generally are opportunity costs (rather than actual costs) that are not reflected in the financial records of the company being investigated, but which must be estimated and reported for purposes of an antidumping inquiry.  Common examples of imputed expenses include credit expenses and inventory carrying costs.

**Indirect Expenses**

*See* **Direct vs. Indirect Expenses**

**Inventory Carrying Costs**

Inventory carrying costs are the interest expenses incurred (or interest revenue foregone) between the time the merchandise leaves the production line at the factory (*i.e.*, when goods are transferred from the work-in-progress ledger to finished goods inventory) to the time the goods are shipped to the first unaffiliated customer.  Commerce normally calculates these costs by applying the firm's annual short-term borrowing rate in the currency of the country where the

inventory is being held, prorated by the number of days between leaving the production line and shipment to the customer, to the unit cost. *See also* **Imputed Expenses**.

## Level of Trade

To the extent practicable, Commerce calculates normal values based on sales made in the foreign market at the same level of trade as the constructed export price (CEP) or export price, or adjusts for the differences in levels of trade. In a CEP situation, economic activities occurring in the United States are not considered in determining the level of trade. The level of trade of the U.S. sale is that associated with the constructed export price.

In order to establish whether differences in levels of trade exist, Commerce reviews distribution systems, including categories of customers, selling activities, and levels of selling expenses for each type of sale. Different levels of trade are typically characterized by purchasers at different stages in the chain of distribution and sellers performing qualitatively and/or quantitatively different selling activities. Different levels of trade necessarily involve differences in selling activities, although differences in selling activities alone are not sufficient to establish differences in levels of trade. Similarly, customer categories such as distributor, wholesaler, retailer, and end-user are often useful in identifying levels of trade, although they, too, are insufficient in themselves to establish differences in levels of trade. Rather, Commerce evaluates differences in levels of trade based on a seller's entire marketing process. (Section 773(a)(1) and 773(a)(7)(A) of the Act; sections 351.412(a)-(c) of Commerce's regulations.)

## Level of Trade Adjustment

When Commerce bases normal value on sales in the foreign market at a level of trade that is different from that of the EP or CEP, Commerce may adjust the normal value to account for differences in levels of trade between the two markets.

Commerce makes these adjustments only when there is a difference in the levels of trade and that difference affects price comparability. Commerce determines whether there is an effect on price comparability by determining whether there is a pattern of consistent price differences between sales at the different levels of trade in the foreign market. Commerce normally calculates any adjustment for level of trade based on the percentage difference between an average of the prices at the different levels of trade in the foreign market, less any expenses adjusted for elsewhere in the normal value calculation. (Sections 773(a)(1) and (7) of the Act; sections 351.412(c), (d), and (e) of the regulations.)

## Movement Expenses

Movement expenses are expenses directly attributable to bringing the merchandise from the original place of shipment to the place of delivery to the United States or in the foreign market.

These expenses may include freight and freight insurance charges, brokerage and handling fees, export taxes, and warehousing expenses incurred after the merchandise leaves the original place of shipment.

Normally, the production facility is considered to be the original place of shipment. However, where export price, constructed export price, or normal value is based on a sale made by a reseller unaffiliated with the producer, Commerce may treat the place from which the reseller shipped the merchandise as the original place of shipment. (Sections 772(c)(2)(A) and 773(a)(6)(B)(ii) of the Act; section 351.401(e) of the regulations.)

## Normal Value

Normal value is the adjusted price of the foreign like product in the home or third-country (foreign) market, or the constructed value of the subject merchandise. Commerce compares the normal value to the export price or constructed export price to determine the margin of dumping, if any.

Commerce initially seeks to calculate normal values based on price. If there are adequate sales in the home market (*see* **Viability**), Commerce calculates normal value based on the price at which the foreign like product is first sold (generally, to unaffiliated parties) in that market; otherwise, if there are adequate sales in a third-country market, Commerce calculates normal value based on the price at which the foreign like product is first sold (generally, to unaffiliated parties) in the third-country market. If there are no appropriate home or third-country market sales, Commerce determines normal value by calculating the constructed value.

To ensure a fair comparison between normal value and export price or constructed export price, Commerce makes adjustments to the price used to calculate the normal value. Commerce adds U.S. packing charges and deducts any of the following expenses included in the foreign market price: packing charges, transportation costs, and any internal tax[2] that was rebated or not collected on the subject merchandise. Commerce may make additional adjustments to account for differences in the conditions under which sales are made in the United States and the foreign market. Thus, Commerce may increase or decrease the normal value to account for differences in quantities, physical characteristics of the merchandise, levels of trade, and other circumstances of sale. (Section 773(a) and 773(c) of the Act.)

## Ordinary Course of Trade

In calculating normal value, Commerce considers only those sales in the foreign market that are in the ordinary course of trade. Generally, sales are in the ordinary course of trade if made under conditions and practices that, for a reasonable period of time prior to the date of sale of the

---

[2] Any internal tax other than an export tax or duty, or other charge described in section 771(6)(C) of the Act.

subject merchandise, have been normal for sales of the foreign like product. (Section 771(15) of the Act; section 351.102(b) of the regulations.) *See also* **Arms-Length Transactions**.

## Price Adjustments

A price adjustment is any change in the price charged for subject merchandise or the foreign like product that is reflected in the purchaser's net outlay. Discounts and rebates are examples of price adjustments.

A discount is a reduction to the gross price that a buyer is charged for goods. Although the discount need not be stated on the invoice, the buyer remits to the seller only the face amount of the invoice, less discounts. Common types of discounts include early payment discounts, quantity discounts, and loyalty discounts.

Similar to discounts, rebates are reductions in the gross price that a buyer is charged for goods. Unlike discounts, rebates do not result in a reduction in the remittance from the buyer to the seller for the particular merchandise with which the rebate is associated. Rather, a rebate is a refund of monies paid, a credit against monies due on future purchases, or the conveyance of some other item of value by the seller to the buyer after the buyer has paid for the merchandise. When the seller establishes the terms and conditions under which the rebate will be granted at or before the time of sale, Commerce reduces the gross selling price by the amount of the rebate. (Section 351.102(b) of the regulations.) *See also* **Direct vs. Indirect Expenses**.

## Proprietary Information

*See* **Business Proprietary Information**

## Proprietary Treatment

If a party requests business proprietary treatment of information claimed to be business proprietary information, and if Commerce agrees that the information is proprietary, Commerce will protect the information from public disclosure. If Commerce does not agree that the information is proprietary, it will return the information and not rely on it in the proceeding, unless the submitting party agrees that it may be made public. When requested, Commerce will disclose business proprietary information only to United States International Trade Commission and United States Customs Service officials and, under limited administrative protective orders, to the representatives of interested parties. (Section 777(b) of the Act.) *See also* **Administrative Protective Order**.

**Rebates**

*See* **Price Adjustments**

---

**Regulations**

*See* **Antidumping Law and Regulations**

---

**Sample Sales**

Sample sales will be excluded from Commerce's calculations as "outside the ordinary course of trade."  In order to conclude sales qualify as "sample sales," Commerce typically requires information demonstrating the sales were not for consideration (*i.e.*, the sales price net of movement expenses is not greater than zero) and not in commercial quantities.

---

**Selling Expenses**

Expenses incurred to sell or distribute the merchandise.  The expenses may be direct or indirect. *See* **Direct vs. Indirect Expenses.**

---

**Similar Merchandise**

In deciding which sales of the foreign like product to compare to sales of the subject merchandise, Commerce first seeks to compare sales of identical merchandise.  If there are no sales of the identical foreign like product, Commerce will compare sales of the foreign like product similar to the subject merchandise.  The similar foreign like product is merchandise that is produced by the same manufacturer in the same country as the subject merchandise, and which, in order of preference,  is either (1) similar to the subject merchandise in component materials, use, and value, or (2) similar in use to, and reasonably comparable to, the subject merchandise.  (Section 771 (16) of the Act.)  *See also* **Identical  Merchandise**, **Foreign Like Product**, and Appendix V.

---

**Subcontractor**

A person or business which contracts with the respondent to provide a process or service.  A specific type of subcontractor is a toller, who may provide processing related to the production of the merchandise under consideration.

---

**Subject Merchandise**

Subject merchandise is the merchandise under investigation or review, *i.e.*, the merchandise described in Appendix III to the questionnaire, and sold in, or to, the United States.  (Section 771(25) of the Act.)

---

**Technical Service Expenses**

Technical service expenses are typically incurred when a producer provides technical advice to customers which are industrial users of the product.  Generally, Commerce considers travel expenses and contract services performed by unaffiliated technicians to be direct expenses. Commerce treats salaries paid to the seller's employees who provide technical services as indirect expenses.

---

**Third-Country Market**

When Commerce cannot use home market sales as the basis for normal value, the preferred alternative method is the use of sales to a third-country market, *i.e.*, export sales of the foreign like product to a country other than the United States.  Generally, in selecting a third-country market to be used as the foreign market, Commerce will choose one of the three third-country markets with the largest aggregate quantity of sales of the foreign like product.  In selecting which country, Commerce will consider product similarity, the similarity of the third-country and U.S. markets, and whether the sales to the third country are representative.  (Section 773(a)(1) of the Act; section 351.404 of the regulations.)  *See also* **Home Market** and **Viability**.

---

**Verification**

To establish the adequacy and accuracy of information submitted in response to questionnaires and other requests for information, Commerce examines the records of the party that provided the information and interviews company personnel who prepared the questionnaire response and are familiar with the sources of the data in the response.  This process is called verification. Commerce will verify information relied upon in making a final determination in an investigation, or in an administrative review when revocation of an antidumping order is properly requested.  Commerce also will verify information submitted in an administrative review if an interested party so requests and no verification of the producer or exporter had been conducted during the two immediately preceding reviews of that producer or exporter, or if good cause for verification is shown.  (Section 782(i) of the Act; section 351.307 of the regulations.)

---

I-16

**Viability**

To calculate normal value based on sales in the home market, Commerce must determine that the volume of sales is adequate in that market and that a particular market situation does not make their use inappropriate.  To calculate normal value based on sales in a third-country market, Commerce must make the same determinations with respect to sales to the third country, and in addition the sales must be representative.  These determinations establish whether a market is viable.

Commerce normally finds sales to be adequate if the quantity of the foreign like product sold is 5 percent or more of the quantity sold to the United States.  In unusual situations, Commerce may find that sales below the 5-percent threshold are adequate, or that sales above the threshold are not.  Also in unusual situations, Commerce may apply the 5-percent test on the basis of value, rather than quantity.  The terms particular market situation and representative are undefined in the statute or the regulations.  A particular market situation might exist, for example, where there was a single sale in the foreign market that constituted 5 percent or more of the quantity sold to the United States, or where government control of pricing is such that prices cannot be competitively set.  (Section 773(a)(1) of the Act; section 351.404(b)(2) of Commerce's regulations.)

---

**Warehousing Expenses**

*See* **Movement Expenses**

## APPENDIX II

## INSTRUCTIONS FOR SUBMITTING
## COMPUTER DATABASES AND WORKSHEETS

1.      <u>Description of Computer File Contents</u>

Each file submitted should be assigned a unique eight character name.  We suggest that the first four positions be used to identify the respondent's name, the next two positions the type of file (*e.g.*, HM = home market sales; US = United States sales; CP = cost), and the last two positions a sequential file number.

For example, the first file of export sales to the United States would be named "FIRMUS01."  If that data file is amended and resubmitted during the course of the proceeding, the second submission would be named "FIRMUS02," and the third submission "FIRMUS03."

Within each file, all information pertaining to a specific sales transaction or to the cost of production for a unique product should be included in one record (row).  Each record should contain the fields (variables) defined in the suggested file formats included in section B (Foreign Market Sales), section C (United States Sales), section D (Cost of Production and Constructed Value) and section E (U.S. Further Manufacturing) of the questionnaire.

In preparing the files, left justify character fields (columns) and right justify numeric fields.  If some of the fields in the suggested file formats are not needed, exclude them from the file.  Explain in the narrative portion of your response why the information in those fields is not applicable.

For each transaction, provide information for all fields/columns.  If any revenue or expense information is not applicable (*e.g.*, no discount on a particular sale), place a zero in the cell.  If date information is not known or is unavailable for a transaction (*e.g.*, payment date), leave that particular cell blank.

Because the suggested file formats can be modified to add or delete fields, we have not specified record length or field position in the file formats.  Commerce, however, does require that each file have a fixed record length and a uniform structure.  Every record within a file must be of the same length and must be formatted exactly like every other record in the file.  This requires that each field within a record have a fixed width and that the fields be consistent from record to record.

All values within each field must have the same format, either all values as numeric or all values as character.  In other words, do not mix character and numeric formats within the same field.  Fields with mixed formats will cause errors.  This is important for all data files, especially for data submitted in Excel spreadsheet format.

II-2

Report numerical data in a numerical format that allows calculations (*e.g.*, 10, not 10 MT). Units should be reported in fields separate from numerical values.

When preparing the completed files for submission, sort each file first by product control number (CONNUM), and then, for sales files only, by date of sale (SALEDT). Packed decimals should be avoided. If you anticipate the need of packed decimals, approval should be obtained from the official in charge.

Commerce uses PC SAS software for calculation purposes. Other suitable formats are Access, dBase, Excel and ASCII text. If you have questions about the software used for submission, contact the official in charge of the case.

For Excel spreadsheet and ASCII text files, use the first row to enter the field names as defined in the questionnaire. Each subsequent row should contain data values. Each row of data values should represent only one transaction (sale, cost record, *etc.*). In Excel spreadsheet files, there should be no hidden rows or columns in the file. Do not protect columns or rows.

For Excel spreadsheet files, report date variables as Excel date values (*e.g.*, the integer value 1 represents January 1, 1900; the integer value 39965 represents June 1, 2009). Format the date value with the Excel MM/DD/YYYY date format (*e.g.*, 06/01/2009). If there is no date to report, leave the field blank.

For SAS dataset files, report date variables as SAS date values (*e.g.*, the integer value 1 represents January 1, 1960; the integer value 18049 represents June 1, 2009). Format the date value with the SAS MM/DD/YYYY date format (*e.g.*, 06/01/2009). If there is no date to report, leave the field blank.

2.      Documentation of File Formats

Provide a record layout for each submitted file which identifies the file name and structure and shows the name, position, and characteristics of all fields in the file.

As noted under the general filing instructions included at the beginning of this questionnaire, for each database submitted in an antidumping proceeding, you must also complete Appendix VII, which is a template providing a standard format for reporting the units of measurement, currencies, and conversion factors. Please complete a separate template for each database submitted (home market sales, U.S. sales, cost, *etc.*) and be sure to provide the requested data for each numerical field in the database.

3.      Filing Instructions

Except as described above under the section "Manual Filing," all database files, including Microsoft Excel spreadsheets that are less than 50 MB in size must be filed electronically using ACCESS. Instructions for using ACCESS can be found above and at https://access.trade.gov. Please refer to the Handbook on Electronic Filing Procedures in the "Help" section of the

website.

Please label the electronic files that you upload in a manner indicating their specific contents.  For example, ABC Subsidiary 1 March 15 Electricity Worksheet, rather than ABC March 15 QR – Excel 1.

For manual filings (when available), separately pack and label the electronic media containing the databases or spreadsheets (*see* section below for labeling and other instructions).  Deliver the package to the address listed in the section "Manual Filing."

Special Instructions for Manual Filing of Database in the Event of ACCESS Technical Failure

In the event of an ACCESS technical failure, you may submit your databases or spreadsheets manually on either a CD or DVD.  Compressed databases are acceptable, but decompression instructions and software must accompany any compressed data submission.

Clearly label the CD or DVD with the following information:

1. Case name, case number, and submission date
2. Name of respondent
3. Proceeding and time period (for example, INV-POI 1/2016-12/2016)
4. Name of official in charge
5. File formats and software used to create the databases or worksheets
6. File names, number of observations, and record lengths
7. ACCESS bar code number

E.    Bracketing of Databases

1.    Database files containing business proprietary information will be considered business proprietary in their entirety.  Brackets are not required for such electronic database files, but where possible, use headers and footers to indicate that the database contains business proprietary information.  You must also submit a public version of the business proprietary database.  The public version must contain brackets around the redacted or ranged business proprietary information, be properly labeled as a public version and submitted as a PDF file.

2.    All databases must be releasable in their entirety under the terms of an administrative protective order.  (During an investigation, Commerce may not release customer names or any information that would lead to their identity.  If your standard customer code plainly identifies the customer, immediately contact the official in charge to obtain authorization for the use of a substitute code.)

## APPENDIX III

## DESCRIPTION OF PRODUCTS UNDER INVESTIGATION

The products covered by this investigation are certain flat-rolled steel products, either clad, plated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished, laminated, or coated with plastics or other non-metallic substances in addition to the metallic coating.  The products covered include coils that have a width of 12.7 mm or greater, regardless of form of coil (e.g., in successively superimposed layers, spirally oscillating, etc.).  The products covered also include products not in coils (e.g., in straight lengths) of a thickness less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness.  The products covered also include products not in coils (e.g., in straight lengths) of a thickness of 4.75 mm or more and a width exceeding 150 mm and measuring at least twice the thickness.  The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process, i.e., products which have been ''worked after rolling'' (e.g., products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above:

(1) Where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

(2) where the width and thickness vary for a specific product (e.g., the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, etc.), the measurement at its greatest width or thickness applies.

Steel products included in the scope of these investigations are products in which:  (1) iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less, by weight.

Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching and/or slitting or any other processing that would not otherwise remove the merchandise from the scope of the investigations if performed in the country of manufacture of the in-scope corrosion resistant steel.

All products that meet the written physical description are within the scope of these investigations unless specifically excluded.  The following products are outside of and/or specifically excluded from the scope of this investigation:

• Flat-rolled steel products either plated or coated with tin, lead, chromium, chromium oxides, both tin and lead ("terne plate") or both chromium and chromium oxides ("tin free steel"), whether or not painted, varnished or coated with plastics or other non-metallic substances in addition to the metallic coating;

• Clad products in straight lengths of 4.7625 mm or more in composite thickness and of a width which exceeds 150 mm and measures at least twice the thickness;

• Certain clad stainless flat-rolled products, which are three-layered corrosion-resistant carbon steel flat-rolled products less than 4.75 mm in composite thickness that consist of a carbon steel flat-rolled product clad on both sides with stainless steel in a 20%-60%-20% ratio; and

Also excluded from the scope of the antidumping duty investigation on corrosion resistant steel from Taiwan are any products covered by the existing antidumping duty order on corrosion-resistant steel from Taiwan. *See Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders*, 81FR 48390 (July 25, 2016); *Corrosion-Resistant Steel Products from Taiwan: Notice of Third Amended Final Determination of Sales at Less Than Fair Value Pursuant to Court Decision and Partial Exclusion from Antidumping Duty Order*, 88 FR 58245 (August 25, 2023).

Also excluded from the scope of the antidumping duty investigation on corrosion-resistant steel from the United Arab Emirates and the antidumping duty and countervailing duty investigations on corrosion-resistant steel from the Socialist Republic of Vietnam are any products covered by the existing antidumping and countervailing duty orders on corrosion-resistant steel from the People's Republic of China and the Republic of Korea and the antidumping duty order on corrosion-resistant steel from Taiwan. *See Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders*, 81 FR 48390 (July 25, 2016); *see also Certain Corrosion-Resistant Steel Products from India, Italy, Republic of Korea and the People's Republic of China: Countervailing Duty Order*, 81 FR 48387 (July 25, 2016). This exclusion does not apply to imports of corrosion-resistant steel that are entered, or withdrawn from warehouse, for consumption in the United States for which the relevant importer and exporter certifications have been completed and maintained and all other applicable certification requirements have been met such that the entry is entered into the United States as not subject to the antidumping and countervailing duty orders on corrosion-resistant steel from the People's Republic of China, the antidumping and countervailing duty orders on corrosion-resistant steel from the Republic of Korea, or the antidumping duty order on corrosion-resistant steel from Taiwan.

The products subject to the investigation are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7210.30.0030, 7210.30.0060, 7210.41.0000, 7210.49.0030, 7210.49.0040, 7210.49.0045, 7210.49.0091, 7210.49.0095, 7210.61.0000, 7210.69.0000, 7210.70.6030, 7210.70.6060, 7210.70.6090, 7210.90.6000,

7210.90.9000, 7212.20.0000, 7212.30.1030, 7212.30.1090, 7212.30.3000, 7212.30.5000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7212.60.0000, 7225.91.0000, 7225.92.0000, 7226.99.0110, and 7226.99.0130.

The products subject to the investigation may also enter under the following HTSUS item numbers:  7210.90.1000, 7215.90.1000, 7215.90.3000, 7215.90.5000, 7217.20.1500, 7217.30.1530, 7217.30.1560, 7217.90.1000, 7217.90.5030, 7217.90.5060, 7217.90.5090, 7225.99.0090, 7226.99.0180, 7228.60.6000, 7228.60.8000, and 7229.90.1000.

The HTSUS subheadings above are provided for convenience and customs purposes only.  The written description of the scope of the investigation is dispositive.

**APPENDIX IV**

**CERTIFICATIONS OF FACTUAL ACCURACY AND CERTIFICATE OF SERVICE**

---

**CERTIFICATIONS OF FACTUAL ACCURACY**

**§ 351.303 Filing, document identification, format, translation, service, and certification of documents.**
**\* \* \* \* \***
(g) *Certifications.*  Each submission containing factual information must include the following certification from the person identified in paragraph (g)(1) of this section and, in addition, if the person has legal counsel or another representative, the certification in paragraph (g)(2) of this section.  The certifying party must maintain the original signed certification for a period of five years from the date of filing the submission to which the certification pertains.  The original signed certification must be available for inspection by U.S. Department of Commerce officials.  Copies of the certifications must be included in the submission filed at Commerce.

(1) For the person(s) officially responsible for presentation of the factual information:

**(i)     COMPANY CERTIFICATION:\***

I, **(PRINTED NAME AND TITLE)**, currently employed by **(COMPANY NAME)**, certify that I prepared or otherwise supervised the preparation of the attached submission of **(IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }:  {THE (ANTIDUMPING OR COUNTERVAILING) DUTY INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**.  I certify that the public information and any business proprietary information of **(CERTIFIER'S COMPANY NAME)** contained in this submission is accurate and complete to the best of my knowledge.  I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce.  I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.  In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.  I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature:** _____

Filed By: William Horn, Filed Date: 11/18/24 12:03 PM, Submission Status: Approved

**Date:** _____

* For multiple person certifications, all persons should be listed in the first sentence of the certification and all persons should sign and date the certification.  In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.,* "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."


**(ii)     GOVERNMENT CERTIFICATION:\*\***

I, **(PRINTED NAME AND TITLE)**, currently employed by the government of **(COUNTRY)**, certify that I prepared or otherwise supervised the preparation of the attached submission of **(IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {THE (ANTIDUMPING OR COUNTERVAILING) DUTY INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**.  I certify that the public information and any business proprietary information of the government of **(COUNTRY)** contained in this submission is accurate and complete to the best of my knowledge.  I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.  I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature:** _____
**Date:** _____

\*\* For multiple person certifications, all persons should be listed in the first sentence of the certification and all persons should sign and date the certification.  In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.,* "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

(2) For the legal counsel or other representative:

**REPRESENTATIVE CERTIFICATION:\*\*\***

I, **(PRINTED NAME)**, with **(LAW FIRM or OTHER FIRM)**, **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {COUNSEL TO} or {REPRESENTATIVE OF})** **(COMPANY NAME, OR GOVERNMENT OF COUNTRY, OR NAME OF ANOTHER**

**PARTY)**, certify that I have read the attached submission of **(IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }:  {THE (ANTIDUMPING OR COUNTERVAILING DUTY) INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**.  In my capacity as **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {COUNSEL} or {ADVISER, PREPARER, OR REVIEWER})** of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge.  I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.  In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.  I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature:** _____
**Date:** _____

*** For multiple representative certifications, all representatives and their firms should be listed in the first sentence of the certification and all representatives should sign and date the certification.  In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.,* "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

**CERTIFICATE OF SERVICE**

I, _____, hereby certify that a copy of the

  (name of certifying official)

foregoing submission on behalf of _____,

(company name)

dated _____, was served by _____ (state the method of service used,

*e.g.*, via ACCESS, by secure electronic transmission, by first class mail, by email, or by hand

delivery) on the following parties:

(Business Proprietary Version)

<u>On Behalf of</u>

Name and address

(Public Version)

<u>On Behalf of</u>

Name and address

_____

(Signature of Certifying Official)

## APPENDIX V

## QUESTIONS REGARDING SECTION 232 DUTIES/CASE-SPECIFIC QUESTIONS AND MODIFICATIONS, INCLUDING MATCHING CRITERIA

1. Please state the total Section 232 duties[1] paid on your U.S. sales for the POR, if known and if applicable. Reconcile this value to your general ledger and U.S. Customs and Border Protection 7501 Entry Forms, if available.

2. Please indicate which entity or entities paid the Section 232 duties related to your sales during the POR and, if not paid by {respondent}, indicate whether {respondent} provided a refund of the duties to the payor.

3. Have you applied for and been granted any exclusions for products affected by Section 232 duties for U.S. sales made during the POR? If so, please list all such exclusion requests, including the date of application, whether the exclusions have been granted and on what dates, and whether the duties have been refunded.

4. For each U.S. sale, create new fields in the U.S. sales database that report the date of entry, the entered value, the per-unit Section 232 duty paid (if any) as USDUTY2U, the vessel on which the merchandise was shipped, the Chapter 99 HTS code used to enter the merchandise, and the U.S. importer of record, if known. In addition, please note in separate columns whether any exclusions have been granted for these Section 232 duties and whether those duties have been refunded.

5. Please provide a reconciliation between the total Section 232 duties reported in response to Question C.1 and the sale-specific amounts reported in the USDUTY2U field in response to question C.4.

---

[1] *See* Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. § 1862); *see also* Presidential Proclamation No. 9705, 83 Fed. Reg. 11625 (Mar. 8, 2018).

## APPENDIX VI

## ARM'S-LENGTH SALES TO AFFILIATED PARTIES

In order to report sales to an affiliated comparison market customer (affiliate) rather than resales to unaffiliated customers by that affiliated comparison market customer, a respondent must demonstrate that the sales to the affiliated comparison market customer are at arm's length. This appendix describes the basis for this analysis, and provides guidance as to how a respondent could go about demonstrating that sales to an affiliated comparison market customer are at arm's length.

Overview

In accordance with section 351.403(c) of Commerce's regulations, we include home market or third-country affiliated party sales in our analysis only if the respondent's sales are made at "arm's length." To be at "arms-length" the prices of the affiliated-party transactions must be comparable to the prices at which the respondent sold identical merchandise to unaffiliated parties. In determining whether affiliated party transactions are made at arm's-length prices, we generally compare the respondent's reported prices to affiliated parties with the respondent's prices to unaffiliated parties at the same level of trade. In making such a comparison, Commerce has established a ratio in which sales by the exporter or producer to an affiliate be included in the normal value calculation. For affiliated party sales to be considered in the normal value calculation, prices to an affiliate must be between 98 percent and 102 percent, inclusive, of prices to unaffiliated customers. If affiliated party prices are, on average, less than 98 percent or more than 102 percent of unaffiliated party prices, then we reject them. In establishing the 98/102 percent band, Commerce aims to prevent distortion of normal value based on sales between affiliates which could be unreasonably high or low-priced. Instead, the ratio is set up to capture only those sales between affiliates which are made in the ordinary course of trade. [1]

Transactions Covered

For investigations, the databases used for the arm's length test are limited to all sale observations with sale dates that fall within the POI. For administrative reviews, the databases used for the arm's-length test are limited to sales observations with sale dates that fall within the appropriate reporting period for the comparison market.

For both investigations and administrative reviews, the databases are also limited to those transactions involving merchandise described in Appendix III of the questionnaire.

---

[1] *See Antidumping Proceedings: Affiliated Party Sales in the Ordinary Course of Trade*, 67 FR 69187 (November 15, 2002).

<u>Net Price Calculations</u>

Commerce's arm's-length test adjusts gross unit prices for relevant adjustments (*e.g.*, for appropriate discounts and rebates, movement expenses, imputed credit expenses, other direct selling expenses, commissions, packing, *etc.*), and, for each affiliated party comparison market customer, compares the net prices, by CONNUM, of sales to the affiliated party to the net prices of sales to all unaffiliated parties.

In instances where certain CONNUMs were sold to an affiliated comparison market customer but not to unaffiliated comparison market customers, the comparisons are made to the most similar product sold to unaffiliated comparison market customers, with appropriate adjustments made for differences in merchandise (the appropriate variable and total cost data for each comparison market CONNUM are therefore used for this calculation). The determination of what constitutes the most similar merchandise is based upon the hierarchy of the product characteristics, and of the subcategories within each characteristic, identified in Section B of the questionnaire.

Comparisons are not allowed across levels of trade, or of prime merchandise to non-prime merchandise, or across manufacturers (MFRH), or, for CONNUMs sold to an affiliated comparison market customer but not to unaffiliated comparison market customers. In such instances where comparisons are not allowed, the sales to the affiliated comparison market customers are ignored for purposes of the results of the arm's length test.

As noted above, for affiliated party sales to be considered in the normal value calculation, prices to an affiliate must on average be between 98 percent and 102 percent, inclusive, of prices to unaffiliated customers.

<u>Arm's-Length Test Programming</u>

The arm's-length test programming language currently used by Commerce is referenced below. To demonstrate that sales to an affiliate were at arm's length, you should utilize the methodology reflected in this programming, in conjunction with your appropriate databases and following the guidance above with respect to appropriate sales observations, adjustments, *etc.* (CMSALES would be the file of all comparison market POI sales of merchandise described in Appendix III of the questionnaire, and &CMAFFL &CMLOT &CMMANF &CMPRIME &CMCUST are references to CUSRELH, LOTH, MFRH, PRIMEH (for those cases in which PRIMEH is included in Section B of Commerce's questionnaire), and CUSCODH, respectively):

The arm's-length test programming language currently used by Commerce can be accessed at https://access.trade.gov/Resources/sas/programs/amcp.html. Click on the "Macros Program" hyperlink and go to section "CM-3: ARM'S LENGTH TEST OF AFFILIATED PARTY SALES."

# APPENDIX VII

# DATABASE SUMMARIES

Tab 4

Galvasid's Section A Response
(December 23, 2024)

PR-137-138, CR-35, 38

Case No. A-201-863
Total Pages: 177
 Investigation
AD/CVD Operations Office VIII
Proprietary Information Deleted
    from Pages iv, 2–3, 5,11–15, 24,
    32, 34, 36, 39, and 44 and
    Appendices A-1, A-2-A, A-2-C,
    A-2-D, A-4, A-6 through A-10,
    and A-13
Public Version

In the Matter of:

LESS-THAN-FAIR-VALUE INVESTIGATION
OF CERTAIN CORROSION-RESISTANT
STEEL PRODUCTS FROM MEXICO

)
)
)
)
)
)
)

# Public Version

RESPONSE OF GALVASID S.A. DE C.V.
TO SECTION A OF THE DEPARTMENT'S NOVEMBER 18 QUESTIONNAIRE

SECTION A

VOLUME I
NARRATIVE RESPONSE AND APPENDICES
A-1 THROUGH A-13

WINTON & CHAPMAN PLLC
1100 13th Street, N.W., Suite 825
Washington, D.C.  20005
+1.202.774.5500

Counsel to Galvasid S.A. de C.V.

December 23, 2024

Table of Contents

Page

1. Quantity and Value of Sales ................................................................................. 1

    a. Total Quantity and Value of Sales ......................................................... 1

    b. Sales to Home-Market or Third-Country Affiliates ............................... 2

    c. Percentage of Sales to Affiliates ........................................................... 2

    d. Home-Market Viability ......................................................................... 3

    e. Five-Percent Threshold ......................................................................... 3

    f. Special Circumstances for Selecting Third-Country Sales .................... 4

    g. Sales to Foreign Trade Zones, to Bonded
       Warehouses or under Temporary Import Bonds ..................................... 4

    h. Sales Reconciliation Documents ............................................................ 5

    i. Country of Origin .................................................................................. 5

2. Corporate Structure and Affiliations ................................................................... 6

    a. Operating Structure ............................................................................... 6

    b. Description of Plants, Offices, and Facilities ...................................... 10

    c. Legal Structure ................................................................................... 10

    d. Shareholders and Affiliated Persons ................................................... 15

    e. Affiliated Groups ................................................................................ 16

    f. Common Control .................................................................................. 17

    g. Affiliation with Other Producers ........................................................ 18

    h. Affiliated Suppliers ............................................................................. 19

    i. Other Business Transactions with Affiliates ....................................... 20

3. Distribution Process ........................................................................................... 20

    a. Channels of Distribution ..................................................................... 22

       (1) Home-Market Sales ...................................................................... 22

(2)   U.S. Sales ................................................................ 22

   b.   Types of Customers................................................................ 24

   c.   Variations in Prices between Distribution Channels ......................................... 24

   d.   Functions Performed in Distribution Channel........................................ 25

4.   Sales Process ......................................................................... 25

   a.   Date of Sale ................................................................ 25

   b.   Description of Sales Process by Distribution Channel...................................... 26

      (1)   Sales Process for Home-Market Sales .......................................... 26

      (2)   Sales Process for U.S. Sales.................................................... 27

   c.   Determination of Ultimate Customer and Market.......................................... 28

   d.   Sales Agreements ................................................................ 30

   e.   Changes after Initial Agreement................................................. 31

   f.   Sales under Each Type of Agreement .......................................... 32

   g.   Price Lists................................................................ 32

   h.   Invoicing Practices ................................................................ 33

5.   Sales to Affiliated Persons in the Foreign Market ....................................... 33

   a.   Affiliates that Purchased and Resold
      the Merchandise in the Foreign Market............................................... 33

   b.   Services Provided by Affiliated Resellers........................................ 34

   c.   Affiliates that Purchase for Consumption in the Foreign Market ....................... 34

6.   Accounting/Financial Practices........................................................... 35

   a.   Description of Accounting and Financial Practices ..................................... 35

   b.   Accounting and Financial Documents.............................................. 35

   c.   Inflation ................................................................ 37

7.   Merchandise ................................................................ 37

a. Description of Merchandise ................................................................ 37

b. Types of Merchandise ..................................................................... 37

c. Product Codes ................................................................................ 38

d. Description of Materials, Specifications, and Production Processes .................. 38

e. Catalogues and Brochures ................................................................ 41

f. Conversion Factors .......................................................................... 42

g. Transactions Involving Merchandise Samples .................................... 42

8. Further Manufacture and Assembly in the United States ............................................. 42

9. Exports Through Intermediate Countries ...................................................... 43

10. Sales of Merchandise Under Review
Supplied by an Unaffiliated Producer ........................................................ 43

<span style="text-decoration: underline;">APPENDICES</span>

A-1: Quantity and Value of Sales

A-2: Corporate Structure

    A. Organization Structure
    B. Addresses
    C. List of Shareholders
    D. Companies Owned by Individual Martínez Family Members

A-3: Distribution Flowcharts

A-4: Selling Functions Chart

A-5: Sales Process

A-6: Sample Sales Documents

    A. Sales Documents for Sample Home-Market Sale
    B. Sales Documents for Sample U.S. Sale

A-7: Sample Home-Market Price List

A-8:   Financial Statements

     A.   Galvasid 2022-23 Audit Financial Statements
     B.   Galvasid Charts of Accounts
     C.   Grupo Industrial LM 2022-23 Audited Unconsolidated Financial Statements
     D.   Grupo Industrial LM 2022-23 Audited Consolidated Financial Statements
     E.   Perfiles 2022-23 Audited Financial Statements
     F.   Indalum 2022-23 Audited Financial Statements
     G.   [                              ] 2022-23 Audited Financial Statements
     H.   [              ] 2022 and 2023 Internal Balance Sheet and Income Statement
     I.   [         ] 2022 and 2023 Internal Balance Sheet and Income Statement
     J.   [           ] 2022 and 2023 Internal Balance Sheet and Income Statement

A-9:   Product Coding System

A-10:   Industry Specifications

A-11:   Product Brochure

A-12:   Website Index

A-13:   Home-Market Sales by Galvasid of CORE
     Products Produced by Other Manufacturers

RESPONSE OF GALVASID S.A. DE C.V.
TO SECTION A OF THE DEPARTMENT'S NOVEMBER 18 QUESTIONNAIRE

This submission is filed on behalf of Galvasid S.A. de C.V. ("Galvasid"), in response

to Section A of the Department's November 18 questionnaire in the antidumping

investigation of Certain Corrosion-Resistant Steel ("CORE") Products from Mexico. For

the Department's reference, each of the questions from the questionnaire is reproduced

below, followed by Galvasid's response.

1. *Quantity and Value of Sales*

*Information on the quantity and value of sales is necessary to determine whether we will attempt to compare the prices of merchandise under investigation sold to the United States market to (a) the prices of comparable merchandise in your home market, (b) prices of comparable merchandise in a third-country market or (c) constructed value. Refer to the term viability in the Glossary of Terms at Appendix I for a more complete discussion.*

*In this questionnaire we generally refer to the home market or third-country market selected for the calculation of normal value as the foreign market.*

a. *Total Quantity and Value of Sales*

*State the total quantity and value of the merchandise under investigation that you sold during the period of investigation (POI) in (or to):*

i. *the United States,*
ii. *the home market, and*
iii. *each of the three largest third-country markets.*

*A chart for reporting the sales quantity and value is included at the end of this section.*

*Complete a combined chart for merchandise produced and sold by your company and its affiliates and, where appropriate, a separate chart for the merchandise of each unaffiliated manufacturer whose merchandise under investigation you sold during the POI. Report the value of all sales in U.S. dollars and convert your quantity of sales to a uniform unit of measure; list the conversion rates used. To the extent possible, sales values should be reported based on the same terms of sale. For sales of merchandise further manufactured or consumed by affiliates in the United States, report the quantity and value (based on the prices you charge to*

Appendix A-6-B

Sales Documents for Sample U.S. Sales

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(14 PAGES)**

Appendix A-8-B

Galvasid Chart of Accounts

Galvasid SA de CV

Charts of Accounts

| Account Code | Account Name in Spanish | Account Name in English |
|---|---|---|
| | | |

Public Version

| Account Code | Account Name in Spanish | Account Name in English |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Public Version

| Account Code | Account Name in Spanish | Account Name in English |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Public Version

| Account Code | Account Name in Spanish | Account Name in English |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Public Version

| Account Code | Account Name in Spanish | Account Name in English |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Public Version

| Account Code | Account Name in Spanish | Account Name in English |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Public Version

| Account Code | Account Name in Spanish | Account Name in English |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Public Version

| Account Code | Account Name in Spanish | Account Name in English |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Public Version

Tab 5

Galvasid's Section B Response
(January 13, 2025)

PR-220, CR-192

Case No. A-201-863
Total Pages: 144
Investigation
AD/CVD Operations Office V
Proprietary Information Deleted
    from Pages 14, 25, 27, 32, and
    43 and Appendices B-1
    through B-19
Public Version

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| | ) |
| LESS-THAN-FAIR-VALUE INVESTIGATION | ) |
| OF CERTAIN CORROSION-RESISTANT | ) |
| STEEL PRODUCTS FROM MEXICO | ) |
| | ) |
| | ) |

**Public Version**

RESPONSE OF GALVASID S.A. DE C.V.
TO SECTION B OF THE DEPARTMENT'S NOVEMBER 18 QUESTIONNAIRE

VOLUME I
SECTION B NARRATIVE RESPONSE AND APPENDICES
B-1 THROUGH B-19

WINTON & CHAPMAN PLLC
1100 13th Street, N.W., Suite 825
Washington, D.C. 20005
+1.202.774.5500

Counsel to Galvasid S.A. de C.V.

January 13, 2025

# Table of Contents

Page

1. Observation Number .................................................................................... 2

2. Complete Product Code.............................................................................. 2

3. Product Information.................................................................................... 2

    1. Matching Control Number ................................................................. 2

    2. Overruns ............................................................................................ 3

    3. Prime or Non-Prime Merchandise.................................................... 4

    4. Specification ...................................................................................... 5

4. Product Characteristics.............................................................................. 5

    1. Cladding or Coating Type ................................................................. 5

    2. Reduction Process ............................................................................. 6

    3. Clad Material/Coating Metal............................................................ 6

    4. Metallic Coating Weight ................................................................... 7

    5. Metallic Coating Process................................................................... 8

    6. Quality .............................................................................................. 8

    7. Yield Strength................................................................................... 9

    8. Nominal Thickness......................................................................... 11

    9. Nominal Width ............................................................................... 12

    10. Form ............................................................................................... 12

5. Customer Codes........................................................................................ 12

    1. Customer Code ............................................................................... 12

    2. Consolidated Customer Code ........................................................ 13

6. Customer Relationship ............................................................................. 14

7. Customer Category................................................................................... 14

8.   Channel of Distribution ............................................................. 15

9.   Sale Invoice Date....................................................................... 16

10.  Date of Sale .............................................................................. 16

11.  Sale Invoice Number ................................................................ 17

12.  Date of Shipment...................................................................... 17

13.  Date of Receipt of Payment...................................................... 18

14.  Terms of Delivery..................................................................... 19

15.  Terms of Payment..................................................................... 20

16.  Quantity .................................................................................... 20

17.  Quantity Unit of Measure ......................................................... 22

18.  Gross Unit Price ....................................................................... 22

19.  Billing Adjustments.................................................................. 23

20.  Discounts .................................................................................. 25

     1.   Early Payment Discounts ................................................ 25

     2.   Quantity Discounts ......................................................... 26

     3.   Other Discounts .............................................................. 26

21.  Rebates ..................................................................................... 27

22.  Level of Trade .......................................................................... 28

23.  Inland Freight from Plant
     to Distribution Warehouse........................................................ 28

24.  Warehousing Expense ............................................................. 29

25.  Inland Freight from Plant
     or Warehouse to Customer ....................................................... 30

26.  Inland Insurance ....................................................................... 32

27.  Destination................................................................................ 32

28. Commissions .................................................................................... 33

29. Selling Agent .................................................................................. 33

30. Selling Agent Relationship ............................................................. 34

31. Credit Expenses .............................................................................. 34

32. Interest Revenue ............................................................................. 36

33. Advertising Expenses ..................................................................... 36

34. Warranty Expense .......................................................................... 37

35. Technical Service Expense ............................................................. 38

36. Royalties ........................................................................................ 39

37. Bank Charges ................................................................................. 39

38. Other Direct Selling Expenses ....................................................... 39

39. Indirect Selling Expenses .............................................................. 40

40. Inventory Carrying Costs ............................................................... 41

41. Packing Cost .................................................................................. 42

42. Manufacturer ................................................................................. 43

43. Samples .......................................................................................... 44

LIST OF APPENDICES

B-1:  Home-Market Sales Listing

B-2:  Computer File Format Description

B-3:  Reconciliation of Reported Sales to Normal Accounting Records

B-4:  Customer Code List

B-5:  Invoices with Pending Payments

B-6:  Billing Adjustment for Sample Transaction

B-7:     Early Payment Discount for Sample Transaction

B-8:     Commercial Discount to Sample Home-Market Customer

B-9:     Inland Freight from Plant or Warehouse to Customer

B-10:    Warehousing Costs

B-11:    Freight for Local Shipments from Warehouse or Plant to Customer

B-12:    Weighted-Average Credit Period for Sample Transaction

B-13:    Short-Term Interest Rate on Mexican Peso Borrowings

B-14:    Late Payment Charges

B-15:    Warranty

B-16:    Home-Market Indirect Selling Expenses

B-17:    Inventory Carrying Costs for Home-Market Sales

B-18:    Packing Costs

B-19:    Yield and Tensile Strength and Elongation for CORE Specifications

Public Version

RESPONSE OF GALVASID, S.A. DE C.V.
TO SECTION B OF THE DEPARTMENT'S NOVEMBER 18 QUESTIONNAIRE

This submission is filed on behalf of Galvasid S.A. de C.V. ("Galvasid"), in response to Section B of the Department's November 18, 2024, questionnaire in the antidumping investigation of Certain Corrosion-Resistant Steel ("CORE") Products from Mexico.

In accordance with the questionnaire's instructions, a computer file containing a detailed listing of Galvasid's home-market sales during the investigation period is being submitted simultaneously with this response. A printout of the reported data for sample home-market transactions is provided in Appendix B-1.[1] A computer file containing a "summary" of Galvasid's home-market sales listing, which was prepared in the format set forth in Appendix VII of the Department's questionnaire, is being submitted concurrently with this submission, and a printout of that file is also provided in Appendix B-2. A reconciliation of the reported home-market sales to Galvasid's financial statements is provided in Appendix B-3.[2]

A narrative response to the questions set forth in Section B of the Department's questionnaire is provided below.

---

[1] Because the number of reported home-market sales transactions is large, the printout provided in Appendix B-1 includes the first three pages, the middle three pages, and the last three pages of the printout of the total database included on the computer file that is being submitted with this response. For ease of reference, Galvasid has referred in this submission to the entire computer file (and not just the printout of sample transactions) as being provided in Appendix B-1.

[2] In the course of preparing this response, Galvasid has identified some errors in the quantity-and value for home-market and U.S. sales set forth in Appendix A-1 of its December 23 submission. A revised quantity-and-value table correcting these errors is included in Appendix B-3.

17. *Quantity Unit of Measure*

FIELD NAME:     QTYUNITH

DESCRIPTION:     *Report all sales in this file in the same unit of measure. Use an abbreviation or code to indicate the unit of measure. For example,*

> *1 or MT = metric tons*
> *2 or KG = kilograms*
> *3 – n or specify a needed*

NARRATIVE:     *Provide a table of the units of measure and abbreviations or codes used. The codes for unit of measure listed above are examples only. You need not use them.*

*Please use a single unit of measure for expressing all prices, expenses, and adjustments you report. If you make sales or incur expenses or adjustments using more than one unit of measure, select the predominantly used unit of measure for sales of merchandise to express all reported data. Additionally, in separate fields report the price, expense or adjustment as it appears in your records (i.e., before the conversion to a single unit of measure), and the conversion factor applied to convert the data to a single unit of measure.*

As mentioned, the quantity for each transaction has been reported in units of metric tons in the "QTYH" field. A code indicating that the quantity was stated on the invoice in units of metric tons has been reported in the "QTYUNITH" field in the sales listing.

18. *Gross Unit Price*

FIELD NAME:     GRSUPRH

DESCRIPTION:     *Report the unit price as it appears on the invoice for sales shipped and invoiced in whole or in part. To report portions of sales not shipped, provide the agreed unit sale price for the quantity that will be shipped to complete the order. This value should be the gross unit price. Discounts and rebates should be reported separately in fields numbered 19.n and 20.n, respectively.*

The gross unit price per metric ton that appears on the invoice for each transaction has been reported in the "GRSUPRH" field in the sales listing provided in Appendix B-1. The

unit prices reported in the "GRSUPRH" field reflect the prices for each individual line-item on Galvasid's invoices.

In addition, Galvasid also charged certain home-market customers for freight and/or insurance, as separate items on the invoice. These amounts are normally stated as total figures for each invoice, and are not stated on a per-unit basis or allocated among individual invoice line-items in Galvasid's invoices or normal accounting records. The amount of any additional amounts charged by Galvasid to the customer for freight and insurance have been reported, on a per-metric-ton basis, in the "FRTREVH" and "INSUREVH" fields in the sales listing provided in Appendix B-1. The reported per-unit additional amounts charged to the customer for freight for each transaction were calculated by allocating the total amount charged for freight on each invoice to the individual products included in the invoice based on the weight in metric tons for each item. The reported per-unit additional amounts charged to the customer for insurance for each transaction were calculated by allocating the total amount charged for insurance on each invoice to the individual products included in the invoice based on the invoice amount (net of freight and insurance) for each line-item.

19. *Billing Adjustments*

    FIELD NAME:    *BILLADJH*

    DESCRIPTION:    *Report any price adjustments made for reasons other than discounts or rebates. State whether these billing adjustments are reflected in your gross unit price. Report a decrease in price as a negative figure and an increase in price as a positive figure. Report zero in this field if no adjustments were made to the price. Create a separate field for each type of billing adjustment (e.g., corrections of invoicing errors, post-invoicing price adjustments).*

*available, provide sample documentation, including sample
agreements, for each type of rebate.*

Galvasid did not provide rebates to home-market customers in connection with sales

of CORE products during the home-market sales investigation period.

22. <u>Level of Trade</u>

FIELD NAME: LOTH

DESCRIPTION: *Report the level of trade. Use an abbreviation or code to
indicate the level of trade.*

NARRATIVE: *Provide a key to any abbreviation or codes used.*

Galvasid considers all of its home-market sales to be at a single level of trade.  A code

identifying the level of trade for Galvasid's home-market sales has been reported in the

"LOTH" field in the sales listing provided in Appendix B-1.  A key to the codes used is

provided in Appendix B-2.

23. Inland Freight from Plant
    <u>to Distribution Warehouse</u>

FIELD NAME: INLFTWH

DESCRIPTION: *Report the unit cost of inland freight from the factory to the
distribution warehouse or other intermediate location.  Where it
is necessary to allocate because multiple items were included in
a shipment, freight cost should be allocated on the basis
incurred (e.g., weight, volume).  If you shipped the product
directly from the factory to the customer, report the cost of
transport in field 25.*

NARRATIVE: *Describe the forms of transport you used to deliver the
merchandise to your distribution warehouse(s) or other
intermediate location and any affiliations you had with the
carriers during the POI.  If you shipped by common carrier,
please submit the specific freight charges incurred on each
transaction and the method of allocation, when more than one
type or size of merchandise was shipped.  If it is not possible to
specifically identify the cost of each shipment, describe how you
calculated the freight cost per unit.  Include your worksheets as
attachments to the narrative response.*

Tab 6

Galvasid's Section C Response
(January 13, 2025)

PR-221, CR-193

Case No. A-201-863
Total Pages: 121
Investigation
AD/CVD Operations Office VIII
Proprietary Information
    Removed from Pages 23 and
    24 and Appendices C-1
    through C-19
Public Version

In the Matter of:               )

)

LESS-THAN-FAIR-VALUE INVESTIGATION  )

OF CERTAIN CORROSION-RESISTANT  )

STEEL PRODUCTS FROM MEXICO  )

)

**Public Version**

RESPONSE OF GALVASID S.A. DE C.V.
TO SECTION C OF THE DEPARTMENT'S NOVEMBER 18 QUESTIONNAIRE

VOLUME II
SECTION C NARRATIVE RESPONSE AND APPENDICES
C-1 THROUGH C-19

WINTON & CHAPMAN PLLC
1100 13th Street, N.W., Suite 825
Washington, D.C. 20005
+1.202.774.5500

Counsel to Galvasid S.A. de C.V.

January 13, 2025

## Table of Contents

Page

1. Observation Number ................................................................................. 2

2. Complete Product Code ............................................................................ 2

3. Product Information .................................................................................. 2

   1. Matching Control Number ................................................................ 2

   2. Overruns ........................................................................................... 3

   3. Prime vs. Secondary Merchandise ................................................... 3

   4. Specification/Grade ......................................................................... 4

4. Product Characteristics ............................................................................ 5

   1. Type ................................................................................................. 5

   2. Reduction Process ............................................................................ 5

   3. Cladding or Coating Metal ............................................................... 6

   4. Metallic Coating Weight .................................................................. 7

   5. Metallic Coating Weight .................................................................. 7

   6. Quality ............................................................................................. 8

   7. Yield Strength .................................................................................. 9

   8. Nominal Thickness ........................................................................... 10

   9. Nominal Width ................................................................................. 11

   10. Form ................................................................................................ 11

5. Sale Type ................................................................................................. 11

6. Consignment Identifier ............................................................................ 12

7. Customer Codes ....................................................................................... 12

   1. Customer Code ................................................................................. 12

   2. Consolidated Customer Code ........................................................... 12

8. Customer Category ..................................................................................... 13

9. Channel of Distribution ............................................................................ 13

10. Sale Invoice Date....................................................................................... 15

11. Date of Sale ............................................................................................... 15

12. Sale Invoice Number ................................................................................. 16

13. Date of Shipment....................................................................................... 16

14. Date of Receipt of Payment....................................................................... 16

15. Terms of Delivery...................................................................................... 17

16. Terms of Payment...................................................................................... 18

17. Quantity ..................................................................................................... 19

18. Quantity Unit of Measure .......................................................................... 20

19. Gross Unit Price ........................................................................................ 20

20. Billing Adjustments................................................................................... 21

21. Discounts ................................................................................................... 22

    1. Early Payment Discounts ..................................................... 22

    2. Quantity Discounts ............................................................... 23

    3. Other Discounts .................................................................... 23

22. Rebates ...................................................................................................... 24

23. Level of Trade ........................................................................................... 25

24. Inland Freight from Plant to Distribution Warehouse............................... 25

25. Warehousing Expense ............................................................................... 26

26. Inland Freight from Plant or
Warehouse to Port of Exportation .............................................................. 27

27. Country of Manufacture Inland Insurance ................................................ 28

28. Brokerage and Handling Incurred
in the Country of Manufacture ................................................................. 29

29. Brokerage and Handling
Incurred in the United States ................................................................. 29

30. International Freight ................................................................................ 30

31. Marine Insurance ................................................................................... 31

32. U.S. Inland Freight from Port to Warehouse......................................... 32

33. U.S. Warehousing Expense .................................................................... 32

34. U.S. Inland Freight from Warehouse to the Customer .......................... 33

35. U.S. Inland Insurance ............................................................................ 34

36. Other U.S. Transportation Expense........................................................ 34

37. U.S. Customs Duty ................................................................................ 35

38. Destination.............................................................................................. 35

    1.   U.S. Postal Code........................................................................ 35

    2.   Destination State........................................................................ 36

39. Duty Drawback....................................................................................... 36

40. Commissions .......................................................................................... 36

41. Selling Agent.......................................................................................... 37

42. Selling Agent Relationship..................................................................... 38

43. Credit Expenses...................................................................................... 38

44. Late-Payment Fee................................................................................... 39

45. Advertising Expenses ............................................................................. 39

46. Warranty Expense .................................................................................. 40

47. Technical Service Expense..................................................................... 41

48. Royalties................................................................................................. 42

49. Bank Charges..........................................................................................42

50. Other Direct Selling Expenses.............................................................43

51. Indirect Selling Expenses ....................................................................43

    1. Indirect Selling Expenses Incurred
       in the Country of Manufacture .....................................................43

    2. Indirect Selling Expenses
       Incurred in the United States .......................................................45

52. Inventory Carrying Costs .....................................................................45

    1. Inventory Carrying Costs Incurred
       in the Country of Exportation......................................................45

    2. Inventory Carrying Costs
       Incurred in the United States .......................................................46

53. Packing Cost........................................................................................47

54. U.S. Repacking Cost.............................................................................48

55. Value Added Tax..................................................................................48

56. Further Manufacturing.........................................................................49

57. Samples................................................................................................49

58. Foreign Trade Zone .............................................................................50

59. Temporary Import Bond.......................................................................50

60. Manufacturer .......................................................................................51

LIST OF APPENDICES

C-1:     U.S. Sales Listing

C-2:     Computer File Format Description

C-3:     Reconciliation of Reported Sales to Normal Accounting Records

C-4:     Customer Code List

C-5:       Weighted-Average Payment Date for Sample Transaction

C-6:       Billing Adjustment

C-7:       Early Payment Discount

C-8:       Commercial Discount

C-9:       Freight for Truck Shipments to U.S. Customer

C-10:     Mexican Brokerage and Handling

C-11:     U.S. Brokerage and Handling

C-12:     Freight for Shipments to Puerto Rico

C-13:     Commissions

C-14:     Credit Expense for Sample Transaction

C-15:     Short-Term U.S. Dollar Interest Rate

C-16:     U.S. Warranty Expense Rate

C-17:     Bank Charge for Sample Transaction

C-18:     Indirect Selling Expenses Incurred in Mexico for U.S. Sales

C-19:     Inventory Carrying Cost Incurred in Mexico for U.S. Sales

Response of Galvasid S.A. de C.V.
to Section C of the Department's November 18 Questionnaire

This submission is filed on behalf of Galvasid S.A. de C.V. ("Galvasid"), in response to Section A of the Department's November 18 questionnaire in the antidumping investigation of Certain Corrosion-Resistant Steel ("CORE") Products from Mexico.

In accordance with the questionnaire's instructions, a computer file containing a detailed listing of Galvasid's sales of CORE Products in the United States during the investigation period is being submitted simultaneously with this response. A printout of the reported data for sample transactions is provided in Appendix C-1.[1] A key to the various codes used in the file is provided in Appendix C-2. A computer file containing a "summary" of Galvasid's U.S. sales listing, which was prepared in the format set forth in Appendix VII of the Department's questionnaire, is being submitted electronically concurrently with this submission, and a printout of that file is also provided in Appendix C-2. A reconciliation of the reported U.S. sales to Galvasid's financial statements is provided in Appendix C-3.[2]

A narrative response to the questions set forth in Section C of the Department's questionnaire is provided below.

---

[1] In view of the large volume of reported U.S. sales transactions, the printout set forth in Appendix C-1 includes the first three pages, middle three pages, and last three pages from the sales listing, as a sample. Data for all U.S. sales transactions is provided in the computer file being submitted herewith.

[2] In the course of preparing this response, Galvasid has identified some errors in the quantity-and-value information for home-market and U.S. sales set forth in Appendix A-1 of its December 23 submission. A revised quantity-and-value table correcting these errors is included in Appendix C-3.

1. *Observation Number*

   FIELD NAME: SEQU

   DESCRIPTION: *Assign a unique sequential number to each sales record. This sales record number should remain constant in all future submissions (i.e., sales record line items should not be renumbered during the course of this segment). This field will assist you in reconciling our calculations with the data you submit in your response.*

A sequential "observation number" for each data record has been reported in the "SEQU" field in the sales listing provided in Appendix C-1.

2. *Complete Product Code*

   FIELD NAME: PRODCODU

   DESCRIPTION: *Report the commercial product code assigned by your company in the normal course of business to the specific product sold in the United States.*

   *If the product sold is further manufactured in the United States, report the product code of the product sold not the product imported.*

   NARRATIVE: *The product code should be described in response to question 7 b in section A of this questionnaire.*

The product code for each U.S. sale is set forth in the "PRODCODU" field in the sales listing provided in Appendix C-1. A description of Galvasid's product coding system was provided in Appendix A-9 of its response to Section A of the Department's questionnaire.

3. *Product Information*

   1. *Matching Control Number*

      FIELD NAME: CONNUMU

      DESCRIPTION: *Assign a control number to each unique product reported in the section C sales data file. Identical products should be assigned the same control number in each record in every file in which the product is referenced (e.g., products*

*with identical physical characteristics reported in the
foreign market sales file and the U.S. market sales file
should have the same control number).*

*If the product sold is further manufactured in the United
States, report the control number of the product imported,
not of the product sold.*

Galvasid has assigned a "control number" to each product reported in the home-

market and U.S. sales data files. The control number for each U.S. sale has been reported

in the "CONNUMU" field in the sales listing provided in Appendix C-1.[3]

> 2.  *Overruns*
>
> FIELD NAME:     *OVERRUNU*
>
> DESCRIPTION:    *Indicate whether the transaction is an overrun or not.
> Please describe in detail how overrun merchandise is
> categorized internally and marketed. If it is not possible to
> separately identify overruns, explain why you are unable to
> do so.*
>
> *Note that this field should not be included in the
> construction of the CONNUM.*
>
>> *Y = Yes, the transaction is an overrun.*
>> *N = No, the transaction is not an overrun.*

Galvasid did not have any U.S. sales of CORE products that were classified as

"overruns" during the investigation period. A code indicating that the product sold in each

transaction was not an overrun has been reported in the "OVERRUNU" field in the sales

listing provided in Appendix C-1. A key to the code used is provided in Appendix C-2.

> 3.  *Prime vs. Secondary Merchandise*
>
> FIELD NAME:     *PRIMEU*

---

[3] Each unique product control number was assigned based on the physical characteristics
described in the Department's questionnaire, in the order in which those characteristics are
listed in the questionnaire.

DESCRIPTION:   *Indicate whether the merchandise is prime or non-prime (secondary) merchandise. Please describe in detail how secondary merchandise is categorized internally and marketed.*

*Note also that this field should <u>not</u> be included in the construction of the CONNUM.*

> *1 = Prime*
> *2 = Non-Prime*

Galvasid did not have any sales of non-prime CORE products to the United States during the investigation period. A code indicating that the merchandise sold in each transaction consisted of prime-quality merchandise has been reported in the "PRIMEU" field in the sales listing provided in Appendix C-1. A key to the code used is provided in Appendix C-2.

    4.   <u>Specification/Grade</u>

FIELD NAME:   *SPECU*

DESCRIPTION:   *Indicate by name the specification and grade of the merchandise. For example, if the merchandise is ASTM A501 grade A, then report ASTM A501 grade A." Report the specification/designation/type/grade of the product. For example, for ASTM A653, designation SS, grade 33, report "ASTM A653 designation SS grade 33;" for ASTM A653, designation CS Type A, report "ASTM A653 designation CS Type A;" etc.*

*Note also that this field should <u>not</u> be included in the construction of the CONNUM.*

*Also, if you have not already done so, submit a complete English language version of every single specification for which you have sales. If products are made to a grade only (e.g., only identification is "SAE grade 1006"), but not a specification, be sure to report the full name of the grade (e.g., "SAE grade 1006"). If a specification is proprietary, provide a complete, legible copy of the original specification and a complete English translation, and explain in your narrative when, by whom, and how the specification was devised.*

A code identifying the specification and grade that the product sold in each transaction was certified to meet has been reported in the "SPECU" field in the sales listing provided in Appendix C-1. A list of the applicable specifications and grades is set forth in Appendix C-2.

4. *Product Characteristics*

1. *Type*

FIELD NAME:     CTYPEU

DESCRIPTION:     *10 = Clad (metals bonded by the hot-rolling process)*
*30 = Coated/plated with metal: Painted, Polyvinylidene Fluoride (PVDF), regardless of whether or not laminated40 = Coated/plated with metal: Painted, All Others (i.e., other than PVDF), regardless of whether or not laminated*
*80 = Coated/plated with metal: Laminated but not painted*
*90 = Coated/plated with metal: Neither painted nor laminated*

*The classification of "painted" does not include pretreatments such as phosphatizing or chromatizing alone, nor does it include temporary oils or greases.*

A code indicating the type of cladding or coating of the CORE sold in each transaction has been reported in the "CTYPEU" field in the sales listing provided in Appendix C-1. A key to the codes used is provided in Appendix C-2.

2. *Reduction Process*

FIELD NAME:     ROLU

DESCRIPTION:     *10 = Cold rolled*
*20 = Not cold rolled*

*Note that temper rolling and skin passing do not constitute "cold rolling" in this context.*

A code indicating whether the CORE product sold in each transaction was cold rolled has been reported in the "ROLU" field in the sales listing provided in Appendix C-1. A key to the codes used is provided in Appendix C-2.

3. *Cladding or Coating Metal*

FIELD NAME: CMETALU

DESCRIPTION: 010 = Zinc/Iron
020 = Zinc (galvanized) (e.g., ASTM A653, coating designation G30)
024 = Zinc (galvannealed) (e.g., ASTM A653, coating designation ZF180)
040 = Zinc/Magnesium
050 = Zinc/Aluminum/Magnesium (approximately 90% Zn/7% Al/ 3% Mg (e.g., ASTM A1046))
060 = Zinc/Aluminum, (approximately 95% Zn/ 5% Al) (e.g., ASTM A875  Type I and ASTM A875 Type II)
065 = Zinc/Aluminum (approximately 55% Al/ 45% Zn (e.g., ASTM A792)
080 = Zinc/Nickel (e.g., ASTM A918)
160 = Aluminum (e.g., ASTM A463)
170 = Aluminum/Silicon
180 = Nickel
190 = Iron/Nickel
200 = Brass

*Use additional number codes for each other clad material/coating metal, and explain what differentiates each of those from the ones listed above.*

*The "zinc/iron" category is for use for products whose coatings, at the time they were being applied, contained both zinc and iron; the "zinc/iron" category is not for use for galvannealed products. If the coating metal is zinc, but the coating is transformed into a zinc and iron intermetallic alloy through subsequent annealing, the "zinc (galvannealed)" category should be used.*

A code identifying the type of cladding or coating material used to manufacture the CORE product sold in each transaction has been reported in the "CMETALU" field in the sales listing provided in Appendix C-1.

4. *Metallic Coating Weight*

FIELD NAME: CWEIGHTU

DESCRIPTION: 10 = < 0.28 oz/ft2 (e.g., ASTM A653 coating designation ZF75)
20 = 0.28 to < 0.48 oz/ft2 (e.g., ASTM A653 coating designations G30 and Z90)
30 = 0.48 to < 0.58 oz/ft2 (e.g., ASTM A792 coating designations AZ50)
40 = 0.58 to < 0.78 oz/ft2 (e.g., ASTM A653 coating designations G60 and Z180)
50 = 0.78 to < 1.10 oz/ft2 (e.g., ASTM A653 coating designations G90 and Z275)
60 = 1.10 to < 1.60 oz/ft2 (e.g., ASTM A653 coating designation G115)
70 = 1.60 to < 2.10 oz/ft2 (e.g., ASTM A653 coating designation Z550)
80 = > 2.10 oz/ft2 (e.g., ASTM A653 coating designations G300 and Z900)

*Note that the coating weights are the minimum requirement for the total of both sides of the steel, and are based on the minimum requirements.*

A code identifying the range within which the metallic coating weight of the CORE product sold in each transaction fell has been reported in the "CWEIGHTU" field in the sales listing provided in Appendix C-1. A key to the codes used is provided in Appendix C-2.

5. *Metallic Coating Weight*

FIELD NAME: CPROCESU

DESCRIPTION: 10 = Hot-dipped
20 = Electrolytically Coated
40 = Clad

A code identifying the metallic-coating process used in the manufacture of the CORE product sold in each transaction has been reported in the "CPROCESU" field in the sales listing provided in Appendix C-1. A key to the codes used is provided in Appendix C-2.

6.  *Quality*

FIELD NAME:    CQUALU

DESCRIPTION:    *30 = Structural (e.g., ASTM A635 designation SS)*
*40 = Commercial (e.g., ASTM A635 designation CS Type A)*
*50 = Drawing (whether or not special killed) (e.g., ASTM A635 designation FS Type B)*
*60 = Bake Hardenable (e.g., ASTM A635 designation BHS)*
*70 = Deep Drawing Steels (e.g., Deep Drawing Quality, Deep Drawing Quality Special Killed, Extra Deep Drawing Quality, Extra Deep Drawing Quality Special Killed, Deep Drawing Quality Special Killed Fully Stabilized, Extra Deep Drawing Quality Special Killed Fully Stabilized, Interstitial Free) (e.g., ASTM A635 designation DDS Type A)*
*80 = HSLA (e.g., ASTM A653 designation HSLA)*
*90 = Advanced High-Strength Steel (e.g., Transformation Induced Plasticity ("TRIP"), TRIP-Assisted, Dual Phase, Multi-Phase, Complex Phase (e.g., ASTM 1079))*
*Use additional number codes for each additional Quality, and explain in detail what differentiates each of those from the ones listed above. Please be sure to describe the properties that distinguish the additional Quality from those listed above.*

*Report as "bake hardenable" sales of all models which are classified as bake hardenable regardless of any other quality designation (e.g., a drawing quality bake hardenable steel would be reported under bake hardenable, not under drawing quality).*

A code identifying the "quality" of the CORE product sold in each transaction has been reported in the "CQUALU" field in the sales listing provided in Appendix C-1. A key to the codes used is provided in Appendix C-2.

7. *Yield Strength*

   FIELD NAME:    CSTRENU

   DESCRIPTION:    *1 = Minimum specified yield strength  to < 25,000 psi*
   *3 = Minimum specified yield strength of 25,000 psi to <*
        *35,000 psi*
   *4 = Minimum specified yield strength of 35,000 psi to <*
        *50,000 psi*
   *5 = Minimum specified yield strength of 50,000 psi to <*
        *65,000 psi*
   *6 = Minimum specified yield strength of 65,000 psi  to<*
        *80,000 psi*
   *7 = Minimum specified yield strength of 80,000 psi to<*
        *100,000 psi '*
   *8 = Minimum specified yield strength of greater than or*
        *equal to 100,000 psi*

   *For example, under ASTM A1079, the minimum specified yield strength for "Designation CP grade 780T/500Y is 500 MPa, which converts to approximately 72,519 psi, so for that product, you would report code "6".*

   *Where no minimum yield strength is required, but a typical minimum is identified within the specification from a standards organization such as ASTM (e.g., under ASTM A653, the typical range of yield strengths for "Designation CS Type A" is identified as 25,000 psi to 55,000 psi, yielding a typical minimum of 25,000 psi, which in turn falls under reporting code "3").*

   *If no such requirements or guidance on minimum specified yield strength is identified in the specification for the product in question, explain in detail your rationale for using one of the above reporting codes to report this field for the product (do not create additional reporting codes).*

   *Finally, provide a chart that identifies all of the specifications/grades/types/designations in your comparison market and U.S. market sales datasbases. After identifying in the first column the complete specification/grade/type/designation identification (e.g., "ASTM A653 Designation SS grade 230"), identify in subsequent columns the allowable range of carbon content, the minimum specified yield strength (in pounds per square inch), the minimum specified tensile strength (in pounds per square inch), and the minimum specified*

*elongation percentage. For those values in this chart that are based on non-mandatory guidance provided in the specification (such as for the minimum yield strength for the ASTM A653 CS Type A products referenced above), place three asterisks next to the value in question (e.g., "25,000\*\*\*").*

A code identifying the minimum-specified yield strength of the CORE product sold in each transaction has been reported in the "CSTRENU" field in the sales listing provided in Appendix C-1. A key to the codes used is provided in Appendix C-2. A table that identifies the minimum-specified yield strength, minimum-specified tensile strength, and the minimum-specified elongation percentage for each of the specifications and grades under which Galvasid sold CORE products in its home market and to the United States is provided in Appendix B-

8. *Nominal Thickness*

*FIELD NAME:* CTHICKU

*DESCRIPTION:* 10 = Hot-dipped
20 = Electrolytically Coated
40 = Clad
001 = < 0.014"
014 = 0.014" to < 0.018"
018 = 0.018" to < 0.022"
022 = 0.022" to < 0.028"
028 = 0.028" to < 0.044"
044 = 0.044" to < 0.060"
060 = 0.060" to < 0.085"
085 = 0.085" to < 0.130"
130 = > or equal to 0.130"

*Report the code based on the nominal thickness. The nominal thickness is the thickness agreed upon between the customer and the supplier at the time of sale. This may be a minimum thickness if the negative thickness tolerance is zero.*

A code identifying the range within which the nominal thickness of the CORE

product sold in each transaction fell has been reported in the "CTHICKU" field in the sales

listing provided in Appendix C-1.  A key to the codes used is provided in Appendix C-2.

> 9.  *Nominal Width*
>
> > FIELD NAME:    *CWIDTHU*
> >
> > DESCRIPTION:    *1 = < 24"*
> > *2 = 24" but < 48"*
> > *3 = 48" but < 60"*
> > *6 = >60"10 = Hot-dipped*

A code identifying the range within which nominal width of the CORE  product sold

in each transaction fell has been reported in the "CWIDTHU" field in the sales listing

provided in Appendix C-1.  A key to the codes used is provided in Appendix C-2.

> 10.  *Form*
>
> > FIELD NAME:    *FORMU*
> >
> > DESCRIPTION:    *1 = Coil*
> > *3 = Not in coil (squares or rectangles)*
> > *4 = Not in coil (not squares or rectangles)*
> > *5 = Not in coil (corrugated)*

A code identifying the form of the CORE product sold in each transaction has been

reported in the "FORMU" field in the sales listing provided in Appendix C-1.  A key to the

codes used is provided in Appendix C-2.

> 5.  *Sale Type*
>
> > FIELD NAME:    *SALEU*
> >
> > DESCRIPTION:    *Identify the sale as either "EP" (export price) or "CEP"*
> > *(constructed export price).*

As explained in its Section A response, all of Galvasid's U.S. sales during the

investigation period were made through direct shipments to unaffiliated customers.  A code

- 11 -

identifying these sales as export-price transactions has been reported in the "SALEU" field

in the U.S. sales listing provided in Appendix C-1. A key to the code used is provided in

Appendix C-2.

6. *Consignment Identifier*

FIELD NAME:     CONSIGNU

DESCRIPTION:    *Identify the sale as either "C" (consignment sale) or "NC" (non-consignment sale).*

Galvasid did not make any U.S. sales on a consignment basis during the investigation

period.

7. *Customer Codes*

1. *Customer Code*

FIELD NAME:     CUSCODU

DESCRIPTION:    *Report the name of the customer or the internal accounting code designating the customer, as used in your normal course of business.*

NARRATIVE:      *Provide a list of customer names and codes as an attachment to your narrative response.*

The customer code for each U.S. sale has been reported in the "CUSCODU" field in

the U.S. sales listing provided in Appendix C-1, based on the code assigned to each

customer in Galvasid's normal records. A list of U.S. customers (which identifies the code

for each customer) is provided in Appendix C-4.

2. *Consolidated Customer Code*

FIELD NAME:     CCUSCODU

DESCRIPTION:    *Report only one name or code for each of your customers, even if more than one name or accounting code exists for that customer in your books and records. For example, if you use different codes for regional offices of the same customer, report the same code for this customer, regardless of the location of the office.*

> NARRATIVE: *Provide a list of customer names and codes as an attachment to your response, ensuring that each customer is assigned only one discrete code for this field.*

The customer codes used by Galvasid in the normal course of business do not assign more than one code to a single customer in order to reflect separate customer locations. Accordingly, the customer code recorded for each customer in Galvasid's normal records has been reported as the "consolidated" customer code in the "CCUSCODU" field in the U.S. sales listing provided in Appendix C-1. As mentioned, a list of Galvasid's U.S. customers for the subject merchandise, which identifies the normal customer code for each customer, is provided in Appendix C-4.

8. *Customer Category*

> FIELD NAME: CUSCATU

> DESCRIPTION: *1 = Original Equipment Manufacturers*
> *2 = Trading Companies*
> *3 = Distributors*
> *4 = Retailers*
> *5 - n   Specify additional categories as required.*

> NARRATIVE: *Identify any additional categories and indicate the code used for each. Identify any customers that have been classified in more than one customer category and explain the circumstances justifying such treatment.*

A code identifying the customer category for each U.S. sale has been reported in the "CUSCATU" field in the sales listing provided in Appendix C-1. A key to the codes used is provided in Appendix C-2.

9. *Channel of Distribution*

> FIELD NAME: CHANNELU

> DESCRIPTION: *The channels of distribution designated in this field should conform to those described in the response to question 3 in section A of the questionnaire.*
>
> *1 = Channel 1*

*2 = Channel 2*
*3 - n = Channel 3 – n*

*NARRATIVE:* *Identify any additional channels and indicate the codes used for each. The codes for channel of distribution listed above are examples only. You need not use them.*

As explained in Galvasid's Section A response, the U.S. sales of subject CORE products during the investigation period were made primarily through direct shipments by Galvasid to the destination in the United States designated by the unaffiliated U.S. customer. Sales to Puerto Rico were made on a CIF basis to an unaffiliated customer. Sales to other U.S. destinations were made on a DDP basis to the destination designated by the customer.

Galvasid also had sales to an unaffiliated service-center customer who took delivery in Mexico and then exported the products to the United States after cutting or slitting the product in Mexico (without performing any substantial transformation of the purchased CORE products). Galvasid knew at the time of its sale to this customer that the merchandise would be exported to the United States after cutting or slitting in Mexico.[4] Because the cutting and slitting performed by the service-center customer in Mexico did

---

[4] Because Galvasid knew that the cut or slit products produced by its customer would be exported to the United States, it did not charge the customer value-added taxes (which are required to be collected on domestic sales, but not on export sales).

Galvasid also had sales to other customers in Mexico who used the purchased CORE products in the production of downstream products (such as appliances). Galvasid knew at the time of its sale to these customers that the merchandise produced by the customers would be exported to the United States. Furthermore, because Galvasid knew that the downstream products produced by these customers would be exported to the United States, it did not charge these customers value-added taxes (which are required to be collected on domestic sales, but not on export sales). However, because the CORE products supplied by Galvasid to the customer underwent a substantial transformation in the customer's facilities, Galvasid has classified these sales as home-market sales in this response.

not substantially transform the merchandise prior to the customer's export to the United States, Galvasid has classified these sales as U.S. sales for purposes of this response.

A code identifying the distribution channel for each U.S. sale has been reported in the "CHANNELU" field in the sales listing provided in Appendix C-1. A key to the codes used is provided in Appendix C-2.

10. *Sale Invoice Date*

FIELD NAME:  *SALINDTU*

DESCRIPTION:  *Positions 1 - 4 = Year*
*Positions 5 & 6 = Month*
*Positions 7 & 8 = Day*

The date of the invoice from Galvasid to the unaffiliated customer for each U.S. sale has been reported, in the format requested, in the "SALINDTU" field in the U.S. sales listing provided in Appendix C-1.

11. *Date of Sale*

FIELD NAME:  *SALEDATU*

DESCRIPTION:  *Include this field only if the date of sale is different from the sale invoice date. The appropriate date to use as date of sale should be determined in consultation with the Official in Charge.*

*Positions 1 - 4  = Year*
*Positions 5 & 6 = Month*
*Positions 7 & 8 = Day*

As explained in Galvasid's Section A response, Galvasid has treated the date of its invoice as the date of sale for U.S. sales during the investigation period, and has reported that date (in the requested format) in the "SALEDATU" field in the home-market sales listing provided in Appendix C-1.

12. *Sale Invoice Number*

    *FIELD NAME:*      *INVOICEU*

    *DESCRIPTION:*      *Report the reference number assigned to the invoice in your accounting system.*

    *NARRATIVE:*      *Describe the invoice numbering system used by each sales entity that originated a sale reported in this data file. Is it simply a sequential number or is additional information included in the code, such as point of sale? If additional information is contained in the code, provide a key describing each component of the code.*

The invoice number that appeared on Galvasid's invoice to the unaffiliated customer for each U.S. market sale has been reported in the "INVOICEU" field in the sales listing provided in Appendix C-1. The invoice numbers recorded in Galvasid's normal computer system consist of a nine-digit sequential number.

13. *Date of Shipment*

    *FIELD NAME:*      *SHIPDATU*

    *DESCRIPTION:*      *Report the date of shipment from the last facility under your control; e.g., the factory or distribution warehouse to the customer.*

                *Positions 1 - 4 = Year*
                *Positions 5 & 6 = Month*
                *Positions 7 & 8 = Day*

The date of shipment from Galvasid's production facility for each U.S. sale has been reported, in the requested format, in the "SHIPDATU" field in the sales listing provided in Appendix C-1.

14. *Date of Receipt of Payment*

    *FIELD NAME:*      *PAYDATEU*

    *DESCRIPTION:*      *Report the date your records indicate payment was received from the customer.*

*Positions 1 - 4  = Year*
*Positions 5 & 6 = Month*
*Positions 7 & 8 = Day*

NARRATIVE:    *Indicate the basis for determining the date of payment and the
ledger from which this date was identified.  If you cannot collect
the dates of payment in the time allowed for responding to this
questionnaire, explain why and do not complete this field.  If
you collect the information but a particular invoice is unpaid,
leave this field blank for that invoice.*

Galvasid's U.S. customers paid the amounts due for each invoice either through a

single payment or in multiple installments.  The weighted-average of the payment dates for

each sale has been reported in the "PAYDATEU" field.  The calculation of the weighted-

average payment date for a sample sale for which payment was received in multiple

installments is provided in Appendix C-5.

15. *Terms of Delivery*

FIELD NAME:    SALETERU

DESCRIPTION:   1 = Delivered
               2 = FOB (specify delivery point; e.g., FOB home market
                   seaport)
               3 - n   Specify other delivery terms as required.

NARRATIVE:    *Describe the terms of delivery offered and indicate the code
used for each.  If the terms vary by channel of distribution,
explain how these are related.*

*The codes for delivery terms listed above are examples only.
You need not use them.*

As mentioned, Galvasid's U.S. sales of subject CORE products to Puerto Rico during

the investigation period were made on a CIF basis.  Its sales to other U.S. customers were

made on a delivered, duty-paid ("DDP") basis to the destination in the United States

designated by the customer.  Finally, its sales to the unaffiliated service-center customer

who took delivery in Mexico and then exported the products to the United States after

cutting or slitting the product in Mexico (without performing any substantial transformation of the purchased CORE products) were made on a delivered basis to the destination in Mexico designated by the customer.

A code indicating the delivery terms for each U.S. sale has been reported in the "SALETERU" field in the sales listing provided in Appendix C-1. A key to the codes used is provided in Appendix C-2.

16. *Terms of Payment*

FIELD NAME: *PAYTERMU*

DESCRIPTION: *Report terms of payment granted the customer.*

*1 = 30 days after invoice.*
*2 = 60 days after invoice.*
*3- n Specify other payment terms as required.*

NARRATIVE: *Describe each of the terms of payment you offer and indicate the code used for each. If the terms vary by channel of distribution, explain how these are related. If the payment terms you offer are tied to early payment discounts or to interest penalties for late payment, please explain. Indicate whether the payment terms are stated or coded on each invoice or, otherwise, how customers agree to payment terms.*

*The codes for payment terms listed above are examples only. You need not use them.*

A code identifying the payment terms for each U.S. sale has been reported in the "PAYTERMU" field in the sale listing provided in Appendix C-1. A key to the codes used is provided in Appendix C-2.

The payment terms for each sale are stated on Galvasid's invoices to the customer. The payment terms for each sale are set through negotiations with the customer.

17.  *Quantity*

FIELD NAME:    *QTYU*

DESCRIPTION:    *Report the sale quantity for this transaction.  In general, this quantity will be the quantity of the specific shipment or invoice line, net of returns where possible.  For sales that have not been fully shipped/invoiced at the time the computer data for this section is prepared, report the quantity of the sale not yet shipped (total quantity sold less the quantity shipped and invoiced to date - and reported in this file in separate records).*

*For example, assume the date of sale is the date of the customer's order.  In the last month the POR a customer orders 100 tons to be shipped in 5 lots of 20 tons each once every 30 days.  At the time of preparation of your questionnaire response, 3 of the 5 shipments have been made and an invoice sent for each shipment to the customer.*

*The file you submit to the Department should contain 4 records: one record for each shipment and invoice and a fourth record for the unshipped amount of 40 tons.  For the record containing the unshipped 40 tons, complete the adjustment fields based on estimates.*

NARRATIVE:    *Explain how returns, if you permit them, affect your sales reported in the general ledger and sales ledger.*

Galvasid's invoices for U.S. sales identify the sales quantities for each line-item in units of metric tons is also stated on the invoices.  The weight of the merchandise shipped to the customer is measured at the conclusion of production when each individual lot comes off Galvasid's production line.

The quantity for each transaction has been reported in units of metric tons in the "QTYU" field, based on the figures that appear on the invoice.  A code identifying the quantity was stated on the invoice in units of metric tons has been reported in the "QTYUNITU" field in the sales listing.  A key to the code used is provided in Appendix C-2.

Returns on Galvasid's U.S. sales of CORE products are recorded through credit notes that are tied to the original invoice that generated the return. The quantities reported in the "QTYU" field for each invoice are net of any returns associated with that invoice.

18. *Quantity Unit of Measure*

FIELD NAME: QTYUNITU

DESCRIPTION: *Report all sales in this file in the same unit of measure. Use an abbreviation or code to indicate the unit of measure. For example,*

> *1  or MT = metric tons*
> *2  or KG = kilograms*
> *3 - n Specify as needed.*

NARRATIVE: *Provide a table of the units of measure and abbreviations or codes used. The codes for unit of measure listed above are examples only. You need not use them.*

*Please use a single unit of measure for expressing all prices, expenses, and adjustments you report. If you make sales or incur expenses or adjustments using more than one unit of measure, select the predominantly used unit of measure for sales of merchandise to express all reported data. Additionally, in separate fields report the price, expense or adjustment as it appears in your records (i.e., before the conversion to a single unit of measure), and the conversion factor applied to convert the data to a single unit of measure.*

As mentioned, Galvasid's invoices to its unaffiliated U.S. customers identify the quantity shipped based on the actual weight in units of metric tons. A code identifying that unit of measure has been reported in the "QTYUNITU" field in the sales listing provided in Appendix C-1.

19. *Gross Unit Price*

FIELD NAME: GRSUPRU

DESCRIPTION: *Report the unit price as it appears on the invoice for sales shipped and invoiced in whole or in part. To report portions of sales not yet shipped, provide the agreed unit sale price for the*

> *quantity that will be shipped to complete the order. This value should be the gross unit price. Discounts and rebates should be reported separately in fields numbered 17.n and 18.n, respectively.*

The gross unit price per unit per metric ton for each U.S. sales transaction has been reported in the "GRSUPRU" field in the sales listing provided in Appendix C-1.

20. *Billing Adjustments*

    *FIELD NAME:*    *BILLADJU*

    *DESCRIPTION:*    *Report any price adjustments made for reasons other than discounts or rebates. State whether these billing adjustments are reflected in your gross unit price. Report a decrease in price as a negative figure and an increase in price as a positive figure. Report zero in this field if no adjustments were made to the price. Create a separate field for each type of billing adjustment (e.g., corrections of invoicing errors, post-invoicing price adjustments).*

    *NARRATIVE:*    *Describe the nature of each type of billing adjustment that is recognized in your sales records. Describe the document flow employed to process the price changes.*

Billing adjustments to correct errors in the quantity or unit price stated on Galvasid's invoices were reflected in Galvasid's accounting system through credit memos (where the error resulted in an overstatement of the total amount shown on the original invoice) or debit memos (where the error resulted in an understatement of the total amount shown on the original invoice). The credit and debit memos identified the original invoice (and invoice line-item) to which the correction applies, as well as the identity of the customer whose accounts receivable balance was affected by the correction.

The amount per metric ton of any billing adjustments made to correct invoicing errors has been reported in the "BILLADJU" field in the sales listing provided in Appendix C-1. The reported billing adjustment amount per metric ton for each transaction was calculated by dividing the total billing adjustment for each invoice line-item by the total quantity in

metric tons for that invoice line-item (as reported in the "QTYU" field).[5]  Billing

adjustments that increased the price (*i.e.,* debit notes) have been reported as positive

amounts in the "BILLADJU" field.  Billing adjustments that reduced the price (*i.e.,* credit

notes) have been reported as negative amounts in the "BILLADJU" field.  The adjusted

price can therefore be calculated by adding the billing adjustment amount reported in the

"BILLADJU" field to the gross unit price reported in the "GRSUPRU" field.

21. *Discounts*

    1. *Early Payment Discounts*

        FIELD NAME:    EARLPYU

        DESCRIPTION:    *Report the unit value of any discount granted to the customer for early payment.*

        NARRATIVE:    *Explain your policy and practice for granting early payment discounts.  Describe the basis for eligibility for such discount.  If discounts vary by channel of distribution (field 8) or by customer category (field 7), provide an explanation of the discounts given to each channel or category.  Explain how you calculated the per-unit discount.  Where available, provide sample documentation, including sample agreements, for this type of discount.*

Galvasid granted early-payment discounts on some of its U.S. sales of CORE

products during the investigation period.  The amount of the early-payment discount for

each sale has been reported on a per-unit basis, in the "EARLYPYU" field in the sales

listing provided in Appendix C-1.  The calculation of the reported per-unit early-payment

discount amount for a sample U.S. sale on which such a discount was granted is provided

in Appendix C-7.

---

[5] The calculation of the reported billing-adjustment for a sample U.S. sale is provided in Appendix C-6.

Under its agreements with certain customers, Galvasid grants an early-payment discount on sales in which the customer pays within [  ] days after invoice.  The discount rate is usually [     ] or [      ] percent, depending on the agreement with the customer.  The customer receives the discount by reducing its payment to Galvasid by the agreed-upon amount.

2.  *Quantity Discounts*

FIELD NAME:   QTYDISU

DESCRIPTION:   *Report the unit value of each type of discount granted to the customer due to the quantity of the purchase.*

NARRATIVE:   *Explain your policy and practice for granting quantity discounts.  Describe the basis for eligibility for such discounts.  If discounts vary by channel of distribution (field 8) or by customer category (field 7), provide an explanation of the discount given to each channel and category.  Explain how you calculated the per-unit discount.   Provide your quantity discount schedule or other documentation establishing the discount program.*

Galvasid did not grant quantity discounts on U.S. sales of CORE products during the investigation period.

3.  *Other Discounts*

FIELD NAME:   OTHDIS(1-n)U

DESCRIPTION:   *Report the unit value of other discounts granted to the customer.  Create a separate field for reporting each discount granted.*

NARRATIVE:   *Explain your policy and practice for granting each additional discount.  Describe each type of discount granted and the basis for eligibility for such discount.  If discounts vary by channel of distribution (field 8) or by customer category (field 7), provide an explanation of the discounts given to each category.  Explain how you calculated each additional per-unit discount.  Where available, provide sample documentation, including sample agreements, for each type of discount.*

During the investigation period, Galvasid granted "commercial discounts" to some of its U.S. customers.  Commercial discounts are granted to some U.S. customers, [

]. Galvasid negotiates the total amount of any commercial discount with the customer on a case-by-case basis.  If a commercial discount is granted, Galvasid issues a credit memo to the customer for the total amount of the agreed-upon discount.  As a result, the total amount of the commercial discount does not appear on the invoice to the customer.  The amount per metric ton of any commercial discount granted to U.S. customers has been reported in the "COMMDISCU" field in the sales listing provided in Appendix C-1.  Supporting documentation for one of Galvasid's U.S. customers that was granted a commercial discount is provided in Appendix C-8.

22. *Rebates*

FIELD NAME: *REBATE(1-n)U*

DESCRIPTION: *Report the unit value of each rebate given to the customer. Create a separate field for reporting each rebate granted. Rebates should be reported with the sales to which they apply.*

NARRATIVE: *Explain your policy and practice for granting rebates. Describe the terms and conditions of each rebate program and when the terms and conditions are established in the sales process.  If rebates vary by customer category (field 7) or channel of distribution (field 8), provide an explanation of the rebates given to each.  For rebates that have not yet been paid, describe how you computed the amount to be rebated.  Include your worksheets as an attachment to the response.  Where available, provide documentation, including sample agreements, for each type of rebate.*

Galvasid did not grant discounts or rebates on its U.S. sales during the investigation period (other than the commercial discounts described above).

23. *Level of Trade*

FIELD NAME:     LOTU

DESCRIPTION:     *Report the level of trade. Use an abbreviation or code to indicate the level of trade.*

NARRATIVE:     *Provide a key to any abbreviation or codes used. For CEP sales, the level of trade specified should be that of the sale to your affiliated importer, not the subsequent sale to the first unaffiliated customer.*

A code identifying the level of trade for each U.S. sale is set forth in the "LOTU" field in the sales listing provided in Appendix C-1. A key to the code used is provided in Appendix C-2. Because Galvasid did not have any constructed-export-price sales during the investigation period, the level of trade reported for Galvasid's U.S. sales reflects the level of Galvasid's sale to its unaffiliated customer for each transaction.

24. *Inland Freight from Plant to Distribution Warehouse*

FIELD NAME:     DINLFTWU

DESCRIPTION:     *Report the unit cost of inland freight from the factory to the distribution warehouse (or other intermediate location) in the country of manufacture. Where it is necessary to allocate because multiple items were included in a shipment, freight cost should be allocated on the basis incurred (e.g., weight, volume). If you ship the merchandise from the factory to the port of exit, report the cost of inland freight in field 25.*

NARRATIVE:     *Describe the forms of transport you used to deliver the merchandise to your distribution warehouse(s) or other intermediate location and any affiliations you had with the carriers during the POR. If you shipped by common carrier, please submit the specific freight charges incurred on each transaction and the method of allocation, when more than one type or size of merchandise was shipped. If it is not possible to specifically identify the cost of each shipment, describe how you calculated the freight cost per unit. Include your worksheets as attachments to the narrative response.*

*If you used your own vehicles to deliver the product, explain how you calculated the freight cost for each sale and provide the total expense incurred by type of expense (e.g., fuel).*

*Include your worksheets as attachments to the narrative response.*

Galvasid did not ship CORE products to, or store CORE products at, distribution warehouses in either Mexico or the United States in connection with its U.S. sales of CORE products during the investigation period. Accordingly, it did not incur any freight costs for shipments from its plant to a distribution warehouse in Mexico in connection with those sales.

25. *Warehousing Expense*

FIELD NAME: *DWAREHU*

DESCRIPTION: *Report the unit cost of warehousing expenses incurred in the country of manufacture on sales to the United States. The cost of warehousing reported in this field should include only expenses incurred at a distribution warehouse not located at the factory that produced the merchandise, less any reimbursement received from the customer.*

NARRATIVE: *Describe the distribution warehousing system you operate and provide a list of the warehouse locations used to distribute the merchandise. Describe any warehousing services provided to customers. Provide a list of customer names and codes that receive warehousing services, including the name and location of the warehouse used. Also, state whether the warehouse is operated by a separate entity that is affiliated with you and describe the nature of the affiliation.*

*Describe the manner in which you calculated the unit cost of warehousing and submit your worksheets as an attachment to the narrative response. If the warehouse is owned by you or an affiliate, describe how you allocated the cost of the warehouse operations.*

As mentioned, Galvasid did not ship CORE products to, or store CORE products at, distribution warehouses in either Mexico or the United States in connection with its U.S. sales of CORE products during the investigation period. Accordingly, it did not incur any

warehousing costs for shipments from its plant to a distribution warehouse in Mexico in connection with those sales.

26. *Inland Freight from Plant or*
    *Warehouse to Port of Exportation*

      *FIELD NAME:*    *DINLFTPU*

      *DESCRIPTION:*    *Report the unit cost of inland freight to the port of exportation in the country of manufacture from the factory or distribution warehouse (or other intermediate location). Where it is necessary to allocate because multiple items were included in a shipment, freight cost should be allocated on the basis incurred (e.g., weight, volume).*

      *NARRATIVE:*    *Describe the forms of transport you used to deliver the merchandise to port of exportation in the country of manufacture and any affiliations you had with the carriers during the POR. If you shipped by common carrier, please submit the specific freight charges incurred on each transaction and the method of allocation, when more than one type or size of merchandise was shipped. If it is not possible to specifically identify the cost of each shipment, please describe how you derived the freight cost per unit. Include your worksheets as attachments to the narrative response.*

                               *If you used your own vehicles to deliver the product, provide the total expense incurred by type of expense (e.g., fuel) and describe the method you used to allocate the expenses incurred to each sale. Include your worksheets as attachments to the narrative response.*

Galvasid's sales of CORE products to Puerto Rico were made Galvasid's sales of CORE products to U.S. customers during the investigation period were made on a CIF basis. The merchandise for those sales was transported from Gavasid's plant in Apodaca to the port of Altamira by unaffiliated trucking companies, and then from the port to Puerto Rico by unaffiliated marine transport carriers. The cost for transport from Galvasid's Apodaca plant to the port of Almira has been reported in the "DINLFTPU" field in the sales listing provided in Appendix C-1, and the cost of sea transport to Puerto Rico has

been reported in the "INTNFRU" field. The calculation of the reported international freight cost for a sample transaction is provided in Appendix C-12.

Galvasid's normal accounting system does not track the actual freight costs for individual shipments to individual locations. While that information is available in off-line records, it was not feasible to link the freight costs to individual shipments in light of the volume of shipment transactions. Accordingly, the cost of transporting the merchandise from Galvasid's Apodaca plant to U.S. customers has been calculated by allocating the total costs incurred by Galvasid for all such shipments based on the distance-weighted quantity for each transaction. (The distance-weighted quantity was calculated by multiplying the quantity of all products shipped to each customer by the distance from Galvasid's plant to the customer's location.) The resulting cost per metric ton for shipments to the relevant customer has been reported in "INTNFRU" field in the sales listing provided in Appendix C-1.

27. *Country of Manufacture Inland Insurance*

FIELD NAME: *INSUREU*

DESCRIPTION: *Report the unit cost of inland insurance on shipments from the factory or distribution warehouse (or other intermediate location) to the domestic port of exportation in the country of manufacture.*

NARRATIVE: *Describe how you calculated the unit cost of inland insurance incurred in the country of manufacture and include your worksheets as attachments to the narrative response.*

Galvasid did not incur any additional costs for insurance of merchandise during transport from the plant to the U.S. customer on U.S. sales of CORE products during the investigation period. In this regard, Galvasid did not obtain transport insurance for sales for which it was responsible for losses during transport. Instead, in the event that the

merchandise was damaged or lost during transport, Galvasid provided compensation to the customer directly.

28. *Brokerage and Handling Incurred*
    *in the Country of Manufacture*

    *FIELD NAME:* *DBROKU*

    *DESCRIPTION:* *Report the unit cost of any brokerage and handling incurred in the country of manufacture on sales to the United States.*

    *NARRATIVE:* *Describe how you calculated the unit cost of brokerage and handling incurred in the country of manufacture and include your worksheets as attachments to the narrative response.*

During the investigation period, Mexican brokerage-and-handling services on Galvasid's U.S. sales were provided by unaffiliated brokers. The Mexican brokerage-and-handling charges for each U.S. sale have been reported, as an amount per metric ton, in the "DBROKU" field in the sales listing provided in Appendix C-1. The reported cost per metric ton was calculated by dividing the total cost incurred during the investigation period by the total quantity of exports during the period. The calculation of the average Mexican brokerage-and-handling cost per metric ton is provided in Appendix C-10.

29. *Brokerage and Handling Incurred in the United States*

    *FIELD NAME:* *USBROKU*

    *DESCRIPTION:* *Report the unit cost of any brokerage and handling incurred in the United States on sales to the United States.*

    *NARRATIVE:* *Describe how you calculated the unit cost of brokerage and handling incurred in the United States and include your worksheets as attachments to the narrative response.*

The U.S. brokerage-and-handling charges for each U.S. sale have been reported, as an amount per metric ton, in the "USBROKU" field in the sales listing provided in Appendix C-1. The reported cost per metric ton was calculated by dividing the total cost

incurred during the investigation period by the total quantity of exports to the United States (excluding sales to Puerto Rico) during the period. The calculation of the average U.S. brokerage-and-handling cost per metric ton is provided in Appendix C-11.

30. *International Freight*

FIELD NAME: *INTNFRU*

DESCRIPTION: *Report the unit cost of ocean freight or air freight incurred on shipments from the port of exit in the country of manufacture to the U.S. port of entry.*

NARRATIVE: *Indicate whether the ocean freight carrier is affiliated. Supply any contracts or tariff rate agreements with carriers that apply to the merchandise under investigation. Describe how you calculated the unit cost of ocean freight and include your worksheets as attachments to the narrative response.*

As mentioned, Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis. The merchandise for those sales was transported from Gavasid's plant in Apodaca to the port of Altamira by unaffiliated trucking companies, and then from the port to Puerto Rico by unaffiliated marine transport carriers. The cost for transport from Galvasid's Apodaca plant to the port of Almira has been reported in the "DINLFTPU" field in the sales listing provided in Appendix C-1, and the cost of sea transport to Puerto Rico has been reported in the "INTNFRU" field. The calculation of the reported international freight cost for a sample transaction is provided in Appendix C-12.

Galvasid's other sales of CORE products to U.S. customers during the investigation period were made through direct shipments on a DDP basis from Galvasid's plant in Apodaca to the destination in the United States designated by the unaffiliated U.S. customer. The merchandise was transported from Galvasid's Apodaca plant to the destination designated by the customer using unaffiliated trucking companies, some of

which invoiced Galvasid in Mexican Pesos, and others of which invoiced Galvasid in U.S. dollars. The cost of transportation for shipments for which the transportation company invoiced Galvasid in Mexican Pesos has been reported in "INTNFRU" field in the sales listing provided in Appendix C-1.

31. _Marine Insurance_

FIELD NAME:    *MARNINU*

DESCRIPTION:    *Report the unit cost of marine insurance incurred on shipments from the port of exit in the country of manufacture to the U.S. port of entry.*

NARRATIVE:    *Describe how you calculated the unit cost of marine insurance and include your worksheets as attachments to the narrative response.*

*narrative response.*

As mentioned, Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis. Although the terms of sale made Galvasid responsible for losses during marine transport, Galvasid did not obtain marine insurance for these sales. Instead, in the event that the merchandise was damaged or lost during transport, Galvasid provided compensation to the customer directly.

Galvasid's other U.S. sales of CORE products during the investigation period were made through direct shipments from Galvasid's plant in Apodaca to the destination in the United States designated by the unaffiliated U.S. customer on a DDP basis. The merchandise was transported from Galvasid's Apodaca plant to the destination designated by the customer using unaffiliated trucking companies. Galvasid did not incur any additional costs for insurance of merchandise during transport from the plant to the U.S. customer on U.S. sales of CORE products during the investigation period.

32. *U.S. Inland Freight from Port to Warehouse*

FIELD NAME: INLFPWU

DESCRIPTION: *For CEP sales, report the unit cost of any freight incurred on shipments from U.S. port of entry to the affiliated reseller's U.S. warehouse or other intermediate location. For EP sales, report the unit cost of freight from the port of entry to an intermediate location.*

NARRATIVE: *Describe how you calculated the unit cost of inland freight from the port to the warehouse and include your worksheets as attachments to the narrative response.*

As mentioned, Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis. Accordingly, Galvasid was responsible for transport from its plant to the port in Puerto Rico, and its customer was responsible for U.S. customs clearance and any transport costs from the port to the final destination.

Galvasid's other sales of CORE products to U.S. customers during the investigation period were made through direct shipments on a DDP basis from Galvasid's plant in Apodaca to the destination in the United States designated by the unaffiliated U.S. customer. Galvasid did not ship CORE products to, or store CORE products at, distribution warehouses in either Mexico or the United States in connection with its U.S. sales of CORE products.

33. *U.S. Warehousing Expense*

FIELD NAME: USWAREHU

DESCRIPTION: *Report the unit cost of warehousing expenses incurred in the United States. The cost of warehousing reported in this field should include only expenses incurred at a warehouse not located at the distribution facility that sold the merchandise. In the case of merchandise processed further in the United States, report only expenses incurred at a warehouse not located at the facility that processed the merchandise. Reduce the cost of warehousing by any reimbursement received from the customer.*

> *Warehousing expenses might be incurred if just-in-time delivery or inventory segregation are conditions of sale.*

> NARRATIVE: *Describe the distribution warehousing system you operate and provide a list of the warehouse locations used to distribute the foreign like product. Describe any warehousing services provided to customers. Provide a list of customer names and codes that receive warehousing services, including the name and location of the warehouse used. Also, state whether the warehouse is operated by a separate entity that is affiliated with you and describe the nature of the affiliation.*

> *Describe the manner in which you calculated the unit cost of warehousing and submit your worksheets as an attachment to the narrative response. If the warehouse is owned by you or an affiliate, describe how you allocated the cost of the warehouse operations.*

As mentioned, As mentioned, Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis. Its sales of CORE products to U.S. customers during the investigation period were made through direct shipments from Galvasid's plant in Apodaca to the destination in the United States designated by the unaffiliated U.S. customer. Galvasid did not ship CORE products to, or store CORE products at, distribution warehouses in either Mexico or the United States in connection with its U.S. sales of CORE products.

34. <u>U.S. Inland Freight from Warehouse to the Customer</u>

> FIELD NAME: INLFWCU

> DESCRIPTION: *For CEP sales, report the unit cost of freight incurred on shipments from the affiliated U.S. reseller to the U.S. unaffiliated customer. For EP sales, report the unit cost of freight to the customer from the port of entry or an intermediate location.*

> NARRATIVE: *Describe how you calculated the unit cost of freight from the warehouse or other intermediate location and include your worksheets as attachments to the narrative response.*

As mentioned, Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis. Accordingly, Galvasid was responsible for transport from its plant to the port in Puerto Rico, and its customer was responsible for U.S. customs clearance and for any transport costs from the port to the final destination.

Galvasid's other sales of CORE products to U.S. customers during the investigation period were made through direct shipments on a DDP basis from Galvasid's plant in Apodaca to the destination in the United States designated by the unaffiliated U.S. customer. The costs for transport from Galvasid's plant to the customer's location have been reported in the "INTNFRU" field in the sales listing provided in Appendix C-1.

35. *U.S. Inland Insurance*

    *FIELD NAME:*    USINSURU

    *DESCRIPTION:*    *Report the unit cost of U.S. inland insurance incurred on shipments within the United States.*

    *NARRATIVE:*    *Describe how you calculated the unit cost of U.S. inland insurance and include your worksheets as attachments to the narrative response.*

As mentioned, Galvasid did not incur any additional costs for insurance of merchandise during transport from the plant to the U.S. customer on U.S. sales of CORE products during the investigation period.

36. *Other U.S. Transportation Expense*

    *FIELD NAME:*    USOTHTRU

    *DESCRIPTION:*    *Report the unit cost of any additional transportation expense incurred in the United States.*

    *NARRATIVE:*    *Describe the expense and how you calculated the unit cost and include your worksheets as attachments to the narrative response.*

The transportation expenses incurred in connection with Galvasid's U.S. sales of subject CORE products have been identified in the responses to sections C-24 to C-35, above.

37. *U.S. Customs Duty*

FIELD NAME:      USDUTYU

DESCRIPTION:     *Report the unit amount of any customs duty paid on the subject merchandise.  Include the unit cost of the U.S. customs processing fee and the U.S. harbor maintenance fee.*

NARRATIVE:       *Describe how you calculated the unit cost of U.S. customs duties and customs fees and include your worksheets as attachments to the narrative response.*

As mentioned, Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis.  Accordingly, Galvasid was responsible for transport from its plant to the port in Puerto Rico, and its customer was responsible for U.S. customs clearance for those sales.  As a result, Galvasid did not pay U.S. customs duties, processing fees, or U.S. harbor maintenance fees on those sales.

The tariff rate on imports of Galvasid's CORE products into the United States was zero.  Accordingly, Galvasid did not pay any U.S. customs duties on its other U.S. sales during the investigation period, even though those sales were made on a DDP basis.  Any fees incurred in connection with importation are included within the amounts charged to Galvasid by its U.S. customs broker (which have been reported in the "USBROKU" field).

38. *Destination*

1. *U.S. Postal Code*

FIELD NAME:      DESTU

DESCRIPTION:     *Report the five-digit U.S. postal "ZIP" code of the customer's place of delivery.*

The U.S. ZIP code for the place of delivery for each U.S. sale has been reported in the "DESTU" field in the sales listing provided in Appendix C-1.

    2.    *Destination State*

        FIELD NAME:    STATEU

        DESCRIPTION:    *Report the state in which the customer's place of delivery is located.*

The two-letter abbreviation of the name of the state in which the customer's place of delivery was located for each U.S. sale has been reported in the "STATEU" field in the sales listing provided in Appendix C-1.[6]

    39.    *Duty Drawback*

        FIELD NAME:    DTYDRAWU

        DESCRIPTION:    *Report the unit amount of any duty drawback received upon exportation of the subject merchandise to the United States.*

        NARRATIVE:    *Explain how the amount of duty drawback received is calculated and submit your worksheets as attachments to the narrative response.*

Galvasid did not receive any duty drawback on exports of subject CORE products to the United States during the investigation period.

    40.    *Commissions*

        FIELD NAME:    COMMU

        DESCRIPTION:    *Report the unit cost of commissions paid to selling agents and other intermediaries. If more than one commission was paid, report each commission in a separate field. Do not report commissions paid to affiliated selling agents unless there is a compelling reason that you cannot report an affiliated agent's actual expenses.*

---

[6] For sales to Puerto Rico, the code "PR" has been reported in the "STATEU" field.

*NARRATIVE:* *Describe the terms under which commissions were paid and how commission rates were determined. Explain whether the amount of the commission varies depending on the party to whom it is paid and whether that party is affiliated with you. Include samples of each type of commission agreement used.*

*If you report payments to any affiliated selling agent in lieu of the agent's actual expenses, provide an explanation of why you are unable to report those actual expenses. Indicate whether the commissions were paid at arm's length by reference to payments to unaffiliated parties in the United States, the foreign market and other markets. Submit evidence demonstrating the arm's-length nature of the commissions.*

Galvasid paid commissions on its U.S. sales of subject CORE products during the investigation period. The commission agreements provide each agent a fixed amount per year for supporting sales to certain U.S. customers. For purposes of this response, the amount of the commission paid to each agent has been allocated over the total amount of sales supported by the agent. The amount of the commission allocated to each sale has been reported on a per-metric-ton basis in the "COMMU" field in the sales listing provided in Appendix C-1.

Copies of the commission agreements that applied to Galvasid's U.S. sales during the investigation period are provided in Appendix C-13, along with the calculation of the reported per-unit commission amount for a sample U.S. sale.

41. <u>Selling Agent</u>

*FIELD NAME:* *SELAGENU*

*DESCRIPTION:* *Report the name or internal code designating the commissioned selling agent or intermediary. If more than one commission was paid, report the name and code of each selling agent in a separate field.*

*NARRATIVE:* *Provide a list of commissioned selling agents and intermediaries and an internal code for each, the applicable commission rates, and whether the agent is affiliated with you.*

- 37 -

A code identifying the selling agent that received the commission on each U.S. sale of subject CORE products on which Galvasid paid commissions has been reported in the "SELAGENU" field in the sales listing provided in Appendix C-1.  A key to the codes used is provided in Appendix C-2.

42. *Selling Agent Relationship*

FIELD NAME:    SELARELU

DESCRIPTION:    *Report the code designating affiliation.*

> *1 = Unaffiliated*
> *2 = Affiliated*

The selling agents that were paid commissions on Galvasid's U.S. sales of subject CORE products during the investigation period were not affiliated with Galvasid.

43. *Credit Expenses*

FIELD NAME:    CREDITU

DESCRIPTION:    *Report the unit cost of credit computed at the actual cost of short-term debt incurred by your company.  It is preferable to use a rate paid on short-term borrowing in U.S. dollars.  If you have not borrowed in U.S. dollars, use a U.S. published commercial short-term lending rate.*

*This expense should be calculated and reported on a transaction-by-transaction basis using the number of days between date of shipment to the customer and date of payment. If you are unable to determine actual payment from your records, you may base the calculation on the average age of accounts receivable.  If payment has not yet been received for this sale, leave this field blank.*

NARRATIVE:    *Provide the equation you have used to calculate credit expenses and a worksheet showing the calculation of your average short-term interest rate.  Explain the calculation and any other factors that affect net credit costs, such as compensating deposits to the extent that they were a precondition for acquiring the loan.  Indicate the source of the short-term interest rates used in the calculation.*

The credit expense for each U.S. sale has been reported in the "CREDITU" field in the sales listing provided in Appendix C-1. The credit expense for each sale was calculated by multiplying the unit amount due from the customer for each sale by the credit period for the transaction, and then multiplying the result by the weighted-average interest rate on Galvasid's short-term borrowings in U.S. dollars during the investigation period.

The credit period for each sale was determined based on the difference between the shipment date and the date of payment. The calculation of the credit period and reported credit expense for a sample transaction is provided in Appendix C-14. The calculation of the weighted-average interest rate on Galvasid's short-term U.S. borrowings during the investigation period is provided in Appendix C-15.

Galvasid did not require any compensating deposits from its U.S. customers during the investigation period. There were no other factors affecting net credit costs on the reported U.S. sales.

44. *Late-Payment Fee*

    *FIELD NAME:*    *LATEPAYU*

    *DESCRIPTION:*    *Report the per unit fees collected on each sale for late payment of the invoice.*

    *NARRATIVE:*    *Describe the conditions under which you charge customers such fees. If the practice varies by channel of distribution or category of customer, explain why it varies and how.*

Galvasid did not charge its customers interest for late payment on U.S. sales of subject CORE products during the investigation period.

45. *Advertising Expenses*

    *FIELD NAME:*    *ADVERTU*

    *DESCRIPTION:*    *Report the unit cost of advertising specifically for the subject merchandise that you have paid on behalf of your customer.*

> *This is the cost you incurred to advertise to your customer's customers.*
>
> *Report all advertising expenses incurred to advertise to your customers as part of indirect selling expenses (Field 50.2)*

NARRATIVE: *Describe separately advertising programs directed at your customer's customer (e.g., co-op advertising) and advertising programs directed at your customers. Provide separate lists of the expenses incurred for each and provide worksheets demonstrating the allocation of the advertising to your customers to each sale of the subject merchandise.*

During the investigation period, Galvasid did not incur any expenses for advertising or sales promotion activities directed at the customers of its unaffiliated U.S. customers. Accordingly, no direct advertising expenses have been reported.

The expenses incurred by Galvasid for advertisements directed at export customers (including the costs of catalogues and brochures) have been included in the indirect selling expenses reported in section 51, below.

46. *Warranty Expense*

FIELD NAME: WARRU

DESCRIPTION: *Report the unit cost of warranty expenses incurred during the POR. Warranty expense should include only the direct expense less any reimbursement received from the customer or unaffiliated parts suppliers. Report indirect warranty expenses as part of indirect selling expenses (field 50.2). If you produce different models or types of the merchandise under investigation, warranty cost should be based upon your experience by model. If this is impractical, express warranty cost on the most product-specific basis possible.*

NARRATIVE: *Describe both the warranty expenses incurred on sales of this merchandise and the reimbursement, if any, received or expected from the customer. Provide lists of the direct and indirect expenses incurred and worksheets demonstrating the allocation of the direct expense to each sale of the foreign like product. Describe the nature and terms of the warranty provided. Include a copy of each type of warranty agreement as an attachment to the response.*

- 40 -

> *Include a schedule of direct and indirect warranty expenses incurred for the subject merchandise for the three most recently completed fiscal years. In addition, calculate a cost per unit for each year.*

During the investigation period, some of Galvasid's U.S. customers claimed that the CORE products they received had been damaged. Instead of having the customer return the damaged merchandise, Galvasid granted the customer a credit memo and allowed the customer either to use or dispose of the damaged goods. The amount of such credit memos for U.S. sales of CORE products has been allocated over all U.S. sales during the period and reported, on a per-unit basis, as a warranty expense in the "WARRU" field in the sales listing provided in Appendix C-1.[7] The reported unit cost was calculated by multiplying the gross unit price for each transaction by a warranty expense rate. The warranty-expense rate was calculated by dividing the amount of credits for warranty claims granted by Galvasid on U.S. sales of CORE products during the investigation period by the total value of Galvasid's sales of CORE products in the U.S. during the investigation period. A worksheet showing the calculation of the warranty-expense rate is provided in Appendix C-16. A list of warranty expenses incurred in connection with each U.S. sale of CORE during the investigation period is also set forth in Appendix C-16.

47. *Technical Service Expense*

FIELD NAME: TECHSERU

DESCRIPTION: *Report the unit cost of technical services. Include only the direct expense less any reimbursement received from the*

---

[7] Under the Department's longstanding practice, the adjustment for warranty expenses is based on the seller's average experience, and not on transaction-specific claims since the seller cannot know at the time of sale whether a particular sale will give rise to a warranty claim.

*customer. Report indirect technical service expenses as part of indirect selling expenses (field 50.2).*

NARRATIVE: *Describe the technical services provided, including any service, repair, or consultation, that directly relate to sales of the subject merchandise. Describe any reimbursement received for these services. Provide lists of the direct and indirect expenses incurred and worksheets demonstrating the allocation of the direct expense to each sale of the subject merchandise.*

Galvasid did not incur technical-service expenses on U.S. sales of subject CORE products during the investigation period.

48. *Royalties*

FIELD NAME: *ROYALU*

DESCRIPTION: *Report the unit cost of any royalties you paid on the sale of the product. Create a separate field for each royalty paid.*

NARRATIVE: *Describe each royalty paid to third parties as a result of production or sale. Include a description of all royalties paid in this section of the narrative but include the unit cost of production royalties as a cost of manufacture (section D). The description should include the key terms of the agreements, the names of the parties that granted the rights, and a list of products covered by the agreements.*

Galvasid did not pay royalties on U.S. sales of subject CORE products during the investigation period.

49. *Bank Charges*

FIELD NAME: *BANKCHARU*

DESCRIPTION: *Report the unit cost of any royalties you paid on the sale of the product. Create a separate field for each royalty paid. Report the unit cost of sales-specific bank charges incurred during the POI, including fees associated with opening letters of credit, transaction fees deducted from electronic payments from customers, etc.*

NARRATIVE: *Describe each type of bank charge incurred and your basis for considering it directly related to sales of the subject merchandise.*

Galvasid incurred a small amount of bank charges on some of its U.S. sales of subject CORE products during the investigation period, when the bank handling a wire transfer deducted a fee from the amount remitted to Galvasid. The amount of the bank charge, if any, incurred on each U.S. sale has been reported in the "BANKCHARU" field in the sales listing provided in Appendix C-1. The calculation of the reported per-unit bank charge for a sample transaction is provided in Appendix C-17.

50. *Other Direct Selling Expenses*

FIELD NAME: DIRSELU

DESCRIPTION: *Report the unit cost of other direct selling expenses you incurred on sales of the subject merchandise which are not reported in other fields. Report each additional direct selling expense in a separate field. Include only the direct expenses incurred less any reimbursement received from the customer. Report the indirect expenses incurred as part of indirect selling expenses (field 50.2).*

NARRATIVE: *Describe each type of direct selling expense incurred and your basis for considering it directly related to the sales of the subject merchandise. Include lists of the direct and indirect expenses incurred and provide worksheets demonstrating any allocation of the direct expenses to each sale of the subject merchandise.*

The direct expenses incurred by Galvasid in connection with U.S. sales of subject CORE products have been identified in sections C-41 to C-50, above.

51. *Indirect Selling Expenses*

1. *Indirect Selling Expenses Incurred in the Country of Manufacture*

FIELD NAME: DINDIRSU

DESCRIPTION: *Report the unit cost of indirect selling expenses (e.g., sales office rent, salesmen's salaries) incurred in the country of manufacture to sell the product to the United States. Where indirect selling expenses have been incurred by the*

> *producer and an affiliated reseller, create separate fields for the expenses of each company.*

> NARRATIVE:   *Describe the sales overhead expenses incurred in the home market. Include a list of the overhead expenses incurred and provide worksheets demonstrating the allocation of these expenses plus the indirect expenses excluded from the circumstance of sale adjustments in fields 40 through 49 to each sale of the subject merchandise. Where more than one company incurred indirect selling expenses submit separate worksheets for each.*

The indirect selling expenses incurred by Galvasid for each U.S. sale have been reported, as an amount per metric ton, in the "DINDIRSU" field in the sales listing provided in Appendix C-1. The indirect selling expense amounts reported in the "DINDIRSU" field were calculated by multiplying the reported net unit price for the sale by an indirect selling expense rate.

Galvasid's normal accounting system records the expenses of its sales departments in three categories: (1) home-market-specific expenses that to personnel that handle home-market sales, (2) export-specific expenses relating to personnel that handle export sales, and (3) and "common" salary expenses for certain personnel that support both home-market and export sales. For purposes of this response, an export expense rate was calculated by dividing the total amount of export-specific expenses during the investigation period by the total amount of export sales during the period, and a "common" expense rate was calculated by dividing the total amount of "common" salary expenses during the investigation period by the total amount of sales in all markets during the period. The indirect selling expense rate for U.S. sales was then calculated by adding the export expense rate and common expense rates to determine a combined rate, which was then applied to the net unit price for each transaction. Details of the calculation of the indirect selling expense rate applied to U.S. sales are provided in Appendix C-18.

2. *Indirect Selling Expenses*
   *Incurred in the United States*

   FIELD NAME: *INDIRSU*

   DESCRIPTION: *Report the unit cost of indirect selling and administrative expenses (e.g., sales office rent and salesmen's salaries) incurred in the United States. Where indirect selling expenses have been incurred by more than one affiliated reseller, create separate fields for the expenses of each company.*

   NARRATIVE: *Describe the sales and administrative overhead expenses incurred in the United States. Include a list of the overhead expenses incurred and provide worksheets demonstrating the allocation of these expenses plus the indirect expenses excluded from the circumstance of sale adjustments in fields 40 through 49 to each sale of the subject merchandise. Where more than one company incurred indirect selling expenses, submit separate worksheets for each.*

As explained in Galvasid's Section A response, Galvasid's U.S. sales of subject CORE products were made directly by Galvasid to its unaffiliated U.S. customers, without the involvement of any U.S. sales affiliate. Accordingly, Galvasid did not incur indirect selling expenses on its U.S. sales of subject CORE products during the investigation period.

52. *Inventory Carrying Costs*

   1. *Inventory Carrying Costs Incurred*
      *in the Country of Exportation*

      FIELD NAME: *DINVCARU*

      DESCRIPTION: *For CEP sales, report the unit opportunity cost incurred from the time of final production to the time of arrival in the United States computed at the actual cost of short-term debt incurred by your company in the country of exportation. If you are a reseller, report the unit opportunity cost incurred from the time you purchased the merchandise to the time of arrival in the United States computed at the actual cost of short-term debt incurred by*

- 45 -

*your company in the country of exportation. If you did not have short-term borrowings during the POR, use a published commercial short-term lending rate.*

*For EP sales, report the unit opportunity cost incurred from the time of final production (or time of purchase) in the country of manufacture to the time of shipment to the United States computed at the same rate of interest as the CEP adjustment described above.*

*Please calculate inventory carrying costs on as specific a basis as possible (e.g., sale, model, product group, etc.).*

NARRATIVE: *Describe how the products under investigation are stored prior to sale. Provide the average length of time in inventory in the country of manufacture and provide separately the average length of time of shipment from the country of manufacture to the United States. Indicate the source of the short-term interest rate used in the calculation. Include your worksheets as attachments to the response.*

The imputed cost for carrying inventory from the completion of production to the date of shipment from Galvasid's facility in Mexico has been reported for each transaction in the "DINVCARU" field in the sales listing provided in Appendix C-1. The imputed cost for each transaction was calculated by multiplying an inventory-carrying-cost rate by the total cost of manufacture for the product sold in the transaction. The inventory-carrying-cost rate was calculated by multiplying the average inventory period in Mexico by the weighted-average interest rate on Galvasid's short-term Mexican peso borrowings during the investigation period. The average inventory period was calculated using an inventory-turnover analysis. Details of this calculation are provided in Appendix C-19.

2. *Inventory Carrying Costs*
   *Incurred in the United States*

FIELD NAME: *INVCARU*

DESCRIPTION: *For CEP sales, report the unit opportunity cost incurred from the time of arrival in the United States until the time*

*of shipment from the warehouse or other intermediate location in the United States to the first unaffiliated customer.*

*Compute the adjustment at the actual cost of U.S. dollar denominated short-term debt incurred by your company. If you have not borrowed in U.S. dollars, use a U.S. published commercial bank prime short-term lending rate.*

*Please calculate inventory carrying costs on as specific a basis as possible (e.g., sale, model, product group, etc.).*

NARRATIVE:     *Describe how the products under investigation are stored in the United States prior to sale and the average length of time in inventory in the United States. Indicate the source of the short-term interest rate used in the calculation. Include your worksheets as attachments to the response.*

As explained in Galvasid's Section A response, Galvasid's U.S. sales of subject CORE products were made directly by Galvasid to its unaffiliated U.S. customers, without the involvement of any U.S. sales affiliate. Accordingly, Galvasid did not hold inventory in a warehouse or other intermediate location in the United States prior to the shipment to its unaffiliated customers, and it therefore did not incur any inventory carrying costs on its U.S. sales of subject CORE products during the investigation period.

53. *Packing Cost*

FIELD NAME:     *PACKU*

DESCRIPTION:    *Report the unit cost of packing the subject merchandise for shipment to the United States. Include the cost of labor, materials and overhead. If a product is produced at more than one plant, report the weighted average packing cost of all plants combined. Report any costs associated with repacking the merchandise in the U.S. separately under field 53.*

NARRATIVE:     *Describe the types of packing used to prepare the subject merchandise for shipment to the United States. For each type of packing, provide a worksheet that demonstrates the calculation of packing material, labor and overhead for a single unit.*

*The worksheets should include a list of packing materials, the average cost of each material, and how much of each material was used. In addition, report the average labor hours by packing type and the average labor cost per hour including benefits. Include also a list of overhead expenses incurred in packing and demonstrate how these expenses were allocated to each packing type.*

The cost for packing for each U.S. transaction has been reported, in Mexico pesos per kilogram of CORE sold, in the PACKU field in the sales listing provided in Appendix C-1. The calculation of the per-unit cost of packing and a description of the packing process is provided in Galvasid's separate response to Section B of the questionnaire.

54. *U.S. Repacking Cost*

     FIELD NAME:    *REPACKU*

     DESCRIPTION:    *For CEP sales, report the unit cost of any repacking in the United States. Include the cost of labor, materials and overhead.*

     NARRATIVE:    *Describe any repacking that occurs in the United States. For each type of packing, provide a worksheet that demonstrates the calculation of packing material, labor and overhead for a single unit.*

                                       *The worksheets should include a list of packing materials, the average cost of each material, and how much of each material was used. In addition, report the average labor hours by packing type and the average labor cost per hour including benefits. Include also a list of overhead expenses incurred in packing and demonstrate how these expenses were allocated to each packing type.*

Galvasid did not repack subject CORE products in the United States for sales to U.S. customers during the investigation period.

55. *Value Added Tax*

     FIELD NAME:    *TAXU*

     DESCRIPTION:    *If you pay value-added taxes on your merchandise sold to the United States and those taxes are not rebated upon export,*

> *report them here. If you paid no such taxes, you may omit this field and note in your narrative response that it does not apply.*

> NARRATIVE: *Provide a complete description of the value-added taxes, including the tax rate and tax base. Include copies of all relevant tax laws.*

No value-added taxes were paid on Galvasid's sales of subject CORE products to the United States during the investigation period.

56. *Further Manufacturing*

> FIELD NAME: *FURMANU*

> DESCRIPTION: *If you are required to report the cost of further manufacture or assembly (further manufacture) performed in the United States, record the unit cost in this field. This value is the total unit cost reported in the computer data file prepared in response to questionnaire section E - Cost of Further Manufacturing Performed in the United States.*
>
> *If you have incurred further manufacturing cost in the United States but are not required to report the cost, record the code "FM" in this field for each sale of a further manufactured product. Enter a zero in this field for sales of products that have not been further manufactured.*

> NARRATIVE: *If you further manufacture subject merchandise in the United States, please contact the official in charge immediately. You may be required to respond to section E of this questionnaire. No additional narrative description is required for this field. Refer to section A question 8.*

The subject CORE products exported by Galvasid did not undergo further processing in the United States prior to sale to the first unrelated purchaser.

57. *Samples*

> FIELD NAME: *SAMPLEU*

> DESCRIPTION: *If the transaction in question involved sample merchandise, please report the code "S" (sample).*

NARRATIVE:   Explain the circumstances surrounding the sales of sample merchandise.  Describe how sales of sample merchandise differ from sales of merchandise that does not fall under this category.

Galvasid did not sell any samples of subject merchandise to customers in the United States during the investigation period.

58. *Foreign Trade Zone*

FIELD NAME:   FTZU

DESCRIPTION:   *Identify all sales of merchandise shipped into foreign trade zones in the United States by recording the code "FTZ" in this field.  If you shipped the subject merchandise to an affiliate in an FTZ that further processed the merchandise into products not within the description of merchandise in Appendix III prior to entry into U.S. customs territory, separately identify these transactions with the code FTZA.  If the merchandise entered U.S. customs territory without being further processed into products not within the description of the merchandise, enter the code FTZB.*

*For merchandise that was not shipped into foreign trade zones or was entered for consumption prior to admission to a foreign trade zone, enter a zero in this field.  If none of your merchandise was shipped into a foreign trade zone, you may omit this field entirely and note in your narrative response that it does not apply.*

NARRATIVE:   *Explain the circumstances that pertained to FTZ transactions. State whether you, your U.S. affiliate, or an unaffiliated firm entered (or may have entered) the merchandise into the Customs territory of the United States.*

Galvasid did not export subject CORE products for entry into a foreign trade zone in the United States during the investigation period.

59. *Temporary Import Bond*

FIELD NAME:   TEMPIMPU

DESCRIPTION:   *Identify all sales of merchandise that you knew were imported under temporary import bonds by recording the code TIB in this field.  If the subject merchandise entered into the United States under a temporary import bond and was processed further by*

*an affiliate into products not within the description of merchandise (see Appendix V) prior to entry into U.S. customs territory, separately identify these transactions with the code "TIBA". If the merchandise entered U.S. customs territory without being further processed into products not within the description of the merchandise, enter the code TIBB.*

*For merchandise that was not shipped under a temporary import bond, enter a zero in this field. If none of your merchandise was imported under a temporary import bond, you may omit this field entirely and note in your narrative response that it does not apply.*

NARRATIVE: *Explain the circumstances that pertained to sales of merchandise imported under temporary import bonds. State whether you, your U.S. affiliate, or an unaffiliated firm entered (or may have entered) the merchandise into the Customs territory of the United States.*

Galvasid did not export subject CORE products for entry into the United States under temporary import bonds during the investigation period.

60. <u>Manufacturer</u>

FIELD NAME: MFRU

DESCRIPTION: *If you have sold the foreign like product of more than one manufacturer, identify the manufacturer in each record by the use of a code. If the manufacturer is unknown, identify your supplier.*

NARRATIVE: *If you are not the manufacturer, report the manufacturer of the merchandise in your narrative response and provide a key to the code.*

As explained in Galvasid's Section A response, all of the subject CORE products sold by Galvasid in the United States during the reporting period were produced by Galvasid.

Appendix C-3

Reconciliation of Reported Sales to
Normal Accounting Records

Galvasid, S.A. de C.V.

Reconciliation of Reported U.S. Sales to Financial Statements

(Unit: 1,000 Mexican Pesos)

| | Fiscal Year 2023 (A) | 01-06 2023 (B) | 01-06 2024 (C) | U.S. Reporting Period (D=A-B+C) | POI (Thousand USD*) (E) |
|---|---|---|---|---|---|
| Net Sales per Accounting System and Financial Statements (A) | | | | | |
| 40010001 National Sales | | | | | |
| 40010002 National Sales Affiliated Companies | | | | | |
| 40030001 Export sales (other countries) | | | | | |
| 40110001 National Sales Discounts | | | | | |
| 40110002 Discounts National Sales Affiliated Companies | | | | | |
| 40110003 Discounts soon payment national sales | | | | | |
| 40120001 Discounts Export Sales to United States of America | | | | | |
| 40130001 Export sales discounts (other countries) | | | | | |
| 40210001 Returns on National Sales | | | | | |
| 40210002 Returns on Sales Affiliated Companies | | | | | |
| 40210003 Export sales returns | | | | | |
| 40300001 Loading an Unloading Goods | | | | | |
| Plus: National Sales Insurance recorded as Other Income (B) | | | | | |
| Total Net Sales (C=A+B) | | | | | |
| Less: Home Market Sales during the POI (D) | | | | | |
| Net U.S. Sales during the POI (E=C-D) | | | | | |
| Less: Sales of Non-CORE product during the POI (F) | | | | | |
| Net U.S. Sales of CORE product during the POI (G=E-F) | | | | | |
| Less: Cancelations/Returns of CORE Related to Sales outside of POI (H) | | | | | |
| Net U.S. Market Sales of CORE Finished product during the POI (I=G-H) | | | | | |
| Plus: Early Discount during the POI (J) | | | | | |
| Plus: Commercial Discount during the POI (K) | | | | | |
| Plus: Commercial Claim during the POI (L) | | | | | |
| Less: Unadjusted Billing Adjustment (M) | | | | | |
| Less: Offset by cancellation incurred after POI (N) | | | | | |
| Reported Gross U.S. Sales of CORE product (=GRSUPRH * QTYH) (O)=(I+J+K+L-M-N) | | | | | |

Public Version

Galvasid, S.A. de C.V.

Antidumping Investigation of
Certain Corrosion-Resistant Steel Products from Mexico

Quantity and Value of Sales

| Market | Period of Investigation | Unit of Measure | Total Sales Quantity (MT) | Total Sales Value (thousand USD) |
|---|---|---|---|---|
| United States<br><br>1. Export Price*<br><br>2. Constructed Export Price<br><br>3. Further Manufactured | July 2023 through June 2024 | M/T | | |
| Total | | | | |
| Home-Market<br><br>1. Affiliated<br><br>2. Unaffiliated | July 2023 through June 2024 | M/T | | |
| Total | | | | |

\*  Amounts in Mexican pesos have been converted into U.S. dollars for purposes of this table using an exchange
rate of 0.0584 U.S. dollars per Mexican peso, which is the simple average of the Mexican peso exchange rates
 listed on the Import Administration web-site for the period of investigation.

Public Version

Tab 7

Commerce's Section B-C Supplemental Questionnaire
(February 6, 2025)

PR-259, CR-299

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-863
Investigation
~~Business Proprietary~~
E&C Office VIII: KK/WH
**PUBLIC VERSION**

February 6, 2025

**Galvasid S.A. de C.V.**
c/o Jeffrey M. Winton
Winton & Chapman, PLLC
1100 13th Street, NW, Suite 825
Washington, DC 20005

Re:     Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products (CORE)
        from Mexico:  Sections B-C Supplemental Questionnaire

Dear Mr. Winton:

The Department of Commerce (Commerce) has reviewed the responses to Sections B and C[1] of
the U.S. Department of Commerce (Commerce) antidumping duty questionnaire filed on behalf
of your client, Galvasid S.A. de C.V. (Galvasid), in the above-referenced investigation.  The
enclosed supplemental questionnaire identifies areas where further information is needed.
Please file your response to the enclosed supplemental questionnaire in accordance with the
filing requirements and guidelines (including the guidelines regarding English translations) as
outlined in Commerce's original questionnaire before **5 p.m. Eastern Time (ET) on Thursday,
February 13, 2025.**

Pursuant to 19 CFR 351.302(d), any information submitted after the applicable deadlines will be
considered untimely and may be rejected.  Furthermore, upon receipt of a response that is
incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce
may not issue additional supplemental questionnaires but may use facts available.

Commerce must conduct this investigation in accordance with statutory and regulatory deadlines.
If you are unable to respond completely to every question in the attached questionnaire by the
established deadline or are unable to provide all requested supporting documentation by the same
date, you must notify the official in charge and submit a request for an extension of the deadline
for all or part of the questionnaire response.  If you require an extension for only part of your
response, such a request should be submitted separately from the portion of your response filed
under the current deadline.  Statements included within a questionnaire response regarding a
respondent's ongoing efforts to collect part of the requested information and promises to supply
such missing information when available in the future, do not substitute for a written extension
request.  Section 351.302(c) of Commerce's regulations requires that all extension requests be in
writing and state the reasons for the request.  Any factual statements made in support of such
reasons must be accompanied by the certifications required under section 351.303(g) of the
regulations.  An extension request submitted without a proper certification for any factual
information contained therein will be considered improperly filed and, as with any other

---

[1] *See* Galvasid's Letter, "Response to Sections B, C, and D of Department's November 18 Questionnaire," dated
January 13, 2025 (BCDQR).

improperly filed document, will not be accepted.  Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  Commerce will not accept any requested information submitted after the deadline.  As required by section 351.302(d) of our regulations, we will reject such submissions as untimely.  Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended, which may include adverse inferences, pursuant to section 776(b) of the Act.

Should you need further assistance or information regarding this case, contact Katerina Katsiadas at Katerina.Katsiadas@trade.gov or Bill Horn at William.Horn@trade.gov.

Sincerely,

Rebecca Trainor
Program Manager
AD/CVD Operations, Office VIII

Enclosure

2

**Antidumping Duty Investigation
of Certain Corrosion-Resistant Steel Products (CORE) from Mexico (A-201-863)
Supplemental Questionnaire to Sections B-C Responses for
Galvasid S.A. de C.V. (Galvasid)**

**NOTE:** *In accordance with section 351.303(e) of Commerce's regulations, "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department."*

**NOTE:** *Please repeat the question prior to giving your response when responding to this supplemental questionnaire.*

---

## SECTION B

1. Provide English translations for the invoices and credit notes in the following appendices:
   a. B-6
   b. B-7
   c. B-8

**Affiliated Sales**

2. Complete the arm's length test program for sales from Galvasid to Perfiles and provide your results.

**Quantity and Value**

1. Reconcile the total sales quantity reported in your Home Market database to your accounting system.

**Commercial Discounts**

2. What are the factors that Galvasid considers when granting a commercial discount and is there a maximum amount of discount that Galvasid can grant for each transaction?

3. Provide documentation demonstrating how the terms of commercial discounts are established and communicated to home market customers. Provide the relevant documentation for an observation in the home market database.

**Appendix B-10: Warehousing Costs**

4. The calculations within Appendix B-10 appear to contain minor errors, specifically with respect to the per-unit warehousing expenses in [                                    ]. Review these calculations and revise your database as appropriate. Provide your calculation worksheet in electronic excel format, including cell formulas.

3

**Early Payment Discounts**

5. You have reported that customers can receive an early payment discount when they pay within [     ] of the date of invoice. In your home market database, there are multiple examples of an early payment discount recorded when the average payment date exceeds the terms of early payment you reported. Provide an explanation for situations in which Galvasid grants early payment discounts even when the actual payment exceeds [     ]. Provide documentation to support your methodology.

**Credit Expense**

6. Revise your calculation of home market credit expenses to exclude revenue fields FRTREVH and INSUREVH.

7. You apply a calculation of the average number of payment days for each sale to the credit expense calculation. However, [                                                    ]. Explain if and how this affects weighted-average payment days by the payment amounts that exceed the total sales value for the reported sale.

8. Are you able to report the payment date on a more specific basis, such as a weighted average payment date calculation that is based on (a) customers making multiple installment payments in the same month covering multiple sales invoices; and/or (b) customers making a single payment covering multiple sales invoices issued in the same month? If so, then report these transactions separately by creating another field labeled PAYDATE2H. Provide a sample calculation for each payment date reporting method described above and provide a worksheet that identifies for each home sales transaction the method that was used to calculate PAYDATE2H.

**Secondary Merchandise**

9. Describe in detail how non-prime merchandise is categorized and tracked internally. Provide documentation from Galvasid's SAP system indicating the changes made to merchandise within the system when its categorization changes from prime to non-prime.

10. You state that "for some non-prime CORE products," you have reported the specification in field SPECH as Commercial Steel Type B under ASTM A653 or ASTM A792 based on your "understanding that the customers for such non-prime products expect them to be generally similar" to this designation. Identify which non-prime sales were reported in this manner. Provide documentation supporting your reporting that all non-prime merchandise is sold as Steel Type B.

## SECTION C

11. You reference an Appendix from your BQR on page 10 of your CQR, however, you have not included this appendix number in your questionnaire response. Provide this missing appendix.

4

**Inland Freight**

12. Provide a calculation worksheet to support the reported inland freight cost calculation from Galvasid's Apodaca plant to U.S. customers.

**Quantity and Value**

13. Reconcile the total sales quantity reported in your U.S. database to your accounting system.

**Early Payment Discounts**

14. Explain your policy for granting early payment discounts to U.S. customers. Provide documentation, including any agreements, to corroborate the reported early payment terms offered to U.S. customers.

15. Are the same terms offered to U.S. customers and home market customers for early payment, *i.e.*, discount for payment within [        ] of the invoice?

**International Freight**

16. Provide any contracts or rate agreements with trucking companies and marine transport carriers in effect during the POI.

**Marine Insurance**

17. Identify specific sales in which merchandise was damaged or lost during transport. Report the amount of compensation allocated to these sales and identify any general ledger accounts associated with such compensation. Revise your U.S. expense reporting accordingly.

**Late Payment Fees**

18. Explain why late payment fees were enforced for home market customers and not for U.S. customers.

5

Tab 8

Commerce's Second Section B-C Supplemental Questionnaire
(February 21, 2025)

PR-276, CR-301

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-863
Investigation
~~Business Proprietary~~
E&C Office VIII: KK
**PUBLIC VERSION**

February 21, 2025

**Galvasid S.A. de C.V.**
c/o Jeffrey M. Winton
Winton & Chapman, PLLC
1100 13th Street, NW, Suite 825
Washington, DC 20005

Re:     Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products (CORE)
        from Mexico:  Sections B-C Second Supplemental Questionnaire

Dear Mr. Winton:

The Department of Commerce (Commerce) has reviewed the responses to Sections B and C[1] of
the U.S. Department of Commerce (Commerce) antidumping duty questionnaire filed on behalf
of your client, Galvasid S.A. de C.V. (Galvasid), in the above-referenced investigation.  The
enclosed supplemental questionnaire identifies areas where further information is needed.
Please file your response to the enclosed supplemental questionnaire in accordance with the
filing requirements and guidelines (including the guidelines regarding English translations) as
outlined in Commerce's original questionnaire before **5 p.m. Eastern Time (ET) on Friday,
February 28, 2025.**

Pursuant to 19 CFR 351.302(d), any information submitted after the applicable deadlines will be
considered untimely and may be rejected.  Furthermore, upon receipt of a response that is
incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce
may not issue additional supplemental questionnaires but may use facts available.

Commerce must conduct this investigation in accordance with statutory and regulatory deadlines.
If you are unable to respond completely to every question in the attached questionnaire by the
established deadline or are unable to provide all requested supporting documentation by the same
date, you must notify the official in charge and submit a request for an extension of the deadline
for all or part of the questionnaire response.  If you require an extension for only part of your
response, such a request should be submitted separately from the portion of your response filed
under the current deadline.  Statements included within a questionnaire response regarding a
respondent's ongoing efforts to collect part of the requested information and promises to supply
such missing information when available in the future, do not substitute for a written extension
request.  Section 351.302(c) of Commerce's regulations requires that all extension requests be in
writing and state the reasons for the request.  Any factual statements made in support of such
reasons must be accompanied by the certifications required under section 351.303(g) of the
regulations.  An extension request submitted without a proper certification for any factual
information contained therein will be considered improperly filed and, as with any other

---

[1] *See* Galvasid's Letter, "Response to Sections B, C, and D of Department's November 18 Questionnaire," dated
January 13, 2025 (BCDQR).

improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the deadline. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended, which may include adverse inferences, pursuant to section 776(b) of the Act.

Should you need further assistance or information regarding this case, contact Katerina Katsiadas at Katerina.Katsiadas@trade.gov.

Sincerely,

Rebecca Trainor
Program Manager
AD/CVD Operations, Office VIII

Enclosure

2

**Antidumping Duty Investigation
of Certain Corrosion-Resistant Steel Products (CORE) from Mexico (A-201-863)
Second Supplemental Questionnaire to Sections B-C Responses for
Galvasid S.A. de C.V. (Galvasid)**

**NOTE:** *In accordance with section 351.303(e) of Commerce's regulations, "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain the Department's approval for submission of an English translation of only portions of a document prior to submission to the Department."*

**NOTE:** *Please repeat the question prior to giving your response when responding to this supplemental questionnaire.*

---

Sales Reconciliations

Part IV the BCQR requests reconciliations of the sales reported in your home market and U.S. sales databases to the total sales listed in your financial statements (profit and loss/income statement). As stated in the questionnaire, your reconciliations **must** provide supporting documentation (*e.g.*, financial statements, trial balance sheets, relevant excerpts from general ledger, sub-ledger, *etc.*) **for each** step in the reconciliations. However, you have not provided the requested supporting documentation and narrative explanations for the reconciliation worksheets submitted in Exhibit B-3 and Exhibit C-3. Provide a complete response to Questions 1-5 in part IV of the BCQR to include **all of the requested documentation and narrative explanations** for the submitted reconciliation worksheets.

Insurance Revenue

Provide a detailed narrative description of the home market data field, INSUREVH. Explain why you have reported insurance revenue but [                    .] Provide worksheets and supporting documentation demonstrating the per-unit amount reported in the home market sales database, and sample documentation for SEQH [    ] and SEQH [    ].

Gross Unit Price

Explain why SEQH [    ] of the home market database has [          ] gross unit price. Provide supporting documentation for this transaction as applicable.

3

Tab 9

Galvasid's Response to Sections B-C Supplemental Questionnaire
(February 24, 2025)

PR-278-279, CR-303-304

Case No. A-201-863
Total Pages: 145
Investigation
AD/CVD Enforcement Office VIII
Proprietary Information Removed
   from Pages 7, 9-10, 12, 19-20,
   22, and 24, and Appendices
   SB-1 to SC-7
Public Version

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| | ) |
| LESS-THAN-FAIR-VALUE INVESTIGATION | ) |
| OF CERTAIN CORROSION-RESISTANT | ) |
| STEEL PRODUCTS FROM MEXICO | ) |
| | ) |

**Public Version**

RESPONSE OF GALVASID, S.A. DE C.V. TO THE DEPARTMENT'S
FEBRUARY 6 SUPPLEMENTAL QUESTIONNAIRE

WINTON & CHAPMAN PLLC
1100 13th St., N.W., Suite 825
Washington, D.C. 20005
(202) 774-5500

Counsel to Galvasid S.A. de C.V.

February 24, 2025

This submission is filed on behalf of Galvasid S.A. de C.V. ("Galvasid"), in response to the Department's February 6 supplemental questionnaire in the antidumping duty investigation of Certain Corrosion-Resistant Steel Products from Mexico. For the Department's reference, each of the questions from the supplemental questionnaire is set forth below, followed by Galvasid's response.

During the preparation of this supplemental questionnaire, a few errors were discovered in the home-market sales listing submitted in Galvasid's January 13 Section B response. In particular,

- Some overrun products were incorrectly coded as non-prime in the home-market database. Correction of this error required changes in the PRIMEH, SPECH, CQUALH, CSTRENH, and CONNUMH fields for sales of those products.

- The specifications for some products were incorrectly coded in the home-market database. Correction of this error required changes in SPECH, CQUALH, CSTRENH, and CONNUMH fields for sales of those products.

- The thickness and width were coded for the home-market sales based on the standard sizes for the material code rather than the actual sizes for the products. Correction of this error required changes in the CTHICKH, CWIDTHH, and CONNUMH fields for sales of those products.

- Advance payments were not reflected in the home-market sales database for some home-market sales. Correction of this error required changes in the PAYDATEH, PAYVALH, and AVGPAYDH fields for those sales.

LIST OF APPENDICES

SB-1:    Revised Home-Market Sales Listing

SB-2:    Computer File Format Description

SB-3:    Revised Yield and Tensile Strength and Elongation for CORE Specifications (B-19)

SB-4-A:  English Translation for Billing Adjustment for Sample Transaction (B-6)

SB-4-B:  English Translation for Early Payment Discount for Sample Transaction (B-7)

SB-4-C:  English Translation for Commercial Discount to Sample Home-Market Customer (B-8)

SB-5:    Arm's Length Test Results

SB-6:    Home-Market Reconciliation to Accounting System

SB-7:    Sample Commercial Discount Documents

SB-8:    Revised Warehousing Costs (B-10)

SB-9:    Sample Early Payment Discount Documents

SB-10:   Sample Calculation of Weighted Average Days Before Payment

SB-11:   Billing and Payment Worksheet for Sample Invoice

SB-12:   Sample SAP Documents for Prime/Non-Prime

SB-13:   Sample Documentation Non-Prime Sold as Steel Type B

SC-1:    Revised U.S. Sales Listing

SC-2:    Computer File Format Description

SC-3:    Calculation Worksheet for Inland Freight

SC-4:    U.S. Reconciliation to Accounting System

SC-5:    Early Payment Discount Policy

SC-6:    Freight Agreements Trucking Companies and Marine Transport Carriers

SC-7:    Transaction-Specific Warranty Worksheet

Appendix SC-4

U.S. Reconciliation to Accounting System

Galvasid, S.A. de C.V.

Reconciliation of Reported U.S. Sales to Financial Statements

(Unit: MT, Mexican Pesos)

| | | Fiscal Year 2023 | | 01-06 2023 | | 01-06 2024 | | U.S. Reporting Period | |
|---|---|---|---|---|---|---|---|---|---|
| | | Quantity (a) | Value (A) | Quantity (b) | Value (B) | Quantity (c) | Value (C) | Quantity (d=a-b+c) | Value (Thousand USD*) (D=A-B+C) |
| Net Sales per Accounting System and Financial Statements | (A=∑(a-c)-∑(d-k)+l) | | | | | | | | |
| 40010001 National Sales | (a) | | | | | | | | |
| 40010002 National Sales Affiliated Companies | (b) | | | | | | | | |
| 40030001 Export sales (other countries) | (c) | | | | | | | | |
| 40110001 National Sales Discounts | (d) | | | | | | | | |
| 40110002 Discounts National Sales Affiliated Companies | (e) | | | | | | | | |
| 40110003 Discounts soon payment national sales | (f) | | | | | | | | |
| 40120001 Discounts Export Sales to United States of America | (g) | | | | | | | | |
| 40130001 Export sales discounts (other countries) | (h) | | | | | | | | |
| 40210001 Returns on National Sales | (i) | | | | | | | | |
| 40210002 Returns on  Sales Affiliated Companies | (j) | | | | | | | | |
| 40210003 Export sales returns | (k) | | | | | | | | |
| 40300001 Loading an Unloading Goods | (l) | | | | | | | | |
| Plus: National Sales Insurance recorded as Other Income | (B) | | | | | | | | |
| Total Net Sales | (C=A+B) | | | | | | | | |
| Less:  Home Market Sales during the POI | (D) | | | | | | | | |
| Net U.S. Sales during the POI | (E=C-D) | | | | | | | | |
| Less:  Sales of Non-CORE product during the POI | (F) | | | | | | | | |
| Net U.S. Sales of CORE during the POI | (G=E-F) | | | | | | | | |
| Less: Cancelations/Returns of CORE Related to Sales outside of Period | (H) | | | | | | | | |
| Net U.S. Sales of CORE Finished Product during the POI | (I=G-J) | | | | | | | | |
| Plus:  Early Discount during the POI | (K) | | | | | | | | |
| Plus:  Commercial Discount during the POI | (L) | | | | | | | | |
| Plus:  Commercial Claim during the POI | (M) | | | | | | | | |
| Less:  Unadjusted Billing Adjustment | (N) | | | | | | | | |
| Less: Offset by cancellation incurred after POI | (O) | | | | | | | | |
| Reported Gross U.S. Sales of CORE product (=GRSUPRH * QTYH) | (P=K+L+M-N-O) | | | | | | | | |

Tab 10

Galvasid's Response to Second Sections B-C Supplemental Questionnaire
(March 3, 2025)

PR-297-298, CR-424, 426

Case No. A-201-863
Total Pages: 116
Investigation
AD/CVD Enforcement Office VIII
Proprietary Information Deleted
from Pages 4-6 and from
Appendices S2B-1 to S2C-1
Public Version

In the Matter of:

LESS-THAN-FAIR-VALUE INVESTIGATION
OF CERTAIN CORROSION-RESISTANT
STEEL PRODUCTS FROM MEXICO

)
)
)
)
)
)
)
)

**Public Version**

RESPONSE OF GALVASID, S.A. DE C.V. TO THE DEPARTMENT'S
FEBRUARY 21 SUPPLEMENTAL QUESTIONNAIRE

WINTON & CHAPMAN PLLC
1100 13th St., N.W., Suite 825
Washington, D.C. 20005
(202) 774-5500

Counsel to Galvasid S.A. de C.V.

March 3, 2025

This submission is filed on behalf of Galvasid S.A. de C.V. ("Galvasid"), in response to the Department's February 21 supplemental questionnaire in the antidumping duty investigation of Certain Corrosion-Resistant Steel Products from Mexico. For the Department's reference, each of the questions from the supplemental questionnaire is set forth below, followed by Galvasid's response.

<u>SALES RECONCILIATIONS</u>

*Part IV the BCQR requests reconciliations of the sales reported in your home market and U.S. sales databases to the total sales listed in your financial statements (profit and loss/income statement). As stated in the questionnaire, your reconciliations must provide supporting documentation (e.g., financial statements, trial balance sheets, relevant excerpts from general ledger, sub-ledger, etc.) for each step in the reconciliations. However, you have not provided the requested supporting documentation and narrative explanations for the reconciliation worksheets submitted in Exhibit B-3 and Exhibit C-3. Provide a complete response to Questions 1-5 in part IV of the BCQR to include all of the requested documentation and narrative explanations for the submitted reconciliation worksheets.*

<u>RESPONSE</u>

### 1. *Home-Market Sales Reconciliation*

In the first step of the home-market reconciliation, Galvasid calculated the total amount of sales of all products in 2023 using the 2023 income statement and calculated the total amount of sales for the first six months of 2023 and the first six months of 2024 using the trial balance. Galvasid then subtracted the sales made in the first six months of 2023 from, and added the sales made in the first six months of 2024 to, the total sales made in 2023 to get the total sales for the period of investigation.

Second, Galvasid removed export sales from the total sales for the period of investigation to get total home-market sales during the period of investigation. Galvasid identified export sales using the "country code" in Galvasid's sales data.

Third, Galvasid removed sales of non-subject products from the total home-market sales during the period of investigation to get total home-market sales of subject products during the period of investigation. Galvasid identified whether each sale involves subject merchandise using the product description on the commercial invoice.

Fourth, Galvasid removed cancellations and returns from the total home-market sales of subject products during the period of investigation. Galvasid identified cancellations and returns using the credit invoice, which identifies the original invoice number.

Fifth, Galvasid removed sales of purchased CORE produced by other producers from the total home-market sales of subject products during the period of investigation. Galvasid identified these sales using Galvasid's purchase data.

Finally, Galvasid made adjustments for early payment discounts, warranty expenses, commercial discounts, and billing adjustments, to get the total reported home-market sales of subject products during the period of investigation. Galvasid identified these adjustments using the credit invoice, which identifies the original invoice number.

### 2. *U.S. Sales Reconciliation*

In the first step of the U.S. sales reconciliation, Galvasid calculated the total amount of sales of all products in 2023 using the 2023 income statement and calculates the total amount of sales for the first six months of 2023 and the first six months of 2024 using the trial balance. Galvasid then subtracted the sales made in the first six months of 2023 from, and added the sales made in the first six months of 2024 to, the total sales made in 2023 to get the total sales for the period of investigation.

Second, Galvasid removed home-market sales and export sales to countries other than the United States from the total sales during the period of investigation to get total U.S. sales during the period of investigation. Galvasid identified export sales using the customer's address on the commercial invoice.

Third, Galvasid removed sales of non-subject products from the total U.S. sales during the period of investigation to get total U.S. sales of subject products during the period of investigation. Galvasid identified whether the sale is for subject merchandise using the product description on the commercial invoice.

Fourth, Galvasid removed cancellations and returns from the total U.S. sales of subject products during the period of investigation. Galvasid identified cancellations and returns using the credit invoice, which identifies the original invoice number.

Fifth, Galvasid made adjustments for early payment discounts, commercial discounts, billing adjustments[1], and sales of CORE products during the period of investigation which were returned after the investigation period for sales during the investigation period, to get the total reported home-market sales of subject products during the period of investigation. Galvasid identified these adjustments using the credit invoice, which identifies the original invoice number.

Annotated versions of the home-market and U.S. sales reconciliations submitted with Galvasid's January 13 response, including relevant supporting documentation, are provided in Appendices S2B-1 and S2C-1.

---

[1] Galvasid has provided an example of an "unadjusted billing adjustment" that Galvasid issued for [                    ], in April 2024. The original sale was made by Galvasid to [        ] in February 2022, prior to the period of investigation, and the cancellation occurred in April 2024.

LIST OF APPENDICES

S2B-1:     Home-Market Reconciliation Supporting Documentation

S2B-2:     Insurance Revenue Supporting Documentation

S2B-3:     Gross Unit Price Supporting Documentation

S2B-4:     Return Methodology Worksheet

S2C-1:     U.S. Reconciliation Supporting Documentation

Appendix S2C-1

U.S. Reconciliation Supporting Documentation

Galvasid, S.A. de C.V.

<u>Q&V Sales Reconciliation (U.S. Sales)</u>

(Unit : MT, Thousand MXN, Thousand USD)



Public Version

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(2 PAGES)**

**Step 2: Non-U.S. Sales**

Galvasid, S.A. de C.V.

Home Market Sales during the POI
(July 2023 to June 2024)

| Month | Quantity (MT) | Value (Thousand MXP) |
|---|---|---|
| 2023-07 | | |
| 2023-08 | | |
| 2023-09 | | |
| 2023-10 | | |
| 2023-11 | | |
| 2023-12 | | |
| **2024-01** | | |
| 2024-02 | | |
| 2024-03 | | |
| 2024-04 | | |
| 2024-05 | | |
| 2024-06 | | |
| Total | | |

Public Version

Galvasid, S.A. de C.V.

Home Market Sales during the POI (January 2024)

| No. | Customer Name | Quantity (MT) | Value (Thousand MXP) |
|-----|---------------|---------------|----------------------|
|     |               |               |                      |

Public Version

| No. | Customer Name | Quantity (MT) | Value (Thousand MXP) |
|-----|---------------|---------------|----------------------|
|     |               |               |                      |

Public Version

| No. | Customer Name | Quantity (MT) | Value (Thousand MXP) |
|-----|---------------|---------------|----------------------|
|     |               |               |                      |

Public Version

| No. | Customer Name | Quantity (MT) | Value (Thousand MXP) |
|-----|---------------|---------------|----------------------|
|     |               |               |                      |

Public Version

| No. | Customer Name | Quantity (MT) | Value (Thousand MXP) |
|-----|---------------|---------------|----------------------|
|     |               |               |                      |
|     |               |               |                      |

Public Version

# Step 2: Supporting Documentation for Non-U.S. Sales

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(5 PAGES)**

**Step 3: U.S. Sales of Non-CORE**

Galvasid, S.A. de C.V.

U.S. Sales of Non-CORE product during the POI
(July 2023 to June 2024)

| Month | Quantity (MT) | Value (Thousand MXP) |
|---|---|---|
| 2023-09 | | |
| 2023-12 | | |
| 2024-02 | | |
| **2024-03** | | |
| Total | | |

Public Version

**Galvasid, S.A. de C.V.**

**U.S. Sales of Non-CORE product (March 2024)**

| No. | Customer Name | Quantity (MT) | Value (Thousand MXP) |
|---|---|---|---|
| [ | | | ] |
| | | | |

Public Version

Galvasid, S.A. de C.V.

U.S. Sales of Non-CORE product (March 2024)

| No. | Invoice Number | Date | Material Code | Customer Name | Quantity (MT) | Value (Thousand MXP) |
|-----|----------------|------|---------------|---------------|---------------|----------------------|
| | | | | | | |
| | | | | | | |

Public Version

Step 3:

Supporting
Documentation for U.S.
Non-CORE Sales

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(12 PAGES)**

# Step 4: Cancellations & Returns of CORE

Galvasid, S.A. de C.V.

Cancellations/Returns of CORE
(July 2023 to June 2024)

| Month | Quantity (MT) | Value (Thousand MXP) |
|---|---|---|
| 2023-07 | | |
| Total | | |

Public Version

Galvasid, S.A. de C.V.

Cancellations/Returns of CORE

| No. | Original Invoice Number | Original Invoice Date | Credit Invoice Number | Credit Invoice Date | Customer Name | Material Code | Quantity (MT) | Value (Thousand MXP) |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

Public Version

Step 4:

Supporting
Documentation for
Cancellations and Returns

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

**Step 5: U.S. Adjustment**

Galvasid, S.A. de C.V.

U.S. Adjustment during the POI
(July 2023 to June 2024)

| Month | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|---|---|---|---|
| 2023-07 | | | |
| 2023-08 | | | |
| 2023-09 | | | |
| 2023-10 | | | |
| 2023-11 | | | |
| 2023-12 | | | |
| 2024-01 | | | |
| 2024-02 | | | |
| **2024-03** | | | |
| **2024-04** | | | |
| 2024-05 | | | |
| 2024-06 | | | |
| Total | | | |

Public Version

Galvasid, S.A. de C.V.

U.S. Adjustments (March 2024)

| No. | Credit Invoice Number | Credit Invoice Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|-----|-----------------------|---------------------|---------------|---------------|------------|---------------|----------------------|----------------------|
|     |                       |                     |               |               |            |               |                      |                      |

Public Version

| No. | Credit Invoice Number | Credit Invoice Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Public Version

| No. | Credit Invoice Number | Credit Invoice Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|
|     |     |     |     |     |     |     |     |     |

Public Version

| No. | Credit Invoice Number | Credit Invoice Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|
|  |  |  |  |  |  |  |  |  |

Public Version

| No. | Credit Invoice Number | Credit Invoice Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|-----|----------------------|---------------------|---------------|---------------|------------|---------------|----------------------|----------------------|
|     |                      |                     |               |               |            |               |                      |                      |

Public Version

Galvasid, S.A. de C.V.

U.S. Adjustments (April 2024)

| No. | Invoice Number | Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|-----|----------------|------|---------------|---------------|------------|---------------|----------------------|----------------------|
|     |                |      |               |               |            |               |                      |                      |

Public Version

| No. | Invoice Number | Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|-----|----------------|------|---------------|---------------|------------|---------------|---------------------|----------------------|
|     |                |      |               |               |            |               |                     |                      |

Public Version

| No. | Invoice Number | Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|-----|----------------|------|---------------|---------------|------------|---------------|----------------------|----------------------|
|     |                |      |               |               |            |               |                      |                      |

Public Version

| No. | Invoice Number | Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|-----|----------------|------|---------------|--------------|-----------|---------------|----------------------|----------------------|
|     |                |      |               |              |           |               |                      |                      |

Public Version

| No. | Invoice Number | Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|-----|----------------|------|---------------|---------------|------------|---------------|----------------------|----------------------|
| | | | | | | | | |

Public Version

Galvasid, S.A. de C.V.

U.S. Adjustments (July 2024)

| No. | Original Invoice Number | Original Invoice Date | Credit Invoice Number | Credit Invoice Date | Customer Name | Material Code | CR/DR memo | Quantity (MT) | Value (Thousand USD) | Value (Thousand MXP) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |

Public Version

Step 5

U.S. Adjustments: Early
Payment Discounts
Example 1

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

Step 5

U.S. Adjustments: Early
Payment Discounts
Example 2

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

Step 5

U.S. Adjustments: Claims

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(4 PAGES)**

Step 5

U.S. Adjustments: Unadjusted
Billing Adjustment

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(4 PAGES)**

# Step 5

## U.S. Adjustments: Commercial Discounts

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

Step 5

U.S. Adjustments: Returns of CORE
Sales After the Period of
Investigation for Sales Made During
the Period of Investigation

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

Tab 11

Galvasid's Supplemental Section D Questionnaire Response
(March 20, 2025)

PR-328, CR-537, 544

Case No. A-201-863
Total Pages: 364
Investigation
AD/CVD Enforcement Office VIII
Proprietary Information Removed
 from Pages 1, 9, 11-13, 17,
 24-26, and 28, and from
 Appendices S3B-1 to SD-1
 and SD-3 to  SD-13
Public Version

|  | ) |  |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| LESS-THAN-FAIR-VALUE INVESTIGATION | ) | **Public Version** |
| OF CERTAIN CORROSION-RESISTANT | ) | |
| STEEL PRODUCTS FROM MEXICO | ) | |
| | ) | |

RESPONSE OF GALVASID, S.A. DE C.V. TO THE DEPARTMENT'S
FEBRUARY 27 SUPPLEMENTAL QUESTIONNAIRE

WINTON & CHAPMAN PLLC
1100 13th St., N.W., Suite 825
Washington, D.C. 20005
(202) 774-5500

Counsel to Galvasid S.A. de C.V.

March 20, 2025

This submission is filed on behalf of Galvasid S.A. de C.V. ("Galvasid"), in response to the Department's February 27 supplemental questionnaire in the antidumping duty investigation of Certain Corrosion-Resistant Steel Products from Mexico. For the Department's reference, each of the questions from the supplemental questionnaire is set forth below, followed by Galvasid's response.

In the course of the preparation of this response, Galvasid discovered the following minor errors in its previous submissions.

(1)  Due to an inadvertent calculation error, Galvasid incorrectly treated products with a width less than 5 inches (12.7 centimeters) as non-subject merchandise, when the scope actually excludes only products with a width less than 0.5 inches (12.7 millimeters). The inclusion of the incorrectly excluded products (i) increases Galvasid's reported home-market sales by [      ] metric tons, which represents [      ] percent ([          ]) of the total quantity of home-market sales for the period of investigation; (ii) increases Galvasid's reported U.S. sales by [      ] metric tons, which represents [      ] percent ([          ]) of the total quantity of U.S. sales the period of investigation; and (iii) increases Galvasid's reported production quantities for subject CORE products by [      ] metric tons, which represents [      ] percent ([          ]) of the total production of CORE products during the period of investigation.

(2)  Due to human error, the characteristics reported in the CQUALH, CSTRENH, CTHICKH, and CWIDTHH fields were revised.[1]

---

[1] In accordance with the instructions of the Department's February 6 questionnaire, Galvasid reclassified certain overrun products from non-prime to prime. Due to this reclassification, the

*(footnote continued on following page)*

LIST OF APPENDICES

S3B-1: Revised Home-Market Sales File

S3B-2: Computer File Format Description

S3C-1: Revised U.S. Sales File

S3C-2: Computer File Format Description

SD-1: Revised Cost Data File

SD-2: Revised Computer File Format Description

SD-3: Revised Inputs

    A. Revised D-4-B-1 and D-4-B-2 (Purchases of Major Inputs from Affiliated Suppliers)
    B. Revised D-4-E and D-4-F (Quarterly Costs)

SD-4: Inventory Reconciliations

    A. Revised D-4-C (Inventory Movement Schedule of Three Most Significant Inputs)
    B. Reconciliation of Beginning and Ending Inventory Quantities to Accounting System
    C. Reconciliation of December 2023 Ending Inventory Value to Accounting System and Balance Sheet
    D. Reconciliation of Total Purchase and Consumption Quantity and Value to Accounting System

SD-5: Calculation Worksheet for Percentage of Total Cost of Manufacturing

SD-6: Revised D-12 (Calculation of Variances for the Period of Investigation)

SD-7: Supporting Documentation of Transactions with Alumacero

    A. Worksheet of Expenses Incurred by Galvasid for Transactions with Alumacero
    B. Alumacero Tax Return for 2023
    C. Supporting Documentation of [    ] Expenses in Reported Costs

SD-8: Revised D-17-A (Galvasid's Trial Balance for 2023)

SD-9: Supporting Documentation for Cost of Goods Sold Reconciliation

    A. Revised D-16 (Cost of Goods Sold Reconciliation Worksheet)
    B. Supporting Documentation for Price Variances Allocated Account

SD-10:  Supporting Documentation for Cost Buildup

      A.   Calculation Worksheet for Cost Elements
      B.   Calculation Worksheet for Previous Cost Element Ratios

SD-11:  G&A Expense Ratio

      A.   Revised D-14 (G&A Expense Ratio Worksheet)
      B.   Reconciliation of G&A Expenses to 2023 Financial Statements

SD-12:  Financial Expense Ratio

SD-13:  Supporting Documentation for Other Direct Materials Cost in Cost Database

Appendix S3C-1

Revised U.S. Sales File

### The CONTENTS Procedure

| | | | |
|---|---|---|---|
| Data Set Name | GALVASID.GALVASIDUS03 | Observations | 7784 |
| Member Type | DATA | Variables | 53 |
| Engine | V9 | Indexes | 0 |
| Created | 03/19/2025 18:08:05 | Observation Length | 408 |
| Last Modified | 03/19/2025 18:08:05 | Deleted Observations | 0 |
| Protection | | Compressed | NO |
| Data Set Type | | Sorted | YES |
| Label | | | |
| Data Representation | WINDOWS_32 | | |
| Encoding | wlatin1  Western (Windows) | | |

### Engine/Host Dependent Information

| | |
|---|---|
| Data Set Page Size | 65536 |
| Number of Data Set Pages | 49 |
| First Data Page | 1 |
| Max Obs per Page | 160 |
| Obs in First Data Page | 144 |
| Number of Data Set Repairs | 0 |
| ExtendObsCounter | YES |
| Filename | c:\galvasidus03.sas7bdat |
| Release Created | 9.0401M7 |
| Host Created | W32_10PRO |
| File Size | 3MB |
| File Size (bytes) | 3276800 |

### Alphabetic List of Variables and Attributes

| # | Variable | Type | Len | Format | Informat |
|---|---|---|---|---|---|
| 49 | BANKCHARU | Num | 8 | COMMA8.2 | |
| 33 | BILLADJU | Num | 8 | COMMA8.2 | |
| 20 | CCUSCODU | Char | 10 | $10. | $10. |
| 22 | CHANNELU | Num | 8 | | |
| 9 | CMETALU | Char | 3 | $3. | |
| 35 | COMMDISCU | Num | 8 | COMMA8.2 | |
| 43 | COMMU | Num | 8 | COMMA8.2 | |
| 3 | CONNUMU | Char | 28 | $28. | $28. |
| 18 | CONSIGNU | Char | 2 | $2. | $2. |
| 11 | CPROCESU | Char | 2 | $2. | $2. |
| 12 | CQUALU | Char | 2 | $2. | $2. |
| 46 | CREDITU | Num | 8 | COMMA8.2 | |
| 13 | CSTRENU | Char | 1 | $1. | $1. |
| 14 | CTHICKU | Char | 3 | $3. | |
| 7 | CTYPEU | Char | 2 | $2. | $2. |
| 21 | CUSCATU | Num | 8 | | |
| 19 | CUSCODU | Char | 10 | $10. | $10. |
| 10 | CWEIGHTU | Char | 2 | $2. | $2. |
| 15 | CWIDTHU | Char | 1 | $1. | $1. |
| 38 | DBROKU | Num | 8 | COMMA8.2 | |
| 41 | DESTU | Char | 5 | $5. | $5. |
| 50 | DINDIRSU | Num | 8 | COMMA8.2 | |

### The CONTENTS Procedure

### Alphabetic List of Variables and Attributes

| #  | Variable   | Type | Len | Format    | Informat |
|----|------------|------|-----|-----------|----------|
| 37 | DINLFTPU   | Num  | 8   | COMMA8.2  |          |
| 51 | DINVCARU   | Num  | 8   | COMMA8.2  |          |
| 34 | EARLPYU    | Num  | 8   | COMMA8.2  |          |
| 16 | FORMU      | Char | 1   | $1.       | $1.      |
| 32 | GRSUPRU    | Num  | 8   | COMMA8.2  |          |
| 40 | INTNFRU    | Num  | 8   | COMMA8.2  |          |
| 25 | INVOICEU   | Char | 9   | $9.       | $9.      |
| 36 | LOTU       | Num  | 8   |           |          |
| 53 | MFRU       | Char | 8   | $8.       | $8.      |
| 4  | OVERRUNU   | Char | 1   | $1.       | $1.      |
| 52 | PACKU      | Num  | 8   | COMMA8.2  |          |
| 27 | PAYDATEU   | Num  | 8   | YYMMDD10. | DATE9.   |
| 29 | PAYTERMU   | Num  | 8   |           |          |
| 5  | PRIMEU     | Num  | 8   |           |          |
| 2  | PRODCODU   | Char | 37  | $37.      | $37.     |
| 30 | QTYU       | Num  | 8   | COMMA8.2  |          |
| 31 | QTYUNITU   | Char | 2   | $2.       | $2.      |
| 8  | ROLLU      | Char | 2   | $2.       | $2.      |
| 24 | SALEDATU   | Num  | 8   | YYMMDD10. |          |
| 28 | SALETERU   | Num  | 8   |           |          |
| 17 | SALEU      | Char | 2   | $2.       | $2.      |
| 23 | SALINDTU   | Num  | 8   | YYMMDD10. |          |
| 44 | SELAGENU   | Char | 2   | $2.       | $2.      |
| 45 | SELARELU   | Char | 1   | $1.       | $1.      |
| 1  | SEQU       | Num  | 8   |           |          |
| 26 | SHIPDATU   | Num  | 8   | YYMMDD10. |          |
| 6  | SPECU      | Char | 43  | $43.      | $43.     |
| 42 | STATEU     | Char | 2   | $2.       | $2.      |
| 39 | USBROKU    | Num  | 8   | COMMA8.2  |          |
| 47 | WARRU      | Num  | 8   | COMMA8.2  |          |
| 48 | WRONGWARRU | Num  | 8   | COMMA8.2  |          |

The CONTENTS Procedure

Variables in Creation Order

| # | Variable | Type | Len | Format | Informat |
|---|----------|------|-----|--------|----------|
| 1 | SEQU | Num | 8 | | |
| 2 | PRODCODU | Char | 37 | $37. | $37. |
| 3 | CONNUMU | Char | 28 | $28. | $28. |
| 4 | OVERRUNU | Char | 1 | $1. | $1. |
| 5 | PRIMEU | Num | 8 | | |
| 6 | SPECU | Char | 43 | $43. | $43. |
| 7 | CTYPEU | Char | 2 | $2. | $2. |
| 8 | ROLLU | Char | 2 | $2. | $2. |
| 9 | CMETALU | Char | 3 | $3. | |
| 10 | CWEIGHTU | Char | 2 | $2. | $2. |
| 11 | CPROCESU | Char | 2 | $2. | $2. |
| 12 | CQUALU | Char | 2 | $2. | $2. |
| 13 | CSTRENU | Char | 1 | $1. | $1. |
| 14 | CTHICKU | Char | 3 | $3. | |
| 15 | CWIDTHU | Char | 1 | $1. | $1. |
| 16 | FORMU | Char | 1 | $1. | $1. |
| 17 | SALEU | Char | 2 | $2. | $2. |
| 18 | CONSIGNU | Char | 2 | $2. | $2. |
| 19 | CUSCODU | Char | 10 | $10. | $10. |
| 20 | CCUSCODU | Char | 10 | $10. | $10. |
| 21 | CUSCATU | Num | 8 | | |
| 22 | CHANNELU | Num | 8 | | |
| 23 | SALINDTU | Num | 8 | YYMMDD10. | |
| 24 | SALEDATU | Num | 8 | YYMMDD10. | |
| 25 | INVOICEU | Char | 9 | $9. | $9. |
| 26 | SHIPDATU | Num | 8 | YYMMDD10. | |
| 27 | PAYDATEU | Num | 8 | YYMMDD10. | DATE9. |
| 28 | SALETERU | Num | 8 | | |
| 29 | PAYTERMU | Num | 8 | | |
| 30 | QTYU | Num | 8 | COMMA8.2 | |
| 31 | QTYUNITU | Char | 2 | $2. | $2. |
| 32 | GRSUPRU | Num | 8 | COMMA8.2 | |
| 33 | BILLADJU | Num | 8 | COMMA8.2 | |
| 34 | EARLPYU | Num | 8 | COMMA8.2 | |
| 35 | COMMDISCU | Num | 8 | COMMA8.2 | |
| 36 | LOTU | Num | 8 | | |
| 37 | DINLFTPU | Num | 8 | COMMA8.2 | |
| 38 | DBROKU | Num | 8 | COMMA8.2 | |
| 39 | USBROKU | Num | 8 | COMMA8.2 | |
| 40 | INTNFRU | Num | 8 | COMMA8.2 | |
| 41 | DESTU | Char | 5 | $5. | $5. |
| 42 | STATEU | Char | 2 | $2. | $2. |
| 43 | COMMU | Num | 8 | COMMA8.2 | |
| 44 | SELAGENU | Char | 2 | $2. | $2. |
| 45 | SELARELU | Char | 1 | $1. | $1. |
| 46 | CREDITU | Num | 8 | COMMA8.2 | |
| 47 | WARRU | Num | 8 | COMMA8.2 | |
| 48 | WRONGWARRU | Num | 8 | COMMA8.2 | |
| 49 | BANKCHARU | Num | 8 | COMMA8.2 | |
| 50 | DINDIRSU | Num | 8 | COMMA8.2 | |
| 51 | DINVCARU | Num | 8 | COMMA8.2 | |

**The CONTENTS Procedure**

**Variables in Creation Order**

| #  | Variable | Type | Len | Format   | Informat |
|----|----------|------|-----|----------|----------|
| 52 | PACKU    | Num  | 8   | COMMA8.2 |          |
| 53 | MFRU     | Char | 8   | $8.      | $8.      |

**Sort Information**

| | |
|---|---|
| Sortedby | SEQU |
| Validated | YES |
| Character Set | ANSI |

| SEQU | PRODCODU | CONNUMU | OVERRUNU | PRIMEU | SPECU | CTYPEU | ROLLU |
|------|----------|---------|----------|--------|-------|--------|-------|
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |

| SEQU | CMETALU | CWEIGHTU | CPROCESU | CQUALU | CSTRENU | CTHICKU | CWIDTHU | FORMU | SALEU | CONSIGNU | CUSCODU | CCUSCODU | CUSCATU | CHANNELU | SALINDTU | SALEDATU |
|------|---------|----------|----------|--------|---------|---------|---------|-------|-------|----------|---------|----------|---------|----------|----------|----------|
| 1 | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | | |

| SEQU | INVOICEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU | QTYUNITU | GRSUPRU | BILLADJU | EARLPYU | COMMDISCU | LOTU | DINLFTPU | DBROKU | USBROKU |
|------|----------|----------|----------|----------|----------|------|----------|---------|----------|---------|-----------|------|----------|--------|---------|
| 1 | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | |

| SEQU | INTNFRU | DESTU | STATEU | COMMU | SELAGENU | SELARELU | CREDITU | WARRU | WRONGWARRU | BANKCHARU | DINDIRSU | DINVCARU | PACKU | MFRU |
|------|---------|-------|--------|-------|----------|----------|---------|-------|------------|-----------|----------|----------|-------|------|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | |

*** PUBLIC VERSION ***

CERTAIN CORROSION RESISTANT STEEL PRODUCTS FROM MEXICO (A-201-863)- GALVASID
POI:  07/01/23 through 06/30/24
U.S. SALES FILE: GALVASIDUS03.SAS7BDAT

2

| SEQU | PRODCODU | CONNUMU | OVERRUNU | PRIMEU | SPECU | CTYPEU | ROLLU |
|---|---|---|---|---|---|---|---|
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |
| 17 | | | | | | | |
| 18 | | | | | | | |
| 19 | | | | | | | |
| 20 | | | | | | | |
| 21 | | | | | | | |
| 22 | | | | | | | |

| SEQU | CMETALU | CWEIGHTU | CPROCESU | CQUALU | CSTRENU | CTHICKU | CWIDTHU | FORMU | SALEU | CONSIGNU | CUSCODU | CCUSCODU | CUSCATU | CHANNELU | SALINDTU | SALEDATU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | | |

| SEQU | INVOICEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU | QTYUNITU | GRSUPRU | BILLADJU | EARLPYU | COMMDISCU | LOTU | DINLFTPU | DBROKU | USBROKU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | |

| SEQU | INTNFRU | DESTU | STATEU | COMMU | SELAGENU | SELARELU | CREDITU | WARRU | WRONGWARRU | BANKCHARU | DINDIRSU | DINVCARU | PACKU | MFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | |

*** PUBLIC VERSION ***

| SEQU | PRODCODU | CONNUMU | OVERRUNU | PRIMEU | SPECU | CTYPEU | ROLLU |
|------|----------|---------|----------|--------|-------|--------|-------|
| 23 | | | | | | | |
| 24 | | | | | | | |
| 25 | | | | | | | |
| 26 | | | | | | | |
| 27 | | | | | | | |
| 28 | | | | | | | |
| 29 | | | | | | | |
| 30 | | | | | | | |
| 31 | | | | | | | |
| 32 | | | | | | | |
| 33 | | | | | | | |

| SEQU | CMETALU | CWEIGHTU | CPROCESU | CQUALU | CSTRENU | CTHICKU | CWIDTHU | FORMU | SALEU | CONSIGNU | CUSCODU | CCUSCODU | CUSCATU | CHANNELU | SALINDTU | SALEDATU |
|------|---------|----------|----------|--------|---------|---------|---------|-------|-------|----------|---------|----------|---------|----------|----------|----------|
| 23 | | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | | | |
| 32 | | | | | | | | | | | | | | | | |
| 33 | | | | | | | | | | | | | | | | |

| SEQU | INVOICEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU | QTYUNITU | GRSUPRU | BILLADJU | EARLPYU | COMMDISCU | LOTU | DINLFTPU | DBROKU | USBROKU |
|------|----------|----------|----------|----------|----------|------|----------|---------|----------|---------|-----------|------|----------|--------|---------|
| 23 | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | | |
| 32 | | | | | | | | | | | | | | | |
| 33 | | | | | | | | | | | | | | | |

| SEQU | INTNFRU | DESTU | STATEU | COMMU | SELAGENU | SELARELU | CREDITU | WARRU | WRONGWARRU | BANKCHARU | DINDIRSU | DINVCARU | PACKU | MFRU |
|------|---------|-------|--------|-------|----------|----------|---------|-------|------------|-----------|----------|----------|-------|------|
| 23 | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | |
| 32 | | | | | | | | | | | | | | |
| 33 | | | | | | | | | | | | | | |

*** PUBLIC VERSION ***

CERTAIN CORROSION RESISTANT STEEL PRODUCTS FROM MEXICO (A-201-863)- GALVASID
POI:  07/01/23 through 06/30/24
U.S. SALES FILE: GALVASIDUS03.SAS7BDAT

4

| SEQU | PRODCODU | CONNUMU | OVERRUNU | PRIMEU | SPECU | CTYPEU | ROLLU |
|------|----------|---------|----------|--------|-------|--------|-------|
| 3876 | | | | | | | |
| 3877 | | | | | | | |
| 3878 | | | | | | | |
| 3879 | | | | | | | |
| 3880 | | | | | | | |
| 3881 | | | | | | | |
| 3882 | | | | | | | |
| 3883 | | | | | | | |
| 3884 | | | | | | | |
| 3885 | | | | | | | |
| 3886 | | | | | | | |

| SEQU | CMETALU | CWEIGHTU | CPROCESU | CQUALU | CSTRENU | CTHICKU | CWIDTHU | FORMU | SALEU | CONSIGNU | CUSCODU | CCUSCODU | CUSCATU | CHANNELU | SALINDTU | SALEDATU |
|------|---------|----------|----------|--------|---------|---------|---------|-------|-------|----------|---------|----------|---------|----------|----------|----------|
| 3876 | | | | | | | | | | | | | | | | |
| 3877 | | | | | | | | | | | | | | | | |
| 3878 | | | | | | | | | | | | | | | | |
| 3879 | | | | | | | | | | | | | | | | |
| 3880 | | | | | | | | | | | | | | | | |
| 3881 | | | | | | | | | | | | | | | | |
| 3882 | | | | | | | | | | | | | | | | |
| 3883 | | | | | | | | | | | | | | | | |
| 3884 | | | | | | | | | | | | | | | | |
| 3885 | | | | | | | | | | | | | | | | |
| 3886 | | | | | | | | | | | | | | | | |

| SEQU | INVOICEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU | QTYUNITU | GRSUPRU | BILLADJU | EARLPYU | COMMDISCU | LOTU | DINLFTPU | DBROKU | USBROKU |
|------|----------|----------|----------|----------|----------|------|----------|---------|----------|---------|-----------|------|----------|--------|---------|
| 3876 | | | | | | | | | | | | | | | |
| 3877 | | | | | | | | | | | | | | | |
| 3878 | | | | | | | | | | | | | | | |
| 3879 | | | | | | | | | | | | | | | |
| 3880 | | | | | | | | | | | | | | | |
| 3881 | | | | | | | | | | | | | | | |
| 3882 | | | | | | | | | | | | | | | |
| 3883 | | | | | | | | | | | | | | | |
| 3884 | | | | | | | | | | | | | | | |
| 3885 | | | | | | | | | | | | | | | |
| 3886 | | | | | | | | | | | | | | | |

| SEQU | INTNFRU | DESTU | STATEU | COMMU | SELAGENU | SELARELU | CREDITU | WARRU | WRONGWARRU | BANKCHARU | DINDIRSU | DINVCARU | PACKU | MFRU |
|------|---------|-------|--------|-------|----------|----------|---------|-------|------------|-----------|----------|----------|-------|------|
| 3876 | | | | | | | | | | | | | | |
| 3877 | | | | | | | | | | | | | | |
| 3878 | | | | | | | | | | | | | | |
| 3879 | | | | | | | | | | | | | | |
| 3880 | | | | | | | | | | | | | | |
| 3881 | | | | | | | | | | | | | | |
| 3882 | | | | | | | | | | | | | | |
| 3883 | | | | | | | | | | | | | | |
| 3884 | | | | | | | | | | | | | | |
| 3885 | | | | | | | | | | | | | | |
| 3886 | | | | | | | | | | | | | | |

*** PUBLIC VERSION ***

| SEQU | PRODCODU | CONNUMU | OVERRUNU | PRIMEU | SPECU | CTYPEU | ROLLU |
|------|----------|---------|----------|--------|-------|--------|-------|
| 3887 | | | | | | | |
| 3888 | | | | | | | |
| 3889 | | | | | | | |
| 3890 | | | | | | | |
| 3891 | | | | | | | |
| 3892 | | | | | | | |
| 3893 | | | | | | | |
| 3894 | | | | | | | |
| 3895 | | | | | | | |
| 3896 | | | | | | | |
| 3897 | | | | | | | |

| SEQU | CMETALU | CWEIGHTU | CPROCESU | CQUALU | CSTRENU | CTHICKU | CWIDTHU | FORMU | SALEU | CONSIGNU | CUSCODU | CCUSCODU | CUSCATU | CHANNELU | SALINDTU | SALEDATU |
|------|---------|----------|----------|--------|---------|---------|---------|-------|-------|----------|---------|----------|---------|----------|----------|----------|
| 3887 | | | | | | | | | | | | | | | | |
| 3888 | | | | | | | | | | | | | | | | |
| 3889 | | | | | | | | | | | | | | | | |
| 3890 | | | | | | | | | | | | | | | | |
| 3891 | | | | | | | | | | | | | | | | |
| 3892 | | | | | | | | | | | | | | | | |
| 3893 | | | | | | | | | | | | | | | | |
| 3894 | | | | | | | | | | | | | | | | |
| 3895 | | | | | | | | | | | | | | | | |
| 3896 | | | | | | | | | | | | | | | | |
| 3897 | | | | | | | | | | | | | | | | |

| SEQU | INVOICEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU | QTYUNITU | GRSUPRU | BILLADJU | EARLPYU | COMMDISCU | LOTU | DINLFTPU | DBROKU | USBROKU |
|------|----------|----------|----------|----------|----------|------|----------|---------|----------|---------|-----------|------|----------|--------|---------|
| 3887 | | | | | | | | | | | | | | | |
| 3888 | | | | | | | | | | | | | | | |
| 3889 | | | | | | | | | | | | | | | |
| 3890 | | | | | | | | | | | | | | | |
| 3891 | | | | | | | | | | | | | | | |
| 3892 | | | | | | | | | | | | | | | |
| 3893 | | | | | | | | | | | | | | | |
| 3894 | | | | | | | | | | | | | | | |
| 3895 | | | | | | | | | | | | | | | |
| 3896 | | | | | | | | | | | | | | | |
| 3897 | | | | | | | | | | | | | | | |

| SEQU | INTNFRU | DESTU | STATEU | COMMU | SELAGENU | SELARELU | CREDITU | WARRU | WRONGWARRU | BANKCHARU | DINDIRSU | DINVCARU | PACKU | MFRU |
|------|---------|-------|--------|-------|----------|----------|---------|-------|------------|-----------|----------|----------|-------|------|
| 3887 | | | | | | | | | | | | | | |
| 3888 | | | | | | | | | | | | | | |
| 3889 | | | | | | | | | | | | | | |
| 3890 | | | | | | | | | | | | | | |
| 3891 | | | | | | | | | | | | | | |
| 3892 | | | | | | | | | | | | | | |
| 3893 | | | | | | | | | | | | | | |
| 3894 | | | | | | | | | | | | | | |
| 3895 | | | | | | | | | | | | | | |
| 3896 | | | | | | | | | | | | | | |
| 3897 | | | | | | | | | | | | | | |

*** PUBLIC VERSION ***

CERTAIN CORROSION RESISTANT STEEL PRODUCTS FROM MEXICO (A-201-863)- GALVASID
POI:  07/01/23 through 06/30/24
U.S. SALES FILE: GALVASIDUS03.SAS7BDAT

6

| SEQU | PRODCODU | CONNUMU | OVERRUNU | PRIMEU | SPECU | CTYPEU | ROLLU |
|------|----------|---------|----------|--------|-------|--------|-------|
| 3898 | | | | | | | |
| 3899 | | | | | | | |
| 3900 | | | | | | | |
| 3901 | | | | | | | |
| 3902 | | | | | | | |
| 3903 | | | | | | | |
| 3904 | | | | | | | |
| 3905 | | | | | | | |
| 3906 | | | | | | | |
| 3907 | | | | | | | |
| 3908 | | | | | | | |

| SEQU | CMETALU | CWEIGHTU | CPROCESU | CQUALU | CSTRENU | CTHICKU | CWIDTHU | FORMU | SALEU | CONSIGNU | CUSCODU | CCUSCODU | CUSCATU | CHANNELU | SALINDTU | SALEDATU |
|------|---------|----------|----------|--------|---------|---------|---------|-------|-------|----------|---------|----------|---------|----------|----------|----------|
| 3898 | | | | | | | | | | | | | | | | |
| 3899 | | | | | | | | | | | | | | | | |
| 3900 | | | | | | | | | | | | | | | | |
| 3901 | | | | | | | | | | | | | | | | |
| 3902 | | | | | | | | | | | | | | | | |
| 3903 | | | | | | | | | | | | | | | | |
| 3904 | | | | | | | | | | | | | | | | |
| 3905 | | | | | | | | | | | | | | | | |
| 3906 | | | | | | | | | | | | | | | | |
| 3907 | | | | | | | | | | | | | | | | |
| 3908 | | | | | | | | | | | | | | | | |

| SEQU | INVOICEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU | QTYUNITU | GRSUPRU | BILLADJU | EARLPYU | COMMDISCU | LOTU | DINLFTPU | DBROKU | USBROKU |
|------|----------|----------|----------|----------|----------|------|----------|---------|----------|---------|-----------|------|----------|--------|---------|
| 3898 | | | | | | | | | | | | | | | |
| 3899 | | | | | | | | | | | | | | | |
| 3900 | | | | | | | | | | | | | | | |
| 3901 | | | | | | | | | | | | | | | |
| 3902 | | | | | | | | | | | | | | | |
| 3903 | | | | | | | | | | | | | | | |
| 3904 | | | | | | | | | | | | | | | |
| 3905 | | | | | | | | | | | | | | | |
| 3906 | | | | | | | | | | | | | | | |
| 3907 | | | | | | | | | | | | | | | |
| 3908 | | | | | | | | | | | | | | | |

| SEQU | INTNFRU | DESTU | STATEU | COMMU | SELAGENU | SELARELU | CREDITU | WARRU | WRONGWARRU | BANKCHARU | DINDIRSU | DINVCARU | PACKU | MFRU |
|------|---------|-------|--------|-------|----------|----------|---------|-------|------------|-----------|----------|----------|-------|------|
| 3898 | | | | | | | | | | | | | | |
| 3899 | | | | | | | | | | | | | | |
| 3900 | | | | | | | | | | | | | | |
| 3901 | | | | | | | | | | | | | | |
| 3902 | | | | | | | | | | | | | | |
| 3903 | | | | | | | | | | | | | | |
| 3904 | | | | | | | | | | | | | | |
| 3905 | | | | | | | | | | | | | | |
| 3906 | | | | | | | | | | | | | | |
| 3907 | | | | | | | | | | | | | | |
| 3908 | | | | | | | | | | | | | | |

*** PUBLIC VERSION ***

CERTAIN CORROSION RESISTANT STEEL PRODUCTS FROM MEXICO (A-201-863)- GALVASID
POI:  07/01/23 through 06/30/24
U.S. SALES FILE: GALVASIDUS03.SAS7BDAT

7

| SEQU | PRODCODU | CONNUMU | OVERRUNU | PRIMEU | SPECU | CTYPEU | ROLLU |
|------|----------|---------|----------|--------|-------|--------|-------|
| 7752 | | | | | | | |
| 7753 | | | | | | | |
| 7754 | | | | | | | |
| 7755 | | | | | | | |
| 7756 | | | | | | | |
| 7757 | | | | | | | |
| 7758 | | | | | | | |
| 7759 | | | | | | | |
| 7760 | | | | | | | |
| 7761 | | | | | | | |
| 7762 | | | | | | | |

| SEQU | CMETALU | CWEIGHTU | CPROCESU | CQUALU | CSTRENU | CTHICKU | CWIDTHU | FORMU | SALEU | CONSIGNU | CUSCODU | CCUSCODU | CUSCATU | CHANNELU | SALINDTU | SALEDATU |
|------|---------|----------|----------|--------|---------|---------|---------|-------|-------|----------|---------|----------|---------|----------|----------|----------|
| 7752 | | | | | | | | | | | | | | | | |
| 7753 | | | | | | | | | | | | | | | | |
| 7754 | | | | | | | | | | | | | | | | |
| 7755 | | | | | | | | | | | | | | | | |
| 7756 | | | | | | | | | | | | | | | | |
| 7757 | | | | | | | | | | | | | | | | |
| 7758 | | | | | | | | | | | | | | | | |
| 7759 | | | | | | | | | | | | | | | | |
| 7760 | | | | | | | | | | | | | | | | |
| 7761 | | | | | | | | | | | | | | | | |
| 7762 | | | | | | | | | | | | | | | | |

| SEQU | INVOICEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU | QTYUNITU | GRSUPRU | BILLADJU | EARLPYU | COMMDISCU | LOTU | DINLFTPU | DBROKU | USBROKU |
|------|----------|----------|----------|----------|----------|------|----------|---------|----------|---------|-----------|------|----------|--------|---------|
| 7752 | | | | | | | | | | | | | | | |
| 7753 | | | | | | | | | | | | | | | |
| 7754 | | | | | | | | | | | | | | | |
| 7755 | | | | | | | | | | | | | | | |
| 7756 | | | | | | | | | | | | | | | |
| 7757 | | | | | | | | | | | | | | | |
| 7758 | | | | | | | | | | | | | | | |
| 7759 | | | | | | | | | | | | | | | |
| 7760 | | | | | | | | | | | | | | | |
| 7761 | | | | | | | | | | | | | | | |
| 7762 | | | | | | | | | | | | | | | |

| SEQU | INTNFRU | DESTU | STATEU | COMMU | SELAGENU | SELARELU | CREDITU | WARRU | WRONGWARRU | BANKCHARU | DINDIRSU | DINVCARU | PACKU | MFRU |
|------|---------|-------|--------|-------|----------|----------|---------|-------|------------|-----------|----------|----------|-------|------|
| 7752 | | | | | | | | | | | | | | |
| 7753 | | | | | | | | | | | | | | |
| 7754 | | | | | | | | | | | | | | |
| 7755 | | | | | | | | | | | | | | |
| 7756 | | | | | | | | | | | | | | |
| 7757 | | | | | | | | | | | | | | |
| 7758 | | | | | | | | | | | | | | |
| 7759 | | | | | | | | | | | | | | |
| 7760 | | | | | | | | | | | | | | |
| 7761 | | | | | | | | | | | | | | |
| 7762 | | | | | | | | | | | | | | |

*** PUBLIC VERSION ***

CERTAIN CORROSION RESISTANT STEEL PRODUCTS FROM MEXICO (A-201-863)- GALVASID
POI:  07/01/23 through 06/30/24
U.S. SALES FILE: GALVASIDUS03.SAS7BDAT

8

| SEQU | PRODCODU | CONNUMU | OVERRUNU | PRIMEU | SPECU | CTYPEU | ROLLU |
|------|----------|---------|----------|--------|-------|--------|-------|
| 7763 | | | | | | | |
| 7764 | | | | | | | |
| 7765 | | | | | | | |
| 7766 | | | | | | | |
| 7767 | | | | | | | |
| 7768 | | | | | | | |
| 7769 | | | | | | | |
| 7770 | | | | | | | |
| 7771 | | | | | | | |
| 7772 | | | | | | | |
| 7773 | | | | | | | |

| SEQU | CMETALU | CWEIGHTU | CPROCESU | CQUALU | CSTRENU | CTHICKU | CWIDTHU | FORMU | SALEU | CONSIGNU | CUSCODU | CCUSCODU | CUSCATU | CHANNELU | SALINDTU | SALEDATU |
|------|---------|----------|----------|--------|---------|---------|---------|-------|-------|----------|---------|----------|---------|----------|----------|----------|
| 7763 | | | | | | | | | | | | | | | | |
| 7764 | | | | | | | | | | | | | | | | |
| 7765 | | | | | | | | | | | | | | | | |
| 7766 | | | | | | | | | | | | | | | | |
| 7767 | | | | | | | | | | | | | | | | |
| 7768 | | | | | | | | | | | | | | | | |
| 7769 | | | | | | | | | | | | | | | | |
| 7770 | | | | | | | | | | | | | | | | |
| 7771 | | | | | | | | | | | | | | | | |
| 7772 | | | | | | | | | | | | | | | | |
| 7773 | | | | | | | | | | | | | | | | |

| SEQU | INVOICEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU | QTYUNITU | GRSUPRU | BILLADJU | EARLPYU | COMMDISCU | LOTU | DINLFTPU | DBROKU | USBROKU |
|------|----------|----------|----------|----------|----------|------|----------|---------|----------|---------|-----------|------|----------|--------|---------|
| 7763 | | | | | | | | | | | | | | | |
| 7764 | | | | | | | | | | | | | | | |
| 7765 | | | | | | | | | | | | | | | |
| 7766 | | | | | | | | | | | | | | | |
| 7767 | | | | | | | | | | | | | | | |
| 7768 | | | | | | | | | | | | | | | |
| 7769 | | | | | | | | | | | | | | | |
| 7770 | | | | | | | | | | | | | | | |
| 7771 | | | | | | | | | | | | | | | |
| 7772 | | | | | | | | | | | | | | | |
| 7773 | | | | | | | | | | | | | | | |

| SEQU | INTNFRU | DESTU | STATEU | COMMU | SELAGENU | SELARELU | CREDITU | WARRU | WRONGWARRU | BANKCHARU | DINDIRSU | DINVCARU | PACKU | MFRU |
|------|---------|-------|--------|-------|----------|----------|---------|-------|------------|-----------|----------|----------|-------|------|
| 7763 | | | | | | | | | | | | | | |
| 7764 | | | | | | | | | | | | | | |
| 7765 | | | | | | | | | | | | | | |
| 7766 | | | | | | | | | | | | | | |
| 7767 | | | | | | | | | | | | | | |
| 7768 | | | | | | | | | | | | | | |
| 7769 | | | | | | | | | | | | | | |
| 7770 | | | | | | | | | | | | | | |
| 7771 | | | | | | | | | | | | | | |
| 7772 | | | | | | | | | | | | | | |
| 7773 | | | | | | | | | | | | | | |

*** PUBLIC VERSION ***

| SEQU | PRODCODU | CONNUMU | OVERRUNU | PRIMEU | SPECU | CTYPEU | ROLLU |
|------|----------|---------|----------|--------|-------|--------|-------|
| 7774 | | | | | | | |
| 7775 | | | | | | | |
| 7776 | | | | | | | |
| 7777 | | | | | | | |
| 7778 | | | | | | | |
| 7779 | | | | | | | |
| 7780 | | | | | | | |
| 7781 | | | | | | | |
| 7782 | | | | | | | |
| 7783 | | | | | | | |
| 7784 | | | | | | | |

| SEQU | CMETALU | CWEIGHTU | CPROCESU | CQUALU | CSTRENU | CTHICKU | CWIDTHU | FORMU | SALEU | CONSIGNU | CUSCODU | CCUSCODU | CUSCATU | CHANNELU | SALINDTU | SALEDATU |
|------|---------|----------|----------|--------|---------|---------|---------|-------|-------|----------|---------|----------|---------|----------|----------|----------|
| 7774 | | | | | | | | | | | | | | | | |
| 7775 | | | | | | | | | | | | | | | | |
| 7776 | | | | | | | | | | | | | | | | |
| 7777 | | | | | | | | | | | | | | | | |
| 7778 | | | | | | | | | | | | | | | | |
| 7779 | | | | | | | | | | | | | | | | |
| 7780 | | | | | | | | | | | | | | | | |
| 7781 | | | | | | | | | | | | | | | | |
| 7782 | | | | | | | | | | | | | | | | |
| 7783 | | | | | | | | | | | | | | | | |
| 7784 | | | | | | | | | | | | | | | | |

| SEQU | INVOICEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU | QTYUNITU | GRSUPRU | BILLADJU | EARLPYU | COMMDISCU | LOTU | DINLFTPU | DBROKU | USBROKU |
|------|----------|----------|----------|----------|----------|------|----------|---------|----------|---------|-----------|------|----------|--------|---------|
| 7774 | | | | | | | | | | | | | | | |
| 7775 | | | | | | | | | | | | | | | |
| 7776 | | | | | | | | | | | | | | | |
| 7777 | | | | | | | | | | | | | | | |
| 7778 | | | | | | | | | | | | | | | |
| 7779 | | | | | | | | | | | | | | | |
| 7780 | | | | | | | | | | | | | | | |
| 7781 | | | | | | | | | | | | | | | |
| 7782 | | | | | | | | | | | | | | | |
| 7783 | | | | | | | | | | | | | | | |
| 7784 | | | | | | | | | | | | | | | |

| SEQU | INTNFRU | DESTU | STATEU | COMMU | SELAGENU | SELARELU | CREDITU | WARRU | WRONGWARRU | BANKCHARU | DINDIRSU | DINVCARU | PACKU | MFRU |
|------|---------|-------|--------|-------|----------|----------|---------|-------|------------|-----------|----------|----------|-------|------|
| 7774 | | | | | | | | | | | | | | |
| 7775 | | | | | | | | | | | | | | |
| 7776 | | | | | | | | | | | | | | |
| 7777 | | | | | | | | | | | | | | |
| 7778 | | | | | | | | | | | | | | |
| 7779 | | | | | | | | | | | | | | |
| 7780 | | | | | | | | | | | | | | |
| 7781 | | | | | | | | | | | | | | |
| 7782 | | | | | | | | | | | | | | |
| 7783 | | | | | | | | | | | | | | |
| 7784 | | | | | | | | | | | | | | |

*** PUBLIC VERSION ***

Appendix S3C-2

Computer File Format Description

Galvasid, S.A. de C.V.

Computer File Format Description
U.S. Sales File

| Market: | Mexico |
|---|---|
| Dataset Name: | galvasidus01 |
| Date Submitted: | 3/20/2025 |

| Field No. | Field Name | Field Description | Currency | Units | Codes |
|---|---|---|---|---|---|
| 0.0 | SEQU | Sequential Number | | | |
| 1.0 | PRODCODU | Complete Product Code | | | |
| 2.0 | CONNUMU | Matching Control Number | | | |
| 2.1 | OVERRUNU | Overruns | | | Y = Yes, the transaction involved overrun merchandise. <br> N = No, the transaction did not involve overrun merchandise. |
| 2.2 | PRIMEU | Prime v.s. Secondary Merchandise | | | 1 = Prime <br> 2 = Non-Prime |
| 2.3 | SPECU | Specification/Grade | | | |
| 3.1 | CTYPEU | Cladding or Coating Type | | | 10 = Clad (metals bonded by the hot-rolling process) <br> 30 = Coated/plated with metal:  Painted, Polyvinylidene Fluoride (PVDF), regardless of whether or not laminated <br> 40 = Coated/plated with metal:  Painted, All Others (i.e., other than PVDF), regardless of whether or not laminated <br> 80 = Coated/plated with metal:   Laminated but not painted <br> 90 = Coated/plated with metal:  Neither painted nor laminated |
| 3.2 | ROLU | Nominal Length of Side Two | | | 10 = Cold rolled <br> 20 = Not cold rolled |
| 3.3 | CMETALU | Clad Material/Coating Metal | | | 010 = Zinc/Iron <br> 020 = Zinc (galvanized) (e.g., ASTM A653, coating designation G30) <br> 024 = Zinc (galvannealed) (e.g., ASTM A653, coating designation ZF180) <br> 040 = Zinc/Magnesium <br> 050 = Zinc/Aluminum/Magnesium (approximately 90% Zn/7% Al/ 3% Mg (e.g., ASTM <br> 060 = Zinc/Aluminum, (approximately 95% Zn/ 5% Al) (e.g., ASTM A875  Type I and ASTM <br> 065 = Zinc/Aluminum (approximately 55% Al/ 45% Zn (e.g., ASTM A792) <br> 080 = Zinc/Nickel (e.g., ASTM A918) <br> 160 = Aluminum (e.g., ASTM A463) <br> 170 = Aluminum/Silicon <br> 180 = Nickel <br> 190 = Iron/Nickel <br> 200 = Brass |
| 3.4 | CWEIGHTHU | Metallic Coating Weight | | | 10 = < 0.28 oz/ft2 (e.g., ASTM A653 coating designation ZF75) <br> 20 = 0.28 to < 0.48 oz/ft2 (e.g., ASTM A653 coating designations G30 and Z90) <br> 30 = 0.48 to < 0.58 oz/ft2 (e.g., ASTM A792 coating designations AZ50) <br> 40 = 0.58 to < 0.78 oz/ft2 (e.g., ASTM A653 coating designations G60 and Z180) <br> 50 = 0.78 to < 1.10 oz/ft2 (e.g., ASTM A653 coating designations G90 and Z275) <br> 60 = 1.10 to < 1.60 oz/ft2 (e.g., ASTM A653 coating designations G115) <br> 70 = 1.60 to < 2.10 oz/ft2 (e.g., ASTM A653 coating designation Z550) <br> 80 = > 2.10 oz/ft2 (e.g., ASTM A653 coating designations G300 and Z900) |
| 3.5 | CPROCESU | Metallic Coating Process | | | 10 = Hot-dipped <br> 20 = Electrolytically Coated <br> 40 =Clad |
| 3.6 | CQUALU | Quality | | | 30 = Structural (e.g., ASTM A635 designation SS) <br> 40 = Commercial (e.g., ASTM A635 designation CS Type A) <br> 50 = Drawing (whether or not special killed) (e.g., ASTM A635 designation FS Type B) <br> 60 = Bake Hardenable (e.g., ASTM A635 designation BHS) <br> 70 = Deep Drawing Steels (e.g., Deep Drawing Quality, Deep Drawing Quality Special Killed, Extra Deep Drawing Quality, Extra Deep Drawing Quality Special Killed, Deep Drawing Quality Special Killed Fully Stabilized, Extra Deep Drawing Quality Special Killed <br> 80 = HSLA (e.g., ASTM A653 designation HSLA) <br> 90 = Advanced High-Strength Steel (e.g., Transformation Induced Plasticity ("TRIP"), TRIP-Assisted, Dual Phase, Multi-Phase, Complex Phase (e.g., ASTM 1079)) |
| 3.7 | CSTRENU | Yield Strength | | | 1 = Minimum specified yield strength  to < 25,000 psi <br> 3 = Minimum specified yield strength of 25,000 psi to < 35,000 psi <br> 4 = Minimum specified yield strength of 35,000 psi to < 50,000 psi <br> 5 = Minimum specified yield strength of 50,000 psi to < 65,000 psi <br> 6 = Minimum specified yield strength of 65,000 psi  to< 80,000 psi <br> 7 = Minimum specified yield strength of 80,000 psi to< 100,000 psi <br> 8 = Minimum specified yield strength of greater than or equal to 100,000 psi |
| 3.8 | CTHICKU | Nominal Thickness | | | 001 = < 0.014" <br> 014 =  0.014" to < 0.018" <br> 018 =  0.018" to < 0.022" <br> 022 =  0.022" to < 0.028" <br> 028 =  0.028" to < 0.044" <br> 044 =  0.044" to < 0.060" <br> 060 =  0.060" to < 0.085" <br> 085 =  0.085" but < 0.130" <br> 130 = > or equal to 0.130" |
| 3.9 | CWIDHTHU | Nominal Width | | | 1 = < 24" <br> 2 = ≥24" to < 48" <br> 3 = ≥ 48" to < 60" <br> 6 = ≥ 60" |
| 3.10 | FORMU | Form | | | 1 = Coil <br> 3 = Not in coil (squares or rectangles) <br> 4 = Not in coil (not squares or rectangles) <br> 5 = Not in coil (corrugated) |
| 4.0 | SALEU | Sale Type | | | EP = Export-Price Sale <br> CEP = Constructed Export Price |
| 5.0 | CONSIGNU | Consignment Identifier | | | C = Consignment sale <br> NC = Non-consigned sale |
| 6.1 | CUSCODU | Customer Code | | | See  Appendix C-4 |
| 6.2 | CCUSCODU | Consolidated Customer Code | | | See  Appendix C-4 |

Public Version

| Field No. | Field Name | Field Description | Currency | Units | Codes |
|---|---|---|---|---|---|
| 7.0 | CUSCATU | Customer Category | | | 3 = Distributor<br>5 = End user |
| 8.0 | CHANNELU | Channel of Distribution | | | 1 = Delivered Duty Paid<br>2 = CIF Sales to Puerto Rico<br>3 = Delivery in Mexico |
| 9.0 | SALINDTU | Sale Invoice Date | | | YYYYMMDD |
| 10.0 | SALEDATU | Date of Sale (if different than Sale Invoice Date) | | | YYYYMMDD |
| 11.0 | INVOICEU | Sale Invoice Number | | | |
| 12.0 | SHIPDATU | Date of Shipment | | | YYYYMMDD |
| 13.0 | PAYDATEU | Date of Receipt of Payment | | | YYYYMMDD |
| 14.0 | SALETERU | Terms of Delivery | | | 1 = CIF<br>2 = DDP Sales<br>3 = Delivery in Mexico |
| 15.0 | PAYTERMU | Terms of Payment | | | 1 = Cash Payment<br>2 = [   ] days after invoice<br>3 = [   ] days after invoice<br>4 = [   ] days after invoice<br>5 = [   ] days after invoice |
| 16.0 | QTYU | Quantity | | MT | |
| 17.0 | QTYUNITU | Quantity Unit of Measure | | | MT = Metric tons |
| 18.0 | GRSUPRU | Gross Unit Price | USD | USD/MT | |
| 19.1 | BILLADJU | Billing adjustments | USD | USD/MT | |
| 20.1 | EARLYPYU | Early Payment Discounts | USD | USD/MT | |
| 20.3 | COMMDISCU | Other Discounts: Commercial Discounts | USD | USD/MT | |
| 22.0 | LOTU | Level of Trade | | USD/MT | 1 = Sale to Customer |
| 23.0 | DINLFTPU | Inland Freight from Plant or Warehouse to Port of Exportation | MXP | MXP/MT | |
| 27.0 | DBROKU | Brokerage and Handling Incurred in the Country of Manufacture | MXP | MXP/MT | |
| 28.0 | USBROKU | Brokerage and Handling Incurred in the United States | USD | USD/MT | |
| 29.0 | INTNFRU | International Freight | MXP | MXP/MT | |
| 37.1 | DESTU | Destination - ZIP | | | |
| 37.2 | STATEU | Destination - State | | | |
| 39.0 | COMMU | Commissions | USD | USD/MT | |
| 40.0 | SELAGENU | Selling Agent | | | FF = "Foxwall LLC" (located at Houston, USA)<br>JJ = "Jimespi Jey S.A." (located at Costa Rica) |
| 41.0 | SELARELU | Selling Agent Relationship | | | 1 = Unaffiliated<br>2 = Affiliated |
| 42.0 | CREDITU | Credit Expense | USD | USD/MT | |
| 45.0 | WARRU | Warranty Expense | USD | USD/MT | |
| 45.1 | WRONGWARRU | Wrong Warranty Expense | USD | USD/MT | |
| 47.1 | BANKCHARU | Bank Charge | USD | USD/MT | |
| 49.1 | DINDIRSU | Indirect Selling Expenses Incurred in the Country of Manufacture | MXP | MXP/MT | |
| 50.1 | DINVCARU | Inventory Carrying Costs Incurred in the Country of Exportation | MXP | MXP/MT | |
| 51.0 | PACKU | Packing Cost | MXP | MXP/MT | |
| 58.0 | MFRU | Manufacturer | | | Galvasid |

Public Version

<u>U.S. Sales Database Summary</u>

General Information:

| | |
|---|---|
| Market | U.S. |
| Data Set Name | galvasidus01 |
| Date Submitted (8 digits) | 03/20/2025 |

Variables in the Data Set:

| Short Description | Variable Name | Unit of Measure in which Reported | Unit of Measure in which Incurred | Conversion Factor (if any) | Currency |
|---|---|---|---|---|---|
| Gross Unit Price | GRSUPRY | USD/MT | | | USD |
| **ADJUSTMENTS, DISCOUNTS AND REBATES** | | | | | |
| Billing Adjustment | BILLADJU | USD/MT | | | USD |
| Early Payment Discounts | EARLYPYU | USD/MT | | | |
| Other Discounts: Commercial Discounts | COMMDISU | USD/MT | | | USD |
| Commission Paid | COMMU | USD/MT | | | USD |
| **MOVEMENT EXPENSES** | | | | | |
| Inland Freight - Plant to Mexican Port - Incurred in Mexican Pesos | DINLFTPU | MXP/MT | | | MXP |
| Inland Freight - Plant to Customer - Incurred in Mexican Pesos | INTNFRU | MXP/MT | | | MXP |
| Mexican Brokerage and Handling | DBROKU | MXP/MT | | | MXP |
| U.S. Brokerage and Handling | USBROKU | USD/MT | | | USD |
| **DIRECT SELLING EXPENSES** | | | | | |
| Imputed Credit Expenses | CREDITU | USD/MT | | | USD |
| Warranty Expense | WARRU | USD/MT | | | USD |
| Bank Charge | BANKCHARU | USD/MT | | | USD |
| **INDIRECT SELLING EXPENSES:** | | | | | |
| Indirect Selling Expenses Incurred in Mexico | DINDIRSU | USD/MT | | | USD |
| Inventory Carrying Costs in Mexico | DINVCARU | USD/MT | | | USD |
| **PACKING** | | | | | |
| Packing Cost | PACKU | MXP/MT | | | MXP |

Tab 12

Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico
(April 3, 2025)

PR-345

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

A-201-863
Investigation
**Public Document**
E&C/OVII: KK/BS

April 3, 2025

**MEMORANDUM TO:**     Christopher Abbott
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

**FROM:**     Scot Fullerton
Acting Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**SUBJECT:**     Decision Memorandum for the Preliminary Affirmative
Determination in the Less-Than-Fair-Value Investigation of
Certain Corrosion-Resistant Steel Products from Mexico

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) preliminarily determines that certain corrosion-resistant steel products (CORE) from Mexico is being, or is likely to be, sold in the United States at less than fair value (LTFV), as provided in section 733 of the Tariff Act of 1930, as amended (the Act). The estimated weighted-average dumping margins are shown in the "Preliminary Determination" section of the accompanying *Federal Register* notice.

## II.     BACKGROUND

On September 5, 2024, Commerce received an antidumping duty (AD) petition concerning imports of CORE from Mexico, filed in proper form on behalf of Steel Dynamics, Inc., Nucor Corporation, United States Steel Corporation, Wheeling-Nippon Steel, Inc., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL–CIO, CLC, (collectively, the petitioners), domestic producers of CORE.[1] On October 2, 2024, Commerce initiated the LTFV investigation on CORE from Mexico.[2]

---

[1] *See* Petitioners' Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties: Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Turkey, the United Arab Emirates, and the Socialist Republic of Vietnam," dated September 5, 2024 (Petition).

[2] *See Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations*, 89 FR 80196 (October 2, 2024) (*Initiation Notice*).

In the "Respondent Selection" section of the *Initiation Notice*, Commerce notified the public that, where appropriate, it intended to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. entries under the appropriate Harmonized Tariff Schedule of the United States subheadings listed in the "Scope of the Investigations" in the appendix of the *Initiation Notice*.[3]  Accordingly, Commerce released the CBP import data to all interested parties under an administrative protective order on the record of this investigation.[4]  Additionally, Commerce invited interested parties to comment on the issue of respondent selection.[5]

On October 7, 2024, Ternium Mexico S.A. de C.V. (Ternium Mexico) requested that Commerce treat it as a voluntary respondent in the event that it was not selected as a mandatory respondent.[6]

On October 21, 2024, we limited the number of respondents selected for individual examination to the two exporters and producers that accounted for the largest volume of entries of the subject merchandise into the United States during the period of investigation (POI):  Galvasid S.A. de C.V. (Galvasid) and Ternium Mexico.[7]  On November 18, 2024, we issued the AD Questionnaire to the mandatory respondents.[8]

On October 25, 2024, the U.S. International Trade Commission (ITC) preliminarily determined that there is a reasonable indication that an industry in the United States has been materially injured by reason of imports of CORE from Mexico.[9]

Between December 2024 and January 2025, Galvasid and Ternium Mexico submitted timely responses to sections A, B, C, and D of Commerce's AD Questionnaire, *i.e.*, the sections relating to general information, comparison market sales, U.S. sales, and cost of production (COP)/constructed value (CV), respectively.[10]

On January 30, 2025, we also instructed Ternium Mexico's affiliate, Tenigal, S. de R.L. de C.V. (Tenigal), to submit its response to sections B and D of Commerce's AD questionnaire,[11] which Commerce received on February 21, 2025.[12]  On February 3, 2025, we also instructed Galvasid's affiliate, Perfiles LM, S.A. de C.V. (Perfiles), to submit its response to section A of Commerce's

---

[3] *Id.*, 89 FR at 80196-80204.

[4] *See* Memorandum, "Release of U.S. Customs and Border Protection Data," dated September 25, 2024.

[5] *Id.*; *see also Initiation Notice*, 89 FR at 80196*.*

[6] *See* Ternium Mexico's Letter, "Comments on US Customs and Border Protection Import Data and Respondent Selection," dated October 7, 2024.

[7] *See* Memorandum, "Respondent Selection," dated October 21, 2024.

[8] *See* Commerce's Letters, "Initial Questionnaire," dated November 18, 2024 (AD Questionnaire).

[9] *See Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, Netherlands, South Africa, Taiwan, Turkey, United Arab Emirates, and Vietnam*, 89 FR 85235 (October 25, 2024).

[10] *See* Galvasid's Letters, "Response to Section A of Department's November 18 Questionnaire," dated December 23, 2024 (Galvasid's AQR); "Response to Sections B, C and D of Department's November 18 Questionnaire," dated January 13, 2025 (Galvasid's BCDQR); *see also* Ternium Mexico's Letters, "Ternium's Response to Section A of the Antidumping Duty Questionnaire," dated December 23, 2024 (Ternium Mexico's AQR); "Ternium's Response to Sections B, C, and D of the Antidumping Duty Questionnaire," dated January 13, 2025 (Ternium Mexico's BCDQR).

[11] *See* Commerce's Letter, "Section A Supplemental Questionnaire," dated January 30, 2025.

[12] *See* Ternium Mexico's Letter, "Response to Tenigal's Response to Sections B and D of the Antidumping Duty Questionnaire," dated February 21, 2025 (Tenigal's BDQR).

AD questionnaire, which Commerce received on February 24, 2025.[13]  From January to March 2025, we issued supplemental questionnaires[14] to, and received timely responses from, Galvasid, Ternium Mexico, and Tenigal.[15]

Based on the petitioners' request,[16] on January 28, 2025, Commerce postponed the preliminary determination of this investigation by 50 days, to April 3, 2025, pursuant to section 733(c)(1)(A) of the Act and 19 CFR 351.205(e).[17]

On March 3, 2025, Ternium Mexico submitted factual information on the record in accordance with 19 CFR 351.301(c)5.[18]  On March 18 and March 20, 2025, the petitioners filed comments for consideration in the preliminary determination.[19]

We are conducting this investigation in accordance with section 733(b) of the Act.

## III.   PERIOD OF INVESTIGATION

The POI is July 1, 2023, through June 30, 2024.  This period corresponds to the four most recent fiscal quarters prior to the month of the filing of the Petition, which was September 2024.[20]

## IV.   SCOPE COMMENTS

In the *Initiation Notice*, Commerce notified parties of an opportunity to comment on the scope of the investigation, as well as on the appropriate physical characteristics of CORE to be reported in response to Commerce's AD Questionnaire.[21]  On October 22, 2024, and November 1, 2024, Commerce received timely-filed comments and rebuttal comments regarding the product

---

[13] *See* Commerce's Letter, "Section A Supplemental Questionnaire," dated February 3, 2025.

[14] *See* Commerce's Letters to Ternium Mexico, "Section B-C Supplemental Questionnaire," dated February 10, 2025; "Section D Supplemental Questionnaire," dated March 3, 2025; *see also* Commerce's Letters to Galvasid, "Sections B-C Supplemental Questionnaire," dated February 6, 2025; "Sections B-C Second Supplemental Questionnaire," dated February 21, 2025;and  "Section D Supplemental Questionnaire," dated February 27, 2025.

[15] *See* Galvasid's Letters, "Response to the Department's February 3 Supplemental Questionnaire," "Response of Galvasid, S.A. de C.V. to the Department's February 6 Supplemental Questionnaire," dated February 24, 2025; and "Response to the Department's February 27 Supplemental Questionnaire," dated March 20, 2025; *see also* Ternium Mexico's Letter, "Ternium Mexico's Response to the Supplemental Sections B and C Questionnaire," dated March 3, 2025; "Ternium's Response to the Supplemental Section D Questionnaire," dated March 24, 2025; and "Tenigal's Response to the Supplemental Section D Questionnaire," dated March 27, 2025.

[16] *See* Petitioners' Letter, "Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Petitioners' Request to Postpone Commerce's Preliminary Determinations," dated January 10, 2025.

[17] *See Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations*, 90 FR 8260 (January 28, 2025).

[18] *See* Ternium Mexico's letter, "Submission of Factual Information," dated March 3, 2025.

[19] *See* Petitioners' Letter, "Pre-Preliminary Comments on Galvasid," dated March 18, 2025; and "Petitioners' Comments in Advance of the Preliminary Results Regarding Ternium and Tenigal," dated March 20, 2025.

[20] *See* 19 CFR 351.204(b)(1).

[21] *See Initiation Notice*, 89 FR at 80196.

characteristics.[22]  On November 18, 2024, Commerce determined the product characteristics applicable to this investigation.[23]

In October and November 2024, and January 2025, we received timely filed comments and rebuttal comments concerning the scope of the investigation from interested parties.  For further details, *see* the Preliminary Scope Decision Memorandum, which we are issuing concurrently with this preliminary decision memorandum.[24]

For a full description of the scope of this investigation, *see* Appendix I of the accompanying *Federal Register* notice.

## V.      AFFILIATION AND SINGLE ENTITY TREATMENT

Section 771(33) of the Act identifies that the following persons that shall be considered "affiliated" or "affiliated persons":  (A) members of a family, including brothers and sisters (whether by the whole or half-blood), spouse, ancestors, and lineal descendants; (B) any officer or director of an organization and such organization; (C) partners; (D) employer and employee; (E) any person directly or indirectly owning, controlling, or holding with power to vote, five percent or more of the outstanding voting stock or shares of any organization and such organization; (F) two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; and (G) any person who controls any other person and such other person.  Section 771(33) of the Act further states that a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.  Commerce's regulations at 19 CFR 351.102(b)(3) state that in determining whether control over another person exists within the meaning of section 771(33) of the Act, Commerce will not find that control exists unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.[25]

We preliminarily determine that Ternium Mexico and Tenigal are affiliated companies because the information on the record indicates both are controlled by Ternium Mexico's parent company, Ternium Internacional España, S.L.U., which owns a significant percentage of Tenigal.  Ternium Mexico also maintained operational control over Tenigal via significant material transactions and common officers, directors, and managerial employees.  Based on this ownership and evidence provided by Ternium Mexico, we find that Ternium Mexico is affiliated with Tenigal pursuant to section 771(33)(F) and (G) of the Act.

---

[22] *See* Memorandum, *"Less-Than-Fair-Value Investigations of Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Correction to Product Characteristics,"* dated November 18, 2024 (Product Characteristics Memorandum).
[23] *Id.*
[24] *See* Memorandum," Less-Than-Fair-Value Investigations of Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam, and Countervailing Duty Investigations of Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam:  Preliminary Scope Decision Memorandum," dated April 3, 2025 (Preliminary Scope Decision Memorandum).
[25] *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27298 (May 19, 1997) (*Preamble*).

19 C.F.R. 351.401(f) sets forth rules for treating affiliated parties as a single entity in an antidumping proceeding. Specifically, where there exists a "significant potential for manipulation of price, production, or other export decisions," then Commerce will collapse the affiliated parties and treat them as a single entity. In this case, we preliminarily determine that record evidence demonstrates that there is a significant potential for manipulation of prices and production of subject merchandise between Ternium Mexico and Tenigal, and we are treating the two companies as a single entity, hereafter referred to as Ternium Mexico/Tenigal. Due to the proprietary nature of information related to this analysis, a more detailed discussion of this matter can be found in the Ternium Mexico/Tenigal Collapsing Memorandum.[26]

We also preliminarily determine that Galvasid and its affiliate, Perfiles, are affiliated companies because the information on the record indicates that both companies have common ownership; they are both entirely owned by members of a single family and the family's holding company Grupo Industrial LM, S.A. de C.V. Galvasid also maintains operational control over Perfiles through their shared managerial staff, directors and sales employees. Based on this evidence provided by Galvasid, we find that Galvasid and Perfiles are affiliated, pursuant to section 771(33)(F) and (G) of the Act.

19 CFR. 351.401(f) sets forth rules for treating affiliated parties as a single entity in an antidumping proceeding. Specifically, where there exists a "significant potential for manipulation of price, production, or other export decisions," then Commerce will collapse the affiliated parties and treat them as a single entity. In this case, we preliminarily determine that record evidence demonstrates that there is significant potential for manipulation of prices and production of subject merchandise between Galvasid and Perfiles, and we are treating the two companies as a single entity, hereafter referred to as Galvasid/Perfiles. Due to the proprietary nature of information related to this analysis, a more detailed discussion of this matter can be found in the Galvasid/Perfiles Collapsing Memorandum.[27]

## VI.    DISCUSSION OF THE METHODOLOGY

### A. Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), to determine whether respondents' sales of the subject merchandise from Mexico to the United States were made at less than normal value (NV), Commerce compared the export price (EP) and constructed export price (CEP) to the NV as described in the "Export Price", "Constructed Export Price" and "Normal Value" sections of this memorandum.

### 1.   Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average EPs or CEPs, *i.e.*, the average-to-average

---

[26] *See* Memorandum, "Preliminary Determination Affiliation and Single Entity Memorandum for Ternium Mexico and Tenigal," dated concurrently with this memorandum (Ternium Mexico/Tenigal Collapsing Memorandum).
[27] *See* Memorandum, "Preliminary Determination Affiliation and Single Entity Memorandum for Galvasid and Perfiles," dated concurrently with this memorandum (Galvasid/Perfiles Collapsing Memorandum).

(A-to-A) method, unless Commerce determines that another method is appropriate in a particular situation.  In LTFV investigations, Commerce examines whether to compare weighted-average NVs with the EPs or CEPs of individual sales, *i.e.*, the average-to-transaction (A-to-T) method, as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the A-to-T method is appropriate in a particular situation consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[28]  Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method in this investigation.  Commerce will continue to evaluate its approach in this area based on comments received in this investigation and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the A-to-A method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used in this preliminary determination examines whether there exists a pattern of EPs (or CEPs) for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all export sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the A-to-A method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported consolidated customer codes.  Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau.  Time periods are defined by the quarter within the POI based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's *d* test" is applied.  The Cohen's *d* coefficient is a generally recognized statistical measure of the extent of the difference between the mean (*i.e.*, weighted-average price) of a test group and the mean (*i.e.*, weighted-average price) of a comparison group.  First, for comparable merchandise, the Cohen's *d* coefficient is calculated when the test and comparison groups of data for a particular purchaser, region, or time period each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise.  Then, the Cohen's *d* coefficient is used to evaluate the extent to which the prices

---

[28] *See, e.g.*, *Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013); *see also Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014); and *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

to the particular purchaser, region, or time period differ significantly from the prices of all other sales of comparable merchandise. The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's $d$ test: small, medium, or large (0.2, 0.5, and 0.8, respectively). Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists. For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's $d$ test, if the calculated Cohen's $d$ coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's $d$ test. If the value of sales to purchasers, regions, and time periods that pass the Cohen's $d$ test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the A-to-T method to all sales as an alternative to the A-to-A method. If the value of sales to purchasers, regions, and time periods that pass the Cohen's $d$ test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an A-to-T method to those sales identified as passing the Cohen's $d$ test as an alternative to the A-to-A method, and application of the A-to-A method to those sales identified as not passing the Cohen's $d$ test. If 33 percent or less of the value of total sales passes the Cohen's $d$ test, then the results of the Cohen's $d$ test do not support consideration of an alternative to the A-to-A method.

If both tests in the first stage (*i.e.*, the Cohen's $d$ test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the A-to-A method can appropriately account for such differences. In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's $d$ and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the A-to-A method only. If the difference between the two calculations is meaningful, then this demonstrates that the A-to-A method cannot account for differences such as those observed in this analysis, and, therefore, an alternative comparison method would be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the A-to-A method and the appropriate alternative method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the A-to-A method and the appropriate alternative method move across the *de minimis* threshold.

Interested parties may present arguments and justifications in relation to the above-described differential pricing approach used in this preliminary determination.

2.  Results of the Differential Pricing Analysis

*Galvasid/Perfiles*

For Galvasid, based on the results of the differential pricing analysis, Commerce preliminarily finds that 58.30 percent of the value of U.S. sales pass the Cohen's *d* test,[29] and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Further, Commerce preliminarily determines that there is no meaningful difference between the weighted-average dumping margin calculated using the A-to-A method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the A-to-T method to those U.S. sales which passed the Cohen's *d* test and the A-to-A method to those sales which did not pass the Cohen's *d* test. Thus, for this preliminary determination, Commerce is applying the A-to-A method for all U.S. sales to calculate the weighted-average dumping margin for Galvasid.

*Ternium Mexico/Tenigal*

For Ternium Mexico, based on the results of the differential pricing analysis, Commerce preliminarily finds that 42.74 percent of the value of U.S. sales pass the Cohen's *d* test,[30] and does confirm the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Further, Commerce preliminarily determines that there is a meaningful difference between the weighted-average dumping margin calculated using the A-to-A method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the A-to-T method to those U.S. sales which passed the Cohen's *d* test and the A-to-A method to those sales which did not pass the Cohen's *d* test. Thus, for this preliminary determination, Commerce is applying the alternative method for all U.S. sales to calculate the weighted-average dumping margin for Ternium Mexico.

## B. Product Comparisons

As stated above, Commerce gave parties an opportunity to comment on the appropriate hierarchy of physical characteristics used to define each product, including for model matching purposes, within a certain deadline.[31] As stated in the Product Characteristics Memorandum, we considered the comments that were submitted and established the appropriate product characteristics to use as a basis for defining the product control numbers in this investigation.[32] Commerce identified 10 criteria for physical characteristics of the subject merchandise: (1) type; (2) reduction process; (3) clad material/coating material; (4) metallic coating weight; (5) metallic coating process; (6) quality; (7) yield strength; (8) nominal thickness; (9) nominal width; and

---

[29] *See* Memorandum, "Preliminary Determination Margin Calculation for Galvasid S.A. de C.V.," dated April 3, 2025 (Galvasid Preliminary Sales Calculation Memorandum).
[30] *See* Memorandum, "Preliminary Determination Margin Calculation for Ternium Mexico S.A. de C.V and Tenigal, S. de R.L. de C.V.," dated April 3, 2025 (Ternium/Tenigal Preliminary Sales Calculation Memorandum).
[31] *See Initiation Notice*, 89 FR at 80196.
[32] *See* Product Characteristics Memorandum.

(10) form.[33]  We instructed Galvasid/Perfiles and Ternium Mexico/Tenigal to use these physical characteristics in its response to the AD Questionnaire.[34]

For each respondent, we compared U.S. sales prices to NVs based on sales prices of identical merchandise in the home market.  Where there were no sales of identical merchandise sold in the home market made in the ordinary course of trade on which to base NV, we based NV on the sale prices of the most similar foreign-like product made in the ordinary course of trade.  Where there were no sales of similar merchandise of the foreign like product, then NV was based on the CV of the subject merchandise.

### C.  Date of Sale

Section 351.401(i) of Commerce's regulations states that Commerce normally will use the date of the sales invoice as the date of sale for sales of the merchandise under consideration unless another date better reflects the date on which the material terms of sale were established.  Additionally, Commerce may use a date other than the date of invoice if it is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.[35]  Finally, Commerce has a long-standing practice of finding that, where the shipment date precedes the invoice date, the shipment date better reflects the date on which the material terms of sale are established.[36]

*Galvasid/Perfiles*

Galvasid and Perfiles reported the shipment date as the date of sale for sales in both the home and U.S. markets, which is the same date that the invoice is generated.[37]  Accordingly, the record of this investigation indicates that the date of shipment and invoice is the date when the material terms of sale are set, and thus, we used this date as the date of sale in both the home and U.S. markets for this preliminary determination.[38]

*Ternium Mexico/Tenigal*

For both the home market and U.S. market, Ternium Mexico reported the invoice date as the date of sale.  Tenigal reported the invoice date as the date of sale for its home market sales.  Ternium Mexico/Tenigal reported that it experiences changes after the purchase order and order confirmation and the essential terms of sale are set when it invoices its unaffiliated customers

---

[33] *Id*.

[34] *Id.*

[35] *See* 19 CFR 351.401(i); *see also Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (CIT 2001) (quoting 19 CFR 351.401(i)).

[36] *See, e.g., Certain Polyester Staple Fiber from the Republic of Korea:  Preliminary Results of the 2007/2008 Antidumping Duty Administrative Review*, 74 FR 27281, 27283 (June 9, 2009), unchanged in *Certain Polyester Staple Fiber from the Republic of Korea:  Final Results of the 2007-2008 Antidumping Duty Administrative Review*, 74 FR 65517 (December 10, 2009).

[37] *See* Galvasid's AQR at A-25 to A-26.

[38] *Id.* at A-25 and Perfiles' AQR at A-24.

upon shipment of product from its facilities.[39]  Accordingly, we used invoice date as the date of sale for both markets.

### D.  Export Price and Constructed Export Price

Section 772(a) of the Act defines EP as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c)" of section 772 of the Act.  Section 772(b) of the Act defines CEP as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d)" of section 772 of the Act.

*Galvasid/Perfiles*

Galvasid's sales to the United States were exclusively EP sales because the first sale to an unaffiliated party was made before the date of importation, and the CEP methodology was not otherwise warranted.  We calculated EP based on the packed price to an unaffiliated purchaser in the United States, based on the reported terms of sale.  We made deductions from the starting price (after accounting for billing adjustments and early payment discounts), where appropriate, for movement expenses (*i.e.*, brokerage and handling incurred in the country of manufacture, inland freight from plant or warehouse to port of exportation, international freight, brokerage and handling incurred in the U.S.), in accordance with section 772(c)(2)(A) of the Act.

*Ternium Mexico/Tenigal*

In accordance with Section 772(b) of the Act, we based U.S. price for Ternium Mexico/Tenigal on CEP because the subject merchandise was first sold in the United States before importation by a seller affiliated with the producer or exporter to an unaffiliated purchaser and EP was not otherwise indicated.  We calculated the CEP based on prices to unaffiliated customers in the United States.  We made deductions from the starting price (after accounting for billing adjustments, early payment discounts, and rebates) for any movement expenses (*i.e.*, inland freight from plant to distribution warehouse, warehousing expense, inland freight from plant to port of exit, inland insurance in the country of manufacturing, freight from plant/warehouse to port of exportation, foreign brokerage and handling, international freight, U.S. inland freight from port to warehouse, U.S. warehousing expenses, U.S. freight from warehouse to the unaffiliated customer, U.S. brokerage and handling fees, U.S. customs duties, and other U.S. transportation expenses from Ternium Mexico's plant to its warehouse), in accordance with section 772(c)(2)(A) of the Act.[40]

In accordance with section 772(d)(1) of the Act, we calculated the CEP by deducting selling expenses associated with economic activities occurring in the United States, which include direct

---

[39] *See* Ternium Mexico's AQR at A-38 to A-39.
[40] *See* Ternium/Tenigal Preliminary Sales Calculation Memorandum at Attachment 2.

selling expenses (imputed credit expenses, royalties, bank charges, warranty expenses, other direct selling expenses, and repacking costs) and indirect selling expenses (U.S. inventory carrying costs and other indirect selling expenses).[41] We also made an adjustment for profit allocated to these selling expenses, in accordance with section 772(d)(3) of the Act. In accordance with section 772(f) of the Act, we calculated the CEP profit rate using the expenses incurred by Ternium Mexico/Tenigal and its U.S. affiliate on their sales of the subject merchandise in the United States and the profit associated with those sales.[42]

Ternium Mexico reported that it paid a fee to unaffiliated parties to further process the subject merchandise prior to sale to the first unaffiliated U.S. customer. For those U.S. sales for which Ternium Mexico contracted unaffiliated parties to further process the subject merchandise prior to sale and reported the fee paid for those services, we have included those sales in our analysis and deducted that fee from U.S. price in accordance with section 772(d)(2) of the Act.[43]

Ternium Mexico also reported that its U.S. affiliate performed a different further manufacturing process on a small quantity of subject merchandise prior to sale and requested that it be excused from reporting the sales and the further manufacturing costs associated with this merchandise. We preliminarily did not require reporting of those sales and their further manufacturing costs in accordance with our practice because of the small quantity and atypical nature of the sales.[44]

## E. Normal Value

### 1. Home Market Viability

To determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV, *i.e.*, the aggregate volume of home market sales of the foreign like product is equal to or greater than five percent of the aggregate volume of U.S. sales, we normally compare the respondent's volume of home market sales of the foreign like product to the volume of U.S. sales of the subject merchandise, in accordance with sections 773(a)(1)(A) and (B) of the Act. If we determine that no viable home market exists, we may, if appropriate, use a respondent's sales of the foreign like product to a third country market as the basis for comparison market sales, in accordance with section 773(a)(1)(C) of the Act and 19 CFR 351.404.

---

[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *See, e.g., Hardwood and Decorative Plywood from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 78 FR 58273 (September 23, 2023), and accompanying Issues and Decision Memorandum (IDM) at 4-5 ("In investigations, the Department is not required to examine all sales transactions. For this reason, our practice has been to disregard unusual transactions when they represent a small percentage (*i.e.*, typically less than five percent) of a respondent's total sales."); *Certain Color Television Receivers from the People's Republic of China*, 69 FR 20594 (April 16, 2004), and accompanying IDM at Comment 27; *Final Determination of Sales at Less than Fair Value: Pure Magnesium from the Russian Federation*, 66 FR 49347 (September 27, 2001), and accompanying IDM at Comment 10; *Notice of Preliminary Determination of Sales at Less Than Fair Value Hot-Rolled Flat-Rolled Carbon Quality Steel Products from Japan*, 64 FR 8291, 8295 (February 19, 1999).

In this investigation, we preliminarily determine that the aggregate volume of Galvasid's and Ternium Mexico's home market sales of the foreign like product was more than five percent of the aggregate volume of its U.S. sales of the subject merchandise.[45] Thus, we preliminarily determine that Galvasid's and Ternium Mexico's home market of Mexico is viable. Therefore, we used home market sales prices as the basis for NV for Galvasid and Ternium Mexico in accordance with sections 773(a)(1)(A) and (B) of the Act.

2. Affiliated Party Transactions and Arm's-Length Test

We exclude comparison market sales to affiliated customers that are not made at arm's-length prices from our margin analysis because we consider them to be outside the ordinary course of trade.[46] To test whether the respondent's comparison market sales are made at arm's-length prices, we compare the prices of sales of comparable merchandise to affiliated and unaffiliated customers, net of all rebates, movement charges, and direct selling expenses. Pursuant to 19 CFR 351.403(c) and in accordance with our practice, when the prices charged to an affiliated party are, on average, between 98 and 102 percent of the prices charged to unaffiliated parties for merchandise comparable to that sold to the affiliated party, we determine that the sales to the affiliated party are at arm's-length prices.[47]

*Galvasid/Perfiles*

Galvasid reported direct sales of CORE during the POI to both affiliated and unaffiliated end-users. As a result of our test, we preliminarily find that certain sales to affiliated parties were not made at arm's-length prices.[48] Accordingly, consistent with 19 CFR 351.403(c), we excluded Galvasid's reported sales of the foreign like product made to affiliated parties which did not pass the arm's-length test in the calculation of NV.

*Ternium Mexico/Tenigal*

Ternium Mexico/Tenigal also reported direct sales of CORE during the POI to both affiliated and unaffiliated end-users. As a result of our test, we preliminarily find that all of Ternium Mexico/Tenigal's sales to affiliated parties were not made at arm's-length prices.[49] Accordingly, consistent with 19 CFR 351.403(c), we excluded Ternium Mexico/Tenigal's reported sales of the foreign like product made to an affiliated party in the calculation of NV.

3. Overrun Sales

Section 773(a)(1)(B)(i) of the Act, states, in part, that NV is "the price at which the foreign like product is first sold (or, in absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade … ." The term

---

[45] *See* Galvasid's AQR at Appendix A-1; and Ternium Mexico's AQR at Exhibit A-1.
[46] *See* 19 CFR 351.403(c).
[47] *See Antidumping Proceedings: Affiliated Party Sales in the Ordinary Course of Trade*, 67 FR 69186 (November 15, 2002).
[48] *See* Galvasid Preliminary Sales Calculation Memorandum at Attachment I.
[49] *See* Ternium/Tenigal Preliminary Sales Calculation Memorandum at Attachment I.

"ordinary course of trade" is defined as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind."[50]  The SAA clarifies this portion of the statute:  "Commerce may consider other types of sales or transactions to be outside the ordinary course of trade when such sales or transactions have characteristics that are not ordinary as compared to sales or transactions generally made in the same market."[51]  Thus, the statute and the SAA are clear that a determination of whether sales (other than those specifically addressed in section 771(15) of the Act, *i.e.*, below-cost sales and sales between affiliates that are not at market prices) are in the ordinary course of trade must be based on an analysis comparing the sales in question with sales of merchandise of the same class or kind generally made in the home market.  In other words, Commerce must consider whether home market sales of overruns are ordinary in comparison with home market sales of non-overruns.

The purpose of the ordinary-course-of-trade provision is to prevent dumping margins from being based on sales which are not representative of the home market.  By basing the determination of NV upon representative sales, the statutory provision ensures that the comparison between NV and sales to the United States is done on an apples-to-apples basis.  Congress has not specified any criteria that the agency should use in determining the appropriate conditions and practices. Thus Commerce, at its discretion, chooses how best to analyze the many factors involved in a determination of whether sales are made within the ordinary course of trade.[52]

In evaluating whether sales of overruns are outside the ordinary course of trade, Commerce has considered several factors.[53]  These non-dispositive factors include, but are not limited to, the following:  (1) whether the merchandise is "off-quality" or produced according to unusual specifications; (2) the comparative volume of sales and the number of buyers in the home market; (3) the average quantity of the overrun and commercial sales; (4) the price and profit differentials in the home market.

*Galvasid/Perfiles*

Galvasid reported that its overrun sales are surplus production that is left over from production for customer orders.[54]  Our analysis demonstrates that overrun sales have four out of four characteristics that are not ordinary when compared to non-overrun sales.[55]  Thus, we find that Galvasid's home market sales of overruns were made outside the ordinary course of trade during the POI and therefore, we have excluded them from our analysis.[56]

---

[50] *See* section 771(15) of the Act.

[51] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 834.

[52] *See Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review; 2021–2022*, 88 FR 48433 (July 27, 2023) and accompanying PDM at 16 (unchanged in *Certain Corrosion-Resistant Steel Products From the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2021–2022*, 88 FR 86113 (December 12, 2023).

[53] *Id*.

[54] *See* Galvasid's BQR at B-3.

[55] *See* Galvasid's Preliminary Sales Calculation Memorandum.

[56] *Id.*

*Ternium Mexico/Tenigal*

Ternium Mexico/Tenigal reported that their overrun sales consist of prime or non-prime merchandise and can be sold as prime or non-prime merchandise or further downgraded to scrap products.[57]  Our analysis shows that overrun sales have four out of four characteristics that are not ordinary when compared to non-overrun sales.[58]  Thus, we find that Ternium/Tenigal's home market sales of overruns were made outside the ordinary course of trade during the POI and therefore, we have excluded them from our analysis.[59]

       4.   Level of Trade

Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sales at the same level of trade (LOT) as the U.S. sales.  Sales are made at different LOTs if they are made at different marketing stages (or their equivalent).[60]  Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing.[61]  To determine whether the comparison market sales are at different stages in the marketing process than the U.S. sales, we examine the distribution system in each market, *i.e.*, the chain of distribution, including selling functions and class of customer (customer category), and the level of selling expenses for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs for EP and comparison market sales, *i.e.*, NV based on either home market or third country prices,[62] we consider the starting prices before any adjustments.  For CEP sales, we consider only the selling activities reflected in the price after the deduction of expenses and profit under section 772(d) of the Act.[63]

When Commerce is unable to determine NV based on the sale prices of the foreign like product in the comparison market at the same LOT as the EP or CEP, Commerce may determine NV based on sale prices at a different LOT in the comparison market.  In comparing EP or CEP to NV based on sale prices at a different LOT in the comparison market, where available data make it possible, we make an LOT adjustment under section 773(a)(7)(A) of the Act.  Finally, for CEP sales only, if the NV LOT is at a more advanced stage of distribution than the LOT of the CEP and there is no basis for determining whether the difference in LOTs between NV and CEP affects price comparability, *i.e.*, no LOT adjustment is possible, Commerce will grant a CEP offset, as provided in section 773(a)(7)(B) of the Act.[64]

---

[57] *See* Section B of Ternium Mexico's BCDQR at B-14; and Tenigal's BQR at B-13.
[58] *See* Ternium Mexico/Tenigal's Preliminary Sales Calculation Memorandum
[59] *Id.*
[60] *See* 19 CFR 351.412(c)(2).
[61] *Id.*; *see also Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010) (*OJ from Brazil 2008-2009 AR*), and accompanying IDM at Comment 7.
[62] Where NV is based on CV, we determine the NV LOT based on the LOT of the sales from which we derive selling, general and administrative expenses, and profit for CV, where possible.  *See* 19 CFR 351.412(c)(1).
[63] *See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314-16 (Fed. Cir. 2001).
[64] *See, e.g.*, *OJ from Brazil* 2008-2009 AR IDM at Comment 7.

*Galvasid/Perfiles*

Galvasid reported in its Section A responses that the LOT at which it made its home market and U.S. sales was not substantially different and would not affect price comparability.[65]  Galvasid did not claim a LOT adjustment or CEP offset (as there were no CEP sales).  We examined the differences in selling functions reported in Galvasid's responses.  Selling activities can be generally grouped into five selling function categories for analysis:  (1) provision of sales support; (2) provision of training services; (3) provision of technical support; (4) provision of logistical services; (5) performance of sales-related administrative activities.

The information provided by Galvasid indicates that the selling functions in both markets are performed with the same level of intensity across all channels of distribution, confirming Galvasid's claim that there is only one LOT in both markets and that the LOT is the same.[66]  Therefore, we have not granted a LOT adjustment pursuant to section 773(a)(7)(A) of the Act.

*Ternium Mexico/Tenigal*

Ternium Mexico/Tenigal reported that it made sales in the home market through three channels of distribution:  *i.e.*, direct shipments to:  1) unaffiliated large industrial customers; 2) smaller local distributors and builders; and 3) large distributors and profilers.[67]  Ternium Mexico/Tenigal reported that it performed a number of different selling activities for home market customers at approximately the same frequency and level of intensity across its home market channels of distribution for the following selling function categories:  (1) provision of sales support; (2) provision of training services; (3) provision of technical support; (4) provision of logistical services; and (5) performance of sales-related administrative activities.[68]  In the U.S. market, Ternium Mexico/Tenigal reported that it made sales through three channels of distribution:  1) back-to-back sales to unaffiliated customers through its U.S. affiliate Ternium USA; 2) sales to unaffiliated U.S. customers from a warehouse; and 3) further processed sales.[69]  Ternium Mexico/Tenigal reported that it performed the same selling functions at the same level of intensity for sales made across the three U.S. distribution channels.  Compared to selling functions performed for its home market sales, Ternium Mexico/Tenigal reported that it undertook fewer selling functions for its CEP sales at substantially lesser levels of intensity.[70]  Consequently, Ternium Mexico/Tenigal claimed the comparison market's LOT is at a more advanced stage of distribution than the LOT of the CEP.

In analyzing the questionnaire responses, we find that the respondent provided sufficient source documentation in response to our request in the initial questionnaire to support the performance of specific selling activities that Ternium claimed to have undertaken for reported home market channels of distribution, however, no such support was provided for Tenigal.  Additionally, the AD questionnaire requires a quantitative analysis demonstrating how:  1) the expenses for sales

---

[65] *See* Galvasid's AQR at A-22.
[66] *See* Galvasid's AQR at Appendix A-4.
[67] *See* Ternium Mexico's AQR at 26-27; *see also,* Tenigal's AQR at 16.
[68] *See* Ternium Mexico's AQR at 28-34 and Exhibit A-14; *see also*, Tenigal's AQR at 17-20 and Exhibit A-7.
[69] *See* Ternium Mexico's AQR at 27.
[70] *Id.* at Exhibit A-14.

made at different claimed LOTs impact price comparability; and (2) the claimed levels of intensity for the selling activities reported in the selling functions chart are quantitatively supported.  No quantitative analysis was provided for Tenigal. The quantitative analysis submitted for Ternium was deficient because  rather than demonstrating how indirect selling expenses vary by different claimed LOTs, the quantitative analysis instead compared the levels of *direct* selling expenses (freight and warehousing) incurred in each market.[71]  The AD questionnaire cautions respondents against using direct selling expenses as the basis for their LOT analysis.[72]  Nevertheless, Ternium Mexico/Tenigal claimed, without support, that "a comparison of direct selling expenses is indicative of the intensity of selling activities performed for the home market and export market."[73]  As to the second purpose of the required quantitative analysis, the analysis provided for Ternium Mexico/Tenigal did not address the claimed levels of intensity for the selling activities reported in the selling functions chart.

Commerce's regulation at 19 CFR 351.401(b)(1) states that the interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of Commerce the amount and nature of a claimed adjustment.  Because Ternium Mexico/Tenigal's reported selling functions and intensities thereof are unsubstantiated, we find that there is insufficient information on the record to determine, quantitatively, whether comparison market sales were made at a different LOT than U.S. sales.  Accordingly, we preliminarily find that Ternium Mexico/Tenigal's home market and U.S. sales are not at different LOTs, and thus neither an LOT adjustment nor a CEP offset is warranted under sections 773(a)(7)(A) or (B) of the Act.[74]

### 5.  Cost of Production Analysis

In accordance with section 773(b)(2)(A)(ii) of the Act, Commerce requested COP and CV information from Galvasid and Ternium Mexico/Tenigal, respectively.[75]  We examined Galvasid's and Ternium Mexico/Tenigal's cost data and determined that the quarterly cost methodology is not warranted for either.  Therefore, we applied our standard methodology of using annual costs based on the reported data.[76]

---

[71] *See* Section B of Ternium Mexico's BCDQR at 36-37 and Exhibit B-15.

[72] *See* Initial Questionnaire at A-7and A-8 ("Provide a quantitative analysis showing how the expenses assigned to POI/POR sales made at different claimed levels of trade impact price comparability. Your analysis should not include direct expenses reported to Commerce in your comparison market and U.S. market sales databases.").

[73] *See* Ternium's BCDQR at B-37.

[74] *See Emulsion Styrene-Butadiene Rubber from Brazil:  Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 38847 (June 29, 2020), and accompanying IDM at Comment 1 (where Commerce declined to find the existence of different LOTs or grant a CEP offset when the record lacked sufficient quantitative evidence corroborating a respondent's LOT claims); *Ripe Olives from Spain:  Final Results of Antidumping Duty Administrative Review; 2018–2019,* 86 FR 35068 (July 21, 2021), and accompanying IDM at Comment 2 (denying a CEP offset due to a lack of a quantitative analysis); *Brass Rod from South Africa:  Final Affirmative Determination of Sales at Less Than Fair Value*, 89 FR 29292 (April 22, 2024 ), and accompanying IDM at Comment 1 (denying a CEP offset due to a lack of a quantitative analysis).

[75] *See* Initial Questionnaire at D-1 through D-20; *see also* Section D of Galvasid's BCDQR; Section D of Ternium Mexico's BCDQR; and Section D of Tenigal's BDQR.

[76] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Galvasid S.A. de C.V;" and "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Ternium Mexico, S.A. de C.V. and Tenigal, S. de R.L. de C.V.," dated concurrently with this memorandum.

a.  Calculation of COP

We calculated the COP based on the sum of the cost of materials and fabrication for the foreign like product, plus amounts for general and administrative and financial expenses, in accordance with section 773(b)(3) of the Act.  We relied on the COP data submitted by Galvasid and Ternium Mexico/Tenigal in their questionnaire responses for the COP calculation except in the following instances where we made adjustments to the submitted data.[77]

*Galvasid/Perfiles*

- We increased Galvasid's general and administrative expense ratio by excluding certain income items from the numerator of the calculation.

*Ternium Mexico/Tenigal*

- We increased Ternium Mexico's reported cost of manufacturing by adjusting the transfer prices of certain affiliated input purchases in accordance with the transactions disregarded rule, section 773(f)(2) of the Act.
- Because we are treating Ternium Mexico and Tenigal as a collapsed entity, we revised each company's reported costs by adjusting the transfer prices of the intercompany transactions to reflect each company's actual costs.

b.  Test of Comparison Market Sales Prices

As required under sections 773(b)(1) and (2) of the Act, we compared the adjusted (where applicable) weighted-average of the COP for the POI to the per-unit price of the comparison market sales of the foreign like product to determine whether these sales had been made at prices below the COP within an extended period of time in substantial quantities, and whether such prices were sufficient to permit the recovery of all costs within a reasonable period of time.  We determined the net comparison market prices for the below-cost test by subtracting from the gross unit price any applicable movement charges, discounts, billing adjustments, direct and indirect selling expenses, and packing expenses, where appropriate.

c.  Results of the COP Test

Pursuant to section 773(b)(2)(C)(i) of the Act, where less than 20 percent of sales of a given product were at prices less than the COP, we did not disregard below-cost sales of that product because we determined that the below-cost sales were not made in substantial quantities, *i.e.*, less than 20 percent of sales of a given product were made at prices less than the COP.  Where 20 percent or more of a respondent's home market sales of a given model were at prices less than the COP, we disregarded the below-cost sales because:  (1) they were made within an extended period of time in substantial quantities in accordance with sections 773(b)(2)(B) and (C) of the Act; and (2) based on our comparison of prices to the weighted average of the COPs, they were

---

[77] *Id.*

at prices which would not permit the recovery of all costs within a reasonable period of time in accordance with section 773(b)(2)(D) of the Act.

*Galvasid/Perfiles*

For Galvasid, our cost test indicated that more than 20 percent of sales of certain home market products were made at prices below the COP within an extended period of time and were made at prices which would not permit the recovery of all costs within a reasonable period of time. Thus, in accordance with section 773(b)(1) of the Act, we excluded these below-cost sales from our analysis for Galvasid and used the remaining above-cost sales to determine NV.

*Ternium Mexico/Tenigal*

For Ternium Mexico/Tenigal, our cost test indicated that more than 20 sales of certain home market products were made at prices above the COP within an extended period of time and were made at prices which would not permit the recovery of all costs within a reasonable period of time.[78] Thus, in accordance with section 773(b)(1) of the Act, we excluded these below-cost sales from our analysis for Ternium Mexico/Tenigal and used them the remaining above-cost sales to determine NV.

6. Calculation of Normal Value Based on Comparison Market Prices

*Galvasid/Perfiles*

We calculated NV based on packed, delivered prices that Galvasid reported for home market sales to unaffiliated customers in Mexico. We made adjustments, where appropriate, to the starting price for billing adjustments and discounts, in accordance with 19 CFR 351.401(c). We also made deductions, where appropriate, from the starting price for movement expenses, including foreign inland freight to warehouse, foreign inland freight from warehouse to customer, and warehousing expenses, pursuant to section 773(a)(6)(B) of the Act. Where applicable, we reduced movement expenses by freight revenue, capped by the amount of the corresponding expenses, in accordance with our practice.[79]

We made adjustments pursuant to section 773(a)(6)(C)(iii) of the Act and 19 CFR 351.410(b) for differences in circumstances of sale. Specifically, we deducted direct selling expenses incurred for home market sales, *i.e.*, imputed credit and warranty expenses, and added U.S. direct selling expenses, *i.e.*, imputed credit expenses, warranty expenses, bank charges and commissions.

We made adjustments, in accordance with 19 CFR 351.410(e), where appropriate, for indirect selling expenses incurred in the home market or the United States where commissions were granted on sales in one market but not in the other, also known as the "commission offset." Specifically, where commissions were incurred in only one market, we limited the amount of

---

[78] *See* Ternium/Tenigal Preliminary Sales Calculation Memorandum at Attachment I.
[79] *See, e.g.*, *Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination*, 77 FR 63291 (October 16, 2012) (*Orange Juice from Brazil 2010-2011 AR*), and accompanying IDM at Comment 6.

such allowance to the amount of either the indirect selling expenses incurred in the one market or the commissions allowed in the other market, whichever is less.

Finally, we deducted home market packing costs and added U.S. packing costs, in accordance with section 773(a)(6)(A) and (B) of the Act. When comparing U.S. sales with home market sales of similar merchandise, we also made adjustments for physical differences in the merchandise, in accordance with section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411. We based this adjustment on the difference in the variable cost of manufacturing for the foreign like product and the subject merchandise.

*Ternium Mexico/Tenigal*

We calculated NV based on packed, delivered prices that Ternium Mexico/Tenigal reported for home market sales to unaffiliated customers in Mexico. We made adjustments, where appropriate, to the starting price for billing adjustments, early payment discounts and rebates, in accordance with 19 CFR 351.401(c). We also made deductions, where appropriate, from the starting price for movement expenses, including foreign inland freight to warehouse, foreign inland freight from warehouse to customer, and warehousing expenses, pursuant to section 773(a)(6)(B) of the Act.

We also made adjustments, in accordance with 19 CFR 351.410(e), where appropriate, for indirect selling expenses incurred in the home market or the United States where commissions were granted on sales in one market but not in the other, also known as the "commission offset." Specifically, where commissions were incurred in only one market, we limited the amount of such allowance to the amount of either the indirect selling expenses incurred in the one market or the commissions allowed in the other market, whichever is less.

Finally, we deducted home market packing costs and added U.S. packing costs, in accordance with section 773(a)(6)(A) and (B) of the Act. When comparing U.S. sales with home market sales of similar merchandise, we also made adjustments for physical differences in the merchandise, in accordance with section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411. We based this adjustment on the difference in the variable cost of manufacturing for the foreign like product and the subject merchandise.

We also capped inland freight revenue by the amount of these expenses incurred on home market sales, where applicable, in accordance with our practice.[80]

### 7. Calculation of Normal Value Based on Constructed Value

In accordance with section 773(a)(4) of the Act, if there is no NV based on home market sale prices of identical or similar merchandise in the ordinary course of trade, we then use CV as the basis for NV. We calculated CV based on the sum of the cost of materials and fabrication, general and administrative and financial expenses as described above in the section titled "Cost of Production Analysis." Further, in accordance with section 773(e)(2)(A) of the Act, we added amounts for selling, general, and administrative expenses, and profit, based on the amounts

---

[80] *See, e.g., OJ from Brazil 2010-2011 AR* IDM at Comment 6.

incurred and realized in connection with the production and sale of the foreign like product in the ordinary course of trade in the home market. We calculated the cost of materials and fabrication, general and administrative and financial expenses based on information submitted.

For comparisons to EP sales, we made circumstances-of-sale adjustments by deducting direct selling expenses incurred on comparison market sales from, and adding U.S. direct selling expenses to, CV, in accordance with section 773(a)(8) of the Act and 19 CFR 351.410. For comparisons to CEP sales, we deducted from CV direct selling expenses incurred on comparison market sales, in accordance with section 773(a)(8) of the Act.

For this preliminary determination for Ternium Mexico/Tenigal and Galvasid/Perfiles, where certain sales of the comparable products failed the COP test, we based NV on CV.

## VII.    CURRENCY CONVERSION

We made currency conversions into U.S. dollars in accordance with section 773A of the Act and 19 CFR 351.415(a), based on the exchange rates in effect on the dates of the U.S. sales as certified by the Federal Reserve Bank. The exchange rates are available on the Enforcement and Compliance website at https://enforcement.trade.gov/exchange/index.html.

## VIII.    ADJUSTMENTS TO CASH DEPOSIT RATES FOR EXPORT SUBSIDIES IN THE COMPANION COUNTERVAILING DUTY INVESTIGATION

In an AD investigation where there is a concurrent countervailing duty (CVD) investigation, it is Commerce's normal practice to calculate the cash deposit rate for each respondent by adjusting the respondent's estimated weighted-average dumping margin to account for export subsidies found for each respective respondent in the concurrent CVD investigation. Doing so is in accordance with section 772(c)(1)(C) of the Act, which states that U.S. price "shall be increased by the amount of any countervailing duty imposed on the subject merchandise {…} to offset an export subsidy."[81]

In the preliminary determination of the companion CVD investigation of CORE from Mexico, Commerce determined that certain producers and exporters of CORE from Mexico benefited from certain subsidy programs contingent on exports.[82] In this investigation, we determined the cash deposit rate for Ternium Mexico/Tenigal by adjusting the estimated dumping margin by the subsidy rate determined for Ternium Mexico/Tenigal for export subsidies in the companion CVD investigation.[83] Similarly, we determined the cash deposit rate for the all others rate by adjusting the estimated dumping margin by the portion of the subsidy rate attributable to export subsidies for the "all others" companies in the companion CVD investigation.[84] Galvasid/Perfiles did not

---

[81] *See, e.g.*, *Carbazole Violet Pigment 23 from India: Final Results of Antidumping Duty Administrative Review*, 75 FR 38076, 38077 (July 1, 2010), and accompanying IDM at Comment 1.
[82] *See Certain Corrosion-Resistant Steel Products from Mexico: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 90 FR 9226 (February 10, 2025), and accompanying PDM at 9-10.
[83] *Id.*
[84] *Id.*

benefit from subsidy programs contingent on exports, so we made no adjustment to Galvasid/Perfiles' cash deposit rate.[85]

## IX.    RECOMMENDATION

We recommend applying the above methodology for this preliminary determination.  If this recommendation is accepted, we will publish the preliminary determination in the *Federal Register* and notify the ITC.

☒                                    ☐
_____          _____
Agree                              Disagree

4/3/2025

X  *Chris Abbott*
_____

Signed by: CHRISTOPHER ABBOTT

Tab 13

Preliminary Affirmative Determination of Sales at Less
Than Fair Value, 90 Fed. Reg. 15349
(April 10, 2025)

PR-362

or other non-metallic substances in addition to the metallic coating. The products covered include coils that have a width of 12.7 mm or greater, regardless of form of coil (*e.g.,* in successively superimposed layers, spirally oscillating, *etc.*). The products covered also include products not in coils (*e.g.,* in straight lengths) of a thickness less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness. The products covered also include products not in coils (*e.g.,* in straight lengths) of a thickness of 4.75 mm or more and a width exceeding 150 mm and measuring at least twice the thickness. The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process, *i.e.,* products which have been ''worked after rolling'' (*e.g.,* products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above:

(1) Where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

(2) where the width and thickness vary for a specific product (*e.g.,* the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of the investigation are products in which: (1) iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less, by weight.

Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching and/or slitting or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the in-scope corrosion resistant steel.

All products that meet the written physical description are within the scope of the investigation unless specifically excluded. The following products are outside of and/or specifically excluded from the scope of the investigation:

• Flat-rolled steel products either plated or coated with tin, lead, chromium, chromium oxides, both tin and lead (''terne plate'') or both chromium and chromium oxides (''tin free steel''), whether or not painted, varnished or coated with plastics or other non-metallic substances in addition to the metallic coating;

• Clad products in straight lengths of 4.7625 mm or more in composite thickness and of a width which exceeds 150 mm and measures at least twice the thickness;

• Certain clad stainless flat-rolled products, which are three-layered corrosion-resistant carbon steel flat-rolled products less than 4.75 mm in composite thickness that consist of a carbon steel flat-rolled product

clad on both sides with stainless steel in a 20%–60%–20% ratio; and

Also excluded from the scope of the antidumping duty investigation on corrosion resistant steel from Taiwan are any products covered by the existing antidumping duty order on corrosion-resistant steel from Taiwan. *See Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,* 81FR 48390 (July 25, 2016); *Corrosion-Resistant Steel Products from Taiwan: Notice of Third Amended Final Determination of Sales at Less Than Fair Value Pursuant to Court Decision and Partial Exclusion from Antidumping Duty Order,* 88 FR 58245 (August 25, 2023).

Also excluded from the scope of the antidumping duty investigation on corrosion-resistant steel from the United Arab Emirates and the antidumping duty and countervailing duty investigations on corrosion-resistant steel from the Socialist Republic of Vietnam are any products covered by the existing antidumping and countervailing duty orders on corrosion-resistant steel from the People's Republic of China and the Republic of Korea and the antidumping duty order on corrosion-resistant steel from Taiwan. *See Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,* 81 FR 48390 (July 25, 2016); *see also Certain Corrosion-Resistant Steel Products from India, Italy, Republic of Korea and the People's Republic of China: Countervailing Duty Order,* 81 FR 48387 (July 25, 2016). This exclusion does not apply to imports of corrosion-resistant steel that are entered, or withdrawn from warehouse, for consumption in the United States for which the relevant importer and exporter certifications have been completed and maintained and all other applicable certification requirements have been met such that the entry is entered into the United States as not subject to the antidumping and countervailing duty orders on corrosion-resistant steel from the People's Republic of China, the antidumping and countervailing duty orders on corrosion-resistant steel from the Republic of Korea, or the antidumping duty order on corrosion-resistant steel from Taiwan.

The products subject to the investigation are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7210.30.0030, 7210.30.0060, 7210.41.0000, 7210.49.0030, 7210.49.0040, 7210.49.0045, 7210.49.0091, 7210.49.0095, 7210.61.0000, 7210.69.0000, 7210.70.6030, 7210.70.6060, 7210.70.6090, 7210.90.6000, 7210.90.9000, 7212.20.0000, 7212.30.1030, 7212.30.1090, 7212.30.3000, 7212.30.5000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7212.60.0000, 7225.91.0000, 7225.92.0000, 7226.99.0110, and 7226.99.0130.

The products subject to the investigation may also enter under the following HTSUS item numbers: 7210.90.1000, 7215.90.1000,

7215.90.3000, 7215.90.5000, 7217.20.1500, 7217.30.1530, 7217.30.1560, 7217.90.1000, 7217.90.5030, 7217.90.5060, 7217.90.5090, 7225.99.0090, 7226.99.0180, 7228.60.6000, 7228.60.8000, and 7229.90.1000.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the investigation is dispositive.

## Appendix II

### List of Topics Discussed in the Preliminary Decision Memorandum

I. Summary
II. Background
III. Period of Investigation
IV. Scope Comments
V. Affiliation and Single Entity Treatment
VI. Discussion of the Methodology
VII. Currency Conversion
VIII. Recommendation

[FR Doc. 2025–06133 Filed 4–9–25; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

[A–201–863]

## Certain Corrosion-Resistant Steel Products From Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) preliminarily determines that certain corrosion-resistant steel products (CORE) from Mexico are being, or are likely to be, sold in the United States at less than fair value (LTFV). The period of investigation is July 1, 2023, through June 30, 2024. Interested parties are invited to comment on this preliminary determination.

**DATES:** Applicable April 10, 2025.

**FOR FURTHER INFORMATION CONTACT:** Katerina Katsiadas or Brian Smith, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–4929 or (202) 482–1766, respectively.

**SUPPLEMENTARY INFORMATION:**

## Background

This preliminary determination is made in accordance with section 733(b) of the Tariff Act of 1930, as amended (the Act). Commerce published the notice of initiation of this investigation

on October 2, 2024.[1] On January 28, 2025, Commerce postponed the preliminary determination of this investigation until April 3, 2025.[2] For a complete description of the events that followed the initiation of this investigation, *see* the Preliminary Decision Memorandum.[3] A list of topics included in the Preliminary Decision Memorandum is included as Appendix II to this notice. The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https:// access.trade.gov.* In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *https://access.trade.gov/public/ FRNoticesListLayout.aspx.*

## Scope of the Investigation

The product covered by this investigation is CORE from Mexico. For a complete description of the scope of this investigation, *see* Appendix I.

## Scope Comments

In accordance with the *Preamble* to Commerce's regulations,[4] in the *Initiation Notice,* Commerce set aside a period of time for parties to raise issues regarding product coverage (*i.e.,* scope).[5]

Certain interested parties commented on the scope of the investigation as it appeared in the *Initiation Notice.* For a summary of the product coverage comments and rebuttal responses submitted to the record for this investigation and accompanying discussion and analysis of all comments timely received, *see* the Preliminary Scope Decision Memorandum.[6] Commerce is not preliminarily modifying the scope language as it appeared in the *Initiation Notice.* In the Preliminary Scope Decision Memorandum, Commerce established the deadline for parties to submit scope case and rebuttal briefs.[7]

## Methodology

Commerce is conducting this investigation in accordance with section 731 of the Act. Commerce calculated export prices for Galvasid S.A. de C.V. and Perfiles LM, S.A. de C.V. (collectively, Galvasid/Perfiles)[8] in accordance with section 772(a) of the Act and calculated constructed export prices for Ternium Mexico, S.A. de C.V. and Tenigal, S.de R.L. de C.V. (collectively, Ternium Mexico/ Tenegal)[9] in accordance with section 772(b) of the Act. Normal value is calculated in accordance with section 773 of the Act. For a full description of the methodology underlying the

preliminary determination, *see* the Preliminary Decision Memorandum.

## All-Others Rate

Sections 733(d)(1)(ii) and 735(c)(5)(A) of the Act provide that in the preliminary determination Commerce shall determine an estimated all-others rate for all exporters and producers not individually examined. This rate shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely under section 776 of the Act.

In this investigation, Commerce calculated estimated weighted-average dumping margins for Galvasid/Perfiles and Ternium Mexico/Tenigal that are not zero, *de minimis,* or based entirely on facts otherwise available. Commerce calculated the all-others rate using a weighted average of the estimated weighted-average dumping margins calculated for the examined respondents using each company's publicly-ranged values for the merchandise under consideration.[10]

## Preliminary Determination

Commerce preliminarily determines that the following estimated weighted-average dumping margins exist:

| Exporter/producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offset(s)) (percent) |
|---|---|---|
| Galvasid S.A. de C.V./Perfiles LM, S.A. de C.V ................................................................... | 14.43 | [11] 14.43 |
| Ternium Mexico S.A. de C.V./Tenigal, S.de R.L. de C.V ...................................................... | 3.43 | [12] 1.87 |
| All Others ............................................................................................................................... | 7.03 | 5.47 |

---

[1] *See Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Initiation of Less-Than-Fair-Value Investigations,* 89 FR 80196 (October 2, 2024) (*Initiation Notice*).

[2] *See Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations,* 90 FR 8260 (January 28, 2025).

[3] *See* Memorandum, ''Decision Memorandum for the Preliminary Affirmaative Determination in the Less-Than-Fair-Value Investigation of Certain Corrosion Resistant Steel Products from Mexico'' dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

[4] *See Antidumping Duties; Countervailing Duties, Final Rule,* 62 FR 27296, 27323 (May 19, 1997).

[5] *See Initiation Notice,* 89 FR at 80197.

[6] *See* Memorandum, ''*Certain Corrosion-Resistant Steel Products From Australia, Brazil, Canada,*

*Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam:* Scope Comments Decision Memorandum for the Preliminary Determination,'' dated concurrently with this Preliminary Determination (Preliminary Scope Decision Memorandum).

[7] *Id.*

[8] Commerce preliminarily determines that Galvasid and Perfiles are a single entity. *See* Preliminary Decision Memorandum.

[9] Commerce preliminarily determines that Ternium Mexico and Tenigal are a single entity. *See* Preliminary Decision Memorandum.

[10] S*ee* Memorandum, ''Calculation of the All-Others Rate,'' dated concurrently with this notice. With two respondents under examination, Commerce normally calculates: (A) a weighted-average of the estimated weighted-average dumping margins calculated for the examined respondents; (B) a simple average of the estimated weighted-average dumping margins calculated for the examined respondents; and (C) a weighted-average of the estimated weighted-average dumping margins calculated for the examined respondents using each

company's publicly-ranged U.S. sales values for the merchandise under consideration. Commerce then compares (B) and (C) to (A) and selects the rate closest to (A) as the most appropriate rate for all other producers and exporters. *See, e.g., Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part,* 75 FR 53661, 53662 (September 1, 2010), and accompanying Issues and Decision Memorandum at Comment 1. As complete publicly ranged sales data were available, Commerce based the all-others rate on the publicly ranged sales data of the mandatory respondents.

[11] *See Certain Corrosion-Resistant Steel Products from Mexico: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination,* 90 FR 9226 (February 10, 2025), and accompanying Preliminary Decision Memorandum at 9–10.

[12] *Id.*

## Suspension of Liquidation

In accordance with section 733(d)(2) of the Act, Commerce will direct U.S. Customs and Border Protection (CBP) to suspend liquidation of entries of subject merchandise, as described in Appendix I, entered, or withdrawn from warehouse, for consumption on or after the date of publication of this notice in the **Federal Register**. Further, pursuant to section 733(d)(1)(B) of the Act and 19 CFR 351.205(d), Commerce will instruct CBP to require a cash deposit equal to the estimated weighted-average dumping margin or the estimated all-others rate, as follows: (1) the cash deposit rate for the respondents listed above will be equal to the company-specific estimated weighted-average dumping margins determined in this preliminary determination; (2) if the exporter is not a respondent identified above, but the producer is, then the cash deposit rate will be equal to the company-specific estimated weighted-average dumping margin established for that producer of the subject merchandise; and (3) the cash deposit rate for all other producers and exporters will be equal to the all-others estimated weighted-average dumping margin.

To determine the cash deposit rates, Commerce normally adjusts the estimated weighted-average dumping margin by the amount of domestic subsidy pass-through and export subsidies determined in a companion countervailing duty (CVD) proceeding when CVD provisional measures are in effect. Accordingly, where Commerce has made a preliminary affirmative determination for domestic subsidy pass-through or export subsidies, Commerce has offset the calculated estimated weighted-average dumping margin by the appropriate rate(s). Any such adjusted cash deposit rate may be found in the ''Preliminary Determination'' section above.

Should provisional measures in the companion CVD investigation expire prior to the expiration of provisional measures in this LTFV investigation, Commerce will direct CBP to begin collecting cash deposits at a rate equal to the estimated weighted-average dumping margins calculated in this preliminary determination unadjusted for the passed-through domestic subsidies or for export subsidies at the time the CVD provisional measures expire.

These suspension of liquidation instructions will remain in effect until further notice.

## Disclosure

Commerce intends to disclose to interested parties the calculations performed in connection with this preliminary determination within five days of its public announcement or, if there is no public announcement, within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

Consistent with 19 CFR 351.224(e), Commerce will analyze and, if appropriate, correct any timely allegations of significant ministerial errors by amending the preliminary determination. However, consistent with 19 CFR 351.224(d), Commerce will not consider incomplete allegations that do not address the significance standard under 19 CFR 351.224(g) following the preliminary determination. Instead, Commerce will address such allegations in the final determination together with issues raised in the case briefs or other written comments.

## Verification

As provided in section 782(i)(1) of the Act, Commerce intends to verify the information relied upon in making its final determination.

## Public Comment

Case briefs or other written comments, excluding scope comments, may be submitted to the Assistant Secretary for Enforcement and Compliance no later than seven days after the date on which the last verification report is issued in this investigation.[13] Rebuttal briefs, limited to issues raised in the case briefs, may be filed not later than five days after the date for filing case briefs.[14] Interested parties who submit case briefs or rebuttal briefs in this proceeding must submit: (1) a table of contents listing each issue; and (2) a table of authorities.[15]

As provided under 19 CFR 351.309(c)(2) and (d)(2), in prior proceedings we have encouraged interested parties to provide an executive summary of their brief that should be limited to five pages total, including footnotes. In this investigation, we instead request that interested parties provide at the beginning of their briefs a public, executive summary for each issue raised

in their briefs.[16] Further, we request that interested parties limit their executive summary of each issue to no more than 450 words, not including citations. We intend to use the executive summaries as the basis of the comment summaries included in the issues and decision memorandum that will accompany the final determination in this investigation. We request that interested parties include footnotes for relevant citations in the executive summary of each issue. Note that Commerce has amended certain of its requirements pertaining to the service of documents in 19 CFR 351.303(f).[17]

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, within 30 days after the date of publication of this notice. Requests should contain: (1) the party's name, address, and telephone number; (2) the number of participants and whether any participant is a foreign national; and (3) a list of the issues to be discussed. If a request for a hearing is made, Commerce intends to hold the hearing at a date and time to be determined. Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled date.

## Postponement of Final Determination and Extension of Provisional Measures

Section 735(a)(2) of the Act provides that a final determination may be postponed until not later than 135 days after the date of the publication of the preliminary determination if, in the event of an affirmative preliminary determination, a request for such postponement is made by exporters who account for a significant proportion of exports of the subject merchandise, or in the event of a negative preliminary determination, a request for such postponement is made by the petitioners. Pursuant to 19 CFR 351.210(e)(2), Commerce requires that requests by respondents for postponement of a final antidumping determination be accompanied by a request for extension of provisional measures from a four-month period to a period not more than six months in duration.

On March 10, 2025, pursuant to 19 CFR 351.210(e), Ternium Mexico/ Tenigal requested that Commerce

---

[13] *See* 19 CFR 351.309(c)(1)(i); *see also* 19 CFR 351.303 (for general filing requirements).

[14] *See* 19 CFR 351.309(d); *see also Administrative Protective Order, Service, and Other Procedures in Antidumping and Countervailing Duty Proceedings,* 88 FR 67069, 67077 (September 29, 2023) (*APO and Service Final Rule*).

[15] *See* 19 351.309(c)(2) and (d)(2).

[16] We use the term ''issue'' here to describe an argument that Commerce would normally address in a comment of the Issues and Decision Memorandum.

[17] *See APO and Service Final Rule.*

postpone the final determination and that provisional measures be extended to a period not to exceed six months.[18] In accordance with section 735(a)(2)(A) of the Act and 19 CFR 351.210(b)(2)(ii), because: (1) the preliminary determination is affirmative; (2) the requesting exporter accounts for a significant proportion of exports of the subject merchandise; and (3) no compelling reasons for denial exist, Commerce is postponing the final determination and extending the provisional measures from a four-month period to a period not greater than six months. Accordingly, Commerce will make its final determination no later than 135 days after the date of publication of this preliminary determination.

## U.S. International Trade Commission (ITC) Notification

In accordance with section 733(f) of the Act, Commerce will notify the ITC of its preliminary determination. If the final determination is affirmative, the ITC will determine before the later of 120 days after the date of this preliminary determination or 45 days after the final determination whether imports of CORE from Mexico are materially injuring, or threaten material injury to, the U.S. industry.

## Notification to Interested Parties

This determination is issued and published in accordance with sections 733(f) and 777(i)(1) of the Act, and 19 CFR 351.205(c).

Dated: April 3, 2025.

**Christopher Abbott,**
*Deputy Assistant Secretary for Policy and Negotiations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

## Appendix I

### Scope of the Investigation

The products covered by this investigation are certain flat-rolled steel products, either clad, plated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished, laminated, or coated with plastics or other non-metallic substances in addition to the metallic coating. The products covered include coils that have a width of 12.7 mm or greater, regardless of form of coil (*e.g.,* in successively superimposed layers, spirally oscillating, *etc.*). The products covered also include products not in coils (*e.g.,* in straight lengths) of a thickness less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness. The products covered also include products not

in coils (*e.g.,* in straight lengths) of a thickness of 4.75 mm or more and a width exceeding 150 mm and measuring at least twice the thickness. The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process, *i.e.,* products which have been "worked after rolling" (*e.g.,* products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above:

(1) Where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

(2) where the width and thickness vary for a specific product (*e.g.,* the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this investigation are products in which: (1) iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less, by weight.

Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching and/or slitting or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the in-scope corrosion resistant steel.

All products that meet the written physical description are within the scope of this investigation unless specifically excluded. The following products are outside of and/or specifically excluded from the scope of this investigation:

• Flat-rolled steel products either plated or coated with tin, lead, chromium, chromium oxides, both tin and lead ("terne plate") or both chromium and chromium oxides ("tin free steel"), whether or not painted, varnished or coated with plastics or other nonmetallic substances in addition to the metallic coating;

• Clad products in straight lengths of 4.7625 mm or more in composite thickness and of a width which exceeds 150 mm and measures at least twice the thickness;

• Certain clad stainless flat-rolled products, which are three-layered corrosion-resistant carbon steel flat-rolled products less than 4.75 mm in composite thickness that consist of a carbon steel flat-rolled product clad on both sides with stainless steel in a 20%–60%–20% ratio.

The products subject to this investigation are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7210.30.0030, 7210.30.0060, 7210.41.0000, 7210.49.0030, 7210.49.0040, 7210.49.0045, 7210.49.0091, 7210.49.0095, 7210.61.0000, 7210.69.0000, 7210.70.6030, 7210.70.6060, 7210.70.6090, 7210.90.6000, 7210.90.9000, 7212.20.0000,

7212.30.1030, 7212.30.1090, 7212.30.3000, 7212.30.5000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7212.60.0000, 7225.91.0000, 7225.92.0000, 7226.99.0110, and 7226.99.0130.

The products subject to this investigation may also enter under the following HTSUS item numbers: 7210.90.1000, 7215.90.1000, 7215.90.3000, 7215.90.5000, 7217.20.1500, 7217.30.1530, 7217.30.1560, 7217.90.1000, 7217.90.5030, 7217.90.5060, 7217.90.5090, 7225.99.0090, 7226.99.0180, 7228.60.6000, 7228.60.8000, and 7229.90.1000.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of this investigation is dispositive.

## Appendix II

### List of Topics Discussed in the Preliminary Decision Memorandum

I. Summary
II. Background
III. Period of Investigation
IV. Scope Comments
V. Affiliation and Single Entity Treatment
VI. Discussion of the Methodology
VII. Currency Conversion
VIII. Adjustments to Cash Deposit Rates for Export Subsidies in the Companion Countervailing Duty Investigation
IX. Recommendation

[FR Doc. 2025–06136 Filed 4–9–25; 8:45 am]
**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–421–818]**

### Certain Corrosion-Resistant Steel Products From the Netherlands: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) preliminarily determines that certain corrosion-resistant steel products (CORE) from the Netherlands are being, or are likely to be, sold in the United States at less than fair value (LTFV). The period of investigation (POI) is July 1, 2023, through June 30, 2024. Interested parties are invited to comment on this preliminary determination.

**DATES:** Applicable April 10, 2025.

**FOR FURTHER INFORMATION CONTACT:** Rachel Jennings or Miranda Bourdeau, AD/CVD Operations, Office V, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington,

---

[18] *See* Ternium Mexico's Letter, "Request to Extend Final Determination," dated March 10, 2025.

Tab 14

Commerce's Sales Verification Agenda for Galvasid
(May 2, 2025)

PR-378, CR-679

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-863
Investigation
~~Business Proprietary~~
OVIII:KK
**PUBLIC VERSION**

May 2, 2025

**Galvasid S.A. de C.V.**
c/o Jeffrey M. Winton
Winton & Chapman, PLLC
1100 13th Street, NW, Suite 825
Washington, DC 20005

Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products (CORE) from Mexico:  Sales Verification Agenda

Dear Mr. Winton:

Enclosed you will find the agenda we intend to follow at the verification of the sales questionnaire responses of Galvasid S.A. de C.V. (Galvasid) in this investigation.  We may, however, revise the order of this agenda, or of specific items described in the agenda, depending on the needs of the verification.  Faris Montgomery and Katerina Katsiadas will conduct the sales verification from May 12 through May 16, 2025, in Monterrey, Mexico.

The purpose of providing this agenda in advance of the actual verification is to allow you to brief the appropriate company personnel on the items to be covered and the type of documentation required to verify each item.  The enclosed agenda is not necessarily all inclusive and we reserve the right to request any additional information or materials necessary for a complete verification.

Please reiterate to your client the statutory requirement for verification and note the following facts:  (1) the information gathered during the verification will be used solely for the purposes of this proceeding; and (2) it is in your client's interest to cooperate since failure to permit verification may result in the Department of Commerce (Commerce) relying on adverse "facts available" under section 776 of the Tariff Act of 1930, as amended (the Act).

To facilitate the verification process, we have described the types of source documents that we will require to support the submitted data.  As you are aware, the time available for the verification is limited.  Consequently, we ask that the necessary information be gathered by the appropriate personnel prior to the verifiers' arrival.  The verifiers will require copies of certain documents for the verification report.  Copies of supporting documentation, along with English translations of all pertinent information, should be made **prior** to the verification.  A photocopying machine should also be made available for use during the entire verification process.

In addition to examining supporting documentation, the verifiers will need to speak to appropriate personnel concerning your client's questionnaire responses and other information

submitted on the record of the proceeding. Please ensure appropriate personnel are made available to the verifiers. Please note that the names and titles of all company personnel and representatives participating in the verification, regardless of the role played, will be included in the verification report and treated as public information.

It is the responsibility of the respondent to be fully prepared for this verification. If your client is not prepared to support or explain a response item at the appropriate time, the verifiers will move on to another topic. If, due to time constraints, it is not possible to return to that item, we may consider the item unverified, which may result in our basing the final determination of this investigation on the facts available, possibly including information that is adverse to the interests of your client.

Please note that verification is not intended to be an opportunity for submission of new factual information. New information will be accepted at verification only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record. In such instances, you must file the information at Commerce and serve it on all parties on the relevant service list(s) within two business days after the information is presented at verification. Our acceptance of such information for examination at verification does not guarantee that we will be able to use it for our final determination.

Section 777(c)(1) of the Act provides for the release of all business proprietary information, under administrative protective order (APO), presented to or obtained by Commerce during a proceeding, except privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure. As such, we request that you file and serve verification exhibits no later than the end of the fifth business day after each verification is completed. Unless you provide detailed, specific information to establish that there is a "clear and compelling need" to withhold a verification exhibit from disclosure, all business proprietary exhibits must be filed with Commerce as business proprietary documents and served on all parties on the APO service list in accordance with 19 CFR 351.303(b) and 351.303(f) no later than the end of the fifth business day after each verification is completed. It is not necessary to create, file, or serve public versions of exhibits that are not public in their entirety. Your submission of the exhibits must be accompanied by the certificate of service required by 19 CFR 351.303(f)(2) indicating service on the parties on the APO service list, as well as the certificates of factual accuracy included with the initial questionnaire issued to you by Commerce. Exhibits that are public in their entirety (e.g., public laws, annual reports) must be filed with Commerce and served in accordance with the requirements set forth in 19 CFR 351.303(b) and 351.303(f) for submission of public information. If, upon review, Commerce finds that any of the exhibits filed do not match the exhibits that Commerce decided to take during verification, Commerce will notify the submitter and other parties, and will take appropriate steps to address any inconsistencies.

All exhibits must be filed electronically using Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). An electronically filed document must be received successfully in its entirety by Commerce's electronic records system, ACCESS, by 5 p.m. ET, unless otherwise specified by Commerce, on the fifth business day after

verification is completed.  Documents excepted from the electronic filing requirement under 19 CFR 351.303(b)(2)(ii) must be filed manually (i.e., in paper form) with the APO/Dockets Unit in Room 18022 and stamped with the date of receipt on the fifth business day after verification is completed.

If you have any questions regarding this verification, please contact Faris Montgomery at (202) 482-1537 or Katerina Katsiadas at (202) 482-4929.  If, upon receipt of this outline, you feel any of the verification procedures cannot be performed, please contact us immediately.

Sincerely,

Rebecca Trainor
Program Manager
AD/CVD Operations, Office VIII

3

Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products (CORE)
From Mexico (A-201-863)
**Galvasid S.A. de C.V. (Galvasid)**
Sales Verification Agenda

The following agenda lists the tentative order in which topics will be considered and the documents that will be examined.  It should be considered illustrative but not all inclusive.

Please note that verifiers cannot accept substantial revisions to information submitted in questionnaire responses.  Minor errors found in preparing for verification should be presented to Department officials at the beginning of verification and submitted for the official record.

The company officials who actually prepared the company responses must be present at verification.  They should have at hand all company records and worksheets used in responding to the questionnaire and supplemental requests.  Each worksheet should contain source references for all the data used in the worksheet calculations.  All documents presented during verification must be translated on the first occasion on which they are presented.  The verifiers will require **two copies** of every document you plan to submit during the verification process and of all additional documents requested during verification, unless you are advised otherwise.  These copies need to be provided prior to verifying a particular topic or immediately after being requested, and should be translated into English, if necessary.  Please ensure that you or your representative retain at least one copy of each document taken by the verifiers.

To facilitate the proceedings, please have the following available for the verifier:

1.      For each verification procedure that indicates the verifier must obtain a list, a schedule, a description, etc., the item must be prepared in advance and available on the first day of verification;

2.      A complete set of all the submissions (to use as a reference);

3.      Copies of the worksheets used to link the submitted amounts to company records;

4.      Original company records and other source documentation used to prepare any part of the response (e.g., general ledger, trial balance, purchase journals, production reports, inventory ledgers, fixed asset ledgers, etc.);

5.      Appropriate personnel who are knowledgeable about the data in the response and the underlying accounting systems, and;

6.      Access to a copy machine and standard office supplies.

**Summary of Required Source Documents**

Although other documents may be required, the following is an illustrative list of the type of source documents that will be examined during verification:

4

1. Complete financial statements and footnotes, or interim financial statements and footnotes, covering the period of investigation (POI).

2. General ledger and subsidiary ledgers for accounts receivable, accounts payable, and expenses.

3. Chart of accounts and sub-accounts covering the POI.

4. Journals for accounts receivable, accounts payable, and sales; cashbook (i.e., the journal recording cash receipts and cash disbursements). These journals will serve as substantiation for summary entries to general ledger accounts.

5. Complete sales records (in addition to sales journals and ledgers), such as sequential invoice and credit memo files. These records will serve as substantiation for summary entries in journals and/or general ledger accounts.

6. Production orders and inventory records. These documents will serve as substantiation for reported information about individual sales as well as total sales figures for the POI.

7. Bill of materials, specification lists, and other factory production documentation. These documents will serve as substantiation for reported product characteristics.

8. Purchase agreements and records of payment made for costs, charges and expenses, such as canceled checks, bank statements, notifications of payment, reconciliations, payment vouchers and invoices.

9. Records of payment received for selected U.S. and home market sales, such as bank statements, lockbox statements with copies of checks and remittance advice, and notifications of payment by customers.

10. Sales agreements or contracts, purchase orders, order confirmation, production advice, invoices, shipping notices and bills of lading for the selected sales.

11. A complete copy of each sales listing reported to Commerce.

Filed By: Katerina Katsiadas, Filed Date: 5/2/25 10:42 AM, Submission Status: Approved

**Verification Agenda**

**I.    INTRODUCTION**

A.    Review of verification outline, schedule, and procedures to be followed.

B.    Presentation by Galvasid officials of minor corrections, if any, to the responses resulting from verification preparation.

**II.    CORPORATE STRUCTURE AND ORGANIZATION**

A.    Review the organizational and corporate structure of Galvasid and the activities of all divisions of Galvasid involved in the production, sale and distribution of CORE to all markets, as identified in your submissions.

B.    Using the fiscal-year balance sheet covering all of the POI, review the account and sub-account detail for all short- and long-term investments and holdings by Galvasid and affiliated companies involved in the sale or production of name product.  If the fiscal-year balance sheet covering all of the POI is not available, then provide the balance sheet that covers the majority of the POI.  If the percentage of Galvasid investments and holdings are not observable from this account detail, calculate these percentages separately.

C.    Review the nature of the affiliation between Galvasid and Perfiles LM, S.A. de C.V., and other companies, including, but not limited to, all suppliers and customers, as reported in your submissions.

D.    Identify the shareholders and officers in Galvasid and every affiliated company involved in the production and sale of CORE.

**III.    ACCOUNTING AND DATA SYSTEMS**

A.    Identify and describe the data systems used to record production and sales data.  Review the manner in which source documents for production, sales, and expenses flow into the financial statements via accounting vouchers, journals, subsidiary ledgers, and general ledger accounts.

B.    Review the chart of accounts for Galvasid and appropriate affiliated companies.

C.    Review the complete General Ledger covering the POI.

D.    Review the translated financial statements and accompanying notes.

E.    Review the cost center codes that are relevant to the production, sale and distribution of CORE.

6

F.     Identify all reports (e.g., production, inventory, sales, shipment) generated from the data system in the ordinary course of business. Provide POI time-period examples of these reports. Ensure that all company source databases used to generate these reports are on-line and accessible by a programmer.

## IV.     SALES PROCESS

A.     Provide an overview of the sales and distribution processes and document flow for sales of CORE in the comparison market and sales to the United States. Provide a diagram showing the paper trail for the recording of these sales in your accounting records. The diagram should start from the receipt of an order through final payment and the year-end posting of sales in the financial statements. Identify each step of the paper trail, all entries that would be recorded in the books and ledgers, the name and number of the accounting code, and the name of the ledger, book, or journal in which each such entry is made. Use specific examples from the preselected sales listed in Attachments I and II.

B.     Discuss and provide support for the reported selling activities, customer categories, sales terms and distribution channels in the United States and the comparison market, referring to your discussion of distribution channels in your questionnaire response.

## V.     DATE OF SALE

A.     Demonstrate that the shipment date is the appropriate date of sale for U.S. and comparison market sales.

## VI.     PRODUCTS SUBJECT TO THE SCOPE OF REVIEW

A.     Identification of in-scope products

1.     Provide/review a complete list of all products sold during the POR, and a list of the internal accounting codes for these products that were used to record costs, sales, or expenses. If a product coding system was created for purposes of identifying products subject to this review, describe how this system was created, defined, and applied in preparing your response. Provide copies of any computer programs used in this process.

2.     From the master list of all products, provide a master list of products that are considered by the company to be merchandise within the scope of the investigation or review. Further, identify on the master list of all products the most similar products that were not considered to be merchandise within the scope of the investigation.

3.     Review the product-matching criteria listed in the Appendix to the questionnaire. Describe the process followed by the company in applying these characteristics to the master list of all products produced by the company in order to derive the master list of products subject to the scope of the investigation. Provide copies of

7

any computer programs used in this process and ensure that the data source files used for this purpose are readily available for access during verification.

For each U.S. and home-market preselected sale listed in the attachments to this outline, list the product characteristic codes you assigned in the response. Support each reported characteristic with product samples, drawings, bill of materials, specification sheets or other documentation.

4. If a conversion factor was used to convert units of measure maintained in the ordinary course of business to units of measure requested by or reported to Commerce, please provide an explanation of the formula used and examples of the conversion.

B. Production Process

1. Review the production process with respect to the in-scope products.

## VII. QUANTITY AND VALUE RECONCILIATION

A. Beginning with your sales system/journal, review the reconciliation worksheets and programs that tie the sales system/journal to the general ledger and into the financial statements sales total. Then tie the sales system to the quantity and value totals reported in the most up-to-date submission of your home and U.S. market databases (see attachment 1).

B. Provide the computer programs used in the reconciliation and have available the source data files and a programmer for testing the reconciliation. Identify key language in the program and its purpose.

C. For the *first* and *fifth* U.S. and comparison-market sale identified in the attachment to this outline, tie the sale into the reconciliation to the financial statement. Provide copies of the relevant documents used in the reconciliation of each.

D. Review any instance where post-sale adjustments have been made to either price or quantity. Demonstrate that those transactions affecting the sales and quantity (i.e., those transactions affected in terms of price and quantity after invoicing) are reflected accurately in your responses.

## VIII. COMPLETENESS TESTS

Completeness is the process which confirms the accuracy and thoroughness of reported sales and expenses. The only completeness test you are required to prepare in advance of the verification is the reconciliation of the quantity and value of sales in Section VII of this outline. During the course of the verification, other completeness tests will be initiated from a variety of sources and records.

8

In a typical completeness test, a control list of line items/transactions/etc. will be selected from the tested record and you will be asked to provide documentation which demonstrates whether the sale or other expense item selected 1) is merchandise subject to the scope of the investigation or review or related to such merchandise; 2) relates to activity in the U.S. or comparison market; and 3) falls within the time frame of the POI. If all of these apply, then you will be asked to identify where you have accounted for the tested item in your response. For example, if the tested item is a sale or related to a sale that should have been reported in your U.S. or comparison-market sales listing, identify the appropriate response Sequence Number. If the tested item is related to a particular expense for which you have reported a ratio, demonstrate that the expense has been captured in the calculation of that ratio.

### IX. VERIFICATION OF REPORTED TRANSACTION-SPECIFIC DATA FOR SELECTED SALES FROM THE COMPARISON MARKET AND U.S. SALES

General Instructions

The purpose of this section is to verify the factual information reported for specific sales transactions listed in your sales responses. Certain U.S. and comparison-market sales have been pre-selected for review and are listed in attachments two and three of this outline. Additional sales to be examined may be identified during verification.

In this verification procedure, we will "trace" the selected sale from initial inquiry/order through your records to receipt of payment from the customer. For the sales trace of each selected sale, a complete set of documents should be prepared for that sale supporting all sale-specific information listed in the U.S. or comparison sales files you reported to Commerce. For charges and adjustments that represent the transaction-specific charges and adjustments for that transaction, such as on-invoice discounts, freight, commissions etc., the supporting documents should be included in the prepared set of support documents for that transaction and, where appropriate, a worksheet should be provided to link the charge or adjustment reported for that observation. The verifier will check each column (e.g., product characteristics, date of sale and invoice, gross price, quantity, shipping date, payment date, commissions, etc.) of the sales files against the documents. Also, include in your sales-trace package, for each sale, copies of records that link the sale to the sales journal used in the reconciliation of overall quantity and value of sales. Charges and adjustments that have been reported on an allocated (non-sale-specific) basis will be verified separately as stand-alone topics. See section X below.

For each U.S and comparison-market sale listed in the attachments to this outline, provide a sales-trace package which includes documents which support each sales-specific data field in the sales listing reported to Commerce. If an affiliated party is involved in the chain of distribution, also incorporate affiliated party documents in the sales trace package. The sales-trace package should include, but is not limited to, the following documents (where applicable):

1. Sales-negotiation correspondence
2. Price Lists
3. Customer contracts
4. Customer purchase orders

9

5. Order confirmations
6. Invoices
7. Packing lists
8. Inspection certificates, mill certifications
9. Shipping documents such as freight bills, bills of lading and airway bills
10. Export licenses and export permits (for export sales)
11. U.S. Customs entry documents (for export sales)
12. Sales journal pages recording the selected sale
13. Accounts receivable page showing the corresponding sales journal information (or summary information) pertaining to the selected sale
14. Records of payment such as canceled checks, letters of credit, debit/credit memos, bank deposit slips and/or bank statements
15. Accounts receivable ledger pages
16. Cash receipts journals
17. General Ledger pages
18. Invoices and records of payment for transaction-specific charges and/or adjustments
19. For expenses calculated using a ratio (e.g., credit), include in each sales trace a worksheet demonstrating that the ratio was applied correctly.

Documents for each selected sale should be grouped together in chronological order and labeled with (a) the observation number identified in the appropriate Attachment and (b) the document type in English (e.g., "Invoice"). A sample of each type of document presented must be completely translated into English at the outset of the sales-trace verification. The original source documents must also be available to the verifiers.

A. Review the information reported for each selected comparison-market sale:

1. Customer Information (CUSCODH, CCUSCODH, CUSCATH), customer relationship (CUSRELH), and Channel of Distribution (CHANNELH)

2. Terms and Dates of Sale (SALEDATH, SALINDTH, INVOICEH, SHIPDATH), Delivery (SALETERH), and Payment (PAYTERMH); and Payment Date (PAYDATE1H)

3. Gross Unit Price (GRSUPRH)

4. Quantity (QTYH)

5. Control Number (CONNUMH)

6. Destination (DESTH)

7. Manufacturer (MRFH)

8. Billing Adjustments (BILLADJH)

10

9. Early Payment Discounts (EARLPYH)

10. Commercial Discounts (COMMDISCH)

B. Review the information reported for each selected U.S. sale:

1. Customer Information (CUSCODU, CCUSCODU, CUSCATU), and Channel of Distribution (CHANNELU)

2. Terms and Dates of Sale (SALEDATU, SALINDTU, INVOICEU, SHIPDATU), Delivery (SALETERU), and Payment (PAYTERMU); and Payment Date (PAYDATEU)

3. Gross Unit Price (GRSUPRU)

4. Quantity (QTYU)

5. Control Number (CONNUMU)

6. Destination (DESTU)

7. Manufacturer (MRFU)

8. Bank Charges (BANKCHARU)

9. Billing Adjustments (BILLADJU)

10. Early Payment Discounts (EARLPYU)

11. Commercial Discounts (COMMDISCU)

## X. **OTHER ADJUSTMENTS AND EXPENSES**

General Instructions

The purpose of this section is to verify each reported adjustment and expense that is not a transaction-specific charge or adjustment that was examined in the context of the selected sales traces in section IX above. We will first review the narrative and worksheets provided in your response which describe and illustrate the methodology applied. If this information was not reported in your response, please prepare a separate package for verification that includes a calculation worksheet which explains the computation of the reported per-unit amount or ratio calculated for each adjustment or expense. Each element of the calculation worksheet must be supported by source documents. Allocation methodologies must be clearly explained, including an explanation of why it was not possible to compute an transaction-specific expense or adjustment for that transaction, and how the allocation covers expenses of merchandise covered

11

by the scope of the investigation or review during the POI.  Examples of supporting documents required include:  (1) appropriate invoices; (2) accounts payable ledger; (3) cash disbursements journal; and (4) canceled checks and bank statements.

Where you have not reported one of these charges or adjustments for any transaction, be prepared to substantiate that you did not incur any such expense.

A.      **Movement Expenses**

1.      Inland Freight-Plant to Warehouse (INLFTWH)

2.      Warehousing Expense (WAREHSH)

3.      Inland Freight-Plant/Warehouse to Customer – Unaffiliated Transport (INLFTCH)

4.      Inland Freight-Plant/Warehouse to Port of Exportation (DINLFTPU)

5.      Brokerage and Handling Incurred in the Country of Manufacture (DBROKU)

6.      Brokerage and Handling Incurred in the United States (USBROKU)

7.      Inland Freight – Plant to Customer (INTNFRU)

B.      **Direct Selling Expenses**

Where applicable, please provide or have available the following: (1) any agreements such as advertising agreements with customers; (2) support documentation for the short-term interest rate; (3) worksheets demonstrating any allocations and supporting documentation; (4) for indirect selling expenses, a list of the account and subaccount codes for all selling, general and administrative (SG&A) accounts and subaccounts, and identify the sections of your company for which indirect selling expenses are claimed.

1.      Commissions (COMMU)

2.      Freight Revenue (FRTREVH)

3.      Credit Expenses (CREDITH)

4.      Warranty Expenses (WARRH/U)

C.      **Indirect Selling Expenses**

1.      Indirect Selling Expenses (INDIRSH/DINDIRSU)

2.      Inventory Carrying Costs (INVCARH/DINVCARU)

12

E.      **Packing Costs** (PACKH/U)

XI.     **Inspection of Certifications**

Please have available for inspection by the verification team the original versions of all certifications of accuracy filed with submissions of factual information.you have filed under the requirements of 19 CFR 351.303(g).

13

LIST OF ATTACHMENTS

Attachment 1:  Total Quantity and Value of Comparison-Market and U.S. Sales

Attachment 2:  List of Pre-selected Comparison-market Sales

Attachment 3:  List of Pre-selected U.S. Sales

# ATTACHMENT 1

## QUANTITY AND VALUE – HOME MARKET

### galvasidhm03 database

| Total Value (MXP) | Total Quantity (MT) |
|:---:|:---:|
| [        ] | [        ] |

## QUANTITY AND VALUE – U.S. MARKET

### galvasidus03 database

| Total Value (USD) | Total Quantity (MT) |
|:---:|:---:|
| [        ] | [        ] |

15

## ATTACHMENT 2

### Pre-Selected Comparison Market Sales Transactions

| SEQH | INVOICEH | SALEDATH |
|------|----------|----------|
| 1830 | [ | ] |
| 2812 | [ | ] |
| 8018 | [ | ] |
| 10171 | [ | ] |

16

## ATTACHMENT 3

## Pre-Selected U.S. Sales Transactions

| SEQU | INVOICEU | SALEDATU |
|------|----------|----------|
| 1558 | [ | ] |
| 1681 | [ | ] |
| 5108 | [ | ] |
| 7575 | [ | ] |

17

Tab 15

Galvasid's Sales Verification Exhibits
(May 22, 2025)

PR-406, CR-741, 745-748

## List of Participants

Alberto Martinez Garza, Chief Financial Officer, Galvasid
Felipe Sergio Martínez Cárdenas, Board Chairman
Jesús Enrique Vázquez Pérez, Treasury Manager
Jesús Angel Silva, Dumping Analyst
Abdi Jonathan Hernandez,  Controller Manager

Jong-Tak (Jeff) Kim, The International Trade Consulting
Chang-Hee Lee, The International Trade Consulting
In-Pyo (David) Hong, The International Trade Consulting
Tae-Eyun (Tae) Kang, International Trade Consulting

Jeffrey Winton, Winton & Chapman PLLC
Rachel Hauser, Winton & Chapman PLLC
Kate Cornman, Winton & Chapman PLLC

MX CORE Sales Verification
List of Sales Verification Exhibits

| SVE | NAME | PAGES (including cover) |
|---|---|---|
| 1-A | Minor Corrections | 60 |
| 2-A | Corporate Structure & Affiliation | 18 |
| 2-B | Shareholders and Officers | 13 |
| 2-C | Short and Long-term Investments | 28 |
| 3-A | Financial Accounting System | 12 |
| 3-B | Cost Accounting System | 14 |
| 3-C | Cost Center List | 4 |
| 4-A | Sales Process | 21 |
| 4-B | Customer Code List | 27 |
| 5-A | Date of Sale | 13 |
| 6-A | List of All Products Sold During the POI | 74 |
| 6-B | Product Code List | 91 |
| 6-C | Product Characteristics | 41 |
| 6-D | Production Process | 4 |
| 7-A | Sales Reconciliation (Domestic) | 83 |
| 7-B | Sales Reconciliation (Export) | 82 |
| 8-A | Completeness Test #1 U.S. Sales | 19 |
| 8-B | Completeness Test #1 Home Market Sales | 16 |
| 8-C | Completeness Test #3 Non-Subject Merchandise | 12 |
| 8-D | Completeness Test #4 Sequential Invoice Testing | 16 |
| 8-E | Completeness Test #5 Breakdown of Freight and Insurance Revenue | 3 |
| 9-A | HM Pre-selected Sale (SEQH = 1830) | 37 |
| 9-B | HM Pre-selected Sale (SEQH = 2812) | 39 |
| 9-C | HM Pre-selected Sale (SEQH = 8018) | 24 |
| 9-D | HM Pre-Selected Sale (SEQH = 10171) | 32 |
| 9-E | U.S. Pre-Selected Sale (SEQU = 1558) | 32 |
| 9-F | U.S. Pre-Selected Sale (SEQU = 1681) | 31 |
| 9-G | U.S. Pre-Selected Sale (SEQU = 5108) | 33 |
| 9-H | U.S. Pre-Selected Sale (SEQU = 7575) | 30 |
| 9-I | Surprise HM Sale (SEQH = 4212) | 23 |
| 9-J | Surprise HM Sale (SEQH = 6315) | 17 |
| 9-K | Surprise HM Sale (SEQH = 9748) | 26 |
| 9-L | Surprise U.S. Sale (SEQU = 273) | 31 |
| 9-M | Surprise U.S. Sale (SEQU = 292) | 30 |
| 9-N | Surprise U.S. Sale (SEQU = 2203) | 32 |
| 10-A | Inland Freight from Plant to Warehouse (Domestic) | 16 |
| 10-B | Domestic Inland Freight to Customer for POI (INFLETCH) | 21 |
| 10-C | International Freight | 60 |
| 10-D | Inland Freight Planthouse to Port (Export) (DINFTPU) | 25 |
| 10-E | Domestic Brokerage for Export Sales | 12 |
| 10-F | U.S. Brokerage Expense | 11 |
| 10-G | Warehousing Expense (Domestic) | 63 |
| 10-H | U.S. Commission | 20 |
| 10-I | Warranty Expense (Domestic) | 9 |
| 10-J | Warranty Expense (Export) | 12 |
| 10-K | Inventory Carrying Period | 27 |
| 10-L | Indirect Selling Expense | 49 |
| 10-M | Late Payment (Domestic) | 8 |
| 10-N | Short Term MXN Interest Rate | 25 |
| 10-O | Short Term USD Interest Rate | 10 |
| 10-P | Packing Cost | 42 |
| 10-Q | Packing Materials Excluded | 27 |
| 10-R | Demonstrating of Account Reclassification | 9 |

SVE-7B

Corrosion-Resistant Steel ("CORE") Products
from Mexico AD Investigation Verification

# Sales Reconciliation

# (Export)

**Galvasid S.A. de C.V.**

**May, 2025**

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(66 PAGES)**

**Corrosion-Resistant Steel ("CORE") Products
from Mexico AD Investigation Verification**

# *HM Pre-selected Sale*

# *(SEQH = 1830)*

**Galvasid S.A. de C.V.**

**May, 2025**



**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(36 PAGES)**

**Corrosion-Resistant Steel ("CORE") Products
from Mexico AD Investigation Verification**

# *HM Pre-selected Sale*

# *(SEQH = 2812)*

## Galvasid S.A. de C.V.

**May, 2025**



**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(38 PAGES)**

SVE-9C

**Corrosion-Resistant Steel ("CORE") Products
from Mexico AD Investigation Verification**

# *HM Pre-selected Sale*

# *(SEQH = 8018)*

## Galvasid S.A. de C.V.

### May, 2025

(23)

BUSINESS PROPRIETARY INFORMATION NOT
SUSCEPTIBLE TO SUMMARIZATION DELETED

(23 PAGES)

**Corrosion-Resistant Steel ("CORE") Products
from Mexico AD Investigation Verification**

# *HM Pre-selected Sale*

# *(SEQH = 10171)*

**Galvasid S.A. de C.V.**

**May, 2025**

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(31 PAGES)**

SVE -9E

# U.S. Pre-selected Sale
# (SEQU = 1558)

## Galvasid S.A. de C.V.

**May, 2025**

(32)

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(31 PAGES)**

SVE-9F

**Corrosion-Resistant Steel ("CORE") Products from Mexico AD Investigation Verification**

# *U.S. Pre-selected Sale*

# *(SEQU = 1681)*

**Galvasid S.A. de C.V.**

**May, 2025**



**BUSINESS PROPRIETARY INFORMATION NOT
SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(30 PAGES)**

SVE - 9 G

**Corrosion-Resistant Steel ("CORE") Products
from Mexico AD Investigation Verification**

# U.S. Pre-selected Sale

# (SEQU = 5108)

## Galvasid S.A. de C.V.

### May, 2025

33

**BUSINESS PROPRIETARY INFORMATION NOT
SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(32 PAGES)**

Corrosion-Resistant Steel ("CORE") Products
from Mexico AD Investigation Verification

# U.S. Pre-selected Sale

# (SEQU = 7575)

## Galvasid S.A. de C.V.

### May, 2025

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(29 PAGES)**

SVE-9I

from Mexico AD Investigation Verification

# *Surprised HM Sale*

# *(SEQH = 4212)*

## Galvasid S.A. de C.V.

BUSINESS PROPRIETARY INFORMATION NOT
SUSCEPTIBLE TO SUMMARIZATION DELETED

(22 PAGES)

from Mexico AD Investigation Verification

# *Surprised HM Sale*

# *(SEQH = 6315)*

## Galvasid S.A. de C.V.

(17)

**BUSINESS PROPRIETARY INFORMATION NOT
SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(16 PAGES)**

from Mexico AD investigation Verification

SVE - 9K

# *Surprised HM Sale*
# *(SEQH = 9748)*

## Galvasid S.A. de C.V.

26

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(25 PAGES)**

SVE - 9L

**Corrosion-Resistant Steel ("CORE") Products**
from Mexico AD Investigation Verification

# *Surprised U.S. Sale*

# *(SEQU = 273)*

May, 2025

**BUSINESS PROPRIETARY INFORMATION NOT
SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(30 PAGES)**

SVE - 9m

# *Surprised U.S. Sale*

# *(SEQU = 292)*

May, 2025

(30)

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(29 PAGES)**

SVE - 9N

# *Surprised U.S. Sale*

# *(SEQU = 2203)*

May, 2025

32

**BUSINESS PROPRIETARY INFORMATION NOT
SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(31 PAGES)**

Tab 16

Verification of the Sales Response of Galvasid S.A. de C.V. (Galvasid) in the Antidumping
Investigation of Certain Corrosion-Resistant Steel Products from Mexico
(July 11, 2025)

PR-421, CR-829



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-863
Investigation
~~Business Proprietary Information~~
AD/CVD OVIII: KK/FM
PUBLIC VERSION

DATE: July 11, 2025

MEMORANDUM TO: The File

FROM: Katerina Katsiadas
 International Trade Compliance Analyst, Office VIII

THROUGH: Kathleen Marksberry
 Director, Office VIII

THROUGH: Faris Montgomery
 Program Manager, Office VIII

SUBJECT: <u>Verification of the Sales Response of Galvasid S.A. de  C.V.
(Galvasid) in the Antidumping Investigation of Certain Corrosion-
Resistant Steel Products from Mexico</u>

The sales verification of Galvasid's questionnaire response took place from May 12 through May 16, 2025, in Monterrey, Mexico.  The attached report outlines the procedures followed at the verification and describes our findings.  We have attached a separate list of exhibits compiled at the verification as Attachment 1.  We have also attached a list of participants at the verification as Attachment 2.  The period of investigation (POI) is July 1, 2023, through June 30, 2024.

The purpose of this verification report is to provide parties with a factual report of the methods, procedures, and results collected and obtained during the Department of Commerce's (Commerce's) verification exercise.  *See* 19 CFR. 351.307(c).  This report does <u>not</u> draw conclusions as to whether the reported information was successfully verified and further does <u>not</u> make findings or conclusions regarding how the facts obtained at verification will ultimately be treated in Commerce's determinations.



2

Verification of Sales Response of Galvasid

The verification steps listed in outline format below were presented to Galvasid in a letter from Commerce dated May 2, 2025. Below each step, we have described the verification procedures performed and cited to the applicable verification exhibit or exhibit from the questionnaire response containing information provided by Galvasid that relates to the procedure. We have also described any changes to our planned procedures that were considered necessary due to the nature of Galvasid's financial and sales accounting systems.

In this report, we have used the following abbreviations to identify Galvasid's questionnaire responses:

- December 23, 2024, Section A Questionnaire Response (AQR);
- January 13, 2025, Section B Questionnaire Response (BQR);
- January 13, 2025, Section C Questionnaire Response (CQR);
- February 24, 2025, Section A Supplemental Questionnaire Response (ASQR);
- February 24, 2025, Section BC Supplemental Questionnaire Response (BCSQR);
- March 3, 2035, Second Section BC Supplemental Questionnaire Response (SBCSQR);
- Home Market Sales Database (hm03 database); and
- U.S. Sales Database (us03 database).

## I.  SUMMARY OF ISSUES

The following is an illustrative list of issues and factual observations that arose during the course of our verification, which may require further consideration by Commerce. Commerce provides this list as a convenience in order to better aid the parties' preparation of comments before Commerce. However, this list is not all inclusive, as all items included within this report are subject to comment and further consideration.

- In our review of the U.S. sales reconciliation and selected sales traces, we found that Galvasid included freight revenue and insurance revenue, which were separately listed on the sale invoices for Galvasid's U.S. sales, in Galvasid's calculation of U.S. gross unit price. Specifically, we found that, when conducting sales traces, freight revenue was included in the calculated gross unit price for SEQUs [                    ] and insurance revenue was included in the calculated gross unit price for SEQU [      ]. Furthermore, the account values for freight revenue and insurance revenue were included in the trial balance in Galvasid's U.S. sales reconciliation. For further discussion, *see* the "Quantity and Value Reconciliation," "Completeness Test 5," and "Verification of Reported Transaction Specific Data for Selected sales from the Comparison and U.S. Market Sales," sections below.
- Galvasid reported at the start of verification that there was a systemic error in its reporting of the quantity used in the calculation of its reported domestic inland freight expense, INLFTCH. However, we tested and confirmed the values reported for the freight expense. For further discussion, *see* section XI.A, "Inland Freight-

3

Plant/Warehouse to Customer – Unaffiliated Transport (INLFTCH)" below.

- In reviewing Galvasid's reported packing expenses, we were unable to trace certain expenses that Galvasid had reassigned to its accounts for packing materials to determine if the inclusion or exclusion of certain of these expenses from Galvasid's packing costs was appropriate. However, we tested and verified the non-reassigned packing expenses within the accounts. For further discussion, *see* section XI.D, "Packing Costs (PACKH/U)," below.

## II.     <u>CORRECTIONS PRESENTED PRIOR TO VERIFICATION</u>

Galvasid submitted corrections to its questionnaire responses which resulted from its verification preparation. We accepted these corrections because we found them to be minor corrections to Galvasid's responses. A detailed list of corrections to the sales file are located in SVE-1A and reported for the record in Galvasid's May 16 submission. Each of the corrections is addressed in the relevant section of the report.

Galvasid submitted the following corrections of reporting errors it discovered while preparing for verification. *See* SVE 1A.

1. **Home-Market Commercial Discounts:** Galvasid found that commercial discounts relating to two home-market sales were assigned to only one sale in its HM sales database. A worksheet identifying the transactions and the correct discount are included in SVE-1A, Attachment 1. We examined this correction further discussed below in part X.

2. **Home-Market Warehousing:** Galvasid found that the warehousing expenses for two warehouses in the home-market were incorrectly reported in the original BQR response. The error resulted in a [    ] percent increase in the per-unit warehousing expense for the Puebla warehouse and a [    ] percent increase in the per-unit warehousing expense for the Chihuahua warehouse. The worksheet correcting these errors is included in SVE-1A, Attachment 2.

3. **Home-Market Warranty Expense:** Galvasid found that although its sales listing was revised to include sales with a width between 0.5 and 5 inches, in its March 20 submission, it did not revise the total value of home-market sales used to allocate warranty expenses. The worksheet correcting this error is included in SVE-1A, Attachment 3. We examined this correction further discussed below in part XI.

4. **Mexican Peso Short-Term Interest Rate:** Galvasid found that certain long-term loans were included in the calculation of the average interest rate from Mexican Peso short-term borrowings its BQR. The worksheet correcting this error is included in SVE-1A, Attachment 4. We examined this correction further discussed below in part XI.

5. **Home-Market Packing Expense:** Galvasid found that the home-market sales reported in its BQR included the quantity of sales of industrial waste. The worksheet correcting this

error is included in SVE-1A, Attachment 5.  We examined this correction further discussed below in part XI.

6.  **Domestic Brokerage for Export Sales:** Galvasid found that the total volume of export sales was incorrectly reported in its CQR. The worksheet correcting this error is included in SVE-1A, Attachment 6.  We examined this correction further discussed below in part XI.

7.  **U.S. Brokerage for Export Sales:** Galvasid found that the total volume of U.S. sales was incorrectly reported in its CQR. The worksheet correcting this error is included in SVE-1A, Attachment 7.  We examined this correction further discussed below in part XI.

8.  **U.S. Freight Expense:**  Galvasid found that some ocean freight expenses for U.S. sales were classified as inland freight expenses for Channels 1 and 3 instead of expenses for Channel 2 sales, in its BCSQR.  Additionally, there was an error in identifying the total inland freight from plant to Port for Channel 2 sales.  The error in allocation resulted in changes to the INTNFRU and DINLFTPU expenses.  The worksheets correcting these errors are provided in SVE-1A, Attachments 8-10.  We examined this correction further discussed below in part XI.

9.  **U.S. Dollar Short-Term Interest Rate:** Galvasid found that there was an error in the loan balance for short-term U.S. borrowings in the month of February 2024 reported in the CQR. The worksheet correcting this error is provided in SVE-1A, Attachment 11.  We examined this correction further discussed below in part XI.

10. **U.S. Commissions:** Galvasid found that there was an error in the total quantity of Channel 1 and 3 sales used as the denominator in the calculation of U.S. commissions reported in the CQR. The worksheet correcting this error is provided in SVE-1A, Attachment 12.  For further discussion of this correction, see part XI, below.

11. **U.S. Warranty Expense:** As stated above, Galvasid found that although its sales listing was revised to include sales with a width between 0.5 and 5 inches, in its March 20 submission, it did not revise the total value of U.S. sales used to allocate warranty expenses. The worksheet correcting this error is included in SVE-1A, Attachment 13.  We examined this correction further discussed below in part XI.

12. **U.S. Sales Reconciliation:** As the total value was corrected in Galvasid's March 20 submission, but the sales quantity and value was not updated, this error was presented to align the sales quantity and value with the corrections above.  Galvasid's U.S. sales database is not affected by this correction.  The worksheet correcting the error is provided in SVE-1A, Attachment 14.  We examined this correction further during the sales quantity and value reconciliation exercise discussed below in part VIII.

In addition, Galvasid reported as a minor correction a systemic error in its underlying calculation of domestic inland freight from plant/warehouse to customer (INLFTCH), due to the selection of

5

a wrong column from a report from its [         ] system, that resulted in the incorrect calculation of Galvasid's INFLTCH expenses for all values in the expense because the quantity used to calculate the per-unit costs for the expense were incorrect.  Consequently, we did not further verify the corrections to the quantity in the calculation or the underlying support.  The discrepancies impact all reported expenses in INLFTCH.  However, we were able to verify, based on the existing record, that the reported total freight values for INLFTCH were accurately reported in Appendix B-11 of Galvasid's BQR.  These values are discussed in section XI A, "Other Movement Expenses," below.

### III.  <u>CORPORATE STRUCTURE AND ORGANIZATION</u>

A.  *Review the organizational and corporate structure of Galvasid and the activities of all divisions of Galvasid involved in the production, sale and distribution of CORE to all markets, as identified in your submissions.*

We reviewed the organization flow chart submitted in Appendix A-2 of the Section A questionnaire response (AQR) and discussed the companies within the company group that are involved in the global production and sale of CORE.   We noted no discrepancies with Galvasid's questionnaire responses.

B.  *Using the fiscal-year balance sheet covering all of the POI, review the account and sub-account detail for all short- and long-term investments and holdings by Galvasid and affiliated companies involved in the sale or production of CORE.  If the fiscal-year balance sheet covering all of the POI is not available, then provide the balance sheet that covers the majority of the POI.  If percentage of Galvasid's investments and holdings are not observable from this account detail, calculate these percentages separately.*

C.  *Review the nature of any affiliations between Galvasid and Perfiles and other companies, including, but not limited to, all suppliers and customers, as reported in your submissions*

D.  *Identify the shareholders and officers in Galvasid, and every affiliated company involved in the production and sale of CORE.*

E.  *Any other company-specific corporate structure issues.*

We discussed items B-E, above, with company officials and reviewed the financial statements included in Appendix A-8 of the AQR.  Company officials provided POI trial balances for [  ] to demonstrate that these companies were [          ].  *See* SVE-2A.  Further, company officials provided articles of association and shareholder and officer lists for Galvasid and its affiliates.  *See* SVE-2B.  SVE-2C contains information regarding the investments of Galvasid and its affiliates, including linking each company's trial balance to its financial statements and a list of the accounts used in each trial balance.  We noted no discrepancies with the questionnaire response.

6

## IV.   ACCOUNTING AND DATA SYSTEMS

A.   *Identify and describe the data systems used to record production and sales data.  Review the manner in which source documents for production, sales, and expenses flow into the financial statements via accounting vouchers, journals, subsidiary ledgers, and general ledger accounts.*

SVE-3A and SVE-3B contain documents used in Galvasid's presentation of its financial and cost accounting systems, respectively.  Company officials provided an overview of Galvasid's accounting systems; the information provided was consistent with Galvasid's descriptions of its accounting system in its questionnaire responses.  Galvasid explained that, for accounting and sales purposes, Galvasid relies on SAP software and [                    ].  During our review of the SAP accounting system, we observed how various reports are accessed online and company officials provided sample documents.  We also examined the menu structure of Galvasid's accounting system.  Company officials explained that Galvasid employs a standard costing system for its production orders, and variances from the costing system are calculated and recorded when the production orders are closed.  The standard costs are [                    ].

B.   *Review the chart of accounts for the company and appropriate affiliated companies (lists).*

We completed this step. Galvasid submitted its chart of accounts at Appendix A-8-B of the AQR.

C.   *Review the complete General Ledger covering the POI.*

We examined Galvasid's SAP accounting system and reviewed the GL covering the POI. Company officials demonstrated how the GL for the sales and expense accounts flow into the audited financial statements. We noted no discrepancies.

D.   *Review the translated financial statements and accompanying notes.*

We completed this review.  Galvasid submitted its FY 2023 and 2024 audited financial statements in Appendix A-8 of the AQR.

E.   *Review the cost center codes that are relevant to the production, sale and distribution of CORE.*

We reviewed the cost center codes relevant to subject merchandise.  *See* SVE-3C.

F.   *Identify all reports (e.g., production, inventory, sales, shipment) generated from the data system in the ordinary course of business.  Provide POI time-period examples of these reports.  Ensure that all Galvasid source databases used to generate these reports are on-line and accessible by a programmer.*

In response to items E. and F., we reviewed the standard chart of accounts used by all companies within the Group (submitted in Appendix A-8-B of the AQR) and identified the accounts and cost center codes that are relevant to home market and U.S. sales. We discussed the general ledger, the various modules that feed into it, and the reports that are prepared in the ordinary course of business. Company officials provided sample reports of the documentation generated by Galvasid's SAP accounting system, found in SVE-3A and SVE 3B.

## V.  SALES PROCESS

A.  *Provide an overview of the sales and distribution processes and document flow for sales of CORE in the comparison market and sales to the United States. Provide a diagram showing the paper trail for the recording of these sales in your accounting records. The diagram should start from the receipt of an order through final payment and the year-end posting of sales in the financial statements. Identify each step of the paper trail, all entries that would be recorded in the books and ledgers, and number of the accounting code, and the of the ledger, book, or journal in which each such entry is made. Use specific examples from the preselected sales listed in Attachment X.*

We completed this step. Our review was consistent with the diagram submitted at Appendix A-5 of the AQR. SVE-4A consists of the "paper trail" diagrams and documents reviewed at verification.

B.  *Discuss and provide support for the reported selling activities, customer categories, sales terms and distribution channels in the United States and the comparison market, referring to your discussion of distribution channels at **list pages** of your Section A response (and supplemental, if relevant).*

We reviewed with Galvasid the questionnaire response information concerning this topic. We also examined selling activities, customer terms and distribution channels as part of our Completeness Tests and review of selected sales. We observed no inconsistencies with the questionnaire responses.

Upon Commerce's request, company officials provided a customer code list for Galvasid (*see* SVE-4B), noting that [                                   ]. Company officials explained that if the [     ] digit of the code is [  ], it indicates that the address associated with a customer code is a [            ]; if [  ], it indicates a [           ]; and if [  ], it indicates [                    ]. Company officials explained that certain customers only have a [         ]. For one company, [ ], customer code [          ], company officials indicated that [                            ]. Company officials provided sample SAP screenshots and invoices demonstrating that the sales to [      ] and other companies [                     ] were made to the home or U.S. market. We observed no discrepancies.

## VI.  DATE OF SALE

A.  *Demonstrate that the date **of invoice (or date of shipment) are** the appropriate dates of*

8

*sale for the U.S. and comparison markets.*

We examined Galvasid's reported date of sale as part of our review of selected sales. We observed that Galvasid properly reported the shipment date as the date of sale for home market and U.S. sales based on our review of the relevant sales documentation for the selected sales.

As noted at page A-26 of the AQR, Galvasid relied on the shipment date as the date of sale for all U.S. sales. Company officials provided an example of a change in sales terms between the sales order and shipment, found in SVE-5A. We noted no discrepancies with Galvasid's responses.

## VII.   <u>PRODUCTS SUBJECT TO THE SCOPE OF INVESTIGATION</u>

A.   *Identification of in-scope products*

1.   *Provide a complete list of all products sold during the **POI**, and a list of the internal accounting codes for these products that were used to record costs, sales, or expenses. If a product coding system was created for purposes of identifying products subject to this **investigation**, describe how this system was created, defined, and applied in preparing your response. Provide copies of any computer programs used in this process.*

Company officials explained the basis for the internal accounting codes assigned to each product and identified all products the company considered to be within the scope of the investigation. We noted no discrepancies with the information reported in the questionnaire responses.

2.   *From the master list of all products, provide a master list of products that are considered by the company to be merchandise within the scope of the investigation. Further, identify on the master list of all products the most similar products that were not considered to be merchandise within the scope of the investigation.*

We obtained these lists. SVE-6A contains a list of all the products sold by Galvasid during the POI and identifies whether each material code was subject or non-subject merchandise. Company officials noted that certain material codes included both subject and non-subject merchandise, depending on the specific product; for these material codes, company officials used the [                    ] to identify whether the merchandise was in-scope. To confirm the accuracy of this process, company officials tied lot information, using a list of invoices for merchandise produced during the POI, to select material codes, including SAP screenshots that linked [                          ] that demonstrated whether the merchandise was in-scope. Company officials noted that [                                        ]. We noted no discrepancies.

3.   *Review the product-matching criteria listed in the Appendix to the questionnaire. Describe the process followed by the company in applying these characteristics to the master list of all products produced by the company in order to derive the*

9

*master list of products subject to the scope of the investigation. Provide copies of any computer programs used in this process and ensure that the data source files used for this purpose are readily available for access during verification.*

As demonstrated in the computer programs submitted in the BQR and CQR, Galvasid identified the subject merchandise through the material codes and [          ] in the SAP system. As discussed above, each invoice can be tied to specific [          ] that identifies the product characteristics of the merchandise, and Galvasid uses this information to assign each product the proper CONNUM.

> *For each of the U.S. and home-market preselected sales listed in the attachments to this outline, list the product characteristic codes you assigned in the response. Support each reported characteristic with product samples, drawings, bill of materials, specification sheets or other documentation.*

We discussed the product characteristics and tested the reported product characteristics against the sales documents for each of the selected home market and U.S. sales, as discussed below. To facilitate this process, Galvasid provided a key for its material codes, and the formatting for its material and product code descriptions, from which we identified the product type, coating weight, size, grade, surface, color and chemical treatment, paint, and finishing of the material from Galvasid's material descriptions. *See* SVE-6B. Additionally, company officials provided a key explaining Galvasid's methodology for assigning product characteristics, including a sample demonstration for selected CONNUMs, in SVE-6C. We noted no discrepancies.

> 4.    *If a conversion factor was used to convert units of measure maintained in the ordinary course of business to units of measure requested by or reported to Commerce, please provide an explanation of the formula used and examples of the conversion.*

Not applicable. Galvasid maintains its records in the same units of measure as were reported to Commerce.

B.    *Production Process*

> 1.    *Review the production process and facilities with respect to the in-scope products.*

We reviewed the production process and product characteristics and discussed Galvasid's production lines and their functions with company officials, who noted that Galvasid [          ]. A diagram of the production process and Galvasid's manufacturing lines, as well as sample production cost report, can be found in SVE-6D. In addition to the production process, we discussed the packing and warehousing of CORE. We noted no discrepancies with the questionnaire response.

10

## VIII.   QUANTITY AND VALUE RECONCILIATION

*A.        Beginning with your sales system/journal, review the reconciliation worksheets and programs that tie the sales system/journal to the general ledger and into the financial statements sales total.  Then tie the sales system to the quantity and value totals reported in the most up-to-date submission of your home and U.S. market databases (see Attachment 1).*

The home market sales quantity and value reconciliation worksheets and supporting documents are contained in SVE-7A.  First, we reconciled Galvasid's reported home market quantity and value with its sales ledgers, reconciling the 2023 and 2024 sales ledger total values to Galvasid's audited financial statements for 2023 and Galvasid's trial balance for the POI.  Company officials explained that Galvasid's 2024 audited financial statements were not yet available.  We then split out the net HM sales during the POI, excluding export sales and sales of non-CORE products.  For the month of April 2024, we reconciled the quantity and value in the general sales ledger to a list of customer purchases.  We selected a sample customer and material code for the month and reconciled the quantity and value of the material sold to the customer to the invoices for the purchases.  Additionally, for sales of non-subject products, company officials reconciled the quantity and value for the month of October 2023 to a list of the quantity and value of non-core products by material code, a sample of which we then tied to Galvasid's SAP system, a commercial invoice, and an SAP sales ledger.

Reconciling items included cancellations and returns, sales of purchased CORE, and sales adjustments, including warranty expenses, early payment discounts, commercial discounts, and billing adjustments.  We tested several reconciling items (*i.e.*, cancellations and returns of CORE, purchases of CORE, and sales adjustments), by tying the items on the reconciliation worksheet to the sales ledger.  For each type of reconciling item, company officials provided a full breakdown of reconciling items for a selected month of the POI and then tied sample line items within the full breakdown to documentation, including purchase documents, sales vouchers, credit or billing invoices, and sales vouchers.  We noted no discrepancies.

The U.S. sales quantity and value reconciliation worksheets and supporting documents are contained in SVE-7B.  First, we reconciled Galvasid's reported U.S. sales quantity and value for the POI with Galvasid's sales ledger and tied the values excluded for HM sales to Galvasid's HM sales reconciliation.  Company officials tied a monthly breakdown of export sales during the POI to Galvasid's general ledger for March 2024 and a breakdown of export sales by customer code for March 2024.  We then selected a sample customer and tied the total quantity and value of the customer's sales to the general ledger and a breakdown of sales by invoice and then tied a selected commercial invoice to the sales list, SAP sales voucher, and U.S. entry summary.  Reconciling items for Galvasid's U.S. sales consisted of cancellations and returns, adjustments (*i.e.*, credit notes for commercial discounts, early payment discounts, and warranty claims), and returns of U.S. sales incurred after the POI.  Company officials provided an SAP ledger for all the cancellations and returns, which occurred in [        ] and were therefore added back into the sales reconciliation because the associated sales were [              ], and tied a sample

return to a commercial invoice, sales voucher, and credit voucher.  For credit notes, company officials provided a chart of the monthly total quantity and value of the credit notes issued.  For two months of the POI, we tied the total monthly values to a list of credit invoices.  We selected sample invoices and company officials provided the original invoice, the credit invoice, the credit voucher, Galvasid's record of the claim, and the general ledger for the adjustment.  For the selected [                ] in [            ] for invoice number [          ], company officials noted that the [                            ] and provided a document flow and SAP records of each [          ] to trace the original sales voucher to the adjustment.  For returns of U.S. CORE incurred after the POI, in [          ], there were [    ] transactions, and company officials tied the sales invoice, credit invoice, and SAP credit voucher to the value reported for one transaction.

We noted that the sales accounts included within Galvasid's total sales values in its U.S. sales reconciliation were inclusive of freight revenue and insurance revenue, which were included in Galvasid's trial balance summary in the sales reconciliation in accounts [                          ], respectively.  The reconciliation did not exclude these values from the total value of Galvasid's U.S. sales.  We noted no other discrepancies beyond the minor correction in reporting the updated total quantity and value of Galvasid's most recent U.S. sales database, as discussed above in the "minor corrections" section.

B.      *Provide the computer programs used in the reconciliation and have available the source data files and a programmer for testing the reconciliation.  Identify key language in the program and its purpose.*

Company officials demonstrated how they used the Business Warehouse module of the SAP system to compile the home market and U.S. sales databases through a series of filtering steps, sorting the sales ledger database by time period, material code, and country of sale.  Screenshots from our review are included in SVE-7A and SVE-7B.

C.      *For the **first** and **fourth** U.S. and comparison-market sale identified in the attachment to this outline, tie the sale into the reconciliation to the financial statement.  Provide copies of the relevant documents used in the reconciliation of each.*

This step was completed as part of Step A above, where Galvasid identified HM1, HM4, US1 and US4 in each phase of its reconciliation methodology.  *See* SVE-7A and SVE-7B.  We observed no discrepancies in the posting of these transactions and their ties to the financial statement.

D.      *Review any instance where post-sale adjustments have been made to either price or quantity.  Demonstrate that those transactions affecting the sales and quantity (i.e., those transactions affected in terms of price and quantity after invoicing) are reflected accurately in your responses.*

As discussed above, we reviewed documentation in SVE-4A and SVE-4B demonstrating the reconciling items and adjustments made to Galvasid's reported sales quantity and values.  We additionally reviewed documentation in SVE-10I and SVE-10J demonstrating Galvasid's

12

reconciliation of warranty claims granted on POI sales.  We observed no discrepancies.

## IX.     <u>COMPLETENESS TESTS</u>

*Completeness is the process which confirms the accuracy and thoroughness of reported sales and expenses.  The only completeness test you are required to prepare in advance of the verification is the reconciliation of the quantity and value of sales in Section VII of this outline.  During the course of the verification, other completeness tests will be initiated from a variety of sources and records.*

<u>Completeness Test 1:  U.S. Customer Reporting</u>

To confirm that Galvasid properly reported U.S. customers in its U.S. sales database, we selected a POI month (December 2023), selected three U.S. customers from that month, and selected invoices relating to purchases from those customers during the selected month.  We reconciled the quantity and value of the merchandise sold to the customers to Galvasid's December 2023 U.S. sales in Galvasid's live SAP system and selected sample invoices to confirm that the sales accurately reported sales of subject merchandise to the U.S.  *See* SVE-8A.

Results:  We found no discrepancies with Galvasid's sales reconciliation or responses.

<u>Completeness Test 2:  Home Market Customer Reporting</u>

To confirm that Galvasid properly reported home market customers in its home market sales database, we selected a POI month (October 2023), selected three home market customers from that month, and selected invoices relating to purchases from those customers during the selected month.  We reconciled the quantity and value of the merchandise sold to the customers to Galvasid's October 2023 HM sales in Galvasid's live SAP system and selected sample invoices to confirm that the sales accurately reported sales of subject merchandise in the HM.  *See* SVE-8B.

Results:  We found no discrepancies with Galvasid's sales reconciliation or responses.

<u>Completeness Test 3:  Non-Subject Merchandise</u>

To confirm that Galvasid correctly excluded from its home market sales reporting of products designated as non-subject merchandise, we selected a POI month (October 2023) and requested that company officials provide a complete sales ledger for non-subject merchandise for that month using Galvasid's live accounting system.  From the section of the listing containing sales classified as non-subject merchandise, we randomly chose ten line items from the monthly sales ledger and traced these line items to the invoices to confirm that the products purchased were not subject merchandise.  Upon request, company officials provided a live demonstration of creating charts with [                ] in SAP and demonstrated that single invoices containing [              ] had the [                       ].  *See* SVE-8C.

13

Results:  We found no discrepancies with Galvasid's exclusion of non-subject merchandise from its home market sales listings.

Completeness Test 4:  Sequential Invoice Testing

We chose a series of invoice numbers that were missing from the invoices sequenced in the home market sales database and the U.S. sales database and examined the underlying invoices to determine whether these sales had been appropriately excluded from the sales listing.  We note that because the sequential invoicing included [                    ], certain invoices numbers selected as [                    ].  Other non-sequential invoices included [                    ]. *See* SVE-8D for examples of our review.

Results:  We noted no discrepancies with the missing sequential invoices from the U.S. and home market databases.

Completeness Test 5:  Breakdown of Freight and Insurance Revenue

In its reconciliation to its 2023 financial statements, Galvasid reported the inclusion of [   ] accounts within its sales ledger in its financial statements.  To confirm that the items in these accounts were appropriately included or excluded using adjustments in the sales reconciliation, we requested company officials to provide a monthly breakdown of the included accounts [ ].  Company officials tied the value of the POI accounts, split into HM and U.S. sales, to Galvasid's 2023 financial statements and trial balance summary in Galvasid's sales reconciliation.  *See* SVE-8E.

Results:  The values in these accounts reported in the trial balance summary for the sales reconciliation tied to the sales reconciliation.  We noted that, while these values (adjusted as discussed above in the "Quantity and Value" reconciliation section), were excluded from Galvasid's HM sales database, hm03, they were included within the gross unit price, GRSUPRU, of Galvasid's US sales database, us03.

## X.      VERIFICATION OF REPORTED TRANSACTION-SPECIFIC DATA FOR SELECTED SALES FROM THE COMPARISON AND U.S. MARKET SALES

We reviewed sales trace data for the Home Market and U.S. sales identified in Attachment 3 and referred to as HM1 – HM7 and US1 – US7.  The trace packages are found in SVEs-9A to 9N. The sales data examined included product characteristics, customer code, invoice number, invoice date, date of shipment, date of payment, sales terms, payment terms, customer information, destination, quantity, gross unit price, international freight charges, inland freight charges, port charges, duty and brokerage charges, and quantity adjustments, as appropriate.

The sales trace packages included the following types of documents, as applicable:

1.      Purchase Order
2.      Commercial Invoice

3. Shipping Invoice
3. Packing List
4. Mill Certificate
5. Bill of Lading
6. CBP Entry Document
7. Bank Statement
8. Brokerage Bill
9. Freight Invoice
10. SAP Journal Entry
11. Credit Note
12. Insurance Revenue Invoice

Using the documents in each sales trace package, it was possible to examine the following sales response data fields: PRODCODH/U, SPECH/U, CUSCODH/U, CCUSCODH/U, CUSCATH/U, CHANNELH/U, INVOICEH/U, SALINDTH/U, SALEDATH/U, SHIPDATH/U, SALETERH/U, PAYDATEH/U, PAYTERMH/U, QTYH/U, QTYUNITH/U, GRSUPRH, FRTREVH, INSUREVH, EARLPYH, INLFTCH, DBROKU, DESTH/U, STATEU, CREDITU, WARRH/U, INDIRSH, DINDIRSU, INVCARH, DINVCARU, PACKH/U, and MFRH/U.

*See* verification exhibits SVE-9A through SVE-9N.

Gross Unit Price (GRSUPRU)

During our review of Galvasid's U.S. preselected and on-site sales trace selections, we discovered that Galvasid had included both freight revenue and insurance revenue in its reported U.S. gross unit price (GRSUPRU). For every U.S. sales trace reviewed, SEQUs [            ], freight revenue was included as a separate line item in the sales invoice. Both freight revenue and insurance revenue were included as a separate line item for sales trace SEQU [    ].

We noted no other discrepancies.

*See* SVEs 9E-9H and 9L-9N.

Commercial Discounts

As discussed in the "minor corrections" section above, company officials noted that the commercial discount for SEQH [    ] applied to two sales, rather than one. A correction to the calculation is included in the sales trace for field COMMDISCH. *See* SVE-9D.

Destination of Sale (DESTU)

We noted during our review of the sales traces that SEQU [    ] contained a zip code in the DESTU field that did not match the destination information in the sales trace. The correct DESTU value is [    ]. Company officials explained that this was an error made when creating Galvasid's U.S. sales database; we did not find errors in the destination field in any of

15

Galvasid's other U.S. sales traces.  *See* SVE-9H.

We found no further discrepancies with the above transaction-specific sales information.

Early Payment Discounts and Late Payment Fees

Company officials explained that, for [                              ], Galvasid offered early payment discounts to customers that paid within [          ] of the invoice.  Company officials noted that these discounts [                              ].  These discounts were applied to invoices through credit memos issued after the sale was completed and were allocated by invoice by Galvasid in its sales databases. For late payment fees, company officials also explained that late payment fees were charged to home-market customers that failed to pay within the agreed payment terms.  These fees were not automatically applied but were applied to certain customers where Galvasid found it appropriate.  Upon Commerce's request, Galvasid provided a late payment calculation for a sample home market sale, SEQH [     ].  We tied the invoice for the sale, the sales voucher, SAP clearing voucher, which demonstrated the payment was late, the debit invoice for the late payment interest charged, and the SAP late payment voucher to the values reported for the sale in Galvasid's HM sales database.  We noted no discrepancies.  *See* SVE-10M.

## XI. **OTHER ADJUSTMENTS AND EXPENSES**

*The purpose of this section is to verify each reported adjustment and expense that is not a transaction-specific charge or adjustment that was examined in the context of the selected sales traces in section IX above.*

### A. **Movement Expenses**

#### 1. *Inland Freight from Plant to Warehouse (INLFTWH)*

Company officials explained that Galvasid used [     ] warehouses during the POI and calculated the inland freight from plant to warehouse based on the quantity shipped and the charges incurred in the normal course of business to ship from Galvasid's plant to each different warehouse (described as the "tariff rate" for shipment in Galvasid's responses), as reported in Appendix B-9 of Galvasid's BQR.  Company officials provided sample freight contracts and invoices for the rates charged for shipment to each warehousing destination, as well as SAP documentation to establish the quantity shipped for December 2023.  We noted no discrepancies with Galvasid's questionnaire responses.  *See* SVE-10A.

#### 2. *Warehousing Expense (WAREHSH)*

We reviewed the chart of Galvasid's reported warehouse expenses, found in Appendix B-10 of Galvasid's BQR.  As discussed in the "minor corrections," section above, Galvasid found that the warehousing expenses for the [          ] and [          ] warehouses contained an error due to missing [                ] and [                  ], respectively, for the POI.  We reviewed a monthly quantity and value breakdown of the warehousing expenses by warehouse, based on the revised

16

reported expenses, and company officials reconciled the total quantity and value reported monthly for each warehouse, inclusive of [                                    ] for selected months to the values in its SAP system.  We noted that, for certain warehouses in certain months, the expenses [                           ].  Company officials explained that [                   ].  Upon request, company officials provided sample warehousing contract documents [                   ].  *See* SVE-10G.  We noted no further discrepancies beyond the minor correction discussed above.

3.  *Inland Freight- Plant/Warehouse to Customer – Unaffiliated Transport (INLFTCH)*

We reviewed the inland freight chart found in Appendix B-11 of Galvasid's BQR.  As discussed above, company officials reported a minor correction in the quantity of merchandise shipped from plant/warehouse to customer during the POI, which Commerce declined to accept.  However, company officials explained that the total inland freight values reported in Appendix B-11 were unchanged.  Company officials explained that, to derive the monthly value of inland freight to customer used in INLFTCH, Galvasid subtracted the calculated values of the domestic inland freight from plant to warehouse, discussed in the INLFTWH expense above, and used the remainder of the monthly expense from the [                  ] account as INLFTCH.   We reviewed the total freight values report in Appendix B-11 of Galvasid's SQR and tied the values to the trial balance in account [                           ] for Galvasid's domestic freight expenses.  Company officials explained that certain expenses in the account were allocated to G&A expenses (cost center [     ]), and the remainder were included in Galvasid's domestic freight calculation.  We tied Galvasid's general ledger for the account to the total freight value reported for each month of the POI.  We noted no further discrepancies beyond the errors in the quantity in the per-unit calculation reported by Galvasid.  *See* SVE-10B.

4.  *Inland Freight – Plant/Warehouse to Port of Exportation (DINLFTPU)*
5.  *International Freight – Plant to Customer (INTNFRU)*

We reviewed the freight expense chart for export sales provided by Galvasid in Appendix C-12 of Galvasid's CQR.  Company officials explained that Galvasid allocated its freight account for U.S. sales, [                       ], into three parts:  inland U.S. freight (INTNFRU) for channels of sale 1 and 3 (U.S. sales shipped exported by land via truck), and inland freight from plant to port (DINLFTPU) and international freight (INTNFRU) for channel 2 sales, which were made to Puerto Rico via a truck and sea transport.  We tied the total freight costs reported to the POI account value in Galvasid's general ledger.  Company officials explained that, to sort which line items in the expense account were associated with freight expenses for trucking into the U.S., Galvasid filtered line items associated with [                     ] to identify the applicable expenses in the account.  Company officials demonstrated this process in Galvasid's live accounting system.  As discussed in the "minor corrections" section above, due to an error in this filter from a typo that resulted in an incorrect text for a filter used, certain freight expenses for sales in sales channel 2, for expenses DINLFTPU and INTNFRU were initially included in the freight expense for channels 1 and 3.  We tied the revised channel 1 and 3 INTNFRU value to the account value in Galvasid's general ledger in SAP using the text filter.  We reviewed the freight allocation by destination with company officials, who explained that Galvasid used the distance from its plant

17

to each customer destination and sales volume to allocate a weighted INTNFRU amount to each destination.

To substantiate the accuracy of the text filter that divided line items in the account by charges, we selected specific transactions within the filtered SAP account ledger. Upon Commerce's request, Galvasid provided supporting documentation for these freight transactions, including SAP vouchers, supplier invoices, and U.S. entry summary data, to confirm that the destination of freight transport in the line item was the continental U.S. We noted no discrepancies with Galvasid's questionnaire responses other than the minor correction discussed. *See* SVE-10C.

Company officials explained that the remainder of the value in the account was attributed to Galvasid's sales to Puerto Rico. To identify these charges, which comprised the remainder of the account, company officials filtered the account by text to include, rather than exclude, the items in the text filter. We tied the value in the general ledger with the filter to the total value of Galvasid's channel 2 freight allocated in INTNFRU and DINLFTPU. We reviewed the general ledger with the text filter and selected specific transactions to demonstrate that the charges incurred were for INTNFRU for channel 2 sales (*i.e.*, [                    ]). *See* SVE-10C. For DINLFTPU, the freight cost from plant to port for sales in channel 2, we reviewed the revised calculation of average per-unit freight cost incurred from the plant to port. We selected line items for [       ] and [       ] within the account and company officials provided the SAP vouchers for the transactions and the associated supplier invoices to demonstrate that the expenses were attributed to the correct channel of sale and freight expense. *See* SVE-10D. We noted no discrepancies with Galvasid's questionnaire responses other than the minor correction discussed.

6. *Brokerage and Handling Incurred in the Country of Manufacture (DBROKU)*
7. *Brokerage and Handling Incurred in the United States (USBROKU)*

As discussed in the "minor corrections" section above, Galvasid reported that the total volume of export sales, used in the calculation of these expenses in Appendices C-10 and C-11 of Galvasid's CQR, was incorrect, and was not subsequently corrected for the expense in Galvasid's supplemental questionnaire responses. We reviewed the revised calculations for these expenses and confirmed that the correct export volume, consistent with Galvasid's U.S. sales database us03, was used in the calculation of the expenses. To substantiate the values reported for brokerage in DBROKU and USBROKU, we confirmed the values reported in the general ledger for account [       ] matched Galvasid's reported brokerage values. Company officials provided a list of brokerage documents in the account, and we selected sample documents, for which Galvasid provided SAP vouchers and supplier invoices. We noted no discrepancies other than the minor correction discussed. *See* SVE-10E (DBROKU) and SVE-10F (USBROKU).

B. **Direct Selling Expenses**

1. *Commissions (COMMU)*

18

We reviewed Galvasid's methodology for calculating its reported commissions as reported on page C-37 of the CQR. Company officials explained that commission agreements provide each agent a fixed amount per year for supporting sales to certain U.S. customers. The amount of the commission paid to each agent was allocated over the total amount of sales supported by the agent. The commission agreements that applied to Galvasid's U.S. sales during the POI can be seen in Appendix C-13 of the CQR. To establish the value of the commissions paid as reported by Galvasid in Appendix C-13 of Galvasid's CQR, we examined Galvasid's accounts payable for its commissions in its live SAP system and confirmed the values reported. For the month of October 2023, we tied Galvasid's reported commissions value to its SAP system and invoices from the agent. As discussed in the "minor corrections," section above, company officials reported an error in the total quantity of U.S. sales for channels 1 and 3 (*i.e.* U.S. sales with a destination that was not [         ]) that was used as the denominator for Galvasid's calculation of average per unit commission paid. We confirmed the revised total quantity of the channels 1 and 3 sales was consistent with the sum of Galvasid's reported quantity for these sales in its U.S. sales database, us03. *See* SVE-10H. We noted no further discrepancies with the reported calculation of U.S. commissions other than the minor correction discussed.

### 2. *Freight Revenue (FRTREVH)*

Company officials explained that freight revenue in the HM was allocated to sales on an invoice-specific basis based on the line item for freight revenue in Galvasid's sales invoices. We examined Galvasid's reporting of FRTREVH in our review of the HM sales traces, as discussed above in section X.

### 3. *Credit Expenses (CREDITH/U)*

Company officials described the methodology used to calculate credit expenses incurred for home market sales at page B-35 of the BQR. The credit expense for each sale was calculated by multiplying the unit amount due from the customer for each sale by the credit period for the transaction and then multiplying the result by the average interest rate on Galvasid's short-term Mexican-peso borrowings during the POI.

The credit period for each home-market sale was calculated based on the number of days between shipment and payment for each sale. For sales for which payments were made in multiple installments, the credit period was calculated based on the weighted-average period between invoice and payment for all payments. The weighted-average period for each sale was calculated by multiplying the number of days for each payment by the amount of the payment, summing up the results for all payments relating to the sale, and then dividing the total by the total amount of payments received for the sale.

Company officials described the methodology used for calculating credit expenses incurred for U.S. sales at page C-39 of the CQR. The credit expense for each sale was calculated by multiplying the unit amount due from the customer for each sale by the credit period for the transaction and then multiplying the result by the weighted-average interest rate on Galvasid's short-term borrowings in U.S. dollars during the investigation period.

The credit period for each sale was determined based on the difference between the shipment date and the date of payment. *See* the discussion of inventory carrying costs below.

Company officials provided minor corrections for the calculation of the weighted-average interest rate for both Galvasid's short-term Mexican-peso (MXP) borrowings as reported in Appendix B-13 of the BQR and short-term U.S. dollar (USD) borrowing during the investigation period as reported in Appendix C-15 of the CQR. Specifically, company officials reported that Galvasid inadvertently included the interest for certain of its long-term loans in the calculation of its short-term MXP interest rate, and that the average loan balance for one month of the POI did not match the values in the general for the calculation of Galvasid's short-term USD interest rate. Company officials noted that the latter correction had no meaningful change to the calculated short-term interest rate. To confirm the accuracy of the revised interest rate calculations, we reviewed the monthly loan end balances in MXP and USD from Galvasid's trial balances and reconciled the values in the trial balances to Galvasid's balance sheet for 2023. We reviewed Galvasid's reported interest expenses in SAP and company officials provided calculations and sample loan contracts and information substantiating the calculation and the interest rates reported. For the sample loan contract in MXP, company officials explained that Galvasid's holding company, Grupo Industrial L.M., SA, [                                                          ]. *See* SVE-10N (Short-Term MXP Interest Rates) and SVE-10O (Short-Term USD Interest Rates).

We noted no discrepancies with the reported calculation of credit expenses beyond the minor corrections to Galvasid's short-term interest rates.

    *4. Warranty Expenses (WARRH/U)*

As reported on pages 37-38 of the BQR and page 41 of the CQR, Galvasid granted customers credit memos for claims of damaged CORE products. Company officials explained that Galvasid calculated the per unit costs for warranties by multiplying the gross unit price for each transaction by a warranty expense rate. The warranty expense rate was calculated by dividing the amount of credits for warranty claims granted by Galvasid on sales of CORE during the POI by the total value of Galvasid's sales of CORE in the HM or U.S. market during the POI, inclusive of freight and insurance revenue. Company officials reported a minor correction in that the total sales of CORE were not updated to include revised sales reporting from its initial reporting in Appendix B-15 of the BQR and Appendix C-16 of the CQR. We reviewed the sales denominators in the revised calculations and confirmed the calculations included the updated total sales of core in the HM or U.S. market.

We reviewed Galvasid's reported domestic and export warranty expenses, which Galvasid reported by invoice. To substantiate the warranty expenses reported, we selected sample invoices and tied the sales invoices and sales vouchers to the value of the warranty expense using the internal approval document for the credit note, the credit note issued by Galvasid, and the SAP credit voucher. We noted no discrepancies beyond the minor correction discussed. *See* SVE-10I (HM warranty expense) and SVE-10J (U.S. warranty expense).

20

C. **Indirect Selling Expenses**

*1.      Indirect Selling Expenses (INDIRSH/DINDIRSU)*

Company officials provided a chart of Galvasid's trial balance and how each account was reported as part of Galvasid's sales, cost of goods sold, selling expenses, G&A expenses, other income and expenses, or financial expenses.  In the chart, Galvasid identified the selling expenses attributable to indirect selling expenses.  Company officials demonstrated the process Galvasid used to identify these expenses in Galvasid's live SAP system using SAP query for [       ] (selling expenses).  We tied sample values in the reported chart to Galvasid's trial balance in SAP and viewed the general ledger for the account to substantiate that the items included were appropriately characterized as indirect selling expenses.  We tested Galvasid's reporting by querying the SAP system for the line items listed in the selling expense and tied the expenses in those accounts to the data provided in Galvasid's chart of its trial balance.  We noted no discrepancies.  *See* SVE-10L.

*2.      Inventory Carrying Costs – (INVCARH/DINVCARU)*

As reported on pages 41-42 of the BQR and page 46 of the CQR, Galvasid calculated inventory carrying costs for its home market and U.S. sales by applying an average inventory-carrying-cost rate to the per-unit cost of manufacture for the product sold in each transaction.  Company officials explained that the inventory-carrying-cost rate was calculated by multiplying the average inventory carrying period by the weighted-average interest rate on Galvasid's short-term Mexican-peso borrowings during the POI.  We reviewed Galvasid's average inventory calculation and inventory movement schedule and tied the values to Galvasid's ending inventory ledger and inventory movement schedule in SAP for each month of the POI.  Company officials explained that these modules were inclusive of all material codes in which subject merchandise was included, including those material codes which were split between subject and non-subject merchandise.  We noted no discrepancies with Galvasid's questionnaire responses.  *See* SVE-10K.

D. **Packing Costs** *(PACKH/U)*

Company officials explained that Galvasid reported packing costs using accounts [       ], and split the values in these accounts for packing materials and expenses used in the production of subject merchandise.  Company officials provided a chart of the general ledger for the three accounts during the POI and reconciled the total value in the ledger to Galvasid's SAP trial balances for the POI.  For line items in the account with a cost center, Galvasid identified the relevance of the packing costs based on whether the material code associated with the profit center was for subject merchandise.  Upon Commerce's request, company officials provided a list of the materials included in the reported accounts and identified expenses for each material and whether Galvasid included the materials as packing expenses.  *See* SVE-10P.

For the line items in the account that did not have a cost center, company officials identified expenses relevant to Galvasid's packing costs by individually examining the line items and

21

determining if the materials purchased were related to subject merchandise.  Upon request, company officials provided the ledger for the transactions in the three accounts that did not have cost centers, and provided accounting vouchers and SAP purchase documentation to substantiate that the materials were not related to packing costs.  The tested items were expenses associated with [                                    ].  We noted no discrepancies.  *See* SVE-10Q.

Additionally, company officials noted that the accounts included certain reclassified expenses, which had initially been reported in different accounts, but had then been reclassified into the accounts reported for Galvasid's packing expenses.  Company officials demonstrated this process with non-packing related products.  *See* SVE-10R.  Company officials provided a list of reclassified line items from the general ledger, and identified that certain of the line items were included in Galvasid's packing costs.  However, upon Commerce's request to provide a material description of the reclassified items to examine whether they were appropriate to include in Galvasid's packing expenses, company officials were unable to locate descriptions of the expenses in either the original reported line item or the reclassified line item.

Finally, Galvasid reported a minor correction in the quantity used in calculating its packing expense, due to the fact that the total quantity of HM sales incorrectly included certain sales not related to subject merchandise.  We reviewed the total quantity of sales used in the revised calculation and confirmed that the volume was consistent with the total quantity of HM and U.S. sales in Galvasid's sales reconciliation.

We noted no further discrepancies.  *See* SVE-10P, SVE-10Q, and SVE-10R.

## XI.      Inspection of Certifications

*Pursuant to revised certification requirements applicable to proceedings initiated on or after March 14, 2011, you must maintain for five years the original versions of all certifications of accuracy filed with submissions of factual information.  (See amendment to 19 CFR 351.303(g) in 76 FR 7491, February 10, 2011.)  Please have available for inspection by the verification team the original versions of all certifications of accuracy you have filed pursuant to these requirements for this review.*

We reviewed the original certifications for the questionnaire responses submitted by Galvasid in this investigation.  We noted no discrepancies.

LIST OF ATTACHMENTS


Attachment 1:  Exhibit List

Attachment 2:  List of Participants

Attachment 3:  List of Sales Examined at Verification

## ATTACHMENT 1

### LIST OF EXHIBITS

| SVE No. | Description |
|---|---|
| 1A. | MINOR CORRECTIONS |
| 2A. | CORPORATE STRUCTURE AND AFFILIATION |
| 2B. | SHAREHOLDERS AND OFFICERS |
| 2C. | SHORT- AND LONG-TERM INVESTMENTS |
| 3A. | FINANCIAL ACCOUNTING SYSTEM |
| 3B. | COST ACCOUNTING SYSTEM |
| 3C. | COST CENTER LIST |
| 4A. | SALES PROCESS |
| 4B. | CUSTOMER CODE LIST |
| 5A. | DATE OF SALE |
| 6A. | LIST OF ALL PRODUCTS SOLD DURING THE POI |
| 6B. | PRODUCT CODE LIST |
| 6C. | PRODUCT CHARACTERISTICS |
| 6D. | PRODUCTION PROCESS |
| 7A. | HOME MARKET SALES RECONCILIATION AND SAMPLES |
| 7B. | U.S. SALES RECONCILIATION AND SAMPLES |
| 8A. | COMPLETENESS #1 U.S. SALES |
| 8B. | COMPLETENESS #2 HOME MARKET SALES |
| 8C. | COMPLETENESS #3 NON-SUBJECT MERCHANDISE |
| 8D. | COMPLETENESS #4 SEQUENTIAL INVOICE TESTING |
| 8E. | COMPLETENESS #5 FREIGHT AND INSURANCE REVENUE |
| 9A. | SEQH 1830 |
| 9B. | SEQH 2812 |
| 9C. | SEQH 8018 |
| 9D. | SEQH 10171 |
| 9E. | SEQU 1558 |
| 9F. | SEQU 1681 |
| 9G. | SEQU 5108 |
| 9H. | SEQU 7575 |
| 9I. | SEQH 4212 |
| 9J. | SEQH 6315 |
| 9K. | SEQH 9748 |
| 9L. | SEQU 273 |
| 9M. | SEQU 292 |
| 9N. | SEQU 2203 |
| 10A. | INLAND FREIGHT PLANT TO WAREHOUSE |
| 10B. | INLAND FREIGHT TO CUSTOMER |
| 10C. | INTERNATIONAL FREIGHT |
| 10D. | INLAND FREIGHT PLANT/WAREHOUSE TO PORT |

Attachment 1 - Page 1

10E.         DOMESTIC BROKERAGE
10F.         U.S. BROKERAGE
10G.        WAREHOUSING EXPENSE
10H.        U.S. COMMISSIONS
10I.         DOMESTIC WARRANTY EXPENSE
10J.         U.S. WARRANTY EXPENSE
10K.        INVENTORY CARRYING
10L.         INDIRECT SELLING EXPENSES
10M.        LATE PAYMENT
10N.        SHORT TERM MXP INTEREST RATES
10O.        SHORT TERM USD INTEREST RATES
10P.         PACKING COST
10Q.        PACKING MATERIALS EXCLUDED
10R.        DEMONSTRATION OF ACCOUNT RECLASSIFICATION

Filed By: Katerina Katsiadas, Filed Date: 7/11/25 1:01 PM, Submission Status: Approved

# ATTACHMENT 2

## LIST OF PARTICIPANTS

### Enforcement & Compliance , U.S. Department of Commerce

| | |
|---|---|
| Faris Montgomery | Program Manager |
| Katerina Katsiadas | International Trade Compliance Analyst |
| Blanca Garza | Contract Interpreter |

### Galvasid

| | |
|---|---|
| Alberto Martinez Garza | Chief Financial Officer, |
| Felipe Sergio Martínez Cárdenas | Board Chairman |
| Jesús Enrique Vázquez Pérez | Treasury Manager |
| Jesús Angel Silva | Dumping Analyst |
| Abdi Jonathan Hernandez | Controller Manager |

### Winton & Chapman PLLC, Counsel to Galvasid

| | |
|---|---|
| Jeffrey Winton | Partner |
| Rachel Hauser | Associate |
| Kate Cornman | Senior International Trade Specialist |

### The International Trade Consulting

| | |
|---|---|
| Jong-Tak (Jeff) Kim | Vice President |
| Chang-Hee Lee | Director |
| In-Pyo (David) Hong | CPA, Consultant |
| Tae-Eyun (Tae) Kang | CPA, Analyst |

## ATTACHMENT 3

### Selected Sales

### Home Market

| Sale ID | SEQH | INVOICEH | SALINDH |
|---------|------|----------|---------|
| HM1 | 1830 | [ | ] |
| HM2 | 2812 | [ | ] |
| HM3 | 8018 | [ | ] |
| HM4 | 10171 | [ | ] |
| HM5 | 4212 | [ | ] |
| HM6 | 6315 | [ | ] |
| HM7 | 9748 | [ | ] |

### U.S. Market

| Sale ID | SEQU | INVOICEU | SALINDTU |
|---------|------|----------|----------|
| US1 | 1558 | [ | ] |
| US2 | 1681 | [ | ] |
| US3 | 5108 | [ | ] |
| US4 | 7575 | [ | ] |
| US5 | 273 | [ | ] |
| US6 | 292 | [ | ] |
| US7 | 2203 | [ | ] |

Attachment 3, Page 1

Tab 17

Petitioners' Case Brief on Sales Issues and Post-Preliminary
Analysis Concerning Galvasid
(July 28, 2025)

PR-446, CR-851

# BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE
# INTERNATIONAL TRADE ADMINISTRATION

DOC Inv. No. A-201-863
Total Pages: 42
POI: 7/1/2023 - 6/30/2024
AD/CVD Operations, Office VIII

**<u>PUBLIC VERSION</u>**
Galvasid's Business Proprietary Information
Released Under APO Redacted from Pages
17-19, 21-23

---

### Certain Corrosion-Resistant Steel Products
### from Mexico

---

## PETITIONERS' CASE BRIEF ON SALES ISSUES AND POST-PRELIMINARY ANALYSIS CONCERNING GALVASID

SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.,
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel to Steel Dynamics,
Inc. and the United Steel,
Paper and Forestry, Rubber,
Manufacturing, Energy,
Allied Industrial and Service
Workers International Union,
AFL-CIO, CLC*

CASSIDY LEVY KENT (USA)
LLP
2112 Pennsylvania Avenue,
N.W., Suite 300
Washington, D.C. 20037
(202) 567-2300

*Counsel to United States
Steel Corporation and
Wheeling-Nippon Steel, Inc.*

July 28, 2025

**Table of Contents**

I.      EXECUTIVE SUMMARY.................................................................................... 1

II.     ARGUMENT..................................................................................................... 2

    A.   Commerce Should Apply Zeroing to All Sales Comparisons and Treat All Non-Dumped Sales as Having Zero Dumping Margins .................................................................... 2

      1. Legal Background.......................................................................................... 3

      2. The Antidumping Statute is Best Read to Require Zeroing................................ 6

      3. There Are No Procedural Requirements Limiting Commerce's Restoration of Zeroing . 14

    B.   Commerce Should Reduce Galvasid's Overstated U.S. Prices that Improperly Include Freight Revenue and Insurance Revenue.................................................................. 16

III.    CONCLUSION ............................................................................................. 23

# Table of Authorities

**Cases**

*AK Steel Corp. v. United States*, 21 C.I.T. 1265, 1267 (1997)........................................................ 22

*Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1339–40
    (Ct. Int'l Trade 2000) (citing *Olympic Adhesives, Inc. v. United States*,
    899 F.2d 1565, 1571–72 (Fed. Cir. 1990))............................................................................ 20

*Allen v. United States*, 2024 WL 4002305 at *1 (Fed. Cir. 2024)................................................. 12

*Bowe Passat Reingungs-Und Waschere-itechnik GmbH v. United States*,
    926 F. Supp. 1138 (Ct. Int'l Trade 1996) ............................................................................... 3

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council Inc.*, 467 U.S. 837 (1984) ...................... 3, 5, 9

*Duncan v. Walker*, 533 U.S. 167, 174 (2001) ................................................................................ 11

*Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343–44 (Fed. Cir. 2021)
    (quoting *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)) ............. 22

*Heveafil Sdn. Bhd. v. United States*, 25 C.I.T. 147, 149 (2001)..................................................... 22

*Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020)............. 20

*Hyundai Heavy Indus., Co Ltd. v. United States*, 332 F. Supp. 3d 1331,
    1340 (Ct. Int'l Trade 2018) ................................................................................................... 18

*Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004) (quoting *Smith v. United States*,
    508 U.S. 223, 228 (1993)) ....................................................................................................... 8

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)............................................... passim

*Loughrin v. United States*, 573 U.S. 351, 358 (2014).................................................................... 12

*New York Life Ins. Co. v. United States*, 190 F.3d 1372, 1382 (Fed. Cir. 1999) .......................... 11

*NEXTEEL Co., Ltd. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) ................................ 18

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) .......................... 20, 21

*Özdemir Boru San ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1242 (Ct. Int'l Trade
    2017) (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294,
    1304 (Ct. Int'l Trade 2004), *aff'd*, 146 Fed. App'x 493 (Fed. Cir. 2005)) .............................. 22

*Paralyzed Veterans of America v. West*, 138 F.3d 1434, 1436 (Fed. Cir. 1998)........................... 16

*Russello v. United States*, 464 U.S. 16, 23 (1983) ........................................................................ 12

*Samsung Elecs. Co. v. United States*, 70 F. Supp. 3d 1350, 1359 (Ct. Int'l Trade 2015) ............. 21

*Serampore Indus. v. United States*, 675 F. Supp. 1354 (Ct. Int'l Trade 1987)................................ 3

*Timken Co. v. United States*, 354 F.3d 1334, 1341 (Fed. Cir. 2004)...................................... 3, 4, 8

*Timken Co. v. United States*, No. 03-1098, 2003 WL 24305310,
    at *18 (Fed. Cir. filed May 19, 2003) ...................................................................................... 4

*U.S. Steel Corp. v. United States*, 621 F.3d 1351 (Fed. Cir. 2010) ("*U.S. Steel*") ........ 5, 11, 12, 13

*Williams v. Taylor*, 529 U.S. 362, 404 (2000).............................................................................. 11

**Statutes and Regulations**

19 C.F.R. § 351.101(a) ........................................................................................... 10
19 C.F.R. § 351.102(a)(21) ..................................................................................... 10
19 C.F.R. § 351.102(b)(21) ....................................................................................... 6
19 C.F.R. § 351.104(a)(1); (a)(3)(ii) ....................................................................... 7
19 C.F.R. § 351.104(a)(3)(ii) .................................................................................. 10
19 C.F.R. § 351.414(c)(2) ......................................................................................... 9
19 U.S.C. § 1677(35)(A) ........................................................................................... 9
19 U.S.C. § 1677(35)(A)-(B) ........................................................................... 7, 8, 15
19 U.S.C. § 1677e .................................................................................................. 22
19 U.S.C. § 1677e(a) .............................................................................................. 20
19 U.S.C. § 1677e(a)(2)(A)–(D) ............................................................................ 19
19 U.S.C. § 1677e(b) .............................................................................................. 20
19 U.S.C. § 1677f-1(d) ..................................................................................... passim
19 U.S.C. § 1677f-1(d)(1)(A)(i) ............................................................................... 9
19 U.S.C. § 1677f-1(d)(1)(A)(ii) .............................................................................. 9
19 U.S.C. § 1677m ................................................................................................. 20
19 U.S.C. § 1677m(d) ............................................................................................ 20
19 U.S.C. § 1677m(i) ............................................................................................. 22
19 U.S.C. § 3512(a) ........................................................................................... 5, 15
19 U.S.C. § 3533 ...................................................................................................... 4
19 U.S.C. § 3533(g)(1) ........................................................................................... 14
19 U.S.C. § 3538 ...................................................................................................... 4
Section 123 of the URAA (19 U.S.C. § 3533) ....................................................... 14

**Administrative Decisions**

*Certain Corrosion-Resistant Steel Products from Mexico,* 90 Fed. Reg. 15,349 (Dep't Commerce
    Apr. 10, 2025) and accompanying Decision Memo ("DM") ....................................................... 3
*Large Power Transformers From the Republic of Korea*, 87 Fed. Reg. 12,932 (Dep't Commerce
    Mar. 8, 2022) and accompanying Issues and Decision memo ("IDM") ................................... 10

**Other Authorities**

*America First Trade Policy*, 90 Fed. Reg. 8,471 (Presidential Documents Jan. 30, 2025) ........ 6, 7
Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947) ........................ 16
Ensuring Lawful Governance and Implementing the President's ''Department of Government
    Efficiency'' Deregulatory Initiative, 90 Fed. Reg. 10,583
    (Presidential Documents Feb. 25, 2025) .................................................................................. 7

Office of Mgmt. & Budget, Exec. Office of the President, Memorandum M-25-28, Guidance Implementing the President's Memorandum Directing the Repeal of Unlawful Regulations (2025) ............................................................................................................................ 6

Statement of Administrative Action Accompanying the URAA, H.R. Rep. No. 103-316 (1994), at 842, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4178 ("SAA") ........................................................ 9

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. I at 870 (1994), *reprinted at* 1994 U.S.C.C.A.N. 4040, 4199 at 870 ("SAA") ............................................................................................................................... 11

*The American Heritage College Dictionary*, 477 (3d. ed. 1993) ...................................................... 8

*United States – Final Antidumping Measures on Stainless Steel from Mexico*, WT/DS344 (Dec. 20, 2007) at para. 7.136 ................................................................................................. 10

*United States – Final Dumping Determination on Softwood Lumber from Canada – Recourse to Article 21.5 of the DSU by Canada*, WT/DS264/RW (Apr. 3, 2006) at para. 5.33 .................. 10

*United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, WT/DS294/R (May 15, 2006) .................................................................... 4, 14

*United States – Measures Relating to Zeroing and Sunset Reviews*, WT/DS322/R (Sept. 20, 2006) at paras. 7.127, 7.138-7.140 .................................................................................. 10

*US-Zeroing (EC)*, WT/DS294/R (Oct. 31, 2005) at para 7.266 .................................................... 10

*Webster's New Twentieth Century Dictionary of the English Language Unabridged*, 636 (2d. ed. 1980) ............................................................................................................................. 8

## I.      EXECUTIVE SUMMARY

In this case brief, Steel Dynamics, Inc., United States Steel Corporation, Wheeling-Nippon Steel, Inc., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Petitioners") present arguments regarding sales issues for mandatory respondent Galvasid, S.A. de C.V. ("Galvasid"), the post-preliminary analysis issued by the U.S. Department of Commerce ("Commerce"), and the actions that Commerce should take to address these issues in the final determination.

**Section II.A.** demonstrates that Commerce must employ the use of zeroing (*i.e.*, assign a value of zero to individual dumping margins where normal value does not exceed the U.S. price) when it calculates the final dumping margins in this investigation, regardless of which comparison method is used. For decades, Commerce applied the average-to-average method in antidumping investigations and the average-to-transaction method in administrative reviews of antidumping duty orders. Commerce also applied the zeroing methodology by assigning a value of zero to non-dumped sales. Commerce abandoned these longstanding practices only because of adverse decisions by the Appellate Body of the World Trade Organization ("WTO") that created obligations that do not appear anywhere in the text of the WTO Antidumping Agreement and that were never agreed to by the United States during negotiations.

Under Commerce's current policy, which implements erroneous WTO decisions, Commerce applies the average-to-average method as the default comparison method in investigations. The average-to-transaction method is used as an exception to address "targeted dumping" if there is a pattern of U.S. prices for comparable merchandise that differ significantly among purchasers, regions, or periods of time and such differences cannot be taken into account

1

using the default average-to-average method. Commerce applies the zeroing methodology only when it calculates dumping margins using the average-to-transaction method.

Commerce's current practice of zeroing only when calculating dumping margins using the average-to-transaction comparison method can no longer stand. As demonstrated below, the best reading of the antidumping statute is to require zeroing regardless of which comparison method is used to calculate a respondent's dumping margin. Thus, based on the Supreme Court's holding in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ("*Loper Bright*") and President Trump's memorandum regarding his "America First Trade Policy," Commerce must apply the zeroing methodology to all sales comparisons and treat all non-dumped sales as having zero dumping margins for purposes of calculating the respondents' weighted-average dumping margins in the final determination.

**Section II.B.** shows that Galvasid improperly included freight revenue and insurance revenue in its U.S. gross unit prices, inflating U.S. prices and decreasing its dumping margin. Galvasid did so even though it reported these revenue items separately from its home market gross unit price. Petitioners calculate an estimated amount by which Galvasid's reporting method overstated U.S. price. In order to address this overstatement, Commerce must decrease U.S. price using facts otherwise available.

## II.     ARGUMENT

### A.  Commerce Should Apply Zeroing to All Sales Comparisons and Treat All Non-Dumped Sales as Having Zero Dumping Margins

In the Preliminary Determination and Post-Preliminary Analysis, Commerce employed a methodology for the calculation of the dumping margins that offset U.S. sales made at prices

2

or statements issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers."[37] An interpretive rule "simply indicates an agency's reading of a statute or a rule. It does not intend to create new rights or duties, but only reminds affected parties of existing duties."[38] As Commerce's practice until 2006 makes clear, zeroing is an existing obligation in U.S. law, and Commerce's restoration of the practice would thus fall outside the purview of APA notice-and-comment procedure.

*     *     *

Therefore, under the best reading of the antidumping statute, Commerce is required to zero all non-dumped sales and must do so in the final determination in this investigation whether it uses the average-to-average or the average-to-transaction comparison method to calculate the respondents' dumping margins. However, if Commerce decides not to engage in zeroing when using the average-to-average comparison method in this proceeding, which would be contrary to law as demonstrated above, it should at a minimum continue to faithfully implement the targeted dumping provision of the statute by using the same differential pricing analysis with zeroing that it used in the post-preliminary analysis.[39]

## B. Commerce Should Reduce Galvasid's Overstated U.S. Prices that Improperly Include Freight Revenue and Insurance Revenue

At verification, Commerce discovered that Galvasid had included both freight revenue and insurance revenue in the gross unit prices that it reported for U.S. sales in the field

---

[37] Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947).

[38] *Paralyzed Veterans of America v. West*, 138 F.3d 1434, 1436 (Fed. Cir. 1998).

[39] *See also* Post-Preliminary Analysis at 4 (applying modified differential pricing analysis to implement targeted dumping provision under 19 U.S.C. § 1677f-1(d)(1)(B)).

16

GRSUPRU, improperly inflating those prices.[40] Commerce found that every U.S. sales trace reviewed – SEQUs [                                    ] – included freight revenue in the gross unit price.[41] Additionally SEQU [     ] included both freight revenue and insurance revenue in the gross unit price.[42] For Commerce's convenience, Petitioners have calculated these amounts for each of the U.S. sales traces based on Sales Verification Exhibits 9-E through 9-H and 9-L through 9-N:

| | SEQU | QTYU | GRSUPRU | Invoice Value | Freight Revenue | Unit Freight Revenue | Insurance Revenue[43] | Unit Insurance Revenue | Total Unit Freight Revenue and Insurance Revenue | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | (MT) | (USD/MT) | (USD) | (USD) | (USD/MT) | (USD) | (USD/MT) | (USD/MT) | |
| | | a | b | c | d | e = d/a | f | g = f/a | h = e+g | |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |

---

[40] *See* Commerce Memorandum re: *Verification of the Sales Response of Galvasid S.A. de C.V. (Galvasid) in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico* (July 11, 2025) ("Verification Report") at 14.

[41] *See id.*; *see also* Letter from Galvasid Counsel to Commerce re: *Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico – Sales Verification Exhibits* (May 23, 2025) ("Sales Verification Exhibits") at 9-E – 9-H and 9-L – 9-N.

[42] *See id.*

[43] Insurance revenue for SEQU [
                                   ]. Further, because the insurance revenue [
                                   ].

Because all sales traces examined during verification include freight revenue, it is reasonable for Commerce to conclude that all U.S. sales reported in Galvasid's U.S. sales database include freight revenue in the reported gross unit price. Additionally, an unknown number of U.S. sales include insurance revenue in the reported gross unit price. In fact, the amount of insurance revenue associated with SEQU [                                         ], making it impossible to determine with certainty how much insurance revenue was incorporated into the U.S. gross unit price.

Galvasid's reporting of GRSUPRU in this manner diverged from its home market sales reporting. First, in its response to Section B of the Questionnaire, Galvasid stated that it "charged certain home market customers for freight and/or insurance, as separate items on the invoice" and that it accordingly reported freight revenue and insurance revenue for home market sales in separate fields, FRTREVH and INSUREVH.[44] At verification, Commerce found that for the U.S. sales traces, freight revenue and insurance revenue were similarly "included as {} separate line item{s} in the sales invoice."[45] However, Galvasid included these items in the gross unit price for U.S. sales and did not report them in separate fields, unlike its reporting for home market sales. Galvasid's divergent reporting method was not explained at verification, but the effect was to inflate the U.S. price and decrease Galvasid's dumping margin.

Further, Commerce's standard practice is to cap freight revenues and insurance revenues by the expense associated with such revenues.[46] However, because these revenue items have

---

[44] *See* Letter from Galvasid Counsel to Commerce re: *Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico – Response to Sections B, C and D of Department's November 18 Questionnaire* (Jan. 13, 2025) at B-23.

[45] Verification Report at 14.

[46] *See NEXTEEL Co., Ltd. v. United States*, 28 F.4th 1226, 1239 (Fed. Cir. 2022) ("Commerce's 'normal practice' is to cap freight revenue at freight cost."); *Hyundai Heavy Indus., Co Ltd. v. United States*, 332 F. Supp. 3d 1331, 1340 (Ct. Int'l Trade 2018) ("When Commerce finds that a service is separately

been included in the reported U.S. gross unit price and have not been separately reported,

Commerce is unable to make this adjustment for U.S. sales. Because Commerce is unable to cap

the freight revenues and insurance revenues relative to their related expenses, the reported U.S.

gross unit price is necessarily overstated in the margin calculation. Petitioners provide a

calculation that estimates the amount of this overstatement by comparing the freight revenue and

insurance revenue amounts from the verification exhibits with the reported freight expense. As

shown in the chart below, Petitioners calculate that, on average, U.S. price is overstated by

[      ]%:

| SEQU | QTYU | Invoice Value | Total Unit Freight Revenue and Insurance Revenue | INTNFRU | DINLFTPU | Total Unit Freight Expense | Total Unit Freight Expense[47] | Amount Overstated | Total Value of Overstatement | Percent Difference |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

     Galvasid's overstatement of its U.S. gross unit prices requires that such prices be reduced

using facts otherwise available. The statute requires Commerce to use facts otherwise available if

"necessary information is not available on the record"[48] or when a respondent "withholds

---

negotiable, its practice has been to cap the service-related revenue by the associated expenses when determining the U.S. price.").

[47] The total unit freight expense in MXN was converted into USD using the prevailing exchange rate on the date of sale: [

].

[48] *See* 19 U.S.C. § 1677e(a)(1).

information that has been requested," "fails to provide such information by the deadlines … or in the form and manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified."[49] Generally, Commerce's authority to resort to facts otherwise available is subject to certain provisions under 19 U.S.C. § 1677m. For example, if Commerce finds that a respondent's response to an information request is deficient, Commerce usually must inform the respondent and, to the extent practicable, provide the respondent with an opportunity to rectify the deficiency.[50] However, the courts have ruled that this obligation does not apply when reporting failures are first discovered at verification.[51] In such a scenario, Commerce may "disregard all or part of the original and subsequent responses" and apply facts available.[52]

In selecting from among the facts available, Commerce may employ an adverse inference if an interested party fails to cooperate by not acting to the best of its ability to comply with Commerce's requests for information.[53] The "best of its ability" standard requires that the respondent maintain full and complete records, be familiar with all of its records, and conduct a careful review of its records.[54] It is not enough for a respondent to simply submit any information to Commerce; the information provided by the respondent must represent the

---

[49] *Id.* § 1677e(a)(2)(A)–(D).

[50] *See* 19 U.S.C. § 1677m(d).

[51] *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1349 (Ct. Int'l Trade 2020) ("Thus, insofar as a respondent's questionnaire answers on their face comply with Commerce's information requests, § 1677m(d) does not apply if Commerce, upon verification, determines that those questionnaire answers are inaccurate. In short, verification is not an opportunity for a do-over; instead, the purpose of verification is to confirm information previously submitted by a respondent in response to Commerce's requests for information.").

[52] *See* 19 U.S.C. §§ 1677e(a) and 1677m(d).

[53] *Id.* § 1677e(b).

[54] *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

20

"maximum it is able to do" and must be complete and accurate.[55] The standard "does not condone inattentiveness, carelessness, or inadequate record keeping."[56] The respondent's motivation or intent is not a relevant consideration.[57]

At verification, Commerce discovered that Galvasid had included freight revenue and insurance revenue in the gross unit prices reported for its U.S. sales in the field GRSUPRU, thereby overstating U.S. prices. This prevented Commerce from employing its capping methodology for these revenue items, significantly impeding the investigation and preventing Commerce from verifying the freight revenue and insurance revenue amounts and accurately calculating GRSUPRU. This requires Commerce to calculate GRSUPRU using facts otherwise available. In this case, Commerce must address Galvasid's failure to separately report its freight revenue and insurance revenue and its improper reporting of U.S. price by decreasing GRSUPRU by [      ] for all U.S. sales.

The reduction of GRSUPRU by [      ] is based on Galvasid's own data regarding the average amount by which the U.S. price was overstated and therefore represents the application of facts available without an adverse inference. It is also appropriate to apply this adjustment to all of Galvasid's U.S. sales because, as established above, the improper reporting of the company's U.S. prices was found for all [      ] of the U.S. sales traces examined at verification. The U.S. Court of International Trade has stated that "{v}erification is a spot check and is not intended to be an exhaustive examination of a respondent's business."[58] This spot check is like

---

[55] *Id.*; *see also Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1339–40 (Ct. Int'l Trade 2000) (citing *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1571–72 (Fed. Cir. 1990)).

[56] *See Nippon Steel*, 337 F.3d at 1382.

[57] *Id.* at 1383.

[58] *See Samsung Elecs. Co. v. United States*, 70 F. Supp. 3d 1350, 1359 (Ct. Int'l Trade 2015).

an audit and involves close examination of a representative sample of the respondent's data, the purpose of which is to ensure that Commerce relies upon complete and accurate information in making a final determination. As the Federal Circuit has explained, "{v}erification represents a point of no return" and "{t}he purpose of verification is 'to test information provided by a party for accuracy and completeness.'"[59] Stated another way, "{v}erification is intended to test the accuracy of data already submitted, rather than to provide a respondent with an opportunity to submit a new response."[60] If the respondent fails at verification to support the sales data that it has reported, as is the case here, Commerce should disregard that information and instead rely on facts otherwise available.[61]

Although the [      ] reduction to U.S. price does not involve the use of an adverse inference in the selection of the facts available to apply (*i.e.*, the use of adverse facts available), such an inference would certainly be warranted here. Galvasid reported GRSUPRU in this manner even though it had reported its home market gross unit prices separately from freight revenue and insurance revenue, demonstrating that Galvasid knew the proper method for reporting the gross unit price. Galvasid's failure to report U.S. and home market gross unit prices using a uniform standard represents a failure to act to the best of its ability and is a clear example of, at minimum, "inattentiveness, carelessness, or inadequate record keeping." In addition,

---

[59] *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343–44 (Fed. Cir. 2021) (quoting *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)).

[60] *See Özdemir Boru San ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1242 (Ct. Int'l Trade 2017) (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1304 (Ct. Int'l Trade 2004), *aff'd*, 146 Fed. App'x 493 (Fed. Cir. 2005)).

[61] *See* 19 U.S.C. §§ 1677e, 1677m(i). *See also Heveafil Sdn. Bhd. v. United States*, 25 C.I.T. 147, 149 (2001); *AK Steel Corp. v. United States*, 21 C.I.T. 1265, 1267 (1997).

Galvasid failed to disclose the error in its reporting of U.S. price either before or at the outset of verification. Therefore, it was not forthcoming in the information it provided to Commerce.

The bottom line is that Galvasid has failed to provide the information necessary for Commerce to accurately calculate Galvasid's U.S. prices and dumping margin. Accordingly, Commerce should reduce the GRSUPRU reported by Galvasid for each of its U.S. sales by [       ] in calculating the company's dumping margin for the final determination.

## III.    CONCLUSION

For the foregoing reasons, Petitioners respectfully submit that Commerce should issue its final determination for Galvasid in this investigation consistent with the arguments presented above.

*       *       *

Tab 18

Rebuttal Brief of Galvasid, S.A. de C.V. on General and Sales Issues
(August 4, 2025)

PR-458, CR-855

Case No. A-201-863
Total Pages: 49
Investigation
AD/CVD Operations Office VIII
Proprietary Information Removed
from Page 16 and Attachments
1-2
Public Version

In the Matter of:                                     )
                                                      )
LESS-THAN-FAIR-VALUE INVESTIGATION                    )
OF CERTAIN CORROSION-RESISTANT                        )
STEEL PRODUCTS FROM MEXICO                            )
                                                      )

**Public Version**

REBUTTAL BRIEF OF
GALVASID, S.A. DE C.V.
ON GENERAL AND SALES ISSUES

WINTON & CHAPMAN PLLC
1100 13th Street NW, Suite 825
Washington, DC 20005
(202) 774-5500

Counsel to Galvasid, S.A. de C.V.

August 4, 2025

Table of Contents

SUMMARY ........................................................................................................... 1

A.   Untimely New Factual Information .............................................................. 1

B.   "Zeroing" ...................................................................................................... 2

C.   U.S. Gross Unit Price .................................................................................. 3

ARGUMENT ........................................................................................................... 4

A.   The Department Should Reject Untimely New  Factual Information in
     Petitioners' Case Brief .................................................................................. 4

     1.   OIRA Memorandum .............................................................................. 4

     2.   Exhibits 1 and 2 of Petitioners' Brief .................................................. 6

B.   The Department Should Reject the Petitioners'  Arguments Concerning the
     Use of "Zeroing" when  Calculating the Dumping Margin for Galvasid ..... 7

     1.   Contrary to Petitioners' Contentions, the  Department Did Not Use a
          Transaction-to-Average  Comparison without "Zeroing" when
          Calculating  Dumping Margins for Galvasid in This Investigation ..... 7

     2.   Petitioners' Assertion that the Department Calculates  Transaction-
          Specific Dumping Margins under the Average- to-Average
          Methodology Is Mathematically Incorrect ........................................... 8

     3.   The Department's Methodology for Combining the  Results for
          Specific Control Numbers in Average-to- Average Comparisons Is
          Consistent with the Statute .................................................................. 9

          a.   Previous Court Decisions Upholding the Department's  Current
               Methodology Remain Binding Legal Authority ......................... 10

          b.   The Court Decisions Upholding the Department's  Current
               Methodology Are Consistent with Loper Bright ........................ 11

          c.   Petitioners' Argument that the Department's Rule is  Not the
               "Best Reading" of the Statute is Meritless ................................ 13

     4.   The Department May Not Change Its Average-to-Average Calculation
          Methodology Without Notice and Comment ....................................... 14

C.   Petitioners' Assertion that Galvasid Overstated  Its Reported U.S. Prices by
     Including Separately- Invoiced Freight and Insurance Revenue  in the
     Reported Gross Unit Price Is False .............................................................. 16

     1.   Galvasid Does Not Separately Negotiate Freight  Revenue or Insurance
          Revenue with U.S. Customers.............................................................. 17

     2.   In the Absence of Evidence that Galvasid Separately  Negotiated
          Amounts for Transport Services with Its  Customers, the Department
          Has No Authority to Exclude  "Revenue" Related to those Services
          from Its Calculations ......................................................................... 19

     3.   Petitioners' Claim that Galvasid Reported Gross  Unit Prices for
          Home-Market Sales in a Manner  Inconsistent with Its Reporting for
          U.S. Sales Is False ............................................................................. 20

     4.   There is No Basis to Apply Adverse Facts Available  Based on
          Galvasid's Reporting of Its Gross Unit Prices ................................... 21

CONCLUSION ...................................................................................................... 23

<u>Table of Authorities</u>

<span style="font-variant: small-caps">Court Decisions</span>

*ABB Inc. v. United States*,
 355 F.Supp.3d 1206 (Ct. Int'l Trade 2022)*;* ................................................................. 19

*BYD (H.K.) Co. v. United States*,
 No. 23-00221, 2025 WL 1420318 (Ct. Int'l Trade May 16, 2025) .............................. 12

*Chevron, U.S.A., Inc., v. Nat. Res. Def. Council, Inc.*,
 467 U.S. 837 (1984) .................................................................................................... 10

*Dongguan Sunrise Furniture Co. v. United States,*
 865 F.Supp.2d 1216 (2012) .......................................................................................... 19

*Gold E. Paper (Jiangsu) Co. v. United States*,
 37 C.I.T. 873 (2013) .................................................................................................... 15

*Hyundai Heavy Industries Co., Ltd. v. United States*,
 393 F.Supp.3d 1293 (Ct. Int'l Trade 2019) .................................................................. 19

*In re Chestek PLLC*,
 92 F.4th 1105 (Fed. Cir. 2024) ..................................................................................... 15

*Invenergy Renewables LLC v. United States*,
 422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019),
 modified, 476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020). ............................................... 15

*Loper Bright Enters. v. Raimondo*,
 603 U.S. 369 (2024 ......................................................................................... 10, 11, 12

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*,
 260 F.3d 1365 (Fed. Cir. 2001) .................................................................................... 15

*NEXTEEL v. United States,*
 28 F.4th 1226 (2022). ................................................................................................... 19

*PSC VSMPO–Avisma Corp. v. United States*,
 688 F.3d 751 (Fed. Cir. 2012). ....................................................................................... 6

*Stupp Corporation v. United States*,
 359 F.Supp.3d 1293 (Ct. Int'l Trade 2019). .................................................................... 6

*Timken Co. v. United States*,
354 F.3d 1334 (Fed. Cir. 2004)...................................................................... 13

*U.S. Steel Corp. v. United States*,
33 C.I.T. 984 (2009),
aff'd, 621 F.3d 1351 (Fed. Cir. 2010)............................................................ 12

*U.S. Steel Corp. v. United States*, 6
21 F.3d 1351 (Fed. Cir. 2010)........................................................... 12, 13, 14

STATUTES

19 U.S.C. § 1677(35) ..................................................................................... 13

19 U.S.C. § 1677e ........................................................................................... 22

19 U.S.C. § 1677f-1 ............................................................................... 9, 13, 14

5 U.S.C. § 553. ................................................................................................ 14

REGULATIONS

19 C.F.R. § 351.102 ...................................................................................... 4, 6

19 C.F.R. § 351.104 ...................................................................................... 4, 5

19 C.F.R. § 351.301 .......................................................................................... 4

ADMINISTRATIVE DECISIONS

*Final Results of Five-Year Sunset Review of Suspended Antidumping Duty Investigation
on Uranium from the Russian Federation*, 71 Fed. Reg. 32517 (June 6, 2006),
and accompanying Issues and Decision Memorandum
(ACCESS Barcode:  Not Available) ............................................................... 11

OTHER AUTHORITIES

*Antidumping Proceedings: Calculation of the Weighted-Average Dumping
Margin During an Antidumping Investigation; Final Modification*,
71 Fed. Reg. 77722 (Dec. 27, 2006). .............................................................. 9

average-to-average comparison methodology to apply "zeroing," it may not unilaterally modify its comparison methodology in this case. In these circumstances, Petitioners' request that the Department modify its final determination to apply "zeroing" under the average-to-average methodology must be rejected.

    C.    *Petitioners' Assertion that Galvasid Overstated Its Reported U.S. Prices by Including Separately- Invoiced Freight and Insurance Revenue in the Reported Gross Unit Price Is False*

Galvasid's U.S. sales during the investigation period were made on a delivered basis.[44] The prices for such sales, by their nature, include the cost of freight and related expenses incurred to transport the merchandise from Galvasid's plant to the location designated by the customer. In all cases, the *invoices* for Galvasid's U.S. sales stated the price on a delivered basis. The U.S. sales invoices did not separately break out amounts for freight, insurance, or other transport-related items. Furthermore, none of the documents shared by Galvasid with its U.S. customers provided such a breakdown of the delivered sales price.

In its internal accounting records, Galvasid does disaggregate the delivered prices for its U.S. sales into separate amounts for the merchandise and for transportation. The disaggregated amounts are recorded in separate accounts. However, although the total sales amounts recorded in Galvasid's accounting system necessarily match the amounts

---

[44] Galvasid's sales to U.S. customers located in Puerto Rico were made on a [   ] basis. Sales to customers located in Mexico (for which Galvasid knew that the merchandise would ultimately be delivered to the United States) were made on a delivered basis. Other sales to U.S. customers were made on a [   ] basis. *See* Galvasid's January 13, 2025, Section C Response at 14; *see also* Galvasid's March 20, 2025, Submission at Appendix S3C-2.

stated on its invoices, the disaggregation of the invoice totals into separate amounts for merchandise and for transportation does not.

Petitioners accuse Galvasid of incorrectly including freight revenue and insurance revenue in its U.S. gross unit prices, thereby "inflating U.S. prices and decreasing its dumping margin."[45]  Petitioners assert that the Department should make an adjustment based on adverse-facts-available, using the disaggregated amounts recorded in Galvasid's accounting records.  Their request is, however, contrary to law.  It is well settled that, when there is no evidence that the seller and customer negotiated separate amounts for freight or other transportation services, the Department has no authority to adjust the invoice price for revenue attributed to those services.

### 1. Galvasid Does Not Separately Negotiate Freight Revenue or Insurance Revenue with U.S. Customers

As an initial matter, we should note that there is a fundamental error in the Department's report on the Galvasid sales verification.  The sales verification report states that the verifiers "found that Galvasid included freight revenue and insurance revenue, which were separately listed on the sale invoices for Galvasid's U.S. sales, in Galvasid's calculation of U.S. gross unit price."[46]  But that statement is incorrect.  None of the invoices examined at verification included separate amounts for freight revenue or

---

[45] Petitioners' Brief at 2.

[46] Department's Memorandum re "Verification of the Sales Response of Galvasid S.A. de C.V. (Galvasid) in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico" (July 11, 2025) at 2.

insurance revenue. Instead, all of the examined invoices stated a single delivered price for each transaction.[47]

For the Department's reference, we have included copies of all of the U.S. sales invoices examined by the Department at verification in Attachment 1 to this brief. The Department can easily confirm that the invoices list only a single price for each transaction, and that there are no separate charges for freight or insurance listed anywhere on those invoices.

It appears that the verifiers may have been confused by a separate document included in each sales trace, which showed how each sale was recorded in Galvasid's normal accounting records. As indicated in those documents, the invoice amounts for each sale were disaggregated and recorded in three separate accounts: The value of the merchandise on an ex-factory basis was recorded in account 40030001 (export sales revenue), the amounts attributable to freight were recorded in account 40300001 (export freight revenue), and the amounts attributable to insurance were (where applicable) recorded in account 40630003 (income for indemnifications).[48] But there is no evidence — and no reason to believe — that Galvasid's internal accounting entries were ever communicated, let alone negotiated, with its U.S. customers. Significantly, none of the purchase orders received by Galvasid from its customers contained any breakdown of the delivered prices

---

[47] *See* Galvasid's May 23, 2025, Sales Verification Exhibits at Exhibits 9-E to 9-H and 9-L to 9-N.

[48] *See* Sales Verification Exhibit 9-E (SEQU 1558) at 15; Sales Verification Exhibit 9-F (SEQU 1681) at 11; Sales Verification Exhibit 9-G (SEQU 5108) at 15; Sales Verification Exhibit 9-H (SEQU 7575) at 12; Sales Verification Exhibit 9-L (SEQU 273) at 15; Sales Verification Exhibit 9-M (SEQU 292) at 13 and 16; Sales Verification Exhibit 9-N (SEQU 2203) at 18.

between an ex-factory price for the merchandise and separate amounts for transport

services. [49]

> 2.    *In the Absence of Evidence that Galvasid Separately*
>        *Negotiated Amounts for Transport Services with Its*
>        *Customers, the Department Has No Authority to Exclude*
>        *"Revenue" Related to those Services from Its Calculations*

The treatment of revenue for transport and other sales-related services has been

addressed in numerous past decisions by the Court of International Trade.  Those decisions

make clear that the Department is permitted to "cap" any upward adjustment for

separately-invoiced service revenue by the amount of the corresponding expenses

incurred.[50]  But the Courts have also been clear that such a "cap" may be applied only

where the amounts for service revenue were separately negotiated with the customer. The

Court has been absolutely clear that the Department *may not rely on purely-internal*

*company documents* to determine whether there is separate service-related revenue that

might be subject to a cap.[51]  As the Court of International Trade stated,

> When substantial evidence does not support a finding that the cost of
> the services was separately negotiable from the price of the subject
> merchandise, the agency is without legal authority to reduce export
> price or CEP except by the amount of the expense in question.[52]

---

[49] *See* Sales Verification Exhibit 9-E (SEQU 1558) at 4-7; Sales Verification Exhibit 9-F
(SEQU 1681) at 4; Sales Verification Exhibit 9-G (SEQU 5108) at 4-6; Sales Verification
Exhibit 9-H (SEQU 7575) at 4; Sales Verification Exhibit 9-L (SEQU 273) at 5-6; Sales
Verification Exhibit 9-M (SEQU 292) at 5; Sales Verification Exhibit 9-N (SEQU 2203)
at 5.

[50] *See, e.g., Dongguan Sunrise Furniture Co. v. United States,* 865 F.Supp.2d 1216,
1247-48 (2012).  *See also NEXTEEL v. United States,* 28 F.4th 1226, 1239-40 (2022).

[51] *See ABB Inc. v. United States*, 355 F.Supp.3d 1206, 1220-21 (Ct. Int'l Trade 2022)*;
Hyundai Heavy Industries Co., Ltd. v. United States*, 393 F.Supp.3d 1293, 1307 (Ct. Int'l
Trade 2019).

[52] *ABB Inc.*, 355 F.Supp.3d at 1220.

As a result, a company must report separate freight or insurance revenue when there is no agreement *with the customer* specifically identifying the amounts of that revenue

In this case, there is no evidence whatsoever that Galvasid separately negotiated amounts for freight or insurance with its customers, or that there was any agreement as to how the delivered prices should be broken down between the ex-factory price for the merchandise and separate revenue amounts for freight or insurance. Instead, the evidence on the record is clear that the unit price that was negotiated with Galvasid's customers and that ultimately appeared on Galvasid's U.S. invoices was a delivered price that included any transport services that Galvasid was required to provide under the agreed-upon terms of sale.

As discussed above, separate amounts for freight and insurance revenue appear only on Galvasid's internal accounting vouchers within its accounting system.[53] As a matter of law, the Department may not rely on those documents to identify the amount of freight revenue or insurance revenue for the sales, or to cap any upward adjustment for such revenues.

> 3. *Petitioners' Claim that Galvasid Reported Gross Unit Prices for Home-Market Sales in a Manner Inconsistent with Its Reporting for U.S. Sales Is False*

Petitioners assert that Galvasid's reporting of the U.S. gross unit price "diverged from its home-market sales reporting."[54] In particular, Petitioners claim that Galvasid reported freight and insurance revenue separately for home-market sales in its home-market sales

---

[53] *See* Galvasid's May 23, 2025, Sales Verification Exhibits at Exhibits 9-E to 9-H and 9-L to 9-N.

[54] Petitioners' Brief at 18.

listing, but included freight and insurance revenue in the reported gross unit prices for U.S. sales in its U.S. sales listings, even though the freight and insurance revenues were separately identified on the invoices for both home-market and U.S. sales. However, Petitioners' description of Galvasid's invoicing practices is simply false.

As explained above, the invoices for Galvasid's U.S. sales stated only a single delivered price for each transaction, without identifying separate amounts for freight or insurance. However, as demonstrated at verification, Galvasid's invoices for home-market sales did state freight and/or insurance revenue as separate items on the invoice for some transactions.[55] For home-market sales for which those amounts were separately identified on its invoices to its customers, Galvasid properly reported the freight and/or insurance revenue amounts in the FRTREVH and INSUREVH fields of its home-market sales listing.[56] And it properly did not separately report freight and/or insurance revenue amounts for any sales — to U.S. or home-market customers — for which the invoices and other sales documents provided to the customer did not separately identify amounts for those services.

    *4.    There is No Basis to Apply Adverse Facts Available*
           *Based on Galvasid's Reporting of Its Gross Unit Prices*

As Petitioner notes, 19 U.S.C. § 1677e(a) authorizes use of facts otherwise available if "necessary information is not available on the record," or when a respondent "withholds information that has been requested," fails to provide such information by the deadlines …

---

[55] *See* Sales Verification Exhibit 9-A (SEQH 1830) at 6; Sales Verification Exhibit 9-C (SEQH 8018) at 6. Copies of the invoices for these sales are provided in Attachment 2 to this brief. There were no separately-invoiced freight or insurance amounts for other home-market sales examined at verification.

[56] *See* Galvasid's January 13, 2025, Section B Response at 22-23.

or in the form or manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified."[57]  Furthermore, 19 U.S.C. § 1677e(b) provides that the Department "may" make an adverse inference where an interested party has not acted to the "best of its ability" to comply with the Department's information requests.[58]  None of these prerequisites have been met.

In this case, Galvasid timely provided the Department with accurate data and full sets of documents generated in the normal course of business, including the actual commercial invoices issued to the customer which confirm that the reported revenue amounts are accurate, in response to the Department's requests for information in this investigation.  In short, the evidence on the record confirms that Galvasid's reporting of its U.S. gross unit prices is fully accurate.  Thus, there are no gaps in the record that would require the Department to resort to use of facts otherwise available for Galvasid's U.S. gross unit prices.

---

[57] 19 U.S.C. § 1677e(a)(1)-(2); *see also* Petitioners' Brief at 19-20.

[58] 19 U.S.C. § 1677e(b).

CONCLUSION

For the reasons set forth above, the Department must reject Petitioners' requests to apply "zeroing" to Galvasid's U.S sales and to apply other facts available to reduce Galvasid's U.S. gross unit prices.

Respectfully submitted,

/s/ Jeffrey M. Winton
Jeffrey M. Winton
Amrietha Nellan
Rachel Hauser

Counsel to Galvasid, S.A. de C.V.

August 4, 2025

LIST OF ATTACHMENTS

1.  Commercial Invoices for U.S. Sales Traces
    Examined by the Department at Verification
    A.  SEQU 1558
    B.  SEQU 1681
    C.  SEQU 5108
    D.  SEQU 7575
    E.  SEQU 273
    F.  SEQU 292
    G.  SEQU 2203

2.  Commercial Invoices for Home-Market Sales Traces
    Examined by the Department at Verification
    A.  SEQH 1830
    B.  SEQH 8018

Attachment 1


Commercial Invoices for U.S. Sales Traces
Examined by the Department at Verification

SEQU 1558

**BUSINESS PROPRIETARY INFORMATION NOT
SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

SEQU 1681

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

SEQU 5108

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

SEQU 7575

**BUSINESS PROPRIETARY INFORMATION NOT
SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

SEQU 273

**BUSINESS PROPRIETARY INFORMATION NOT
SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

SEQU 292

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**



SEQU 2203

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(3 PAGES)**

Attachment 2

Commercial Invoices for Home-Market Sales
Traces Examined by the Department at Verification

SEQH 1830

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(7 PAGES)**

SEQH 8018

**BUSINESS PROPRIETARY INFORMATION NOT SUSCEPTIBLE TO SUMMARIZATION DELETED**

**(5 PAGES)**

Tab 19

Issues and Decision Memorandum for the Final Affirmative
Determination of Sales at Less Than Fair Value in the
Investigation of Certain Corrosion-Resistant Steel Products from
Mexico
(August 25, 2025)

PR-466

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

A-201-863
Investigation
**Public Document**
E&C/OVIII: Team

August 25, 2025

| | |
|---|---|
| **MEMORANDUM TO:** | Abdelali Elouaradia<br>Deputy Assistant Secretary<br>  for Enforcement and Compliance |
| **FROM:** | Scot Fullerton<br>Acting Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from Mexico |

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) determines that Certain Corrosion-Resistant Steel Products (CORE) from Mexico are being, or are likely to be, sold in the United States at less than fair value (LTFV), as provided in section 735 of the Tariff Act of 1930, as amended (the Act).  The period of investigation (POI) is July 1, 2023, through June 30, 2024.

Based on our analysis of the comments submitted by interested parties, and based on our findings at verification, we made certain changes to the *Preliminary Determination*.[1]  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Below is the complete list of the issues for which we received comments from interested parties:

General

    Comment 1:   Use of Zeroing
    Comment 2:   Flaws in Applying the New Differential Price Test
    Comment 3:   Use of Average-to-Average Method

Ternium/Tenigal

    Comment 4:   Use of Facts Otherwise Available With An Adverse Inference

---

[1] *See Certain Corrosion-Resistant Steel Products from Mexico:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 90 FR 15349 (April 10, 2025) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

Filed By: Brian Smith, Filed Date: 8/26/25 12:03 PM, Submission Status: Approved



Comment 5:   Multiple Costs Reported for the Same Control Number
Comment 6:   Adjusting Cost of Manufacture for Unreconciled or Unexplained Differences
Comment 7:   Adjusting Affiliated Purchase Prices to Reflect Actual Market Prices
Comment 8:   Treatment of Certain Excluded Expenses
Comment 9:   U.S. Warehousing Expenses, Home Market and U.S. Freight Expenses, and Home Market Credit Expenses (Calculated Using Average Payment Dates)
Comment 10:  Cash Deposit Instructions
Comment 11:  U.S. and Home Market Royalty Expenses and U.S. Insurance Expenses

<u>Galvasid/Perfiles</u>

Comment 12:  U.S. Freight and Insurance Revenue
Comment 13:  U.S. Warranty Expenses

## II.    BACKGROUND

On April 10, 2025, Commerce published in the *Federal Register* the *Preliminary Determination*, in which we also postponed the final determination until August 25, 2025, and invited parties to comment on the *Preliminary Determination*.[2]  In April and May 2025, Commerce conducted verifications of the sales and cost information reported by Ternium Mexico S.A. de C.V. (Ternium)/Tenigal, S. de R.L. de C.V. (Tenigal) (collectively, Ternium/Tenigal)[3] and Galvasid S.A. de C.V. (Galvasid)/Perfiles LM, S.A. de C.V. (Perfiles) (collectively, Galvasid/Perfiles),[4] which we have relied upon in making the final determination in this investigation, consistent with section 782(i) of the Act.[5]

Between May 5 and 20, 2025, Commerce received case and rebuttal briefs from interested parties regarding scope-related issues.  For further details, *see* the Final Scope Decision Memorandum, issued concurrently with this final decision memorandum.[6]  On August 1, 2025,

---

[2] *See Preliminary Determination*, 90 FR at 15352.

[3] We are treating Ternium and Tenigal as a single entity in this investigation.  *See Preliminary Determination* PDM at 4-5 for further discussion.

[4] We are also treating Galvasid and Perfiles as a single entity in this investigation.  *See Preliminary Determination* PDM at 4-5 for further discussion.

[5] *See* Memoranda, "Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated May 12, 2025 (Galvasid Cost Verification Report,); "Verification of the Cost Response of Ternium Mexico, S.A. de C.V. in the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated June 23, 2025 (Ternium Cost Verification Report); "US. Verification of the Sales Response of Ternium USA, Inc. in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products (CORE) from Mexico," dated July 10, 2025 (Ternium U.S. Sales Verification Report); "Verification of the Sales Response of Galvasid S.A. de C.V. (Galvasid) in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated July 11, 2025 (Galvasid Sales Verification Report); and "Verification of the Sales Response of Ternium Mexico S.A. de C.V. (Ternium Mexico) in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated July 18, 2025 (Ternium Home Market Sales Verification Report).

[6] *See* Memorandum, "Less-Than-Fair-Value Investigations of Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam, and Countervailing Duty Investigations of Certain Corrosion-

2

Commerce held a public hearing regarding the scope of this investigation.[7]  The product covered by this investigation is CORE from Mexico.  For a full description of the scope of this investigation, *see* Appendix I of the accompanying Federal Register notice.

On June 24, 2025, we requested Ternium to submit a revised cost database incorporating specific minor corrections identified in the cost verification report,[8] which it timely submitted on June 27, 2025.[9]  On July 1, 2025, we set the briefing schedule for cost issues.[10]  On July 8, 2025, we received a timely-filed case brief regarding cost issues from only the petitioners.[11]  On July 16, 2025, we received a rebuttal brief regarding cost issues from Ternium/Tenigal.[12]

On July 18, 2025, we issued a post-preliminary analysis incorporating the revised differential pricing analysis and provided interested parties the opportunity to submit comments on this determination in their sales case briefs.[13]  On July 21, 2025, we placed on the record the final sales verification report and set the case brief schedule for sales issues and the post-preliminary analysis,[14] and requested Ternium to submit revised sales databases incorporating specific minor corrections identified in the sales verification reports.[15]

On July 23, 2025, we rejected unsolicited and untimely new factual information (NFI) submitted by Ternium which Commerce previously did not accept at both sales verifications because it was information which Ternium should have submitted in its questionnaire responses and because the data corrections were not minor in nature but were either pervasive with respect to four data fields or a major correction to a revised expense reporting methodology for one data field.[16]

On July 28, 2025, we received timely filed case briefs from the petitioner, Galvasid/Perfiles, and Ternium/Tenigal regarding sales issues and the Post-Preliminary Analysis.[17]  On July 31, 2025,

Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam:  Final Scope Decision Memorandum," dated concurrently with this memorandum (Final Scope Decision Memorandum)

[7] *See* Hearing Transcript, "Public Hearing, in the Matter of the Less-Than-Fair-Value Investigations of Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam, and Countervailing Duty Investigations of Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam," dated August 1, 2025.

[8] *See* Memorandum, "Request for a Revised Cost Database for Ternium Mexico, S.A. de C.V. in the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated June 24, 2025.

[9] *See* Ternium's Letter, " Response to Request for Revised Cost Database," dated June 27, 2025.

[10] *See* Memorandum, " Briefing Schedule for Cost Issues," dated July 1, 2025.

[11] The petitioners are United States Steel Corporation, Wheeling-Nippon Steel, Inc., Steel Dynamics, Inc., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.  *See* Petitioner's Letter, "Petitioner's Brief on Cost Issues Concerning Ternium," dated July 8, 2025 (Petitioner's Cost Case Brief).

[12] *See* Ternium/Tenigal's Letter, "Rebuttal Brief for Cost Issues," dated July 16, 2025 (Ternium/Tenigal Cost Rebuttal Brief).

[13] *See* Memorandum, "Post-Preliminary Analysis for the Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated July 18, 2025 (Post-Preliminary Analysis).

[14] *See* Memorandum, " Briefing Schedule," dated July 21, 2025.

[15] *See* Commerce's Letter, "Ternium Mexico Post-Verification Corrections," dated July 21, 2025.

[16] *See* Commerce's Letter, "Notice of Rejection of Ternium Mexico's July 22, 2025, Filing," dated July 23, 2025.

[17] *See* Petitioners' Letter, "Petitioners' Ternium Sales Issues Sales Brief," dated July 28, 2025 (Petitioner's

3

both interested parties that requested a hearing[18] in this investigation withdrew their requests for a hearing.[19] On August 4, 2025, we received timely filed rebuttal briefs regarding the sales issues and our post-preliminary analysis from the petitioner, Galvasid/Perfiles, and Ternium/Tenigal.[20]

## III. CHANGES SINCE THE *PRELIMINARY DETERMINATION*

Based on our analysis of the comments received, we made changes to the margins assigned in the *Preliminary Determination* and Post-Preliminary Analysis. As discussed below, we have applied partial facts available with adverse inferences in determining the weighted-average dumping margin for Galvasid/Perfiles (*i.e.*, for U.S. freight and insurance revenue and for home market inland freight to customer) as discussed below and in Comment 12. We have also applied partial facts available with adverse inferences in determining the weighted-average dumping margin for Ternium/Tenigal (*i.e.*, for U.S warehousing expenses, two U.S. movement expenses, home market inland freight from the factory to the warehouse, and home market credit expenses involving two or more installment payments), as discussed in Comment 9 below.

Based on our review of minor corrections submitted during verification and analysis of the comments received from the interested parties, we made the following additional changes to the preliminary and post-preliminary margin calculations for Galvasid/Perfiles[21] and Ternium/Tenigal.[22]

*Galvasid/Perfiles:*
- We incorporated minor corrections to specific sales expenses and a discount reported by Galvasid based on our verification findings. Specifically, we made adjustments to home market commercial discounts, home market warehousing, home market warranties, home

---

Ternium/Tenigal Sales Case Brief); *see also* Petitioners' Letter, "Petitioners' Case Brief on Sales Issues and Post-Preliminary Analysis Concerning Galvasid," dated July 28, 2025 (Petitioners' Galvasid/Perfiles Sales Case Brief); Galvasid/Perfiles' Letter, "Case Brief of Galvasid on General and Sales Issues," dated July 28, 2025 (Galvasid/Perfiles' Sales Case Brief); and Ternium/Tenigal's Letter, "Case Brief Regarding Sales Issues and Post-Preliminary Determination," dated July 28, 2025 (Ternium/Tenigal's Sales Case Brief).

[18] *See* Petitioners' Letter, "Request for Hearing," dated May 9, 2025; *see also* Ternium/Tenigal's Letter, "Hearing Request," dated May 12, 2025.

[19] *See* Petitioners' Letter, "Withdrawal of Request for a Hearing," dated July 31, 2025; *see also* Ternium/Tenigal's Letter, "Withdrawal of Hearing Request," dated July 31, 2025.

[20] *See* Petitioners' Letter, "Petitioners' Rebuttal Brief on Sales Issues and Post-Preliminary Analysis Concerning Galvasid," dated August 4, 2025 (Petitioners' Galvasid/Perfiles Sales Rebuttal Brief); *see also* Petitioners' Letter, "Petitioners' Rebuttal Brief on Ternium Sales Issues," dated August 4, 2025 (Petitioners' Ternium/Tenigal Sales Rebuttal Brief); Galvasid/Perfiles' Letter, "Rebuttal Brief of Galvasid on General and Sales Issues," dated August 4, 2025 (Galvasid/Perfiles Sales Rebuttal Brief); and Ternium/Tenigal's Letter, "Rebuttal Brief Regarding Sales Issues and Post-Preliminary Determination," dated August 4, 2025 (Ternium/Tenigal's Sales Rebuttal Brief).

[21] *See* Memoranda, "Final Determination Margin Calculation Memorandum for Galvasid S.A. de C.V.," (Galvasid/Perfiles Final Sales Calculation Memorandum), dated concurrently with this memorandum.

[22] *See* Memoranda, "Final Determination Margin Calculation for Ternium Mexico S.A. de C.V. and Tenigal, S. de R.L. de C.V.," (Ternium/Tenigal Final Sales Calculation Memorandum) and "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Ternium Mexico, S.A. de C.V. and Tenigal, S. de R.L. de C.V.," (Ternium/Tenigal Final Cost Calculation Memorandum) dated concurrently with this memorandum.

market credit, home market inventory carrying costs, home market packing, inland freight to port, and international freight.

- We revised Galvasid's reported home market inland freight to customer (INLFTCH) based on our verification findings.  As discussed in the "Application of Facts Available and Use of Adverse Inferences," section below, because we found that Galvasid's submitted correction to the sales denominators used in this expense was not minor in nature, we are applying partial adverse facts available (AFA) to the expense. Accordingly, as AFA, we have applied the lowest reported per-unit value of the home market inland freight to customer for all sales with the expense reported.[23]

- As discussed in the "Application of Facts Available and Use of Adverse Inferences," section below and in Comment 12, as partial AFA, we reduced Galvasid's reported U.S. gross unit prices (GRSUPRU) by the average estimated amount of freight and insurance revenue due to our findings at verification that Galvasid did not report revenues it received for freight and insurance for its U.S. sales.

*Ternium/Tenigal:*
- We used the requested cost and sales databases incorporating minor corrections to Ternium's reported expenses and costs based on our verification findings.

- As discussed in Comment 11, we revised Ternium's reported home market and U.S. royalty expenses and U.S. insurance expenses based on our verification findings.

- As discussed in Comment 8, we revised Ternium's home market indirect selling expense and indirect selling expenses in the country of manufacture to include certain expenses based on our verification findings.

- As discussed in Comment 11, we revised Ternium's country of manufacture insurance expenses (INSUREU) by removing DIRSEL2U from this expense in order to avoid double-counting because it was separately reported in the U.S. sales database.

- As discussed in the "Application of Facts Available and Use of Adverse Inferences," section below and in Comment 9, as partial AFA, we applied the highest reported per-unit expense to all applicable U.S. sales for which Ternium reported an amount for reported U.S. warehousing expenses (*i.e.*, USWAREHU).

- As discussed in the "Application of Facts Available and Use of Adverse Inferences," section below and in Comment 9, as partial AFA, we applied the highest reported per-unit expense which did not appear to be an outlier to all U.S. sales for which Ternium reported no expense for inland freight from the factory to the port of exportation (*i.e.*, DINLFTP1U).[24]

- As discussed in the "Application of Facts Available and Use of Adverse Inferences," section below and in Comment 9, as partial AFA, we applied the highest reported per-unit expense to all U.S. sales for which Ternium reported no expense for inland freight from the factory to the warehouse (*i.e.*, DINLFTWU).

- As discussed in the "Application of Facts Available and Use of Adverse Inferences," section below and in Comment 9, as partial AFA, we applied the lowest home market inland freight to warehouse (*i.e.*, INLFTWH) expense reported in the home market sales

---

[23] For further discussion, *see* Galvasid/Perfiles Final Sales Calculation Memorandum.
[24] For further discussion of this partial AFA calculation see Ternium/Tenigal Final Sales Calculation Memorandum.

database to all home market sales.

- As discussed in the "Application of Facts Available and Use of Adverse Inferences," section below and in Comment 9, as partial AFA, we used the first payment date field (rather than the average payment date field) to calculate credit expenses for the home market sales (*i.e.*, CREDITH).
- We adjusted Ternium's COM by disallowing the non-prime cost adjustments and including the unreconciled difference in the cost reconciliation.
- For both Ternium and Tenigal, we relied on the cost of the CONNUM "as produced" for the cost of overrun products and continued to weight-average the multiple costs per CONNUM to calculate one single cost.

## IV.    APPLICATION OF FACTS AVAILABLE AND USE OF ADVERSE INFERENCES

For the reasons stated below, we have determined that the use of facts otherwise available with adverse inferences, pursuant to sections 776(a) and (b) of the Act, is appropriate with respect to Galvasid/Perfiles and Ternium/Tenigal.

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Act provide that, if necessary information is not available on the record, or an interested party:  (A) withholds information that has been requested by Commerce; (B) fails to provide such information in a timely manner or in the form or manner requested subject to sections 782(c)(1) and (e) of the Act; (C) significantly impedes a proceeding; or (D) provides such information but the information cannot be verified as provided for in section 782(i) of the Act, Commerce shall, subject to subsection 782(d) of the Act, use facts otherwise available in reaching the applicable determination.

Section 782(c)(1) of the Act states that Commerce shall consider the ability of an interested party to provide information in the form and manner requested upon a prompt notification by that party that it is unable to submit the information in the form and manner required, and if that party also provides a full explanation for the difficulty and suggests an alternative form in which the party is able to provide the information.

Section 782(d) of the Act states that if Commerce "determines that a response to a request for information … does not comply with the request," it "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews … ."

Section 782(e) of the Act states further that Commerce shall not decline to consider submitted information if all of the following requirements are met:  (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

6

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of that party in selecting the facts otherwise available.[25] In doing so, Commerce is not required to determine, or make any adjustments to, estimated dumping margins based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.[26] In addition, the SAA explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[27] Furthermore, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[28] It is Commerce's practice to consider, in employing adverse inferences, the extent to which a party may benefit from its own lack of cooperation.[29]

In *Nippon Steel*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) provided an explanation of the phrase "failure to act to the best of its ability," stating that the ordinary meaning of "best" means "one's maximum effort," and that the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do.[30] The Federal Circuit acknowledged, however, that, while there is no willfulness requirement, "deliberate concealment or inaccurate reporting" would certainly be sufficient to find that a respondent did not act to the best of its ability, although it indicated that inadequate responses to agency inquiries "would suffice" as well.[31] Compliance with the "best of its ability" standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation or review.[32] The Federal Circuit further noted that, while the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.[33]

---

[25] *See* 19 CFR 351.308(a); *see also Common Alloy Aluminum Sheet from Romania: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 65358 (October 15, 2020) (*Aluminum Sheet from Romania*), unchanged in *Common Alloy Aluminum Sheet from Romania: Final Determination of Sales at Less Than Fair Value*, 86 FR 13320 (March 8, 2021); *Notice of Final Results of Antidumping Duty Administrative Review: Stainless Steel Bar from India*, 70 FR 54023, 54025-26 (September 13, 2005); and *Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances: Carbon and Certain Alloy Steel Wire Rod from Brazil*, 67 FR 55792, 55794-96 (August 30, 2002).
[26] *See* section 776(b)(1)(B) of the Act.
[27] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 870; and *Certain Polyester Staple Fiber from Korea: Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 69663, 69664 (December 10, 2007).
[28] *See, e.g., Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1382-83 (Fed. Cir. 2003) (*Nippon Steel*); *see also Notice of Final Determination of Sales at Less Than Fair Value: Circular Seamless Stainless-Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); and *Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27340 (May 19, 1997).
[29] *See, e.g., Steel Threaded Rod from Thailand: Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013), and accompanying PDM at 4, unchanged in *Steel Threaded Rod from Thailand: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014).
[30] *See Nippon Steel*, 337 F. 3d at 1382.
[31] *Id.*, 337 F. 3d at 1380.
[32] *Id.*, 337 F. 3d at 1382.
[33] *Id.*

**A.**  **Application of Partial Facts Otherwise Available with Adverse Inferences to Galvasid/Perfiles**

Pursuant to section 782(i)(1) of the Act and 19 CFR 351.307(b)(1)(i), prior to making a final determination in an investigation, Commerce will verify relevant factual information relied upon in making the final determination.  During Galvasid's sales verification, as discussed in detail in Comment 12, we observed certain discrepancies with respect to Galvasid's freight and insurance revenue not separately reported in its U.S. sales database.[34]  Commerce requested such separate revenue reporting in its AD questionnaire,[35] but Galvasid did not indicate in its questionnaire response that it also included these revenue items in its reported U.S. gross unit prices, as discussed at length below in Comment 12.  Therefore, we find that necessary information is missing from the record, was not provided when requested, and could not be verified, pursuant to sections 776(a)(1) and (2)(A)-(D) of the Act.  Consequently, we determine that it is necessary to resort to facts otherwise available in reaching this final determination.  Further, in accordance with section 776(b) of the Act and 19 CFR 351.308(a), we determine Galvasid did not cooperate to the best of its ability because it failed to provide information that Commerce had specifically requested in a timely manner and in the form required, thus significantly impeding the proceeding, regarding its U.S. freight and insurance revenue and thus an adverse inference is warranted when selecting from among the facts otherwise available to remedy certain of these reporting errors.  Also, during verification, we did not accept a minor correction on home market inland freight to customer, which was a systemic error in its reporting of the quantity used in the calculation of this expense and therefore we determined it was not minor in nature.  Pursuant to sections 776(a)(1) and 776(a)(2) of the Act, we find that the application of AFA with respect to the expenses for which Commerce declined to accept minor corrections is warranted.  Therefore, we are applying partial AFA to Galvasid's U.S. freight and insurance revenue, and inland freight to customer for this final determination.[36]

**B.**  **Application of Partial Facts Otherwise Available with Adverse Inferences to Ternium/Tenigal**

Pursuant to section 782(i)(1) of the Act and 19 CFR 351.307(b)(1)(i), prior to making a final determination in an investigation, Commerce will verify relevant factual information relied upon in making the final determination.  During Ternium's sales verifications, as discussed in detail in Comment 9, we observed certain discrepancies with respect to Ternium's U.S. warehousing expenses, two U.S. freight expenses, and home market inland freight (from the factory to the warehouse), and home market credit expenses involving two or more installment payments.[37] Commerce determined at verification that the corrections to these expense fields that Ternium submitted at verification were not minor,[38] and for this reason Commerce rejected the corrections, as discussed at length below in Comment 9.  Therefore, we find that necessary information is missing from the record, was not provided when requested, and could not be

---

[34] *See* Galvasid Sales Verification Report at page 13.
[35] *See* Commerce's Letter, "Request for Information," dated November 18, 2024 (AD Questionnaire).
[36] *See infra* Comment 9 for further details.
[37] *See* Ternium's Home Market Sales Verification Report at PDF pages 2-3; and Ternium's U.S. Sales Verification Report at 2.
[38] *Id*.

verified, pursuant to sections 776(a)(1) and (2)(A)-(D) of the Act. Consequently, we determine that it is necessary to resort to facts otherwise available in reaching this final determination. Further, in accordance with section 776(b) of the Act and 19 CFR 351.308(a), we determine Ternium did not cooperate to the best of its ability because it failed to provide information that Commerce had specifically requested in a timely manner and in the form required that Commerce had specifically requested regarding the aforementioned expenses, thus significantly impeding the proceeding. Accordingly, an adverse inference is warranted when selecting from among the facts otherwise available to remedy certain of these reporting errors. Therefore, we are applying AFA to Ternium's U.S. warehousing expenses, two U.S. freight expenses, home market inland freight (from the factory to warehouse), and home market credit expenses involving two or more installment payments for this final determination.[39]

## V.      DISCUSSION OF THE ISSUES

General

## Comment 1:  Use of Zeroing

*Petitioners' Sales Case Brief (on Galvasid/Perfiles)*:

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[40]  For further details, *see* Petitioners' Galvasid/Perfiles Sales Case Brief at 2-16.

> Section II.A. demonstrates that Commerce must employ the use of zeroing (*i.e.*, assign a value of zero to individual dumping margins where normal value does not exceed the U.S. price) when it calculates the final dumping margins in this investigation, regardless of which comparison method is used. For decades, Commerce applied the average-to-average method in antidumping investigations and the average-to-transaction method in administrative reviews of antidumping duty orders. Commerce also applied the zeroing methodology by assigning a value of zero to non-dumped sales. Commerce abandoned these longstanding practices only because of adverse decisions by the Appellate Body of the World Trade Organization (WTO) that created obligations that do not appear anywhere in the text of the WTO Antidumping Agreement and that were never agreed to by the United States during negotiations.
>
> Under Commerce's current policy, which implements erroneous WTO decisions, Commerce applies the average-to-average method as the default comparison method in investigations. The average-to-transaction method is used as an exception to address "targeted dumping" if there is a pattern of U.S. prices for comparable merchandise that differ significantly among purchasers, regions, or periods of time and such differences cannot be taken into account using the default average-to-average method. Commerce applies the zeroing methodology only when it calculates dumping margins using the average-to-transaction method.

---

[39] *See infra* Comment 9 for further details.
[40] *See* Petitioners' Galvasid/Perfiles Sales Case Brief at 1-2.

Commerce's current practice of zeroing only when calculating dumping margins using the average-to-transaction comparison method can no longer stand. As demonstrated below, the best reading of the antidumping statute is to require zeroing regardless of which comparison method is used to calculate a respondent's dumping margin. Thus, based on the Supreme Court's holding in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (*Loper Bright*) and President Trump's memorandum regarding his "America First Trade Policy," Commerce must apply the zeroing methodology to all sales comparisons and treat all non-dumped sales as having zero dumping margins for purposes of calculating the respondents' weighted-average dumping margins in the final determination.

*Galvasid/Perfiles' Sales Rebuttal Brief:*

The following is a verbatim summary of argument submitted by Galvasid/Perfiles (internal citations omitted).[41]  For further details, *see* Galvasid/Perfiles' Sales Rebuttal Brief at 7-16.

> Petitioners contend that {Commerce} must apply "zeroing" when calculating the dumping margin for Galvasid.  However, Petitioners' argument has no relevance to {Commerce's} preliminary and post-preliminary calculations of Galvasid's dumping margin in this investigation because {Commerce} did not use a transaction-to-average comparison in which "zeroing" was not applied.  Moreover, Petitioners' argument that {Commerce} should also "zero" the dumping margins for any transactions with negative margins under the average-to-average comparison is mathematically nonsensical because under the average-to-average methodology, {Commerce} does not calculate dumping margins on individual transactions, but instead, compares the combined weighted-average price for all U.S. sales of each control number to the average normal value.

> Petitioners' argument that {Commerce} should use "zeroing" under the average-to-average comparison is also legally unsupported.  First, the Supreme Court's decision in *Loper Bright* does not negate the legal authority of previous court decisions that upheld {Commerce}'s rule to not apply "zeroing" under the average-to-average comparison.  Second, {Commerce's} decision to not use "zeroing" under the average-to-average comparison is a reasonable exercise of {Commerce}'s administrative discretion and therefore consistent with *Loper Bright*.  Third, Petitioners' claim that {Commerce}'s rule is not the "best reading" of the statute relies solely on arguments that have already been addressed and rejected by the courts.  Finally, {Commerce} may not change its practice with regards to "zeroing" without notice and comment in accordance with the Administrative Procedure Act.

**Commerce's Position:**  We have made no changes from the Post-Preliminary Analysis.  The petitioners are correct in that Commerce stopped applying its "zeroing" methodology — *i.e.*, denying offsets to positive dumping margins for non-dumped sales by assigning a value of zero

---

[41] *See* Galvasid/Perfiles' Sales Rebuttal Brief at 2-3.

10

to the comparison result — when applying the average-to-average (A-A) comparison method in response to a series of adverse decisions by the Appellate Body of the World Trade Organization (WTO)[42] rather than domestic litigation.

We disagree with the petitioners that the Supreme Court's decision in *Loper Bright* requires that Commerce zero in all instances, including when using the A-A method. The Supreme Court's holding in *Loper Bright* does not negate prior Federal Circuit holdings that held Commerce was neither required to use nor prohibited from using zeroing methodology by its governing statute.[43] The Supreme Court stated:

> By overruling *Chevron*, though, the Court does not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful — including the Clean Air Act holding of *Chevron* itself — are still subject to statutory *stare decisis* despite the Court's change in interpretive methodology.[44]

Further, the Federal Circuit in *Timken* held that the definition of "dumping margin" and the meaning of the word "exceeds" is not "so clear as to compel a finding that Congress expressly intended to require zeroing."[45] Further, in *Union Steel*, the Federal Circuit has held that the definition of "dumping margin" and the meaning of the word "exceeds" may have different meanings in different contexts.[46] As a result, as Federal Circuit precedent has recognized, zeroing in one context may be appropriate, while granting offsets may be appropriate in a different context. Accordingly, consistent with this Federal Circuit precedent, and in accordance with *Loper Bright* that "did not call into question prior cases that relied on the *Chevron* framework," we have not changed our practice in this final determination.

Separate from the issue of whether Commerce can apply zeroing in some contexts but not others, which has already been upheld by the Federal Circuit, parties debate whether "mathematical equivalence" would exist without the application of zeroing in both the A-A and average-to-transaction (A-T) methods. We agree that without zeroing, a weighted-average dumping margin calculated using the A-A method and the A-T method will normally result in the identical value

---

[42] *See* Appellate Body Reports: (1) *United States—Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, WT/DS294/AB/R (April 18, 2006); (2), *United States - Measures Relating to Zeroing and Sunset Reviews*, WT/DS322/AB/R (January. 9, 2007); (3) *United States - Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing") - Recourse to Article 21.5 of the DSU*, WT/DS294/AB/RW (May 14, 2009); (4) *United States - Measures Relating to Zeroing and Sunset Reviews - Recourse to Article 21.5 of the DSU*, WT/DS322/AB/RW (August 18, 2009); (5) *United States - Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing") - Recourse to Article 22.6 of the DSU by the United States: Communication from the Arbitrator,* WT/DS294/39 (December 8, 2010); and (6) *United States - Measures Relating to Zeroing and Sunset Reviews - Recourse to Article 22.6 of the DSU by the United States: Communication from the Arbitrator,* WT/DS322/38 (December 15, 2010).

[43] *See U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1361 (Fed. Cir. 2010) (*U.S. Steel*) (citing *Timken Company v. U.S.*, 354 F.3d 1334, 1341-43 (Fed. Cir. 2004) (*Timken*); and *Corus Staal BV v. Department of Commerce*, 395 F.3d 1343, 1347 (Fed. Cir. 2005) (*Corus Staal*)).

[44] *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 376 (2024) (*Loper Bright*).

[45] *See Timken*, 354 F.3d at 1341.

[46] *See Union Steel v. United States*, 713 F.3d 1101, 1110 (Fed. Cir. 2013) (*Union Steel*); *see also U.S. Steel*, 621 F.3d at 1361-63.

11

(*i.e.*, the calculated results are mathematically equivalent). This would render the alternative A-T method, the exception to the A-A method, inoperative. However, this does not mean that Commerce is required to start applying zeroing when making A-A comparisons. In *U.S. Steel*, for example, the Federal Circuit sustained Commerce's decision to cease zeroing when making A-A comparisons in antidumping duty investigations while recognizing Commerce intended to continue zeroing in other circumstances.[47] In particular, the Federal Circuit relied upon the differences among various types of comparison methodologies, recognizing that section 777A(d)(1) of the Act allows Commerce to use A-T comparisons in investigations where certain patterns of significant price differences exist.[48] Because Commerce does not grant offsets when applying the A-T method, mathematical equivalence does not exist between the A-A method (with offsets) and the A-T method (with zeroing), and Commerce practice's does not render the statutory provision for the alternative comparison method inoperative. The petitioners' logic that mathematical equivalence demonstrates that Commerce must zero in all situations, including when using the A-A method, is without merit.

Because we are not adopting a change to our current practice with respect to zeroing, it is unnecessary to address arguments regarding whether a change in Commerce's practice concerning zeroing requires notice and comment pursuant to the Administrative Procedure Act is moot. Finally, we disagree with the respondent that the exhibits attached to the petitioners' case brief are untimely submitted new factual information (NFI). As an initial matter, the two exhibits contain hypothetical mathematical explanations that illustrate the petitioners' arguments with respect to zeroing. As such, the exhibits are not factual information as defined by 19 CFR 351.102(b)(21). Thus 19 CFR 351.301(c)(5), which sets the deadline for NFI, is also inapplicable here. Moreover, unlike *Stupp* where the Court found that Commerce correctly rejected the respondent's brief because it cited specific academic authorities which were NFI, the exhibits in question do not cite any academic authorities.[49] Likewise, *PSC VSMPO–Avisma Corp.*, which dealt with a specific third-party expert's affidavit rather than argument illustrated with hypothetical mathematical examples, is similarly inapposite. In our view, *hypothetical* examples that illustrate an argument, such as those presented here, do not constitute factual information within the meaning of 19 CFR 351.102(b)(21). On this basis, we have not rejected the petitioners' Post-Preliminary Analysis Comments from the record.

In their respective comments, the petitioners do not challenge the revised differential pricing analysis adopted by Commerce in the Post-Preliminary Analysis or make any arguments about whether the revised differential pricing analysis complies with the Federal Circuit's holdings in *Marmen*.[50] Indeed, the petitioners state that if Commerce decides not to engage in zeroing when using the A-A method in this final determination, then it should use the same revised differential pricing analysis that it issued in the Post-Preliminary Analysis.[51]

---

[47] *See U.S. Steel*, 621 F.3d at 1355 n.2, 1362-63.
[48] *Id*., 621 F.3d at 1362.
[49] *See Stupp Corporation v. United States*, 5 F.4th 1341, 1350 (Fed. Cir. 2021) (*Stupp*).
[50] *See* Petitioners' Galvasid/Perfiles Sales Case Brief at 1-16 (citing *Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen*)).
[51] *Id.* at 16.

12

**Comment 2: Flaws in Applying the New Differential Price Test**

*Ternium/Tenigal's Sales Case Brief*:

The following is a verbatim summary of argument submitted by the Ternium/Tenigal (internal citations omitted).[52]  For further details, *see* Ternium/Tenigal's Sales Case Brief at 32-39.

> The "price difference" test applied by { Commerce } in the differential pricing analysis in the post-preliminary determination (in place of the Cohen's *d* test) does not meet the statutory requirements for using an average-to-transaction (A-T) comparison.  The two percent threshold of the price difference test does not provide a reasonable basis to determine if prices for comparable merchandise differ "significantly" among purchasers, regions, or time periods.  Nor does {Commerce's} "ratio" test comport with the requirements of the statute.  Therefore, {Commerce} should apply an average-to-average (A-A) comparison in the final determination.

*Petitioners' Sales Rebuttal Brief (on Ternium/Tenigal):*

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[53]  For further details, *see* Petitioners' Ternium/Tenigal Sales Rebuttal Brief at 31-43.

> Commerce adjusted its differential pricing analysis to conform with the Federal Circuit's recent holdings in *Marmen* and *Stupp*.  Ternium incorrectly argues that Commerce's modified differential pricing analysis does not satisfy the statutory requirements to use the "Average-to-Transaction" comparison method and therefore that Commerce should use the "Average-to-Average" method in its final determination.  In support of this argument, Ternium has placed untimely factual information on the record in the form of new calculations, which Commerce should reject (Section III.A).
>
> Ternium broadly expresses discontent regarding Commerce's decision to reconsider its differential pricing analysis and describes Commerce's revised methodology as "drastic, unexplained, and unsupportable."  However, there is no procedural irregularity in Commerce's approach; rather, as Commerce explained, the holdings of *Marmen* and *Stupp* oblige Commerce to reevaluate its use of the Cohen's *d* test to uncover pricing patterns that differ significantly.  In fact, Ternium itself acknowledged Commerce's discretion to modify its differential pricing analysis when Ternium submitted "scientific literature related to the Cohen's *d* test…for the Department's consideration in calculating a dumping margin for Ternium."  Ternium is estopped {sic} from now complaining that Commerce has in fact "considered" the matter (Section III.B).

---

[52] *See* Ternium/Tenigal's Sales Case Brief at 4-5.
[53] *See* Petitioners' Ternium/Tenigal Sales Rebuttal Brief at 5-7.

Filed By: Brian Smith, Filed Date: 8/26/25 12:03 PM, Submission Status: Approved

Ternium next claims that Commerce has failed to adequately justify its modified differential pricing analysis; specifically, Ternium takes issue with the two-percent threshold of the "price difference test" as well as the discontinuation of the "Mixed Method" and modified "ratio test." Contrary to Ternium's assertions, Commerce's modified differential pricing analysis is reasonable and compliant with the Federal Circuit's decisions in *Marmen* and *Stupp*. Commerce's "price difference" test is consistent with other relevant measures of significance in Commerce's regulations—and thus not "arbitrary." Ternium is, moreover, wrong to assert that Commerce must formulate unique analyses specific to the facts of each case, a position the U.S. Court of International Trade {CIT} has repeatedly rejected. (Section III.C.1).

Finally, Ternium takes issue with Commerce's discontinuation of the "Mixed Method" methodology of calculating Ternium's dumping margin, and the resultant changes in the "ratio test." Ternium cites no precedent or statutory mandate that Commerce alter its practice with regards to applying a single combined "ratio test" and Ternium similarly cannot provide any authority to undermine Commerce's non-use of the "Mixed Method" approach to calculating dumping margins. With the "mixed method" eliminated, a dataset passing the 33 percent threshold must be considered for the "average-to-transaction method," in lieu of the default "average-to-average method." However, the fact that passing the 33 percent threshold triggers Commerce's consideration of alternatives to the "average-to-average method" is no different from Commerce's prior practice, including in the preliminary results of this investigation (Section III.C.2).

Thus, Commerce's revised differential pricing analysis is reasonable and complaint with the Federal Circuit's decisions in *Marmen* and *Stupp*. Commerce should continue to employ the methodological changes described in its post-preliminary differential pricing analysis for purposes of the final determination in this investigation.

**Commerce's Position:**

### A. Adequacy of Rationale

Commerce determines to continue applying the modified differential pricing methodology issued in its Post-Preliminary Analysis. Commerce explained how and why it changed its practice in the Post-Preliminary Analysis. In the Post-Preliminary Analysis, Commerce explained how each step of the revised differential pricing analysis addresses the criteria set forth in section 777A(d)(1)(B) of the Act.[54] The explanation provided is nearly identical to the explanation provided in the prior differential pricing analysis (first used in 2013),[55] but explicitly notes two

---

[54] *See* Post-Preliminary Analysis.

[55] *See, e.g., 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from India: Preliminary Results of Antidumping Duty Administrative Review; 2011-2012; and Intent to Revoke Order (in Part)*, 78 FR 25699 (May 2, 2013), and accompanying PDM at 4-6; *Non-Oriented Electrical Steel from the Republic of Korea: Preliminary Affirmative*

changes:  we now identify price differences according to a two-percent test and we are discontinuing the use of a "mixed method" as a potential alternative comparison methodology.  In particular, we stated:

> In prior investigations and administrative reviews, Commerce used the Cohen's *d* test as part of the differential pricing analysis, but the Federal Circuit recently held that it is unreasonable to use the Cohen's *d* test when the Cohen's *d* test is applied to data that do not satisfy the statistical assumptions of normal distribution, equal variances, and sufficiently numerous data.  *See Marmen*; *see also Stupp* (nonprecedential disposition).  Subsequently, Commerce sought information and public comment regarding alternatives to the use of the Cohen's *d* test to define when prices differ significantly among purchasers, regions, and time periods, pursuant to section 777A(d)(1)(B)(i) of the Act.  *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025).  Against this backdrop and in an effort to comply with the Federal Circuit's holdings, Commerce has discontinued the use of the Cohen's *d* test and has discontinued the use of the "mixed method" as a potential alternative comparison methodology.[56]

Additionally, Commerce released complete calculations for the Post-Preliminary Analysis detailing the implementation of the revised analysis.[57]

Regarding the basis for eliminating the use of the mixed comparison method, the mixed method was introduced when Commerce adopted the Cohen's d test in connection with the Cohen's d test.[58]  The statute does not require Commerce to use a "mixed" method as a comparison methodology.  While the statute permits Commerce's previous policy that adopted a hybrid version of the two available comparison methodologies, Commerce's new policy aligns more closely with the statutory text, which permits Commerce to use the A-T method when certain conditions set forth in section 777A(d)(1)(B) of the Act are satisfied.  In light of the foregoing, Commerce does not consider it necessary to continue to use the mixed method, particularly when discontinuation of the "mixed" method enhances the ability to address masked dumping, which is consistent with the objective of the statute, and more closely aligns with the statutory language that expressly authorizes the use of the A-T comparison method when the conditions set forth in section 777A(d)(1)(B) of the Act are satisfied.  The Federal Circuit has recognized Commerce's "growing experience" in applying section 777A(d)(1)(B) of the Act as a basis for establishing

---

*Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances, and Postponement of Final Determination*, 79 FR 29426 (May 22, 2014), and accompanying PDM at 6-8; *Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea:  Preliminary Results and Rescission in Part of Antidumping Duty Administrative Review; 2023- 2024*, 90 FR 21891 (May 22, 2025), and accompanying PDM at 4-7; and *Hard Empty Capsules from the Socialist Republic of Vietnam:  Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 90 FR 22708 (May 29, 2025), and accompanying PDM at 16-18.

[56] *See* Post-Preliminary Analysis at 2.

[57] *See* Memoranda, "Post-Preliminary Analysis Memorandum for Ternium Mexico S.A. de C.V and Tenigal, S. de R.L. de C.V. (Ternium Mexico)," dated July 18, 2025, and Memoranda, "Post-Preliminary Analysis Memorandum for Galvasid S.A. de C.V./ Perfiles LM, S.A. de C.V.," dated July 21, 2025.

[58] *See Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013), and accompanying IDM at 28.

15

what ratio justifies application of an alternative methodology.[59]  In addition, these arguments are inconsequential to the outcome of our calculations, because the result of the ratio test for both respondents is that less than 33 percent of their sales passed the price difference test.  Thus, even if we were to retain the mixed method, it would not apply to any of the respondents here.  Regarding the two-percent test, its use is consistent with the statute.  The CIT has held that the language in section 777A of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[60]  As more fully explained in Commerce's position below, a two-percent threshold is a reasonable measure of significance, is used by Commerce in other contexts, and is consistent with other aspects of Commerce's practice in antidumping proceedings.

### B.  The Price Difference Test

Commerce determines to continue applying the modified differential pricing analysis, including the two-percent price difference test.  The two-percent test is consistent with the statute.  The CIT has held that the language in section 777A of the Act affords Commerce flexibility to implement a test that it deems appropriate to identify significant price differences.[61]  A two-percent threshold is a reasonable measure of significance and is consistent with other aspects of Commerce's practice in antidumping proceedings.

In the arm's-length test conducted pursuant to 19 CFR 351.403(c), Commerce finds that sales between affiliated parties in the comparison market are not at arm's length and fall outside the ordinary course of trade if the average, product-specific, comparison market prices to an affiliated customer are not within a range of 98 percent to 102 percent of the average, product-specific, comparison market prices to unaffiliated customers (*i.e.*, a plus or minus a two-percent difference from the weighted-average price to unaffiliated customers).  In fact, Commerce has found that average prices to an affiliated customer that differ by at least two percent, and therefore fail the arm's-length test, "differ significantly" from market prices.[62]  The distinction between being within or outside of the ordinary course of trade is a significant difference, as sales which are found to be outside the ordinary course of trade are excluded from Commerce margin calculations, *e.g.*, excluded from the calculation of normal value.

Moreover, pursuant to sections 733(b)(3) and 735(a)(4) of the Act, the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is two percent.  In other words, an estimated weighted-average dumping margin of at least two percent is significant, and not zero.  Commerce has synonymously referred to non-*de minimis* levels of dumping as a

---

[59] *See Stupp*, 5 F.4th at 1355.

[60] *See Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355, 1366 (CIT 2024).

[61] *Id.*

[62] *See Large Diameter Welded Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value,* 84 FR 6382 (February 27, 2019), and accompanying IDM at Comment 4 ("the prices at issue differ significantly from the prices charged to an unaffiliated company (*i.e.*, they are not within 98 to 102 percent of the price charged for or by an unaffiliated party), which leads us to conclude that these prices are affected by the relationship between Borusan and Borusan Logistik.")).

"significant" amount of dumping.[63] If a weighted-average difference of two percent between U.S. prices and normal value is significant enough to warrant an affirmative determination of sales at less-than-fair-value, then it is reasonable to conclude that a two-percent price difference is significant within the context of section 777A(d)(1)(b)(ii) of the Act. Furthermore, in an administrative review, the *de minimis* threshold is one half of one (0.5) percent, which suggests that the two percent threshold from investigations is more conservative. (According to 19 CFR 351.106(c), in an administrative review, Commerce will treat as *de minimis* any weighted-average dumping margin that is less than 0.5 percent and will liquidate without regard to antidumping duties all entries during the relevant period of review, but dumping duties will be collected if the weighted-average dumping margin is 0.5 percent or more.)

We disagree that the revised price difference test amounts to a brightline rule that is inconsistent with language in the SAA to conduct the analysis on a case-by-case basis. The test does not stipulate an absolute value as a threshold (*e.g.*, $5 per kg) but a threshold that measures relative differences (*i.e.*, a percentage) on a case-by-case basis by a comparison to case-specific averages dependent upon the customer, region, and temporal data provided by the respondent, specific to the period under examination and to the merchandise, and thus, the market under consideration.

Additionally, the "meaningful difference" test provides additional tailoring of the differential pricing analysis to the specifics of each respondent. The question of whether the A-A method or the A-T method is warranted is specific to the administrative segment as well as the respondent under examination. If the selection of the alternative A-T method does not result in a meaningful difference in the weighted-average dumping margins, then that is evidence that the respondent's pricing behavior in the U.S. market can be adequately addressed through the standard A-A methodology. Accordingly, Commerce's determination of whether the A-T method is permitted under section 777A(d)(1)(B) of the Act is determined on a case-specific basis.

Finally, the Post-Preliminary Analysis offered parties the opportunity to make case-specific arguments and we intend to continue to do so in the future.[64] In particular, while parties have commented that Commerce does not demonstrate how a two-percent threshold is significant in comparison to the normal variance that may exist across prices of the "base group," no party attempted to demonstrate how Commerce could identify and quantify the so-called "normal" variance that might exist among prices in the U.S. market. No party in this investigation argues for an adjustment to the two-percent test as a method of identifying the significance of the observed price differences.

Regarding the petitioners' claim that Ternium has placed untimely factual information on the record in the form of new calculations, we disagree that the exhibit at issue attached to Ternium/Tenigal's sales case brief is untimely submitted NFI. The exhibits provided contain hypothetical mathematical explanations that illustrate the Ternium/Tenigal's argument with respect to the price difference test. As such, the exhibit is not factual information as defined by

---

[63] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 26401 (June 6, 2019), and accompanying IDM at Comment 2 ("Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping…").
[64] *See* Post-Preliminary Analysis at 4 ("Interested parties may present arguments and justifications in relation to the above-described differential pricing approach used in this post-preliminary analysis.").

17

19 CFR 351.102(b)(21). Thus 19 CFR 351.301(c)(5), which sets the deadline for NFI, is also inapplicable here.

### C. The Ratio Test

Commerce determines to continue applying the modified differential pricing analysis, including the ratio test. The ratio test is consistent with the ordinary meaning of the word "pattern," which can be defined as "a frequent or widespread incidence." The Federal Circuit has upheld the ratio test as a reasonable method for addressing the pattern requirement of section 777A(d)(1)(B)(i) of the Act and has held that "there is no statutory language telling Commerce how to detect patterns of significantly differing export prices, much less how to aggregate and quantify pricing comparisons across product groups in order to select a statutorily defined comparison method. Commerce therefore has discretion to determine a reasonable methodology to implement the statutory directive."[65] The Federal Circuit has also rejected the argument that the statute requires Commerce "to determine the reasons why there is a pattern of export prices for comparable merchandise that differs significantly among purchasers, regions, or time periods{.}"[66] The Federal Circuit agreed with the CIT that there is no intent requirement in the statute and that requiring Commerce to determine intent of targeted dumping "would create a tremendous burden on Commerce that is not required or suggested by the statute."[67]

### Comment 3: Use of Average-to-Average Method

*Galvasid/Perfiles' Sales Case Brief:*

The following is a verbatim summary of argument submitted by Galvasid/Perfiles (internal citations omitted).[68] For further details, *see* Galvasid/Perfiles' Sales Case Brief at 3-8.

> {Commerce's *Preliminary Determination* PDM} stated that it intended to use the dumping margin calculated for Galvasid using the average-to-average comparison methodology, because there was no "meaningful difference" between that result and the results of the alternative calculations considered by { Commerce}. However, due to an apparent error, {Commerce} erroneously reported the higher result of the "mixed" comparison methodology in its published notice of the preliminary determination. {Commerce} should correct that error in its final determination.
>
> {Commerce}'s revised post-preliminary determination in this case does not alter that conclusion. Indeed, the post-preliminary determination explicitly states that {Commerce} intends to use the dumping margin calculated for Galvasid using the average to-average comparison methodology, because there still is no

---

[65] *See Stupp*, 5 F.4th at 1354.
[66] *See JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015) (*JBF RAK*); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 Fed. Appx. 948, 949 (Fed. Cir. 2015) (non-precedential); and *Nan Ya Plastics Corp., Ltd. v. United States*, 128 F. Supp. 3d 1345 (CIT 2015).
[67] *See JBF RAK*, 790 F.3d at 1368.
[68] *See* Galvasid/Perfiles' Sales Case Brief at 2.

"meaningful difference" between that result and the results of the alternative calculation considered by {Commerce}. More generally, even if there were a "meaningful difference" in the results, the revised "Differential Pricing Analysis" described in the post-preliminary determination would not provide a reasonable basis for departing from the average-to-average methodology, because it fails to satisfy {Commerce}'s burden of establishing that the observed price differences constitute a true "pattern," and not just random fluctuations that occurred by chance.

*Petitioners' Sales Rebuttal Brief (on Galvasid/Perfiles):*

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[69] For further details, *see* Petitioners' Galvasid/Perfiles Sales Rebuttal Brief at 2-6.

> Section II.A. demonstrates that the differential pricing analysis applied by Commerce in the post-preliminary analysis satisfies the requirements of {section 777A(d)(1)(B) of the Act} and that Commerce should reject Galvasid's arguments to the contrary. Despite claiming that Commerce failed to establish what Galvasid terms a "true" pattern of significant price differences, Galvasid points to no persuasive legal authority defining what that might be and relies on conjecture regarding alleged empirical shortcomings in Commerce's method without providing any analysis or evidence demonstrating that such shortcomings occurred. Commerce carefully explained each of the three steps of its differential pricing analysis and was within its discretion under the statute to define standards for the existence of a pattern of significant price differences.

**Commerce's Position:** Based on the results of our analysis, we have applied the A-A methodology for the final determination for both Galvasid/Perfiles and Ternium/Tenigal. Therefore this argument is moot, and we have not addressed it in this final determination.

Ternium/Tenigal Issues

**Comment 4: Use of Facts Otherwise Available With An Adverse Inference**

*Petitioners' Cost Case Brief*:

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[70] For further details, *see* Petitioners' Cost Case Brief at 7-17.

> Ternium's cost reporting does not reasonably reflect the production costs associated with physically different products. Commerce should reject Ternium's cost database and rely instead on facts otherwise available with an adverse inference.

---

[69] *See* Petitioners' Galvasid/Perfiles Sales Rebuttal Brief at 1.
[70] *See* Petitioners' Cost Case Brief at 1-2. We have excluded any information that is business proprietary in nature from the verbatim summary of argument provided, as indicated by the brackets {} below.

Despite Commerce having precluded Ternium from proffering methodological changes at verification, Ternium {} and relied on new methodologies and {} to separate out material costs. Reliance on these new methodologies precludes Commerce from concluding that Ternium verified its as-submitted {}. Moreover, neither Commerce's verification report nor Ternium's exhibits explain why these changes were made or what they represent (Section I.A).

Separately, Ternium's pervasive failure to report material costs such that they vary with physical differences is well-established on the record. The entire point of reporting costs on a CONNUM-specific basis is to tie cost differences to physical differences. Although Ternium attempted to explain one of the aberrational trends observed, Commerce's verification findings demonstrate that Ternium's proffered justification is an impossibility. Thus, even assuming *arguendo* that Ternium traced its figures to its accounting system, those cost data are unusable for purposes of the dumping calculation and should be disregarded pursuant to {section 773(f)(1)(A) of the Act}. Commerce cannot accept such flagrant inaccuracies, and because Ternium failed to cooperate to the best of its ability by proffering an untrue "explanation" for the aberrational trends, Commerce should apply facts otherwise available with an adverse inference in lieu of Ternium's reported costs (Section I.B).

*Ternium/Tenigal's Cost Rebuttal Brief:*

The following is a verbatim summary of argument submitted by Ternium/Tenigal (internal citations omitted).[71] For further details, *see* Ternium/Tenigal's Cost Rebuttal Brief at 2-9.

In Section I, Ternium rebuts both Petitioners' allegations that Ternium's production quantities and certain elements of its costs should be rejected, and Petitioners' clamoring for {AFA}. Both are inconsistent with the record evidence and should be rejected.

**Commerce's Position:** After considering the record evidence and the arguments presented in the interested parties' case and rebuttal briefs, for the final determination, we have determined that the application of AFA to Ternium's reported costs of production (COP) is not warranted.

According to sections 776(a)(1) and 776(a)(2) of the Act, Commerce shall use, subject to section 782(d) of the Act, facts otherwise available in reaching the applicable determination, "if necessary information is missing from the record, or if an interested party or any other person: (A) withholds information that has been requested by the administering authority or the Commission under this title; (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782; (C) significantly impedes a proceeding under this title; or (D) provides such information but the information cannot be verified as provided in section 782(i) of the Act." Further, section 776(b) of the Act provides that Commerce may use an adverse inference in

---

[71] *See* Ternium/Tenigal's Cost Rebuttal Brief at 1-2.

selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.

The petitioners argue that Ternium's methodology for reporting the production quantity at verification was different from its prior reporting.[72] As discussed in Comment 5 below, Ternium reported "multiple costs" for certain CONNUMs, one of which was a CONNUM reviewed during the cost verification. The petitioners contend that for this CONNUM, the quantity assigned to each cost line changed at verification and the record does not illustrate the new methodology for reporting these quantities. Thus, according to the petitioners, there is an inconsistency between the documents submitted at verification and the previously submitted data. To clarify, for this CONNUM, the cost database includes two cost lines with the associated production quantities.[73] One cost line reports the regular production and the other one reports the products produced as prime but reclassified to non-prime.[74] However, the CONNUM cost buildup worksheets for this CONNUM report the actual production costs by SKU and, as such, include three cost lines with the associated production quantities.[75] Therefore, the petitioners' argument is based on a comparison of the CONNUM quantities reported in the cost database which are grouped based on prime/non-prime classifications versus the CONNUM quantities reported in the CONNUM cost buildup worksheets which are grouped based on Ternium's SKU product code grouping.[76] Consequently, the petitioners' comparison is not on an "apples to apples" basis.[77] We note that the SKU grouping of the quantities for this CONNUM was presented in the CONNUM cost buildup worksheets submitted in the section D supplemental questionnaire response.[78] Further, Commerce verified Ternium's production quantity, and the reported quantity for this CONNUM was the same in both Ternium's cost of production databases submitted before and after verification.[79] Thus, there is no inconsistency between the information obtained at verification and the previously submitted data.

The petitioners also argue that Ternium introduced new cost fields (*i.e.*, OTHDIRMAT and OTHDIRMATVAR) at verification. The petitioners contend that Ternium failed to identify the cost elements included in these fields and that the record does not illustrate how the costs reconcile to the supporting documentation included in the submitted CONNUM cost buildups. Contrary to the petitioners' claim, the CONNUM cost buildup worksheets obtained at verification were also submitted in the section D supplemental questionnaire response and illustrated how the costs classified under the OTHDIRMAT and OTHDIRMATVAR fields were combined and reported in the variable overhead costs (*i.e.*, VOH and VOHVAR cost fields) in the cost database.[80] Therefore, OTHDIRMAT and OTHDIRMATVAR do not represent new

---

[72] *See* Petitioners' Cost Brief at 9-11.

[73] *See* Ternium's cost databases TERNIUMCOP02 and TERNIUMCOP03.

[74] *Id*.

[75] *See* Ternium's Letter, "Ternium's Response to Section D Supplemental Questionnaire," dated March 24, 2025 (Ternium's March 24, 2025 SDQR) at Exhibit Supp D-21; *see also* Ternium Cost Verification Report at Cost Verification Exhibit (CVE) 7.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *See* Ternium Cost Verification Report at 12; *see also* Ternium's Cost database TERNIUMCOP02 and TERNIUMCOP03 (submitted after verification to incorporate the minor corrections).

[80] *See* Ternium's March 24, 2025 SDQR at Exhibits Supp D-21 and Supp D-22; *see also* Ternium Cost Verification Report at CVEs 7-8.

21

cost fields. Commerce verified that Ternium separately tracks other material costs such as rollers, rolling oils, anti-rust oil, molds, *etc.*, and these costs were included in the reported VOH costs.[81] Therefore, the case record demonstrates: (1) that OTHDIRMAT and OTHDIRMATVAR are not new cost fields; (2) the types of costs captured under these fields; and (3) how these costs were ultimately captured in the reported VOH costs.[82]

Lastly, the petitioners argue that Ternium's costs showed aberrational trends between the raw material costs and the physical characteristics of the product. According to the petitioners, Ternium's reported costs are unreliable and Commerce should apply facts otherwise available with an adverse inference. As some of the information relating to this issue is business proprietary in nature, please refer to Ternium/Tenigal's Final Cost Calculation Memorandum for further discussion of the issue.[83]

In this case, we find that neither facts available under section 776(a) of the Act nor AFA under section 776(b) of the Act is warranted. In particular, we find that necessary information is available on the record of this investigation. In addition, with respect to Ternium's cost reporting, Ternium has not withheld information, failed to provide information, significantly impeded this proceeding, or provided information that cannot be verified with respect to these issues. Throughout the course of this investigation, Ternium has demonstrated its willingness to cooperate with Commerce's requests for information and has responded to Commerce's requests to the best of its ability with respect to Ternium's reporting of its production costs. Therefore, for this final determination, we find that the application of AFA is not warranted for Ternium's reported costs.

## Comment 5: Multiple Costs Reported for the Same Control Number

*Petitioners' Cost Case Brief*:

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[84] For further details, *see* Petitioners' Cost Case Brief at 17-20.

> Without acknowledging or explaining the change, Ternium made a sweeping methodological change to its second cost database, introducing multiple costs for individual CONNUM codes. Indeed, despite this, Ternium described its second cost database as "virtually identical" to the first. As Commerce recognized in *Bottom Mount Refrigerator Freezers from Korea*, failing to "discuss the {change} in the narrative" and instead "effectively bur{ying} this information in an accompanying exhibit" as Ternium did here is not cooperative reporting. Confronted with this at verification, Ternium belatedly explained that the various duplicate costs represented different potential production lifecycles, *e.g.*, reclassification after production. But the fact that a large manufacturer might have

---

[81] *See* Ternium Cost Verification Report at 13 and Ternium Cost Verification Report at CVE 7 (PDF 20 and PDF 42); *see also* Ternium's March 24, 2025 SDQR at Exhibit Supp D-21.
[82] *Id.*
[83] *See* Ternium/Tenigal Final Cost Calculation Memorandum.
[84] *See* Petitioners' Cost Case Brief at 2-4.

different pathways for generating a final product is unremarkable and does not justify Ternium's undisclosed reporting change.

For a respondent's cost reporting to be reliable, Commerce must "examine{} and confirm{}…that the costs are reasonably and accurately allocated to individual control numbers." Ternium has precluded that exercise by failing to report costs for individual control numbers and instead proffering a "choose your own adventure" of alternative cost options. The point of the antidumping cost calculation is to identify an overall cost experience tied to physical characteristics, not the idiosyncrasies of a particular production pathway. Ternium's reporting fails to adhere to this basic principle. Explaining the matter at verification is too little, too late. As in *Wire Rod from Mexico*, Ternium "fail{ed} to adequately disclose the nature of the revision and…mischaracteriz{ed} the revision as 'minor.'" Commerce should therefore reject Ternium's cost database and apply facts otherwise available with an adverse inference, if it does not already do so for the reasons explained in Section I. Or, at a bare minimum, Commerce should weight average Ternium's duplicative costs into a single cost per CONNUM for purposes of the final results.

*Ternium/Tenigal's Cost Rebuttal Brief:*

The following is a verbatim summary of argument submitted by Ternium/Tenigal (internal citations omitted).[85] For further details, *see* Ternium/Tenigal's Cost Rebuttal Brief at 9-12.

In Section II, Ternium rebuts Petitioners' claims that Ternium made an "undisclosed shift" to reporting multiple TOTCOMs for individual CONNUMs in the COP02 and COP03 databases. Ternium explained its reporting of these costs for certain overruns (which account for a minuscule proportion of production), which {Commerce} verified without discrepancy. Moreover, Petitioners' allegations of discrepancies in PROQTY are incorrect.

**Commerce's Position:** After considering record evidence and the arguments presented in the interested parties' case and rebuttal briefs, we have determined that the application of AFA is not warranted for Ternium's reported costs. For the final determination, consistent with the *Preliminary Determination*, we weight averaged the multiple costs per CONNUM, if applicable, to calculate a single cost for each CONNUM. In our calculations, however, we have now relied on the cost of the CONNUM "as produced" for the cost of overruns.

The petitioners argue that Ternium did not disclose the shift from reporting one cost per CONNUM in its TerniumCOP01 cost database to reporting multiple costs per CONNUM, for certain CONNUMs, in its TerniumCOP02 cost database. Thus, according to the petitioners, Commerce should reject Ternium's reported costs and apply AFA. We disagree. In its March 24, 2025 SDQR, Ternium explained it reported multiple costs for certain CONNUMs in the TerniumCOP02 database.[86] Specifically, Ternium included additional lines for certain

---

[85] *See* Ternium/Tenigal's Cost Rebuttal Brief at 1.
[86] *See* Ternium's March 24, 2025 SDQR at 38-39; *see also* Ternium Cost Verification Report at 10-11 .

CONNUMs to report:  1) overrun production that was reclassified from one CONNUM to another CONNUM (*i.e.,* CONNUMs identified in the cost database fields CONNUM ("as sold") and PRODCONNUM ("as produced")); and 2) coils produced as prime prior to the POI but reclassified to non-prime during the POI (*i.e.,* flag code "0" in the cost database).[87]

For all production other than overruns, the CONNUM "as sold" is identical to the "as produced" CONNUM.[88]  As discussed in Ternium's Cost Verification Report, Ternium had POI overrun production that was sold to customers as overruns.  When overrun products are sold, Ternium normally assigns a different product code and generally expands the ranges of certain product characteristics on the invoice, but these expanded ranges still meet the ranges of the ASTM specifications.[89]  In certain cases, this resulted in the reclassification of a CONNUM from CONNUM "as produced" to CONNUM "as sold."[90]  Because the cost of the CONNUM should reflect its actual production cost, for the final determination, we have relied on the cost of the CONNUM "as produced" for the cost of the overruns.[91]  Further, because the changes made to the "TerniumCOP02" cost database were disclosed in its March 24, 2025 SDQR and Commerce was able to verify the information, rejecting Ternium's reported costs and applying AFA are not warranted.  Therefore, for the final determination, consistent with the *Preliminary Determination*, we weight averaged the multiple costs per CONNUM to calculate a single cost for each CONNUM.[92]

If Commerce issues an antidumping duty order in this proceeding, we will require parties to determine the CONNUM assigned to overrun products, both in the cost and sales databases, by the characteristics of the actual product produced.  We will continue to examine overrun production in future segments of this proceeding, to ensure the correct CONNUM is reported for these products.

**Comment 6:  Adjusting Cost of Manufacture for Unreconciled or Unexplained Differences**

*Petitioners' Cost Case Brief*:

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[93]  For further details, *see* Petitioners' Cost Case Brief at 20-23.

> First, Commerce instructed Ternium in Section III.B of the initial questionnaire to quantify, document, and explain differences between its accounting records and its antidumping costs, and provided Ternium a supplemental opportunity to explain several reconciling adjustments.  Despite this, Commerce's verification report identified two substantial unreconciled amounts.  Consistent with Commerce's practice in *Hot-Rolled Steel from Brazil, Light-Walled Rectangular Pipe from*

---

[87] *See* Ternium's March 24, 2025 SDQR at 38-39.
[88] *See* Ternium Cost Verification Report at 10-11; *see also* Ternium's March 24, 2025 SDQR at 38-39.
[89] *Id*.
[90] *See* Ternium Cost Verification Report at 10-11.
[91] *See* Ternium/Tenigal Final Cost Calculation Memorandum.
[92] *Id*.  The CONNUMs of sales in the U.S. market used in the calculation of the antidumping duty margin did not require adjustment because Termium reported them on an "as produced" basis.
[93] *See* Petitioners' Cost Case Brief at 4.

*Mexico, and Pasta from Italy*, Commerce should "include {the unreconciled difference between amounts in the accounting records and reported costs} in the calculation of COP and CV unless respondent can identify and document why such amount does not relate to the merchandise under investigation."

*Ternium/Tenigal's Cost Rebuttal Brief:*

The following is a verbatim summary of argument submitted by Ternium/Tenigal (internal citations omitted).[94]  For further details, *see* Ternium/Tenigal's Cost Rebuttal Brief at 12-13.

> Petitioners argue that {Commerce} should add to TOTCOM the non-prime adjustments shown in the cost reconciliation.  These adjustments accurately reflect the differences between Ternium's financial accounting and TOTCOM.  Thus, no adjustment to TOTCOM is warranted.  Petitioners also argue that {Commerce} should add to TOTCOM the total difference between the COM per financial accounting and the extended TOTCOM.  This difference is minor and {Commerce} should disregard it.

**Commerce's Position:**  After considering the record evidence and the arguments presented by interested parties, for the final determination, we have increased Ternium's reported COM to disallow the non-prime adjustments and to include an unreconciled cost difference from the cost reconciliation.[95]

Ternium argues that the non-prime adjustments in the cost reconciliation reflect the difference between Ternium's financial accounting system and the reported total COM and there is no basis to increase the reported costs by the non-prime adjustments.  As discussed in Ternium's Cost Verification Report, in the normal course of business, Ternium values non-prime products differently than prime products and treats them as part of the scrap offset.[96]  However, for the reported costs, Ternium allocated the same production costs to both prime and non-prime products and excluded the value of non-prime products from the calculation of the scrap offset.[97]  In calculating the total reported costs, Ternium included two separate adjustments in the cost reconciliation to reallocate the prime and non-prime product costs.[98]

Section 773(f)(1)(A) of the Act requires that Commerce rely on the records of the exporter or producer of the merchandise if such records are kept in accordance with the generally accepted accounting principles of the exporting country and reasonably reflect the costs associated with the production and sales of the merchandise.[99]  Normally, the cost allocation between prime and non-prime products does not have an impact on the total costs because the total pool of costs allocated to prime and non-prime products remain the same regardless of how these costs are

---

[94] *See* Ternium/Tenigal's Cost Rebuttal Brief at 1-2.
[95] *See* Ternium/Tenigal Final Cost Calculation Memorandum.
[96] *See* Ternium Cost Verification Report at 9-10; *see also* Ternium's March 24, 2025 SDQR at 29-30.
[97] *Id.*
[98] *See* Ternium Cost Verification Report at 2, 9-10, and CVE 5.
[99] *See Polytetrafluoroethylene Resin from India:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 48594 (September 26, 2018), and accompanying IDM at Comment 5.

Filed By: Brian Smith, Filed Date: 8/26/25 12:03 PM, Submission Status: Approved

allocated.[100] Thus, we find that Ternium's non-prime cost allocation methodology is a departure from its normal books and records and distorts the reported costs. As such, Ternium's reported costs do not reasonably reflect the costs associated with the production and sales of the merchandise under consideration. Therefore, for the final determination, we adjusted Ternium's reported COM by the net difference of the two reconciling adjustments related to non-prime product costs. Further, Ternium's cost reconciliation showed an unreconciled difference between the costs recorded in its accounting system and the reported extended TOTCOM.[101] Thus, we also adjusted Ternium's reported COM by the unreconciled difference for the final determination.[102]

**Comment 7: Adjusting Affiliated Purchase Prices to Reflect Actual Market Prices**

*Petitioners' Cost Case Brief*:

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[103] For further details, *see* Petitioners' Cost Case Brief at 23-29.

> Second, Section 773(f)(2) of the Act instructs that affiliate transactions "may be disregarded if…the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration." In applying that test, it is critical for Commerce to recognize record evidence establishing that the cost of certain types of inputs that Ternium acquired from affiliated suppliers varies according to the input's specific characteristics. The record contains data necessary to conduct certain product-specific comparisons as between affiliated and unaffiliated suppliers. This comparison demonstrates that an additional input should be adjusted to more accurately reflect market prices (Section III.B.1). Separately, Commerce already adjusted for a certain subset of affiliate transactions in the {*Preliminary Determination*}. For purposes of the final results, however, Commerce should update its calculations for the affiliated transaction adjustment for a different input to reflect figures that were verified in Commerce's report (Section III.B.2).

*Ternium/Tenigal's Cost Rebuttal Brief:*

The following is a verbatim summary of argument submitted by Ternium/Tenigal (internal citations omitted).[104] For further details, *see* Ternium/Tenigal's Cost Rebuttal Brief at 13-15.

> Petitioners argue that {Commerce} should increase Ternium's costs under the "major input rule" based on (1) a single price comparison for one input, and (2) the

---

[100] *See* Ternium/Tenigal Cost Verification Report at 2, 9-10, and CVE 5.
[101] *Id.* at 2, 10, and CVE 5.
[102] *See Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017,* 84 FR 16646 (April 22, 2019), and accompanying IDM at Comment 9.
[103] *See* Petitioners' Cost Case Brief at 4-5.
[104] *See* Ternium/Tenigal's Cost Rebuttal Brief at 2.

recalculation of an affiliated party's acquisition cost of another input. These arguments are inconsistent with {Commerce's} practice and the evidence.

**Commerce's Position:** During the POI, Ternium obtained multiple direct material inputs from affiliated suppliers. In the *Preliminary Determination*, we analyzed the affiliated purchases in accordance with the transactions disregarded rule under section 773(f)(2) of the Act, and made an adjustment to Ternium's COM for certain affiliated inputs because they did not reflect arm's-length transactions.[105] After considering the record evidence and the arguments presented by the interested parties, for the final determination, we did not make further adjustments to the direct material inputs purchased from affiliated suppliers and are continuing to analyze purchases from affiliates in accordance with the transactions disregarded rule.

Under section 773(f)(2) of the Act, the transactions disregarded rule provides that "a transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration."[106] The petitioners argue that Commerce needed to analyze the affiliated transactions on as specific a basis as possible, because the price of the material inputs vary significantly by certain physical characteristics of the input.[107]

Specifically, the petitioners argue that Commerce should make an adjustment to a certain direct material input based on product-specific comparisons.[108] In this investigation, Ternium provided the POI weight-averaged per-unit price paid to its affiliated trading company as well as its affiliated trading company's POI weight-averaged per-unit purchase prices (*i.e.,* trading company's purchases from its affiliated and unaffiliated customers).[109] However, the prices used by the petitioners in their suggested analysis were not based on the total POI purchases of this input. Instead, the petitioners' analysis was based on an extremely limited number of transactions selected from purchase information on the record.[110] In this case, we find that this analysis is unreasonable because it is based on cherry-picked transactions that do not represent the total population of the POI purchases for the input.[111] Further, Commerce's standard questionnaire instructs respondents to provide the total volume and value for major inputs purchased from affiliated and unaffiliated parties; it does not require the purchases of major inputs to be further segregated by their physical characteristics.[112] Furthermore, Commerce did not request such information in the supplemental questionnaires issued to Ternium. Finally, the

---

[105] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Ternium Mexico, S.A. de C.V. and Tenigal, S.de R.L. de C.V.," dated April 3, 2025 (Ternium/Tenigal Preliminary Cost Calculation Memorandum), at 2-3.

[106] *See Mattresses from Indonesia: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 FR 85240 (December 7, 2023), and accompanying IDM at Comment 2.

[107] *See* Petitioner's Cost Case Brief at 25.

[108] *Id.* at 27-28.

[109] *See* Ternium's March 24, 2025 SDQR at Exhibit Supp D-12.

[110] *See* Petitioner's Cost Case Brief at 27; *see also* Ternium's March 24, 2025 SDQR at Exhibit Supp D-12.

[111] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from Belgium: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2021-2022*, 88 FR 86635 (December 14, 2023), and accompanying IDM at Comment 2; *see also* Ternium's March 24, 2025 SDQR at Exhibits Supp D-9 and Supp D-12.

[112] *See* Ternium's January 13, 2025 DQR at 12-13.

27

physical characteristic of the input is not a physical characteristic in the buildup of the CORE CONNUMs.

Based on the comparison of the POI weighted-average transfer and market prices under section 773(f)(2) of the Act, we determined that the affiliated purchases of this input reflect arms'-length transactions.[113] Therefore, no adjustment is warranted. The petitioners also argue that one of the inputs which Commerce adjusted in the *Preliminary Determination* should be updated based on information in the verification report. Based on the review of the record, one of the figures listed in the verification report was inadvertently transposed.[114] Thus, we find that a revision to the adjustment is not necessary. Therefore, for the final determination, we have not made additional adjustments with respect to Ternium's affiliated transactions.

## Comment 8: Treatment of Certain Excluded Expenses

*Petitioners' Cost Case Brief*:

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[115] For further details, *see* Petitioners' Cost Case Brief at 29-32.

> Finally, despite Commerce's initial questionnaire instructing Ternium to "describe and quantify each reconciling item," Ternium completely excluded certain significant expenses from the cost of subject merchandise without a word of explanation. Commerce instructed Ternium to "explain the nature of the transactions included" in these accounts in a supplemental questionnaire. While Ternium responded by labeling the type of transaction, it inaccurately described *Hot-Rolled Steel from India* as supporting exclusion of the figure. In fact, that decision and many others establish that Commerce's practice is to include this type of transaction in the cost buildup. Moreover, settled practice is to directly tie such expenses to subject merchandise when related to sales of subject merchandise. Because Ternium failed to cooperate to the best of its ability to describe these expenses in terms relevant to their ordinary treatment in Commerce's margin calculation, Commerce should not only incorporate these expenses into the margin calculation, but treat them as directly related to sales of subject merchandise (Section III.C).

*Ternium/Tenigal's Cost Rebuttal Brief:*

The following is a verbatim summary of argument submitted by Ternium/Tenigal (internal citations omitted).[116] For further details, *see* Ternium/Tenigal's Cost Rebuttal Brief at 15-17.

> Petitioners argue that {Commerce} should treat two accounts in Ternium's general ledger as US direct selling expenses. The amounts recorded in these accounts are

---

[113] *See* Ternium's March 24, 2025, SDQR at Exhibits Supp D-9.
[114] *See* Ternium Cost Verification Report at 16 and CVE 10.
[115] *See* Petitioners' Cost Case Brief at 5-6.
[116] *See* Ternium/Tenigal's Cost Rebuttal Brief at 2.

not related to particular sales and are not direct selling expenses, and only relate to the domestic market. Likewise, there is no "gap in the administrative record," nor any failure to cooperate on Ternium's part. There is no basis for using AFA.

**Commerce's Position:** Our examination of Ternium's general and administrative (G&A) expense calculation at verification indicates that Ternium correctly excluded from its G&A expense calculation the amounts included in this expense type[117] because this expense type is not generally considered a G&A expense.[118] However, Commerce normally treats this expense type as an indirect selling expense if the actual expense amount cannot be tied directly to a sales transaction. In this case, there is no record evidence that the amounts in this expense type category are tied to specific sales transactions or that Ternium should have reported this expense as a direct selling expense. The account description information that Ternium provided also support including the amounts from this expense category in the expense allocation ratio used to calculate and report indirect selling expenses in both the home market and U.S. sales databases.[119] Given that the expense allocation ratio calculation worksheet in Ternium's questionnaire response notes the amounts incurred during the POI for this expense category that Ternium should have also included in expense ratio calculation, we are able to make the correction based on record information.[120] Therefore, for the final determination, we have revised Ternium's home market indirect selling expense calculation to also include this expense in the allocation ratio used to calculate the per-unit indirect selling expense amounts in the appropriate data fields in its home market and U.S. sales databases.[121]

**Comment 9: U.S. Warehousing Expenses, Home Market and U.S. Freight Expenses, and Home Market Credit Expenses (Calculated Using Average Payment Dates)**

*Petitioners' Sales Case Brief (on Ternium/Tenigal)*:

The following is a verbatim summary of argument regarding U.S. warehousing expenses (USWAREHU) submitted by the petitioners (internal citations omitted).[122] For further details, *see* Petitioners' Ternium/Tenigal Sales Case Brief at 1-3.

> Ternium's U.S. warehousing expenses are incomplete, unsupported, distortively allocated, and unverifiable. A gap exists in the administrative record with respect to U.S. warehousing expenses (USWAREHU) and Ternium has manifestly failed to cooperate to the best of its ability in reporting accurate information. First, Ternium proffered apparently incomplete USWAREHU reporting. Commerce

---

[117] Ternium has claimed business proprietary treatment for this expense type. Therefore, we are only referring to this expense type in a general manner. For more detailed information, *see* the Ternium/Tenigal Final Sales Calculation Memorandum.

[118] *See* Ternium Cost Verification Report at Exhibit CVE 11.

[119] These data fields are INDIRSH in Ternium's home market sales database and DINDIRSU in Ternium's U.S. sales database.

[120] *See* Ternium/Tenigal's Letter, "Ternium's Response to Sections B, C, and D of the Antidumping Duty Questionnaire," dated January 13, 2025 (Ternium/Tenigal's BCDQR) at Exhibit B-52.

[121] *See* Ternium/Tenigal Final Sales Calculation Memorandum for further discussion.

[122] *See* Petitioners' Ternium/Tenigal Sales Case Brief at 1-3.

instructed Ternium to revise or explain its reporting and provide supporting documentation in a supplemental questionnaire. Rather than address Commerce's instruction, however, Ternium made an unsolicited across-the-board change to its USWAREHU expense reporting methodology, reallocating existing USWAREHU amounts. This new methodology was not supported by the requested documentation, *e.g.*, copies of the SAP reports Ternium had supposedly relied upon to determine the relevant payment amounts and volumes moved. Nor did Ternium explain how it had tied a given "vendor" to a given U.S. sale.

Second, Ternium's regulatory obligation is to report expenses on the most transaction specific basis possible that is not otherwise distortive. Ternium reported that it could match some U.S. warehousing payment amounts with volume moved, but nevertheless maintained a quantity-based allocation, inconsistent with—and less specific than—how the expenses were actually assessed.

Finally, flaws in Ternium's approach to calculating warehouse-specific amounts ultimately rendered its USWAREHU amounts unverifiable. Ternium attempted to proffer a correction to its "warehouse-specific rate calculations reported for USWAREHU" during verification. The error was widespread and significant in its magnitude, the result of Ternium carelessly including "a pre-POI month of quantity data in the denominator used to calculate {certain} warehouse-specific per-unit amounts." By operation of Section 776(a)(2)(D) of the Tariff Act of 1930, as amended (the "Act"), Ternium's unverifiable USWAREHU data require Commerce to resort to facts otherwise available.

Ternium's flawed reporting falls far short of Ternium's obligation to cooperate to the "best of its ability" under Section 776(b) of the Act and the U.S. Court of Appeals for the Federal Circuit's decision in Nippon Steel. The "best of its ability" standard "does not condone inattentiveness, carelessness, or inadequate record keeping" and "requires the respondent to do the maximum it is able to do." Ternium's careless inclusion of extraneous data in its USWAREHU calculations is not "the maximum it is able to do," particularly when coupled with Ternium's lack of transparency in describing its reporting methodology and the fact that Ternium's documentation establishes that it could have adopted a more specific and accurate allocation methodology from the investigation's outset. The statute empowers Commerce to apply an adverse inference in selecting among facts otherwise available, and Commerce should do so. To ensure that Commerce's "adverse" inference yields an "adverse" outcome necessary to serves the AFA provision's deterrence purpose, Commerce must, at minimum, apply Ternium's highest reported USWAREHU value to all U.S. sales observations.

The following is a verbatim summary of argument for home market credit expenses submitted by the petitioners (internal citations omitted).[123] For further details, *see* Petitioners' Ternium/Tenigal Sales Case Brief at 4-6.

---

[123] *See* Petitioners' Ternium/Tenigal Sales Case Brief at 4-6.

30

After Commerce disclosed that it would scrutinize Ternium's average payment date (AVGPAYDATEH) reporting at verification, Ternium attempted to disclose both a new CREDITH calculation methodology and a major reporting error. In Ternium's telling, AVGPAYDATEH is the product of averaging installment payment dates (PAYDATE(1-n)H), weighted according to the amount of each installment payment (PAYAMT(1-n)H). In fact, Ternium revealed during verification that PAYDATE(1-n)H and PAYAMT(1-n)H erroneously include ancillary adjustments, thereby distorting the AVGPAYDATEH. Ternium also disclosed for the first time that AVGPAYDATEH had been used to calculate CREDITH values. Consequently, both fields are distorted.

At verification, despite having an army of 44 participants and five counsel present, Ternium initially acknowledged that "sales with errors for…weighted average payment date could not be identified using Ternium's sales databases." Then, on the last day, Ternium claimed to know "how to identify the sales with errors in…PAYDATE(1-n)H and PAYAMT(1-n)H," but Commerce determined that no time remained "to further verify the corrections to the expenses or the underlying support" such that Commerce could not verify Ternium's reported PAYDATE(1-n)H, PAYAMT(1-n)H, AVGPAYDATEH, or CREDITH values.

The resulting gap affects Ternium's entire home market sales database. Ternium characterized the error as "inadvertently includ{ing} adjustments to its HM sales, such as early payment discounts and other credit notes, in the calculation of its average payment date." But Ternium's last-second "explanation" from verification is flatly contradicted by data on the administrative record. First, the number of installment sales observations that fit Ternium's description is materially greater than the number in Commerce's verification report. Second, the AVGPAYDATEH differs from PAYDATE1H—even where PAYDATE1H is the only payment date associated with the observation. Mathematically, this should never occur.

Third, Ternium reports installment sales observations where it is mathematically impossible for the AVGPAYDATEH to represent an "average" of the reported PAYDATE(1-n)H, no matter how the individual dates are weighted or what ancillary data might be included. The nature of the errors would tend to benefit Ternium in the margin calculation. Fourth, Ternium reported yet other home market sales observations with a PAYDATE2H that is out of sequence with Ternium's description of its installment payments. Incorrectly timed payments would further distort the calculation of AVGPAYDATEH. In short, the number of home market sales observations affected by erroneous payment date and credit expense reporting is simply unknown, and a gap in the record exists with respect to the CREDITH of all home market sales observations.

Ternium's careless calculations fall short of the "best of its ability" standard, and Commerce should thus apply the lowest CREDITH expense to all home market sales observations.

31

The following is a verbatim summary of argument for the home market freight expense INLFTWH and the two U.S. freight expenses DINLFTWU and DINLFTPU[124] submitted by the petitioners (internal citations omitted).[125]  For further details, *see* Petitioners' Ternium/Tenigal Sales Case Brief at 6-9.

> At verification, Ternium described for the first time how INLFTWH, DINLFTWU, and DINLFTPU data were recorded in Ternium's accounting system and how Ternium had prepared those data for its antidumping sales databases.  Essentially, Ternium had relied upon SQL programming to extract costs from its accounting system and link them to a given coil.  This process contradicts Ternium's questionnaire responses, which had asserted that expenses were reported for (A) freight-to-warehouse (INLFTWH), (B) freight-to-"intermediate location" (DINLFTWU), and (C) freight-to-port (DINLFTPU) based on "freight invoices" specific to the "transaction" or "the provisional freight expense that Ternium Mexico's SAP system assigned to the shipment."  Ternium's misdirection impeded meaningful scrutiny.
>
> Moreover, Ternium "misallocated or omitted certain freight expenses in allocating its freight account into different types of freight for reporting purposes."  Ternium asserted that this error affected a certain number of SEQHs and SEQUs, but the administrative record contains nothing identifying those sales observations.  It was not until the final day of verification that Ternium claimed it had "determined how to identify the sales with errors in the…INLFTWH…and DINLFTPU fields."  Evidently, Ternium never identified which sales had DINLFTWU reporting errors.
>
> Commerce correctly rejected Ternium's last second attempt to address this widespread problem.  Commerce was "unable to further verify the corrections to the expenses or the underlying support" and limited verification of these values to those selected sales "where…the{se three} expenses were reported correctly {(*i.e.*, "for specific coils")} in Ternium's sales databases."  With respect to all other home market and U.S. sales observations, Ternium's INLFTWH, DINLFTWU, and DINLFTPU reporting could not be verified.
>
> Commerce must therefore rely on facts otherwise available for these fields.  Commerce can apply an adverse inference whenever a respondent does not cooperate to the best of its ability.  Ternium failed to do so here.  The reporting process and errors that Ternium revealed at verification are unremarkable.  At base, Ternium used erroneous SQL programming to obtain freight data, which variously "duplicated expenses due to the inclusion of both the provisional and actual freight expenses recorded for the coil in Ternium Mexico's freight account," "resulted in the omission of such expenses," excluded "certain sales terms…in the query for the expense," or removed "certain reallocated costs….from the expenses."  These are run-of-the-mill quality control errors that a careful respondent would have caught and corrected in their initial or supplemental questionnaire responses.  Yet, Ternium

---

[124] This correct expense variable name is DINLFTP1U in Ternium's U.S. sales database.
[125] *See* Petitioners' Ternium/Tenigal Sales Case Brief at 6-9.

32

did not recognize its error until verification and never identified sales with faulty DINLFTWU reporting.

Consistent with Commerce's established methodology for applying an adverse inference when faced with similar failures to verify, Commerce should apply AFA by (A) denying all INLFTWH expenses and (B) applying the highest DINLFTWU and DINLFTPU values reported for any U.S. sales observation to all DINLFTWU and DINLFTPU fields, respectively.

*Ternium/Tenigal's Sales Brief:*

The following is a verbatim summary of argument of U.S. warehousing expenses, home market credit expenses (calculated using average payment dates), and U.S. and home market freight expenses submitted by Ternium/Tenigal (internal citations omitted).[126]  For further details, *see* Ternium/Tenigal's Sales Brief at 5-30.

> {Commerce} should not have rejected minor corrections that Ternium presented at the sales verifications for certain observations with respect to (1) the US warehousing expenses reported in Field USWAREHU, (2) the domestic inland freight to warehouse expenses reported in Field DINLFTWU, (3) the domestic inland freight to port expenses reported in Field DINLFTPU, (4) the inland freight to warehouse expenses reported in Field INLFTWH, and (5) the home-market payment dates and amounts reported in Fields PAYDATE(1-n)H and PAYAMT(1-n)H. {Commerce} did not explain why it rejected these corrections, while accepting others.  However, the information on the record shows that the proposed corrections were "minor" under {Commerce}'s well established test, and should have been accepted and verified.  Because the lack of verified corrected information is due to an error by {Commerce}, it should apply facts available without an adverse inference for the affected observations and expenses.

*Petitioners' Sales Rebuttal Brief (on Ternium/Tenigal):*

The following is a verbatim summary of argument submitted by petitioners (internal citations omitted).[127]  For further details, *see* Petitioners' Ternium/Tenigal Sales Rebuttal Brief at 8-29.

> Ternium incorrectly suggests that Commerce erred in rejecting some of Ternium's "minor corrections."  But Ternium had every opportunity to prepare adequate responses—it received 72 days' worth of extensions to respond to two questionnaires and proffered ten single spaced pages' worth of unsolicited revisions.  Despite this, Ternium arrived at verification with twenty-one distinct revisions.  The five that Commerce rejected fall far short of established standards for allowing last-second revisions (Section I).

---

[126] *See* Ternium/Tenigal's Sales Case Brief at 4.
[127] *See* Petitioners' Ternium/Tenigal Sales Rebuttal Brief at 1-4.

Filed By: Brian Smith, Filed Date: 8/26/25 12:03 PM, Submission Status: Approved

Time is a key factor Ternium fails to acknowledge. Commerce must verify all information used in a final determination. Thus, verification's purpose is to confirm the accuracy and completeness of already submitted information. Although "Commerce has discretion to accept or reject corrective information on a case-by-case basis," the acceptance of such corrections must be compatible with verification of both the correction and the remaining record information covered by Commerce's 35-page verification outlines. Here, the five corrections that Commerce rejected (having already taken the time to verify and accept sixteen others) were seriously delayed. Indeed, the issues with Ternium's DINLFTWU and DINLFTPU were first raised at U.S. Sales Verification in April and Commerce allowed Ternium to present a solution at Mexico Sales Verification more than a month later. Inexplicably, Ternium, who had an army of 62 company personnel and five counsel present at its sales verifications, failed to do so. Indeed, Ternium was unable to explain and trace its corrections with respect to these two fields, as well as PAYAMT, PAYDAT, CREDITH, and INLFTWH until the final day of verification. Ternium thus precluded verification of these corrections by running out the clock, an independently sufficient reason for rejecting them (Section I.A).

Substantively, Ternium's corrections were far from "minor." The Federal Circuit in *Goodluck India* and Commerce interpret "minor" as requiring that corrections be neither methodological nor substantial. Each of Ternium's rejected corrections is both. Regarding USWAREHU, verification was the first time Ternium disclosed its methodology for pulling quantity data in SAP, and the errors revealed affected a significant number of Ternium's warehouses, each requiring unique corrective calculations. Regarding PAYDATE, PAYAMT, and CREDITH, these errors involved Ternium disclosing an entirely new CREDITH calculation methodology, which had been distorted by Ternium's failure to design a reliable method for identifying installment payments. The explanation Ternium proffered at verification fails to capture the scope of the problem, which pervades Ternium's reporting. Finally, Ternium revealed a flawed methodology for obtaining INLFTWH, DINLFTWH, and DINLFTPU data from its systems. Unlike the examples on which Ternium relies, several types of data error resulted, yielding a variety of flaws within each affected field. Nor was Ternium able to timely trace the errors to individual sales using record information. In short, each revision was both methodological and substantial in nature. Commerce correctly rejected them at verification (Section I.B).

*Ternium/Tenigal's Sales Rebuttal Brief:*

The following is a verbatim summary of argument submitted by Ternium/Tenigal.[128] For further details, *see* Ternium/Tenigal's Sales Rebuttal Brief at 2-33.

There is no basis to apply AFA to any of the expenses identified by Petitioners, namely: US warehousing expenses (Field USWAREHU), credit expenses (Field CREDITH), inland freight to warehouse (Field INLFTWH), domestic inland

---

[128] *See* Ternium/Tenigal's Sales Rebuttal Brief at 1-2.

freight to warehouse (Field DINLFTWU), and domestic inland freight to port (Field DINLFTPU). Ternium acted the best of its ability in responding to the Department's questionnaires. {Commerce's} rejection of certain minor corrections that Ternium presented at the beginning of verification does not support a finding that it did not cooperate to the best of its ability. Instead, and for the reasons discussed in Ternium's case brief, {Commerce} should apply neutral facts available (FA). If {Commerce} incorrectly decides to apply AFA, it should not use the AFA proposed by Petitioners because doing so would be punitive.

**Commerce's Position:** As discussed below, we find that the application of AFA with respect to the expenses for which Commerce declined to accept corrections to the record that were not minor in nature is warranted. Sections 776(a)(1) and 776(a)(2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not available on the record or, if an interested party or any other person: (A) withholds information that has been requested by Commerce; (B) fails to provide such information by the deadlines for such information or in the form and manner requested; (C) significantly impedes a proceeding under the Act; or (D) provides information which cannot be verified, Commerce shall use, subject to sections 782(d) and (e), facts otherwise available in reaching the applicable determination. Further, section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of that party in selecting from among the facts otherwise available. While the standard for cooperation does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.[129]

Commerce's verification agenda stated that new information would be accepted at verification only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record.[130] Commerce routinely accepts minor corrections at the outset of verification because such errors may be uncovered by respondents as they prepare for verification. The corrections accepted at verification typically include corrections of minor mistakes in addition, subtraction, or other arithmetic function, minor data entry mistakes, clerical errors resulting from inaccurate copying, duplication, or the like, and minor classification errors.[131] The U.S. Court of Appeals for the Federal Circuit, in *Goodluck India*, when defining a minor correction, clarified that "{t}his practice, as applied at verification, strikes an appropriate balance between finality and accuracy. Moreover, importantly, it is within Commerce's discretion to decide which interest outweighs the other on a

---

[129] *See Nippon Steel,* 337 F.3d at 1382.

[130] *See*, *e.g.*, Commerce's Letters, "Constructed Export Price (CEP) Sales Verification Agenda," dated April 7, 2025 Ternium U.S. Sales Verification Agenda), at 2; and "Sales Verification Agenda for Ternium Mexico S.A. de C.V.," dated May 8, 2025 (Ternium Home Market Sales Verification Agenda), at 2.

[131] *See*, *e.g.*, *Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 75 FR 59217 (September 27, 2010) (*Coated Paper from China*), and accompanying IDM at Comment 10.

Filed By: Brian Smith, Filed Date: 8/26/25 12:03 PM, Submission Status: Approved

case-by-case basis."[132]  The courts have held that Commerce possesses broad discretion to set its own verification procedures and to decide what information to accept at verification.[133]

The number of transactions that are affected by a correction are not necessarily determinative of whether a correction is significant, or if the rejected correction warrants the application of AFA.[134]  The U.S. Court of International Trade (CIT) has held that the issue is not the value of the errors as a percentage of total sales, or the number of instances of errors, but rather the nature of the errors and their effect on the validity of the submission.[135]

In determining whether to accept Ternium's minor corrections, we evaluated both the nature of the errors and whether we were able to verify the errors, including the extent to which the errors were present in Ternium's sales databases, and were satisfied with the documentary support for Ternium's submissions.  Commerce must determine whether the errors had "a significant impact" or would "call into question the overall integrity of {the respondent's} reported data."[136] For the reasons discussed in detail below, for five corrections presented by Ternium, we found at verification that the errors reported called into question the overall reliability of the reported associated expense fields, either due to large contradictions with information previously placed on the record or the inability to verify the extent of the changes as a result of the correction, and therefore it was within Commerce's discretion not to accept the changes to each respective expense or sales database field as a minor correction at verification.  Each piece of new information reported at verification is discussed in detail below, as well as Commerce's reasoning for not accepting that specific change to the databases.

*USWAREHU*

We find that the application of AFA is warranted for Ternium with respect to its U.S. warehousing expenses in the final determination.

For the U.S. warehousing expenses, Ternium made changes to its expense calculation methodology for this expense in its SQR, which resulted in changes to the sales where Ternium

---

[132] *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021) (*Goodluck India*) (citing *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997) (*Micron*)); and *American Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994) (*American Alloys*)).

[133] *See*, *e.g.*, *FAG Kugelfischer Georg Schafer AF. v. United States*, 131 F. Supp. 2d 104, 106 (CIT 2001) (quoting *PMC Specialties Group, Inc. v. United States*, 20 CIT 1130, 1134 (CIT August 30, 1996); and *Phang Iron and Steel Co. v. United States*, 23 CIT 778 (CIT October 20, 1999)) ("'{Commerce} has considerable latitude in picking and choosing which items it will examine in detail." In fact, 'Commerce enjoys wide latitude in its verification procedures.' The Court defers to the agency's sensibility as to the depth of inquiry needed."); *Carlisle Tire & Rubber Co., Division of Carlisle Corp. v. United States*, 622 F. Supp. 1071, 1082 (CIT 1985); *American Alloys*, 30 F.3d at 1475 ("{T}he statute{s} give Commerce wide latitude in its verification procedures."); and *Micron*, 117 F.3d at 1396 ("Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc."))

[134] *See*, *e.g.*, *Fine Denier Polyester Staple Fiber from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018), and accompanying IDM at Comment 1a.

[135] *See Coalition for Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 236 (CIT 1999) (quoting *Tatung Co. v. United States*, 18 CIT 1137, 1141 (1994)).

[136] *See Ferrosilicon from Malaysia:  Final Affirmative Determination of Sales at Less than Fair Value and Final Negative Determination of Critical Circumstances*, 90 FR 14105 (March 28, 2025), and accompanying IDM at Comment 1.

36

reported a warehousing expense.[137] Ternium provided basic supporting documentation for its warehouse-specific per unit amounts, and a brief explanation for the changes being made in determining which sales incurred a warehousing expense. Specifically, Ternium indicated in its SQR that there was a significant coding error in its initial reporting of this expense with many sales transactions for which Ternium did not report a warehousing expense actually incurring this expense based on other information for those sales.[138] In addition, Ternium indicated that it was relying on different SAS reports for purposes of calculating the this expense of a warehouse-code-specific basis.[139] Commerce accepted Ternium's revised calculation methodology for the *Preliminary Determination* because Ternium provided a brief description of its revised calculation methodology along with a calculation worksheet and the backup information for its warehouse code-specific amounts.[140] However, due to the change in methodology in the supplemental questionnaire response, Commerce did not have the opportunity to issue another supplemental questionnaire to further examine whether the changes Ternium made to its reporting methodology were accurate.

At verification, Ternium presented a correction to this expense that impacted a significant number of its reported warehouse-code-specific per unit amounts. Specifically, Ternium informed Commerce that its reported warehouse-code-specific per unit amounts were incorrect because its reported warehouse quantity data included an extra month of data. While Ternium portrays this correction as a minor alteration to a single denominator and argues that Commerce should have accepted this correction at verification, the correction presented by Ternium was not minor and would have resulted in a substantial revision to its reported data. Moreover, the underlying report provided as supporting documentation by Ternium to demonstrate the values used in the calculation of the expense in its supplemental questionnaire response was incorrect, which resulted in Ternium presenting Commerce with a substantively different report at verification than the report provided in its supplemental questionnaire response. As a result, Commerce needed to rely on a new version of the report at verification, with different factual information, to verify the data itself. Therefore, Ternium's entire submission in its supplemental questionnaire response with respect to its U.S. warehousing expenses, including both a substantive portion of its underlying values and its supporting documentation, was incorrect because Ternium tried to correct it with new factual information presented to Commerce at verification.[141] While Commerce was able to confirm through testing at verification that Ternium did not incur U.S. warehousing expenses for its U.S. sales for which it reported a zero amount, the extent of Ternium's inaccuracy in reporting in its supplemental questionnaire response with respect to the expense calls into question the validity of Ternium's reporting with respect to the entirety of this expense.[142]

While Ternium cites instances in *Aluminum Lithographic Printing Plates from China*, *Sodium Sulfate Anhydrous from Canada*, *Cut-to-Length Steel Plate from Belgium*, *Ripe Olives from Spain*, and *Aluminum Extrusions from India* where Commerce has found clerical errors or

---

[137] *See* Ternium/Tenigal's Letter, "Ternium's Response to the Supplemental Sections B and C Questionnaire," dated March 3, 2025 (Ternium/Tenigal's BCSQR) at 31-33 and Exhibit BC-30.
[138] *Id.* at 32.
[139] *Id*. at 33.
[140] *Id*. at 31-33 and Exhibit BC-30.
[141] See Ternium U.S. Sales Verification Report at 2.
[142] *Id.*

reported instances of including incorrect data in the calculation of the expense accepted as a minor correction, we find these examples to be inapposite.[143] The Federal Circuit has clarified that Commerce has discretion to accept or reject minor corrections on a case-specific basis, dependent on the circumstances of the correction provided.[144] The same expenses or type of corrections may be accepted or rejected depending on the support provided by the underlying case record, including but not limited to the ability of Commerce to substantiate the scope of the error and the correction using the respondent company's accounting records, whether the error is systemic or methodological in nature, such that a large portion of the database for that expense is affected, and whether the acceptance of the error would be the acceptance new factual information rather than a correction to existing information. As such, comparing the acceptance or rejection of corrections across cases records requires, at minimum, comparison of the underlying case record and information available to Commerce, the respondent company's accounting system; therefore, the acceptance of a correction as "minor in nature" is made entirely on a fact and case-specific basis. Here, while Ternium's error resulted from an extra month included in its warehouse quantity data, the error was compounded on both a substantial portion of the calculation and its underlying supporting documentation.

Accordingly, pursuant to sections 776(a)(1) and (2)(B)-(D) of the Act, we find that necessary information is missing from the record, was not provided in a timely manner or in the form or manner requested, significantly impeded the proceeding, and could not be verified. In this instance, application of AFA is warranted for those sales for which Ternium reported a warehousing expense because Ternium failed to accurately report this expense with respect to either the data reported or the supporting documentation provided. Furthermore, per section 776(b) of the Act, we find that Ternium has not acted to the best of its ability to comply with our request for information. Specifically, despite the fact that we provided Ternium the opportunity to report accurate data for this expense in multiple questionnaire responses, we identified widespread inaccuracies in the reported data at verification.[145] While the standard for cooperation does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.[146] The continuous changes to the reporting for this expense, as well Ternium's inability to substantiate the basis for the correction, undermines the reliability of Ternium's reporting with respect to this expense. Ternium argues that the error does not call into question the overall integrity of its submission of warehousing expenses, and that it only affects a subset of sales (*i.e.*, those where U.S. warehousing was reported). However, we find that the existence of errors in reporting for the sales where U.S. warehousing was

---

[143] *See* Ternium/Tenigal's Sales Case Brief at 11-13 (citing *Aluminum Lithographic Printing Plates from the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Affirmative Determination of Critical Circumstances*, 89 FR 79256 (September 27, 2024) (*Aluminum Lithographic Printing Plates from China*), and accompanying IDM at Comment 1; *Sodium Sulfate Anhydrous from Canada: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 FR 17534 (March 30, 2020) (*Sodium Sulfate Anhydrous from Canada*), and accompanying IDM at Comment 3; *Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium: Final Results of Antidumping Duty Administrative Review; 2016-2018*, 85 FR 3028 (January 17, 2020) (*Cut-to-Length Steel Plate from Belgium*), and accompanying IDM at Comment 3; *Ripe Olives from Spain: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 28193 (June 18, 2018) (*Ripe Olives from Spain*), and accompanying IDM at Comment 9; and *Aluminum Extrusions from India: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 FR 80452 (October 3, 2024), (*Aluminum Extrusions from India*), and accompanying IDM at Comment 3).

[144] *See Goodluck India*, 11 F.4th at 1343.

[145] *Id.*

[146] *See Nippon Steel,* 337 F.3d at 1382.

reported does undermine the validity of an expense for U.S. warehousing because it calls into question the reliability of the underlying data. Accordingly, we determine that Ternium failed to act to the best of its ability to comply with Commerce's requests for information and did not put forth maximum effort to provide Commerce with full and complete answers to all inquiries, within the meaning of *Nippon Steel*.[147] Therefore, in accordance with section 776(b) of the Act and 19 CFR 351.308(a), we determine that an adverse inference is warranted when selecting from among the facts otherwise available.[148] Therefore, as partial AFA, we have applied the highest reported per-unit expense to all applicable U.S. sales for which Ternium reported a warehousing expense in the final determination.[149]

*Home Market Inland Freight to Warehouse (INLFTWH), U.S. Domestic Inland Freight to Port (DINLFTP1U) and U.S. Domestic Inland Freight to Warehouse (DINLFTWU)*

We find that the application of AFA is warranted for Ternium with respect to the INLFTWH, DINLFTP1U and DINLFTWU freight expenses in the final determination. For the inland freight expense incurred for home market sales and two freight expenses incurred for U.S. sales, our verification findings clearly note that Ternium misallocated or omitted these freight expenses in allocating its freight account into different types of freight for reporting purposes.[150] While we agree with Ternium that the errors were a result of issues with the programming used by Ternium in the creation of its questionnaire responses, and not a change in reporting methodology, we nevertheless find that the errors, which involved multiple errors in misallocation of Ternium's freight expense account amongst its reported sales, the extent of which Commerce could not clearly identify and verify, called into question the extent of the accuracy and integrity of Ternium's reporting of certain freight expenses, such that the application of AFA to these expenses is appropriate.[151]

As noted in Ternium's Home Market Sales Verification Report, company officials from Ternium reported minor corrections to four expenses. For the expenses where Ternium could identify and isolate the extent of the error, such that Commerce could reasonably test and verify the correction, (*i.e.*, home market inland freight to customer, INLFTCH), we accepted the minor corrections.[152] However, for the remaining three expenses, Commerce was unable to verify that Ternium's had accurately identified and corrected the errors to the field in full, either through a reconciliation of the total value for the freight expense that demonstrated that the corrected values represented the full extent of the expense, or by identifying the fields affected by the errors in Ternium's sales databases, thereby allowing Commerce to confirm the extent of the errors and thus determine if the errors were minor classification or data entry errors.[153]

---

[147] *Id.*

[148] *See, e.g., Aluminum Sheet from Romania*, 85 FR at 65358; *see also Non-Oriented Electrical Steel from Germany, Japan, and Sweden: Preliminary Determinations of Sales at Less Than Fair Value, and Preliminary Affirmative Determinations of Critical Circumstances, in Part*, 79 FR 29423 (May 22, 2014) (*Non-Oriented Electrical Steel Prelim*), and accompanying PDM at 7-11, unchanged in *Non-Oriented Electrical Steel from Germany, Japan, the People's Republic of China, and Sweden: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determinations of Critical Circumstances, in Part*, 79 FR 61609 (October 14, 2014) (*Non-Oriented Electrical Steel Final*).

[149] *See* Ternium/Tenigal Final Sales Calculation Memorandum for further details.

[150] *See* Ternium's Home Market Sales Verification Report at 2-5 and 22-23.

[151] *Id.*

[152] *Id.* at 3-4.

[153] *Id.* at 2-5 and 22-23.

39

Specifically, Ternium's failure to correctly isolate its freight expenses from the plant to the warehouse incurred for home market sales (*i.e.*, INLFTWH) resulted, according to Ternium's presentation of the correction, misallocating or simply not correctly reporting the value of the freight expense. Ternium was unable to demonstrate at verification how to identify which sales were impacted in sufficient time for Commerce to confirm the extent of the errors and verify the corrected values, or explain why it failed to report this expense for certain sales for which the terms of delivery indicated it should have reported this expense.[154] As discussed in Ternium's Home Market Sales Verification Report, Ternium did not provide information on how Commerce could verify the extent of the errors in its sales database when requested.[155] Though we verified that Ternium correctly reported this expense for certain pre-selected and on-site sales,[156] this testing method did not resolve the question regarding how Ternium determined the number of sales, which sales it did not report the correct expense or simply did not report (but should have reported) the expense. The verifiers provided Ternium time and opportunity within the constraints of the verification schedule to collect and provide information in order to attempt to demonstrate the impact of this error on its reported data.[157] Ternium initially responded that it was unable to provide information for Commerce to confirm the extent of the error, and instead presented the information on the final day of verification, at which point Commerce had already determined not to accept the corrections as minor. Even if Commerce had not already made a determination with respect to the presented corrections, the verifiers did not have sufficient time remaining during the verification to test or examine further the expenses to confirm that Ternium's identification of the magnitude of the errors was accurate, such that Commerce could consider the errors minor classification or data entry errors.[158] In this instance, to the application of AFA is warranted based on Ternium's failure to demonstrate how it could isolate its error and demonstrate how the programming error affecting its data was limited and minor in nature. Therefore, as AFA, we have applied an INLFTWH freight expense of zero, which is the lowest INLFTWH expense reported in the home market sales database, to all of Ternium's home market sales in the final determination.[159]

Regarding Ternium's inland freight from the plant to the warehouse (*i.e.*, DINLFTWU), Ternium failed to report an expense in its US sales database, even though the expense was incurred, for a number of its U.S. sales.[160] Likewise for this expense, Ternium: (1) was unable to explain why it failed to report this expense for a number of its U.S. sales; and (2) did not timely provide answers to the verifiers' questions in order to identify and understand the extent of this error affecting its reported data.[161] In this instance, resorting to AFA is also warranted based on Ternium's failure to demonstrate how it determined which sales it should have also reported an amount for this expense or show how the programming error affecting its data was limited and minor in nature. Therefore, as partial AFA, we have applied the highest reported per-unit

---

[154] *Id.*
[155] *Id.*
[156] *Id.* at 2-3 and 19-22.
[157] *Id.* at 4-5 and 22-23.
[158] *Id.*.
[159] *See* Ternium/Tenigal Final Sales Calculation Memorandum for further details.
[160] *See* Ternium's Home Market Sales Verification Report at 2-5 and 22-23.
[161] *Id.*

expense which did not appear to be an outlier to all U.S. sales for which Ternium reported no expense for inland freight from the factory to the port of exportation in the final determination.[162]

Finally, Ternium's Home Market Sales Verification Report notes that Ternium committed the same errors, as described above for DINLFTWU, when reporting its expense for domestic inland freight to port (DINLFTP1U) for a number of its U.S. sales.[163] Therefore, resorting to AFA is also warranted for this expense based on Ternium's failure to demonstrate how it could isolate its error and show how the programming error affecting its data was limited and minor in nature. As AFA, we have applied the highest reported per-unit expense to all U.S. sales for which Ternium reported no expense in these expense fields in the final determination.[164]

Accordingly, pursuant to sections 776(a)(1) and (2)(B)-(D) of the Act, we find that necessary information is missing from the record, was not provided in a timely manner or in the form or manner requested, significantly impeded the proceeding, and could not be verified. In this instance, Ternium failed to demonstrate, using verifiable record evidence, that the corrections to its freight expenses were minor in nature and could be isolated as a result of specific classification or data entry errors. Furthermore, per section 776(b) of the Act, we find that Ternium has not acted to the best of its ability to comply with our request for information. Specifically, despite the fact that we provided Ternium the opportunity to report accurate data for these expenses in multiple questionnaire responses, we identified widespread inaccuracies in the reported data at verification.[165] While the standard for cooperation does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.[166] While Ternium cites to a number of cases where it claims Commerce accepted similar errors, those instances cite a clear underlying reason in support of the correction. At verification, Ternium acknowledged that its SQL programming resulted in multiple errors within the freight expenses, and we were unable to isolate and determine the extent of the errors either quantitatively or qualitatively based on the information Ternium was unable to provide.[167] While Ternium argues that the errors are clerical and do not affect a substantive portion of the submission, and cites to a number of cases which it claims contain similar errors, the cases cited all clearly explain a distinct and identifiable error from which Commerce was able to isolate and verify the extent of the correction. Such information was not provided for the minor corrections to the freight expenses rejected by Commerce in this case.[168] Accordingly, we determine that Ternium failed to act to the best of its ability to comply with Commerce's requests for information and did not put forth maximum effort to provide Commerce with full and complete answers to all inquiries, per *Nippon Steel*.[169] Therefore, in accordance with section 776(b) of the Act and 19 CFR 351.308(a), we determine that an adverse

---

[162] *See* Ternium/Tenigal Final Sales Calculation Memorandum for further details.
[163] *See* Ternium's Home Market Sales Verification Report at 2-5 and 22-23.
[164] *See* Ternium/Tenigal Final Sales Calculation Memorandum for further details.
[165] *See* Ternium's Home Market Sales Verification Report at 2-5 and 22-23.
[166] *See Nippon Steel,* 337 F.3d at 1382.
[167] *See* Ternium's Home Market Sales Verification Report at 2-5 and 22-23.
[168] *Id.*
[169] *See Nippon Steel*, 337 F. 3d at 1382.

inference is warranted when selecting from among the facts otherwise available.[170]  Accordingly, we have applied partial AFA to each of these expenses as described above.

*CREDITH*

For the final determination, we find that the application of AFA is warranted for Ternium with respect to Ternium's reported home market credit expenses because the information provided by Ternium to calculate its weighted average payment date, used in the calculation of Ternium's home marked credit expense, CREDITH, contained substantive and systematic underlying errors.[171]  At verification, Ternium reported as a minor correction that its weighted average payment dates in the home market were miscalculated because Ternium had inadvertently included the payment dates and amounts of any adjustments to the sale, including items such as credit notes for retroactively applied discounts, sales returns, *etc.*[172]  Ternium initially explained to Commerce that it was unable to systematically identify or isolate the specific sales where the average payment date was incorrect, beyond isolating the error to any weighted average payment date where multiple dates and amounts were reported.[173]  While Ternium notes correctly that Commerce was able to verify certain payment dates within Ternium's home market sales traces, because of the inability to isolate which sales were affected by the error, verifying the corrections would have required Commerce to individually examine every sale affected and determine whether the sale had multiple payments and/or adjustments in its accounting system.[174]  We disagree with Ternium that because the error was made as a result of an error in SQL programming, it is therefore clerical.  Here, Ternium's methodology used in reporting, *i.e.*, using the dates and amounts of all the financial transactions associated with the sale in its accounting system in the calculation of the weighted average payment date, was clearly inaccurate.  As discussed in *Nippon Steel*, the statute does not condone inattentiveness, carelessness, or inadequate record keeping.  Here, Ternium made a methodological error that could have been easily avoided had it confirmed the payment data it was reporting prior to its preparation for verification.

Accordingly, pursuant to sections 776(a)(1) and (2)(B)-(D) of the Act, we find that necessary information is missing from the record, was not provided in a timely manner or in the form or manner requested, significantly impeded the proceeding, and could not be verified.  In this instance, resorting to AFA is warranted for the home market credit expense because Commerce is unable to rely on the calculated value reported by Ternium due to the inaccuracy in the weighted average payments dates included in the calculation of the expense.  Furthermore, per section 776(b) of the Act, we find that Ternium has not acted to the best of its ability to comply with our request for information.   Accordingly, we determine that Ternium failed to act to the best of its ability to comply with Commerce's requests for information and did not put forth maximum effort to provide Commerce with full and complete answers to all inquiries, per *Nippon Steel*.[175]  Therefore, in accordance with section 776(b) of the Act and 19 CFR

---

[170] *See, e.g., Aluminum Sheet from Romania*, 85 FR at 65358; *see also Non-Oriented Electrical Steel Prelim* PDM at 7-11, unchanged in *Non-Oriented Electrical Steel Final*  IDM.
[171] *See* Ternium's Home Market Sales Verification Report at 2-5 and 20.
[172] *Id.*
[173] *Id.*
[174] *Id.* at 2.
[175] *See Nippon Steel*, 337 F. 3d at 1382.

351.308(a), we determine that an adverse inference is warranted when selecting from among the facts otherwise available.[176]  As partial AFA, we have therefore recalculated Ternium's home market credit expenses, CREDITH, using the first reported payment date in the calculation rather than the weighted average payment date.[177]

## Comment 10:  Cash Deposit Instructions

*Petitioner's Sales Case Brief (on Ternium Tenigal)*:

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[178]  For further details, *see* Petitioners' Ternium/Tenigal Sales Case Brief at 9.

> Ternium sourced certain inputs into the production of CORE from third countries. Nevertheless, for purposes of this antidumping investigation, Ternium has treated such products as CORE from Mexico.  Proprietary details indicate that Ternium's treatment of these sales as "Mexican" for purposes of {antidumping duty/countervailing duty (AD/CVD)} duty assessment is likely incorrect.  For any such entries, treating the imported CORE as Mexican could allow Ternium to pay incorrect AD/CVD cash deposit rates.  While the administrative record does not permit Commerce to identify the specific sales observations affected for purposes of adjusting the antidumping calculation, Commerce should nevertheless specify in its cash deposit instructions that CORE produced from such inputs and exported to the United States should be declared as subject to the rate associated with the country from which the input originated, if that country is subject to a CORE AD or CVD order.  If the country from which the input was obtained is not subject to a CORE AD or CVD order, then Ternium should enter the good as subject to the CORE Mexico AD and CVD rates.

*Ternium/Tenigal's Sales Rebuttal Brief:*

The following is a verbatim summary of argument submitted by Ternium/Tenigal.[179]  For further details, *see* Ternium/Tenigal's Sales Rebuttal Brief at 33-34.

> {Commerce} should not instruct {U.S.} Customs and Border Protection (CBP) to apply {} cash deposit rates based on the country where Ternium sourced the inputs to produce CORE in Mexico.  Ternium has clearly stated throughout this investigation that it reported all sales of CORE coated in Mexico regardless of the origin of the input ({}) used to produce it.  Further, Ternium identified in Field INPUTORIGIN the country in which the input used to produce the CORE was sourced, and {Commerce} verified this information.  Petitioners' request that

---

[176] *See, e.g., Aluminum Sheet from Romania*, 85 FR at 65358; *see also Non-Oriented Electrical Steel Prelim* PDM at 7-11, unchanged in *Non-Oriented Electrical Steel Final* IDM.

[177] *See* Ternium/Tenigal Final Sales Calculation Memorandum for further details.

[178] *See* Petitioners' Ternium/Tenigal Sales Case Brief at 9.

[179] *See* Ternium/Tenigal's Sales Rebuttal Brief at 2.  We have excluded any information that is business proprietary in nature from the verbatim summary of argument provided, as indicated by the brackets {} below.

{Commerce} apply findings from a different {} of different producers with different supply chains in a different country is contrary to the statute and regulations and should be rejected.

**Commerce's Position**:  We disagree with the petitioners that their prescribed cash deposit instructions that assign country-specific rates to the CORE based on the origin of the input used to produced that CORE if not sourced from Mexico are feasible or warranted in this investigation.  Commerce's LTFV investigation concerns CORE, a separate class or kind of merchandise, produced in Mexico, and whether such merchandise was sold in the United States at LTFV.  Under section 781 of the Act, Commerce conducts such a country-of-origin analysis within a circumvention inquiry, which considers whether foreign producers and exporters are evading existing AD or CVD orders, and only issues instructions of the type proposed by the petitioners if we have made an affirmative circumvention finding involving the finishing or completion in a third country of the inputs into the class or kind of merchandise covered by an AD or CVD order.  Such a finding does not currently exist with respect to CORE completed in Mexico.  We therefore disagree that Commerce should take into consideration the origin of the inputs to produce the subject merchandise.

Moreover, we disagree with Ternium/Tenigal that Commerce should further clarify what process(es) determines the origin of the CORE, as the description of subject merchandise in the scope is sufficient for this purpose in a LTFV investigation and the country of investigation is clearly defined.

## Comment 11: U.S. and Home Market Royalty Expenses and U.S. Insurance Expenses

*Ternium/Tenigal's Sales Case Brief*:

The following is a verbatim summary of argument submitted by the Ternium/Tenigal (internal citations omitted).[180]  For further details, *see* Ternium/Tenigal's Sales Case Brief at 30-31.

> {Commerce} accepted and verified corrected information for the royalty expenses reported in Fields ROYALH and ROYALU and for the domestic insurance expenses for US sales reported in Field INSUREU. {Commerce} should incorporate these minor corrections into the sales databases submitted by Ternium after the sales verifications using the programming language provided in Exhibit 1 to this brief.

*Petitioners' Sales Rebuttal Brief (on Ternium/Tenigal):*

The following is a verbatim summary of argument submitted by petitioners (internal citations omitted).[181]  For further details, *see* Petitioners' Ternium/Tenigal Sales Rebuttal Brief at 28-32.

> Ternium argues that, for purposes of its final results, Commerce should make certain adjustments to Ternium's reported data to account for corrections to

---

[180] *See* Ternium/Tenigal's Sales Case Brief at 4.
[181] *See* Petitioners' Ternium/Tenigal Sales Rebuttal Brief at 4-5.

ROYALU, ROYALH, and INSUREU that Ternium proffered during verification. With respect to ROYALU, Commerce did not accept this "correction" and, as Ternium concedes, the administrative record lacks data necessary to accurately correct ROYALU values for a material proportion of Ternium's U.S. sales. Even if Commerce were inclined to make some adjustment, the SAS language that Ternium proffers is flawed and would introduce inaccuracies if implemented. Commerce should therefore not use Ternium's programming language to adjust ROYALU and should not make an uneven adjustment only to ROYALH. Commerce should simply use the values for these two fields as reported in Ternium's post-verification U.S. and home market sales databases.

Similarly, with respect to INSUREU, Commerce described the reporting error as the double-counting of a defined category of expenses in both INSUREU and DIRSEL2U. However Commerce treats this issue for the final results, Commerce should not utilize Ternium's proposed SAS programming, which would adjust Ternium's INSUREU values in ways that are unpredictable and inconsistent with Commerce's description of the reporting problem.

**Commerce's Position:** While we accepted the minor correction to U.S. royalty expenses at verification as it related to the expense reported for the sales transactions reported in its original U.S. sales database, Ternium failed to identify in its description of this correction that it had included additional U.S. sales transactions in its updated U.S. sales database (*i.e.*, TerniumUS02) that were not included in Ternium's initial U.S. sales database (*i.e.*, TerniumUS01).[182] We are therefore unable to make any changes to the royalty expense reported for the U.S. sales that are included in the updated U.S. sales database that do not also appear in the original U.S. sales database. Moreover, there is no evidence on the record that the royalty expense reported for all of those additional sales included in Ternium's updated U.S. sales database is incorrectly reported for those additional sales. Accordingly, for the final determination, we have only incorporated the royalty expense reported in the original U.S. sales database for sales transactions that also appear in the updated U.S. sales database and necessarily appear in the corrected U.S. sales database (*i.e.*, TerniumUS03) Commerce requested Ternium to provide based on Commerce's verification findings. We have not incorporated Ternium/Tenigal's suggested SAS programming to make this correction but rather revised that SAS programming to make the correction to U.S. royalty expenses as described above because Ternium/Tenigal's suggested SAS programming assigns a weighted-average royalty expense to those additional sales at issue.[183]

For home market royalty expenses, we find that that the sales Ternium reported in its original home market sales database also appear in its updated home market sales database. However, to incorporate the correction accepted at verification, we have relied on the data in the freight revenue field reported in the original home market sales database (*i.e.*, TerniumHM01) as this data field is necessary for correctly recalculating royalty expenses based on the calculation formula reported in Ternium/Tenigal's initial and supplemental questionnaire responses and also

---

[182] *See* Ternium U.S. Sales Verification Report at 3 and verification exhibit SVE-US1A.
[183] *See* Ternium/Tenigal Final Sales Calculation Memorandum for further details.

45

in a verification exhibit for this expense.[184] In summary, we have applied this calculation formula to make the correction to these expenses in the corrected home market sales database that Commerce requested Ternium to provide based on Commerce's verification findings.[185] However, we have not used the exact SAS language proposed by Ternium in its case brief to make this correction as that SAS language does not recalculate this expense in an error free manner given the different manner in which Ternium reported its freight revenue field in its original home market sales database from its updated home market sales database.[186]

Finally, regarding Ternium's correction to the country of manufacture insurance expenses (*i.e.*, INSUREU) that Commerce accepted at verification, we find that the information is on the record that allows Commerce to remove the expenses from it that Ternium also reported in a separate data field (*i.e.*, DIRSEL2U) in the U.S. sales database.[187]

Galvasid/Perfiles Issues

**Comment 12:  Freight and Insurance Revenue**

*Petitioners' Sales Case Brief (on Galvasid/Perfiles)*:

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[188]  For further details, *see* Petitioners' Galvasid/Perfiles Sales Case Brief at 2.

> Section II.B. shows that Galvasid improperly included freight revenue and insurance revenue in its U.S. gross unit prices, inflating U.S. prices and decreasing its dumping margin.  Galvasid did so even though it reported these revenue items separately from its home market gross unit price.  Petitioners calculate an estimated amount by which Galvasid's reporting method overstated U.S. price.  In order to address this overstatement, Commerce must decrease U.S. price using facts otherwise available.

*Galvasid/Perfiles' Sales Rebuttal Brief:*

The following is a verbatim summary of argument submitted by Galvasid/Perfiles (internal citations omitted).[189]  For further details, *see* Galvasid/Perfiles' Sales Rebuttal Brief at 16-22.

> Petitioners contend that Galvasid overstated its U.S. prices by including separately invoiced freight and insurance revenue in its reported U.S gross unit price.  Petitioners are incorrect.  First, the sales verification report incorrectly states that the verifiers "found that Galvasid included freight revenue and insurance revenue,

---

[184] *See* Ternium/Tenigal's BCDQR at B-50, Ternium/Tenigal's BCSQR at 22-23, and the Ternium Home Market Sales Verification Report at verification exhibit SVE-1A.
[185] *See* Ternium Home Market Sales Verification Report at verification exhibit SVE-1A.
[186] *See* Ternium/Tenigal Final Sales Calculation Memorandum for further details.
[187] *Id.*; *see also* Ternium Home Market Sales Verification Report at 4, 24-25, 28 and verification exhibits SVEs 1A and 10K.
[188] *See* Petitioners' Galvasid /Perfiles Sales Case Brief at 2.
[189] *See* Galvasid/Perfiles' Sales Rebuttal Brief at 3-4.

46

which were separately listed on the sale invoices for Galvasid's U.S. sales, in Galvasid's calculation of U.S. gross unit price." However, all of Galvasid's U.S. invoices state the price on a delivered basis and do not separately identify amounts for freight or insurance revenue. And there is no evidence to suggest that Galvasid separately negotiated amounts for transport services with its customers. Numerous past decisions by the {CIT} have made clear that, absent such evidence, {Commerce} may not rely on purely internal company documents to determine whether there is a separate service-related revenue that may be capped.

Second, Petitioners' assertion that Galvasid reported gross unit prices for home-market sales in a manner inconsistent with its reporting for U.S. sales is false. Unlike its U.S. sales invoices, Galvasid's invoices for some home-market sales did state freight and/or insurance revenue as separate items on the invoice, and Galvasid properly reported those freight and/or insurance revenue amounts in the FRTREVH and INSUREVH fields of its home-market sales listing. Finally, there is no basis to apply adverse facts available based on Galvasid's reporting of its gross unit prices because Galvasid timely and fully complied with {Commerce's} requests for information and the evidence on the record confirms that Galvasid's reporting of its U.S. gross unit prices is fully accurate.

**Commerce's Position:** We agree with the petitioners. Commerce's practice is to exclude freight and insurance revenue from the calculation of gross unit price and instead cap these revenues by the expense amount when appropriate.[190] Commerce's AD Questionnaire includes instructions requesting the respondent report the revenues it receives in separate data fields in its sales database. Specifically, Commerce's AD Questionnaire instructs Galvasid to report all revenues and expenses incurred for the sale of subject merchandise in the United States:

> The fields listed above {for expenses in the Section C AD questionnaire} have been designed to capture all revenues and expenses you have incurred in selling the subject merchandise in the United States market. If there are additional revenues or expenses that are not reported above, such as export taxes incurred in the country of manufacture, create a field for each in the computer file, describe the revenue or expense in your narrative response, and include all calculation worksheets as attachments to your narrative response.[191]

While Commerce instructs that "the gross unit price less price adjustments should equal the net amount of revenue received from the sale" and "{i}f the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge," this instruction pertains to the reporting of the gross unit price.[192] The AD Questionnaire is explicit that companies should report all revenues incurred in selling the subject merchandise in the U.S., and that any types of revenue not already specifically included within the AD questionnaire should still be disclosed.

---

[190] *See e.g.*, *Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review and Final No Shipment Determination*, 77 FR 63291 (October 16, 2012), and accompanying IDM at Comment 6.
[191] *See* Commerce's Letter, "Request for Information" (AD Questionnaire) at C-37.
[192] *Id.* at C-16.

In this case, Galvasid failed to disclose in its questionnaire responses that it had included freight revenue and insurance revenue in its reported U.S. gross unit prices, or that it received these revenues in the U.S. market at all.[193] In fact, Commerce did not discover until verification that Galvasid included additional accounts containing freight and insurance revenue within its sales reconciliation, and that Galvasid received such revenue and had included the revenue in its reported U.S. prices.[194] Because Galvasid failed to also provide separate revenue data fields in its U.S. sales database, or disclose the existence of such revenues in the U.S. market, it was impossible for Commerce to determine whether the reporting of such expenses within the gross unit price was appropriate prior to verification, much less identify the amount of freight revenue and insurance revenue attributed to each individual gross unit price or which sales Galvasid also received freight and/or insurance revenue in its U.S. sales database.

As Commerce noted in its verification report, of the seven pre-select and on-site U.S. sales transactions examined at verification, all seven sales included freight revenue and one sale included both freight revenue and insurance revenue.[195] While we agree with Galvasid that our verification report inadvertently stated, incorrectly, that freight revenue was separately listed on the U.S. sales invoices for these transactions, and that the separation of freight revenue was instead included in the total invoice value and separately listed in the associated accounting vouchers presented in the sales traces, Commerce was nevertheless unaware of the fact that Galvasid was receiving these revenues. The record supports the fact that freight revenue was not reported to Commerce in the questionnaire response nor was there an explanation that freight revenue was included in the total invoice value.[196] Moreover, with respect to insurance revenue, we identified an instance where Galvasid issued a separate invoice.[197] Commerce was unable to determine or verify whether these revenues are not listed separately in all invoices, or if there were exceptions such as the one noted above, because we were previously unaware of the existence of the revenues in the U.S. market.

It was incumbent upon Galvasid to sufficiently develop the administrative record for Commerce to properly consider the appropriate treatment for the freight and insurance revenue. Commerce's regulations provide that "Commerce obtains most of its factual information in antidumping . . . duty proceedings from submissions by interested parties during the course of the proceeding."[198] The courts have found repeatedly that the obligation to develop the record rests with interested parties.[199] Here, a gap in the record exists to the extent that Galvasid failed

---

[193] *See* Galvasid's Letter, "Response Of Galvasid S.A. De C.V. To Section C Of The Department's November 18 Questionnaire," dated November 18, 2024, at C-21 (Galvasid's CQR).
[194] *See* Galvasid's Sales Verification Report.
[195] *Id.* at 13.
[196] *See* Galvasid's CQR.
[197] *See* Galvasid's Letter, "Sales Verification Exhibits," dated May 23, 2025, at Sales Verification Exhibit (SVE)-9M.
[198] *See* 19 CFR 351.301(a).
[199] *See QVD Food Co. v. United States,* 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("…the burden of creating an adequate record lies with interested parties…")); see also *NTN Bearing Corp. of Am. v. United States*, 997 F.2d 1453, 1458-59 (Fed. Cir. 1993); *Alloy Piping Prods. Inc. v. United States*, 201 F.Supp.2d 1267, 1284 (CIT 2002) ("The general rule with regard to a respondent's submission of data to {Commerce} during the course of an {antidumping duty} investigation or review is that the respondent bears the burden and responsibility of creating an accurate record within the statutory timeline."); and *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp.

to report all of its revenues and expenses, as directed in the AD questionnaire, and that Commerce was unable to verify whether Galvasid's treatment of freight and insurance revenue in the U.S. market was appropriate because the fact that Galvasid received these revenues was not known until verification. Accordingly, pursuant to sections 776(a)(1) and (2)(B)-(D) of the Act, we find that necessary information is missing from the record, was not provided in a timely manner or in the form or manner requested, significantly impeded the proceeding, and could not be verified. Furthermore, per section 776(b) of the Act, we find that Galvasid has not acted to the best of its ability to comply with our request for information. Accordingly, we determine that Galvasid failed to act to the best of its ability to comply with Commerce's requests for information and did not put forth maximum effort to provide Commerce with full and complete answers to all inquiries, per *Nippon Steel*.[200] Therefore, in accordance with section 776(b) of the Act and 19 CFR 351.308(a), we determine that an adverse inference is warranted when selecting from among the facts otherwise available.[201]

Based on the above, as partial adverse facts available, we find it appropriate to use the sample results provided by the petitioner for purposes of applying an estimated amount by which Galvasid's reporting method overstated U.S. price and decreasing all of Galvasid's reported U.S. gross unit prices by that estimated amount to account for the freight and insurance revenue included in Galvasid's reported gross unit prices. We find this estimated amount to be reliable given that it is based on Galvasid's data and Commerce's findings after examining the data.

**Comment 13: U.S. Warranty Expenses**

*Galvasid/Perfiles' Sales Case Brief*:

The following is a verbatim summary of argument submitted by Galvasid/Perfiles (internal citations omitted).[202] For further details, *see* Galvasid/Perfiles' Sales Case Brief at 8-9.

> {Commerce's} practice has long recognized that sellers cannot predict in advance which particular sales will experience defects or damage, and that the adjustment for items like warranty should therefore be based on the seller's historical experience. In accordance with that practice, Galvasid reported the warranty expenses for home-market and U.S. sales based on its average experience during the investigation period. However, {Commerce's} preliminary determination treated the warranty expense on individual U.S. transactions as direct selling expenses for the particular transactions on which the expenses were incurred and deducted the transaction-specific expenses from the sales prices for those individual transactions. {Commerce} should revise its calculations for the final determination to treat the average warranty expense for all U.S. sales as direct selling expenses

---

1008, 1015 (CIT 1992) ("the burden of creating an adequate record lies with {interested parties} and not with Commerce.").

[200] *See Nippon Steel*, 337 F. 3d at 1382.

[201] *See, e.g., Aluminum Sheet from Romania*, 85 FR at 65358; *see also Non-Oriented Electrical Steel Prelim* PDM at 7-11, unchanged in *Non-Oriented Electrical Steel Final* IDM.

[202] *See* Galvasid/Perfiles' Sales Case Brief at 2-3.

and not deduct transaction-specific expenses from the prices for the individual sales on which those expenses were incurred.

*Petitioners' Sales Rebuttal Brief (on Galvasid/Perfiles):*

The following is a verbatim summary of argument submitted by the petitioners (internal citations omitted).[203]  For further details, *see* Petitioners' Galvasid/Perfiles Sales Rebuttal Brief at 6-8.

> Section II.B. shows that Galvasid's request for Commerce to calculate its U.S. warranty expenses on the basis of its "average historical experience" was mooted by Galvasid's own failure to comply with Commerce's request for historical warranty expense information.  Because that information was absent from the record, Commerce calculated Galvasid's warranty expense using the information that was on the record – *i.e.*, transaction-specific warranty expenses for Galvasid's sales during the {POI}.  Calculating Galvasid's U.S. warranty expenses on a transaction-specific basis is in harmony with Commerce's regulations, is based on record information that Galvasid provided, and reflects Galvasid's actual expenses incurred selling subject merchandise.  Commerce should therefore make no change to its calculation method in the final determination.

**Commerce's Position:**  We disagree with Galvasid and have not relied on its averaging method for reporting the U.S. warranty expense in this investigation.  As a general matter, Commerce's practice is to require a respondent to report expenses on a transaction-specific basis.  Specifically, Commerce's standard market-economy questionnaire clearly directs the respondent to report this expense as specifically as possible to the product, and Galvasid/Perfiles was instructed accordingly:

> "Report the unit cost of warranty expenses incurred during the POI. Warranty expense should include only the direct expense less any reimbursement received from the customer or unaffiliated parts suppliers.  Report indirect warranty expenses as part of indirect selling expenses.  If you produce different models or types of the merchandise under investigation, warranty cost should be based upon your experience by model.  If this is impractical, express warranty cost on the most product-specific basis possible." [204]

In this case, Galvasid reported this expense on both a transaction-specific basis and by using an averaging method for the POI. Even though there is no apparent distortion using an average reporting method, our preference is to require the respondent to report this expense on the most product-specific basis as possible.[205]  Therefore, for the final determination, we have continued to use Galvasid's transaction-specific U.S. warranty expenses as provided in the field WRONGWARRU, which is the most specific manner of reporting that Galvasid was able to report expense as instructed by Commerce's questionnaire.

---

[203] *See* Petitioners' Galvasid Sales Rebuttal Brief at 1-2.
[204] *See* AD Questionnaire at C-29.
[205] *Id.*

50

## VI.     RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final determination of this investigation and the final dumping margins in the *Federal Register* and will notify the U.S. International Trade Commission of our determination.

☒                              ☐
_____                    _____
Agree                        Disagree


X   *Elouaradia*

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

Tab 20

Final Determination Margin Calculation Memorandum for
Galvasid S.A. de C.V.
(August 25, 2025)

PR-475, CR-866

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

A-201-863
Investigation
~~Business Proprietary Document~~
E&C VIII: KK
PUBLIC VERSION

MEMORANDUM TO:    The File

FROM:    Katerina Katsiadas
International Trade Compliance Analyst
AD/CVD Operations, Office VIII

THROUGH:    Faris Montgomery
Program Manager
AD/CVD Operations, Office VIII

RE:    <u>Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico</u>

SUBJECT:    Final Determination Margin Calculation Memorandum for Galvasid S.A. de C.V.

DATE:    August 25, 2025

---

This memorandum transmits the Department of Commerce's (Commerce's) final determination margin calculation for Galvasid S.A. de C.V. (Galvasid) in the above-referenced investigation.

Attachment 1 to the proprietary version of this memorandum consists of the comparison market program log and output. Attachment 2 to the proprietary version of this memorandum consists of the margin program log and output. The public version of this memorandum does not include these attachments.

Commerce used the following databases for calculating Galvasid's margin: 1. Home market sales database, named galvasidhm03, ACCESS barcode 4734341-08; 2. U.S. market sales database, named galvasidus03, ACCESS barcode: 4734341-09; 3. Cost of production database, named galvasidcop02, ACCESS barcode: 4734341-07.

## I.     Adjustments to the Comparison Market Program

### A.  Revision to Commercial Discounts (COMMDISCH)

As noted in the Issues and Decision Memorandum (IDM),[1] based on a minor correction reported at verification, we revised the commercial discounts reported for two sales that were incorrectly allocated.  Below is the SAS program language incorporating our verification findings.  *See* comparison market program at lines 723-725.

```
If SEQH = [    ] then COMMDISCH = [     ];

If SEQH = [    ] then COMMDISCH = [     ];
```

### B.  Revision to Warehousing Expense (WAREHSH)

As noted in the IDM, based on a minor correction reported at verification, we revised the warehousing expenses for two warehouses that were reported incorrectly.  Below is the SAS program language incorporating our verification findings.  *See* comparison market program at lines 727-729.

```
If WHSCODEH = [    ] then WAREHSH = [    ];

If WHSCODEH = [    ] then WAREHSH = [    ];
```

### C.  Revision to Warranty Expense (WARRH)

As noted in the IDM, based on a minor correction reported at verification, we revised the warranty expense to incorporate a correction to the warranty cost ratio. Below is the SAS program language incorporating our verification findings.  *See* comparison market program at lines 731-733.

```
RWARRH = 0.00;

RWARRH = GRSUPRH * [     ];
```

### D.  Revision to Credit Expense (CREDITH)

As noted in the IDM, based on a minor correction reported at verification, we  revised the credit expense to incorporate a correction to the calculation of the average interest rate for Mexican-Peso short-term borrowings. Below is the SAS program language incorporating our verification findings.  *See* comparison market program at lines 735-737.

```
RCREDITH = 0.00;
```

---

[1] *See* Memorandum, "Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated concurrently with this memorandum, at 4-5.

```
RCREDITH = GRSUPRH * ( AVGPAYDH / 365 ) * [    ];
```

### E.  Revision to Inventory Carrying Cost  (INVCARH)

We revised the inventory carrying cost expense due to the revision to thecredit expense above. Below is the SAS program language incorporating this change.  *See* comparison market program at lines 743-745.

```
RINVCARH = 0.00;
```

```
RINVCARH = INVCARH * [           ];
```

### F.  Revision to Packing Expense (PACKH)

As noted in the IDM, based on a minor correction reported at verification, we  revised the average per-unit packing cost which was incorrectly reported.  Below is the SAS program language incorporating our verification findings.  *See* comparison market program at lines 739-741.

```
RPACKH = 0.00;
```

```
RPACKH = [    ];
```

### G.  Partial AFA on Home Market Inland Freight to Customer Expense (INLFTCH)

As discussed in the IDM, Galvasid reported during verification that there was a systemic error in its reporting of the quantity used in the calculation of its reported home market inland freight expense, INLFTCH.  However, we did not accept this error as a minor correction at verification and therefore are applying the lowest reported inland freight to customer to all sales with this field reported. Below is the SAS program language incorporating this change.  *See* comparison market program at lines 747-749.

```
RINLFTCH = 0.00;
```

```
If INLFTCH GT 0 then RINLFTCH = [    ];
```

## II.      Adjustments to the Margin Calculation Program

### A.  Revision to Inland Freight and International Freight Expenses

As noted in the IDM, based on a minor correction reported at verification, we  revised Galvasid's freight expenses for channel 2 sales to correct a misallocation of expenses based on sales channels.  Below is the SAS program language incorporating this change.  *See* margin program at lines 958-964.

```
RDINLFTPU = 0.00;
```

```
If CHANNELU = '2' then RDINLFTPU = [    ];

RINTNFRU = INTNFRU;

If CHANNELU = '2' then RINTNFRU = [    ];
```

### B. Revision to International Freight Expense

As noted in the IDM, based on a minor correction reported at verification, we revised the international freight expense to correct errors to freight allocation by destination. Below is the SAS program language incorporating this change. *See* margin program at lines 966-1084.

```
If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];

If DESTU = [    ] then RINTNFRU = [    ];
```

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

If DESTU = [        ] then RINTNFRU = [        ];

```
If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];

If DESTU = [      ] then RINTNFRU = [      ];
```

### C. Partial AFA on U.S. Gross Unit Price

As discussed in Comment 12 of the IDM, during our review of the U.S. sales reconciliation and sales traces at verification, we found that Galvasid included freight revenue and insurance revenue in Galvasid's calculation of U.S. gross unit price. We do not have the ability to identify which sales are affected within the U.S. sales data. Therefore, as adverse facts available, we are applying a [    ] percent overall reduction to GRSUPRU, as this is the average amount by which U.S. prices were increased by the inclusion of freight and insurance revenue. Below is the SAS program language incorporating this change (*see* margin program at lines 1086 to 1088):

```
RGRSUPRU = 0.00;

RGRSUPRU = GRSUPRU * [    ];
```

### III.   Results of Differential Pricing Analysis

In order to determine whether to consider an alternative to the average-to-average (A-to-A) comparison method, Commerce performed a differential pricing analysis of Galvasid/Perfiles' U.S. sales. The results of the differential pricing analysis are as follows:

| Value of Passing Sales | Value of All Sales | U.S. Sales Passing the Differential Pricing Test |
|---|---|---|
| [            ] | [            ] | 92.05% |

The weighted-average dumping margins calculated using the two methodologies are shown below:

| STANDARD METHOD | A-to-T ALTERNATIVE METHOD |
|---|---|
| 24.05 | 24.16 |

Based on the results of the differential pricing analysis, Commerce finds that 92.05 percent of the value of U.S. sales pass the price difference test and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods. Further, Commerce determines that there is no meaningful difference between the weighted-average dumping margin calculated using the A-to-A method and the weighted-average dumping margin calculated using the A-to-T method. Thus, for this final analysis, Commerce is applying the A-to-A method to calculate the weighted-average dumping margin for Galvasid/Perfiles.

Tab 21

Final Affirmative Determination of Sales at
Less Than Fair Value, 90 Fed. Reg. 42187
(August 29, 2025)

PR-482

VIII. Recommendation

[FR Doc. 2025–16653 Filed 8–28–25; 8:45 am]

**BILLING CODE 3510–DS–P**

---

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

[A–201–863]

**Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that certain corrosion-resistant steel products (CORE) from Mexico are being, or are likely to be, sold in the United States at less than fair value (LTFV). The period of investigation (POI) is July 1, 2023, through June 30, 2024.

**DATES:** Applicable August 29, 2025.

**FOR FURTHER INFORMATION CONTACT:** Brian Smith or Katerina Katsiadas, AD/CVD Operations, Office VIII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–1766 or (202) 482–4929, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

On April 10, 2025, Commerce published in the **Federal Register** its preliminary affirmative determination in the LTFV investigation of CORE from Mexico, in which we also postponed the final determination to August 25, 2025, and invited interested parties to comment on the *Preliminary Determination.*[1] On July 18, 2025, Commerce issued a post-preliminary analysis memorandum in which we made certain changes to our differential pricing analysis.[2] We invited interested parties to comment on the Post-Preliminary Analysis.[3]

A summary of the events that occurred since Commerce published the Preliminary Determination, as well as a full discussion of the issues raised by parties for this final determination, may be found in the Issues and Decision Memorandum.[4] The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *https://access.trade.gov/public/FRNoticesListLayout.aspx.*

**Scope of the Investigation**

The product covered by this investigation is CORE from Mexico. For a full description of the scope of this investigation, *see* Appendix I.

**Scope Comments**

In the Preliminary Scope Memorandum, we set aside a period of time for parties to raise issues regarding product coverage (*i.e.,* scope) in scope-specific case briefs or other written comments.[5] We received scope case and rebuttal briefs from multiple interested parties. For a summary of the product coverage comments and rebuttal responses submitted to the record for this final determination, and accompanying discussion and analysis of all comments timely received, *see* the Final Scope Memorandum.[6] In the Final Scope Memorandum, Commerce made no changes to the scope language as it

appeared in the *Initiation Notice.*[7] *See* Appendix I.

**Verification**

As provided in section 782(i) of the Tariff Act of 1930, as amended (the Act), in April and May 2025, we conducted verification of the sales and cost information submitted by Ternium Mexico S.A. de C.V. (Ternium)/Tenigal, S.de R.L. de C.V. (Tenigal) (collectively, Ternium/Tenigal) and Galvasid S.A. de C.V. (Galvasid)/Perfiles LM, S.A. de C.V. (Perfiles) (collectively, Galvasid/Perfiles) for use in our final determination.[8] We used standard verification procedures, including an examination of relevant sales and accounting records, and original source documents provided by Ternium/Tenigal and Galvasid/Perfiles.

**Analysis of Comments Received**

All issues raised in case and rebuttal briefs submitted by interested parties in this investigation are addressed in the Issues and Decision Memorandum. A list of the issues addressed in the Issues and Decision Memorandum is attached to this notice at Appendix II.

**Changes Since the Preliminary Determination**

Based on our analysis of the comments received and our findings at verification, we made certain changes to Galvasid/Perfiles' and Ternium/Tenigal's margin calculations. For a discussion of these changes, *see* the Issues and Decision Memorandum.

**All-Others Rate**

Section 735(c)(5)(A) of the Act provides that the estimated weighted-average dumping margin for all other producers and exporters not individually investigated shall be an amount equal to the weighted-average of the estimated weighted-average

---

[1] *See Certain Corrosion-Resistant Steel Products From Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15349 (April 10, 2025) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[2] *See* Memorandum, "Post-Preliminary Analysis for the Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated July 18, 2025 (Post-Preliminary Analysis).

[3] *See* Memorandum, "Briefing Schedule," dated July 21, 2025.

[4] *See* Memorandum, "Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[5] *See* Memorandum, "Less-Than-Fair-Value Investigations of Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam, and Countervailing Duty Investigations of Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam: Preliminary Scope Decision Memorandum," dated April 3, 2025 (Preliminary Scope Memorandum).

[6] *See* Memorandum, "Less-Than-Fair-Value Investigations of Certain Corrosion-Resistant Steel Products from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam, and Countervailing Duty Investigations of Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam: Final Scope Decision Memorandum," dated concurrently with this notice (Final Scope Memorandum).

[7] *See Certain Corrosion-Resistant Steel Products from Brazil, Canada, Mexico, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations,* 89 FR 80204 (October 2, 2024) (*Initiation Notice*).

[8] *See* Memoranda, "U.S. Verification of the Sales Response of Ternium USA, Inc. in the Antidumping Duty Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated July 10, 2025; "Verification of the Sales Response of Ternium Mexico S.A. de C.V. in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated July 18, 2025; "Verification of the Cost Response of Ternium Mexico, S.A. de C.V. in the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated June 23, 2025; "Verification of the Sales Response of Galvasid S.A. de C.V. in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated July 11, 2025; and "Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated May 12, 2025.

dumping margins established for exporters and producers individually investigated excluding rates that are zero, *de minimis,* or determined entirely under section 776 of the Act, *i.e.,* facts otherwise available. Therefore, we calculated the all-others rate based on a weighted average of the dumping margins calculated for the mandatory respondents using each company's publicly ranged values for the merchandise under consideration.[9]

**Final Determination**

Commerce determines that the following estimated weighted-average dumping margins exist:

| Producer or exporter | Weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offset(s)) (percent) |
|---|---|---|
| Galvasid S.A. de C.V./Perfiles LM, S.A. de C.V .................................................................... | 24.05 | [10] 24.05 |
| Ternium Mexico S.A. de C.V./Tenigal, S.de R.L. de C.V ...................................................... | 14.17 | [11] 1.07 |
| All Others ............................................................................................................................. | 17.40 | 4.30 |

**Disclosure**

Commerce intends to disclose the calculations performed in connection with this final determination to interested parties within five days of any public announcement or, if there is no public announcement, within five days of the publication of the notice in the **Federal Register**, in accordance with 19 CFR 351.224(b).

**Continuation of Suspension of Liquidation**

In accordance with section 735(c)(1)(B) of the Act, Commerce will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all appropriate entries of subject merchandise, as described in Appendix I of this notice, which were entered, or withdrawn from warehouse, for consumption on or after April 10, 2025, the date of publication of the *Preliminary Determination* in the **Federal Register**.

Pursuant to section 735(c)(1)(B)(ii) of the Act and 19 CFR 351.210(d), where appropriate, Commerce will instruct CBP to require a cash deposit equal to the estimated weighted-average dumping margin or the estimated all-others rate, as follows: (1) the cash deposit rate for the respondents listed above will be equal to the company-specific estimated weighted-average dumping margin determined in this final determination; (2) if the exporter is not a company identified above but the producer is, then the cash deposit rate will be equal to the company-specific estimated weighted-average dumping margin established for that producer of the subject merchandise; and (3) the cash deposit rate for all other producers and exporters will be equal to the all-others estimated weighted-average dumping margin. These suspension of liquidation instructions will remain in effect until further notice.

To determine the cash deposit rate, Commerce normally adjusts the estimated weighted-average dumping margin by the amount of export subsidies countervailed in a companion CVD proceeding, when CVD provisional measures are in effect. Accordingly, where Commerce has made a final affirmative determination for countervailable export subsidies, Commerce offsets the estimated weighted-average dumping margin by the appropriate CVD rate. Commerce would adjust the cash deposit rate for export subsidies in the companion CVD investigation by the appropriate export subsidy rate; however, suspension of liquidation of provisional measures in the companion CVD proceeding has been discontinued.[12] Therefore, we are not instructing CBP to collect cash deposits based upon the adjusted estimated weighted-average dumping margin for those export subsidies at this time. If the U.S. International Trade Commission (ITC) makes a final affirmative determination of injury due to both dumping and subsidies, then the cash deposit rate will be revised effective on the date of the publication of the ITC's final affirmative determination in the **Federal Register** to be the company-specific estimated weighted-average dumping margin adjusted for export subsidies.

**U.S. International Trade Commission (ITC) Notification**

In accordance with section 735(d) of the Act, Commerce will notify the ITC of the final affirmative determination of sales at LTFV. Because Commerce's final determination is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports or sales (or the likelihood of sales) by reason of importation of CORE from Mexico, no later than 45 days after this final determination. If the ITC determines that such injury does not exist, this proceeding will be terminated, and all cash deposits posted will be refunded and suspension of liquidation will be lifted. If the ITC determines that such injury does exist, Commerce will issue an antidumping duty order directing CBP to assess, upon further instruction by Commerce, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation, as discussed above in the "Continuation of Suspension of Liquidation" section. In addition, we are making available to the ITC all non-privileged and non-proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under administrative protective order (APO), without the written consent of the Assistant

---

[9] We followed our normal practice, which is, with two respondents, we calculate (A) a weighted-average of the dumping margins calculated for the mandatory respondents; (B) a simple average of the dumping margins calculated for the mandatory respondents; and (C) a weighted-average of the dumping margins calculated for the mandatory respondents using each company's publicly-ranged values for the merchandise under consideration. We then compare (B) and (C) to (A) and select the rate closest to (A) as the most appropriate rate for all other companies. See Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part, 75 FR 53661, 53663 (September 1, 2010).

[10] See the unpublished companion CVD final determination, Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Countervailing Duty Determination, dated concurrently with this memorandum.

[11] Id.

[12] See section 703(d) of the Act, which states that the provisional measures may not be in effect for more than four months, which in the companion CVD case is 120 days after the publication of the preliminary determination, or June 9, 2025 (i.e., the last day provisional measures are in effect).

Secretary for Enforcement and Compliance.

## Administrative Protective Order (APO)

This notice will serve as a final reminder to parties subject to an APO of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

## Notification to Interested Parties

This determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Act, and 19 CFR 351.210(c).

Dated: August 25, 2025.

**Abdelali Elouaradia,**
*Deputy Assistant Secretary for Enforcement and Compliance.*

## Appendix I

### Scope of the Investigation

The products covered by this investigation are certain flat-rolled steel products, either clad, plated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished, laminated, or coated with plastics or other non-metallic substances in addition to the metallic coating. The products covered include coils that have a width of 12.7 mm or greater, regardless of form of coil (*e.g.,* in successively superimposed layers, spirally oscillating, etc.). The products covered also include products not in coils (*e.g.,* in straight lengths) of a thickness less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness. The products covered also include products not in coils (*e.g.,* in straight lengths) of a thickness of 4.75 mm or more and a width exceeding 150 mm and measuring at least twice the thickness. The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process, *i.e.,* products which have been "worked after rolling" (*e.g.,* products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above:

(1) Where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

(2) where the width and thickness vary for a specific product (*e.g.,* the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, etc.), the

measurement at its greatest width or thickness applies.

Steel products included in the scope of this investigation are products in which: (1) iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less, by weight.

Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching and/ or slitting or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the in-scope corrosion resistant steel.

All products that meet the written physical description are within the scope of this investigation unless specifically excluded. The following products are outside of and/or specifically excluded from the scope of this investigation:

• Flat-rolled steel products either plated or coated with tin, lead, chromium, chromium oxides, both tin and lead ("terne plate") or both chromium and chromium oxides ("tin free steel"), whether or not painted, varnished or coated with plastics or other nonmetallic substances in addition to the metallic coating;

• Clad products in straight lengths of 4.7625 mm or more in composite thickness and of a width which exceeds 150 mm and measures at least twice the thickness;

• Certain clad stainless flat-rolled products, which are three-layered corrosion-resistant carbon steel flat-rolled products less than 4.75 mm in composite thickness that consist of a carbon steel flat-rolled product clad on both sides with stainless steel in a 20%-60%-20% ratio.

The products subject to this investigation are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7210.30.0030, 7210.30.0060, 7210.41.0000, 7210.49.0030, 7210.49.0040, 7210.49.0045, 7210.49.0091, 7210.49.0095, 7210.61.0000, 7210.69.0000, 7210.70.6030, 7210.70.6060, 7210.70.6090, 7210.90.6000, 7210.90.9000, 7212.20.0000, 7212.30.1030, 7212.30.1090, 7212.30.3000, 7212.30.5000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7212.60.0000, 7225.91.0000, 7225.92.0000, 7226.99.0110, and 7226.99.0130.

The products subject to this investigation may also enter under the following HTSUS item numbers: 7210.90.1000, 7215.90.1000, 7215.90.3000, 7215.90.5000, 7217.20.1500, 7217.30.1530, 7217.30.1560, 7217.90.1000, 7217.90.5030, 7217.90.5060, 7217.90.5090, 7225.99.0090, 7226.99.0180, 7228.60.6000, 7228.60.8000, and 7229.90.1000.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of this investigation is dispositive.

## Appendix II

### List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Changes Since the *Preliminary Determination*

IV. Application of Facts Available and Use of Adverse Inferences
V. Discussion of the Issues
   Comment 1: Use of Zeroing
   Comment 2: Flaws in Applying the New Differential Price Test
   Comment 3: Use of Average-to-Average Method
   Comment 4: Use of Facts Otherwise Available With An Adverse Inference
   Comment 5: Multiple Costs Reported for the Same Control Number
   Comment 6: Adjusting Cost of Manufacture for Unreconciled or Unexplained Differences
   Comment 7: Adjusting Affiliated Purchase Prices to Reflect Actual Market Prices
   Comment 8: Treatment of Certain Excluded Expenses
   Comment 9: U.S. Warehousing Expenses, Home Market and U.S. Freight Expenses, and Home Market Credit Expenses (Calculated Using Average Payment Dates)
   Comment 10: Cash Deposit Instructions
   Comment 11: U.S. and Home Market Royalty Expenses and U.S. Insurance Expenses
   Comment 12: U.S. Freight and Insurance Revenue
   Comment 13: U.S. Warranty Expenses
VI. Recommendation

[FR Doc. 2025–16605 Filed 8–28–25; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–602–812]

### Certain Corrosion-Resistant Steel Products From Australia: Final Affirmative Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that imports of certain corrosion-resistant steel products (CORE) from Australia are being, or are likely to be, sold in the United States at less than fair value (LTFV) for the period of investigation (POI) of July 1, 2023, through June 30, 2024.

**DATES:** Applicable August 29, 2025.

**FOR FURTHER INFORMATION CONTACT:** Krisha Hill, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–4037.

**SUPPLEMENTARY INFORMATION:**

### Background

On April 10, 2025, Commerce published in the **Federal Register** its

Tab 22

Galvasid's Final Determination Ministerial Error
Comments (September 2, 2025)

PR-483, CR-869



JEFFREY M. WINTON
JWINTON@WINTON.LAW
+1.202.774.5503

September 2, 2025

Case No. A-201-863
Total Pages: 11
Investigation
AD/CVD Operations, Office VIII
Proprietary Information Removed
   from Page 6
Public Version

<u>By Electronic Filing</u>

Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
Constitution Ave. & 14th St., NW
Washington, DC  20230

**Public Version**

Re:  Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel
     <u>Products from Mexico — Final Determination Ministerial Error Comments</u>

Dear Secretary of Commerce,

In accordance with the schedule established by the Department in this proceeding,[1]

we are writing on behalf of Galvasid, S.A. de C.V. ("Galvasid") to request that the

Department correct a ministerial error in its Final Determination in the above-referenced

investigation of Certain Corrosion-Resistant Steel Products from Mexico.

In the Final Determination, the Department applied partial adverse facts available

("AFA") to decrease Galvasid's reported U.S. gross unit prices by an estimated amount "to

account for the freight and insurance revenue included in Galvasid's reported gross unit

---

[1] *See* Department's August 27, 2025, Deadline for Ministerial Error Concerning Final
Determination Memorandum.

prices."[2]  However, the Department's decision to apply partial AFA to Galvasid's U.S.

prices to "account for freight and insurance revenue" overlooked record evidence, is

contrary to the established methodology, and must be corrected.

    1.   *The Department's Application of AFA to*
           *Galvasid Was Based on a Factual Error that*
           *Ignores Irrefutable Evidence on the Record*

In its Final Determination, the Department gave the following explanation of its

application of partial AFA to Galvasid:

> In this case, Galvasid failed to disclose in its questionnaire responses
> that it had included freight revenue and insurance revenue in its
> reported U.S. gross unit prices, or that it received these revenues in the
> U.S. market at all.[3]

That statement is incorrect.  As explained in Galvasid's Section C response, Galvasid's

U.S. sales were made either on a DDP or CIF basis.[4]  And, Galvasid reported the sales

terms for all U.S. sales as either DDP or CIF in its U.S. sales listing, which the Department

verified without issue.[5]  The term DDP stands for "*delivered*, duty paid" and the term CIF

stands for "cost, *insurance, and freight.*"  Therefore, the prices for such sales, by

definition, include freight and insurance to transport the merchandise from Galvasid's

plant to the location designated by the customer.  And, the Department has consistently

---

[2] *See* Department's August 25, 2025, Issues and Decision Memorandum (hereinafter "Final I&D Memorandum") at cmt. 12.

[3] *Id.*

[4] *See* Galvasid's January 13, 2025, Section C Response at 14, 17-18; 27-28 and 30-33.

[5] *See* Galvasid's March 20, 2025, U.S. Sales Database and Galvasid's August 4, 2025, Rebuttal Brief at 16-20.  *See also*, Department's July 11, 2025, Sales Verification Report for Galvasid at 14.

WINTON & CHAPMAN
PLLC

found that the reported sales term is sufficient evidence of whether freight and insurance

are included in the invoice price.[6]

Furthermore, Galvasid's Section C response explained that because freight and

insurance were included in the invoice price under these sales terms, the related expenses

were being reported as reductions to the reported gross unit price.  For example, Galvasid

reported in its Section C response that:

> As mentioned, Galvasid's sales of CORE products to Puerto Rico
> during the investigation period were made on a CIF basis.  The
> merchandise for those sales was transported from Gavalsid's plant in
> Apodaca to the port of Altamira by unaffiliated trucking companies,
> and then from the port to Puerto Rico by unaffiliated marine transport
> carriers.  The cost for transport from Galvasid's Apodaca plant to the
> port of Almira has been reported in the "DINLFTPU" field in the sales
> listing provided in Appendix C-1, and the cost of sea transport to
> Puerto Rico has been reported in the "INTNFRU" field.  The

---

[6] *See e.g.*, *Polyester Textured Yarn from Thailand: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 58883 (Oct. 25, 2021), and accompanying Issues and Decision Memorandum (hereinafter "*Polyester Textured Yarn from Thailand I&D Memo*") at 25 (ACCESS Barcode:  4173539-02) (recognizing that "{f}or CIF and DDP sales, the price that Sunflag charges to its customers includes freight and insurance in accordance with CIF and DDP terms of sale…{and, therefore,} the unit price which appears in the invoice is the final agreed/negotiated price based on the terms of sale and is inclusive of freight and insurance"); *Welded Stainless Pressure Pipe From India: Amended Final Results of Antidumping Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 48442 (July 27, 2023), and accompanying Issues and Decision Memorandum at 7 (ACCESS Barcode:  4385064-02) (recognizing that that the price included ocean freight "{b}ecause sales were made on a DDP basis"); and *Common Alloy Aluminum Sheet from India: Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 Fed. Reg. 76724 (Nov. 7, 2023), and accompanying Issues and Decision Memorandum at cmt. 1 (ACCESS Barcode:  4456562-02) (the Department declined to find that the respondent had incorrectly reported its U.S. price when the sales terms clearly indicated that the price would be inclusive of freight and duty).

It should be noted that Galvasid also explained in its briefing to the Department how the reported sales terms indicated that freight and insurance were included in the U.S. sales price.  *See* Galvasid's August 4, 2025, Sales Rebuttal Brief at 18.

calculation of the reported international freight cost for a sample transaction is provided in Appendix C-12.

Galvasid's other sales of CORE products to U.S. customers during the investigation period were made through direct shipments on a DDP basis from Galvasid's plant in Apodaca to the destination in the United States designated by the unaffiliated U.S. customer. The merchandise was transported from Galvasid's Apodaca plant to the destination designated by the customer using unaffiliated trucking companies, some of which invoiced Galvasid in Mexican Pesos, and others of which invoiced Galvasid in U.S. dollars. The cost of transportation for shipments for which the transportation company invoiced Galvasid in Mexican Pesos has been reported in "INTNFRU" field in the sales listing provided in Appendix C-1.[7]

Indeed, pursuant to the statute and the Department's questionnaire instructions, if freight and insurance were not included in the invoice price, it would not have been appropriate to report these expenses as a reduction to gross unit price.[8] Thus, the fact that Galvasid reported all U.S. sales were made either on a DDP or CIF basis and reported the related freight and insurance expenses in its Section C response confirm that Galvasid fully disclosed to the Department in its questionnaire responses that the invoice price for U.S. sales included an amount for freight and insurance.

---

[7] *See* Galvasid's January 13, 2025, Section C Response at 27-28. *See also id*. at 33-34 ("As mentioned, Galvasid's sales of CORE products to Puerto Rico during the investigation period were made on a CIF basis. *Accordingly, Galvasid was responsible for transport from its plant to the port in Puerto Rico,* and its customer was responsible for U.S. customs clearance and for any transport costs from the port to the final destination.").

[8] *See* 19 U.S.C. § 1677a(c)(2) (explaining that export price and constructed export price may only be reduced by the costs "incident to bringing the subject merchandise" from the original location to the United States if such costs were "*included in such price*") (emphasis added). *See also* Department's November 18, 2025, Initial Questionnaire at B-22 and C-20 ("Report the information requested concerning the direct cost incurred to bring the merchandise from the original place of shipment to the customer's place of delivery *if included in the price charged to your customer*.).

WINTON & CHAPMAN
PLLC

It appears that the Department failed to recognize that Galvasid's U.S. invoice price included freight and insurance — despite the reported terms of sale that included freight and insurance — because Galvasid did not report separate fields for freight and insurance "revenue" in its U.S. sales listing unlike its home-market sales listing.[9] However, Galvasid was not required to separately report the amount of freight and insurance included in the invoice price as "revenue" for its U.S. sales.

The Department's questionnaire instructions explain what "revenues" are required to be reported in separate fields. The Department's questionnaire states that:

> The gross unit price less price adjustments should equal the net amount of revenue received from the sale. *If the invoice to your customer includes separate charges* for other services directly related to the sale, such as a charge for shipping, *create a separate field for reporting each additional charge.*[10]

This means that Galvasid would have additional "revenues" to report *only if* the amount of freight and insurance included in the invoice price was separately identified on the invoice to its customers.[11] Notably, the Department's questionnaire instructions are consistent with the Department's practice of "capping" service revenue by the related expense. In that regard, pursuant to the statute, the Department only "caps" such service revenue when the amount charged for the service is separately negotiated with the customer.[12] The

---

[9] *See* Final I&D Memorandum at 47.

[10] *See* Department's November 18, 2025, Initial Questionnaire at B-18 and C-16.

[11] *See also Polyester Textured Yarn from Thailand* I&D Memo at cmt. 10.

[12] *See id*. (the Department explained that "…consistent with section 772a(c) of the Act, it is our practice to cap separately negotiated sales related revenues in our calculations"). *See also ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1220 (Ct. Int'l Trade 2018) (explaining that "There {is} no dispute that the use of the cap was appropriate to reflect

(continued)

WINTON & CHAPMAN
PLLC

Department is not permitted to "cap" service revenue included in the invoice price of subject merchandise when the invoice does not separately identify the amount of the service being charged to the customer.[13]

In the Final Determination, the Department confirmed that there was an incorrect statement in the verification report and that the invoices related to Galvasid's U.S. sales, in actuality, did *not* separately identify the amount charged for freight or insurance.[14]  In these circumstances, there was no additional "revenue" to report in separate fields in the

_____

(continued)
service revenues negotiated between Hyosung and its customers. That is not the case with respect to certain of Hyundai's service-related revenues that are only reflected in internal documentation. Here, the inquiry is whether Commerce may rely on internal company communications, rather than documentation or communications shared with the unaffiliated customer, to determine that there is separate service-related revenue to cap. The court concludes that it may not.").

[13] *See id*.  *See also Hyundai Heavy Indus. Co. v. United States*, 393 F. Supp. 3d 1293, 1308 (Ct. Int'l Trade 2019) (holding that "Absent substantial evidence to support a finding that Hyosung's provision of the services identified in the OAF was separately negotiable with the unaffiliated customer, Commerce lacked a legal basis to reduce the gross unit price and fault Hyosung for failing to report this information" separately as revenue).

[14] *See* Final I&D Memorandum at 48.

   It should be noted that there is an incorrect statement in the Final Determination as well. The Department stated that it "identified an instance where Galvasid issued a separate invoice" for insurance revenue in Sales Verification Exhibit ("SVE") 9M.  *See id*. at 48 and note 197.  However, an examination of the sales trace provided in SVE-9M confirms that *no* invoice was issued from Galvasid to its U.S. customer ([                              ]) for insurance.  *See* Galvasid's May 23, 2025, Sales Verification Exhibits at SVE-9M. Instead, there was a *credit* from Galvasid to the customer as compensation for damaged merchandise, and an invoice from Galvasid to the insurance provider ([                    ]) for compensation.  *See id*. at 15 and 17.  The payment from the insurer (in Mexican pesos) was the same as the credit given to the customer (when converted to Mexican pesos).  *See id*. at 16 and 18.

sales listing for Galvasid's U.S. sales.[15] Therefore, consistent with the Department's questionnaire instructions (as well as the statute, case law, and long-standing agency practice), Galvasid correctly reported the gross unit price based on the invoice price without separately reporting an amount for freight or insurance "revenue" for its U.S. sales.[16] And, in turn, the Department is not permitted to "cap" the amount of freight and insurance included in the U.S. invoice price.[17]

In short, the record confirms that Galvasid did inform the Department that freight and insurance were included in the U.S. invoice price prior to verification and the amount of freight and insurance included in the invoice price was not required to be separately reported "revenue" in the U.S. sales listing subject to a "cap."

2.    *The Department Has the Authority
       and Responsibility to Correct Its Error*

The Department has held in past cases that the "ministerial error" procedures can be used to correct determinations, including a determination to apply AFA, that "overlooked" record information. In the investigation of *Shrimp from Ecuador,* for example, the

---

[15] By contrast, for certain home-market sales, Galvasid's invoice did separately identify the amount freight included in the price. Accordingly, Galvasid reported the freight revenue in separate fields for home-market sales.

[16] *See e.g., Polyester Textured Yarn from Thailand* I&D Memo at cmt. 10 (confirming that the respondent was not required to separately report an amount for freight and insurance revenue included in the invoice price because "no freight and insurance revenues were separately negotiated and recovered from the customer").

[17] *See id*. at cmt. 1 and 10 (declining to apply AFA and finding that the Department's practice of "capping" service revenue did not apply to the respondent "because Sunflag has not reported freight revenues, and the record does not suggest that Sunflag should have done so…" given that "no freight and insurance revenues were separately negotiated and recovered from the customer").

Department used the "ministerial error" procedure to recalculate the rate assigned to a respondent where it found that its final determination had "inadvertently overlooked information that Santa Priscila submitted in its supplemental questionnaire response and pre-preliminary comments indicating the adjusted tax deduction amount it and Produmar reported." [18] Similarly, in *Iron Mechanical Transfer Drive Components from China,* the Department revised its calculation of the respondent's costs where it found that its final determination had "inadvertently overlooked" reported consumption figures.[19] As the Department explained in that case, "This is a type of unintentional error similar to the errors identified as ministerial errors in the regulations and thus it constitutes a ministerial error within the meaning of 19 CFR 351.224(f)."[20] And, in *Certain Frozen Warmwater Shrimp from India*, the Department reversed its application of AFA to a respondent in the final determination where the Department was mistaken that the respondent had not reported quantity-and-value information.[21] The Department explained in that case, that reversal of AFA was a ministerial error correction consistent with "section 751(h) of the

---

[18] *See Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation*, 89 Fed. Reg. 31722-01 (April 25, 2024), and accompanying Memorandum at 4 (ACCESS Barcode: 4546321-02).

[19] *See* Department's November 28, 2016, Ministerial Error Memorandum in the *Less-Than-Fair-Value Investigation of Certain Iron Mechanical Transfer Drive Components from the People's Republic of China* at 3 (ACCESS Barcode: 3526646-01).

[20] *Id*.

[21] *See Certain Frozen Warmwater Shrimp from India: Amended Final Results of Antidumping Duty Administrative Review and Rescission In Part*, 72 Fed. Reg. 60638 (Oct. 25, 2007).

Act."[22]

The Department's past decisions also confirm that a failure to follow the statutorily-required scheme constitutes a correctible ministerial error.[23]  In this case, the statute is clear:  When freight and insurance are "included" in the price from the seller to its customer, the Department must deduct the *costs* of providing freight and insurance from the invoice price.[24]  There is no basis for any further adjustment to disaggregate the price between the merchandise and freight-and-insurance services and then "cap" the amount for freight-and-insurance services when those amounts were not separately negotiated with the customer.

The Department's analysis in this case was factually wrong because it overlooked record information, and its methodology was contrary to the statutory scheme because it effectively double-counted the freight and insurance costs by making an AFA adjustment for the supposed "revenue" and a separate adjustment for the actual costs incurred.  The Department must not allow such an error to stand, and should correct the error consistent with its past decisions.

*          *          *

We request confidential treatment for this submission, which contains highly-sensitive business proprietary information, the release of which could cause substantial harm to

---

[22] *Id*.

[23] *See Certain Stainless Steel Wire Rods from France: Amended Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 25915 (May 12, 1997) (finding that correcting the constructed-export-price profit calculation to reflect the Department's normal methodology set forth in the statute constituted a ministerial error correction).

[24] *See* 19 U.S.C. §1677A(c)(2)(A).

Galvasid.  The information for which proprietary treatment is requested has been bracketed

("[ ]") in this letter and in the enclosed attachments.  We agree to the release of this

information under an appropriately-drawn administrative protective order, and understand

that a copy of the business proprietary version of this submission will be made available to

the parties granted access to proprietary information in this proceeding through the

Department's ACCESS system.  In accordance with the Department's regulations, we will

submit the public version of this submission today under separate cover.

Please do not hesitate to contact us if you have any questions.

Respectfully submitted,

/s/ Jeffrey M. Winton
Jeffrey M. Winton
Amrietha Nellan
Rachel Hauser
Gi Beom Ryu
  *Foreign Trade Consultant*

Counsel to Galvasid, S.A. de C.V

WINTON & CHAPMAN
PLLC

U.S. DEPARTMENT OF COMMERCE
PUBLIC CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing submission is being served this 2nd day of

September, 2025, via ACCESS,[1] on the following parties:

| | |
|---|---|
| Stephanie M. Bell, Esq.<br>Wiley Rein LLP<br>2050 M Street, NW<br>Washington, DC 20036<br>sbell@wiley.law | Thomas M. Beline, Esq.<br>Cassidy Levy Kent (USA) LLP<br>2112 Pennsylvania Ave, NW<br>Suite 300<br>Washington DC 20037<br>tbeline@cassidylevy.com |
| Roger B. Schagrin, Esq.<br>Schagrin Associates<br>900 7th Street, NW<br>Washington, DC 20001<br>rschagrin@schagrinassociates.com | Stephen P. Vaughn, Esq. p<br>King & Spalding LLP<br>1700 Pennsylvania Ave, NW<br>Washington, DC 20006<br>svaughn@kslaw.com |
| David E. Bond, Esq.<br>White & Case LLP<br>701 Thirteenth Street, NW<br>Washington, DC 20005-3807<br>dbond@whitecase.com | Robert George Gosselink, Esq.<br>Trade Pacific PLLC<br>700 Pennsylvania Avenue, SE<br>Suite 500<br>Washington, DC 20003<br>rgosselink@tradepacificlaw.com |
| John Anwesen, Esq.<br>Lighthill PC<br>300 New Jersey Ave, NW<br>Suite 300<br>Washington, DC 20001<br>j.anwesen@lighthilltrade.com | Antonino Bertoni<br>Government of Mexico<br>Pachuca 189, Col. Condesa, C.P.<br>06140, Cuauhtemoc, CDMX<br>antonino.bertoni@economia.gob.mx |

/s/ Jeffrey M. Winton
Jeffrey M. Winton

---

[1] *See* 19 C.F.R. § 351.303(f)(1)(i) ("Service of a public document or public version of a business proprietary document is effectuated on the persons on the public service list upon the electronic filing of the submission in ACCESS, unless it is filed manually in accordance with paragraph (b)(2) of this section, or ACCESS is unavailable.") (effective October 30, 2023).

Tab 23

Petitioners' Final Determination Ministerial Error Comments
(Sept 2, 2025)

PR-484, CR-870

September 2, 2025

DOC Inv. No. A-201-863
Total Pages: 4
POI: 7/1/2023 - 6/30/2024
AD/CVD Operations, Office VIII

**PUBLIC VERSION**
Business Proprietary Information Released
Under APO Removed from Page 2

**VIA ELECTRONIC FILING**
The Honorable Howard Lutnick
Secretary of Commerce
International Trade Administration
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

  **Re:** **Certain Corrosion-Resistant Steel Products from Mexico: Ministerial Error
Comments on Final Determination**

Dear Secretary Lutnick:

On behalf of Steel Dynamics, Inc., United States Steel Corporation, Wheeling-Nippon

Steel, Inc., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied

Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Petitioners"),

we hereby request that the U.S. Department of Commerce ("Commerce") correct a ministerial

error in the final dumping margin calculations for Galvasid S.A. de C.V. ("Galvasid") in the

**PUBLIC VERSION**

above-referenced investigation. This submission does not contain new factual information and is timely filed in accordance with the deadline established by Commerce.[1]

A "ministerial error" is defined to include errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which Commerce considers ministerial.[2] The error described below regarding Galvasid's interest expense ("INTEX") ratio falls within this definition and should be corrected by Commerce.

In Galvasid's list of minor corrections presented to Commerce at the start of the cost verification, Galvasid identified an error in the calculation of its INTEX ratio.[3] As demonstrated in its calculation, the INTEX ratio was revised from [       ] percent to [       ] percent.[4] However, in the final margin calculations, Commerce inadvertently applied the original INTEX ratio of [       ] percent instead of Galvasid's corrected ratio of [       ] percent.[5] As currently reflected in Commerce's comparison market program, the interest expense calculation reads:

[                                                                    ]

To correct this error, Commerce should revise [               ] to read:

[                                                                    ]

The error discussed above constitutes a "ministerial error" because it is an unintentional and/or clerical error. Petitioners therefore respectfully request that Commerce correct this error

---

[1] *See* 19 C.F.R. § 351.224(c)(2)(i).

[2] *See* 19 C.F.R. § 351.224(f).

[3] *See* Galvasid's Cost Verification Minor Corrections (May 7, 2025) at 2 and Attachment 6.

[4] *Id.* at Attachment 6.

[5] *See* Commerce's Final Determination Margin Calculation Memorandum for Galvasid S.A. de C.V. (Aug. 25, 2025), at Attachment 1, Log line [       ].

2

**PUBLIC VERSION**

and issue an amended final determination with a recalculated weighted-average dumping margin

for Galvasid and all other producers and exporters.

Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

/s/ Roger B. Schagrin
Roger B. Schagrin
Jeffrey D. Gerrish
Luke A. Meisner
Nicholas C. Phillips*
David Albright, *Senior Analyst*

/s/ Thomas M. Beline
Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Margaret E. Monday
Catherine J. Cartsos, *Sr. Int'l Trade Advisor*
Matthew P. Berrigan, *Trade Accountant*

**SCHAGRIN ASSOCIATES**
*Counsel to Steel Dynamics, Inc. and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC*

**CASSIDY LEVY KENT (USA) LLP**

*Counsel to United States Steel Corporation and Wheeling-Nippon Steel, Inc.*

*Admitted only in New York. Practice limited to federal courts and agencies.

3

# <u>CERTIFICATE OF SERVICE</u>

**Corrosion-Resistant Steel Products from Mexico**

**A-201-863**
**Investigation**

I, Steve Satchell, hereby certify that copies of the attached *public version* document were served on September 2, 2025, via ACCESS electronic service:

Stephanie M. Bell, Esq.
**Wiley Rein LLP**
2050 M Street, NW
Washington, DC 20036

Thomas M. Beline, Esq.
**Cassidy Levy Kent (USA) LLP**
2112 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20037

Stephen P. Vaughn, Esq.
**King & Spalding LLP**
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706

David E. Bond, Esq.
**White & Case LLP**
701 Thirteenth Street, NW
Washington, DC 20005-3807

Robert George Gosselink, Esq.
**Trade Pacific PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003

Jeffrey M. Winton, Esq.
**Winton & Chapman PLLC**
1100 13th Street NW
Suite 825
Washington, DC 20005

Antonino Bertoni
**Government of Mexico**
Ministry of Economy of Mexico
Pachuca 189, Col. Condesa, C.P. 06140
Cuauhtemoc, CDMX

John Anwesen, Esq.
**Lighthill PC**
300 New Jersey Avenue, NW
Suite 300
Washington, DC 20001

/s/ *Steve Satchell*
Steve Satchell
SCHAGRIN ASSOCIATES

Tab 24

Petitioners' Response to Galvasid's Ministerial Error Comments
(September 8, 2025)

PR-486

September 8, 2025

DOC Case No. A-201-863
Total Pages: 7
Investigation
AD/CVD Operations Office VIII

**PUBLIC DOCUMENT**

The Honorable Howard Lutnick
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
1401 Constitution Avenue N.W.
Washington, D.C. 20230

Re:  *Certain Corrosion-Resistant Steel Products from Mexico:* **Petitioners'
Response to Galvasid's Ministerial Error Comments**

Dear Secretary Lutnick:

On behalf of Steel Dynamics, Inc., United States Steel Corporation, Wheeling-Nippon

Steel, Inc., and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied

Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Petitioners"),

we hereby respond to the ministerial error comments filed by Galvasid, S.A. de C.V.

("Galvasid") in the above-referenced investigation. This filing does not contain any new factual

information and is timely filed within five days of Galvasid's comments.[1] As discussed below,

the U.S. Department of Commerce ("Commerce") did not err – let alone commit a ministerial

error – in its determination to apply partial adverse facts available ("AFA") to Galvasid's

reported gross U.S. unit prices based on Galvasid's failure to accurately report freight and

---

[1] *See* Letter from Galvasid to Commerce re: *Less-Than-Fair-Value Investigation of Certain
Corrosion-Resistant Steel Products from Mexico – Final Determination Ministerial Error
Comments* (Sept. 2, 2025) ("Galvasid Ministerial Error Comments").

insurance revenue that had been included in those prices.[2] What Galvasid styles as "ministerial error comments" are in fact an improper attempt to rehash substantive arguments that Galvasid previously asserted and that Commerce has already rejected on this issue. The error alleged by Galvasid is methodological, rather than ministerial, in nature. Galvasid's arguments must, therefore, be rejected.

Galvasid does not bother to ground its comments in the legal standard for ministerial errors. This omission is understandable, because the standard completely forecloses Galvasid's arguments. As the statute and Commerce's regulations make clear, a "ministerial error" is an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which Commerce considers ministerial.[3] The U.S. Court of Appeals for the Federal Circuit has held that an alleged error that "is not an arithmetic or clerical error or similar inadvertent mistake…does not fall within the statutory definition of 'ministerial error.'"[4] This includes alleged errors that "are methodological in nature."[5] Accordingly, Commerce routinely rejects allegations that mischaracterize methodological decisions – including the decision to apply AFA – as ministerial in nature.[6] Where the purported error relates to Commerce's substantive methodological choice,

---

[2] *See Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less Than Fair Value in the Investigation of Certain Corrosion-Resistant Steel Products from Mexico* (Aug. 25, 2025) ("IDM") at Comment 12.

[3] *See* 19 U.S.C. § 1673d(e); 19 C.F.R. § 351.224(f).

[4] *QVD Food Co. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011)

[5] *Id.*

[6] *See, e.g.*, *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from the People's Republic of China, the Federal Republic of Germany, India, Italy, the Republic of Korea, and Switzerland: Antidumping Duty Orders; and Amended Final Determinations of Sales at Less Than Fair Value for the People's Republic of China and Switzerland*, 83 Fed. Reg. 26,962, 26,963 (Dep't Commerce June 11, 2018) ("Additionally, we find that the alleged ministerial

rather than an inadvertent omission or similar mistake, the alleged error is not ministerial in nature and Commerce may not alter the final determination to address it.

Galvasid flagrantly ignores this clear rule – even going so far as to openly complain that "{Commerce's} *methodology* was contrary to the statutory scheme{.}"[7] Specifically, Galvasid argues that Commerce "has held in past cases that the 'ministerial error' procedures can be used to correct determinations, including a determination to apply AFA, that 'overlooked' record information."[8] However, Commerce "overlooked" nothing regarding the issue Galvasid raises. Indeed, Galvasid's comments merely repeat arguments that were already fully briefed, and which Commerce intentionally rejected. Galvasid's comments assert that it had previously informed Commerce that freight and insurance revenue were included in the U.S. gross price and that, because these revenue amounts were not separately negotiated with customers, Commerce was not permitted to cap them.[9] However, Galvasid made the same contention in its rebuttal brief, as the verbatim summary of Galvasid's argument contained in Commerce's Issues and Decision Memorandum ("IDM") makes clear.[10]

---

error regarding our application of adverse facts available (AFA) for certain of Benteler Rothrist comparison market sales is methodological, rather than ministerial, in nature."); *Notice of Antidumping Duty Order: Certain Steel Nails from the People's Republic of China*, 73 Fed. Reg. 44,961, 44,962 (Dep't Commerce Aug. 1, 2008) ("ITW's disagreement with our application of partial AFA is methodological, rather than ministerial, in nature.").

[7] Galvasid Ministerial Error Comments at 9 (emphasis added).

[8] *Id.* at 7.

[9] *Id.* at 2-7.

[10] *See* IDM at 46-47 (recounting Galvasid's argument that "all of Galvasid's U.S. sales invoices state the price on a delivered basis and do not separately identify amounts of freight or insurance revenue" and that "there is no evidence to suggest that Galvasid separately negotiated amounts for transport services with its customers.").

Commerce fully considered Galvasid's arguments on this issue. Across multiple pages of analysis in the IDM, Commerce explained that it "did not discover until verification that Galvasid included additional accounts containing freight and insurance revenue within its sales reconciliation, and that Galvasid received such revenue and had included the revenue in its reported U.S. prices."[11] Because Galvasid did not report this revenue in the form and manner requested by Commerce, the agency was unable to verify these revenues and determine their proper treatment.[12] Galvasid's argument that the revenues were not separately negotiated was thus of no moment – Commerce was not able to determine whether that was the case at or prior to verification because Galvasid did not comply with Commerce's reporting instructions. Commerce's full consideration of Galvasid's rebuttal brief arguments means that nothing alleged in Galvasid's ministerial error comments was "overlooked," and Commerce's treatment of the issue was not "inadvertent" or "unintentional," as required by the regulation and case law concerning ministerial errors. The opposite is true – Commerce's final determination reflected an intentional methodological choice concerning Galvasid's freight and insurance revenues.

The past determinations that Galvasid cites in support of its argument are inapposite. In both *Shrimp from Ecuador* and *Iron Mechanical Transfer Drive Components from China*, Commerce specifically noted that its errors were the result of "inadvertent" and "unintentional" mistakes on the agency's part.[13] Indeed, in *Shrimp from Ecuador*, Commerce distinguished the

---

[11] *Id.* at 48.

[12] *Id.* at 48-49.

[13] *See Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation* (Dep't Commerce 89 Fed. Reg. 31,722-01 (Apr. 25, 2024) and accompanying *Preliminary Determination Memorandum* (ACCESS barcode 4546321-02) at 4 (stating that Commerce "inadvertently overlooked information that Santa Priscila submitted{.}"); *Less-Than-Fair-Value Investigation of Certain Iron Mechanical Transfer Drive Components from the People's Republic of China*, Commerce Memorandum re: Allegations of

relevant ministerial error from an additional ministerial error allegation that Commerce rejected for being "methodological in nature."[14] Here, Commerce's treatment of Galvasid's arguments was a fully intentional methodological choice that was not inadvertent. In *Shrimp from India*, Commerce reversed its application of AFA to a respondent, Lotus, under exceptional circumstances. As Commerce explained, it had incorrectly "believed that {Lotus} had failed to submit a response to the Department's quantity and value questionnaire when, in fact, it had done so."[15] This resulted in application of the AFA rate to Lotus – even though Lotus had not exported any subject merchandise during the period of review.[16] This fact pattern reflects a binary error – whether or not Lotus submitted a questionnaire response – that did not implicate any substantive methodological choice on Commerce's part. It is thus wholly distinct from the instant case. Finally, in *Steel Wire Rod from France*, Commerce corrected a straightforward, technical error in applying its standard calculation of CEP profit that had not been previously briefed by the parties.[17] This 1997 case is therefore also inapposite to the situation here, which involves arguments that had been fully briefed before Commerce and that concern substantive methodological choices by Commerce.

---

Ministerial Errors in the Final Determination (Nov. 28, 2016) (ACCESS Barcode: 3526646-01) at 3 (stating that Commerce "inadvertently overlooked" figures in a verification exhibit).

[14] *Shrimp from Ecuador* PDM at 4.

[15] *Certain Frozen Warmwater Shrimp from India: Amended Final Results of Antidumping Duty Administrative Review and Rescission In Part*, 72 Fed. Reg. 60,638 (Dep't Commerce Oct. 25, 2007).

[16] *See id.*

[17] *Certain Stainless Steel Wire Rods from France: Amended Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 25915 (Dep't Commerce May 12, 1997).

Galvasid has thus entirely failed to allege any error that is ministerial in nature and that should be corrected. Commerce should reject Galvasid's allegation and make no change to its final determination.

*     *     *

Should you have any questions regarding this submission, please contact the undersigned.

Respectfully submitted,

| | |
|---|---|
| /s/ Roger B. Schagrin | /s/ Thomas M. Beline |
| Roger B. Schagrin | Thomas M. Beline |
| Jeffrey D. Gerrish | Myles S. Getlan |
| Luke A. Meisner | James E. Ransdell |
| Nicholas C. Phillips* | Margaret E. Monday |
| David Albright, *Senior Analyst* | Catherine J. Cartsos, *Sr. Int'l Trade Advisor* |
| | Matthew P. Berrigan, *Trade Accountant* |
| | |
| **SCHAGRIN ASSOCIATES** | **CASSIDY LEVY KENT (USA) LLP** |
| | |
| *Counsel to Steel Dynamics, Inc. and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC* | *Counsel to United States Steel Corporation and Wheeling-Nippon Steel, Inc.* |

*Admitted only in New York. Practice limited to federal courts and agencies.

# CERTIFICATE OF SERVICE

**Corrosion-Resistant Steel Products from Mexico**
**A-201-863**

I, Steve Satchell, hereby certify that copies of the attached PUBLIC DOCUMENT were served today, September 8, 2025, via ACCESS electronic service:

Stephanie M. Bell, Esq.
**Wiley Rein LLP**
2050 M Street, NW
Washington, DC 20036

Thomas M. Beline, Esq.
**Cassidy Levy Kent (USA) LLP**
2112 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20037

Stephen P. Vaughn, Esq.
Representative of Cleveland-Cliffs Inc.
**King & Spalding LLP**
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706

David E. Bond, Esq.
**White & Case LLP**
701 Thirteenth Street, NW
Washington, DC 20005-3807

Robert George Gosselink, Esq.
Representative of Lámina y Placa Comercial, S.A. de C.V.
**Trade Pacific PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003

Jeffrey M. Winton, Esq.
Representative of Galvasid S.A. de C.V.
**Winton & Chapman PLLC**
1100 13th Street NW
Suite 825
Washington, DC 20005

Antonino Bertoni
**Government of Mexico**
Ministry of Economy of Mexico
Pachuca 189, Col. Condesa, C.P. 06140,
Cuauhtemoc, CDMX

John Anwesen
**Lighthill PC**
300 New Jersey Avenue, NW
Suite 300
Washington, D.C. 20001

/s/ *Steve Satchell*
Steve Satchell
SCHAGRIN ASSOCIATES

Tab 25

Galvasid's Request for Rejection of Petitioners'
September 8 Letter (September 11, 2025)

PR-488



JEFFREY M. WINTON
JWINTON@WINTON.LAW
+1.202.774.5503

September 11, 2025

Case No. A-201-863
Total Pages: 6
Investigation
AD/CVD Operations Office VIII
Public Document

B<small>Y</small> E<small>LECTRONIC</small> F<small>ILING</small>

**Public Document**

Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
Constitution Ave. & 14th St., NW
Washington, DC  20230

  Re: Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant
    Steel Products from Mexico —— Request for Rejection of Petitioners'
    September 8 Letter and for Sanctions Pursuant to 19 C.F.R. § 351.313

Dear Secretary of Commerce,

  We are writing, on behalf of Galvasid, S.A. de C.V. ("Galvasid"), to request that the

Department reject Petitioners' September 8, 2025, letter in response to Galvasid's

ministerial error comments, and that it also commence an inquiry pursuant to Section

351.313 of the Department's regulations into the conduct of Petitioners' counsel.[1]

---

[1] *See* Petitioners' September 8, 2025, Letter re "Certain Corrosion-Resistant Steel Products
from Mexico: Petitioners' Response to Galvasid's Ministerial Error Comments."  It should
*(footnote continued on following page)*

1.      The Department's memorandum regarding the deadline for filing ministerial

error comments for the Final Determination explicitly states, "Commerce will not consider

replies to ministerial error comments."[2]  Petitioners' letter in response to Galvasid's

ministerial error comments simply ignores that explicit statement.  Petitioners could, of

course, have asked the Department to modify the deadlines for this proceeding to permit

rebuttal comments.  But they are not authorized to make such a change unilaterally.

Petitioners' September 8 letter must be rejected.

2.      Petitioners' July 28 case brief in this proceeding contained false claims (1) that

Galvasid had failed to report freight and insurance revenue amounts set forth on their

invoices,[3] and (2) that Galvasid had treated freight and insurance revenue on U.S. sales

differently from freight and insurance revenue on home-market sales.[4]  However, as the

Department's final determination makes clear, there was *no* freight and insurance revenue,

as the Department's questionnaire defines those terms, on Galvasid's U.S. sales invoices.[5]

Furthermore, the evidence is clear that the invoices for Galvasid's U.S. sales did not

---

*(footnote continued from previous page)*
be noted that even though the Petitioners' letter is dated September 8, the letter was not
made available on ACCESS for Galvasid's review until September 10.

[2] *See* Department's August 27, 2025, Memorandum re "Less-Than-Fair-Value
Investigation of Certain Corrosion-Resistant Steel Products from Mexico:  Deadline for
Ministerial Error Concerning the Final Determination.

[3] *See, e.g.,* Petitioners' July 28 Case Brief at 17-18.

[4] *Id.,* at 18, 22.

[5] *See, e.g.,* Galvasid's September 2 Letter at 5, 6; Department's August 25, 2025, Issues
and Decision Memorandum at 48.

WINTON & CHAPMAN
PLLC

identify separate amounts for freight and insurance revenue, while the invoices for some home-market sales did identify such figures.[6]

Petitioners' brief appears to have tried to blame the Department's verification report as the source for their false claims. But their brief also suggested, falsely, that verification documents supported their claims.[7] In reality, as the Department's final determination makes clear, the verification documents cited by Petitioners demonstrate that there was no freight or insurance revenue, as those terms are defined by the Department's questionnaire, on U.S. sales. As experienced practitioners in this field, Petitioners' counsel knew or should have known that their arguments were false, and likely to mislead the Department.

An ethical lawyer, when faced with the overwhelming evidence of such error, would have retracted their false claims. Instead, Petitioners' September 8 letter doubled down on their deception by claiming, falsely, that the ministerial error identified in Galvasid's September 2 letter was already fully addressed by Galvasid's rebuttal brief and the Department's final determination in this case. That claim cannot possibly be true. As explained in Galvasid's September 2 letter, the Department's final determination issued on August 25 erroneously overlooked record information. Under the Department's past decisions, such mistakes constitute ministerial errors.[8] And Galvasid's rebuttal brief,

---

[6] *See, e.g.,* Galvasid's September 2 Letter at 7, n.15. *See also* Galvasid's August 4 Rebuttal Brief at 21.

[7] *See* Petitioners' July 28 Case Brief at 17, n.41.

[8] *See* Galvasid's September 2 Letter at 7-8.

which was filed on August 4, could not have addressed that error because the error was not made until three weeks after the rebuttal brief was filed.

The tight window between the submission of briefs in this case and the deadline for the Department's final determination left little time for the Department to review the arguments by the parties. The Department was entitled to rely upon counsel to ensure that their arguments were supported by the facts and reflected appropriate diligence. Sadly, Petitioners' counsel in this case chose a path of deception.

The Department has previously offered the following description of "improper conduct" by counsel that warrants sanction under Section 351.313 of the regulation:

> Clearly improper conduct includes, but is not limited to, knowingly providing incorrect information to the agency; knowingly making misrepresentations of fact or law; *knowingly making false accusations in a proceeding; failing to engage in reasonable diligence* including failure to exercise such diligence in the preparation and/or review of submissions....[9]

---

[9] *Regulation Strengthening Accountability of Attorneys and Non-Attorney Representatives Appearing Before the Department,* 74 Fed. Reg. 22773, 22775 (April 17, 2013) (emphasis added).

Under that standard, Petitioners' arguments in their case brief and in their September 8 letter constitute "improper conduct" and warrant sanction by the Department under Section 351.313 of the Department's regulations, and by the relevant Bar authorities under the Rules of Professional Conduct.

Respectfully submitted,

/s/ Jeffrey M. Winton
Jeffrey M. Winton
Amrietha Nellan
Rachel Hauser

Counsel to Galvasid, S.A. de C.V.

U.S. DEPARTMENT OF COMMERCE
PUBLIC CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing submission is being served this 11th day

of September, 2025, via ACCESS,[1] on the following parties:

Stephanie M. Bell, Esq.
Wiley Rein LLP
2050 M Street, NW
Washington, DC 20036
sbell@wiley.law

Thomas M. Beline, Esq.
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Ave, NW
Suite 300
Washington DC 20037
tbeline@cassidylevy.com

Roger B. Schagrin, Esq.
Schagrin Associates
900 7th Street, NW
Washington, DC 20001
rschagrin@schagrinassociates.com

Stephen P. Vaughn, Esq. p
King & Spalding LLP
1700 Pennsylvania Ave, NW
Washington, DC 20006
svaughn@kslaw.com

David E. Bond, Esq.
White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
dbond@whitecase.com

Robert George Gosselink, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003
rgosselink@tradepacificlaw.com

John Anwesen, Esq.
Lighthill PC
300 New Jersey Ave, NW
Suite 300
Washington, DC 20001
j.anwesen@lighthilltrade.com

Antonino Bertoni
Government of Mexico
Pachuca 189, Col. Condesa, C.P.
06140, Cuauhtemoc, CDMX
antonino.bertoni@economia.gob.mx

/s/ Jeffrey M. Winton
Jeffrey M. Winton

---

[1] *See* 19 C.F.R. § 351.303(f)(1)(i) ("Service of a public document or public version of a business proprietary document is effectuated on the persons on the public service list upon the electronic filing of the submission in ACCESS, unless it is filed manually in accordance with paragraph (b)(2) of this section, or ACCESS is unavailable.") (effective October 30, 2023).

Tab 26

Rejection of Galvasid's September 11, 2025, Request to Reject the Petitioners' Rebuttal Comments and Providing Galvasid an Opportunity to Submit Rebuttal Comments
(September 16, 2025)

PR-490-91

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-863
Investigation
**Public Document**
E&C/OVIII: BS

September 16, 2025

MEMORANDUM TO:     The File

FROM:     Brian Smith
     Senior International Trade Compliance Analyst
     AD/CVD Operations, Office VIII

RE:     Antidumping Duty Investigation of Certain Corrosion-Resistant
     Steel Products (CORE) from Mexico

SUBJECT:     Rejection of Galvasid's September 11, 2025, Request to Reject the
     Petitioners' Rebuttal Comments and Providing Galvasid an
     Opportunity to Submit Rebuttal Comments

---

On August 27, 2025, the U.S. Department of Commerce (Commerce) issued a ministerial error allegation schedule for the final determination in the above-referenced investigation, specifically notifying parties that the deadline for submitting comments was September 2, 2025.[1]

On September 2, 2025, both the petitioners and Galvasid, S.A. de C.V. (Galvasid), a respondent in this investigation, submitted ministerial error allegation comments, respectively.[2] On September 8, 2025, the petitioners submitted rebuttal comments on Galvasid's September 2 Comments.[3]

On September 11, 2025, Galvasid requested Commerce to reject the petitioners' September 8, 2025, Rebuttal Comments, claiming that Commerce specifically informed parties that no rebuttal comments were permitted.[4]

---

[1] See Memorandum, "Deadline for Ministerial Error Concerning the Final Determination," dated August 27, 2025 (Ministerial Error Allegation Schedule Memorandum).
[2] See Galvasid's Letter, "Final Determination Ministerial Error Comments," dated September 2, 2025) ( Galvasid's September 2 Comments); and Petitioners' Letter, "Ministerial Error Comments on Final Determination," dated September 2, 2025 (Petitioners' September 2 Comments).
[3] See Petitioners' Letter, "Petitioners' Response to Galvasid's Ministerial Error Comments," dated September 8, 2025 (Petitioners' September 8 Rebuttal Comments).
[4] See Galvasid's Letter, "Request for Rejection of Petitioners' September 8 Letter and for Sanctions Pursuant to 19 C.F.R. § 351.313," dated September 11, 2025 (Galvasid's September 11 Letter).

INTERNATIONAL
**TRADE**
ADMINISTRATION

Although our ministerial error allegation schedule memorandum stated that "{in} accordance with 19 CFR 351.224(c)(3), Commerce will not consider replies to ministerial error comments," this statement was incorrect because 19 CFR 351.224 allows for rebuttal comments for final determinations.[5]  Therefore, we have accepted the Petitioners' September 8 Rebuttal Comments because they are permitted under 19 CFR 351.224.

Furthermore, we are rejecting Galvasid's September 11 Letter because it includes surrebuttal comments not contemplated by 19 CFR 351.224(c)(3).  Accordingly, Commerce is rejecting and removing from the record of this investigation Galvasid's September 11 Letter, pursuant to 19 CFR 351.104(a)(2)(i), and 19 CFR 351.302(d)(1)(i).

However, to correct our error in the ministerial error allegation memorandum, we are providing interested parties an opportunity until September 19, 2025, to submit rebuttal comments to reply to the Petitioners' September 2 Comments.

If you have any questions on this matter, please contact Brian Smith or Faris Montgomery at (202) 482-1766 or (202) 482-1537, respectively.

---

[5] *See* Ministerial Error Allegation Schedule Memorandum.

2

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-863
Investigation
**Public Document**
E&C/OVIII:  BS

**DATE:**                        September 16, 2025

**MEMORANDUM TO:**    All Interested Parties

**FROM:**                        Brian Smith
                                       Senior International Trade Compliance Analyst
                                       AD/CVD Operations, Office VIII
                                       Enforcement and Compliance

**RE:**                            Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant
                                       Steel Products from Mexico

**SUBJECT:**                  Rejection and Removal of September 11, 2025, Filing from
                                       Galvasid S.A. de C.V.

---

On September 16, 2025, the U.S. Department of Commerce (Commerce) issued a memorandum[1] rejecting Galvasid S.A. de C.V.'s (Galvasid's) September 16, 2025, filing.  For the reasons articulated in Commerce's September 16, 2025, letter, please reject and remove from the record the following barcode associated with Galvasid's September 11, 2025, filing:

- ACCESS Barcode  **4824730-01** (public document).

---

[1] *See* Memorandum, "Rejection of Galvasid's September 11, 2025, Request to Reject the Petitioners' Rebuttal Comments and Providing Galvasid an Opportunity to Submit Rebuttal Comments," dated September 16, 2025.



Tab 27

Commerce's September 26, 2025, Ministerial Error Allegations
Memorandum
(September 26, 2025)

PR-492, CR-871

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-201-863
Investigation
~~Business Proprietary Document~~
E&C/OVIII: Team
**PUBLIC VERSION**

September 26, 2025

**MEMORANDUM TO:** Scot Fullerton
Acting Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

**THROUGH:** Kathleen Marksberry
Director, Office VIII
Antidumping and Countervailing Duty Operations

**FROM:** Brian Smith
Katerina Katsiadas
International Trade Compliance Analysts, Office VIII
Antidumping and Countervailing Duty Operations

**SUBJECT:** Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico: Analysis of Ministerial Error Allegations for the Final Determination

---

## I. SUMMARY

On August 29, 2025, the U.S. Department of Commerce (Commerce) published the final affirmative determination in the above-referenced antidumping duty (AD) investigation.[1] On September 2, 2025, we received timely filed ministerial error allegations from: (1) Galvasid S.A. de C.V. (Galvasid)/Perfiles LM, S.A. de C.V. (Perfiles) (collectively, Galvasid/Perfiles),[2] one of the mandatory respondents, with respect to the application of partial adverse facts available (AFA) to Galvasid's U.S. prices for the final determination; and (2) the petitioners,[3] with respect

---

[1] *See Certain Corrosion-Resistant Steel Products From Mexico: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 FR 42187 (August 29, 2025) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).

[2] We have treated Galvasid and Perfiles as a single entity in this investigation. *See Certain Corrosion-Resistant Steel Products from Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 90 FR 15349 (April 10, 2025) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 4-5 for further discussion, unchanged in *Final Determination*.

[3] The petitioners are: United States Steel Corporation, Wheeling-Nippon Steel, Inc., Steel Dynamics, Inc., and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC.



to Galvasid's financial expense ratio.[4]  On September 8, 2025, the petitioners timely submitted replies to Galvasid's ministerial error allegation.[5]  On September 16, 2025, we extended the deadline until September 19, 2025, for interested parties to submit rebuttal comments on the petitioners' ministerial error allegation.[6]  We received no further rebuttal comments.

For the reasons explained below, we recommend finding that the petitioners' allegation regarding the financial expense ratio constitutes a ministerial error within the meaning of section 735(e) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.224(f).  Accordingly, we recommend amending Galvasid/Perfiles' final calculated dumping margin.  However, we also recommend finding that Galvasid's allegation pertaining to the application of partial AFA for its U.S. gross unit prices, does not constitute a ministerial error within the meaning of 19 CFR 351.224(f).  Therefore, consistent with 19 CFR 351.224(e), we recommend not amending Galvasid/Perfiles' dumping margin calculated for the *Final Determination* with respect to this allegation.

The resulting amended estimated weighted-average dumping margins for Galvasid/Perfiles and all other companies not selected for individual examination are 24.09 percent and 17.42 percent, respectively.

## II.     LEGAL AUTHORITY

Commerce's regulations stipulate that it will disclose calculations performed, if any, in connection with a final determination, to interested parties, and that those parties may submit comments concerning ministerial errors in such calculations.[7]  Section 351.224(e) of Commerce's regulations explains that "{t}he Secretary will analyze any comments received and, if appropriate…correct any ministerial error by amending the final determination…"  Interested parties must explain any ministerial errors alleged in their comments through reference to the applicable evidence on the official record, and must present what, in the party's view, is the appropriate correction.[8]  Any issue raised by interested parties as a ministerial error, which, in fact, is the result of a methodological decision by Commerce, will not be considered a ministerial error, because it does not meet the regulatory definition of the term.[9]

A "ministerial error" is defined as including errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which Commerce considers ministerial.[10]

---

[4] *See* Galvasid/Perfiles' Letter, "Final Determination Ministerial Error Comments," dated September 2, 2025 (Galvasid/Perfiles' Ministerial Error Allegation); *see also* Petitioners' Letter, "Ministerial Error Comments on Final Determination," dated September 2, 2025 (Petitioners' Ministerial Error Allegation).
[5] *See* Petitioners' Letter, "Response to Galvasid's Ministerial Error Comments," dated September 8, 2025 (Petitioner's Reply Comments).
[6] *See* Memorandum, "Rejection of Galvasid's September 11, 2025, Request to Reject the Petitioners' Rebuttal Comments and Providing Galvasid an Opportunity to Submit Rebuttal Comments." Dated September 16, 2025.
[7] *See* 19 CFR 351.224(b) and (c).
[8] *See* 19 CFR 351.224(d).
[9] *See* 19 CFR 351.224(f).
[10] *See* section 735(e) of the Act; and 19 CFR 351.224(f).

Pursuant to 19 CFR 351.224(e), Commerce will analyze any comments received and, if appropriate, "correct any ministerial error by amending the final determination." Allegations concerning methodological decisions by Commerce are not considered ministerial in nature.[11]

## III.    ANALYSIS OF ALLEGED MINISTERIAL ERRORS

**Allegation 1:  Whether Commerce Inadvertently Applied the Original Financial Expense Ratio**

*Petitioners' Comments*:[12]

- At the start of the cost verification, Galvasid presented a minor correction related to the calculation of its financial expense ratio.  In the final margin calculation, Commerce inadvertently applied the original financial expense ratio of [     ] percent instead of the corrected ratio of [     ] percent.
- Commerce should correct this error and issue an amended final determination with a recalculated weighted-average dumping margin for Galvasid/Perfiles.

No other interested party commented on this issue.

**Commerce's Position:**  We agree with the petitioners that a ministerial error was made in the application of the financial expense ratio in the *Final Determination* by not incorporating a minor correction with respect to this ratio that was accepted at verification as the correct financial expense ratio applicable to Galvasid.[13]  Therefore, we revised the calculation of Galvasid's per-unit financial expense to reflect the correct financial expense ratio based on our verification findings.[14]  Correcting the alleged financial expense ratio error increases Galvasid/Perfiles' margin from 24.05 percent to 24.09 percent.[15]  We also recommend revising the all-others rate for non-responsive companies to account for Galvasid/Perfiles' revised margin.[16]  Thus, the all-others rate also increases from 17.40 percent to 17.42 percent as a result of this correction.[17]

---

[11] *See* 19 CFR 351.224(f); *see also*, *e.g.*, *Alloy Piping Prods. v. United States*, 201 F.Supp.2d 1267, 1285 (CIT 2002) (*Alloy Piping*) ("The error in question must be demonstrated to be a clerical error, not a methodological error, an error in judgment, or a substantive error").

[12] *See* Petitioners' Ministerial Error Allegation at 2.

[13] *See* Memorandum, "Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Mexico: {Galvasid Cost Verification Report}, dated May 12, 2025, at 3 and 12-13.

[14] *Id*. at 3.

[15] *See* Memorandum, "Amended Final Determination Margin Calculation Memorandum for Galvasid S.A. de C.V.," dated concurrently with this memorandum.

[16] *See* Memorandum, "Amended Final Analysis Calculation of the Cash Deposit Rate for Non-Selected Companies," dated concurrently with this memorandum.

[17] *Id*.

**Allegation 2:  Whether Commerce Overlooked Record Evidence and Incorrectly Applied Partial AFA**

*Galvasid's Comments*:[18]

- Commerce's application of AFA to Galvasid was based on a factual error that ignores irrefutable evidence on the record.  Galvasid's U.S. sales were reported on a DDP {Delivered Duty Paid} or CIF {Cost, Insurance, and Freight} basis, and by definition, the sales prices include freight and insurance transport to a customer designated location. Commerce has further found that this reported sales term is evidence of whether freight and insurance are included in the invoice price.[19]

- Galvasid explained that related freight and insurance expenses were reported as reduction to the gross unit price, noting that its domestic inland freight to port (DINLFTPU) and international freight (INTNFRU) were part of its DDP and CIF terms, and reporting freight and insurance expenses in its section C response confirm that Galvasid fully disclosed that its U.S. invoice prices included an amount for freight and insurance.[20]

- Commerce's instructions in its questionnaire do not require respondents to separately report its freight and revenue insurance included in the invoice price as revenue, as Commerce's antidumping duty questionnaire only requires reporting of this revenue if the charges are separate.

- The U.S. Court of International Trade (CIT) has found that Commerce may not cap service revenue included in the invoice price of subject merchandise when the invoice does not separately identify the amount of the service charged to the customer.[21]

- Commerce has previously found that, where it "inadvertently overlooked information" on the record, the ministerial error procedure can be used to correct the record and recalculate the dumping margin.  In *Shrimp from India*, Commerce reversed the application of AFA to the respondent where Commerce inaccurately stated that the company did not provide quantity and value information.[22]

---

[18] *See* Galvasid/Perfiles' Ministerial Error Allegations at 2 and 7.

[19] *Id.* at 2-3 (citing Galvasid's Letter, "Response of Galvasid S.A. de C.V. to Section C of the Department's November 18 Questionnaire," dated January 13, 2025, (Galvasid CQR) at 14, 17-18, 27-28, and 30-33; Galvasid's Letter, "Response to the Department's February 27 Supplemental Questionnaire," dated March 20, 2025, (Galvasid SSDQR) at Exhibit S3C-1, Galvasid's sales database US03; Galvasid's Letter, "Rebuttal Brief of Galvasid on General and Sales Issues," dated August 4, 2025, at 16-20; Memorandum, "Verification of the Sales Response of Galvasid S.A. de C.V. (Galvasid) in the Antidumping Investigation of Certain Corrosion-Resistant Steel Products from Mexico," dated July 11, 2025 (Galvasid's Sales Verification Report) at 14; *Polyester Textured Yarn from Thailand:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 58883 (Oct. 25, 2021) (*Yarn from Thailand*), and accompanying IDM at 25; *Welded Stainless Pressure Pipe From India:  Amended Final Results of Antidumping Duty Administrative Review*; 2020-2021, 88 FR 48442 (July 27, 2023) (*Welded Pipe from India*) and accompanying IDM at 7; and C*ommon Alloy Aluminum Sheet from India:  Final Results of Antidumping Duty Administrative Review; 2020-2022*, 88 FR 76724 (November 7, 2023) (*CAAS from India*), and accompanying IDM at Comment 1).

[20] *Id.* at 4

[21] *Id.* at 5-6 (citing *ABB Inc. v. United States*, 355 F.Supp.3d 1206, 1220 (CIT 2018) (*ABB Inc.*); *Hyundai Heavy Indus. Co. v. United States*, 393 F.Supp.3d 1293, 1308 (CIT 2019) (*Hyundai Heavy Indus.*); and *Yarn from Thailand* IDM at Comment 10).

[22] *Id.* at 7-9 (citing *Yarn from Thailand* IDM at Comments 1 and 10; *Certain Frozen Warmwater Shrimp from India:*

- Commerce should correct its error and not apply AFA to Galvasid's sales because Galvasid did not fail to report or improperly report its freight and insurance revenue, and was not required to separately report revenue subject to a freight cap in its U.S. sales.

*Petitioners' Reply Comments*:[23]

- The error alleged by Galvasid/Perfiles is methodological, rather than ministerial, in nature, and Commerce should reject Galvasid's arguments because they repeat previous assertions that Commerce rejected. The comments are not grounded in the legal standard for ministerial errors, and Commerce routinely rejects arguments that mischaracterize methodological decisions, including the decision to apply AFA, as ministerial in nature.
- Substantive methodological decisions, rather than an inadvertent omission or similar mistake, are not ministerial in nature, and Galvasid acknowledges in its comments that it is arguing that Commerce's methodology was contrary to the statute.[24]
- Galvasid's arguments repeated comments and contentions from its case and rebuttal briefs, and Commerce fully considered the arguments and explained its rationale for applying AFA in the *Final Determination*.
- Galvasid's arguments that the revenues were not separately negotiated are meritless, because Commerce was unable to determine if that was the case prior to or during verification because Galvasid did not comply with Commerce's reporting instructions.
- The cases Galvasid cites in support of its argument are inapposite, because they are a result of "inadvertent" or "unintentional" mistakes or an acknowledge binary error that does not imply a substantial methodological choice by Commerce.
- Commerce should reject Galvasid/Perfiles' allegation and make no change to its final determination.

No other interested party commented on this issue.

**Commerce's Position:** We find that Galvasid/Perfiles's allegation does not constitute a ministerial error pursuant to 19 CFR 351.224(f). In the *Final Determination*, we applied partial AFA to Galvasid due to the fact that Commerce discovered at verification that Galvasid had not disclosed to Commerce that it incurred freight and insurance revenue on its U.S. sales, noting the following:

> Galvasid failed to disclose in its questionnaire responses that it had included freight revenue and insurance revenue in its reported U.S. gross unit prices, or that it received these revenues in the U.S. market at all. In fact, Commerce did not discover until verification that Galvasid included additional accounts containing freight and insurance revenue within its sales reconciliation, and that Galvasid received such revenue and had included the revenue in its reported U.S. prices. Because Galvasid failed to also provide separate revenue data fields in its U.S. sales

---

*Amended Final Results of Antidumping Duty Administrative Review and Rescission In Part*, 72 FR 60638 (October 25, 2007); *Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation*, 89 FR 31722 (April 25, 2024)).

[23] *See* Petitioners' Response at 2 -6.

[24] *Id.* at 2 (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011)).

database, or disclose the existence of such revenues in the U.S. market, it was impossible for Commerce to determine whether the reporting of such expenses within the gross unit price was appropriate prior to verification, much less identify the amount of freight revenue and insurance revenue attributed to each individual gross unit price or which sales Galvasid also received freight and/or insurance revenue in its U.S. sales database.[25]

Galvasid/Perfiles argues both that Commerce overlooked information on the record that was sufficient for Commerce to understand that Galvasid incurred freight and insurance revenue on its U.S. sales, and that Galvasid was not required by Commerce's questionnaire to explicitly report or disclose the existence of freight and insurance revenue in the first place, because it was included within a single value in the invoice applied to the customers, contending that Commerce overlooking such information on the record constitutes a ministerial error.  For the reasons explained below, we disagree both that Galvasid/Perfiles provided information overlooked by Commerce, and that the issue is ministerial in nature.

Galvasid/Perfiles argues that its sales terms of DDP and CIF, alone, should have been sufficient disclosure for Commerce to understand that Galvasid was receiving freight and insurance revenue in its sales prices to its customers.  However, we disagree that these sales terms alone are sufficient to explain how Galvasid incurred revenue for freight and insurance.  While it is correct that DDP denotes freight incurred by the seller and the CIF sales term denotes both insurance and freight incurred by the seller, these sales terms denote expenses incurred by the seller and do not explain how, if any, revenue is incurred and how it is accounted. Galvasid/Perfiles argues that its discussion of the sales terms when reporting DINLFTPU and INTNFRU disclosed that Galvasid incurred freight revenue; again, these are likewise expenses and do not explain how, if any, freight revenue is incurred.  Regarding insurance revenue, while Galvasid reported a freight expense for all of its U.S. sales with CIF sales terms, it did not separately report an insurance expense for these sales in its U.S. sales database.  Thus, a review of the record demonstrates that Galvasid's sales terms do not match its reporting, even for expenses.  In fact, in Galvasid's sales reporting, Galvasid reported sales terms of DDP, CIF, and [          ][26] for [     ], [     ], and [     ] of its U.S. sales, respectively.[27]  A further review of the sales terms in Commerce's sales traces conducted at verification confirm that, in practice, these reported sales terms in fact do not correspond to Galvasid's receipt of freight and insurance revenue in its accounting system.  Sales for which Galvasid reported [        ] are reported under both CIF and DDP sales terms, while the sales trace for SEQU [    ] reports CIF sales terms and [                        ], but does not [                        ].[28]  The record remains unclear regarding when and how Galvasid charged for freight and insurance revenue, and how Galvasid

---

[25] *See Final Determination* IDM at Comment 12.

[26] *See* Galvasid CQR at Appendix C-2.

[27] *See* Galvasid SSDQR at Exhibit SC3-1 (which includes U.S. sales database named GALVASIDUS03).

[28] *See* Galvasid's Sales Verification Report at Exhibits SVE-9E through SVE-9H and SVE-9L through SVE-9N.  In these exhibits, SEQUs [          ] report DDP sales terms with corresponding [          ], while SEQU [     ] reports CIF sales terms with [          ].

was accounting for such revenue in both its accounting system and its invoice prices. In actual practice, the sales terms reported do not consistently explain what revenues are incurred.

Galvasid also argues that Commerce has previously found that reporting of DDP and CIF sales terms, alone, is sufficient to disclose freight and insurance revenue, and Commerce should have accepted such sales terms as reporting freight and insurance revenue. Galvasid cites to three Commerce decisions[29] in its comments that it claims require Commerce to change its decision on this matter. The records in each case use shipping terms to add weight to the appropriateness of the respondent company's reporting, rather than sufficing, in and of itself, as a reporting of freight and insurance revenue. *Yarn from Thailand* states that CIF and DDP sales indicate that the price the respondent charged to its customers included freight and insurance in accordance with the terms of sale, but Commerce explains that "the freight and insurance that appear separately in the invoice and that the petitioners allege is indicative of freight revenue is in fact the declaration to facilities U.S. Customs and Border Protection… with calculating the free on board price and duties."[30] No such clarifying information that discloses the existence of freight and insurance revenue in the first place exists in Galvasid's questionnaire responses. *Welded Pipe from India* is not applicable, as it discusses sales terms in the context of the selection of the appropriate date of sale, and the statement made that "sales were made on a DDP basis, and thus, included ocean freight," does not speak to the reporting or inclusion of freight revenue; in fact, Commerce notes that "the customer was later asked to pay more for the purchase to cover ocean freight costs," indicating that substantially more information exists on the record regarding freight revenue.[31] *CAAS from India* involves a decision where freight revenue is separately listed on the invoice, "for customs declaration purposes only," and clearly discusses more information on the record regarding freight revenue than simple sales terms reporting.[32]

Secondly, Galvasid cites to two CIT decisions to support its claim that if the freight and insurance is not separately identified in the sales invoice, then Commerce's questionnaire does not require a respondent to separately report the amounts of freight and insurance included in the invoice price in the first place.[33] However, Galvasid mischaracterizes these decisions. Galvasid's cite to *ABB Inc.* states that "the inquiry is whether Commerce may rely on internal company communications, rather than documentation or communications shared with the unaffiliated customer, to determine that there is a separate service-related revenue to cap."[34] Here, the issue at hand is whether or not Galvasid should have disclosed that it received freight and insurance revenue in the first place; the issue of its reporting of the gross unit price and its expenses is secondary, because Commerce did not receive the underlying information to make the determination of the appropriateness of requiring a freight or insurance revenue cap. In *Hyundai Heavy Indus.*, the CIT refers to "services-related revenues that are only reflected in internal documentation," and "absent substantial evidence to support a finding that Hyosung's provision of the services identified…was separately negotiable with the unaffiliated customer,

---

[29] *See*, *e.g.*, *Yarn from Thailand* IDM at Comment 10; *see also Welded Pipe from India* IDM at Comment 1; and *CAAS from India* IDM at Comment 1.

[30] *See Yarn from Thailand* IDM at Comment 10.

[31] *See Welded Pipe from India* IDM at Comment 1.

[32] *See CAAS from India* IDM at Comment 1.

[33] *See ABB Inc. v. United States*, 355 F.Supp.3d 1206, 1220 (CIT 2018); and *Hyundai Heavy Indus. Co. v. United States*, 393 F.Supp.3d 1293, 1308 (CIT 2019).

[34] *See* Galvasid/Perfiles Ministerial Error Allegation at 5-6 (citing *ABB Inc.*, 355 F.Supp.3d at 1220).

Filed By: Brian Smith, Filed Date: 9/29/25 9:52 AM, Submission Status: Approved

Commerce lacked a legal basis to reduce the gross unit price and fault {the respondent} for failing to report this information."[35]  However, in this case, Commerce did not have "internal documentation" regarding freight and insurance revenue until verification, and applied partial AFA due to the failure of Galvasid to disclose those facts, rather than for failing to separately report the freight and insurance revenue from the gross unit price.  Moreover, Commerce's findings at verification indicated that U.S. customers were purchasing [          ] of merchandise.[36]  The basis of the AFA determination is that Commerce was unable to examine and issue further supplemental questionnaires to determine whether Galvasid's reporting was appropriate in the first place, not that the reporting of the gross unit price and expense fields was, in and of itself, inappropriate.

Therefore, a clear gap existed in the record that was later contradicted by information Commerce found at verification – namely, that Galvasid collected insurance revenue.  Regardless of whether Galvasid appropriately reported its gross unit price and freight expenses in its U.S. sales database, Galvasid was not excused from disclosing that it incurred freight and insurance revenue to Commerce.  With a gap in the record with respect to these facts, such that there was no record evidence or statement of Galvasid collecting freight and insurance revenue until verification, Commerce cannot determine whether Galvasid's reporting was correct in the first place.  Commerce clearly explained its decision to apply AFA, and the basis of the application of AFA, to Galvasid based on the fact that Galvasid did not disclose that it received freight and insurance revenue in the *Final Determination*, noting that we had requested in the antidumping duty questionnaire explicitly that the respondents should report all revenues incurred in selling the subject merchandise in the U.S., and any types of revenue not already specifically included within the AD questionnaire should still be disclosed.[37]  Because Galvasid did not disclose that it received these revenues, Commerce was unable to timely determine whether Galvasid appropriately reported the same sales database fields that it argues properly disclosed the freight and insurance revenue.

For the reasons discussed above, we find that there is no evidence of information "overlooked" by Commerce in the record such that Commerce made an error that could be considered clerical in nature and concerns "addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, {or} any other similar type of unintentional error," and is therefore ministerial in nature as defined in 19 CFR 351.224(f).  Galvasid/Perfiles's arguments rather pertain to the appropriateness of Commerce's decision to apply AFA to Galvasid, which was an intentional methodological decision clearly explained within the *Final Determination*.  Accordingly, we are making no changes to the *Final Determination* due to Galvasid's ministerial allegation.

---

[35] *See Hyundai Heavy Indus*., 339 F.Supp.3d at 1308.
[36] *See* Galvasid's Sales Verification Report at Exhibit 4A (wherein a [                              ]).
[37] *See Final Determination* IDM at Comment 12.

## IV. RECOMMENDATION

We recommend correcting for the error outlined above in Allegation 1, by amending the *Final Determination* consistent with 19 CFR 351.224(e), and not making changes to the *Final Determination* for Allegation 2 because it does not constitute a ministerial error. If the U.S. International Trade Commission makes an affirmative final injury determination, we will publish an antidumping duty order incorporating the amended final determination reflecting the revised margins for Galvasid/Perfiles and all-other producers and/or exporters.

☒ ☐
_____ _____
Agree Disagree

9/26/2025

X _____

Signed by: SCOT FULLERTON

Scot Fullerton
Acting Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

Tab 28

Amended Final Antidumping Duty Determination and Order,
90 Fed. Reg. 59,494
(December 19, 2025)

PR-508



# DEPARTMENT OF COMMERCE

## International Trade Administration

[A–602–812, A–351–862, A–122–871, A–201–863, A–421–818, A–791–829, A–583–878, A–489–855, A–520–811, A–552–843]

## Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the U.S. Department of Commerce (Commerce) and the U.S. International Trade Commission (ITC), Commerce is issuing the antidumping duty (AD) orders on corrosion-resistant steel products (CORE) from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Türkiye (Türkiye), the United Arab Emirates, and the Socialist Republic of Vietnam (Vietnam). In addition, Commerce is amending its final determinations of sales at less than fair value (LTFV) with respect to CORE from Brazil and Mexico to correct ministerial errors.

**DATES:** Applicable December 19, 2025.

**FOR FURTHER INFORMATION CONTACT:** Krisha Hill (Australia), Office IV, telephone: (202) 482–4037; Nathan Araya (Brazil), Office II, telephone: (202) 482–3401; Reginald Anadio (Canada), Office IV, telephone: (202) 482–3166; Brian Smith (Mexico), Office VIII, telephone: (202) 482–1766; Rachel Jennings (Netherlands), Office V, telephone: (202) 482–1110; Jacob Saude (South Africa), Office VII, telephone: (202) 482–0981; Preston Cox (Taiwan), Office VI, telephone: (240) 956–8630; Olivia Woolverton (Türkiye), Office V, telephone: (202) 482–7452; Jose Rivera (United Arab Emirates), Office VII, telephone: (202) 482–0842; Jacob Waddell (Vietnam), Office VI, telephone: (202) 482–1369; AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

## Background

On August 29, 2025, Commerce published its affirmative final determinations in the LTFV investigations of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam in accordance with sections 735(d) and 777(i) of the Tariff Act of 1930, as amended (the Act).[1] In the LTFV investigations of CORE from Brazil and Mexico, interested parties timely alleged that Commerce made certain ministerial errors. *See* ''Amendment to the Brazil Final Determination of Sales at Less than Fair Value'' and ''Amendment to the Mexico Final Determination of Sales at Less than Fair Value'' sections below for further discussion.

On November 28, 2025, pursuant to sections 735(d) of the Act, the ITC notified Commerce of its final affirmative determinations that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of dumped imports of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam.[2]

## Scope of the Orders

The product covered by these orders is CORE from Australia, Brazil, Canada,

Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam. For a complete description of the scope of the orders, *see* the appendix to this notice.

## Amendment to the Final Determination of Sales at LTFV for Brazil

We determine that we made a ministerial error in the final determination of sales at LTFV for Brazil. Pursuant to 19 CFR 351.224(e), and as explained further in the Brazil Ministerial Error Memorandum,[3] Commerce is amending the *Brazil Final Determination* to reflect the correction of a ministerial error.[4] Correction of this error changes the final AD adjusted cash deposit rate for Usiminas Siderugicas de Minas Gerais S.A., as well as the cash deposit rate for all other producers and exporters not individually investigated. The revised rates are listed in the ''Estimated Weighted-Average Dumping Margins'' section, below.

## Amendment to the Final Determination of Sales at LTFV for Mexico

We determine that we made a ministerial error in the final determination of sales at LTFV for Mexico. Pursuant to 19 CFR 351.224(e), and as explained further in the Mexico Ministerial Error Memorandum,[5] Commerce is amending the *Mexico Final Determination* to reflect the correction of a ministerial error.[6] Correction of this error changes the final AD adjusted cash deposit rate for Galvasid S.A. de C.V./Perfiles LM, S.A. de C.V., as well as the cash deposit rate for all other producers and exporters not individually investigated. The revised rates are listed in the ''Estimated Weighted-Average Dumping Margins'' section, below.

## AD Orders

Based on the above-referenced affirmative final determinations, in accordance with section 735(c)(2) of the Act, Commerce is issuing these AD orders. Because the ITC determined that an industry in the United States is materially injured by reason of imports of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab

---

[1] *See Certain Corrosion-Resistant Steel Products from Australia: Final Affirmative Determination of Sales at Less than Fair Value,* 90 FR 42189 (August 29, 2025); *Certain Corrosion-Resistant Steel Products from Brazil: Final Affirmative Determination of Sales at Less than Fair Value,* 90 FR 42219 (August 29, 2025) (*Brazil Final Determination*); *Certain Corrosion-Resistant Steel Products from Canada: Final Affirmative Determination of Sales at Less than Fair Value,* 90 FR 42194 (August 29, 2025); *Certain Corrosion-Resistant Steel Products from Mexico: Final Affirmative Determination of Sales at Less than Fair Value,* 90 FR 42187 (August 29, 2025) (*Mexico Final Determination*); *Certain Corrosion-Resistant Steel Products from the Netherlands: Final Affirmative Determination of Sales at Less than Fair Value,* 90 FR 42213 (August 29, 2025); *Certain Corrosion-Resistant Steel Products from South Africa: Final Affirmative Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part,* 90 FR 42198 (August 29, 2025); *Certain Corrosion-Resistant Steel Products from Taiwan: Final Affirmative Determination of Sales at Less than Fair Value,* 90 FR 42210 (August 29, 2025); *Certain Corrosion-Resistant Steel Products from the Republic of Türkiye: Final Affirmative Determination of Sales at Less than Fair Value,* 90 FR 42216 (August 29, 2025); *Certain Corrosion-Resistant Steel Products from the United Arab Emirates: Final Affirmative Determination of Sales at Less than Fair Value and Final Negative Determination of Critical Circumstances,* 90 FR 42226 (August 29, 2025); *Certain Corrosion-Resistant Steel Products from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less than Fair Value,* 90 FR 42223 (August 29, 2025) (collectively, *Final Determinations*).

[2] *See* ITC's Letter, ''Notification of ITC Final Determinations,'' dated November 28, 2025 (ITC Notification Letter).

[3] *See* Memorandum, ''Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel from Brazil: Analysis of Ministerial Error Allegations,'' September 16, 2025 (Brazil Ministerial Error Memorandum).

[4] *Id.*

[5] *See* Memorandum, ''Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel from Mexico: Allegation of Ministerial Error in the Final Determination,'' dated concurrently with this notice (Mexico Ministerial Error Memorandum).

[6] *Id.*

Emirates, and Vietnam, unliquidated entries of such merchandise from these countries, entered or withdrawn from warehouse for consumption, are subject to the assessment of antidumping duties.

Therefore, in accordance with section 736(a)(1) of the Act, Commerce will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by Commerce, antidumping duties equal to the amount by which the normal value of the merchandise exceeds the export price (or constructed export price) of the merchandise on all relevant entries of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam. Antidumping duties will be assessed on unliquidated entries of CORE entered, or withdrawn from warehouse, for consumption on or after April 10, 2025, the date of publication of the *Preliminary Determinations,*[7] but will not include entries occurring after the expiration of the provisional measures period and before publication of the ITC's final injury determination, as further described below.

## Suspension of Liquidation and Cash Deposits

In accordance with section 736 of the Act, Commerce intends to instruct CBP to reinstitute the suspension of liquidation and continue the suspension of liquidation, as applicable, on all relevant entries of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam, effective on the date of publication of the ITC's final affirmative injury determination in the **Federal Register**. Commerce also intends to instruct CBP to require cash deposits equal to the estimated weighted-average dumping margins indicated in the table below. These instructions suspending liquidation and cash deposit requirements will remain in effect until further notice.

Commerce also intends to instruct CBP to require cash deposits equal to the estimated weighted-average dumping margins indicated in the tables below, adjusted by the relevant subsidy offsets. Accordingly, effective on the date of publication in the **Federal Register** of the notice of the ITC's final

affirmative injury determination, CBP will require, at the same time as importers would normally deposit estimated customs duties on subject merchandise, a cash deposit equal to the dumping rates listed in the tables below. The all-others rate for each country applies to all producers or exporters not specifically listed, as appropriate.

## Critical Circumstances

Because the final critical circumstances determination for CORE from the United Arab Emirates was negative, in accordance with section 735(c)(3) of the Act, we will instruct CBP to terminate the retroactive suspension of liquidation ordered at the *Preliminary Determination* for all other producers/exporters and to refund any cash deposits required with respect to entries of subject merchandise covered by the retroactive suspension of liquidation.

## Estimated Weighted-Average Dumping Margins

The estimated weighted-average dumping margins are as follows:

### AUSTRALIA

| Exporter/producer | Weighted-average dumping margin (percent) |
| --- | --- |
| BlueScope Steel Ltd./BlueScope Distribution Pty Ltd./Fielders Manufacturing Pty Ltd./Lysaght Building Solutions Pty Ltd .... | 19.10 |
| All Others ................................................................................................................................................................ | 19.10 |

### BRAZIL

| Exporter/producer | Dumping rate (percent) | Cash deposit rate adjusted for subsidy offset(s) (percent) |
| --- | --- | --- |
| Companhia Siderugica Nacional; Companhia Metalurgica Prada ............................................................... | 191.26 | 191.26 |
| Usinas Siderurgicas de Minas Gerais S.A.; Unigal Ltda.; Soluçoes em Aco Usiminas ............................ | 26.15 | 22.22 |
| All Others ..................................................................................................................................................... | 161.52 | 157.59 |

[7] *See Certain Corrosion-Resistant Steel Products from Australia: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15347 (April 10, 2025); *Certain Corrosion-Resistant Steel Products from Brazil: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15333 (April 10, 2025); *Certain Corrosion-Resistant Steel Products from Canada: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15337 (April 10, 2025); *Certain Corrosion-Resistant Steel Products from Mexico: Preliminary Affirmative Determination of Sales at Less than Fair Value,*

*Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15349 (April 10, 2025); *Certain Corrosion-Resistant Steel Products from the Netherlands: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15352 (April 10, 2025); *Certain Corrosion-Resistant Steel Products from South Africa: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15330 (April 10, 2025); *Certain Corrosion-Resistant Steel Products from Taiwan: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15359 (April 10, 2025); *Certain Corrosion-Resistant Steel*

*Products from the Republic of Türkiye: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15340 (April 10, 2025); *Certain Corrosion-Resistant Steel Products from the United Arab Emirates: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15355 (April 10, 2025); *Certain Corrosion-Resistant Steel Products from the Socialist Republic of Vietnam: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 90 FR 15343 (April 10, 2025) (collectively, *Preliminary Determinations*).

CANADA

| Exporter/producer | Dumping rate (percent) | Cash deposit rate adjusted for subsidy offset(s)) (percent) |
|---|---|---|
| ArcelorMittal Dofasco G.P./ArcelorMittal Coteau-du-Lac Limited Partnership | 5.59 | 5.59 |
| Stelco Inc | 8.13 | 8.13 |
| Nova Steel Inc | *52.08 | 50.25 |
| All Others | 5.79 | 5.79 |

*Rate based on facts available with adverse inferences.

MEXICO

| Exporter/producer | Dumping rate (percent) | Cash deposit rate adjusted for subsidy offset(s)) (percent) |
|---|---|---|
| Galvasid S.A. de C.V./Perfiles LM, S.A. de C.V | 24.09 | 24.09 |
| Ternium Mexico S.A. de C.V./Tenigal, S.de R.L. de C.V | 14.17 | 1.07 |
| All Others | 17.42 | 4.32 |

THE NETHERLANDS

| Exporter/producer | Weighted-average dumping margin (percent) |
|---|---|
| Tata Steel IJmuiden BV/Wuppermann Staal Nederland BV/Service Center Maastricht BV | 22.64 |
| All Others | 22.64 |

SOUTH AFRICA

| Exporter/producer | Weighted-average dumping margin (percent) |
|---|---|
| Duferco Steel Processing PTY Ltd | 19.21 |
| All Others | 19.21 |

TAIWAN

| Exporter/producer | Weighted-average dumping margin (percent) |
|---|---|
| Yieh Phui Enterprise Co., Ltd | 10.85 |
| Sheng Yu Steel Co. Ltd | *67.81 |
| Kounan Steel Co. Ltd | *67.81 |
| Meglobe Co. Ltd | *67.81 |
| All Others | 10.85 |

*Rate based on facts available with adverse inferences.

TÜRKIYE

| Exporter/producer | Weighted-average dumping margin (percent) |
|---|---|
| Borcelik Celik Sanayii Ticaret AS, ArcelorMittal Çelik Ticaret A.Ş., Bamesa Celik Servıs San. Ve Tic. A.Ş. and Bamesa Muradiye Demir Çelik San. Ve Tic. A.Ş | 6.48 |
| Yıldız Demir Çelik Sanayi A.S., and Yıldız Entegre Ağaç Sanayi ve Ticaret A.S | 10.49 |
| All Others | 8.06 |

UNITED ARAB EMIRATES

| Exporter/producer | Weighted-average dumping margin (percent) |
|---|---|
| Al Ghurair Iron & Steel LLC ............................................................................................................................................. | 7.20 |
| United Iron & Steel Company LLC/United Metal Coating ................................................................................................. | 16.38 |
| All Others .......................................................................................................................................................................... | 8.40 |

VIETNAM

| Exporter | Producer | Dumping rate (percent) | Cash deposit rate adjusted for subsidy offset(s) (percent) |
|---|---|---|---|
| Hoa Sen Group/Hoa Sen Nghe An One Member Limited Liabilities Company/Hoa Sen Nhon Hoi—Binh Dinh One Member Limited Liabilities Company. | Hoa Sen Group/Hoa Sen Nghe An One Member Limited Liabilities Company/Hoa Sen Nhon Hoi—Binh Dinh One Member Limited Liabilities Company. | 110.19 | 110.19 |
| Ton Dong A Corporation ........................................ | Ton Dong A Corporation ........................................ | 87.07 | 87.07 |
| China Steel and Nippon Steel Viet Nam Joint Stock Company. | China Steel and Nippon Steel Viet Nam Joint Stock Company. | 94.89 | 94.89 |
| Hoa Phat Steel Sheet Limited Liability Company .. | Hoa Phat Steel Sheet Limited Liability Company .. | 94.89 | 94.89 |
| Maruichi Sun Steel Joint Stock Company ............. | Maruichi Sun Steel Joint Stock Company ............. | 94.89 | 94.89 |
| Nam Kim Steel Joint Stock Company .................... | Nam Kim Steel Joint Stock Company .................... | 94.89 | 94.89 |
| Pomina Flat Steel Joint Stock Company ............... | Pomina Flat Steel Joint Stock Company ............... | 94.89 | 94.89 |
| Sam Hwan Vina Co., Ltd ....................................... | Sam Hwan Vina Co., Ltd ....................................... | 94.89 | 94.89 |
| Southern Steel Sheet Co., Ltd .............................. | Southern Steel Sheet Co., Ltd .............................. | 94.89 | 94.89 |
| Tay Nam Steel Manufacturing & Trading Co., Ltd | Tay Nam Steel Manufacturing & Trading Co., Ltd | 94.89 | 94.89 |
| TVP Steel Trading Joint Stock Company .............. | TVP Steel Trading Joint Stock Company .............. | 94.89 | 94.89 |
| Viet Phap Steel Corrugated Joint Stock Company | Viet Phap Steel Corrugated Joint Stock Company | 94.89 | 94.89 |
| Vietnam-Wide Entity .............................................. | ................................................................................... | * 162.96 | * 162.96 |

\* Rate based on facts available with adverse inferences.

**Provisional Measures**

Section 733(d) of the Act states that suspension of liquidation pursuant to an affirmative preliminary determination may not remain in effect for more than four months, except where exporters representing a significant proportion of exports of the subject merchandise request that Commerce extend the four-month period to no more than six months. At the request of exporters that accounted for a significant proportion of exports of CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam, Commerce extended the four-month period to no more than six-months.[8]

In the underlying investigations, Commerce published the *Preliminary Determinations* on April 10, 2025. Therefore, the six-month period beginning on the date of the publication of the *AD Preliminary Determinations* ended on October 6, 2025. Therefore, in accordance with section 733(d) of the Act and our practice, Commerce will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of CORE from Australia, Brazil,

Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam entered, or withdrawn from warehouse, for consumption on or after October 7, 2025, the day on which the provisional AD measures expired, until and through the day preceding the date of publication of the ITC's final injury determinations in the **Federal Register**. Suspension of liquidation and the collection of cash deposits will resume on the date of publication of the ITC's final determinations in the **Federal Register**.

**Establishment of the Annual Inquiry Service Lists**

On September 20, 2021, Commerce published the *Final Rule* in the **Federal Register**.[9] On September 27, 2021, Commerce also published the *Procedural Guidance* in the **Federal Register**.[10] The *Final Rule* and *Procedural Guidance* provide that Commerce will maintain an annual inquiry service list for each order or

suspended investigation, and any interested party submitting a scope ruling application or request for circumvention inquiry shall serve a copy of the application or request on the persons on the annual inquiry service list for that order, as well as any companion order covering the same merchandise from the same country of origin.

In accordance with the *Procedural Guidance,* for orders published in the **Federal Register** after November 4, 2021, Commerce will create an annual inquiry service list segment in Commerce's online e-filing and document management system, Antidumping and Countervailing Duty Electronic Service System (ACCESS), available at *https://access.trade.gov,* within five business days of publication of the notice of the order. Each annual inquiry service list will be saved in ACCESS, under each case number, and under a specific segment type called "AISL-Annual Inquiry Service List." [11]

---

[8] *See Preliminary Determinations.*

[9] *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 86 FR 52300 (September 20, 2021) (*Final Rule*).

[10] *See Scope Ruling Application; Annual Inquiry Service List; and Informational Sessions,* 86 FR 53205 (September 27, 2021) (*Procedural Guidance*).

[11] This segment will be combined with the ACCESS Segment Specific Information (SSI) field which will display the month in which the notice of the order or suspended investigation was published in the **Federal Register**, also known as the anniversary month. For example, for an order under case number A–000–000 that was published in the **Federal Register** in January, the relevant
Continued

Interested parties who wish to be added to the annual inquiry service list for an order must submit an entry of appearance to the annual inquiry service list segment for the order in ACCESS within 30 days after the date of publication of the order. For ease of administration, Commerce requests that law firms with more than one attorney representing interested parties in an order designate a lead attorney to be included on the annual inquiry service list. Commerce will finalize the annual inquiry service list within five business days thereafter. As mentioned in the *Procedural Guidance,*[12] the new annual inquiry service list will be in place until the following year, when the *Opportunity Notice* for the anniversary month of the order is published.

Commerce may update an annual inquiry service list at any time as needed based on interested parties' amendments to their entries of appearance to remove or otherwise modify their list of members and representatives, or to update contact information. Any changes or announcements pertaining to these procedures will be posted to the ACCESS website.

## Special Instructions for the Petitioners and Foreign Governments

In the *Final Rule,* Commerce stated that, "after an initial request and placement on the annual inquiry service list, both petitioners and foreign governments will automatically be placed on the annual inquiry service list in the years that follow." [13] Accordingly, as stated above, the petitioners and the Governments of Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam should submit their initial entries of appearance after publication of this notice in order to appear in the first annual inquiry service lists for these orders. Pursuant to 19 CFR 351.225(n)(3), the petitioners and the Governments of Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam will not need to resubmit their entries of appearance each year to continue to be included on the annual inquiry service list. However, the petitioners and the Governments of Australia, Brazil, Canada, Mexico, the Netherlands, South

Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam are responsible for making amendments to their entries of appearance during the annual update to the annual inquiry service list in accordance with the procedures described above.

## Notification to Interested Parties

This notice constitutes the AD orders with respect to CORE from Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, Türkiye, the United Arab Emirates, and Vietnam, pursuant to section 736(a) of the Act. Interested parties can find a list of AD and countervailing duty orders currently in effect at *https://enforcement.trade.gov/stats/iastats1.html.*

The amended Brazil and Mexico final determinations and these AD orders are published in accordance with sections 735(e) and 736(a) of the Act, 19 CFR 351.224(e), and 19 CFR 351.211(b).

Dated: December 15, 2025.

**Christopher Abbott,**

*Deputy Assistant Secretary for Policy and Negotiations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

## Appendix

### Scope of the Orders

The products covered by these orders are certain flat-rolled steel products, either clad, plated, or coated with corrosion-resistant metals such as zinc, aluminum, or zinc-, aluminum-, nickel- or iron-based alloys, whether or not corrugated or painted, varnished, laminated, or coated with plastics or other non-metallic substances in addition to the metallic coating. The products covered include coils that have a width of 12.7 mm or greater, regardless of form of coil (*e.g.,* in successively superimposed layers, spirally oscillating, *etc.*). The products covered also include products not in coils (*e.g.,* in straight lengths) of a thickness less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness. The products covered also include products not in coils (*e.g.,* in straight lengths) of a thickness of 4.75 mm or more and a width exceeding 150 mm and measuring at least twice the thickness. The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieved subsequent to the rolling process, *i.e.,* products which have been "worked after rolling" (*e.g.,* products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above:

(1) Where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

(2) where the width and thickness vary for a specific product (*e.g.,* the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of these orders are products in which: (1) iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less, by weight.

Subject merchandise also includes corrosion-resistant steel that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching and/or slitting or any other processing that would not otherwise remove the merchandise from the scope of the orders if performed in the country of manufacture of the in-scope corrosion resistant steel.

All products that meet the written physical description are within the scope of the order unless specifically excluded. The following products are outside of and/or specifically excluded from the scope of these orders:

• Flat-rolled steel products either plated or coated with tin, lead, chromium, chromium oxides, both tin and lead ("terne plate") or both chromium and chromium oxides ("tin free steel"), whether or not painted, varnished or coated with plastics or other non-metallic substances in addition to the metallic coating;

• Clad products in straight lengths of 4.7625 mm or more in composite thickness and of a width which exceeds 150 mm and measures at least twice the thickness;

• Certain clad stainless flat-rolled products, which are three-layered corrosion-resistant carbon steel flat-rolled products less than 4.75 mm in composite thickness that consist of a carbon steel flat-rolled product clad on both sides with stainless steel in a 20%–60%– 20% ratio; and

Also excluded from the scope of the antidumping duty order on corrosion resistant steel from Taiwan are any products covered by the existing antidumping duty order on corrosion-resistant steel from Taiwan. *See Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,* 81 FR 48390 (July 25, 2016); *Corrosion-Resistant Steel Products from Taiwan: Notice of Third Amended Final Determination of Sales at Less Than Fair Value Pursuant to Court Decision and Partial Exclusion from Antidumping Duty Order,* 88 FR 58245 (August 25, 2023).

Also excluded from the scope of the antidumping duty order on corrosion-resistant steel from the United Arab Emirates and the antidumping duty and countervailing duty order on corrosion-resistant steel from the Socialist Republic of Vietnam are any products covered by the existing antidumping and countervailing duty orders on corrosion-resistant steel from the People's Republic of China and the Republic of Korea and the antidumping duty order on corrosion-resistant steel from Taiwan. *See*

---

segment and SSI combination will appear in ACCESS as "AISL–January Anniversary." Note that there will be only one annual inquiry service list segment per case number, and the anniversary month will be pre-populated in ACCESS.

  [12] *See Procedural Guidance,* 86 FR at 53206.
  [13] *See Final Rule,* 86 FR at 52335.

*Certain Corrosion-Resistant Steel Products from India, Italy, the People's Republic of China, the Republic of Korea and Taiwan: Amended Final Affirmative Antidumping Determination for India and Taiwan, and Antidumping Duty Orders,* 81 FR 48390 (July 25, 2016); *see also Certain Corrosion-Resistant Steel Products from India, Italy, Republic of Korea and the People's Republic of China: Countervailing Duty Order,* 81 FR 48387 (July 25, 2016). This exclusion does not apply to imports of corrosion-resistant steel that are entered, or withdrawn from warehouse, for consumption in the United States for which the relevant importer and exporter certifications have been completed and maintained and all other applicable certification requirements have been met such that the entry is entered into the United States as not subject to the antidumping and countervailing duty orders on corrosion-resistant steel from the People's Republic of China, the antidumping and countervailing duty orders on corrosion-resistant steel from the Republic of Korea, or the antidumping duty order on corrosion-resistant steel from Taiwan.

The products subject to the orders are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7210.30.0030, 7210.30.0060, 7210.41.0000, 7210.49.0030, 7210.49.0040, 7210.49.0045, 7210.49.0091, 7210.49.0095, 7210.61.0000, 7210.69.0000, 7210.70.6030, 7210.70.6060, 7210.70.6090, 7210.90.6000, 7210.90.9000, 7212.20.0000, 7212.30.1030, 7212.30.1090, 7212.30.3000, 7212.30.5000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7212.60.0000, 7225.91.0000, 7225.92.0000, 7226.99.0110, and 7226.99.0130.

The products subject to the orders may also enter under the following HTSUS item numbers: 7210.90.1000, 7215.90.1000, 7215.90.3000, 7215.90.5000, 7217.20.1500, 7217.30.1530, 7217.30.1560, 7217.90.1000, 7217.90.5030, 7217.90.5060, 7217.90.5090, 7225.99.0090, 7226.99.0180, 7228.60.6000, 7228.60.8000, and 7229.90.1000.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the orders are dispositive.

[FR Doc. 2025–23431 Filed 12–18–25; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–570–979, C–570–980]**

### Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Changed Circumstances Reviews, and Revocation of the Antidumping and Countervailing Duty Orders, in Part

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) is issuing the final results of changed circumstances reviews (CCRs) of the antidumping duty (AD) and countervailing duty (CVD) orders on crystalline silicon photovoltaic (CSPV) cells, whether or not assembled into modules (solar cells), from the People's Republic of China (China) to revoke the orders, in part, with respect to certain off-grid CSPV panels.

**DATES:** Applicable December 19, 2025.

**FOR FURTHER INFORMATION CONTACT:** Maureen Shaheen, Acting Director, Office of Antidumping Policy, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–3004.

**SUPPLEMENTARY INFORMATION:**

### Background

On December 7, 2012, Commerce published the *Orders* on solar cells from China.[1] On September 30, 2025, Commerce published the initiation and preliminary results of these CCRs, finding that revocation, in part, of the *Orders,* with respect to certain off-grid CSPV panels was warranted, pursuant to section 751(b)(1)(A) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.216(b).[2] We also stated our intent to apply the partial revocation to unliquidated entries of merchandise subject to the CCRs that were entered or withdrawn from warehouse, for consumption, on or after January 1, 2024, for the *CVD Order,* and December 1, 2024, for the *AD Order,* and provided interested parties with the opportunity to comment on the *Preliminary Results.*[3] On November 4 and 13, 2025, we received comments on the *Preliminary Results* from Nextpower LLC, formerly known as Nextracker LLC (Nextpower), and the American Alliance for Solar Manufacturing (the petitioner), respectively.[4]

[1] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012) (*AD Order*); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012) (*CVD Order*) (collectively, *Orders*).

[2] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Initiation and Preliminary Results of Changed Circumstances Reviews and Intent to Revoke the Antidumping and Countervailing Duty Orders, in Part,* 90 FR 46795 (September 30, 2025) (*Preliminary Results*).

[3] *Id.,* 90 FR at 46797.

[4] *See* Nextpower's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Case

Due to the lapse in appropriations and Federal Government shutdown, on November 14, 2025, Commerce tolled all deadlines in administrative proceedings by 47 days.[5] Additionally, due to a backlog of documents that were electronically filed via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS) during the Federal Government shutdown, on November 24, 2025, Commerce tolled all deadlines in administrative proceedings by an additional 21 days.[6] Accordingly, the deadline for these final results is now January 21, 2026.

### Analysis of Comments Received

All issues raised in the case briefs filed by parties in this CCR are addressed in the Issues and Decision Memorandum[7] and listed in the appendix to this notice. The Issues and Decision Memorandum is a public document and is on file electronically via ACCESS. ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Issues and Decision Memorandum can be accessed at *https://access.trade.gov/public/FRNoticesListLayout.aspx.*

### Final Results of CCRs and Revocation of the Orders, in Part

In light of Nextpower's request, and the domestic interested parties' lack of interest in maintaining the *Orders* with respect to the products under consideration, Commerce continues to find, pursuant to sections 751(d)(1) and 782(h)(2) of the Act and 19 CFR 351.222(g), that changed circumstances exist that warrant revocation of the *Orders,* in part. No interested party opposed this partial revocation. Moreover, no parties provided other information or evidence that calls into question the partial revocation described in the *Preliminary Results.* Specifically, because producers accounting for substantially all the

Brief for Changed Circumstances Review," dated November 4, 2025; and Petitioner's Letter," Changed Circumstances Review Request of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Case Brief," dated November 13, 2025.

[5] *See* Memorandum, "Deadlines Affected by the Shutdown of the Federal Government," dated November 14, 2025.

[6] *See* Memorandum, "Tolling of All Case Deadlines," dated November 24, 2025.

[7] *See* Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Final Results of Changed Circumstances Reviews," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).